# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

WORLDSPAN MARINE INC., a Canadian
corporation, CSPAN FINANCIAL, LLC, a
Florida limited liability company, and
WEDMORE FINANCIAL, LLC, a Florida
limited liability company,

      Plaintiffs,                                        CASE NO.:

v.

COMERICA BANK, a Texas banking association
KURT YOUNKER, an individual, BARRY SHAW,
an individual, CYNTHIA JONES, an individual,
HARRY SARGEANT III, an individual,
DEBORAH SARGEANT, an individual,
MERVYN MONGER, an individual, and
KEVIN KIRKEIDE, an individual

      Defendants.

_____/

## COMPLAINT FOR DAMAGES AND
## <u>DEMAND FOR JURY TRIAL</u>

# TABLE OF CONTENTS

SUMMARY OF THE ACTION ................................................................................................. 5

PARTIES, VENUE, AND JURISDICTION .......................................................................... 13

A. Plaintiffs.............................................................................................................. 13

B. Defendants .......................................................................................................... 13

C. Relevant Non-Parties ......................................................................................... 17

Non-Parties Who Are Co-Conspirators ............................................................ 17

Non-Parties Who Are Not Co-Conspirators ..................................................... 19

D. Jurisdiction and Venue ....................................................................................... 21

FACTUAL BASIS FOR ALL CLAIMS ............................................................................... 28

The Initial Involvement of Plaintiffs with Sargeant III, Deborah Sargeant and Comerica.......... 28

The Mechanics of the Credit Bid Schemes – BTB and Worldspan............................................. 29

The United States Department of Defense Contract and The Resulting Fraud............................ 43

IOTC Bahamas and Other IOTC Entities Created for Sole Purpose of Diverting Income Generated from IOTC USA as Contracting Party for Services Actually Rendered by IOTC Jordan ....................................................................................................................................................... 45

International Oil Trade Center ("IOTC Jordan") ................................................... 45

International Oil Trading Company, LLC ("IOTC USA")........................................ 46

IOTC Dubai / IOTC Bahamas, the alter ego of IOTC USA ("IOTC Bahamas")..................... 48

IOTC Bahamas / The alter ego of Sargeant III ...................................................... 50

International Oil Trading Company B.V. ("IOTC Netherlands")............................. 51

The April 10, 2008 Al-Saleh Fraud Complaint Against Sargeant III et al / The July 28, 2011 $28.8 Million Fraud Judgment Against Sargeant III et al.......................................................... 52

The October 21, 2008 Supreme Fuels Fraud / RICO Complaint against Sargeant III, IOTC / The May 6, 2011 Supreme Fuels $5 Million Fraud Judgment against Sargeant III, IOTC................. 56

Sargeant III's Fraudulent Assignments ........................................................................................ 56

Sargeant III Litigation Regarding HS3 Videos & Still Photographs........................................... 57

2009 Comerica Bank Commences Money Laundering ............................................................... 61

The July 2009 Delray Beach Fraudulent Inducement Meeting with Comerica VP and Sargeant III / The August 14, 2009 Assignment.............................................................................................. 62

Sargeant III's Death Threat and 2 Million Dollar Extortion of the Principal of Plaintiff Corporations ................................................................................................................................. 70

2

Damages as a Result of the RICO Conspiracy ......................................................................... 72

Punitive Damages ..................................................................................................................... 85

The August 7, 2012 United States District Court for the Southern District of Texas Findings of Fact that Sargeant III Orchestrated a Fraudulent Transfer with BTB Refining LLC, Utilizing Comerica as Banker for BTB Refining LLC ............................................................................ 90

In 18 Months Sargeant III and Companies He Controlled Had Two Judgments Entered Against Them Totaling Approximately $51 Million Dollars, Both Founded on Claims of Fraud ............ 91

The 2013 Advisement to Comerica Of Sargeant III's Credit Bid Fraud as Found by the United States District Court for the Southern District of Texas ............................................................ 92

The June 26, 2014 Comerica / Sargeant III Superyacht Credit Bid Fraud and Conspiracy.......... 92

U.S. Bankruptcy Court S.D. Florida Chapter 7 Trustee's Adversary Proceeding for Fraud Against Deborah Sargeant, et al. ........................................................................................................... 93

Deborah Sargeant's Fraud to Convert Non-Exempt Cash ($9,681,615.00) Subject to Garnishment to being Exempt from Execution ................................................................................................ 97

The Individuals & Entities That Severed Their Relationships with Sargeant III ...................... 103

Comerica: The First Bank in U.S. History to Become a Principal and a Mastermind in a RICO Enterprise................................................................................................................................. 107

Co-Conspirator Comerica Instrumental in Worldwide Fraudulent Schemes............................ 108

Comerica Deliberately Disregarded Internal Controls and Aided and Participated in Sargeant III's Fraudulent Schemes .................................................................................................................. 111

Comerica Repeatedly Ignored a Series of Obvious Anti-Money Laundering Red Flags and Facilitated the Money Laundering Scheme ............................................................................... 113

Comerica Acted with Knowledge.............................................................................................. 118

RICO Predicate Acts ................................................................................................................ 119

    Mail Fraud and Wire Fraud................................................................................................. 119

    Money Laundering .............................................................................................................. 121

    Fraudulent Transfers by Comerica Bank to Plaintiff Worldspan Pursuant to August 14, 2009 Assignment – Aiding and Abetting Fraud ............................................................................. 123

    Comerica Launders Fraudulently Obtained Funds from IOTC Bahamas Across State Lines and International Borders to Plaintiff Worldspan ........................................................................ 124

    Violations of the Travel Act................................................................................................. 127

Enterprise................................................................................................................................. 128

Relatedness and Continuity ..................................................................................................... 131

Injury....................................................................................................................................... 132

CAUSES OF ACTION ............................................................................................. 133

COUNT I – RACKETEERING IN VIOLATION OF RICO, 18 U.S.C. §§1962 (c), 1964 (c)) 133

COUNT II – RACKETEERING IN VIOLATION OF RICO, 18 U.S.C. § 1962(d) ................ 135

COUNT III – FRAUD ............................................................................................. 137

COUNT IV – CONSPIRACY TO DEFRAUD ............................................................. 142

COUNT V – FLORIDA RICO (Violation of §772.103, Fla. Stat.) ........................................ 143

COUNT VI – PRESERVATION ORDER .......................................................................... 144

DEMAND FOR JURY TRIAL ..................................................................................... 148

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

## SUMMARY OF THE ACTION

1.     The Plaintiffs bring this racketeering, fraud and tort action against Comerica Bank ("Comerica"), Kurt Younker ("Younker"), Barry Shaw ("Shaw"), Cynthia Jones ("Jones"), Mervyn Monger ("Monger"), Kevin Kirkeide ("Kirkeide"), Harry Sargeant III ("Sargeant III") and Deborah Sargeant ("Deborah" or "Deborah Sargeant") (collectively, "Defendants" or "Enterprise") for wrongful acts that they and their co-conspirators committed in United States, Jordan, United Kingdom, Bahamas, the Netherlands, Canada and elsewhere as part of an international enterprise and scheme to unlawfully devalue, compromise and misappropriate the assets of the Plaintiffs and others through a pattern of unlawful activities constituting:  mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; bank fraud in violation of 18 U.S.C. § 1344; money laundering in violation of 18 U.S.C. § 1956; monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, violations of the Travel Act in violation of 18 U.S.C. § 1952, violations of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. ch. 2b § 78a et seq.; a death threat made with a $2 million dollar extortion threat, as well as numerous acts of fraud in violation of applicable state law and punishable by imprisonment for more than one year.

2.     Comerica and the rest of the Defendants and their co-conspirators also undertook actions to cover up and conceal their scheme through fraud and obstruction, as well as other unlawful activities, including multiple and continuing violations of the sections and principles of, *inter alia*, the Bank Secrecy Act (BSA), the USA PATRIOT Act, and the Office of Foreign Assets Control (OFAC).

3.     Sargeant III and the co-conspirators, operating from Florida, and travelling in aid of the Enterprise, over a period of years, undertook a continuing, ruthless and relentless pattern of conduct whereby Sargeant III obtained and misappropriated hundreds of millions of dollars of

5

corporate cash flow, goods and credit, then failed to pay.  Sargeant III also defrauded business partners, the United States Department of Defense, banks and others.

4.      The victims of the Enterprise included small businessmen who lost everything, including family homes, while Sargeant III and his wife, Deborah, lived off the avails of the illegal Enterprise in a 19,000 square foot waterfront mansion and enjoyed an extraordinarily lavish lifestyle.

5.      One of the key Sargeant III alter ego offshore corporations, International Oil Trading Company Ltd., ("IOTC Bahamas"), upon information and belief, banked at Wachovia bank. Wachovia bank terminated the banking relationship as a result of money laundering transactions. Comerica has been the banker for IOTC Bahamas since 2009, at the Comerica Boca Raton branch, with Comerica account ending #8666. The IOTC Bahamas corporation was used for, among other things, the following purposes:

(a.) Laundering $11,064,525.38 to the Plaintiff, Worldspan, for payment towards the construction of the 144-foot Superyacht;

(b.) Paying a $9 million-dollar bribe to a Jordanian government official related to a United States Department of Defense contract that paid $2.1 billion dollars to move fuel through Jordan to U.S. troops in Iraq;

(c.) Laundering $180,350,558.05 as part of the conspiracy and fraud against Al-Saleh and others.

6.      IOTC Bahamas, with its predecessor corporation, laundered $180,350,558.05.  IOTC Bahamas is the same company that paid a $9 million-dollar bribe to a Jordanian government official, General Mohammad Dahabi, as part of the illegal activity on a $2.1 billion-dollar U.S. Department of Defense contract. IOTC Bahamas was the corporation used to launder $9,387,398.67 to Deborah, who was sued by the United States Chapter 7 Trustee for fraud as a result of these payments totaling $9,387,398.67.  IOTC Bahamas was the corporation used to launder $11,064,525.38 to the Plaintiff, Worldspan.  Mohammad Al-Saleh claimed against Worldspan for the $11,064,525.38, seeking the

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

disgorgement from Worldspan of the $11,064,525.38, asserting that these funds had been defrauded from him by Sargeant III.

7.     The victims of the illegal Enterprise included the Plaintiffs, small businessmen, individuals, the contractor who renovated the 19,000 square foot waterfront mansion owned by Sargeant III and Deborah Sargeant, Sargeant III's father and brother, the Sargeant family businesses, corporations, the national oil company of Venezuela, Petróleos de Venezuela, S.A. ("PDVSA"), the former brother in law of the King of Jordan, Mohammad Al-Saleh ("Al-Saleh"), the United States Department of Defense, U.S. Taxpayers, business partners, banks, and others.

8.     Persons or entities targeted by Sargeant III and the other co-conspirators are either destroyed or demoralized.  Sargeant III, acting as the front man, engages in litigation against the victims of his frauds, said litigation taking place in various countries[1] and in Florida.  Sargeant III's victims are either financially destroyed, give up, or settle on unfavorable terms.  Sargeant III utilizes litigation as a major component of his schemes.  Sargeant III and Comerica have put an enormous amount of strain on the judicial system, utilizing massive judicial resources as part of their RICO Enterprise, which includes litigation as referred to herein in detail.

9.     All directions and control relating to Sargeant III's and the co-conspirators continuum of fraud were and are undertaken from Florida.  In the case of Comerica, the directions and control came from Florida, with certain control and instructions from Cynthia Jones, an executive of Comerica in Detroit, Michigan.  The nerve center for these continuing predicate acts was and is

---

[1] Sargeant III's frauds have created litigation in various places, including, but not limited to, Jordan, Venezuela, England, the United Kingdom, the Netherlands, the Bahamas, Canada, the Dominican Republic and the United States. The Enterprise as described in this Complaint, as it relates to Sargeant III's role, utilizes litigation in furtherance of the illegal Enterprise.

7

Florida, where Comerica's Boca Raton branch and Fort Lauderdale branch that undertook the predicate acts is located.  Sargeant III resides in Gulf Stream, Florida.

10.     As found in the May 8, 2013 *Daniel Sargeant vs. Sargeant III*[2]  Florida State Court lawsuit, Sargeant III spent huge sums of money on his lifestyle that includes / included a 19,000 square foot, waterfront mansion in Gulf Stream, Florida, expensive travel for himself, his bodyguards, expenditures for henchmen, payments to co-conspirators, a 9 million dollar bribe, millions and millions of dollars in legal fees,[3] a superyacht, a fishing yacht, three private aircraft, a fleet of three jets, numerous exotic cars, a personal firetruck, an extensive watch collection, featuring Rolex and other luxury brands, and other toys ("*Daniel Sargeant v. Sargeant III*").

11.     Sargeant III's lavish expenditures include, but are not limited to, $10,000.00 per night sporting event private suites, extravagant night clubs in various countries, lavish and very costly expenditures on his mistresses, including but not limited to, Samantha Zapoleon,[4] expensive hotel suites, $15,000 per month for private security, four figure hand-made shoes and suits, seven figure political donations, charitable donations totaling seven figures, and many, many other extraordinarily extravagant expenditures.

---

[2] Daniel Sargeant is Harry Sargeant III's brother. *Daniel Sargeant v. Harry Sargeant III, IOTC Asphalt LLC, Rafferty, Teneholtz, Hess & Hudson, P.A. and William Raffety, Esq..,* Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, Case No. 2013CA007925.

[3] A component of Sargeant III's continuing Enterprise is litigation – first embezzle, loot, defraud, obtain credit, collateralize assets to make them judgment proof; then Sargeant III litigates, counterclaims, and spends years on litigation until the victim gives up, is destroyed, or the victim settles on unfavorable terms. After looting and embezzling the family asphalt business, Sargeant III created a web of fourteen lawsuits. Sargeant III then was involved in numerous other lawsuits with his family. This is only a small part of the litigation that Sargeant III has engaged in.

[4] Samantha Zapoleon was deposed in the Proceedings Supplementary wherein Al-Saleh spent $12 million dollars collecting his $28.8 million-dollar Florida State court fraud judgment against Sargeant III et al. Samantha Zapoleon was deposed in an attempt to understand the financial machinations of Sargeant III. This took place while Comerica laundered millions and millions of dollars for Sargeant III and his wife, Deborah Sargeant.

12.     Sargeant III and his wife, Deborah Sargeant, have spent millions of dollars over the years, maintaining a lifestyle enjoyed by the very rich and famous, while their victims seek payment / recourse with Comerica being instrumental throughout the continuing conspiracy.

13.      The Sargeant family business was asphalt refining and supply.  Sargeant III was sued by his brother and father, resulting in web of 14 lawsuits. This was the result of Sargeant III defrauding his brother, Daniel Sargeant, and as a result of Sargeant III looting and embezzling the Sargeant family businesses. *See* **Exhibit 24**, Complaint filed on May 8, 2013 in *Daniel Sargeant v. Sargeant III.*

14.     Sargeant III has been sued under RICO in prior litigation.  On October 21, 2008, Sargeant III, his business partner, Mustafa Abu–Naba'a, IOTC International Oil Trading Company LLC and International Oil Trade Center were sued by Supreme Fuels Trading FZE[5] in the U.S. District Court Southern District of Florida, Miami Division (the "*2008 Supreme RICO Suit*"), this resulted in a $5 million-dollar fraud judgment against International Oil Trading Company, LLC.

15.     Over a period of years, a cohesive group of individuals and corporate entities, including Comerica, Comerica Employees, the Defendants and Sargeant III associated together in an Enterprise to accomplish the scheme.  Comerica and Sargeant III were the masterminds and controlled and/or beneficially owned a number of the members of the enterprise.  In other instances, the members of the Enterprise were associated with or rendered services to and/or the other members of the Enterprise.  Acting together, and based upon mutual agreement and intent, these persons and entities knowingly conspired with each other to operate the referenced Enterprise and to execute the

---

[5] Supreme Fuels FZE claimed against the Superyacht, partially constructed by Worldspan, attempting unsuccessfully to attach Sargeant III's interest in the Superyacht, Supreme Fuels FZE thwarted by the fraudulent actions of Sargeant III and Comerica and their co-conspirators.

scheme to the detriment of the Plaintiffs and other victims while unjustly benefiting themselves, with the benefits of the scheme flowing to Florida.

16.     As a result of the wrongful acts of Comerica, Comerica's Employees, the Defendants and their co-conspirators, the assets of the Plaintiffs that were destroyed had a value of **$66,268,832.00**.

17.     As a result of the wrongful acts of the Defendants, and their co-conspirators, Worldspan Marine, Inc.'s business was permanently destroyed; the cost to reconstitute the business is **$42 million dollars**.

18.      The Plaintiffs seek compensatory damages plus treble damages of **$198,806,496.00** under its statutory RICO claim, attorney's fees, interest and the costs of this action.  Based on the deliberate and 9-year conduct of Comerica, as referred to in detail herein, the Plaintiffs advance common law claims, including punitive damages, against Comerica, in an amount of not less than $4.1 billion dollars.

19.     This Court has personal jurisdiction over Comerica and Comerica because they: (a) undertook the conspiracy utilizing the foundational document, which Comerica created and executed, said document being an assignment, which contains a choice of law clause that stipulates Florida law shall apply; (b) created and executed a related document, the Construction Loan Agreement, which contains a choice of law clause that stipulates Florida law shall apply (c) operated, conducted, engaged in, or carried on a business or business venture in  Florida and had an office in Florida at all times relevant hereto; (d) committed tortious acts within Florida; and (e) acted as Florida-based co-conspirators in the conspiracy described in this Complaint (f) reside and continue to reside in Florida.

20.     The foundational document for the superyacht credit bid conspiracy and fraud against the Plaintiffs is the August 14, 2009 Assignment of Security, which assigned to Comerica Sargeant

III's security in the Superyacht and Sargeant III's interest in the construction contract for the Superyacht[6] (the "Superyacht Credit Bid Fraud and Conspiracy").

21.     Without the August 14, 2009 Assignment, the Superyacht Credit Bid Fraud and Conspiracy could not have been undertaken.  The August 14, 2009 Assignment was the cornerstone document utilized by the conspirators in the conspiracy against the Plaintiffs and others.

22.     The August 14, 2009 Assignment contains a choice of law clause stipulating that all legal matters arising from the August 14, 2009 Assignment shall be exclusively dealt with by the Florida Courts.

23.     The choice of law clause in the August 14, 2009 Assignment makes the Plaintiffs injuries resulting from the predicate acts of the defendants construed to have occurred in Florida. This is also consistent with Florida State law, which adheres to *lex loci*, and is consistent with Federal statute and law.  Florida adheres to the doctrine of *lex loci contractus*, set forth in the Restatement (First) of Conflict of Laws.

24.     The document that underlies the August 14, 2009 Assignment is the Comerica Construction Loan Agreement dated August 14, 2009, the agreement between Comerica and Sargeant wherein Comerica agreed to loan funds to Sargeant to be paid to Worldspan for construction of the Superyacht.  This is the loan agreement that resulted in Comerica co-mingling $9,387,398.67 of its own funds with the proceeds of fraud against Al-Saleh that Comerica had laundered from IOTC Bahamas.  Sargeant III is the director and president of IOTC Bahamas.  The August 14, 2009

---

[6] The August 14, 2009 Assignment by Sargeant III to Comerica of Sargeant III's security interest in the Superyacht transferred Sargeant III's security to Comerica as well as transferring the construction contract for the Superyacht to Comerica, making Comerica the contracting party with Worldspan.

Comerica Construction Loan Agreement has a choice of law clause that stipulates Florida law shall apply.

25.     In perpetrating their fraudulent scheme, Comerica, Sargeant III and their co-conspirators have violated the laws of the United States, the State of Florida, Jordan, Canada, the United Kingdom, Venezuela, the Bahamas, the Dominican Republic, the Netherlands as well as violating international law.   In connection with the acts and course of conduct alleged in this Complaint, Comerica, Comerica Employees and the Defendants directly and indirectly used means and instrumentalities of interstate and foreign commerce, including the United States mail and wires, interstate telephone, the United States Federal Reserve, and the national and international banking systems to commit mail, wire and banking fraud as well as money laundering in violation of U.S. law.  The violations also included violations of the Travel Act and the Foreign Corrupt Practices Act.

26.     Comerica, Comerica Employees' and the Defendants' schemes have had, and were intended to have, and continue to have, wide ranging effects in Florida.

27.     In addition, a significant and meaningful part of the scheme, including all of the planning, control and direction of the scheme,[7] occurred in Florida and Comerica, Comerica Employees and the Defendants repeatedly committed violations of state and federal law, *i.e.*, "predicate acts," in Florida to perpetuate and to conceal the unlawful scheme.

28.     Comerica, Comerica Employees and the Defendants engaged in a pattern of misrepresentation and concealment to perpetuate the fraud and conspiracy to prevent the discovery of its role and conduct in the fraudulent scheme and other wrongful conduct.  Comerica, Comerica Employees and the Defendants created and distributed fraudulent letters, fraudulent documents,

---

[7] Certain instructions were issued by Cynthia Jones an executive working in the Detroit, Michigan office of Comerica.

obstructed the Plaintiffs' efforts, responded in an untruthful manner, and held back documents that would have disclosed the mechanisms employed in the execution of the fraudulent scheme, including the mechanisms used to perpetuate the scheme referred to herein.

## PARTIES, VENUE, AND JURISDICTION
### A. Plaintiffs

29.     Plaintiff CSPAN Financial, LLC ("**CSPAN**") is a Florida limited liability company with its principal place of business located at Vero Beach, Florida.

30.     The Plaintiff Wedmore Financial LLC ("**Wedmore**") is a Florida limited liability company with its principal place of business located at Vero Beach, Florida.

31.     CSPAN with Wedmore own the assets that were injured as a result of the predicate acts of Comerica and the Defendants.  Comerica and the Defendants' predicate acts injured U.S. based property and harmed U.S. plaintiffs, thereby creating domestic injury.

32.     Plaintiff Worldspan Marine Inc. ("**Worldspan**") is a Canadian corporation.

### B. Defendants

33.     Defendant Comerica Bank ("**Comerica**") is a Texas banking association headquartered in Dallas, Texas and has retail banking operations in Texas, Michigan, Arizona, California and more relevant hereto, Florida.  Comerica is a "person" as defined in the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*  At all times relevant hereto, Comerica provided, and continues to provide, a number of banking services from its Florida locations.  Comerica's Florida's retail banking operation is headquartered in Boca Raton, Florida and Fort Lauderdale, Florida. Comerica's Florida market specializes in providing high net worth banking and other wealth management services.

13

34.     Defendant Comerica is chartered by the State of Texas and subject to supervision and regulation by the Texas Department of Banking under the Texas Finance Code. Comerica is also a member of the Federal Reserve System under the Federal Reserve Act and thus subject to federal regulations.

35.     Comerica is a subsidiary of Comerica Incorporated, which is incorporated under Delaware law and headquartered in Dallas, Texas. According to Comerica Incorporated's Form 10-K filed with the SEC for 2017, "Based on total assets as reported in the most recently filed Consolidated Financial Statements for Bank Holding Companies (FR Y-9C), it was among the 25 largest commercial United States ("U.S.") financial holding companies" and "[a]t December 31, 2016, Comerica had total assets of approximately $73.0 billion".

36.     Comerica Incorporated further states in its 2017 Form 10-K that it "[complies] with [anti-money laundering regulations, including the Bank Secrecy Act (BSA) and the USA PATRIOT ACT] obligations, Comerica and its various operating units have implemented appropriate internal practices, procedures, and controls.

37.     Defendant Barry Shaw ("**Shaw**") is an individual residing in Florida and who is otherwise *sui juris*.  Shaw held the title of Vice President of Comerica Private Banking, with an address of 100 NE Third Ave., Suite 100, Fort Lauderdale, FL 33301.  Shaw made representations of fact that were false and known to be false made to fraudulently induce Steven Barnett ("Barnett"), the principal of Worldspan, Wedmore and CSPAN to act, specifically to agree to an assignment of Sargeant III's interest in the Superyacht to Comerica.  This was foundational to the Superyacht Credit Bid Fraud and Conspiracy.

38.     Further, Shaw executed the Assignment of Security Agreement and Mortgage dated August 14, 2009.  Shaw deliberately concealed facts material to the assignment and other events.

14

39.     Defendant Kurt Younker ("**Younker**") is an individual residing in Florida and who is otherwise *sui juris*.  Younker held the title of Regional Manager of Comerica with an address of 100 NE Third Ave., Suite 100, Fort Lauderdale, FL 33301.

40.     Younker made representations of fact that were false made to induce Barnett, the principal of Worldspan, Wedmore and CSPAN to act, specifically to undertake acts related to Sargeant III and Comerica's positions as it related to the Superyacht.

41.     Defendant Cynthia Jones ("**Jones**") is an individual residing in Michigan and who is otherwise *sui juris*.  Jones held and holds the title of Vice President at Comerica in Detroit, Michigan. Jones, Shaw and Younker conspired with Sargeant to have Sargeant III act as Comerica's proxy in a conspiracy against Worldspan, Wedmore, CSPAN, Al-Saleh, PDVSA, Supreme Fuels and others. Jones made representations of fact that were false made to induce Barnett, the principal of Worldspan, Wedmore and CSPAN to act, specifically to undertake acts related to Sargeant III and Comerica's positions as it related to the Superyacht.

42.     Defendants Comerica Employees are persons who reside in the United States, and a "person" as defined in the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq*.  At all times relevant hereto, Comerica Employees provided, and continue to provide assistance to the RICO scheme.

43.     Defendant Deborah Sargeant ("**Deborah**" or "**Deborah Sargeant**") is an individual residing in Florida and who is otherwise *sui juris*.  Deborah is the spouse of Sargeant III.  Deborah is a homemaker who does not have an occupation that is known to the Plaintiffs.  Sargeant and Deborah opened and maintain a joint bank account with Bank of America held as tenants by the entirety. Sargeant III received at least $3,082,010.64 in passive income from IOTC Bahamas in tax years 2009

through 2011 and he deposited all of these funds into Sargeant III's and Deborah Sargeant's tenants by entities account.

44.     Deborah has been an active co-conspirator, utilizing, for years, tenants by entireties and money laundering as a means of precluding victims and creditors from being paid, while she and Sargeant III received and spent millions of dollars and lived an extraordinarily opulent and lavish lifestyle.

45.     Deborah utilized tenants by entireties bank accounts at Comerica to receive $9,387,398.67 personally, from Sargeant III's frauds, while Sargeant III's victims desperately attempted to recover from Sargeant III. Deborah Sargeant was paid these amounts despite the fact that she has not worked in decades. These amounts were paid to Deborah Sargeant with no proper consideration.  Deborah Sargeant was paid $9,387,398.67 up until 2012; it is unknown what amounts she has been paid in the past six years.

46.     Defendant Harry Sargeant III is businessman and a resident of Florida ("**Sargeant III**") and who is otherwise *sui juris*.  Sargeant III and Comerica conspired together and conspired with the other Defendants as described in this Complaint.  Sargeant III travelled to British Columbia, Canada, for the purpose of attending the premises of Worldspan where the Superyacht was being constructed.   Sargeant III also travelled to England, Jordan, Switzerland, the Dominican Republic, and other countries in furtherance of and in assistance to the illegal Enterprise.

47.     Defendant Kevin Kirkeide ("**Kirkeide**") is an individual residing in Florida and who is otherwise *sui juris*.  Kirkeide is a Chartered Accountant who acts as one of the strategy and logistics operatives for Sargeant III's various frauds committed in the United States and various other countries.  Kirkeide is a resident of West Palm Beach, Florida.  Kirkeide has been deposed by victims of Sargeant III's frauds; these depositions were the result of Kirkeide's intimate involvement in these

16

frauds as detailed in this Complaint.  Kirkeide was involved in the conspiracy against the Plaintiffs and others in this case.

48.     The Defendant Monger is an individual residing in Florida and who is otherwise *sui juris*.  Monger was a full-time employee of Sargeant III, for years, commencing at least as early as 2008.  Monger was an agent of Comerica and Sargeant III.  Commencing in 2008, in assistance of the illegal Enterprise, Monger travelled across State lines and across international borders in furtherance of the operation of the Enterprise.

49.     Specifically, Monger travelled to and lived in British Columbia, Canada, taking up residence in West Vancouver, British Columbia, Canada in 2008.  Monger supervised the construction of the Superyacht at the premises of Worldspan from 2008 until 2010.  Subsequent to cessation of construction on the Superyacht, Monger remained in Canada and provided false and fraudulent statements to both the Federal Court of Canada and the British Columbia Supreme Court.  Monger's activities are detailed in this Complaint.

50.     Deborah, Sargeant III, Kirkeide, and Monger are individuals, and each of them is a "person" as defined in the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*  At all times relevant hereto, Deborah, Sargeant III, Kirkeide and Monger provided, and continue to provide assistance to the RICO Enterprise.

### C. Relevant Non-Parties

<u>Non-Parties Who Are Co-Conspirators</u>

51.     William L. Rafferty an attorney licensed to practice law in the State of Florida ("Rafferty").  William L. Rafferty is a resident of Miami-Dade County, Florida.  Rafferty has provided legal services to Daniel Sargeant, Sargeant III and other clients in Palm Beach County, Florida.  Rafferty has a unique and special relationship with Sargeant III, Rafferty and Sargeant III

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

attended Florida State University together, they were fraternity brothers and have been best friends. Rafferty was one of the controlling minds of Rafferty, Tenenholtz, Hess & Hudson, P.A. ("Rafferty Law"). Utilizing Rafferty Law, Rafferty has laundered millions and millions of dollars for Sargeant III through his law firm's trust account.

52.     Sargeant III has used Rafferty on numerous litigation matters, including defending the fraud claims brought against Sargeant III *et al,* by Al-Saleh that resulted in the 28.8 million fraud judgment against Sargeant III et al. Both William Rafferty and Rafferty Law were sued by Daniel Sargeant for distributing millions of dollars relating to the proceeds of a contractual agreement to Sargeant III, despite the fact that the contract stipulated that payment was to be made to Daniel Sargeant.

53.     Rafferty, Tenenholtz, Hess & Hudson, P.A. ("Rafferty Law") was a law firm operating as a Florida professional association with its principal place of business located in Miami-Dade County Florida. Rafferty Law provided legal services to Daniel Sargeant and Sargeant III and to others in Palm Beach County, Florida.

54.     Mustafa Abu-Naba'a ("Abu-Naba'a"), is a Dominican/Jordanian national residing in the Dominican Republic.  Abu-Naba'a was International Oil Trade Center Jordan's ("IOTC Jordan") general manager during relevant time periods and owns one-third of the capital shares of IOTC Jordan.  Abu-Naba'a also owns one half of interest in IOTC USA and is a manager of IOTC USA. Abu-Naba'a was a co-defendant in the Complaint filed by Mohammad Al-Saleh that resulted in a $28.8 million-dollar fraud judgment against Abu-Naba'a, Sargeant III, and IOTC USA.

55.     Marty Martin ("Martin") is a resident of Florida and a Sargeant III operative.  Martin formerly held a very senior position with the Central Intelligence Agency ("CIA").  At the trial of the *Al-Saleh v. Sargeant III et al*. lawsuit in Florida State Court, in response to the assertion that a $9

18

million-dollar bribe had been paid to General Mohammad Dahabi, regarding the $2.1 billion-dollar U.S. Department of Defense contract Al-Saleh was defrauded on, Martin testified that he did not know what happened to the 9 million dollars. Sargeant III also testified he did not know what happened to the $9 million dollars.

56.     BTB Refining, LLC ("BTB") was initially formed as a Florida limited liability company in December 2007 and is now a Texas limited liability Company.  Sargeant III is the 100% owner and sole member of BTB. Sargeant III exercises exclusive control over BTB.  Comerica is and was BTB's banker.  The various IOTC entity iterations that are referred to in this Complaint were alter egos of Sargeant III and were utilized for the purpose of fraud and conspiracy.  Comerica is and was the banker for various IOTC corporate iterations as for BTB and other entities beneficially owned directly or indirectly by Sargeant III.

<u>Non-Parties Who Are Not Co-Conspirators</u>

57.     Mohammad Al-Saleh is the former brother-in-law of the King of Jordan and a resident of Florida ("Al-Saleh").

58.     Al-Saleh obtained a $28.8 million-dollar fraud judgment against Sargeant III, et al, on July 28, 2011 after filing a Complaint on April 10, 2008 in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, Case No. 50 2008 CA 010187 XXXX MB AJ ("Al-Saleh v. Sargeant III").[8]

59.     Comerica was aware of Al-Saleh's fraud complaint and fraudulently misrepresented the nature and effect of the Al-Saleh fraud litigation at the time it sought to induce Worldspan into executing the August 14, 2009 Assignment of Sargeant's security interest in the Superyacht to

---

[8] Mohammad Anwar Farid Al-Saleh v. Harry Sargeant, III, Mustafa Abu-Naba'a and International Oil Trading Company, LLC, In the Circuit Court of the 15th Judicial Circuit In And For Palm Beach County, Florida, Case No. 50 2008 CA 010187 XXXX MB AJ.

Comerica.  Further, Comerica continued to launder the proceeds of fraud against Al-Saleh, and despite the fraud lawsuit and subsequent Florida State Court $28.8 million-dollar fraud judgment awarded to Al-Saleh against Sargeant III, *et al.* Comerica profited financially from the RICO Enterprise and caused injury to the Plaintiffs.

60.     PDVSA Petroleo S.A. is the National Oil Company of Venezuela ("PDVSA"). PDVSA was one of the victims of Sargeant III's BTB Credit Bid Fraud in Texas.  In *PDVSA v. BTB Refining LLC, et al*, the United States District Court reversed the BTB Credit Bid Fraud.  PDVSA had shipped tens of millions of dollars in oil to the Corpus Christi Texas refinery, Sargeant III used the same fraudulent methodology in the BTB Credit Bid Fraud in Corpus Christi, Texas as used in the Superyacht Credit Bid Fraud and Conspiracy undertaken by Comerica and Sargeant III against the Plaintiffs.

61.     In *PDVSA v. BTB Refining LLC*, *et al.*,[9] the Court found that Sargeant III had committed fraud utilizing a fraudulent credit bid with BTB (the "BTB Credit Bid Fraud").

62.      Supreme Fuels Trading FZE is incorporated and headquartered in the United Arab Emirates ("Supreme Fuels FZE").  On October 21, 2008 Supreme Fuels brought a RICO Complaint against Sargeant III, et al in the United States District Court Southern District of Florida Miami Division.[10]  This RICO complaint resulted in a $5 million-dollar judgment on May 6, 2011.

63.     Comerica was aware of this RICO complaint and concealed it from the Plaintiffs. Further, Comerica continued to launder money and proceeds of fraud for Sargeant III and the various IOTC alter egos he controlled, despite the fraud lawsuits and fraud judgments. Comerica profited

---

[9] PDVSA Petroleo S.A. v. BTB Refining, LLC, et al, United States District Court, S.D. Texas, Corpus Christi Division, Case No. 2:09-cv-00038.

[10] Supreme Fuels Trading FZE v. Harry Sargeant III, Mustafa Abu-Naba'a, International Oil Trading Company, LLC, and International Oil Trade Center, United States District Court Southern District of Florida Miami Division, Case No. 08-81215-CIV-HURLEY/HOPKINS.

from the RICO enterprise and caused significant harm to the Plaintiffs.  Supreme Fuels FZE claimed against the Plaintiff Worldspan.

64.     Daniel Sargeant is the brother of Sargeant III and is a resident of Florida.  On May 8, 2013, Daniel Sargeant filed a Complaint[11] in Florida Federal Court against Sargeant III, et al for fraud.

### D. Jurisdiction and Venue

65.     This Court has personal jurisdiction over the Defendants because they participated in tortious acts directed towards Florida, do sufficient business in Florida, reside in Florida, undertook the conspiracy from Florida, issued the instructions and controlled the conspiracy from Florida and have sufficient minimum contacts with Florida, and / or otherwise intentionally avail themselves of the Florida consumer market through various means.

66.     Not only do the Defendants transact substantial business in Florida, the causes of action asserted in this lawsuit arise directly out of the Defendants' Florida acts, in controlling and issuing all of the directions and instructions regarding the Enterprise, with the exception of limited instructions issued by Comerica employee, Cynthia Jones, from Detroit, Michigan.

67.     This Court has personal jurisdiction over Comerica because Comerica's executives employed at a Florida branch of Comerica made fraudulent misrepresentations to Barnett, the principal of Worldspan, the principal of CSPAN and Wedmore, as referred to in this Complaint.

68.     This Court has personal jurisdiction over Comerica and its executives named in this action, because Comerica and or its executives committed tortious acts in Florida, violated RICO statutes in Florida, transacts business in Florida, derives substantial revenue from business in Florida,

---

[11] Daniel Sargeant v. Harry Sargeant III, IOTC Asphalt, LLC, Rafferty, Tenenholtz, Hess, & Hudson, P.A., and William Rafferty, Esq, In The Circuit Court Of The Fifteenth Judicial Circuit In And For Palm Beach County Florida, Case No. 2013CA0079925 Division AN.

derives substantial revenue from interstate commerce and foreign commerce with consequences in the State of Florida. Comerica owns real property in the State of Florida. Comerica's executives employed at a Florida branch of Comerica made fraudulent omissions to Barnett, the principal of Worldspan, CSPAN and Wedmore, as referred to in this Complaint.

69.     Comerica drafted a document, the August 14, 2009 Assignment, that the Florida Comerica executives induced Steven Barnett, a resident of Florida, to have executed by one of his subordinates.  The August 14, 2009 Assignment stipulates that Florida law shall govern in the event of a dispute.  The August 14, 2009 Assignment was the cornerstone document of the RICO Superyacht Credit Bid Fraud and Conspiracy; the RICO conspiracy could not have been undertaken without the August 14, 2009 Assignment.  The Comerica Florida branch and Comerica aided and abetted Sargeant III's fraudulent schemes.

70.     The Comerica Fort Lauderdale, Florida branch granted a Construction Loan Agreement to Sargeant III for construction on the Superyacht, the superyacht loan was part of the Superyacht Credit Bid Fraud and Conspiracy.

71.     Comerica utilized its Florida offices to conduct many of the transactions referred to in this Complaint. Comerica's executives met with Steve Barnett, the principal of the Plaintiff corporations, and fraudulently misrepresented facts and fraudulently omitted facts in order to induce the Plaintiff Worldspan to enter into the August 14, 2009 Assignment.

72.     The millions of dollars paid to Worldspan for the construction of the Superyacht was laundered through Comerica Florida bank locations from IOTC Bahamas.

73.    The Florida Comerica branch co-mingled $9,387,398.67 of its own funds with the funds that were the proceeds of fraud against Al-Saleh that Comerica had laundered from IOTC Bahamas.[12]

74.    Comerica advertises that its Florida subsidiary, headquartered in Boca Raton, specializes in providing high net worth banking and other Wealth Management services.

75.    In the Federal Court of Canada proceedings individuals and companies who had a claim against the Superyacht were ordered to make claims pursuant to a Federal Court Claims Process Order.  The Federal Court of Canada ordered that all individual and corporate claimants were to file a claims process affidavit.  During the Federal Court proceedings Comerica repeatedly asserted that their only involvement in the Federal Court of Canada proceedings was to have to the court determine the priority of Comerica's security on the Superyacht (which had been assigned to Comerica by Sargeant III) and nothing more.   The litigation in the Federal Court of Canada relates to *in rem* claims against the sales proceeds of the Superyacht.

76.    In the Federal Court of Canada proceedings, counsel for Comerica was asked by the Federal Court Judge if Comerica was illegally banking in Canada. Comerica's counsel responded to the Judge by stating that he had no instructions.

---

[12] IOTC Bahamas, a Sargeant III alter ego corporation, that was used as a vehicle of fraud against Al-Saleh and others, previously banked with Wachovia Bank. The money laundering transactions undertaken with this account caused Wachovia Bank to cease dealing with IOTC Bahamas, at which time, Comerica became the IOTC Bahamas money laundering bank and continued to be the money laundering bank for years.  Comerica also laundered funds for Sargeant's alter ego corporation BTB Refining LLC (found to have been a vehicle of fraud by the Court of Appeals, Thirteenth District of Texas Corpus Christi-Edinburg Court in *Harry Sargeant III, BTB Refining LLC, Appellants, v. Mohammad Anwar Farid Al Saleh*, Appellee in Case Nos. 13-15-0327-CV and 13-15-00395-CV and the United States District Court, S.D., Texas, Corpus Christi Division in PDVSA Petroleo S.A. v. Trigeant, Ltd. et al, Case No. 2:09-cv-00038).

77.     Sargeant III fraudulently brought an application for a receiver manager wherein Monger falsely swore that Sargeant III was the secured creditor of the Superyacht, when, in fact, Comerica was the secured creditor, not Sargeant III.

78.     Sargeant III and Comerica, operating in concert, and in contravention of section 1.06 of the August 14, 2009 Assignment, (the August 14, 2009 Assignment was created by Comerica) had Sargeant III commence litigation in British Columbia Supreme Court against Worldspan and its directors. This litigation claimed for breach of contract, overcharging, breach of trust and other claims.

79.     The document that was the cornerstone document to the Superyacht Credit Bid Fraud and Conspiracy was the August 14, 2009 Assignment, which assigned Sargeant III's security interest in the Superyacht to Comerica.  The August 14, 2009 Assignment contained at section 1.06 a provision that stipulates, that in the event of breach of the contract to construct the Superyacht, only Comerica can take steps relating to the security on the Superyacht and the contract to construct the Superyacht. The provision reads as follows:

> *"Section 1.06. Vessel Construction Agreement. ..... (i) upon receipt of a written notice that an Event of Default under the Vessel Construction Agreement has occurred, that all rights of the Secured Party* [Sargeant] *under the Vessel Construction Agreement **may only be exercised by the Assignee [Comerica Bank]**, ..."* (Emphasis added).

80.     In the face of provision 1.06 of the August 14, 2009 Assignment, which stipulated that, after breach of the contract to construct the Superyacht,[13] only Comerica could exercise any

---

[13] On October 28, 2010, Worldspan issued notice to Comerica and Sargeant III of breach of the contract to construct the Superyacht. On November 29, 2010, Sargeant III issued notice to Worldspan of termination of the agreement to construct the Superyacht. From October 28, 2010 onward only Comerica had the right to enforce the security registered against the Superyacht – Comerica had their agent, proxy and co-conspirator, exercise these rights, when Sargeant III had no right to do so.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

rights of the secured party, Comerica allowed Sargeant III to advance the claims regarding the mortgage priority, as Comerica wished to conceal its mastermind role in the Superyacht Credit Bid Fraud and Conspiracy.  Comerica also wanted to conceal the fact that it was (and still is) illegally banking in Canada.

81.     Comerica also attempted to conceal the fact that it was illegally banking in Canada by purporting that the loan Comerica granted to Sargeant for the construction of the Superyacht was issued out of the Comerica's Ontario, Canada office.  Comerica has a limited banking license in Ontario, Canada.  Comerica has no banking license for British Columbia, Canada.

82.     The Comerica loan to Sargeant III for the construction of the Superyacht was issued out of the Florida branch of Comerica. Comerica's Canadian counsel refused to provide a responsive answer to the question posed to Comerica's Canadian counsel by a Justice of the Federal Court of Canada. The Justice of the Federal Court of Canada asked Comerica's Canadian counsel if Comerica was illegally banking in Canada, to which Comerica's Canadian counsel replied that he had no instructions.

83.     All directions and control relating to Comerica's participation in the illegal enterprise, referred to herein, for Comerica's RICO activities, derived exclusively and only from Florida and Detroit, Michigan.

84.     The August 14, 2009 Comerica Superyacht Construction Loan Agreement advanced to Sargeant III was signed by Barry W. Shaw, Vice President, Comerica Bank 100 N.E. 3rd Avenue, Suite 100, Fort Lauderdale, Florida and by Daniel Sargeant, as Borrower and as Attorney-in-fact for Harry Sargeant III, with an address of 3020 North Military Trail, Suite 100, Boca Raton, Florida.

85.     Both Daniel Sargeant and Sargeant III are residents of Florida and own real property in Florida, including, but not limited to, their personal residences.

86.     The August 14, 2009 Comerica Superyacht Construction Loan Agreement, at section 8.5, stipulates that the governing laws are the State of Florida. Section 8.5 reads as follows:

> Section 8.5 Governing Law. This Note shall be governed by and construed in accordance with the internal laws of the State of Florida, including all matters of construction, validity and performance.

87.     Specifically, Monger travelled to and lived in British Columbia, Canada, taking up residence in West Vancouver, British Columbia, Canada in 2008.   Monger supervised the construction of the Superyacht at the premises of Worldspan from 2008 until 2010.  Subsequent to cessation of construction on the Superyacht, Monger remained in Canada and provided false and fraudulent statements to both the Federal Court of Canada and the British Columbia Supreme Court. Monger's activities are detailed in this Complaint.

88.     This Court has original jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331 and 1337 because the claims arise under federal law, including RICO violations under 18 U.S.C. § 1961 *et seq.*

89.     Subject matter jurisdiction also exists over the RICO claims under 18 U.S.C. § 1964(c).

90.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

91.     This Court has personal jurisdiction over Defendants because they committed unlawful acts in this judicial district, the Defendants all reside in Florida, with the exception of Cynthia Jones who resides in Michigan.  All directions and control for the Enterprise were issued from Florida by Florida residents, with the exception of directions that were issued by Cynthia Jones, who is an executive at Comerica.

92.     Defendants also committed acts elsewhere with the purpose and intent that their acts would cause harm to the Plaintiffs in this judicial district. Additionally, Defendants' acts in fact had immediate and direct consequences in this judicial district.

93.     In perpetrating their fraudulent scheme, Defendants and their co-conspirators have violated United States and Florida law.  In connection with the acts and course of conduct alleged in this Complaint, Defendants directly and indirectly used means and instrumentalities of interstate and foreign commerce, including the United States mail and wires, interstate telephone, the United States Federal Reserve, and the national and international banking systems to commit mail, wire and banking fraud as well as money laundering in violation of U.S. law.

94.     In addition, a significant and meaningful part of the scheme, including planning and execution of the scheme, occurred in Florida and Defendants repeatedly committed violations of state and federal law, i.e., "predicate acts," in Florida to perpetuate and to conceal the unlawful scheme.

95.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district. Venue is also proper against Defendants under 28 U.S.C. § 1391 because they are subject to the Court's personal jurisdiction with respect to this action.

96.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22 because Defendants are subject to personal jurisdiction in this District for the claims alleged and a substantial part of the events and omissions giving rise to these claims occurred in this District.

97.     Venue is also proper under 18 U.S.C. § 1965(a) because all of the Defendants transact their affairs in this judicial district. Additionally, venue is proper under 18 U.S.C. § 1965(b) because the ends of justice require that Defendants be brought before this Court to the extent that the federal RICO claims against them would not otherwise be subject to venue in this Court.

## FACTUAL BASIS FOR ALL CLAIMS

### *The Initial Involvement of Plaintiffs with Sargeant III, Deborah Sargeant and Comerica*

98.     This RICO action derives from the conduct of Comerica who conspired with Sargeant III and the other co-conspirators to defraud the Plaintiffs, corporations and individuals in Florida, other states and in other countries.  Comerica and Sargeant III were an association-in-fact and an association-at-law who participated in, conspired and both profited from the nine-year scheme involving defrauding individuals and corporations of hundreds of millions of dollars, and, as such, constitute an enterprise under 18 U.S.C. § 1961(4) (the Enterprise).

99.     The purpose of the Enterprise was, through a series of illicit and illegal devices, fraud, money laundering, misappropriation, assignments, transfers, collateralization, fraudulent misrepresentations, fraudulent inducements, fraudulent omissions, and other mechanisms, to defraud victims.  The scheme required the coordination and active participation of Comerica and Sargeant III, both of whom were involved in the Enterprise as the masterminds with various other co-conspirators participating in the conspiracy.

100.    Comerica, as the 25th largest bank in the United States, participating in a RICO conspiracy has far reaching societal interest and impact, both in Florida and the United States.  Both Comerica and Sargeant III received the ill-gotten profits of the RICO conspiracy in Florida.

101.    Sargeant III utilized, among other things, alter ego corporations, security in favor of Comerica and other financial institutions (including AmCap Financial Services, Inc. and ABN AMRO Bank N.V.) Comerica and alter ego corporations, assignments, collateralization and mortgages on assets subject to seizure, tenancy by the entirety (paying many millions of dollars to his wife who has not worked in 20 years), bankruptcy, litigation, counterclaims, money laundering, offshore corporations, all to effectuate his frauds and conceal and protect his ownership of assets derived from fraud against companies and individuals.

28

102.     Comerica and Sargeant III were involved in a massive credit bid fraud in Corpus Christi, Texas. The United States District Court for the Southern District of Texas, Corpus Christi Division in *PDVSA Petroleo S.A. v. Trigeant, Ltd. et al*, Case No. 2:09-cv-00038 (the "PDVSA Credit Bid Judgment") found that Sargeant III had orchestrated actual fraud with a fraudulent credit bid utilizing his alter ego corporation, BTB. Comerica was and is the banker for BTB. In 2013, Comerica was provided written advisement of the finding of the Texas District Court. On June 26, 2014, one year after receiving this advisement, Comerica, in concert with Sargeant III, attempted the same credit bid fraud against the Plaintiffs. See **Exhibit 1**, PDVSA Credit Bid Judgment.

### The Mechanics of the Credit Bid Schemes – BTB and Worldspan

103.     In the PDVSA case, the United States District Court for the Southern District of Texas, Corpus Christi Division found that Sargeant III had orchestrated a credit bid fraud regarding an oil refinery located in Corpus Christi, Texas.  The credit bid fraud worked as follows:

a.  <u>Accruing debt against an asset</u>[14]. In the PDVSA case the corporation that owned the Corpus Christi refinery, Trigeant Ltd., controlled by Sargeant, accrued tens of millions of dollars in obligations to PDVSA for oil shipments to the refinery and then failed to pay;

b.  <u>Failing to pay the obligations</u>[15];

c.  <u>Having a conventional lender</u>[16] <u>loan money and implement security against the asset</u>. In the PDVSA case the asset was the Corpus Christi refinery and lender was AmCap Financial Services;

---

[14] In the Worldspan case, Comerica, the contracting party with Worldspan, accrued $4.9 million dollars  in unpaid invoices for the construction of the Superyacht.

[15] In the Worldspan case, the $4.9 million dollars owed by Comerica to Worldspan has never been paid.

[16] In the Worldspan case, Comerica not only lent money against the asset (the Superyacht), Comerica became Sargeant III's alter ego corporation, becoming the contracting party (as opposed to a mortgagee simpliciter), and the mortgagee, thereby fulfilling the role that was undertaken by Sargeant III's alter ego corporation, BTB Refining LLC, the corporation that was found by the Federal Court in Texas to be Sargeant III's alter ego vehicle of fraud.

d. <u>Devaluing the asset</u>[17]. In the case of the Corpus Christi, Texas oil refinery the refinery was purchased with a fraudulent credit bid for only a fraction of what the refinery ultimately sold for after the U.S. District Court reversed the fraudulent credit bid sale.  The US District Court reversed the credit bid for fraud and the refinery ultimately sold for its true value, close to 100 million dollars, many times the amount that had been paid with the fraudulent credit bid;

e. <u>Purchasing the debt and security with an alter ego, Sargeant III controlled corporation.</u> In the BTB Credit Bid Fraud and Conspiracy case, the alter ego corporation was BTB Refining LLC;

f. <u>Having the alter ego corporation purchase the asset using the debt and security to make a credit bid, thereby changing the title holder to the name of the alter ego corporation, not the corporation that accrued the debt, thereby precluding creditors from recovery against the asset for amounts they were owed</u>[18].  The creditors were left holding debt against a corporation (Trigeant Ltd., the prior owner of the refinery) that had no asset, as the refinery had been purchased by a credit bid made by the alter ego corporation, BTB Refining LLC, which did not owe the creditors anything. The US District Court saw through this artifice and fraud and reversed the credit bid, putting the refinery back into the hands of the company that accrued the debt, Trigeant Ltd.

---

[17] In the Worldspan case, in January 2011, Comerica's own appraiser valued the as-is, where-is Superyacht at $15 million dollars.  After Comerica opposed and interfered with the marketing and sale of the Superyacht and Monger, Sargeant III's employee, illegally and fraudulently interfered with the marketing and sale, Comerica submitted to the Federal Court of Canada in 2014 that the Superyacht was now obsolete and the same as a "Commodore 64". The verbatim language used by Comerica in 2014 was "Commodore 64". Comerica advised the Federal Court of Canada that they wished to have a Sargeant III controlled corporation acquire Comerica's security on the Superyacht and then credit bid on the Superyacht which was now only worth $5 million dollars.  The Federal Court of Canada refused to allow this to happen. As part of Comerica's opposition to the sale of the Superyacht, Comerica and Sargeant submitted that the Superyacht should be moved from Worldspan's facility to a Sargeant III controlled superyacht shipyard, DG Shipyards LLC, a Florida alter ego corporation controlled by Sargeant III. Sargeant III fraudulently described the facility the Superyacht should be shipped to as a "state-of-the-art facility", when, in fact, it was an empty building.

[18] In the Worldspan case, Sargeant III defrauded Al-Saleh and others of tens of millions of dollars, then, to preclude his victims from claiming against the Superyacht, Sargeant III transferred his interest in the Superyacht (Sargeant held the security against the Superyacht in his name) to Comerica, thereby implementing one of the fundamental predicate acts in the Superyacht Credit Bid Fraud and Conspiracy. At the time Al-Saleh, Supreme Fuels, the *in rem* trade creditors and Worldspan claimed against the Superyacht, Comerica opposed their claims, based on the fact that Comerica, not Sargeant III (who had defrauded these victims), now held security against the Superyacht.

104.     This is the same credit bid artifice and scheme that Comerica, the Defendants and Sargeant III undertook against the Plaintiffs, with the exception of the fact that Comerica acted with a level of manifest dishonesty and fraud so profound that Sargeant III did not require an alter ego corporation to remove the asset from the debtor corporation.  In this case, Comerica became the alter ego corporation, undertaking the same position as BTB, the company that was found by the US District Court for the Southern District of Texas to have been the vehicle of fraud against creditors.

105.     Not only did Comerica implement security and comingle its funds with the funds they laundered from IOTC Bahamas, Comerica even became the contracting party, replacing Sargeant as the contracting party with the yacht builder Worldspan – Comerica then failed to pay Worldspan $4,920,796.11.  This amount has never been paid.

106.     Comerica then opposed the sale of the Superyacht, while it became obsolete. Comerica opposed the claims of Al-Saleh, who had an unpaid $28.8 million-dollar fraud judgment (plus interest) against Sargeant III.  Comerica opposed the claims of all who claimed against the Superyacht.

107.     Comerica repeatedly made submissions to the Federal Court of Canada that Comerica's only involvement was to determine the priority of Comerica's mortgage on the Superyacht and nothing else.

108.     In 2013, Worldspan delivered the affidavit of Michael Nesbit, Chartered Accountant, to Comerica's Vancouver attorneys which provided details of the United States District Court for the Southern District of Texas, Corpus Christi Division finding that Sargeant III had, utilizing his alter ego corporation, BTB, orchestrated a credit bid fraud against the national oil company of Venezuela, PDVSA, and others. *See* **Exhibit 2**, Affidavit of Michael Nesbit, Chartered Accountant sworn May 31, 2013.

31

109.     Given the fact that Comerica's attorneys were delivered the above referenced affidavit, there is no doubt that Comerica was entirely aware of the United States District Court for the Southern District of, Texas, Corpus Christi Division findings that Sargeant III had orchestrated a credit bid fraud related to the Corpus Christi Texas oil refinery.

110.     In 2014, one of the unpaid Superyacht trade creditors brought an application in the Federal Court of Canada seeking an order approving the sale of the unfinished Superyacht for the amount of $5,000,000.00. Both Sargeant III and Comerica opposed the sale order. In Comerica's opposition to the application to sell the Superyacht, Comerica advised the Court that the Superyacht was as obsolete as a "Commodore 64".

111.     Sargeant III and Comerica, as part of their Superyacht Credit Bid Fraud and Conspiracy, opposed the marketing and sale of the Superyacht for years.

112.     Monger, a co-conspirator and a full-time employee of Sargeant III, was paid very substantial sums on an ongoing basis, for years, by Sargeant III, thereby profiting from the illegal Enterprise. The Federal Court of Canada ordered the marketing of the Superyacht. Monger illegally and improperly interfered with the Federal Court of Canada order regarding the marketing and sale of the Superyacht.

113.     Monger and his partner, Tiffiny Klenner, moved to West Vancouver, British Columbia, Canada.   Monger supervised the construction of the Superyacht at the premises of Worldspan from the beginning of the construction at Worldspan to the end of the construction. Monger attended at the manufacturing premises of Worldspan on a regular basis during the construction of the Superyacht by Worldspan.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

114.    Subsequent to the cessation of the construction on the Superyacht in 2010, Monger supervised the litigation and provided false and fraudulent evidence to the British Columbia Supreme Court and the Federal Court of Canada as referred to in detail herein.

115.    Monger was Sargeant III's full time employee and agent.  Monger was the agent of Comerica and Sargeant III, providing false and fraudulent information to the Courts and illegally interfering with the marketing and sale of the Superyacht.

116.    While present at the premises of Worldspan, during the construction of the Superyacht, in the time period between December 2009 and April 2010, Monger stated to Worldspan employees that Worldspan would be paid for the work it was undertaking on the Superyacht.

117.    This representation was made for the purpose of inducing Worldspan to continue supplying materials and labor to the Superyacht and resulted in Worldspan being owed $4.9 million dollars which has never been paid.  The statements made by Monger to Worldspan to the effect that Worldspan would be paid for the work it was doing between December 2009 and April 2010 were false, fraudulent and in furtherance of the illegal Enterprise described herein.

118.    Worldspan relied on these fraudulent misrepresentations and continued working on the Superyacht in the expectation of being paid.  This resulted in Comerica owing Worldspan $4.9 million dollars, which was never paid, and which was a major factor in the destruction of Worldspan.

119.    During the time period between December 2009 and April 2010, Comerica was Worldspan's sole contracting party.  Sargeant III had assigned his interest in the Superyacht construction contract to Comerica on August 14, 2009, at the same time Sargeant III assigned his security in the Superyacht to Comerica.  *See* **Exhibit 3**, August 14, 2009 Assignment of Security. *See* **Exhibit 4**, August 14, 2009 Assignment of Insurances.  *See* **Exhibit 5**, August 14, 2009 Construction Loan Agreement.

33

120.     Monger was the individual who provided the false and fraudulent evidence to the British Columbia Supreme Court in support of the *ex parte* receivership application brought against Worldspan by Sargeant III.  In the receivership application, Monger stated that Sargeant III was the secured creditor of Worldspan, and that Worldspan was indebted to Sargeant III for millions of dollars.  These statements which were the foundational statements for the receivership application were fraudulent and false, and known to be false to Comerica and Sargeant III, as Sargeant III had assigned his security interest in the Superyacht to Comerica on August 14, 2009.

121.     Monger benefited from his role in the illegal Enterprise. The Comerica bank statements show large and continuing payments to Monger from Sargeant III.  Monger resided, for years, in the expensive and exclusive community of West Vancouver, British Columbia, Canada, with all of his expenses being paid by Sargeant III.

122.     Comerica was fully aware of the fraudulent affidavit that Monger swore in support of the *ex parte* receivership application.  Jones, Vice President of Comerica, in the Detroit Michigan office, wrote to Sargeant III and referred to the fraudulent receivership application that was brought in the name of Sargeant III when it could only be legally brought in the name of Comerica. Comerica, as an active co-conspirator and one of the two masterminds of the Enterprise, allowed this fraudulent receivership application to be brought against Worldspan as part of the Superyacht Credit Bid Fraud and Conspiracy.

123.     Jones was aware of the fact that Comerica was illegally banking in British Columbia, Canada and that Comerica had contracted with Worldspan to construct a Superyacht.  Jones was instrumental in allowing Comerica to take the steps referred to herein regarding the Superyacht Credit Bid Fraud and Conspiracy.

34

124.    Jones personally benefitted from the illegal Enterprise as a result of being paid for being an Executive at Comerica.

125.    Jones was the individual at Comerica who approved Comerica and Sargeant III making the fraudulent credit bid attempt on June 26, 2014 – one year after Comerica had been advised that the Texas District Court had found Sargeant III's BTB credit bid to be a fraud.  Jones was the individual at Comerica who approved Comerica advising the Federal Court of Canada that they wished to have the Superyacht moved from Worldspan's premises to a Sargeant III controlled shipyard.

126.    The Sargeant III controlled shipyard, DG Shipyards, was located in Richmond, B.C. Monger provided sworn evidence, that was false, to the Federal Court of Canada in support of the application to move the Superyacht to the Sargeant III controlled shipyard.  Specifically, Monger provided sworn evidence that the facility Sargeant III and Comerica wished to have the Superyacht moved to was a "state of the art" superyacht manufacturing facility.

127.    When agents of the Plaintiffs attended at the "state of the art" superyacht manufacturing facility, they found an individual who was intoxicated in the parking lot of the facility. The intoxicated individual was living in a travel trailer in the parking lot with dogs leashed to the travel trailer.  The building did not have the equipment, tools or facilities to construct a Superyacht. The sworn statement made by Monger that the facility was a "state of the art" superyacht manufacturing facility was patently false and fraudulent and known to be false.

128.    Photographs of this individual, the trailer and the building are attached to this claim. The fraudulent evidence regarding the "state of the art" superyacht manufacturing facility was presented to the Federal Court of Canada by Comerica and Sargeant III.  *See* **Exhibit 6**, photographs of DG Shipyards, the shipyard that Monger swore under oath was "state of the art."

129.    Monger, in concert with Comerica and Sargeant III, had thwarted the sale of the Superyacht to a prior purchaser of the Superyacht.  This purchaser had submitted a written offer to purchase the Superyacht. The conduct of Sargeant III and Comerica resulted in the purchaser rescinding his offer to purchase the Superyacht.  The purchaser was the landlord of the building that the Superyacht was located in.  This individual had purchased the land and building and was renting the building to Worldspan.

130.    In furtherance of the illegal Enterprise Monger travelled to Vancouver, British Columbia from Florida and from Florida to Vancouver, B.C. on an ongoing basis for years, in furtherance of the illegal Enterprise referred to herein, thereby violating the 18 U.S.C. § 1952 (Travel Act).

131.    Monger was one of the central conspirators in the fraud involving Sargeant III's London solicitors wherein Comerica and Sargeant III fraudulently conspired to obtain the millions of dollars in accessories that were not attached to the Superyacht but had been purchased by Worldspan and were in Worldspan's possession, as referred to herein.

132.    Monger illegally and improperly interfered with the marketing and sale of the Superyacht by, among other things, advising superyacht brokers in the United States not to have their clients make a purchase bid for the Superyacht and by illegally and improperly advising the superyacht brokers that the Superyacht would not be sold and advising the superyacht brokers that the Superyacht was a problem ridden yacht.

133.    In 2012, counsel for Worldspan wrote to counsel for Sargeant III, with a copy to Comerica's counsel, regarding Monger's illegal activities (the "Illegal Interference Letter") and advised him of the following:

36

a) Fraser Yachts[19] has reason to believe that Monger has been actively interfering with the marketing efforts of Fraser Yachts as it relates to the Superyacht;

b) Monger has been making statements to the representatives of potential purchasers[20] in order to dissuade potential purchases from making offers on the Superyacht;

c) The Superyacht was for sale pursuant to the order of the Federal Court of Canada;

d) Monger is in contempt of the Federal Court of Canada order stipulating that the Superyacht be marketed and sold;[21]

e) Monger is acting on the instructions of his employer, Sargeant III;[22]

f) Monger's activities have delayed the sale of the Superyacht and prejudiced its marketability;

g) Monger must cease and desist, forthwith, in interfering with the marketing and sale of the Superyacht and Monger is to cease and desist communicating with potential purchasers.

134.   The Illegal Interference Letter was followed by an affidavit sworn by the Chartered Accountant, Michael Nesbit, and provided to both Comerica and Sargeant III. This affidavit stated, among other things, the following:

---

[19] Fraser Yachts is the world's largest superyacht broker, with offices worldwide, including in Florida. The Federal Court of Canada order specified that the Superyacht was to be marketed by Fraser Yachts. During Fraser Yachts' court ordered marketing of the Superyacht, they learned that Monger, a full time employee of Sargeant, was illegally and improperly interfering with their marketing efforts, accordingly, they contacted representatives of Worldspan and advised them of Monger's illegal activities.

[20] Superyacht purchasers are wealthy individuals. These individuals are the customers of various superyacht brokers, the superyacht brokers recommend certain superyachts to their clients. Monger's illegal acts, which were in contempt of the Federal Court order and in furtherance of the Superyacht Credit Bid Fraud and Conspiracy, had one purpose – to keep the Superyacht from being sold.

[21] In 2010, the Superyacht was arrested in the Federal Court of Canada by an *in rem* trade creditor who was not paid as a result of Comerica failing to pay Worldspan 4.9 million dollars towards the construction of the Superyacht.

[22] Comerica, Sargeant III and Monger did everything they could to stop the sale of the Superyacht. Ultimately, the Superyacht, on which construction had started in 2008, was not sold until 2014, at which time it was characterized by Comerica's counsel as being as obsolete as a "Commodore 64". A Commodore 64 computer is a completely obsolete computer.

a) That Fraser Yachts (the world's largest superyacht broker who was marketing the Superyacht pursuant to the order of the Federal Court of Canada) had contacted Michael Nesbit and advised Michael Nesbit that Monger was actively interfering with the Fraser Yachts marketing efforts related to the Superyacht.

b) That Michael Nesbit advised Worldspan's Canadian attorney of Monger's deliberate attempts to interfere with the sale of the Superyacht.

c) This resulted in Worldspan's Canadian attorney writing to Sargeant III's Canadian attorney and advising that Monger should cease and desist interfering with the marketing efforts of Fraser Yachts.

*See* **Exhibit 7,** April 13, 2012 letter provided to Sargeant III and Comerica.

135.   Comerica, Monger and Sargeant III were central to and the most active co-conspirators in the scheme to defraud Worldspan as it related to the change orders relating to the construction of the Superyacht.  During the construction of the Superyacht by Worldspan, there were a number of changes to the specifications of the Superyacht.

136.   These changes to the Superyacht specifications cost millions of dollars.  These changes included both materials and labor, paid for by Worldspan.  Monger, in concert with the other co-conspirators, refused to pay Worldspan for any Change Orders that were not signed even though the material and work had been supplied. Monger and the co-conspirators attempted to defraud Worldspan by having their London solicitor's state in writing that no payment would be made to Worldspan for the materials and labor associated with unsigned Change Orders. *See* **Exhibit 8**, October 20, 2009 letter, Sargeant III's counsel to Worldspan's counsel.

137.   Comerica and Sargeant III then attempted to have all of the materials that were not attached to the Superyacht but had been purchased by Worldspan delivered to the empty building that was fraudulently represented as a Superyacht manufacturing facility - without paying for millions of dollars' worth of materials that the London solicitors for Sargeant III had stated in writing would not

be paid for.  This blatant fraud was engineered and masterminded by Sargeant III and Comerica, with one of the main operatives being Monger.

138.    After being advised in 2013, by way of the Michael Nesbit Chartered Accountant affidavit, of the findings of Sargeant III's credit bid fraud by the U.S. District Court for the Southern District of Texas,[23] Comerica, on June 26, 2014, in concert with Sargeant III, for the first time ever, disclosed their intention to undertake the same fraudulent credit bid scheme against the Plaintiffs as was undertaken in the BTB Credit Bid Fraud.  Comerica and Sargeant advised the Federal Court of Canada on June 26, 2014 that they intended to have a Sargeant controlled corporation acquire Comerica security, and, the Sargeant controlled corporation would then use that security to credit bid on the Superyacht.   This is when the Plaintiffs, as a result of Comerica and Sargeant III's disclosure of their fraudulent credit bid scheme, first learned of the RICO conspiracy directly targeting them, with the masterminds being Comerica and Sargeant III.  Prior to the 2014 discovery of the Superyacht Credit Bid Fraud and conspiracy, the Plaintiff did not know that Comerica had conspired with Sargeant III to effectuate a fraudulent credit bid against Worldspan, the in rem trade creditors, and others in the same manner as was undertaken in the BTB Credit Bid Fraud and conspiracy.  After Comerica was provided with an affidavit detailing The United States District Court for the Southern District of Texas, Corpus Christi Division in *PDVSA Petroleo S.A. v. Trigeant, Ltd. et al*, Case No. 2:09-cv-00038 (the PDVSA Credit Bid Judgment)  finding that Sargeant III had orchestrated actual

---

[23] Comerica and Sargeant III were both involved in the massive credit bid fraud relating to the Corpus Christi, Texas oil refinery. The United States District Court for the Southern District of Texas, Corpus Christi Division in *PDVSA Petroleo S.A. v. Trigeant, Ltd. et al*, Case No. 2:09-cv-00038 (the PDVSA Credit Bid Judgment) found that Sargeant III had orchestrated actual fraud with a fraudulent credit bid utilizing his alter ego entity, BTB.  Comerica was and is the banker for BTB. In 2013, Comerica was provided written advisement of the finding of the Texas District Court. Despite being advised in 2013 of the findings of the U.S. District Court for the Southern District of Texas, Comerica, on June 26, 2014, one year after receiving this advisement, in concert with Sargeant III, attempted an identical credit bid fraud against the Plaintiffs.

fraud with a fraudulent credit bid utilizing his alter ego entity, BTB, on June 26, 2014, for the first time ever, Comerica and Sargeant disclosed the fact that they intended to undertake the same credit bid scheme to acquire the Superyacht – with the same effect on the creditors and victims as had been the case in the BTB Credit Bid Fraud.

139. Directing and controlling the Superyacht Credit Bid Fraud and Conspiracy from Florida, Comerica and Sargeant III were of the belief that they had destroyed Worldspan (by, among other things, failing to pay Worldspan $4.9 million dollars, fraudulent receivership application, delaying the sale of the Superyacht for years, and undertaking numerous predicate acts to destroy the Plaintiffs businesses and devalue the Superyacht).

140. Shaw, who benefited from the illegal Enterprise as a consequence of being an Executive paid by Comerica, made false and fraudulent statements to Barnett, the principal of Worldspan at the Delray Beach Comerica Meeting as referred to in detail in this Complaint.

141. Younker, who benefited from the illegal Enterprise as a consequence of being an Executive paid by Comerica, made false and fraudulent statements at a meeting in Florida in 2011 (the "Younker Florida Meeting"). At the Younker Florida Meeting, Younker made false and fraudulent statements to Steven Barnett, the principal of the Plaintiff corporations.

142. At the Younker Florida Meeting, Younker fraudulently concealed critical facts from Barnett, the principal of Worldspan in 2011. At the Younker Florida Meeting, Younker fraudulently told Barnett, the principal of Worldspan that Sargeant III was going to complete the Superyacht at Worldspan's premises.

143. At the Younker Florida Meeting, Younker fraudulently concealed from Barnett, the principal of Worldspan that Comerica had been laundering millions and millions of dollars from offshore accounts in order to fraudulently defeat the claims of Sargeant III's victims, including, but

not limited to Al-Saleh – the same individual who had sued Sargeant III for fraud and whose lawsuit was fraudulently misrepresented as being a lawsuit that was not relevant to or of any concern to the Plaintiffs.

144.    Al-Saleh claimed against Worldspan for over $11 million dollars after these fraudulent misrepresentations made by Comerica.  *See* **Exhibit 9**, Al-Saleh Complaint filed April 10, 2008 in *Al-Saleh v. Sargeant III*.  *See* **Exhibit 10**, November 2, 2011 Al-Saleh Affidavit in Federal Court of Canada.

145.    At the Younker Florida Meeting, Younker fraudulently concealed from Barnett that Comerica and Sargeant had no interest in resolving anything with Worldspan.  Sargeant III and Comerica had already implemented the foundational steps in the Superyacht Credit Bid Fraud and Conspiracy so as to defraud the Plaintiffs, Al-Saleh and others.

146.    Comerica, illegally banking in Canada and being one of the two masterminds of a nine-year criminal conspiracy, believed they had destroyed the Plaintiffs, Comerica believed it would not be discovered or exposed and would not face liability from American banking regulators and liability for its RICO activities.

147.    Comerica believed that their illegal and fraudulent activities regarding laundering millions of dollars for Sargeant III, Deborah Sargeant, and his alter ego corporations, utilizing offshore corporations, not subject to the oversight of American banking regulators, and in countries that do not enforce anti-money laundering laws, would not be discovered or exposed, and that Comerica would not be subject to liability from American banking regulators, RICO legislation or the U.S. courts.

148.    Comerica went far beyond money laundering and wire fraud, becoming one of the two masterminds in an almost decade long conspiracy,[24] commencing in 2009, with the victims being Al-Saleh, Supreme Fuels FZE, PDVSA, creditors, the Plaintiffs and many others.

149.    On June 26, 2014, the Plaintiffs learned of the conspiracy, which was the Superyacht Credit Bid Fraud and Conspiracy, and have brought this civil RICO Complaint within the statutory time limits with all of the constituent components required to bring a RICO Complaint.  All control and direction for the conspiracy originated exclusively from Florida and Detroit, Michigan. The foundational document and the document that supported the foundational document both contain choice of law clauses that stipulate Florida law shall apply.  All of the parties and witnesses are domiciled in Florida, with the exception of Cynthia Jones who is in Detroit, Michigan. All of the profits were made in Florida.

150.    Kirkeide, who is an accountant, benefitted substantially from the illegal Enterprise by being paid large sums of money on an ongoing basis by Sargeant III.  Kirkeide's role in the Enterprise included, but was not limited to, acting as the logistics conspirator who dealt with the implementation of the various schemes and artifices referred to in this Complaint.  Kirkeide' s intimate involvement with the Enterprise referred to in this Complaint has resulted in victims deposing Kirkeide under oath for the purpose of obtaining evidence to assist the victims in recovering from Sargeant III.

151.    Kirkeide communicated, on an ongoing basis, with Sargeant III, Comerica and the other co-conspirators.

152.    Kirkeide was essential to the illegal Enterprise as he utilized his accounting and corporate skills to assist in the creation of complex corporate structures as directed by Sargeant and Comerica, said alter ego corporations used as vehicles of fraud as described in this Complaint.

---

[24] That continues at this time.

42

Kirkeide assisted in creating the means and mechanisms for the money laundering transactions referred to in this Complaint. Kirkeide assumed the role of director of certain Sargeant III alter ego corporations. Kirkeide's involvement in the illegal Enterprise spans years and includes hundreds of acts in furtherance of the illegal Enterprise.

153. Kirkeide was also instrumental in the money laundering undertaken by Sargeant III and Comerica. Kirkeide was the accountant for the illegal Enterprise referred to herein and was intimately familiar with the money laundering transactions referred to in this Complaint, as well as with the design and implementation of the fraudulent credit bit schemes referenced herein. In furtherance of the illegal Enterprise, Kirkeide communicated extensively with Sargeant III, the banks referred to in this Complaint, Monger and the other co-conspirators, thereby committing wire fraud and mail fraud. Kirkeide also travelled to assist in the illegal Enterprise, thereby violating the Travel Act. Kirkeide, as an accounting professional, ignored his professional obligations and responsibilities, including, but not limited to, his obligation to report the illegal activities referred to in this Complaint, electing instead to become an active participant in the illegal Enterprise. Kirkeide was paid significant sums of money by Sargeant III for his participation in the Enterprise.

### The United States Department of Defense Contract and The Resulting Fraud

154. Mohammad Al-Saleh, the former brother-in-law of Jordan's King Abdullah II, was one of three equal partners in a company called IOTC Jordan. The other two equal (1/3 each) partners were Sargeant III and Mustafa Abu-Naba'a.

155. Through his valuable, high level contacts with the Jordanian government, Mohammad Al-Saleh was able to secure a letter of authorization that gave IOTC Jordan exclusive rights to truck fuel through Jordan to military bases in Iraq during the Iraq war.

156.    Mohammad Al-Saleh, Sargeant III and Mustafa Abu-Naba'a were each entitled to one third of the profits from the IOTC Jordan contract with the US department of Defense.

157.    Through a series of alter ego corporations with names very similar to IOTC Jordan, Sargeant III and Mustafa Abu-Naba'a diverted the profits from the IOTC Jordan contract and undertook numerous steps to defraud Mohammad Al-Saleh and launder funds defrauded from Mohammad Al-Saleh. One of these corporations utilized as a vehicle of fraud was IOTC USA, another was IOTC Bahamas.

158.    As a result of the U.S. Department of Defense contracts, IOTC USA generated over $1.95 billion in revenue and reported profits ranged between 210 million and 133 million from 2005 to 2010.

159.    These funds all originated from US taxpayers; they were then paid from the U.S. Department of Defense to the alter ego corporations as part of the scheme to defraud Mohammad Al-Saleh.

160.    Millions of dollars of the U.S. Department of Defense funds obtained by fraud were laundered through Comerica, including, but not limited to, millions of dollars paid to Worldspan in Canada towards the construction of a 144-foot Superyacht for Sargeant III.[25]

---

[25] On February 28, 2008 Sargeant III entered into a contract with a Canadian boat builder Worldspan to construct a 144' Superyacht.  At this time Sargeant III had been defrauding Mohammad Al-Saleh for years on the IOTC Jordan defense contract and Comerica had been laundering funds obtained by the fraud against Mohammad Al - Saleh for Sargeant. 42 days later Mohammad Al-Saleh sued Sargeant III for fraud related to the IOTC Jordan contract (the Florida jury entered a 6 count fraud judgement against Harry Sargeant III on July 27, 2011 for 28.8 million). Commencing in early 2009 Comerica laundered proceeds of fraud from IOTC Bahamas, transferring these funds to Worldspan for the construction of the 144' Superyacht. Comerica and Sargeant III concealed the Mohammad Al-Saleh fraud lawsuit in 2009 when they sought and obtained the consent of Barnett, the principal of Worldspan to have Sargeant III assign his security and construction contract to Comerica for the purpose a defeating claims by Mohammad Al-Saleh against Sargeant III and for the secret purpose of making a credit bid on the 144' Superyacht in the future.

44

161.     Millions of dollars of funds obtained by fraud were laundered through Comerica from IOTC Bahamas. These laundered funds included, but were not limited to, $11,064,525.38 that was paid to Worldspan for the construction of the Superyacht.

162.     These laundered funds also included funds paid to Comerica for loan payments for the loan Comerica advanced to Sargeant III towards the construction of the 144 Superyacht. Comerica laundered funds obtained by fraud for their own benefit and for the fraudulent purposes of Sargeant III.  These funds came from an offshore company with no business operations, no employees and from a company that was used as a vehicle of fraud against Al-Saleh, Worldspan and all the other entities referred to herein.

163.     Comerica then co-mingled their own funds with the funds they had laundered for Sargeant III by having Sargeant III assign his superyacht security and construction contract to Comerica. This was done to defraud Al-Saleh and others who were seeking recovery of the millions of dollars that Sargeant III had defrauded from them on various frauds, including, but not limited to, the IOTC Jordan contract and for the purpose of defrauding the Plaintiffs and others by way of a secret and fraudulent scheme for Sargeant III to obtain the Superyacht by fraudulent credit bid in the future.

### *IOTC Bahamas and Other IOTC Entities Created for Sole Purpose of Diverting Income Generated from IOTC USA as Contracting Party for Services Actually Rendered by IOTC Jordan*

#### International Oil Trade Center ("IOTC Jordan")

164.     International Oil Trade Center ("IOTC Jordan") was restructured in January 2004 to change the corporate ownership so that Al-Saleh, Sargeant III and Mustafa Abu-Naba'a each owned one-third of its capital share.

165.    In 2004, IOTC Jordan submitted bids to Defense Logistics Agency formerly known as the Defense Energy Support Center for a contract for the transportation of oil to Iraq through Jordan. IOTC Jordan was awarded the contract because of Al-Saleh's essential role in securing a Letter of Authorization from the Jordanian Government. Al-Saleh, Sargeant III and Abu-Naba'a equally were to share equally in the profits generated by the contracts between IOTC Jordan and the Defense Energy Support Center.

166.    Subsequently, Sargeant III and Abu-Naba'a, without Al-Saleh's knowledge, formed International Oil Trading, LLC ("IOTC USA") in early 2005.   Sargeant III and Abu-Naba'a became joint owners of IOTC USA – each had a half-interest membership interest in IOTC USA.  Later on, International Oil Trading Company, Ltd. ("IOTC Bahamas") formerly known as International Oil Trading FZCO ("IOTC Dubai") became the sole member of IOTC USA as set forth below.

<u>International Oil Trading Company, LLC ("IOTC USA")</u>

167.    IOTC Bahamas is the sole member of a Florida Limited Liability Company International Oil Trading Company, LLC, known as IOTC USA, that generated hundreds of millions of dollars in profits from the contracts with the U.S. Department of Defense. The proceeds were ultimately paid to IOTC Bahamas.

168.    Unbeknownst to Al-Saleh, IOTC USA replaced IOTC Jordan as the contracting party in the contract awarded by DESC to IOTC Jordan.  In addition, IOTC USA subsequently bid for and obtained additional contracts with the Defense Energy Support Center.

169.    IOTC USA's contracts with Defense Energy Support Center were in fact serviced by IOTC Jordan pursuant to a services contract entered into between IOTC Jordan and IOTC Dubai acting for IOTC USA as set forth in this Complaint.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

170.    IOTC USA then diverted all Defense Energy Support Center contract proceeds and profits away from IOTC Jordan to other IOTC entities, including IOTC Bahamas, formerly known as IOTC Dubai. This was done to defraud Al-Saleh who was fraudulently deprived of his share of the profits as a result of the conspiracy employed by Sargeant III and Abu-Naba'a.

171.    As described in this Complaint, IOTC Jordan entered into a services agreement with IOTC Dubai acting on behalf of IOTC USA in order that IOTC USA could perform the contracts that it entered in with Defense Energy Support Center by using IOTC Jordan's licenses, permits and capabilities.    This resulted in IOTC USA being the contracting party in the contracts with Defense Energy Support Center, when actual performance of the contracts was undertaken by IOTC Jordan.

172.    The only revenue that IOTC Jordan received consisted of payments made by IOTC Dubai under the services agreement.  These payments only covered the costs of IOTC Jordan's operations.  The remainder of the revenues, meaning the profits under the Defense Energy Support Center contracts, were laundered to IOTC Bahamas[26] formerly known as IOTC Dubai through a credit facility extended by ABN AMRO Bank N.V. as further alleged below.  The ABN AMRO Bank N.V. was used to collateralize the receivables to prevent them from being attached, utilizing one of Sargeant III's common artifices, that being collateralization of assets that Sargeant III wished to fraudulently protect from attachment by his victims.

173.    IOTC Jordan performed on the Defense Energy Support Center contracts; however, the profits were fraudulently stripped out of that entity, leaving in place a service company whose

---

[26] IOTC Bahamas paid the Plaintiff Worldspan $11,064,525.38. IOTC Bahamas paid Deborah Sargeant $9,387,398.67 (she was sued for fraud by the U.S. Chapter 7 Trustee as a result of these payments). IOTC Bahamas, with its predecessor corporation, laundered $180,350,558.05. Comerica not only laundered $11,064,525.38 to the Plaintiff Worldspan, it laundered $9,387,398.67 to Deborah Sargeant and then Comerica co-mingled $9,387,398.67 of its own funds as part of the Superyacht Credit Bid Fraud and Conspiracy.

revenues matched, dollar-for-dollar, its expenses incurred in servicing IOTC USA and other IOTC's business.

174.     In furtherance of their fraudulent conspiracy to defraud Al-Saleh, Sargeant III and Abu-Naba'a created other IOTC entities for the purpose of further isolating Al-Saleh and to prevent Al-Saleh from obtaining his share of the profits generated by IOTC USA from its contracts with the Defense Energy Support Center.

175.     On May 12, 2005, Sargeant III and Abu-Naba'a formed IOTC Dubai, a corporation organized under the laws of the United Arab Emirates.  On May 17, 2005, Sargeant III and Abu-Naba'a transferred their membership interests in IOTC USA to IOTC Dubai, and IOTC Dubai became the owner of 100% of the membership interest in IOTC USA.  IOTC Dubai was subsequently re-domiciled in the Commonwealth of the Bahamas as IOTC Bahamas on March 5, 2008.

        IOTC Dubai / IOTC Bahamas, the alter ego of IOTC USA ("IOTC Bahamas")

176.     IOTC Bahamas is the alter ego of its wholly-owned subsidiary, IOTC USA.  IOTC Bahamas was and is under the joint ownership and control of Sargeant III and Abu-Naba'a (each owning a half-interest in IOTC Bahamas).  IOTC Bahamas and its predecessor IOTC Dubai were formed by Sargeant III and Abu-Naba'a to defraud Al-Saleh by diverting the profits generated by IOTC USA from contracts with the Defense Energy Support Center.

177.     IOTC USA was jointly owned by Sargeant III and Abu-Naba'a (each owning a half interest in IOTC USA) until such time where their membership interests in IOTC USA were transferred to IOTC Bahamas in order to thwart the enforcement of Al-Saleh's $28.8 million-dollar fraud judgment and to defraud other creditors.

178.     IOTC USA does not create or maintain financial statements, all of IOTC USA's revenues, costs and expenses were and continue to be paid to IOTC Bahamas, formerly known as

48

IOTC Dubai.  This is reflected in the financial statements of IOTC Bahamas, formerly known as IOTC Dubai.

179.    IOTC Bahamas and its predecessor, IOTC Dubai, were exclusively created for the purpose of diverting the profits generated by IOTC USA from its contracts with the Defense Energy Support Center.

180.    IOTC Bahamas does not have any current or past legitimate business activity other than being utilized as:

a) A means of fraudulently paying, with the proceeds of fraud and for no proper consideration, Deborah Sargeant $9,387,398.67;

b) A means of paying law firms, with the proceeds of fraud, funds for legal fees to litigate against victims of Sargeant III's frauds and to litigate against the Plaintiffs. These payments were made to lawyers in Florida, Texas and other States, Canada, England, Jordan and other countries;

c) A means of paying Comerica, among other things, fees, interest payments and loan payments, including but not limited to, paying Comerica over 4.4 million dollars on the loan that Comerica advanced to Sargeant III for payment to Worldspan towards the construction of the Superyacht[27];

d) A vehicle of fraud against various creditors and victims;

e) The vehicle for the diversion of the profits generated by IOTC USA;

f) The means to pay for Sargeant III and Abu-Naba'a's lavish lifestyles;

g) The means to launder $11,064,525.38 to the Plaintiff corporation, Worldspan, for the construction of the Superyacht. Sargeant III swore an affidavit wherein he stated that the $11,064,525.38 was paid to Worldspan from IOTC Bahamas;

h) The means to defraud ABN AMRO Bank N.V.;

i) The means to defraud Supreme Fuels FZE;

---

[27] This was the loan made pursuant to the August 14, 2009 Assignment of Sargeant III's interest in the Superyacht to Comerica. Comerica comingled $9,387,398.67 of Comerica's funds with the $11,064,525.38 Comerica laundered from IOTC Bahamas into the Superyacht.

49

j) The means to make property beneficially owned by Sargeant III in Florida judgment proof and exempt from execution by creditors and victims of Sargeant III.[28]

<u>IOTC Bahamas / The alter ego of Sargeant III</u>

181.   IOTC Bahamas is the alter ego of Sargeant III.

182.   IOTC Bahamas was and is, at all times, controlled, dominated and operated by Sargeant III as his alter ego. The activities and business of IOTC Bahamas were carried out without holding of Directors or Shareholder meetings, without any corporate records or records of minutes, or records of corporate proceedings.

183.   Sargeant III entered into the fraudulent transactions referred to in this Complaint with IOTC Bahamas without the approval of other directors and shareholders, with the exception of Mustafa Abu-Naba'a, who was also a judgment debtor as a result of the $28.8 million-dollar fraud judgment against Sargeant III, Abu-Naba'a et al.

184.   Sargeant III and Abu-Naba'a are 50/50 shareholders of the corporate stock of IOTC Bahamas.

185.   The unity of interest between Sargeant III and Abu-Naba'a and IOTC Bahamas is such that there is no individuality or separateness between IOTC Bahamas and Sargeant III and Abu-Naba'a.

---

[28] As part of the scheme that utilizes IOTC Bahamas for a litany of fraudulent purposes (Comerica was and is IOTC Bahamas banker, and has laundered millions and millions of dollars for IOTC Bahamas) IOTC Bahamas became the sole member of two Florida limited liability companies, 400 S. Ocean #9, LLC and 400 S. Ocean Cabana #7, LLC, that own a condominium and a boat slip in Boca Raton, Florida. Both the condominium and boat slip are beneficially owned and utilized solely by Sargeant III.  Sargeant III previously owned in whole or in part, the membership interests of these Florida limited liability companies. This luxurious and expensive property of Sargeant III was made judgment proof by utilizing IOTC Bahamas.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

186.    Sargeant III and Abu-Naba'a used and continue to use the assets of IOTC Bahamas for their personal use and caused and continue to cause assets of IOTC Bahamas to be transferred to them and to others, including, but not limited to Deborah Sargeant, for their benefit, without adequate consideration.

187.    Sargeant III and Abu-Naba'a have withdrawn and continue to withdraw funds from IOTC Bahamas' bank accounts for their own personal use.

188.    Sargeant III and/or Abu-Naba'a are the only authorized signatories on IOTC Bahamas' bank accounts.

<u>International Oil Trading Company B.V. ("IOTC Netherlands")</u>

189.    On September 14, 2006, Sargeant III and Abu-Naba'a created International Oil Trading, B.V ("IOTC Netherlands").  A B.V. entity is the functional equivalent of a Florida limited liability company in the Netherlands.

190.    IOTC Bahamas, formerly known as IOTC Dubai is the sole shareholder of IOTC Netherlands.  IOTC USA, IOTC Netherlands and IOTC Dubai and later IOTC Bahamas acted in concert with each other at the direction of Sargeant III and/or Abu-Naba'a to divert the proceeds of the Defense Energy Support Center contracts generated by IOTC USA as a contracting party for services rendered by IOTC Jordan from IOTC USA to IOTC Bahamas formerly known as IOTC Dubai for the ultimate benefit of both Sargeant III and Abu-Naba'a.

191.    The scheme to embezzle and loot IOTC USA involved structuring, layering and the utilization of an intermediary (controlled by Sargeant III), referred to in money laundering terminology as a "cut-out", that being IOTC Netherlands. This was done by having IOTC USA pledge

51

the receivables generated for its purported services under the Defense Energy Support Center contracts to ABN AMRO Bank N.V.[29]

192.    The receivables were pledged as collateral for a credit facility issued by ABN AMRO Bank N.V. in the Netherlands to IOTC Netherlands.  IOTC Netherlands was the nominal beneficiary of the credit facility which was only created because ABN AMRO Bank N.V. required that the borrower be incorporated under the laws of the Netherlands.  As a result of this structure, IOTC Dubai first and later IOTC Bahamas were the ultimate beneficiaries of the proceeds generated from the Defense Energy Support Center contracts by IOTC USA.

193.    This elaborate layered structure was for the purpose of defrauding Sargeant III's victims, including, but not limited to, Al-Saleh.

194.    The use of these corporate vehicles also served the purpose of secreting the assets of IOTC USA, Sargeant III and Abu-Naba'a by placing them into these offshore entities.

### The April 10, 2008 Al-Saleh Fraud Complaint Against Sargeant III et al / The July 28, 2011 $28.8 Million Fraud Judgment Against Sargeant III et al

195.    Unbeknownst to the Plaintiffs, but known to Comerica, was that Al-Saleh had filed a Complaint on April 10, 2008 in Florida State Court for fraud against Sargeant III and the International Oil Trading Company, LLC (IOTC USA), et al. *See* **Exhibit 9**, *Al-Saleh v. Sargeant III,* Complaint filed on April 10, 2008 in the Florida State Court.

196.    Unbeknownst to the Plaintiffs, at the time of the August 14, 2009 Assignment, Comerica had been laundering huge transactions (acting as the bagman for Sargeant III, moving many

---

[29]Sargeant III, using his common artifice of collateralization (used in, but not limited to, the assignment in the BTB Credit Bid Fraud, the assignment in the Superyacht Credit Bid Fraud and Conspiracy, the assignment to his lawyers of Sargeant III's interest in the Superyacht appraisal fee), charged the receivables in favor of ABN AMRO Bank N.V. so as to fraudulently exempt these receivables from seizure by victims of his frauds, including, but not limited to Al-Saleh.

millions of dollars from Sargeant III controlled corporations that had no employees, no business operations, no corporate records, no shareholders meetings and were in offshore jurisdictions that do not enforce anti-money laundering laws) from offshore corporations that were the repositories of the funds defrauded from Al-Saleh.

197.   Commencing immediately after the August 14, 2009 Assignment, Comerica began paying Worldspan towards the construction of the 144' Superyacht with the proceeds of a Comerica loan to Sargeant III, co-mingling Comerica's loan proceeds in the amount $9,387,398.67 with the $11,064,525.38 that Comerica had laundered from IOTC Bahamas into the Superyacht.

198.   Comerica (with full knowledge of the Al-Saleh fraud lawsuit against Sargeant III), conspired with Sargeant III to deliberately co-mingle $9,387,398.67 of its own funds (Comerica loan funds) into the 144 Superyacht with the amount of $11,064,525.38 which Comerica had laundered into the Superyacht for Sargeant III from his IOTC Bahamas Comerica account ending in #8666.  *See* **Exhibit 11**, Affidavit of Sargeant III sworn October 12, 2011; **Exhibit 12**, Affidavit of Cynthia Jones sworn October 12, 2011.

199.   On July 27, 2011 a jury returned a verdict in favor of Al-Saleh the amount of $28.8 million dollars finding against Sargeant III, IOTC USA and Mustafa Abu-Naba'a in *Al-Saleh v. Sargeant III*.  *See* **Exhibit 13**, $28.8 million-dollar Jury Verdict in *Al-Saleh v. Sargeant III*.

200.   After Al-Saleh expended millions of dollars attempting to collect on his $28.8 million-dollar fraud judgment, Al-Saleh obtained an injunction against the proceeds of sale of the Corpus Christi, Texas refinery.

201.    In *Sargeant III, (Appellant) et al., v. Al-Saleh (Appellee)*,[30] the Court of Appeal found BTB was a Florida limited liability company but was converted to a Texas limited liability company on June 25, 2011, two days before entry of the $28,800,000.00 Al-Saleh fraud judgement against Sargeant III.  *See* **Exhibit 14**, Texas Appellate Court Opinion pronounced January 28, 2016.  This further underline the myriad fraudulent steps undertaken by Sargeant III and his co-conspirators and continuing pattern of fraud that spans from 2004 to present.

202.    The Texas Appellate Court found that Al-Saleh had presented evidence from which the trial court may have concluded that BTB's assets were related to the subject of the Florida State Court $28.8 million-dollar fraud judgment, specifically that Al-Saleh's affidavit affirmatively links BTB's assets, including the promissory note with Sargeant Marine to the funds at issue in the $28.8 million-dollar Florida fraud judgment against Sargeant. Al-Saleh also sought recovery of the same funds, claiming against Worldspan, seeking the disgorgement of the funds Comerica laundered from IOTC Bahamas to Worldspan through Comerica Florida account ending in #8666.

203.    After Al-Saleh obtained a Florida State Court $28.8 million-dollar fraud judgment against Sargeant III et al on July 27, 2011, Al-Saleh incurred legal fees and costs of $12 million dollars attempting to collect the $28.8 million-dollar fraud judgment.

204.    Comerica was aware of the $28.8 million-dollar fraud judgment and actively participated in a conspiracy with Sargeant III to launder millions of dollars, with enormous payments to, among other things, Sargeant III and Deborah Sargeant, alter ego corporations and proxies, and individuals that Sargeant paid to participate in his conspiracies. The Comerica bank account

---

[30] Harry Sargeant III, and BTB Refining LLC (Appellants) v. Mohammad Anwar Farid Al-Saleh (Appellee), State of Texas Court of Appeals, Thirteenth District of Texas Corpus Christi-Edinburg, Case Nos: 13-15-00327-CV and 13-15-0395-CV.

statements are glaring and blatant in that they demonstrate, with no doubt, that Sargeant III and Deborah Sargeant laundered millions and millions of dollars.

205.    As a result of Sargeant III flaunting the Florida Court order to pay Al-Saleh 28.8 million, the fraud judgment accrued to over 36 million dollars with interest.   Some of the extraordinary steps that Al-Saleh took in attempting to collect his fraud judgment included obtaining a Break Order and Order Authorizing and Directing the Palm Beach County Sheriff's Department to Levy on certain property of Sargeant III's located in the mansion resided in by Sargeant III and Deborah Sargeant (the "Break Order").   *See* **Exhibit 15**, Florida State Court Break Order dated August 29, 2013.

206.    The Break Order authorized the Sheriff to break into Sargeant III's 19,000 square foot mansion and retrieve certain, limited, property of Sargeant III in an attempt to satisfy the $28.8 million-dollar fraud judgment that Sargeant III refused to pay.   Daniel Sargeant, Sargeant III's brother and ex business partner, was so outraged by Sargeant III's fraudulent enterprises that he provided an affidavit against his own brother. Daniel Sargeant provided an affidavit to Al-Saleh to assist Al-Saleh in executing his Break Order against the residence of Deborah and Sargeant III.   The Break Order was executed and property was seized from Sargeant III's mansion, this resulted in a very small recovery.   *See* **Exhibit 16**, Declaration of Daniel Sargeant, in support of Break Order, filed in Al-Saleh Florida State Court action.

207.    Al-Saleh engaged private investigators in various countries in an attempt to locate assets that he could seize.   During this entire time frame and continuing to present, Sargeant III and Deborah Sargeant, have lived an extraordinarily ostentatious, luxurious and lavish lifestyle while Al-Saleh and other creditors, including the Plaintiffs, were unable to recover anything from Sargeant III.

***The October 21, 2008 Supreme Fuels Fraud / RICO Complaint against Sargeant III, IOTC / The May 6, 2011 Supreme Fuels $5 Million Fraud Judgment against Sargeant III, IOTC***

208.     On October 21, 2008 Supreme Fuels filed a Complaint in United States District Court Southern District of Florida, Miami Division bringing fraud and RICO claims against Sargeant III, Insertional Oil Trading Company, LLC and International Oil Trade Center, et al. *See* **Exhibit 17**, Supreme Fuels FZE, Complaint filed in United States District Court, Southern District of Florida on October 21, 2008.

209.     On May 6, 2011 Supreme Fuels obtained judgment in the amount of $5 million. Supreme Fuels FZE was unsuccessful in their efforts to collect on their multi-million-dollar fraud judgment. *See* **Exhibit 18**, Supreme Fuels FZE, Judgment in United States District Court, Southern District of Florida filed on June 20, 2011.

210.     Comerica had full knowledge of the Supreme Fuels RICO complaint and fraudulently failed to disclose this information to the Plaintiff. As referred to herein, Supreme Fuels FZE claimed against the Superyacht titled in the name of Worldspan.

***Sargeant III's Fraudulent Assignments***

211.     During the years that Al-Saleh searched for Sargeant III's assets and litigated against Sargeant III in Proceedings Supplementary in Florida, Comerica acted as a co-conspirator to Sargeant, by laundering the proceeds of fraud and becoming an active co-conspirator by way of transferring Sargeant III's asset, his security interest in the Superyacht, to Comerica and then allowing Sargeant III to make claims against the Superyacht, acting as Comerica's agent, when the August 14, 2009 Assignment contract stipulated that only Comerica could make claims against the Superyacht.

212.     Sargeant III paid for an appraisal to determine the cost of completion and was to be repaid this amount from the sale proceeds of the Superyacht. The amount was 144,766.56 CDN plus

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

interest. Al-Saleh attempted to claim this amount, however Sargeant assigned III the amount to his lawyers, thereby precluding Al-Saleh from attaching these funds.

213.    This is yet another example of Sargeant III utilizing one of his commonly used artifices to defeat the claims of victims. Sargeant III utilized assignments in many instances, including but not limited to the following instances:

a)  The assignment of the debt against the Corpus Christi oil refinery, as part of the massive BTB Credit Bid Fraud, that The United States District Court for the Southern District of Texas Corpus Christi Division found was fraudulent;

b)  The assignment of Sargeant III's security interest in the Superyacht to Comerica as a fundamental step in the Superyacht Credit Bid Fraud and Conspiracy;

c)  The assignment of Sargeant III's interest in the Superyacht construction contract as one of the steps he undertook to facilitate the Superyacht Credit Bid Fraud and Conspiracy;

d)  The assignment of the IOTC USA's receivables due from the United States Department of Defense to ABN AMRO Bank N.V. to, among other things, facilitate the fraud against Al-Saleh on the $2.1 billion-dollar U.S. Department of Defense contract;

e)  The assignment of the repayment of the appraisal charge relating to quantifying the completion costs of the Superyacht, said charge repaid from the sale proceeds of the Superyacht, said charge in the amount of $144,766.56 CDN, assigned from Sargeant III to his lawyers. *See* **Exhibit 19**, Assignment from Sargeant IIII to Bull Housser & Tupper, LLC dated July 9, 2014.

### *Sargeant III Litigation Regarding HS3 Videos & Still Photographs*

214.    On September 25, 2017, Sargeant III filed his original complaint in Harry *Sargeant III v. Maroil Trading, Inc., Sea Pioneer Shipping Corporation, Wilmer Ruperti Pedromo, Daniel Sargeant, Daniel Hall and Andrew Preston (Defendants) and Latin American Investments, Ltd. (Intervenor),* In the United States District Court for the Southern District of Florida, Case No.: 9:17-cv-81070-BLOOM/Hopkins ("S*argeant III v. Maroil Trading, Inc").* This complaint contained claims against Maroil Trading, Inc., Sea Pioneer Shipping Corporation, and Wilmer Ruperti Pedromo (the "Ruperti Parties")

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

215.     The claims in S*argeant III v. Maroil Trading, Inc* were related to a contract for shipping and were based on fraud, misrepresentation and unjust enrichment.

216.     The claims all sounded in alleged fraud, misrepresentation, and unjust enrichment related to a shipping contract.

217.     Latin American Investments, Ltd., ("LAIL"), a company controlled by Daniel Sargeant, Sargeant III's brother, intervened in the action. Sargeant III had an interest in LAIL at one time; however, as a result of Sargeant III's fraud and embezzlement against the Sargeant family businesses, the Sargeant family businesses severed all ties with Sargeant III, including all ties he had with LAIL.

218.     Sargeant III then filed an amended complaint with the same claims against the Ruperti Parties, with a new cause of action against LAIL for alleged breach of a non-disparagement provision in a bankruptcy settlement agreement. The bankruptcy settlement agreement was related to the settlement of fraud claims against Sargeant III by his brother, Daniel Sargeant, and others.

219.     The Ruperti Parties settled with Sargeant III in January 2018, meaning that, as it related to the causes of action in the amended complaint, there was no remaining dispute for the court to resolve other than the breach of the settlement agreement claim against LAIL. The Court granted LAIL's motion to dismiss on January 19, 2018. The Court gave Sargeant III leave to amend his complaint, which resulted in Sargeant III's second amended complaint.

220.     In Sargeant III's second amended complaint, Sargeant III alleged, among other things, that videos and still photographs that were located on the Sargeant family business computer server located in Boca Raton, Florida were traded for information that was used to have a $30 million-dollar settlement payment made to LAIL.

221.    The videos and still photographs are of Sargeant III and his mistress, Samantha Zapoleon, wherein Sargeant III demonstrates adulation for and emulation of one of the most evil groups of people in the history of humankind (the "HS3 Videos & Still Photographs").

222.    In Sargeant III's second amended complaint, Sargeant III named as defendants *Maroil Trading, Inc., Sea Pioneer Shipping Corporation, Wilmer Ruperti Pedromo, Daniel Sargeant, Daniel Hall and Andrew Preston (Defendants) and Latin American Investments, Ltd. (Intervenor).*

223.    Daniel Hall is a Director and co-head of Burford Capital's global corporate intelligence, asset tracing and enforcement business.  Burford Capital is a litigation funding company that funded the collection efforts of Al-Saleh. Burford Capital paid $12 million dollars towards the collection efforts of Al-Saleh, these funds were paid after the Florida Court issued a $28.8 million-dollar fraud judgment against Sargeant III et al.

224.    Burford Capital funded the lawyers who claimed against the Plaintiffs in this Complaint for the disgorgement of $11,064,525.38, the amount that Sargeant III laundered through IOTC Bahamas (using Comerica bank accounts in Florida).  Al-Saleh sought the return of the $11,064,525.38 paid to Worldspan, claiming that these funds were the proceeds of Sargeant III's fraud against him.

225.    In Sargeant III's second amended complaint, he pled that Daniel Hall (Director at Burford Capital) obtained the HS3 Videos & Still Photographs for the purpose of having Sargeant III pay Al-Saleh the amount due pursuant to the Florida Court $28.8 million-dollar fraud judgment against Sargeant (which became over $35 million dollars as a result of post-judgment interest).

226.    After Comerica failed to pay Worldspan $4.9 million dollars, and after Sargeant III failed to pay Al-Saleh what became, with post judgment interest, over 35 million dollars, and after Al-Saleh claimed against Worldspan, Sargeant III claimed against, among others, Daniel Hall at

Burford Capital, claiming that the HS3 Videos & Still Photographs were obtained by Burford Capital for the purpose of having Burford Capital's client, Al-Saleh being paid on his $28.8 million-dollar fraud judgment.

227.    Sargeant III claimed for the payment to LAIL of 30 million dollars was paid as a result of material that was provided to Daniel Sargeant in exchange for the HS3 Videos & Still Photographs

228.    Sargeant III had previously brought a claim seeking to have the client solicitor privilege between Al-Saleh and Burford Capital waived.  This resulted in more litigation and costs for Al-Saleh.  Sargeant III's claim for privilege waiver was unsuccessful.

229.    Sargeant III also brought numerous claims against his brother, Daniel Sargeant, alleging that his brother had violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §1030; the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 *et seq.*; Florida's Computer Abuse and Data Recovery Act ("CADRA"), Fla. Stat. § 668.801 *et seq.*, based on the assertion that Daniel Sargeant hacked his own computer, which one cannot do.  Sargeant III also advanced claims under Florida law for breach of contract, invasion of privacy and civil conspiracy.   *See* **Exhibit 20**, *Sargeant III v. Maroil Trading, Inc.*, Second Amended Complaint dated February 20, 2018.

230.    Daniel Sargeant responded to the second amended complaint by stating that the computer server that contained the HS3 Videos & Still Photographs was owned by and located on the premises of the Sargeant family business and that he had the right to access any and all materials located on the Sargeant family business server.

231.    This litigation underlines the egregious, abusive and punitive nature of Sargeant III's litigation, wherein he litigated against not only Al-Saleh, whom he defrauded, (and then cost Al-Saleh $12 million dollars to collect on his judgment), but against Al-Saleh's litigation funding company (litigating against privilege and then against a Director of Burford Capital), his brother and family

and others.  Sargeant III even claimed that he was entitled to the entire $30 million dollars that was paid to LAIL, a Sargeant family company that he had no further interest in.  Sargeant III's relationship with LAIL, along with all Sargeant family businesses, had been severed as a result of Sargeant III's fraud and embezzlement of the Sargeant family businesses.

232.    Sargeant III litigated against a director of the company (Burford Capital) that funded Al-Saleh's Proceedings Supplementary, wherein it cost Al-Saleh $12 million dollars to collect on his $28.8 million-dollar fraud judgment against Sargeant III.  During the time period that Al-Saleh spent $12 million dollars, Comerica, on a regular and ongoing basis, laundered millions and millions of dollars, working with Sargeant III so as to make it impossible for Al-Saleh to be paid by attaching the funds that Comerica laundered for Sargeant III.

233.    As a result of Comerica and Sargeant III's activities, Al-Saleh spent a high six figure amount on solicitors claiming against the Superyacht and against Worldspan for the disgorgement of $11,064,525.38, a significant portion of which Comerica had laundered a from IOTC Bahamas and paid to Worldspan. Subsequent to costing Al-Saleh 12 million dollars to collect on his judgment, Sargeant III sued a director of the company that funded the $12 million-dollar collection effort. Comerica was fundamental to and essential to the conspiracy that resulted in Al-Saleh having to spend $12 million dollars to get paid on his $28.8 million-dollar judgment.

### *2009 Comerica Bank Commences Money Laundering*

234.    In 2009, or earlier, Deborah Sargeant and Sargeant III controlled corporations began their banking relationship.  From the beginning Comerica undertook money laundering transactions from Sargeant III alter ego corporations with no business operations and no employees, and which were located in offshore jurisdictions that do not enforce anti money laundering laws.  Comerica continued and continues this pattern of predicate acts until present, undertaking hundreds of

transactions, many for very large sums of money and many with blatantly obvious hallmarks of money laundering

235. Comerica aided and abetted in Sargeant III's frauds by acting as one of the two masterminds (Sargeant III and Comerica were the two masterminds) and as the bagman, transferring funds in a manner such that they could not be attached by creditors and victims that Sargeant III had defrauded.

***The July 2009 Delray Beach Fraudulent Inducement Meeting with Comerica VP and Sargeant III / The August 14, 2009 Assignment***

236. At the time of the July 2009 Delray beach meeting, Worldspan had been, since February 2008, constructing a 144' luxury superyacht for Sargeant III, based on a contract between Sargeant III and Worldspan to construct the Superyacht.

237. From the commencement of the construction in February 2008, until July of 2009, Sargeant III had been paying Worldspan towards the construction of the Superyacht, paying in total, $11,064,525.38.

238. Sargeant had been defrauding Al-Saleh on the 2.1 billion IOTC Jordan contract with the US Department of Defense since 2005. Sargeant had created corporations with names almost identical to IOTC Jordan and had directed the US Department of Defense to pay the contract funds to the alter ego corporations that were very similar in name to the original contracting corporation, IOTC Jordan.

239. Unbeknownst to Worldspan, the payments for the construction Worldspan received for working on the Superyacht were laundered by Comerica from IOTC Bahamas, these funds were the proceeds of fraud against Al-Saleh.

240.    IOTC USA, a corporation used as a vehicle of fraud against Al-Saleh, along with Sargeant III, et al had been sued by Al-Saleh for fraud on April 10, 2008, forty-one days after executing the Vessel Construction Agreement.

241.    A RICO Complaint had also been brought against Sargeant et al by Supreme Fuels.

242.    Faced with this fraud lawsuit and the RICO lawsuit,[31] Sargeant and Comerica had been laundering millions of dollars through IOTC Bahamas. Comerica's money laundering transactions included the payments made to Worldspan from IOTC Bahamas, as well as millions of dollars of money laundering transactions undertaken by Comerica with the money laundering funds being paid to Sargeant III personally, Deborah Sargeant, and various other persons and entities – all without proper consideration and with Comerica acting in a conspiracy to prevent victims of Sargeant III's fraud from attaching the proceeds of fraud and, in the case of the Plaintiffs from attaching Sargeant III's interest in the Superyacht.

243.    Sargeant III and Comerica undertook the next step in the conspiracy wherein Comerica graduated from being a bank undertaking millions of dollars in money laundering transactions, aiding and abetting fraud, to being one of the two active masterminds of a RICO conspiracy against the Plaintiffs, Al-Saleh, and victims in the United States and throughout the world.

244.    In July of 2009 Comerica representatives and Sargeant III advised Steve Barnett that they wanted to meet to discuss arranging a Comerica construction loan for the completion of the 144-foot Superyacht.  Steve Barnett was advised that Comerica wished to grant a loan to Sargeant III in order to generate loan funds to be paid to Worldspan for the completion of the Superyacht.

---

[31] Sargeant had no meaningful defense to the Al-Saleh fraud lawsuit, or the Supreme Fuels RICO lawsuit, both of these lawsuits resulted in fraud judgments against Sargeant. The Al-Saleh fraud complaint resulted in a 28.8 million dollar judgment against Sargeant, et al. The Supreme Fuels RICO resulted in a 5 million dollar fraud judgment against Sargeant *et al.*

245.     Sargeant III and Florida Comerica executive, Shaw, arranged to meet Steve Barnett, the principal of the Plaintiffs corporations, at a restaurant[32] in Delray Beach so as to obtain his consent to assign the superyacht security and construction contract from Sargeant III to Comerica (the "Delray Beach Comerica Meeting").

246.     During the Delray Beach Comerica Meeting, Shaw, of Comerica, in the presence of Sargeant III, made representations, fraudulent statements and fraudulent omissions to Steven Barnett, as referred to herein.

247.     During the Delray Beach Comerica Meeting, Shaw stated to Steve Barnett that he would like to continue the meeting with Sargeant III in private after the three individuals discussed the assignment of the Superyacht contract and security to the Comerica Bank.

248.     During the Delray Beach Comerica Meeting, Shaw stated to Steve Barnett that he and Sargeant III needed to discuss a litigation matter in private that did not concern Worldspan.

249.     During the Delray Beach Comerica Meeting, Shaw fraudulently misrepresented to Steve Barnett that the litigation matter he would be discussing with Sargeant III that involved Sargeant III was of no importance to him or Worldspan, would not have any effect on Worldspan and that he need not concern himself with the litigation against Sargeant III.[33]

---

[32] The restaurant in Delray Beach that the Delray Beach Comerica Meeting took place was the Tramonti Ristorante Italiano, located at 119 E Atlantic Avenue, Delray Beach, Florida.

[33] This critical fraudulent misrepresentation was made regarding the litigation that was underway against Sargeant III, who, at that time, had defrauded Al-Saleh on a 2.1 billion dollar US Department of Defense contract, had set up myriad alter ego corporations and bank accounts, was laundering millions of dollars through offshore corporations with no employees, no business operations and in jurisdictions that do not enforce anti-money laundering laws. The money laundering included millions of dollars to Sargeant III's wife, Deborah Sargeant, and millions of dollars to Sargeant III and the co-conspirators. The litigation was critically important to Worldspan, as the Plaintiff in the fraud litigation against Sargeant III subsequently claimed against Worldspan seeking the disgorgement of over 11 million dollars that had been defrauded from him by Sargeant III. Comerica acquired Sargeant III's security interest in the Superyacht as part of the Superyacht Credit

250.    During the Delray Beach Comerica Meeting, Shaw fraudulently misrepresented to Steve Barnett that the assignment of Sargeant III's security interest in the Superyacht and construction contract to Comerica was for the purpose of Comerica granting Sargeant III a construction loan.

251.    During the Delray Beach Comerica Meeting, Shaw fraudulently misrepresented to Steve Barnett that the assignment of Sargeant III's interest in the Superyacht and the assignment of Sargeant III's interest in the construction contract for the Superyacht, to Comerica, was a good means of having the Superyacht funded to completion.

252.    During the Delray Beach Comerica Meeting, Shaw fraudulently misrepresented to Steven Barnett that the assignment and the construction loan would be beneficial to Worldspan.

253.    During the Delray Beach Comerica Meeting, Shaw fraudulently concealed that Comerica had been laundering millions of dollars for Sargeant and his wife, Deborah, laundering these funds so that they were protected from creditors by Sargeant and his wife being Tenants by entireties. By December 6, 2012, Sargeant III and his wife, as tenants by entireties, had received $9,681,615.00.

254.    Sargeant III laundered funds through Rafferty Law which were paid to Sargeant III and his wife, tenants by entireties.

255.    Sargeant III laundered a total of $180,350,558.05 by directing the transfer of these funds to bank accounts held by Sargeant III and his wife, tenants by entireties, from IOTC Bahamas and its predecessor, IOTC Dubai.   This was done to put those assets beyond the reach of creditors, including but not limited to Al-Saleh.

---

Bid Fraud and Conspiracy and then Comerica litigated against Al-Saleh, the unpaid trade creditors who worked on the Superyacht, Worldspan and Supreme Fuels.

256.    These payments were for six and seven figure amounts, transfer after transfer, millions of dollars, continuing for years. These payments were made from IOTC Bahamas to Sargeant and his wife, Deborah Sargeant, personally. Deborah Sargeant had not worked for 20 years at the time these payments were made to her.

257.    During the Delray Beach Comerica Meeting fraudulently concealed from Barnett that the company he was the principal of, Worldspan, was the recipient of millions of dollars of funds that had been laundered by Comerica from IOTC Bahamas. These funds which were the proceeds of fraud against Al-Saleh were laundered by Comerica and paid to Worldspan for the construction of the Superyacht.

258.    During the Delray Beach Comerica Meeting, Shaw fraudulently concealed from Barnett the fact that Comerica intended to co-mingle $9,387,398.67 of its own funds (the Comerica Superyacht loan proceeds) with the funds that were the proceeds of fraud against Al-Saleh that Comerica had laundered from IOTC Bahamas and paid to Worldspan for the construction of the Superyacht.

259.    During the Delray Beach Comerica Meeting Shaw fraudulently misrepresented the nature of the Al-Saleh lawsuit against Sargeant III and IOTC USA that was commenced on April 10, 2008. Shaw did this by fraudulently misrepresenting to Steven Barnett that there was litigation involving Sargeant that was not relevant or germane or of any concern to the August 9, 2009 Assignment. Not only was this litigation relevant and germane, Al-Saleh subsequently claimed against Worldspan for the disgorgement of the funds that Comerica had laundered from IOTC Bahamas34 to Worldspan for the construction of the superyacht. Al-Saleh subsequently claimed

---

34 Comerica laundered millions of dollars from IOTC Bahamas, paying these laundered funds from a company with no business operations, no employees, located in a jurisdiction that does not enforce anti-money laundering laws, a company that kept no corporate records and no records of

against Worldspan, claiming that these laundered funds were the proceeds of fraud and should be disgorged by Worldspan.

260.    During the Delray Beach Comerica Meeting, Shaw fraudulently concealed from Steven Barnett the Superyacht Credit Bid Fraud and Conspiracy that was founded on the August 9, 2009 Assignment.  Comerica's purpose at the Delray Beach Comerica Meeting was to induce Steven Barnett to sign the August 9, 2009 Assignment, along with Comerica and Sargeant III.

261.    During the Delray Beach Comerica Meeting, Shaw fraudulently concealed from Barnett the fact that Comerica had laundered millions of dollars for Sargeant through Comerica bank accounts with hundreds of blatantly obvious money laundering transactions that had every hallmark of fraud and money laundering associated with them, in amounts up to half a million dollars at a time.

262.    During the Delray Beach Comerica Meeting Shaw fraudulently concealed from Steve Barnett that Sargeant had no need or requirement for a superyacht construction loan.[35]

263.    During the Delray Beach Comerica Meeting, Shaw concealed from Steve Barnett that the superyacht construction loan / August 9, 2009 Assignment was part of the Superyacht Credit Bid Fraud and Conspiracy to encumber the Superyacht with a charge in favor of Comerica for the purpose of defeating creditor claims and ultimately making a credit bid on the superyacht after the security was transferred from Comerica to a Sargeant controlled corporation.[36]

---

shareholder meetings. These money laundering payments, for many millions of dollars, were made to Sargeant III, Sargeant III's wife, Deborah Sargeant, various individuals, various entities, including, but not limited to, Worldspan.

[35] The Comerica Superyacht loan was for the purpose of Comerica obtaining security against the Superyacht, by assigning Sargeant III's security in the Superyacht to Comerica, for the purpose of defeating creditors and undertaking the Superyacht Credit Bid Fraud and Conspiracy. Sargeant did not need this loan, he had more than adequate resources to fund the Superyacht construction.

[36] This was the same methodology that was used in the BTB Credit Bid that was found by the United States District Court for the Southern District of Texas to be actual fraud.  Shortly after Sargeant began defrauding Al-Saleh on the IOTC fuel contract with the US Department of Defense, Sargeant charged IOTC's receivables in favor of ABN AMRO, a bank in the Netherlands. The IOTC

264.    The August 14, 2009 Assignment, which was the cornerstone of the Superyacht Credit Bid Fraud and Conspiracy, was authored and created exclusively and only by Comerica with the no input or involvement whatsoever from the Plaintiffs.

265.    During the Delray Beach Comerica Meeting Shaw concealed from Steve Barnett that Comerica was the banker for BTB, the entity the United States District Court for the Southern District of Texas, Corpus Christi Division found Sargeant III had used as a vehicle of fraud against PDVSA, utilizing the BTB Credit Bid.  The same credit bid scheme, with the intimate involvement of Comerica Bank and Comerica Employees was planned and conspired by Comerica Bank and Sargeant III against Worldspan.

266.    During the Delray Beach Comerica Meeting Shaw concealed from Steve Barnett that Comerica had been laundering funds for Sargeant, III, his wife, and his associates, aiding and abetting Sargeant's frauds and profiting from their involvement with Sargeant's fraudulent transactions.

267.    Sargeant III, working in concert and in tandem with Shaw at the Delray Beach Comerica Meeting, parroted what Shaw said, making the same fraudulent misrepresentations and the same fraudulent omissions.

268.    Steve Barnett relied on the fraudulent representations and fraudulent omissions at the Delray Beach Comerica Meeting.  Based on the fraudulent representations, and fraudulent omissions, made by Shaw and Sargeant III at the July 2009 Delray Beach Comerica Meeting, Barnett, as a principal of Worldspan agreed to the August 14, 2009 Assignment and Barnett, on behalf of

---

receivables were charged in favor of ABN AMRO as part of the conspiracy to defraud Al-Saleh from his share of the IOTC Jordan contract with the US Department of Defense. Sargeant utilized loans as a means of fraud, by charging assets that creditors would not rank in priority claim against, in the case of the Superyacht Credit Bid Fraud and Conspiracy, the BTB Credit Bid fraud and the loans from ABN AMRO.

Worldspan, signed the August 14, 2009 Assignment. The August 14, 2009 Assignment was also signed by Daniel Sargeant as Attorney-in-Fact for Sargeant III and by Shaw on behalf of Comerica.

269.    Sargeant III and Comerica utilized assignment and collateralization as an essential element in their Superyacht Credit Bid Conspiracy and Fraud.  Sargeant III had also utilized collateralization and a credit bid in the BTB Credit Bid Fraud. In the fraud against Al-Saleh and others (Al-Saleh claimed against Worldspan for funds defrauded by Sargeant III), Sargeant III used, among other things, assignment and collateralization. Sargeant III assigned to ABN AMRO Bank N.V., Rotterdam Branch, The Netherlands, the payments received from the US Department of Defense.

270.    By assigning the receivables from the US Department of Defense to ABN AMRO, payable pursuant to the contract in which Al-Saleh was a 1/3rd partner, Al-Saleh was unable to attach, realize or seize the amounts he was defrauded of by Sargeant III. Sargeant had already created alter ego corporations to divert the proceeds of the fuel contracts with the US Department of Defense so as to defraud Al-Saleh. The Department of Defense contracts generated 1.95 billion dollars, the contract that Al-Saleh and others were defrauded on.

271.    Ultimately, Al-Saleh expended 12 million dollars attempting to collect on his 28.8 million Florida State Court fraud judgment against Sargeant III.  The assignment of the receivables to ABN AMRO was the same methodology as used in the Superyacht Credit Bid Fraud and Conspiracy and the BTB Credit Bid Fraud (collateralization of an asset to avoid seizure).

272.    Subsequent to obtaining a $28.8 million-dollar fraud judgment from the Florida State Court against Sargeant III (which accrued to over $35 million dollars with interest), Al-Saleh obtained an order in the Florida State Court Proceedings Supplementary (the proceedings wherein Al-Saleh litigated in an attempt to collect his judgment) that assigned Sargeant III's interest in the Superyacht to Al-Saleh.  As a result of the Superyacht Credit Bid Fraud and Conspiracy, the Florida Court Order

assigning Sargeant III's interest in the Superyacht to Al-Saleh was of no effect as Sargeant's interest in the Superyacht had been assigned to Comerica as part of the fraud and conspiracy on the part of Sargeant III, Comerica and the other co-conspirators.

273.    Comerica and Sargeant III had taken active steps to defeat Al-Saleh's claims against both the Superyacht and the millions of dollars in cash that Sargeant III was laundering with his wife, Deborah Sargeant, his alter ego corporations and his other co-conspirators.

274.    The assignment of the receivables was security for a $55 million-dollar loan from ABN AMRO.  Once the collateralization served no further purpose, Sargeant III defaulted on the $55 million-dollar ABN AMRO loan.

### *Sargeant III's Death Threat and 2 Million Dollar Extortion of the Principal of Plaintiff Corporations*

275.    On Tuesday, February 15, 2011 at approximately 3:00 p.m., Steve Barnett, the principal of the Plaintiff corporations, met with Sargeant III at Jet Aviation, Palm Beach International Airport (the "Jet Aviation Death Threat & Extortion Meeting"). Jet Aviation is a Fixed Base Operation (FBO), which is a company that provides services for those that have private aircraft, including fueling, a lounge, hangaring, and maintenance.

276.    Jet Aviation in Palm Beach has a lobby / lounge where customers can meet with friends and associates. The lounge area of Jet Aviation has doors on one side that open to the tarmac where the aircraft are located, and doors on the other side that open to the vehicle parking area.

277.    At the Jet Aviation Death Threat & Extortion Meeting, Steve Barnett met with Sargeant III in the lounge area of Jet Aviation. Sargeant III's private jet, a Hawker Jet, was parked on the tarmac outside the Jet Aviation lounge area.

278.     At the Jet Aviation Death Threat & Extortion Meeting, Sargeant III advised Steve Barnett that he was about to depart for Colombia with a number of Colombians who were travelling on his Hawker jet with him.

279.     At the Jet Aviation Death Threat & Extortion Meeting, Steve Barnett and Sargeant III walked from the lobby of Jet Aviation to Sargeant III's Hawker Jet.  Steve Barnett did not enter the Hawker Jet, nor did he climb the stairs; however, Steve Barnett stood beside the Hawker Jet, the passenger door was open and Steve Barnett observed a number of male passengers seated in Sargeant III's Hawker Jet.

280.     At the Jet Aviation Death Threat & Extortion Meeting, Steve Barnett and Sargeant III discussed the construction of the Superyacht by Worldspan.

281.     At the Jet Aviation Death Threat & Extortion Meeting, Sargeant III was angry regarding the construction costs of the Superyacht, which was constructed by Worldspan. Sargeant III waved a piece of paper that he claimed demonstrated that he had been overcharged on the Superyacht. Steve Barnett asked to see the paper and Sargeant III refused to give it him.

282.     At the Jet Aviation Death Threat & Extortion Meeting, Sargeant III took Steve Barnett aside in the Jet Aviation lounge and threatened him face-to-face. Sargeant III told Steve Barnett that he was going to destroy all of the companies Steve Barnett was associated with unless Steve Barnett paid him 2 million dollars within two months.

283.     At the Jet Aviation Death Threat & Extortion Meeting, Sargeant III told Steve Barnett that if he did not pay him 2 million dollars within two months he was going to have him killed. Sargeant III told Steve Barnett that he had people who could execute the contract to kill him.

284.     The Jet Aviation Death Threat & Extortion Meeting ended at approximately 3:30 p.m. Tuesday, February 15, 2011.

285.   Steve Barnett drove away from the Jet Aviation Death Threat & Extortion Meeting. Steve Barnett was so overwhelmed by fear from the death threat and extortion threat that he had to stop driving and pull over to compose himself.

286.   Immediately after the Jet Aviation Death Threat & Extortion Meeting, Steve Barnett advised a senior member of Florida law enforcement of the death threat and extortion threat made by Sargeant III at the Jet Aviation Death Threat & Extortion Meeting. Steven Barnett advised this senior member of Florida law enforcement that if he were to be murdered that it would have been Sargeant III that had him killed.

287.   Immediately after the Jet Aviation Death Threat & Extortion Meeting, Steve Barnett also advised other individuals of the death and extortion threats made by Sargeant III. Steve Barnett also advised his attorney of the death and extortion threat made by Sargeant III at the Jet Aviation Death Threat & Extortion Meeting.

288.   At the Jet Aviation Death Threat & Extortion Meeting Sargeant III stated that he was going to destroy Steve Barnett's Florida corporations. Sargeant III's goal was the destruction of these corporations, with Sargeant specifically articulating his intent to destroy these Florida corporations.

***Damages as a Result of the RICO Conspiracy***

289.   Worldspan was a Canadian superyacht builder located in Maple Ridge, British Columbia, Canada, which is 27 miles east of Vancouver, BC, Canada. Worldspan's premises were located on 9.315 acres of level waterfront that included a 150-foot double sided wharf, a high quality 90,435 square foot purpose-built building (built for the purpose of constructing superyachts), and a waterfront residence. Property taxes were $137,377.65 per year.  Worldspan employed approximately 100 employees, many of them specialized in the construction of Superyachts.

72

290.    As a direct and proximate cause of the Superyacht Credit Bid Fraud and Conspiracy, the Crescent brand was destroyed, along with the Queenship brand and along with Worldspan.

291.    As a direct and proximate cause of the Superyacht Credit Bid Fraud and Conspiracy, among other things, all of the employees permanently lost their jobs, and the 9.315-acre waterfront property with the purpose-built building and waterfront home was lost and Worldspan's business was destroyed.[37]

292.    On February 29, 2008, Sargeant III entered into a contract with Worldspan to construct the Superyacht.[38]

293.    The Superyacht was constructed inside the purpose-built building, and, given the size (144 feet long, plus scaffolding) and height (three stories high plus keel depth, plus scaffolding) of the Superyacht, the Superyacht had such a large footprint that no other yachts could be constructed on the Worldspan premises while the Superyacht was on the premises. This meant no other yacht construction revenue during the time the Superyacht was on Worldspan's premises.

294.    When Worldspan attempted to sell the Superyacht, Comerica and Sargeant opposed and interfered with the sale, their agent Monger illegally interfered with the Superyacht marketing efforts of Fraser Yachts, while Worldspan was saddled, for years, with a 90,435 square foot building,

---

[37] In the conspiracy with Comerica, Sargeant III and Comerica implemented many of Sargeant's fraudulent protocols including obtaining goods and services on credit and not paying creditors (Comerica failed to pay Worldspan $4.9 million dollars and has never paid it) and by the fraudulent credit bid scheme (as used against PDVSA and other creditors). Comerica became an active mastermind of the RICO conspiracy and Comerica undertook the same fraudulent role as Sargeant's alter ego corporation BTB undertook in the BTB Credit Bid Fraud.

[38] On April 10, 2008, forty-one days after entering into the February 29, 2008 contract to construct the Superyacht, Sargeant III et al was sued in Florida State Court for fraud by Al-Saleh. This resulted in a 28.8 million dollar fraud judgment against Sargeant III et al in favor of Al-Saleh. It cost Al-Saleh years of litigation and 12 million dollars in fees to collect part of the judgment.

Law Offices of Rodrigo S. Da Silva, P.A.

with an incomplete, three-story, Superyacht in the building, with no revenue. The City placed a six-figure tax lien on the waterfront property, CSPAN was forced to sell the waterfront property.

295.    After the forced sale of the waterfront property, the new owner charged Worldspan rent for the building that housed the incomplete Superyacht.  Part of the Superyacht Credit Bid Fraud and Conspiracy was to destroy the company and devalue the asset, the Superyacht.

296.    The Superyacht was titled in the name of the builder, Worldspan, who contracted to construct the Superyacht for Sargeant III. The Superyacht was titled in the name of Worldspan so as to comply with Canada Revenue Agency regulations in order to avoid paying Goods and Services Tax ("GST"), with delivery to be made to Sargeant III at the point in time the Superyacht was completed.  Sargeant III had security against the Superyacht and was the original contracting party for the construction of the Superyacht with Worldspan.

297.    On August 14, 2009, both Sargeant III's security in the Superyacht and Sargeant III's contract to construct the Superyacht were assigned to Comerica, as one of the essential and foundational elements of their Superyacht Credit Bid Fraud and Conspiracy. As Sargeant III had assigned his interest in the Superyacht construction contract to Comerica, Comerica became the sole contracting with the yacht builder, Worldspan, and Comerica became the holder of the security on the Superyacht.

298.    Comerica did not charge Sargeant III's interest in the Superyacht construction contract with Worldspan; Comerica took over Sargeant III's position in the Superyacht construction contract by having the contract assigned to Comerica, thereby making Comerica the only contracting party with Worldspan.

299.     Comerica did not lien Sargeant III's security on the Superyacht, (which was and still is titled in the name of Worldspan).[39]   Comerica took Sargeant III's security in the Superyacht by having Sargeant III assign the security in the Superyacht to Comerica.

300.     From February 29, 2008 until August 2009, Sargeant III paid Worldspan $11,064,525.38 towards the construction of the Superyacht.  Comerica laundered these funds through a Florida Comerica bank account number ending in #8666 from the offshore corporation IOTC Bahamas, a corporation with no employees and no business operations located in Bahamas, a jurisdiction that does not enforce anti money laundering laws.  IOTC Bahamas was used as a vehicle of fraud against Al-Saleh and others, millions of dollars were laundered through IOTC Bahamas over a period of years.

301.     As part of the fraud against Al-Saleh and others, Sargeant III laundered over 170 million dollars through IOTC Bahamas and its predecessor IOTC Dubai.

302.     At the July 2009 Delray Beach Comerica Meeting, Comerica fraudulently misrepresented to the Plaintiffs the nature and effect of the fraud lawsuit brought by Sargeant III's business partner, Al-Saleh. Al-Saleh obtained a $28.8 million-dollar fraud judgment against Sargeant III, *et al.* Al-Saleh claimed against Worldspan seeking the disgorgement of the funds that were the proceeds of fraud against Al-Saleh, said funds ($11,064,525.38) laundered by Comerica.

303.     Comerica conspired with Sargeant III in a RICO enterprise to defeat Al-Saleh's claim against Sargeant III's interest in the Superyacht and to defraud Worldspan and others by having Sargent III assign his interest in the Superyacht to Comerica. Comerica then co-mingled

---

[39] The Superyacht was sold by order of the Federal Court of Canada. The Federal Court of Canada ordered that the sale proceeds of the Superyacht had the exact same legal status as did the Superyacht.

$9,387,398.67 of Comerica's own funds[40], (not merely a lien) by paying these funds to Worldspan towards the construction of the Superyacht. Comerica co-mingled the proceeds of fraud, the $11,064,525.38 Comerica had laundered from IOTC Bahamas, with the $9,387,398.67 of Comerica's own funds.

304.    In 2010, construction ceased on the Superyacht.  At the time construction ceased, Comerica, (who was the contracting party with Worldspan as a result of the assignment of the August 14, 2009 of the Superyacht construction agreement), owed Worldspan $4.9 million dollars, which has never been paid. This was part of the conspiracy, in that Comerica and Sargeant conspired and schemed to destroy Worldspan in various ways, including by saddling it with an unpaid amount of $4.9 million dollars, an amount that caused Worldspan to fail.

305.    The two foundational documents of the Superyacht Credit Bid Fraud and Conspiracy were the August 14, 2009 Assignment and the August 14, 2009 Construction Loan Agreement.

306.    The August 14, 2009 Assignment (executed by Comerica, Daniel Sargeant as attorney-in-fact for Sargeant III, and Worldspan) contained, at section 1.06, a provision that stipulated that, in the event of breach of the Superyacht construction contract dated February 29, 2008, only Comerica could take steps pursuant to the security registered against the Superyacht and only Comerica could take steps pursuant to the Superyacht construction contract dated February 29, 2008.[41]  *See* **Exhibit 21**, superyacht construction agreement dated February 29, 2008, without attachments.

---

[40] Comerica comingled $9,387,398.67 of Comerica loan proceeds (the loan Comerica advanced to Sargeant III towards the construction of the Superyacht) with the $11,064,525.38 laundered by Comerica from IOTC Bahamas.

[41] Section 1.06 of the August 14, 2009 Assignment reads as follows:  *"Section 1.06. Vessel Construction Agreement. ..... (i) upon receipt of a written notice that an Event of Default under the Vessel Construction Agreement has occurred, that all rights of the Secured Party [Sargeant] under the Vessel Construction Agreement may only be exercised by the Assignee [Comerica Bank], ..."*

307.    On October 28, 2010 Worldspan sent notice of breach of the Superyacht construction contract to Shaw, Vice President at Comerica Bank and Sargeant III.

308.    On November 29, 2010 Sargeant III sent notice of breach of the Superyacht construction contract to Worldspan.

309.    Comerica was fully aware of the August 14, 2009 Assignment that Comerica authored and executed.  The August 14, 2009 Assignment included a specific provision precluding Sargeant III from taking any steps regarding the Superyacht security or the Superyacht construction agreement after breach of the same upon Worldspan's written notification to Sargeant III.  Notwithstanding Comerica's actual knowledge of this contractual provision, Comerica allowed Sargeant III to act as their proxy in furtherance of the conspiracy.

310.    With full knowledge and consent of Comerica, Sargeant III has violated section 1.06 of the August 14, 2009 Assignment.

311.    Sargeant III commenced insolvency proceedings against Worldspan in British Columbia Supreme Court. Sargeant III falsely stated in the insolvency affidavit (sworn by his employee Monger) that he was the secured creditor of Worldspan. Sargeant III was not the secured credit, as he had assigned his interest to Comerica on August 14, 2009 and Comerica was the secured creditor.

312.    Comerica was fully aware of Sargeant III's *ex parte* application, which was founded on a fraud by stating that Sargeant III was the secured creditor.  Comerica had no direct involvement in these proceedings, but was involved behind the scenes, fully aware of all of Sargeant III's actions and approving of all of Sargeant III's actions (as found in correspondence from Comerica). Comerica, continuing the conspiracy, insulated themselves by having Sargeant III act as their proxy and co-conspirator, as outlined in this Complaint.

77

313.    The Sargeant III receivership application against Worldspan was turned into a proceeding under the Companies Creditors' Arrangement Act, ("CCAA") which is very similar to Chapter 11 proceedings under the United States Bankruptcy Code.  In both the case of a Chapter 11 proceeding and a CCAA proceeding, the debtor remains in possession (Debtor-in-Possession proceedings), wherein the management of the corporation remains intact.  The CCAA proceedings ended with the management of Worldspan intact and in place, as is the case today.

314.    On July 28, 2010, in the Federal Court of Canada, the Superyacht was arrested by an unpaid creditor (Offshore Interiors), who was not paid as a result of Comerica not paying Worldspan $4.9 million dollars.[42] The Federal Court of Canada issued a Claims Process Order that directed all those that had in rem maritime claims against the Superyacht (the Superyacht was the res against which the in rem claims were made, the Superyacht was sold and the Court ordered that the sale proceeds had the exact same legal status as the physical Superyacht) to file a claims process affidavit with the Court. Al-Saleh,[43] Supreme Fuels (a company that brought a successful Florida Federal RICO complaint against Sargeant III), the *in rem* trade creditors, Sargeant III, Worldspan, and Comerica filed claims process affidavits claiming an interest in the Superyacht.

---

[42] Due to the foreclosure, the owner of Offshore Interiors lost the home he and his wife had worked for years to own; his small company could not withstand the failure of Worldspan to pay him the amounts he was owed, Worldspan could not pay Offshore Interiors as Comerica had failed to pay Worldspan 4.9 million dollars. Other creditors and employees had their lives destroyed by Comerica's Superyacht Credit Bid conspiracy.

[43] Al-Saleh's claim against the Superyacht was twofold; (1) Al-Saleh claimed as a unpaid execution creditor of Sargeant, based on his 28.8 million dollar fraud judgment (which, after years of Sargeant refusing to pay accrued, with post judgment interest, to more than $36 million), and, (2) on the basis that the $11,064,525.38 laundered by Comerica from IOTC Bahamas that were paid to Worldspan towards the construction of the Superyacht was the proceeds of fraud and should be disgorged by Worldspan and paid to Al-Saleh.

315.    In January 2011, Comerica commissioned a maritime appraisal of the unfinished Superyacht, as is-where is.  The appraised value of the Superyacht as is-where is, as of January 2011 was $15 million dollars.

316.    In 2009, when Comerica and Sargeant first implemented their conspiracy against the Plaintiffs, Worldspan was an operational superyacht construction yard located in a modern, high quality, 90,435 square foot facility, located on over 9 acres of level waterfront. The property also featured a boat launching ramp, a 150-foot double sided concrete dock with 440-volt, three phase power, an enclosed workshop on the dock and a separate two-story waterfront home.

317.    The main building, had a specialty woodworking shop, an electrical shop, a lay-up area, a millwright area, a large paint booth, a very large lunch room, lockers for employees, and multiple large washrooms. The offices included several large board rooms, reception area, offices for management and offices for the design and engineering departments.

318.    Approximately 100 specialized employees worked at Worldspan, including shipwrights, millwrights, electricians, carpenters, fiberglass experts, and engine specialists, as well as a complete office staff.

319.    After Comerica became the contracting party with Worldspan by way of the August 14, 2009 Assignment, Comerica and Sargeant III induced Worldspan to continue working with the expectation of being paid. Worldspan ended up being owed approximately $4.9 million dollars by Comerica that has never been paid.

320.    This created a domino effect where employees were terminated without proper notice, resulting in over 2 million dollars in penalties being assessed against Worldspan by government agencies for improper termination. Worldspan was unable to pay its suppliers, resulting in the arrest

of the Superyacht in the Federal Court of Canada by Offshore Interiors, an unpaid in rem trade creditor.

321.    Construction on the Superyacht ceased, saddling Worldspan with an enormous, unfinished Superyacht occupying all of the usable workspace on the main floor of the facility, making it impossible to work on any other yachts.

322.    Worldspan had no revenue.  Comerica and Sargeant III implemented further steps in their conspiracy, improperly bringing an ex parte insolvency application by Sargeant III, who filed a false affidavit stating he was the secured creditor. This resulted in very large legal fees. Comerica challenged Worldspan's right to be paid the 4.9 million dollars it was owed, which could only be recovered from the sale of the Superyacht.

323.    Using the same methodology as in the BTB Credit Bid Fraud, which involved depreciation of the asset (in the BTB Credit Bid Fraud case the depreciation of the Corpus Christi refinery) both Comerica and Sargeant III opposed the marketing and sale of the Superyacht while the Superyacht depreciated and accrued charges against it. Superyachts are a compilation of the latest technology in Navionics, electronics, electronic entertainment systems, engine control systems, lighting systems, stabilization systems, galley and cooking systems as well a myriad of high tech systems. Superyachts are enormously complex and represent one of the most technical and challenging construction projects of any type in the world. Superyachts are expected to be representative of the very latest technology from bow to stern.

324.    Construction on the Superyacht started in 2008 and ceased in early 2010.  As a result of the actions of the co-conspirators, Comerica and Sargeant III, the Superyacht was not sold until 2014. In 2014, Comerica submitted to the Federal Court of Canada that the Superyacht was as

obsolete as a "Commodore 64" computer.  This statement was made to the Federal Court of Canada in 2014 when Comerica opposed the sale of the Superyacht for 5 million dollars.

325.    The Superyacht had been appraised by Comerica's appraiser in 2011 and valued at $15 million dollars as-is-where-is.  As a direct and proximate result of the Superyacht Credit Bid Fraud and Conspiracy, which included devaluing the asset titled in the name of Worldspan, the Superyacht, by hindering and delaying the marketing and sale of the Superyacht, the Superyacht ultimately sold for only 5 million dollars. This was $10 million dollars less than Comerica's 2011 appraisal.

326.    As a result of the Superyacht Credit Bid Fraud and Conspiracy, the Superyacht was analogous to a "Commodore 64" computer.  The new purchaser of the Superyacht replaced all of the obsolete electronics and Navionics (millions of dollars' worth) as well as major systems throughout the entire Superyacht.

327.    As a direct and proximate result of the Comerica and Sargeant III RICO Superyacht Credit Bid Fraud and Conspiracy, according to Comerica's own 2011 appraisal, $10 million dollars value of the Superyacht was lost.

328.    Al-Saleh and Supreme Fuels joined the claimants against the Superyacht, and, after the sale of the Superyacht, against the proceeds of sale which amounted to only $5 million dollars. Al-Saleh claimed that he had an interest in the Superyacht pursuant to his $28.8 million dollars fraud judgment from the Florida Court. Al-Saleh also claimed that the $11,064,525.38 laundered by Comerica from IOTC Bahamas and paid through Comerica's Florida branch to Worldspan towards the construction of the Superyacht should be disgorged and returned to him, as the $11,064,525.38 was the proceeds of Sargeant's fraud against him.

329.     The Superyacht was sold for $5 million dollars to an individual who then undertook an extensive re-design and upgrade of the partially finished Superyacht. The new owner spent 30 million dollars on the Superyacht. Worldspan was unable to complete this work and earn a very large profit as the business had been destroyed by the Comerica and Sargeant III RICO Superyacht Credit Bid Fraud and Conspiracy. The new owner had to spend hundreds of thousands of dollars to transport the partially completed Superyacht from Worldspan's premises to a different superyacht facility, where he then spent 30 million dollars on a massive re-design and upgrade of the Superyacht.

330.     As a direct and proximate result of the Comerica and Sargeant III RICO Superyacht Credit Bid Fraud and Conspiracy, the Superyacht brand name   was destroyed.  The Crescent brand name was valued on August 31, 2005, by Evans & Evans, Inc., which is a leading investment banking firm with offices and affiliates in Canada, the U.S. and Asia. The comprehensive and extensive appraisal is 53 pages in length and contains a detailed description of valuation methodologies and methods employed, arriving at a value for the brand Crescent $7,119,112.00.

331.     The Crescent brand was assigned to and owned by CSPAN. CSPAN is a Florida limited liability company.  Comerica and its co-conspirators caused direct injury to the U.S. entity, CSPAN, thereby creating domestic injury by destroying the brand Crescent.

332.     As a direct and proximate result of the Comerica and Sargeant III RICO Superyacht Credit Bid Fraud and Conspiracy, the Superyacht brand name Queenship was destroyed. The Queenship brand name was valued on December 7, 2004, by Evans & Evans, Inc., which is a leading investment banking firm with offices and affiliates in Canada, the U.S. and Asia.  The comprehensive and extensive appraisal is 49 pages in length and contains a detailed description of valuation methodologies and methods employed, arriving at a value for the brand Queenship of $6,649,720.00.

333.    The Queenship brand was assigned to and owned by CSPAN.  CSPAN is a Florida limited liability company.  Comerica and its co-conspirators caused direct injury to the U.S. entity, CSPAN, thereby creating domestic injury by destroying the brand Queenship.

334.    The Plaintiffs lost the Worldspan business and the entire value of the Worldspan business.

335.    Worldspan assets were assigned to and owned by CSPAN.  CSPAN is a Florida limited liability company.  Comerica and its co-conspirators caused direct injury to the property of the U.S. entity, CSPAN, thereby creating domestic injury by destroying Worldspan.

336.    Neither Sargeant III nor Comerica ever had security over Worldspan, CSPAN, or Wedmore.  Sargeant III's security, implemented in February 2008, was vessel security only, on the Superyacht. Sargeant III's security on the Superyacht was assigned to Comerica on August 14, 2009.

337.    The title holder to the Superyacht was and is the Plaintiff Worldspan. The sale proceeds of the Superyacht have the same legal status as the Superyacht.

338.    The shareholder of Worldspan is Wedmore.

339.    Michael Nesbit has been a Chartered Accountant for over 35 years and has conducted numerous forensic audits; filed numerous experts' reports with the British Columbia Supreme Court and has been engaged by numerous corporations and individuals in Canada and the United States. Michael Nesbit has also been engaged by clients to deal with matters of financial reporting, taxation, forensic accounting, mergers, bankruptcy, acquisitions and litigation support.

340.    Michael Nesbit's spectrum of expertise includes experience as a forensic accountant in fraud, economic damages, forecasting, accounting malpractice, management negligence, contractual performance failures, bankruptcy and other matters involving general commercial litigation. Michael Nesbit has extensive accounting and consulting experience as it relates to the super

yacht construction industry.  Michael Nesbit has been involved in the superyacht industry for decades and has consulted regarding the sale and construction of tens of millions of dollars' worth of superyachts, similar in nature to the Superyacht referred to herein.

341.     Michael Nesbit has valued Worldspan's business with a replacement cost valuation of $42 million dollars.  Comerica and its co-conspirators are responsible for this amount to the Plaintiffs, plus interest from the date of destruction until paid in full, as well as the other amounts referred to herein.

342.     The total principal amount claimed against Defendants is $66,268,832.00, which is subject to treble damages, making the amount $198,806,496.00, plus applicable interest and attorney's fees and costs.

343.     The Plaintiffs also lost the waterfront property as they were forced to sell it as a result of the illegal and improper conduct of Comerica.  This property is situated in one of the hottest real estate markets in the world.  The property would cost millions of dollars more to replace today than it was sold for as a result of the Superyacht Credit Bid Fraud and Conspiracy.

344.     As a result of the conspiracy, the Superyacht, which was titled in the name of Worldspan and had a security interest registered against it by Comerica, was devalued, by utilizing Comerica's own appraisers' valuation, by $10 million dollars.   The Plaintiffs assert that the Superyacht was worth more than $15 million dollars at the time it was appraised by Comerica's appraiser.  This represents another $10 million-dollar loss to the Plaintiffs, directly caused by the conspiracy.

345.     The Plaintiffs incurred years of massive legal fees litigating against Comerica and Sargeant.  Comerica's failure to pay Worldspan $4.9 million dollars resulted in millions of dollars in penalties and fines.  Worldspan incurred a six-figure amount in rent for the building that housed the

Superyacht after construction ceased. A six-figure tax lien was placed on the property by the City of Maple Ridge, (British Columbia, Canada).  Millions of dollars of interest were accrued on the amounts that were owed to unpaid creditors, along with millions of dollars that are owed to unpaid creditors, all resulting from the conspiracy undertaken by Sargeant and Comerica.

### *Punitive Damages*

346.    In addition to the RICO claims in this action, the Plaintiffs advance common law claims against all of the Defendants for, among other things, fraud and conspiracy. Under these common law claims the Plaintiffs seek punitive damages against Comerica.

347.    Given the deliberate, egregious and continuing nature of the conduct of Comerica and given the financial size of Comerica, the tortfeasor, the Plaintiffs seek punitive damages in the amount of not less than 4.1 billion dollars ($4,100,000,000.00). Comerica's conduct is far more egregious than other U.S. banks that have had punitive awards against them for far greater amounts.

348.    The Plaintiffs assert that this amount must be assessed against Comerica given its financial size and given the egregious nature of its conduct and given the fact that Comerica's conduct continued and continues, unabated, for at least 9 years. Comerica's conduct referred to in this Complaint is not only a RICO conspiracy, with a continuum of predicate acts, it is a continuum of national and international criminal conduct, with a minimum of nine years of criminal conduct involving, among other things, money laundering, fraud,  criminal fraudulent misrepresentation and criminal fraudulent omission, fraudulent transfers, co-mingling funds with the proceeds of fraud, litigating against victims of the frauds and providing false evidence to courts. The other mastermind the enterprise, Sargeant III, left a trail of victims across the United States and a trail of victims internationally. Sargeant III threatened to kill Steve Barnett unless Steve Barnett paid him 2 million

85

dollars within 60 days. Sargeant III told Steve Barnett he had people who could execute the contract to murder Steve Barnett.

349.    Comerica worked and continues to work as one of the two masterminds of the illegal enterprise and as one of the principal beneficiaries of the illegal enterprise (having received over 4.4 million dollars in loan and interest payments with numerous fees and charges for money laundering transactions and various other predicate acts committed by Comerica), conspiring with Sargeant III who has, since 2005, undertaken a continuous series of frauds against victims that he then sued, made a death threat against Steven Barnett, extorted Steven Barnett, and utilized complex offshore money laundering schemes in concert with Comerica and the Superyacht Credit Bid Fraud and Conspiracy.

350.    In *Al-Saleh v. Sargeant III*, the Florida Court found that Sargeant III had been defrauding Al-Saleh on the $2.1 billion-dollar Department of Defense Contract since 2005.  Sargeant III's frauds and the extraordinary spending spree of Sargeant III and Deborah Sargeant continued, unabated, from 2005 until present.  The victims included, among others, Daniel Sargeant, Sargeant III's family members, the Sargeant family businesses, Curtis Meade, Supreme Fuels FZE, ABN AMRO bank, PDVSA, Old Castle, the United States Department of Defense, American taxpayers, the Plaintiffs, the *in rem* trade creditors and creditors of the Corpus Christi refinery.

351.    Comerica was provided with an affidavit in 2013 that detailed the findings of the United States District Court for the Southern District of Texas, Corpus Christi Division in *PDVSA Petroleo S.A. v. Trigeant, Ltd. et al*, Case No. 2:09-cv-00038 wherein the Court found that Sargeant had committed actual fraud using a credit bid. Comerica was the banker for BTB, the company that the U.S. District Court found was the vehicle of fraud. The BTB Credit Bid Fraud caused victims to lose tens of millions of dollars even after the United States District Court reversed the fraudulent credit bid and put the refinery back in the hands of the Sargeant III controlled corporation that had

86

obtained massive amounts of credit and then did not pay those that advanced the credit, including, but not limited to, PDVSA.

352. In 2014, Comerica tried an identical credit bid scheme against the Plaintiffs. Comerica did this one year after being advised in an affidavit of the findings of the United States District Court for the Southern District of Texas, Corpus Christi Division in *PDVSA Petroleo S.A. v. Trigeant, Ltd. et al*, Case No. 2:09-cv-00038. Comerica litigated against Al-Saleh, one of Sargeant III's victims. The Superyacht Credit Bid Fraud and Conspiracy could not have been undertaken without Comerica. The Superyacht Credit Bid Fraud and Conspiracy defeated the claims of Supreme Fuels and defeated the claims of Al-Saleh and other creditors.

353. Comerica was aware of the $28.8 million-dollar fraud judgment against Sargeant III, yet Comerica ruthlessly, and, for years, laundered millions and millions of dollars in a manner such that Al-Saleh could not attach these funds (which were the proceeds of fraud) with his judgment and in a manner that none of the victims of Sargeant III's frauds could attach these funds.

354. Comerica undertook a form of conduct never before undertaken by a U.S. bank when Comerica took over the contract to construct the Superyacht and took over the security that Sargeant III had on the Superyacht for the fraudulent purpose of making it impossible for Al-Saleh, Worldspan, Supreme Fuels FZE and the other victims to claim against Sargeant's interest in the Superyacht.

355. Comerica did this through the Superyacht Credit Bid Fraud and Conspiracy that is detailed herein.

356. The illegal actions of Comerica are a very large part of the reason why Al-Saleh spent 12 million dollars attempting to collect on his $28.8 million-dollar fraud judgment. During the time that Al-Saleh spent $12 million dollars attempting to collect on his fraud judgment, Comerica laundered millions and millions of dollars to Deborah Sargeant, Sargeant III, Sargeant III's co-

conspirators and Sargeant III's henchmen. Comerica was the bagman that funded the extraordinary opulent lifestyle of Deborah Sargeant and Sargeant III while Sargeant III's victims desperately tried to recover against Sargeant III for the frauds committed against them by Sargeant III.

357.   Comerica's 9 years of continuous and unabated illegal conduct is a textbook example of willful misconduct. Punitive damages are appropriate in order to deter Comerica from continuing to act in the manner they have acted and continue to act. Punitive damages are warranted to deter Comerica from engaging in similar conduct in the future and to induce other victims to take actions against Comerica.

358.   Comerica acted with knowledge that Al-Saleh, Supreme Fuels, FZE, Worldspan, and others sought to recover from Sargeant III's frauds, while, at the same time, Comerica laundered millions and millions of dollars, with transactions that were blatantly and obviously designed to prevent Sargeant III's victims from attaching these laundered funds.

359.   The Comerica bank statements attached to this Complaint demonstrate the number, size and type of money laundering transactions that Comerica undertook for Sargeant III. The Comerica bank statements attached to this Complaint are only for a limited period of time; the money laundering activities of Comerica commenced in 2009 and continue to this day.

*See* **Exhibit 11**, Affidavit of Sargeant III sworn October 12, 2011, with exhibits.

*See* **Exhibit 12**, Affidavit of Cynthia Jones sworn October 7, 2011, with exhibits.

*See* **Exhibit 22**, First Amended Motion for Proceedings Supplementary to Execution and For Related Relief in, *Al-Saleh v. Sargeant III*, body only, with attached exhibits O, P, Q, S, T, U, V and W.

360.   Comerica, acting with knowledge, and continuing its willful misconduct, implemented the Superyacht Credit Bid Fraud and Conspiracy, for the purpose of defeating the claims of Sargeant

III and Comerica's victims and for the purpose of devaluing the Superyacht, damaging and destroying the Plaintiffs' businesses.

361.   Comerica should and must be subject to very significant regulatory penalties for blatantly violating, on an ongoing basis, for at least 9 years, the sections of the United States banking statutes referred to in this Complaint.

362.   Comerica's conduct as a national bank is extraordinarily and uniquely egregious in that, unlike typical RICO complaints against banks, wherein banks are sued for money laundering and other associated wrongdoing, Comerica took the extraordinary step of becoming one of the two active masterminds in a nine-year RICO conspiracy against PDVSA,[44] Al-Saleh,[45] Supreme Fuels,[46] the Plaintiffs, ABN AMRO,[47] and many others.

363.   Everything Comerica and Sargeant III undertook in their RICO conspiracy, against all of the companies and individuals referred to in this Complaint, and as it relates to the Superyacht Credit Bid Fraud and Conspiracy, with no exceptions, was devised, engineered, directed and ordered from Florida and, to a limited extent, from Detroit.

---

[44] PDVSA, the National oil company of Venezuela, who was victimized by the BTB Credit Bid Fraud. Comerica was and is the banker for BTB Refining LLC, the corporation that was used as a vehicle of fraud against PDVSA and the other victims of the BTB Credit Bid Fraud.

[45] The business partner of Sargeant III who obtained a 28.8 million dollar fraud judgment against Sargeant III and was unable to be paid for years, expending 12 million dollars to collect on his fraud judgment. During the time period that Al-Saleh attempted to collect his 28.8 million fraud judgement, Comerica laundered millions and millions of dollars for Sargeant and his wife, paying these amounts from offshore corporation in huge blocks of funds to Sargeant, his wife, Deborah Sargeant, and Sargeant's proxies, all in a manner such that Al-Saleh could not attach these funds.

[46] Comerica actively assisted Sargeant III in preventing Supreme Fuels from being paid both prior to bringing its RICO lawsuit against Sargeant and subsequent to Supreme Fuels obtaining judgment pursuant to its RICO lawsuit against Sargeant III.

[47] ABN AMRO, a Netherlands bank, was utilized by Sargeant III to collateralize the receivables of IOTC so as to make the receivables impossible to Al-Saleh to attach, which was part of Sargeant III's strategy in defrauding Al-Saleh of millions of dollars. Ultimately, Sargeant III had no more use for ABN AMRO and ABN AMRO became yet another victim of the conspiracy that involved Comerica and Sargeant III.

364.    The ill-gotten gains from the illegal Enterprise were ultimately returned to Florida.

### The August 7, 2012 United States District Court for the Southern District of Texas Findings of Fact that Sargeant III Orchestrated a Fraudulent Transfer with BTB Refining LLC, Utilizing Comerica as Banker for BTB Refining LLC

365.    The Corpus Christie credit bid fraud was perpetuated by Sargeant III incurring many millions of dollars' worth of in oil on credit from PDVSA, the national oil company of Venezuela, having a conventional lender take security against the refinery the oil was shipped to, having the refinery default on the loan, having a Sargeant III controlled corporation obtain the security, then having the Sargeant controlled corporation make a fraudulent credit bid on the refinery.

366.    In 2013, United States District Judge Nelva Gonzales Ramos found the credit bid to be actual fraud. The Judge found that Trigeant, a Harry Sargeant III controlled corporation, acted with actual intent to defraud the plaintiff.  The court reversed the credit bid that was part of a scheme to defraud creditors, including, but not limited to, PDVSA.

367.    Comerica was aware of Sargeant III's fraud against PDVSA and other creditors of the refinery and Comerica was the banker for Sargeant's alter ego corporation, BTB, which was the entity that was central to the fraud that was committed and directed by Sargeant III against the creditors of the Corpus Christi refinery, including, but not limited to, PDVSA.

368.    Comerica concealed from the Plaintiffs the BTB Credit Bid Fraud. Comerica profited from its conspiracy with Sargeant regarding the BTB Credit Bid Fraud.

369.    Comerica was aware of the BTB Credit Bid Fraud scheme and concealed it from the Plaintiffs.  Comerica laundered the proceeds of the BTB Credit Bid Fraud, concealed the BTB Credit Bid Fraud from the Plaintiffs, and, one year after the Plaintiffs advised Comerica of the BTB Credit Bid Fraud ruling by the Texas Federal Court in *PDVSA v. BTB Refining LLC, et al*, attempted a credit bid.

370.     Comerica was the bank for BTB, said account number ending #46951, said account opened on or about August 26, 2009.

371.     Comerica was the bank for BTB Refinancing, LLC, said account number ending #58476.

### *In 18 Months Sargeant III and Companies He Controlled Had Two Judgments Entered Against Them Totaling Approximately $51 Million Dollars, Both Founded on Claims of Fraud*

372.     On July 27, 2011, Sargeant III et al were found guilty by a jury of committing fraud against Al-Saleh, their partner in the $2.1 billion-dollar U.S. Department of Defense contract. The fraud judgment was for $28.8 million dollars. Comerica opposed Al-Saleh's claim against the Superyacht. Comerica was the banker who laundered millions and millions of dollars for Sargeant III and the other conspirators in a manner to preclude Al-Saleh from collecting on his fraud judgment.

373.     In *PDVSA Petroleo S.A. v. Trigeant, Ltd., BTB Refining LLC, and Harry Sargeant III*, Case No. 09-cv-00038, in the United States District Court for the Southern District of Texas, on April 27, 2012, the presiding Federal Judge filed her 22 page Findings of Fact establishing that Sargeant III orchestrated a fraudulent transfer with actual intent that prejudiced the plaintiff who had already received two international arbitration awards totaling 53 million against Trigeant Ltd., a company that was managed by Sargeant III.  A final judgment was entered in the BTB Credit Bid Fraud case which quantified the amount of the debt on the affected underlying promissory note at $22,565,193.55.  The banker for BTB Refining LLC was and is Comerica.

374.     In 18 months, Sargeant III and companies he controlled had two judgments entered against them, totaling approximately $51 million dollars, both founded on claims of fraud.

*The 2013 Advisement to Comerica Of Sargeant III's Credit Bid Fraud as Found by the United States District Court for the Southern District of Texas*

375.     In 2013 Worldspan advised Comerica of Sargeant's credit bid fraud with BTB. This was done by delivering an affidavit to Comerica's counsel that specifically referred to the United States District Court Southern District of Texas, Corpus Christi Division in *PDVSA Petroleo S.A. v. Trigeant, Ltd. et al*, Case No. 2:09-cv-00038 finding that Sargeant III had committed credit bid fraud utilizing Sargeant III's alter ego corporation, BTB.

376.     Despite being specifically advised of the BTB Credit Bid Fraud, one year later, Comerica attempted an identical fraudulent credit bid scheme against Worldspan and other creditors.

*The June 26, 2014 Comerica / Sargeant III Superyacht Credit Bid Fraud and Conspiracy*

377.     Comerica concealed the Superyacht Credit Bid Fraud and Conspiracy they were involved in until 2014 when Sargeant III and Comerica were faced with an application brought by an unpaid trade creditor in the Federal Court of Canada to sell the Superyacht.   During the sale application Comerica and Sargeant III, for the first time ever, disclosed the fact that Sargeant and Comerica, in the same manner as in the Corpus Christie fraudulent credit bid, intended to have a Harry Sargeant III controlled corporation acquire Comerica's Superyacht security and then use the security to credit bid on the Superyacht.

378.     This is when Worldspan first learned of the RICO conspiracy involving Comerica as specifically targeting the Plaintiffs. The prior activities of Comerica then made sense in the context of those acts being predicate acts in furtherance of the scheme to thwart and harm others, including but not limited to Worldspan and creditors, devalue the asset titled in the name of Worldspan, the Superyacht, and then credit bid in the same manner as the fraudulent Corpus Christie refinery credit bid.

92

379.     Comerica and Sargeant III devalued the secured asset, the Superyacht, and then, in 2014, attempted to perpetuate the fraudulent credit bid scheme that Sargeant had perpetuated in Texas with the Corpus Christi oil refinery.[48]

380.     To implement this fraudulent credit bid scheme, Comerica and Sargeant III required that Sargeant III's security in the 144' Superyacht and the contract with Worldspan to construct the yacht be assigned from Sargeant III to Comerica.

**U.S. Bankruptcy Court S.D. Florida Chapter 7 Trustee's Adversary Proceeding for Fraud Against Deborah Sargeant, et al.**

381.     On August 18, 2016, Nicole Testa, as Chapter 7 Trustee, of the Bankrupt Estate of International Oil Trading Company, LLC, brought an Adversary Complaint for damages, to establish alter ego liability, to void and recover fraudulent transfers, for declaratory judgment and other relief against Deborah Sargeant, Sargeant III and Mustafa Abu-Naba'a (the "Adversary Proceeding").

382.     In the Adversary Proceeding, the Trustee stated as follows:

### *C. The Scheme to Loot IOTC, and Divert and Secrete its Assets*

*22. Commencing in early 2005 with the incorporation of IOTC USA, Sargeant and Abu-Naba'a commenced a willful and deliberate course of action intended to loot, divert, and secrete the assets of IOTC USA for their own benefit and use, to the detriment of IOTC USA and its creditors, including Al-Saleh.*

*27. As a result of the DESC contracts, IOTC USA generated over $1.95 billion dollars in revenue, with profits ranging between $133 million and $210 million from 2005 to 2010. Despite the foregoing, today IOTC USA has no readily available cash or unencumbered assets to pay its creditors.*

---

[48] After being the bagman for Sargeant's alter ego corporation, BTB Refining LLC, (the corporation that was used as a vehicle of fraud in the Corpus Christi oil refinery credit bid fraud) and after being served with an affidavit in 2013 that detailed the United States District Court For The Southern District of Texas Corpus Christi Division ruling that found that Sargeant had committed actual fraud by way of fraudulent credit bid utilizing the alter ego corporation BTB Refining LLC, Comerica, one year later, in 2014, tried an identical credit bid scheme against Worldspan and other creditors.  The foundational document for the Worldspan credit bid scheme was the August 9, 2009 Assignment of Sargeant's interest in the superyacht to Comerica.

*30. On September 14, 2006, Sargeant and Abu-Naba'a formed International Oil Trading Company, B.V. ("IOTC Netherlands"). IOTC Bahamas is the sole shareholder of IOTC Netherlands. IOTC USA, IOTC Netherlands and IOTC Dubai and later IOTC Bahamas acted in concert with each other at the direction of Sargeant and/or Abu-Naba'a and their agents to divert the proceeds and profits of the DESC contracts generated by IOTC USA as a contracting party in the DESC contracts for services actually rendered by IOTC Jordan. The DESC contract proceeds and profits were diverted from IOTC USA to IOTC Netherlands, which then remitted large amounts to IOTC Bahamas for the ultimate benefit of both Sargeant and Abu-Naba'a (as alleged in more detail below).*

*33. First, IOTC USA pledged the receivables generated for its rendition of services under the DESC contracts to ABN AMRO. The receivables were pledged as collateral for a credit facility issued by ABN AMRO in the Netherlands to IOTC Netherlands. IOTC Netherlands was the nominal beneficiary of the credit facility, which was only created because ABN AMRO, a Dutch bank, required that the borrower be organized under the laws of the Netherlands.*

*35.  Indeed, this elaborate, layered structure was implemented and followed for one primary purpose – to hinder, delay, and defraud creditors of IOTC USA, including Al-Saleh. The use of these corporate vehicles also served the purpose of secreting the assets of IOTC USA, Sargeant and Abu-Naba'a by placing them into these offshore entities. As further detailed below, IOTC Bahamas (formerly known as IOTC Dubai) is the alter ego of: (i) Sargeant and/or Abu-Naba'a and/or (ii) IOTC USA. The scheme to hinder, delay, and defraud creditors culminated as the direct result of IOTC Bahamas managing the proceeds generated from the contracts between DESC and IOTC USA to fund the personal, luxurious lifestyles of both Sargeant and Abu-Naba'a.*

*39. From October 12, 2007 to February 10, 2010, IOTC Bahamas, and its predecessor IOTC Dubai, received $170,618,943.05 in DESC contract proceeds wired from IOTC Netherlands, which upon information and belief were accepted in bad faith and for no reasonably equivalent value. As previously noted above, it was IOTC Jordan that performed under the DESC contracts. At all times material hereto, IOTC Jordan, IOTC Dubai, IOTC Bahamas, and IOTC Netherlands (collectively, the "IOTC Sham Entities"), by and through Sargeant and Abu-Naba'a, were agents, alter egos, and/or mere conduits of IOTC USA, and received funds and other property pursuant to DESC contracts and other sources that constitute property of the estate pursuant to Section 541 of the Bankruptcy Code (the "DESC Contract Property").*

**D. The Avoidable Transfers and Transactions at Issue**

*40. To further thwart and hinder Al-Saleh's post-judgment collection efforts, Sargeant and Abu-Naba'a caused IOTC USA to be looted and stripped of assets*

> through a series of fraudulent transfers. The two main recipients of these fraudulent transfers were Sargeant and Deborah Sargeant as "Tenants by the Entireties" ("Sargeant TBE") and IOTC Bahamas
>
> 46. Sargeant and Abu-Naba'a, along with the entities which they control, IOTC Bahamas and IOTC Netherlands, secreted the total sum of **$180,350,558.05** to be held in their names to put those assets beyond IOTC USA's reach by directing the transfer of these funds to bank accounts held by Sargeant TBE, IOTC Bahamas and its predecessor IOTC Dubai.

383.    Worldspan was paid $11,064,525.38 with funds laundered by Comerica's Florida branch from IOTC Bahamas.  The Chapter 7 Trustee referred to the funds that were laundered through IOTC Bahamas and its predecessor as follows:

> From October 12, 2007 to February 10, 2010, IOTC Bahamas, and its predecessor IOTC Dubai, received $170,618,943.05 in DESC contract proceeds wired from IOTC Netherlands, which upon information and belief were accepted in bad faith and for no reasonably equivalent value.

384.    At the time of the Adversary Proceeding, Al-Saleh's $28.8 million-dollar Florida State Court fraud judgment against Sargeant III had grown to over $35 million dollars with post judgment interest.

385.    Burford Capital, LLC, funded Al-Saleh's collection efforts against Sargeant III, which cost Al-Saleh $12 million dollars, providing yet another example of Sargeant III and his co-conspirators' strategy of using litigation after committing fraud.  Burford referred to the collection efforts in a feature article on its website as follows:

> Instead of paying the judgment debt, Sargeant and Abu-Naba'a ensured they were "judgment proof" by making full use of different corporate veils in a multitude of onshore and offshore locations.[49]
>
> …

---

[49] Burford refers to certain of the components of the conspiracies undertaken by Sargeant III and his co-conspirators, all of which are overlaid with intense litigation – in Al-Saleh's case, 12 million dollars' worth.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

And so Al-Saleh was left with a very expensive piece of legal paper against individuals who were more than able to pay him what they owed[50] - but chose not to.

…

On Al-Saleh's behalf, there was a need to mount a multijurisdictional offensive against the judgment debtors' interests worldwide,[51] combining unique investigative and legal methodologies that we have developed

…

First, we were able to freeze $21.8m in Texas on the basis that BTB Refining LLC, a company registered in Texas which owned a refinery in Corpus Christi, was the recipient of some funds from the original IOTC fuel contracts and that BTB was itself an alter ego of Sargeant.[52] The judge agreed that Al-Saleh's claim had a strong chance of succeeding on its merits, and issued a temporary injunction preventing Sargeant or BTB Refining from transferring funds out of the jurisdiction of the court.

…

Second, the strategy led to the appointment of an equitable receiver over a number of the duo's holding companies in the Bahamas. A Bahamian judge declared that the companies had breached a previously obtained Bahamian freezing order by causing funds to be distributed improperly amongst other companies in the debtors' Bahamian and US network. The appointment of a receiver had the effect of freezing assets down the chain of subsidiaries, as well as enabling a court appointed, independent third party to engage with current commercial counterparties of the debtors (never great for business).

Finally, Al-Saleh was able to tip IOTC USA into insolvent bankruptcy in Florida following testimony from Sargeant's de facto CFO in a separate action that the

---

[50] At this time, Sargeant III owed Al-Saleh over 35 million dollars pursuant to the Florida Court fraud judgment. The 9.4 million dollar loan that Sargeant III obtained from Comerica for the purpose of funding construction on the Superyacht located in Worldspan's premises was not necessary as Sargeant III did not need a loan – the loan was part of the Superyacht Credit Bid Fraud and Conspiracy.  The loan was an essential component of the Superyacht Credit Bid Fraud and Conspiracy.

[51] All control and decisions of the frauds engineered by Sargeant III, Comerica and others are exclusively made in and from Florida and exclusively with residents of Florida. The frauds target individuals and entities in Florida, the U.S. and around the world. All profits from the conspiracies are ultimately returned to Florida utilizing money laundering through co-conspirators, in this case, Comerica.

[52] The BTB Credit Bid Fraud, was used against PDVSA, Al-Saleh, and others while Comerica acted as the BTB Refining LLC bagman, laundering funds for Sargeant III and BTB Refining LLC. The United States District Court, S.D., Texas, Corpus Christi Division found that Sargeant III had, utilizing his alter ego corporation, BTB Refining LLC, orchestrated a credit bid fraud against the national oil company of Venezuela, PDVSA, Al-Saleh and others.

96

company had fewer than three outstanding creditors. If that is the case, under US bankruptcy law the presence of one creditor is sufficient to initiate such proceedings. This action had the dual effect of freezing subsidiary structures and assets (including a fuel tank complex in Aqaba, Jordan) and placing a US trustee in oversight of the company, including having the right to review all of the company's communications with its own lawyers.

### *Deborah Sargeant's Fraud to Convert Non-Exempt Cash ($9,681,615.00) Subject to Garnishment to being Exempt from Execution*

386.    Deborah, a socialite, Board Vice Chairman of the Bethesda Hospital Foundation and Executive Committee, Chairman of the Bethesda Ball, Board Member of the Delray Beach Historical Society, President of the Governor's Mansion Foundation (as well as being involved with other charities), portrays herself as an individual who helps those in need, when, in fact, she is one of the most active and ruthless conspirators with Sargeant III in defrauding, among others, the Plaintiffs, Al-Saleh, Supreme Fuels FZE, Curtis Meade, individuals, corporations and small businessmen.

387.    Deborah defrauded the small businessman, Curtis Meade, who undertook the extensive renovation on the 19,000 square foot waterfront mansion that Deborah and Sargeant III reside in.  Curtis Meade was placed in severe financial distress and had to sue Deborah and Sargeant III and place a $505,150.41 lien on their mansion simply to get paid. Utilizing one of his commonly used artifices, the counterclaim, Sargeant III counterclaimed against Meade for $46,691.49, ultimately paying Meade so as to have the lien on their 19,000 square foot mansion removed.

388.    Deborah, the wife of Sargeant III, who resides with Sargeant III, has been involved with the Plaintiffs since prior to the commencement of the construction of the Superyacht.  Prior to the commencement of the construction of the Superyacht, representatives of Worldspan met with Deborah and Sargeant III at their 19,000 square foot waterfront mansion in Gulf Stream, Florida, regarding the upcoming construction of the Superyacht (the "Deborah Sargeant Superyacht Meeting").

389. At the Deborah Sargeant Superyacht Meeting, Deborah advised the Worldspan representatives that the Superyacht was hers. Deborah had involvement with the Superyacht both prior to and throughout the construction.

390. Deborah is one of the co-conspirators who received the most benefit from the illegal enterprise. All of the co-conspirators benefited financially, as referred to herein, Deborah, Sargeant III and Comerica benefited the most financially.

391. As a direct consequence of the conduct of Deborah and the other co-conspirators, Al-Saleh claimed against Worldspan seeking the disgorgement of the funds paid to Worldspan for the construction of the Superyacht. Al-Saleh claimed that those funds were the proceeds of Sargeant III's fraud against him.

392. On August 18, 2016 the United States Trustee, as Chapter 7 Trustee, Nicole Testa Mehdipour filed an Adversary Proceeding in the U.S. Bankruptcy Court Southern District of Florida (West Palm Beach) styled as, *Nicole Testa Mehdipour (United States Bankruptcy Trustee) Plaintiff, v. Harry Sargeant III, Mustafa Abu-Naba'a and Deborah Sargeant*, Adversary Proceeding Case No. 16-0-1430-EPK (the "Deborah Sargeant Adversary Action"). *See* **Exhibit 23**, Chapter 7 Adversary Complaint in the Deborah Sargeant Adversary Action.

393. In the Deborah Sargeant Adversary Action, the United States Trustee, as Chapter 7 Trustee of the Bankruptcy Estate of IOTC USA, filed an Adversary Complaint for damages, to establish alter ego liability, to avoid and recover fraudulent transfers and for other relief against Deborah, Sargeant III and Mustafa Abu-Naba'a.

394. In the Deborah Sargeant Adversary Action, at paragraphs 40-41, 67-69 the Chapter 7 Trustee, states as follows:

*40.    To further thwart and hinder Al-Saleh's post-judgment collection efforts, Sargeant and Abu- Naba'a caused IOTC USA to be looted and stripped of assets through a series of fraudulent transfers. The two main recipients of the fraudulent transfers were Sargeant and Deborah Sargeant as "Tenants by the Entireties" (Sargeant TBE") and IOTC Bahamas.*

*41. Deborah is the spouse of Sargeant. According to her own testimony in post-judgment collection proceedings undertaken by Al-Saleh, Deborah has not engaged in any gainful employment in the past 20 years. Rather, Deborah's voluntary unemployment was made possible by Sargeant's directing the transfer of funds that are not exempt from execution to be deposited into bank accounts held by Sargeant TBE in order to fraudulent convert non-exempt cash subject to garnishment to being exempt from execution by Al-Saleh as property of the Sargeant TBE. As alleged in more detail below, the Sargeant TBE received the total sum of $9,681,615.00 from March 1, 2007 to December 6, 2012.*

*67. The Sargeant TBE Transfers were made by or on behalf of the Debtor with actual intent to hinder, delay, or defraud creditors of the Debtor, were received with knowledge of the voidability of the transfers and lacking of good faith, and are otherwise avoidable pursuant to Section 548 and Chapter 726 of the Florida Statutes or other applicable avoidance law.*

*68. The Debtor owned a legal and/or equitable interest in the funds that are the subject of each of the Transfers defined above, including the Sargeant TBE Transfers, and Sargeant and Deborah Sargeant are entities "for whose benefit" such transfers were made.*

*69. As a result of the above, the Trustee can avoid the Sargeant TBE Transfers pursuant to Sections 544 and 548 of the Bankruptcy Code and Chapter 726 of the Florida Statues, and recover the value thereof for the benefit of the Estate pursuant to Section 550 of the Bankruptcy Code.*

395.    Deborah conspired with Sargeant III to launder and fraudulently keep almost 10 million dollars from Al-Saleh, while at the same time Al-Saleh was defrauded and then spent 12 million dollars attempting to collect on his fraud judgement against Sargeant III.

396.    One of Deborah Sargeant's roles in the Enterprise was to launder funds from IOTC Bahamas – the United States Chapter 7 Trustee claimed against Deborah Sargeant for fraud as a result of her laundering $9,681,615.00 between March 1, 2007 and December 6, 2012.  IOTC Bahamas was the same offshore corporation that paid Worldspan $11,064,525.38. Deborah knew Worldspan was being paid from the same offshore corporation, IOTC Bahamas, that paid her $9,681,615.00. Deborah Sargeant, according to the Chapter 7 Trustee, had not worked for 20 years.

99

397.    IOTC Bahamas, in 68 months (it is unknown whether funds were paid to Deborah outside of this time period) paid Deborah $9,681,615.00. IOTC Bahamas, with its predecessor corporation, laundered $180,350,558.05. Deborah was intimately involved in this money laundering.

398.    Deborah knew that funds were being laundered into the Superyacht that she referred to as hers. The $11,064,525.38 that was laundered by Comerica from IOTC Bahamas came from the same corporation, IOTC Bahamas that fraudulently paid Deborah $9,387,398.67. The US Chapter 7 Trustee sued Deborah Sargeant for fraud as a result of these payments.

399.    Before the construction commenced on the Superyacht Deborah met with representatives of Worldspan at her Gulf Stream waterfront mansion. During this meeting she told the Worldspan representatives how she wanted her Superyacht constructed. During the construction of the Superyacht she provided additional instructions to Worldspan as to the specifications of her Superyacht.

400.    Deborah knew that Sargeant III and Comerica conspired to not pay Worldspan $4.9 million dollars towards the construction of her Superyacht (an amount that has never been paid). Deborah knew that Sargeant III and Comerica conspired together, with the other co-conspirators, to illegally and improperly interfere with the marketing and sale of the Superyacht.

401.    Deborah knew of her husband's frauds against Daniel Sargeant (her brother-in-law), the Sargeant family businesses, PDVSA, ABN AMRO, Supreme Fuels FZE and others.

402.    Deborah knew that Sargeant III was sued by Al-Saleh for fraud on April 10, 2008. Deborah knew that Al-Saleh obtained a $28.8 million-dollar fraud judgment against Sargeant III on July 27, 2011. Deborah knew that the mansion she lived in with Sargeant was entered by Sheriff's Deputies pursuant to a Florida State Court Break Order, as a consequence of Sargeant III refusing to pay the $28.8 million-dollar fraud judgment. One of the items sized from the mansion was a stock

certificate with a value of approximately $1 million dollars.   Litigation ensued regarding this certificate, Al-Saleh was unable to attach the certificate as a result of Deborah Sargeant's name being on the certificate.

403.    Deborah issued instructions to Curtis Meade regarding the million-dollar upgrade to her Gulf Stream mansion.   Deborah was aware of the fact that her husband, Sargeant III, utilized one of his common artifices against Curtis Meade by claiming that Curtis Meade had overbilled him, thereby creating a fraudulent basis for Deborah and Sargeant III not to pay Curtis Meade.   Deborah and her husband claimed that Curtis Meade overbilled them $46,691.49, even though they admit they owe Curtis Meade $505,150.41.   A common fraud undertaken by Sargeant III is to incur indebtedness and then fail to pay, purporting that he has been overcharged.    Sargeant then litigates and counterclaims against the victims.

404.    For the past two decades until present Deborah lived and continues to live the extraordinary lavish lifestyle referred to herein, paid for with the funds defrauded from the victims of the frauds referred to herein.   Deborah is intimately aware of the extraordinary expenditures that are made by Sargeant III, as referred to in this Complaint.

405.    Deborah laundered payments to herself and Sargeant III, in amounts of a quarter million dollars at a time, over and over, for years, while victims desperately attempted to be paid. The bank statements attached to this Complaint clearly demonstrate the nature, type, amount and volume of money laundering transactions involving Deborah.

406.    Deborah is also involved in a not for profit trust with Sargeant III.   Deborah Sargeant is the Director and Officer of a not for profit trust in concert with Sargeant III, the trust being the Deborah & Harry Sargeant Foundation, Inc.

407.    Deborah was and is aware of the BTB Credit Bid Fraud and the Superyacht Credit Bid Fraud and Conspiracy.

408.    Deborah was aware of the fact that Wachovia Bank ended its relationship with Sargeant III as a result of Sargeant III's money laundering activities, including, but not limited to, the money laundering activities that took place with IOTC Bahamas.  As an active participant in the illegal Enterprise referred to herein, Deborah worked in concert with Sargeant III and Comerica to launder millions and millions of dollars.

409.    The U.S. Chapter 7 Bankruptcy Trustee refers to Deborah as one of the two main recipients of the funds obtained by fraud and as the party who conspired with Sargeant to fraudulently exempt cash subject to garnishment to exempt funds.

410.    In the Deborah Sargeant Adversary Action, the U.S. Chapter 7 Bankruptcy Trustee states, at paragraph 46, the following:

> *Sargeant and Abu-Naba'a, along with the entities they control, IOTC Bahamas and IOTC Netherlands, secreted the total sum of **$180,350,558.05** to be held in their names to put those assets beyond IOTC USA's reach by directing the transfer of those funds to bank accounts held by Sargeant TBE, IOTC Bahamas and its predecessor IOTC Dubai.*

411.    In addition to the other enormous sums laundered by Comerica, Comerica laundered millions of dollars to Deborah both before and after Al- Saleh obtained the $28.8 million-dollar fraud judgement against Sargeant III.  As of the date of the Deborah Sargeant Adversary Action, Al-Saleh's fraud judgment had accrued to over 35 million with interest.  Comerica was essential to and acted with knowledge of both the fraud lawsuit and the fraud judgement while it laundered millions of dollars to Deborah, thereby precluding Al-Saleh and other creditors from attaching the laundered funds.

412.    The Deborah Sargeant Adversary Action was dismissed after Al-Saleh finally collected on his fraud judgement against Sargeant III.

### *The Individuals & Entities That Severed Their Relationships with Sargeant III*

413.    As a result of Sargeant III and his wife's out of control, thirteen year spending spree, fueled by his criminal activities that include, but are not limited to, paying a $9 million dollar bribe to a Jordanian government official, General Mohammad Dahabi (on a $2.1 billion dollar US Department of Defense contract), committing fraud on a $2.1 billion dollar US Department of Defense Contract (as found by the Florida Court[53]), money laundering, wire fraud, mail fraud, defrauding, among others, suppliers, defrauding business partners, defrauding banks (including the third largest bank in the Netherlands, ABN AMRO Bank N.V.), defrauding the national oil company of Venezuela, PDVSA, defrauding and embezzling the Sargeant family businesses, defrauding his brother, Daniel Sargeant, and defrauding the Plaintiffs, the following entities, among others, have severed their relationships with Sargeant III:

    a)   Wachovia Bank. Wachovia Bank severed its banking relationships with Sargeant III as a result of his money laundering activities;

    b)   The Republican Party of Florida. Sargeant III was the Chairman of the Finance Committee for Florida.  Sargeant III was a powerhouse fundraiser for the Republican party, raising millions of dollars for the party.  The Republican party severed ties as a result of Sargeant III's business frauds;

    c)   Most nations prohibit contracting with individuals that have bribed officials as part of a government contract and most nations prohibit contracting with individuals that have committed fraud in relation to a government contract. Comerica has full knowledge that Sargeant III committed fraud on a $2.1 billion-dollar U.S. Department of Defense

---

[53] On July 27, 2011, in *Al-Saleh v. Sargeant III,* the Jury rendered a six-count fraud verdict against Sargeant III et al.  This verdict found that Sargeant III had defrauded Al-Saleh on the 2.1 billion U.S. Department of Defense contract to move fuel through Jordan to the United States troops in Iraq.

contract,[54] yet Comerica continues to launder funds from the enterprises that Sargeant III is involved in with individuals, corporations and Nation States;

d)  ABN AMRO Bank N.V., Sargeant III utilized ABN AMRO to collateralize U.S. Department of Defense receivables to preclude Al-Saleh from seizing the receivables, Sargeant III then defrauded ABN AMRO bank by not paying the $60 million-dollar loan;

e)  Various other financial institutions that have ended their relationship with Sargeant III as a result of his money laundering;

f)  Daniel Sargeant, Sargeant III's brother, was, for his entire lifetime, on good terms with Sargeant III, and was involved in the family asphalt business (said to be the largest asphalt business in the world) with Sargeant III, until such time as Sargeant III, looted, embezzled and defrauded the family businesses and Daniel Sargeant himself;

g)  The Sargeant family businesses and the Sargeant family members have severed all relationships with Sargeant III as a result of Sargeant III looting, embezzling and defrauding the family businesses and causing massive financial harm to the family businesses, and permanent harm to the name and reputation of the Sargeant family members and the Sargeant family businesses;

h)  Supreme Fuels FZE, who Sargeant III defrauded of $5 million dollars.  Supreme Fuels FZE sued Sargeant III under RICO. Supreme Fuels FZE obtained a $5 million-dollar fraud judgment against IOTC USA under the RICO lawsuit;

i)  Old Castle a company who was left unpaid by Sargeant III;

j)  PDVSA, the national oil company of Venezuela who was the victim, among others, of the massive BTB Credit Bid Fraud;

---

[54] On February 13, 2018, IOTCA USA, represented by Sargeant III and the Defense Logistics Agency Energy reached a settlement agreement regarding the procurement of petroleum fuel products to Western Iraq arising for alleged underpayments from the dispute over the quantity of fuel delivered. This agreement does not establish any precedent. DLA Energy agreed not to consider the fraud allegations raised in the appeals in making future contract award decisions.  Sargeant III issued a false and misleading press release stating that the settlement reached between IOTC USA and the DLA Energy was a total refutation of fraud allegations against IOTC USA - The Florida Court found that Sargeant III had committed fraud on the $2.1 billion dollar U.S. Department of Defense contract. This is a ruling of the Court and it was not and cannot be refuted by a settlement over a fuel quantity dispute. The Florida Court found Sargeant III liable for fraud in the amount of $28.8 million dollars, ruling in favor of his partner in the $2.1 billion contract, Al-Saleh.

k) Curtis Meade, the contractor who worked on Sargeant III's 19,000 square foot waterfront Delray Beach mansion, who had to sue Sargeant III and his wife, Deborah Sargeant, and place a lien on the property in order to be paid the amounts that were due to him;

l) Various asphalt and oil companies that will no longer have anything to do with Sargeant III or any company that he is associated with.

414.    Sargeant III, Comerica and their co-conspirators, have left a trail of national and international financial disaster and ruin as referred to herein.  As a result of Sargeant III's conduct, he has fallen from grace and has been thrown out of the family asphalt businesses.  Sargeant III will never have a $2.1 billion-dollar contract with the U.S. Department of Defense and all of the countries, corporations and individuals referred to in this Complaint will never do business with Sargeant III again.

415.    Sargeant III has a reputation as an international fraud artist.  Sargeant III has been the subject of numerous articles in numerous publications, including smaller publications and larger publications, such as NBC News and the Wall Street Journal. The internet has dozens of stories regarding Sargeant III's frauds, war profiteering, bribery of Jordanian officials, fraud on the $2.1 billion-dollar U.S. Department of Defense contract, fraud against the former brother in law of the King of Jordan, fraud against his brother, fraud against his family, fraud against PDVSA, the BTB Credit Bid Fraud, the collection efforts of Al-Saleh and many other stories. *See* **Exhibit 25**, letter from Congressman Henry Waxman to Robert M. Gates, Secretary, U.S. Department of Defense dated October 16, 2008.

416.    The NBC News article refers to Sargeant III as hard-driving, and obsessed with crushing competitors, or, as quoted in the NBC News article, Sargeant III stated, "bleeding them out like pigs".  None of any of the actions of Sargeant III have caused Comerica to end their participation

in the illegal Enterprise with Sargeant III.  Driven by profit, Comerica has demonstrated manifest contempt for the victims of the illegal Enterprise. Comerica has been a fundamental and necessary member of the Enterprise.

417.   In the face of Sargeant III's thirteen year long criminal enterprise, every legitimate person, corporation and government agency has severed their relationship with Sargeant, while, at the same time and continuing to today, Comerica has reaffirmed its relationship with Sargeant III demonstrating contempt and indifference to many victims of Sargeant III's frauds and profiting from the enormous damage that Sargeant III has done to all of the persons and entities referred to herein.

418.   Comerica's conduct is unlike any other bank in U.S. history, in that the level and extent of Comerica's egregious conduct is unique. Comerica graduated from being a financial institution that laundered money for Sargeant III to being a financial institution that implemented the same strategies that the United States District Court for the Southern District of Texas Corpus Christi Division found were fraudulent.  In the face of being provided with the ruling from the United States District Court for the Southern District of Texas Corpus Christi Division, Comerica, one year later, attempted the same credit bid fraud, this time against the Plaintiffs, Al-Saleh, the *in rem* creditors and others.

419.   Sargeant III and Comerica have now moved into a different tier of fraudulent conspiracy, wherein they are involved with much lower echelon of individuals and business deals. The last publicized deal of Sargeant III was his involvement with the Ionian Refining & Trading Company (IRTC), which rented the ARMO refinery in Ballsh, Albania.  Sargeant III promised to invest $52 million dollars in the refinery – at the same time he owed over $35 million dollars to Al-Saleh pursuant to Al-Saleh's Florida State Court fraud judgment.

420.    Shortly after Sargeant III's sold his stake in the Ballsh refinery, tragedy struck at the refinery as a result of mortally dangerous work conditions.  Four workers were badly injured and one was killed in an explosion.  The refinery was also saddled with an unpaid tax bill of over $60 million dollars.  The workers had another mass protest (these protests had been going on for a considerable period of time).  The workers protested the extremely dangerous working conditions (which led to the death of one worker and serious injury to four others).  The workers also protested the fact that they had not been paid for four months.  Albania is one of the most corrupt countries in the world and the Ballsh refinery is the main refinery for the entire country.

### Comerica: The First Bank in U.S. History to Become a Principal and a Mastermind in a RICO Enterprise

421.    Comerica used its position and authority as a large, ostensibly legitimate, and national banking corporation, to illegally launder millions and millions of dollars, said funds known by Comerica to be the subject of fraudulent conduct.  Comerica used its banking licenses and banking operations to facilitate the illegal Enterprise referred to herein, said Enterprise that Comerica was involved from at least 2009 until present, and continuing.

422.    Comerica used its position and authority as an ostensibly legitimate banking corporation to conspire with Sargeant III and shield Sargeant III's assets from seizure with money laundering transactions and with Comerica's security, said security that was obtained by Comerica's fraudulent representations.

423.    Sargeant III's banking activities with Comerica were integral to Sargeant and Comerica's schemes to defraud Worldspan and others.

424.    Comerica deliberately co-mingled $9,387,398.67 of its funds with Sargeant's funds which were impressed with a fraud judgment in order to allow Sargeant to continue to perpetuate his fraud, avoid paying creditors and continue to profit from its business arrangements with Sargeant.

107

425.    Comerica was one of the masterminds of the Superyacht Credit Bid Fraud and Conspiracy and was the banker for the BTB Credit Bid fraud.

426.    Comerica is therefore liable to the Plaintiffs for their losses.

***Co-Conspirator Comerica Instrumental in Worldwide Fraudulent Schemes***

427.    Comerica conspired with and was instrumental in the conspiracy, fraud and money laundering related to Al-Saleh, the Plaintiffs, PDVSA, Supreme Fuels, BTB, Daniel Sargeant, the Sargeant family members, the Sargeant family businesses and other persons and companies.

428.    Over a nine-year period (at a minimum), Comerica conspired with and aided and abetted Sargeant III and others in their fraudulent schemes that victimized individuals, companies as referred to in this Complaint.

429.    These schemes were masterminded and engineered in Florida and had wide ranging effects in Florida.   Comerica, among other things, provided the support and assistance of money laundering, acting as the bagman in multiple and continuing schemes that defrauded the entities referred to in this Complaint.

430.    To avoid scrutiny and to avoid potentially enormous financial sanctions, penalties and fines from U.S. banking and other U.S. regulatory bodies, and to avoid the liability of being held accountable under RICO ligation, Comerica concealed their conduct by concealing documents, facts and by using proxies to undertake RICO predicate acts both in the U.S. and in various countries.

431.    Comerica ignored laws and regulations relating to money laundering and laundered millions and millions of dollars, blatantly ignoring the fact that the companies undertaking these huge and continuing transfers of funds (for years) had no employees, no business operations, were text book examples of money laundering corporations and were located offshore in jurisdictions that fail to enforce money laundering laws.

432.     Importantly, Comerica was aware of the fact that Sargeant had fraud and RICO litigation outstanding against him and very large fraud judgements outstanding and unpaid against him and companies he controlled.  Comerica laundered these funds so as to preclude the victims of these frauds from obtaining financial redress from Sargeant.

433.     Comerica, not satisfied with the profits from fees and charges from hundreds of millions of dollars of money laundering transactions related to funds obtained by fraud, became a leading participant, and one of the masterminds, in the fraud against Al-Saleh, the former brother in law of the King of Jordan, against the Plaintiffs, and against the other individuals and entities referred to in this Complaint.

434.     Comerica's Florida location, acting in concert with Sargeant, laundered millions of dollars from IOTC Bahamas into a superyacht in Canada.  Comerica and Sargeant conspired to defraud Al-Saleh and Worldspan.  Al-Saleh was unable to seize the superyacht due to Comerica's security on the superyacht.

435.     Comerica evolved from money laundering and aiding and abetting Sargeant III to being one of the masterminds of the Superyacht Credit Bid Fraud and Conspiracy.

436.     All of these schemes required, as an essential and continuing element, a bagman, an entity that would launder, on an ongoing basis, for years, in huge transactional amounts, the proceeds of fraud against victims in the U.S. and other countries.  The bagman and one of the two masterminds was and still is Comerica.

437.     Comerica used its authority and perceived legitimacy as a major bank in order to perpetuate its RICO predicate acts.

438.     Comerica used its position, authority and perceived legitimacy as a major bank to launder money, aid and abet Sargeant III, implementing security in favor of Comerica and acting as

one of the masterminds in the Superyacht Credit Bid Fraud and Conspiracy, working hand in hand with Sargeant III and the other co-conspirators.

439.    This conspiracy, fraud and money laundering victimized Sargeant III's family members, the Sargeant family businesses, the national oil company of Venezuela, PDVSA, Al-Saleh, the Plaintiffs and many other persons and companies.

440.    In addition to the victims referred to herein, the victims include the American taxpayers and the United States Department of Defense.  The US department of defense and the American taxpayers are entitled to have a $2 billion-dollar defense contract performed honestly and without defrauding Mohammad Al-Saleh, the former brother in law of the King of Jordan.

441.    The fraud on the contract included replacing, for the purposes of fraud, the equal IOTC partner Al-Saleh with a Sargeant III operative (Marty Martin) who bribed Jordanian officials.  Both fraud and bribery committed in relation a defense contract is illegal and this came to the attention of the United States Department of Defense, who, as a result of the fraud and bribery, commenced costly litigation related to the IOTC contract, said litigation at the expense of the U.S. taxpayer.

442.    Former Chairman of the House Oversight Committee, Henry Waxman, investigated Sargeant III for war profiteering (making excessive and criminal profits on U.S. Government war contracts) related to the $2 billion dollar IOTC contract in which Comerica acted as the money laundering bagman for the funds obtained by fraud against Al-Saleh.  Chairman Waxman did not know that the IOTC profit was far greater than known due to the fact that Sargeant defrauded banks and suppliers related to the IOTC contract, thereby further increasing the profit on the IOTC contract.

443.    A Congressional Committee in 2008 stated that Sargeant III had engaged in "the worst form of war profiteering."

444.    Sargeant III's war profiteering was referred to as being the worst type of war profiteering and was at the expense of the American taxpayer.  The U.S. Department of Defense made multiple requests directly and personally to Sargeant III asking that he reduce the contract price so as to not overcharge the American taxpayers hundreds of millions of dollars, Sargeant III refused to reduce the contract price.

445.    An audit by the U.S. Defense Department's inspector general, which was posted on the Pentagon's web site, estimated that the department paid Sargeant III "$160 [million] to $204 million more for fuel than could be supported by price or cost analysis." The study also reported that the three contracts were awarded under conditions that effectively eliminated the other bidders.

446.    Congressman Henry Waxman estimated that the American taxpayers would have saved approximately 180 million dollars if the U.S. Department of Defense contract had been awarded to the lowest bidder.

447.    This all occurred subsequent to Al-Saleh being circumvented and removed from the contracting company with the Department of Defense, as part of the conspiracy and fraud against Al-Saleh.

***Comerica Deliberately Disregarded Internal Controls and Aided and Participated in Sargeant III's Fraudulent Schemes***

448.    Comerica had notice of Sargeant's fraud from a series of red flags associated with Sargeant controlled bank accounts which Sargeant utilized to launder misappropriated funds and conduct his fraudulent affairs.  Comerica enabled Sargeant III's fraud.

449.    Sargeant III, utilizing his Comerica bank accounts, routinely engaged in atypical banking activities.  Sargeant III used his Comerica bank accounts to spend millions on luxury purchases as well as transfer millions of dollars to himself, his wife and others with funds that were known by Comerica to be obtained by fraud.

450.    The steps taken in this conspiracy were masterminded from Florida and the United States and were undertaken, in various places, including, in the United States, Jordan, Bahamas, Dubai, Netherlands, Canada, and Venezuela.

451.    All directions relating to the RICO conspiracy and the predicate acts of Comerica and the Comerica Employees were made from and originated in the U.S.

452.    The documents referred to herein reveal complicity and substantial assistance by Comerica.

453.    The conduct of Comerica and Comerica Employees evidences a pattern of mail fraud, wire fraud, bank fraud, money laundering, and monetary transactions involving unlawful and illegal activity.

454.    Numerous red flags, regarding money laundering and monetary transactions involving unlawful and illegal transactions, as described in detail herein, are evident from a review of the documents and facts.  Comerica participated and /or was willfully blind to such illegality.  Moreover, Comerica failed to act either by implementing normal industry safeguards and procedures, reporting the suspicious activity, or ending the banking relationship.

455.    Comerica laundered millions and millions of dollars from IOTC Bahamas corporate checking account ending in 8666 directly to Sargeant III and Deborah (husband and wife) personally commencing in June 16, 2009 and continuing to present.

456.    Sargeant III and Deborah opened and maintain a joint bank account at Bank of America.  Sargeant received at least $3,082,010.64 in passive income from IOTC Bahamas in tax years 2009 through 2011 and he deposited all of these funds into Sargeant tenants by their entirety account at Bank of America, thereby funding Sargeant's lavish lifestyle.

457.    Comerica recommitted itself to the relationship time and again, disregarding anti-money laundering safeguards and other legal and regulatory requirements that it was legally required to implement, and allowed the scheme to continue unabated.

458.    The motive for this is that Comerica obtained many thousands of dollars in loan origination, renewal and late fees, wire transfers, other transfers and other fees by facilitating and participating in the alleged scheme.   The actions of Comerica and Comerica Employees were designed to protect the co-conspirators.

### Comerica Repeatedly Ignored a Series of Obvious Anti-Money Laundering Red Flags and Facilitated the Money Laundering Scheme

459.    A scheme of the scale and scope alleged herein was undertaken by the purposeful and knowing involvement of the financial institution hosting the key money laundering accounts, in this case, Comerica.   It was only with Comerica's substantial and sustained assistance that Sargeant III and his co-conspirators were able to launder, on an ongoing basis the funds referred to herein.

460.    Comerica's actions over the course of a multi-year period between 2009 and present constituted a flagrant disregard and violation of anti-money laundering laws.

461.    The Currency and Foreign Transactions Reporting Act, also known as the Bank Secrecy Act (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1829(b), and 1951-1959, the "BSA"), and its implementing regulation (31 C.F.R. 103), were enacted to prevent banks and other financial service providers from being used as intermediaries for, or to hide the transfer or deposit of money derived from, illegal and criminal activity.

462.    Since its passage in 1970, Congress has amended the BSA a number of times to enhance its effectiveness, including in the aftermath of the September 11, 2001 terrorist attacks in the United States.   However, even before the 2001 enhancements to the BSA, more than 170 crimes were listed in the money laundering statutes then in force.   The laws applicable to the subject transactions

required financial institutions to educate their employees, to understand their customers and their businesses, and to have systems and procedures in place to distinguish routine transactions from ones that rose to the level of suspicious or illegal activity.

463.   Among other things, the BSA and related regulations promulgated by the relevant bank regulators required banks to develop, administer, and maintain a program that ensured and monitored compliance with the BSA and its implementing regulations, including record keeping and reporting requirements.

464.   In addition, an effective compliance program during the relevant time period described here should have included controls and measures to identify and timely report suspicious transactions. A financial institution was required to employ due diligence to be able to make an informed decision about the suspicious nature of a particular transaction and whether to file a suspicious activity report.

465.   For example, in its September 2000 Comptroller's BSA/Anti-Money Laundering Handbook, the Office of Currency Comptroller ("OCC"), an independent bureau with the U.S. Department of Treasury described money laundering as follows:

I. Money laundering is the criminal practice of filtering ill-gotten gains or "dirty" money through a maze or series of transactions, so the funds are "cleaned" to look like proceeds from legal activities. Money laundering does not have to involve cash at every stage of the laundering process. Any transaction conducted with a bank might constitute money laundering. Although money laundering is a diverse and often complex process, it basically involves three independent steps that can occur simultaneously:

    i.   Placement: The process of placing, through deposits or other means, unlawful cash proceeds into traditional financial institutions.

    ii.   Layering: The process of separating the proceeds of criminal activity from their origin through the use of layers of complex financial transactions, such as converting cash into traveler's checks, money orders, wire transfers, letters of credit, stocks, bonds, or purchasing valuable assets, such as art or jewelry.

iii. Integration: The process of using an apparently legitimate transaction to disguise the illicit proceeds, allowing the laundered funds to be disbursed back to the criminal. Different types of financial transactions, such as sham loans or false import/export invoices, can be used.

466.  This case features classic money laundering activity undertaken through the transfer of funds from offshore companies with no operational business, no operational business, said funds transferred in very large tranches, continuing for years and years, from offshore corporations into the United States of America, with the full assistance and participation of Comerica.

467.  This includes but is not limited to very large transactions from IOTC Bahamas, an offshore corporation, with no employees, business operations that is domiciled in a country that does not enforce anti-money laundering laws.

468.  The facts described herein also reveal multiple instances of placement, layering and integration as described in the OCC Handbook.

469.  In addition, the OCC Handbook provides guidance for banks to use when opening business accounts.  Included are instructions to:

I.  Determine who are the beneficial owners of all accounts in private banking, trust, and other specialized banking departments. The bank should pay particular attention to corporate entities, international business corporations, bearer share companies, or nominee officers, especially if such organizations are based in countries or jurisdictions considered to be secrecy or money laundering havens.

II.  Consider the source of funds used to open the account. Large deposits, especially cash, should be questioned.

470.  Comerica failed to carry out these steps or any proper account opening procedures from the outset of the banking relationship with the various corporations that were alter ego corporations of Sargeant III, including both domestic and offshore corporations and accounts.

115

471.    These activities were violative of obligations applicable to the operation of Comerica in Florida pursuant to, among others things, the BSA, Chapter 655 of the Florida Statutes, and of applicable Federal Deposit Insurance Corporation regulations.

472.    It was part of Comerica's duties to verify the source of funds used to pay down the $9.4 million-dollar loan advanced by Comerica to Sargeant III for the construction of the Crescent 144, aka the Superyacht. The original balance on the Comerica loan to Sargeant for construction on the Superyacht was $9.4 million, on August 31, 2016 the loan balance was $2,023,672.85.

473.    Sargeant paid the Superyacht loan down by reducing the principal from $9.4 million to $2,023,672.85, thereby reducing the principal in the amount of $7,376,327.15.  These payments were made from the offshore corporation IOTC Bahamas, the same corporation that was used as a vehicle of fraud against Al-Saleh and others and the same corporation that, with its predecessor corporation, laundered over $180 million dollars.

474.    During the time period from August 9, 2009 to present there was also a substantial amount of interest paid by Sargeant III to Comerica on the Superyacht loan.  Comerica took no steps to determine the source of these funds.

475.     Comerica took no steps to determine or verify the payment by Sargeant III of over $11 million towards the construction of the Crescent 144, and the payment of Monger, the employee and agent of Sargeant III, the full-time employee of Sargeant III who was involved in the construction of the superyacht.

476.    Comerica also ignored an extensive number of industry-recognized "red-flags" that should have triggered investigation, reporting and the cessation of the banking relationships with Sargeant III and his alter ego corporations.

477.    The September 2000 Comptroller's Handbook compiled by the OCC provides an extensive list of "potentially suspicious activities that should raise red flags for further investigation to determine whether the transactions or activities reflect illicit activities rather than legitimate business activities and whether a SAR should be filed." These suspicious activities include:

•       **"A business account history that shows little or no regular, periodic activity; the account appears to be used primarily as a temporary repository for funds that are transferred abroad."**
The alter ego corporations of Sargeant III were utilized to launder funds by Sargeant III. These very large transfers were textbook examples of money laundering, utilizing corporations with no business operations, no employees, located in offshore jurisdictions, to effect multiple transfers of very large sums of money, continuing for years and years, from offshore into the United States as part of Sargeant III's continuing pattern of international money laundering.

•       **"A customer's place of business or residence is outside the financial institution's service area."**
The businesses were, in many instances, outside of the service area of Comerica, in that the money laundering scheme required offshore corporations to effect the transfer of funds from offshore into the United States.

•       **"Unusual transfer of funds among related accounts or accounts that involve the same principal or related principals."** Comerica knew that the loan made for the Crescent 144 superyacht, the payments made on the loan, and the funds utilized to pay for the construction of the Crescent 144 superyacht, and the funds utilized to pay for Monger all involved Sargeant III directly or derived from corporations all controlled by and / or beneficially controlled by Sargeant III.

•       **"Wire transfer activity to/from financial secrecy haven countries without an apparent business reason or when it is inconsistent with the customer's business or history."**
The offshore corporations utilized by Sargeant III to effect his money laundering and facilitate his scheme were undertaken without an apparent business reason and were inconsistent with the business history of Sargeant III. Funds that originated from American taxpayers that were paid from the United States Department of Defense to Sargeant III's alter ego corporations, including to IOTC Bahamas and IOTC USA, for the purpose of defrauding Worldspan, numerous corporations, individuals, and for the purpose of defrauding Al – Saleh of his share of the profits from the IOTC Jordan Contract with the United States Department of Defense, were laundered by Comerica.

•       **"Funds transferred in and out of an account on the same day or within a relatively short period of time."**
Funds were transferred in and out of accounts controlled by Sargeant III and his alter ego corporations in a relatively short period of time as these transactions had, at their heart, the

purpose of defrauding Al-Saleh of his share of the profits he was entitled to from the IOTC Jordan Contract with the United States Department of Defense and defrauding the other entities referred to in this Complaint.

- **"Regular deposits or withdrawals of large amounts of cash, using wire transfers to, from, or through countries … whose laws are ineffective in controlling the laundering of money."**
Sargeant III had his alter ego corporations transfer funds, in very large amounts, for years, from accounts located in countries including, but not limited to, the Bahamas, whose laws are ineffective in controlling the laundering of money and countries which have a history of being blacklisted by the U.S. regulators as a result of ineffective anti-money laundering regulations and controls.

- **"Unusual or suspicious identification documents that the financial institution cannot readily verify."**
Comerica failed to conduct enquiries into the identification documents utilized in regard to the alter ego corporate accounts that were utilized by Sargeant III. The underlying basis for these accounts was never investigated by Comerica.

### *Comerica Acted with Knowledge*

478.    Comerica and its co-conspirators conducted this racketeering activity through a pattern of predicate acts that began in 2009 and continues to this day.  The predicate acts all had the common purpose of facilitate the Superyacht Credit Bid Fraud and Conspiracy, and as part of the scheme to defraud Al-Saleh and the other persons and entities referred to in this Complaint.  This constituted a continuing and concerted effort to obfuscate the scheme and to prevent the detection and uncovering of the involvement and extent of the roles of Sargeant III and Comerica in the Superyacht Credit Bid Fraud and Conspiracy.

479.    A number of key facts confirm that Comerica and Sargeant III acted with knowledge of the underlying fraud and conversion and that Comerica and Sargeant III intentionally acted in furtherance of the Superyacht Credit Bid Fraud and Conspiracy and cover-up.

*RICO Predicate Acts*

<u>Mail Fraud and Wire Fraud</u>

480.   The Defendants activities affected interstate and foreign commerce.

481.   Beginning in at least 2005, as it relates to Sargeant III and Deborah and as it relates to Comerica and the other co-conspirators, beginning in at least 2009, and continuing today, the Defendants perpetrated an ongoing massive fraudulent scheme against the individuals, corporations and the Plaintiffs referred to in this Complaint.  This fraudulent scheme resulted in victims claiming against Worldspan for funds they were defrauded of by the fraudulent scheme and it resulted in the destruction of the Plaintiffs as referred to herein.

482.   The scheme was directed, in large part, towards the assets of the Plaintiffs.  Many of the underlying transfers at the heart of the scheme involved the transfer of money paid into Comerica and from Comerica accounts in Florida and the United States.

483.   The Defendants made extensive use of the U.S. mails and wires, in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).  Instructions were made utilizing U.S. mails and wires, by the Defendants, to transfer funds and fraudulently charge assets. This included, but was not limited to, transferring funds into and out of Comerica accounts, transferring funds from offshore corporations, making payments to Worldspan for the construction of the Superyacht, said funds that were the proceeds of fraud of the fraudulent scheme.  This also included transferring funds in and out of Comerica accounts for payments to the Defendants and the co-conspirators, with funds that were the proceeds of fraud against victims of the fraudulent scheme.  Many of the instructions were sent to and sent from Florida, directing the transfer of funds and the fraudulent charging of assets.

119

484.     The frauds referred to herein and the scheme would not have been possible had the Defendants not used the mails and wires to send and receive instructions in and out of Florida.

485.     The Defendants' fraudulent scheme gives rise to numerous predicate acts of mail and wire fraud under RICO. These acts include, but are not limited to:

(a.) Communications to Monger from Sargeant III, while Sargeant III was in Florida and while Monger was in Florida, other States, and in Canada;

(b.) Numerous wire transfers made from offshore corporations, through Comerica accounts located in Florida and in Texas, to effectuate the money laundering transactions and the money laundering referred to herein.

(c.) Numerous emails from Florida and Canada to England to correspond with Sargeant III's London solicitors who stated that Worldspan would not be paid for the millions of dollars' worth of unattached accessories to the Superyacht, which was then followed by communications from Florida to and from Monger, who was in Canada, followed by Comerica and Sargeant communicating, between Florida, Michigan, Canada, and England to effectuate their purpose of fraudulently seeking to obtain millions of dollars' worth of unattached accessories to the Superyacht, without paying for the unattached accessories.

(d.) Hundreds of wire transfers were made by Sargeant III, his alter ego corporations, Comerica, into and out of accounts in Florida

(e.) Sargeant III, Comerica and Deborah arranged for numerous wire transfers into joint accounts (Tenants by Entireties) of Deborah and Sargeant III, in Florida, for the purpose of having non-exempt funds subject to seizure by Al-Saleh and others become exempt from seizure.

(f.) Sargeant III, Comerica and Deborah arranged for numerous wire transfers into the Canadian bank account of Worldspan for the purpose of paying for the construction of the Superyacht.  These wire transfers were made from IOTC Bahamas.  These wire transfers were made in conjunction with numerous emails and facsimiles to Worldspan in Canada to assist in effectuating these wire transfers.   The wire transfers were from IOTC Bahamas to Worldspan.  IOTC Bahamas had no employees, no business operations, no legitimate business purpose and is situated in a country that does not enforce anti-money laundering laws.  IOTC Bahamas and its predecessor corporation laundered in excess of 180 million dollars.

(g.) All of these wire transfers were made at the explicit direction and for the illicit personal benefit of the Defendants and their co-conspirators.

Certain of these wire transfers referred to above and related instructions are reflected in **Exhibits 11, 12, 22 and 23**.

(h.) Frequent phone conversations between the Defendants or those acting upon their instructions, including, but not limited to phone conversations between Sargeant III in Florida and Monger in British Columbia, Canada were made for the purpose of effectuating the wire transfers and the Superyacht Credit Bid Fraud and Conspiracy.

486.   These multiple and frequent acts of mail and wire fraud establish a pattern of racketeering and further, give context to the Defendants' related racketeering activity that persisted from 2005 until present and continues unabated today.  These acts were all undertaken in furtherance of the scheme.

<u>Money Laundering</u>

487.   Comerica is a bank with locations in Florida and its activities affect interstate and foreign commerce.

488.   Beginning in at least 2009 and continuing through present, Comerica, Sargeant III, Deborah and the other co-conspirators, unlawfully obtained millions of dollars through theft, fraud, embezzlement and other artifices.

489.   Over that same time period, Comerica, Sargeant III, Deborah and the other co-conspirators, have made numerous financial transactions, money laundering transactions, with the proceeds of theft, fraud and embezzlement, and for the purpose of theft, fraud and embezzlement, said transactions being undertaken with Comerica bank accounts utilizing offshore corporations, alter ego corporations, tenants by their entireties accounts (Deborah and Sargeant III), in violation of 18 U.S.C. §§ 1956 and 1957.

490.   The Laundering Transactions currently known include, but are not limited to, the transfers to and through Comerica bank accounts in Florida, said transactions being for millions and millions of dollars.

491.   The Laundering Transactions currently known include, but are not limited to, the transfers to and through Comerica bank accounts in Florida, said transactions being for millions and millions of dollars.

492.   The bank statements of the accounts at Comerica demonstrate blatant and obvious examples of money laundering, with millions and millions of dollars being transferred from offshore corporations with no employees, no business operations and located in jurisdictions that do not enforce anti-money laundering laws. These transactions are, among other things, to Deborah, Sargeant III, alter ego corporations, and co-conspirators.  Sargeant III and Comerica laundered over $11 million dollars from IOTC Bahamas and paid it to Worldspan towards the construction of the Superyacht. These same funds were then claimed by other victims of Comerica and Sargeant III's frauds, the victims bringing claims against Worldspan for the return of their funds that were defrauded from them by Comerica and Sargeant III.

493.   Each of the Laundering Transactions was for an amount in excess of $10,000.

494.   The Laundering Transactions were made by Comerica, Sargeant III, Deborah and the co-conspirators, with the intent of concealing the scheme.

495.   Upon information and belief, Comerica, Sargeant III, Deborah and the other co-conspirators, made the Laundering Transactions with the specific intent to conceal or disguise the nature, location, source, ownership, or control of the Illegal Proceeds, because the Laundering Transactions were made in an unnecessarily complicated way, because they were made without a legitimate business purpose, because their effect was to enrich Comerica, Sargeant III, Deborah and the other co-conspirators to the detriment of the Plaintiffs and the other victims.

496.   The Laundering Transactions affected interstate and foreign commerce as they involved the transfer of money between accounts in the United States or between accounts located in

the United States, the Bahamas, the Netherlands, Jordan, Canada and elsewhere. The Laundering Transactions were undertaken in violation of banking law and statute by Comerica.

497.    Upon information and belief, the nature and intent of the Laundering Transactions were concealed by Comerica, Sargeant III, Deborah and the other co-conspirators from the Plaintiffs and the victims and the applicable banking and government authorities and were made with the specific intent to, among other things, avoid being subject to sanctions, penalties and fines by banking and government authorities, and to enrich the Defendants.

498.    The scheme gives rise to multiple predicate acts of money laundering under RICO. The money laundering activities of Comerica, Sargeant III, Deborah and the other co-conspirators establish a pattern of racketeering and give context to their related racketeering activity that persisted for years and continue to this day.

Fraudulent Transfers by Comerica Bank to Plaintiff Worldspan Pursuant to August 14, 2009
Assignment – Aiding and Abetting Fraud

499.    On or about August 2009, in furtherance of the conspiracy, and after fraudulently inducing the Plaintiff to execute the August 14, 2009 Assignment, Comerica transferred its funds across state lines and across an international border, to the account of Worldspan, located in Canada, the amount of $1,024,485.00.

500.    On or about September 2009, in furtherance of the conspiracy, and after fraudulently inducing the Plaintiff to execute the August 14, 2009 Assignment, Comerica transferred its funds across state lines and across an international border, to the account of Worldspan, located in Canada, the amount of $1,672,824.40.

501.    On or about October 2009, in furtherance of the conspiracy, and after fraudulently inducing the Plaintiff to execute the August 14, 2009 Assignment, Comerica transferred its funds

across state lines and across an international border, to the account of Worldspan, located in Canada, the amount of $945,993.40.

502. On or about November 2009, in furtherance of the conspiracy, and after fraudulently inducing the Plaintiff to execute the August 14, 2009 Assignment, Comerica transferred its funds across state lines and across an international border, to the account of Worldspan, located in Canada, the amount of $1,182,714.22.

503. On or about December 2009, in furtherance of the conspiracy, and after fraudulently inducing the Plaintiff to execute the August 14, 2009 Assignment, Comerica transferred its funds across state lines and across an international border, to the account of Worldspan, located in Canada, the amount of $1,186,780.59.

504. On or about January 2010, in furtherance of the conspiracy, and after fraudulently inducing the Plaintiff to execute the August 14, 2009 Assignment, Comerica transferred its funds across state lines and across an international border.

505. On or about February 2010, in furtherance of the conspiracy, and after fraudulently inducing the Plaintiff to execute the August 14, 2009 Assignment, Comerica transferred its funds across state lines and across an international border, to the account of Worldspan, located in Canada, the amount of $1,253,794.46.

506. On or about March 2010, in furtherance of the conspiracy, and after fraudulently inducing the Plaintiff to execute the August 14, 2009 Assignment, Comerica transferred its funds across state lines and across an international border, to the account of Worldspan, located in Canada, the amount of $137,258.49.

<u>Comerica Launders Fraudulently Obtained Funds from IOTC Bahamas Across State Lines and International Borders to Plaintiff Worldspan</u>

124

507.    On or about May 29, 2009, in furtherance of the conspiracy, and after fraudulently inducing the Plaintiff to execute the August 14, 2009 Assignment, Sargeant transferred across state lines and across an international border, from IOTC Bahamas Comerica Account ending in #8666, to the account of Worldspan, located in Canada, the amount of $857,715.30.

508.    On or about June 25, 2009, in furtherance of the conspiracy, and after fraudulently inducing Worldspan to execute the August 14, 2009 Assignment, Sargeant transferred across state lines and across an international border, from IOTC Bahamas Comerica Account ending in #8666, to the account of Worldspan, located in Canada, the amount of $200,000.00.

509.    On or about July 10, 2009, in furtherance of the conspiracy, and after fraudulently inducing the Worldspan to execute the August 14, 2009 Assignment, Sargeant transferred across state lines and across an international border, from IOTC Bahamas Comerica Account ending in #8666, to the account of Worldspan, located in Canada, the amount of $500,000.00.

510.    On or about August 5, 2009, in furtherance of the conspiracy, and after fraudulently inducing the Worldspan to execute the August 14, 2009 Assignment, Sargeant transferred across state lines and across an international border, from IOTC Bahamas Comerica Account ending in #8666, to the account of Worldspan, located in Canada, the amount of $100,000.00.

511.    On or about August 13, 2009, in furtherance of the conspiracy, and after fraudulently inducing Worldspan to execute the August 14, 2009 Assignment, Sargeant transferred across state lines and across an international border, from IOTC Bahamas Comerica Account ending in #8666, to the account of Worldspan, located in Canada, the amount of $30,00.00.

512.    On or about April 30, 2010, in furtherance of the conspiracy, and after fraudulently inducing the Worldspan to execute the August 14, 2009 Assignment, Sargeant transferred across state

125

lines and across an international border, from IOTC Bahamas Comerica Account ending in #8666, to the account of Worldspan, located in Canada, the amount of $200,000.00

513.     There are hundreds of payments from IOTC Bahamas, facilitated and conducted by Comerica, each of these payments was part of the scheme and in furtherance of the scheme to defraud numerous individuals and corporations, including the Plaintiffs and Al-Saleh.

514.     Comerica transferred its funds across state lines and across an international border in transactions wherein Comerica transferred funds from Comerica Bank in the United States to the account of Worldspan in Canada for the purposes referred to in detail in the Complaint and as part of a conspiracy to defraud the Plaintiffs.

515.     Worldspan's account was located at the Bank of Montreal, in Maple Ridge, B.C. Canada.   These funds were paid for the construction of a 144-foot Superyacht that was being constructed for Harry Sargeant III by Worldspan.  The payments made by Comerica, pursuant to the loan that Comerica granted to Sargeant III, commenced in 2009.

516.     IOTC Bahamas commenced using Comerica as its primary bank on or about May of 2009 (possibly earlier).

517.     The prior payments made to Worldspan for the construction of the Superyacht had been made by Sargeant III using funds that Sargeant III had defrauded from Al-Saleh in a Department of Defense contract.  Comerica commingled their funds with the funds obtained by fraud by paying Worldspan with loan payments from a loan made to Sargeant III for the purpose of defrauding Al-Saleh and Worldspan.

518.     As referred to herein in detail, Comerica participated in a continuing enterprise and conspiracy to defraud many individuals and corporations, including Al-Saleh and Worldspan.

<u>Violations of the Travel Act</u>

519.    Monger, Sargeant III's full time employee, and co-conspirator, who, among other things, as referred to herein, undertook the following acts:

a.   falsely stated in an insolvency proceeding that Sargeant was a secured creditor;

b.   illegally interfered with the Court ordered sale of the Superyacht;

c.   provided false evidence regarding the existence of a Superyacht manufacturing facility that in fact did not exist,

d.   participated in a fraud against Worldspan for millions of dollars in materials and equipment purchased by Worldspan pursuant to Change Orders wherein the London solicitors of Sargeant stated in writing there would be no payment for these materials and equipment, followed by Comerica, acting with Sargeant III and Monger, attempting to defraud Worldspan of millions of dollars' worth of equipment without paying for it.

520.    In furtherance of the enterprise, Monger travelled from his residence in Florida to Vancouver, B.C, Canada on numerous occasions. In furtherance of the enterprise, Monger also travelled to various locations in the United States, this travel was to carry out his role in the illicit scheme in violation of 18 U.S.C. § 1952 (the Travel Act).  Monger could not have carried out his role in the scheme without traveling to Canada and throughout the United States to undertake the illegal acts referred to herein.

521.    Sargeant III attended at the premises of Worldspan in Maple Ridge, B.C., Canada during the construction of the Superyacht in furtherance of the enterprise referred to herein.  While present at the premises of Worldspan, Sargeant III made representations regarding Sargeant III paying for the construction of the Superyacht that were fraudulent, false and misleading.  This travel was in furtherance of the illicit scheme referred to herein and in violation of 18 U.S.C. § 1952.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

522.    Comerica, Sargeant III, Deborah and the other co-conspirators, nine-year scheme gives rise to several predicate violations of 18 U.S.C. § 1952 under RICO.  These violations establish a pattern of racketeering and give context to the related racketeering activity that persisted for years.

### *Enterprise*

523.    An association in fact of Comerica, Younker, Shaw, Jones, Sargeant III, Deborah, Monger, Kirkeide, and the other co-conspirators referred to herein and individuals who participated in, conspired, and profited from the scheme to devalue the Plaintiffs' assets, undertake a fraudulent credit bid, destroy the Plaintiffs' companies and brands, cause harm to the principals , including but not limited to Steven Barnett the principal of the Plaintiffs, constitute an enterprise under 18 U.S.C. § 1961(4) (the Enterprise).

524.    The Enterprise also caused financial harm to others who then claimed against the Plaintiffs on the basis that funds obtained by fraud against them had been paid by Sargeant III and Comerica to the Plaintiffs.

525.    The purpose of the Enterprise was, through a series of illicit and illegal devices (principally through fraud, fraudulent misrepresentation, fraudulent omission, collateralization of assets for illegal purpose, mail fraud, money laundering, a death threat, extortion, wire fraud, assignment of Sargeant III's interest in the Superyacht and misappropriation), to wrongfully obtain property and money from the Plaintiffs.  They used positions of control and authority to systematically devalue the Plaintiffs' assets and destroy the Plaintiffs' businesses money from the Plaintiffs. The scheme required the coordination and active participation of each and every defendant and co-conspirator involved in the Enterprise.

128

526.     Comerica and Sargeant III are the masterminds of the nine-year scheme and their participation in the Enterprise, along with the participation of the other individual defendants and co-conspirators, is detailed above.

527.     The conspirators used IOTC Bahamas to pay the Plaintiffs with funds that were the proceeds of fraud as referred to herein.  The conspirators laundered millions of dollars in a manner so as to preclude Al-Saleh and other creditors from recovering on judgments and amounts due, thereby causing Al-Saleh to claim against the Plaintiffs for the disgorgement of over $11 million dollars.  Comerica comingled its own funds with the over $11 million dollars it had laundered from IOTC Bahamas as part of the Superyacht Credit Bid Fraud and Conspiracy.

528.     The conspirators utilized offshore alter ego corporations as referred to herein.  The conspirators undertook a nine-year illegal enterprise that targeted not only the Plaintiffs but an individual (Al-Saleh was defrauded by Sargeant III) and a corporation (Supreme Fuels FZE who was defrauded by Sargeant III) who then claimed against the Plaintiffs seeking the recovery of their funds that had been stolen and or defrauded from them by the co-conspirators.

529.     Comerica actively participated in and undertook the same role as did the alter ego corporation, BTB, the company that the Texas Federal Court found to be a vehicle of fraud against PDVSA, Al-Saleh and others, as referred to herein.

530.     The masterminds, Comerica and Sargeant III, used a series of artifices and frauds to effectuate and conceal the fraudulent scheme.

531.     Upon information and belief, the association in fact that made up the Enterprise includes other individuals and entities whose identity is not currently known, including, but not limited to, other further Comerica executives and employees whose identities will be made known through the litigation discovery process.

532.    The Enterprise is engaged in, and its activities affected foreign commerce, including but not limited to, Florida, Michigan, Texas, Canada, Bahamas, Netherlands, England, Venezuela, Jordan and other countries.  The Enterprise destroyed businesses located in Canada and owned by American corporations and American individuals.

533.    All of the decisions and control made by the co-conspirators were made from Florida, with the individuals undertaking the decision and control being residents of Florida, with the exception of Comerica employee, Cynthia Jones, of Detroit, Michigan. The profits from the Enterprise were received in Florida.

534.    The association-in-fact Enterprise in this Complaint has a structure distinct from the pattern of racketeering activity described in this Complaint.  The association-in-fact Enterprise in this Complaint possesses three characteristics as follows:

1.  A purpose; the purpose, as referred to herein in detail, was and is to defraud and financially harm the Plaintiffs, individuals, and corporations for the illegal financial benefit of the co-conspirators;

2.  The relationships among those associated with the Enterprise exists as a result of all of the co-conspirators performing acts in furtherance of the Enterprise,[55] in a relationship that includes, among other things, payment to the co-conspirators (all co-conspirators received financial benefit from the Enterprise), all co-conspirators associated with members of the Enterprise to further the purpose of the Enterprise and each of those associated with the Enterprise undertook acts with other members of the Enterprise in furtherance of the Enterprise; and,

3.  The association-in-fact Enterprise has longevity so that it permitted the associates to pursue the Enterprises' purpose. Comerica's participation in the Enterprise commenced in, at a minimum, in 2009 and continues to this day, meaning that Comerica's participation in the Enterprise spans a nine-year period at a minimum. The other co-conspirators participation in the Enterprise date back to as early as 2005, with the last co-conspirator to join the Enterprise being Comerica, who joined the Enterprise in 2009.

---

[55] The acts of those associated with the Enterprise are referred to in specific detail in this Complaint and refer, in detail, to the relationships between those associated with the Enterprise.

535.    Comerica used its separate legal incorporation to facilitate the racketeering activity referred to herein. Comerica also engaged in a pattern of racketeering activity referred to herein through legal entities beyond its control, including, but not limited to, independent banks, law firms, Sargeant III's alter ego corporations, the Society for Worldwide Interbank Financial Telecommunications (SWIFT), third-party banks, correspondent and intermediary banks, the Federal Reserve, its internet service provider, the U.S. mail system and by engaging in the enterprise in the manner referred to in this complaint with the co–conspirators, including, but not limited to, Monger, Deborah, Sargeant III and Kirkeide.

536.    The Enterprise continues to this day, as Comerica, the other Defendants and Sargeant III and the co-conspirators continue to act in assistance of the Enterprise and continue to conceal the scheme and to thwart the Plaintiffs' efforts to uncover the full scope of the fraud.

### *Relatedness and Continuity*

537.    From at least 2009 and continuing today, in Florida and elsewhere, the defendants repeatedly engaged in acts indictable under 18 U.S.C. §§ 1341 (relating to mail fraud), 1343 (relating to wire fraud), 1952 (relating to the Travel Act), and 1956 (relating to the laundering of monetary instruments), and thereby continually engaged in racketeering activity within the meaning of 18 U.S.C. 1961(1)(b).

538.    A Defendants' violations of 18 U.S.C. §§ 1341, 1343, 1952 and 1956-1957 extended over a period of years (at least 2009 until present and continuing) and involved distinct and independent criminal acts.  They were neither isolated nor sporadic events, but involved regular and repeated violations of law to accomplish the defendants' desired ends in the course of the business of the Enterprise.  These acts were related to each other by virtue of:

a) Common participants – Sargeant III, Deborah, Comerica, Comerica Employees, including but not limited to, Younker, Shaw and Jones, Monger, Kirkeide, and the other co-conspirators referred to herein;

b) Common victims – the Plaintiff corporations referred to herein and Barnett, resident of Florida, and the victims who claimed against the Plaintiffs, Al-Saleh and Supreme Fuels FZE;

c) Common methods of commission – complicated financial and corporate transactions effectuated through off-shore shell companies in the Bahamas, Jordan, Dubai, Netherlands and other countries as referred to herein, and designed to obfuscate the transfer of laundered funds to Sargeant III, Deborah, Comerica, Comerica bank employees, and the other co-conspirators referred to herein. The common methods of commission also included Comerica, in concert with Sargeant III and other co-conspirators, effectuating the Superyacht Credit Bid Fraud and Conspiracy as referred to herein;

Sargeant III and Comerica, the two masterminds, both contracted with Plaintiff Worldspan, first Sargeant III, and then, by way of assignment of the Superyacht construction contract, Comerica. As part of the scheme, Comerica induced Worldspan to undertake work on the Superyacht with the expectation of being paid, ultimately failing to pay Worldspan $4.9 million dollars (still outstanding today) an amount that, among other illegal acts undertaken by the co-conspirators, caused Worldspan to fail; and,

d) The common purpose of devaluing and destroying the assets of the Plaintiffs, including, but not limited to, illegally interfering with the marketing and sale of the Superyacht, improperly bringing an insolvency application, allowing Sargeant III to advance claims that only Comerica could advance, failing to pay $4.9 million dollars, illegally banking in Canada, making false representations regarding a non-existent Superyacht manufacturing facility, and devaluing and destroying the assets of the Plaintiffs as well as causing to be imposed on the Plaintiffs costs, expenditures, fines and levies as referred to herein.

### *Injury*

539.    The Defendants' violations of 18 U.S.C. § 1962(c) proximately caused the Plaintiffs to suffer the damages and losses described above.  As a direct consequence of the RICO violations, Comerica, Sargeant III and their co-conspirators destroyed the Plaintiffs businesses and brands and devalued the Superyacht titled in the name of Worldspan as well as causing to be imposed massive costs levied by government agencies.  The Plaintiffs also incurred very significant costs and legal fees.

540.    The actions of the co-conspirators, as referred to herein, were the direct and proximate cause of the devaluation of the Superyacht titled in the name of Worldspan, the destruction of the business Worldspan, the destruction of the value of the brands, Queenship and Crescent, the injury to CSPAN and Wedmore.  Very substantial sums were expended on accountants, experts, attorneys, and others as a result of the actions of the co-conspirators referred to herein.

541.    The Plaintiffs injuries are Florida injuries. The brands Queenship and Crescent are owned by Florida limited liability companies. Worldspan is owned by a Florida limited liability company. The Superyacht is titled in the name of Worldspan, which is owned by a Florida limited liability company.

542.    The Defendants targeted the assets of the Plaintiffs which are located in Florida and devalued and or destroyed these assets.

### CAUSES OF ACTION

### COUNT I – RACKETEERING IN VIOLATION OF RICO, 18 U.S.C. §§1962 (c), 1964 (c)
### (By All Plaintiffs Against All Defendants)

543.    The Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 542 above by reference as constituting and describing the Defendants' schemes.

544.    At all relevant times, each of the Plaintiffs is a "person" within the meaning of RICO 18 U.S.C. §§ 1961(3) and 1964(c).

545.    Each of the Defendants are "persons" as defined in 18 U.S.C. § 1961 (3) and 1962(c).

546.    Comerica is a bank doing business in Florida, and whose activities affect interstate and foreign commerce.  At all times relevant, Comerica was employed by or associated with the enterprise described above.

547.   The Defendants reside in Florida, with the exception of Jones who resides in Michigan, and engaged in activities that affect interstate and foreign commerce.  At all times relevant, the Defendants were employed by or associated with the enterprise described herein.

548.   At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

549.   At all relevant times, Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

550.   Specifically, at all relevant times, Defendants engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth above.

551.   The acts set forth in this Complaint constitute a violation of one or more of the following statutes: 18 U.S.C. § 1952 (Travel Act); 18 U.S.C. § 1956 (money laundering); 18 U.S.C. §1343 (wire fraud); 18 U.S.C. §1341 (mail fraud); extortion and a death threat in violation of applicable Florida state law.

552.   Each of the Defendants committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

553.   The acts of racketeering activity referred to in the previous paragraph constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The acts alleged were related to each other by virtue of common participants, a common victim (the Plaintiffs), a common method of commission, a common purpose, to enrich the Defendants, and the common result of devaluing the Superyacht and destroying the Plaintiffs businesses.

554.   As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c), the Plaintiffs were injured in their businesses and property, with damages of $66,268,832.00.

555.     As a result of their misconduct, Defendants are liable to the Plaintiffs for their losses in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs requests that this Court enter judgment in favor of Plaintiffs against the Defendants awarding Plaintiffs' treble damages in the amount of $198,806,496; reasonable attorneys' fees and costs, pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which the Plaintiffs may be entitled at law or in equity.

### COUNT II – RACKETEERING IN VIOLATION OF RICO, 18 U.S.C. § 1962(d)
### (By All Plaintiffs Against All Defendants)

556.     Plaintiffs incorporate and reallege the preceding paragraphs 1 through 542 as if fully set out herein.

557.     Comerica is a bank doing business in Florida, and whose activities affect interstate and foreign commerce.  At all times relevant, Comerica was employed by or associated with the enterprise described above.

558.     Each of the Defendants engaged in, and whose activities affect, interstate commerce. At all times relevant, each of the Defendants was employed by or associated with the Enterprise described above.

559.     The Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally diverting, laundering and converting millions of dollars.

560.     Pursuant to and in furtherance of the illegal scheme, the Defendants knowingly agreed to perform acts, and did perform multiple related acts of mail, wire and bank fraud, money laundering and monetary transactions in property derived from specified unlawful activity all of which facilitated

the activities and conduct of those operating and managing the enterprise in an illegal manner, including but not limited to, the acts referred to herein.

561.    The acts of mail, wire and bank fraud, money laundering and monetary transactions in property derived from specified unlawful activity, set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

562.    The Defendants directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering described above in violation of 18 U.S.C. § 1962(c).

563.    As a direct and proximate result of the Defendants racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs were injured in its business and property through the loss of more than $66 million dollars.

564.    As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).

565.    The Defendants conspired to conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally diverting, laundering and converting millions of dollars.

566.    The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme described above and to enrich themselves.

567.    That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

568.    As a direct and proximate result of the Defendants conspiracy with the members of the enterprise, the overt acts of mail, wire and bank fraud, money laundering and monetary

transactions in property derived from specified unlawful activity taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs were injured in its business and property through the loss of more than $66,268,832.00.

**WHEREFORE**, Plaintiffs requests that this Court enter judgment in favor of Plaintiffs against the Defendants awarding Plaintiffs' treble damages in the amount of $198,806,496; reasonable attorneys' fees and costs, pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which the Plaintiffs may be entitled at law or in equity.

## COUNT III – FRAUD
### (By Plaintiff Worldspan Against Comerica, Shaw and Sargeant III)

569.     Worldspan incorporate and realleges the preceding paragraphs 1 through 542 as if fully set out herein.

570.     The Defendants committed fraud against Worldspan.

571.     As set forth in the preceding paragraphs, the Defendants Comerica, Shaw and Sargeant III and / or their representatives knowingly and fraudulently made numerous false statements to Plaintiffs and / or their representatives, and knowingly and fraudulently concealed numerous material facts from Worldspan and their representatives, concerning various events related to the Superyacht Credit Bid Fraud and Conspiracy and Worldspan, including, but not limited to the following:

    a) At the Delray Beach Comerica Meeting, Shaw, a Vice President at Comerica, falsely represented to Barnett that the litigation underway against Sargeant III was of no importance to him or Worldspan, would not have any effect on Worldspan and that Barnett need not be concerned about the litigation against Sargeant III;[56]

---

[56] This fraudulent misrepresentation was made regarding the litigation that was underway against Sargeant III, who, at that time, had defrauded Al-Saleh on a $2.1 billion dollar U.S. Department of Defense contract, had set up myriad alter ego corporations and bank accounts, was laundering millions of dollars through offshore corporations with no employees, no business operations and in jurisdictions that do not enforce anti-money laundering laws. The money laundering included millions of dollars laundered through IOTC Bahamas to Sargeant III's wife, Deborah

b) At the Delray Beach Comerica Meeting, Shaw falsely represented to Barnett that the purpose of the assignment in Sargeant III's security interest in the Superyacht was for the purpose of granting Sargeant III a loan in order that payments could continue to be made to Worldspan towards the construction of the Superyacht. The purpose of the August 14, 2009 Assignment was, among other things, to prevent Al-Saleh and other creditors, including the Plaintiffs, from claiming against Sargeant III's interest in the Superyacht;

c) At the Delray Beach Comerica Meeting, Shaw falsely represented to Barnett that Sargeant III needed a loan to complete the Superyacht, when in fact, Sargeant III did not need a loan to complete the Superyacht, the loan was part of the Superyacht Credit Bid Fraud and Conspiracy;

d) During the Delray Beach Comerica Meeting, Shaw falsely represented to Barnett that the assignment of Sargeant III's interest in the Superyacht and the assignment of Sargeant III's interest in the construction contract for the Superyacht, to Comerica, was a good means of having the Superyacht funded to completion.

e) At the Delray Beach Comerica Meeting, Shaw falsely represented to Barnett that the August 14, 2009 Assignment and the construction loan would be beneficial to Worldspan, when, in fact, it was for the purpose of precluding creditors, including, but not limited to, Al-Saleh, Supreme Fuels FZE, the Plaintiffs and others from claiming against Sargeant III's interest in the Superyacht and the August 14, 2009 Assignment and construction loan resulted in Al-Saleh and Supreme Fuels claiming against Worldspan for over $11 million dollars, precluded Worldspan from claiming against Sargeant III and resulted in Comerica owing Worldspan 4.9 million dollars that has never been paid.

572.    As set forth in the preceding paragraphs, the Defendants Comerica, Shaw and Sargeant

III and/or their representatives, knowingly and fraudulently concealed numerous material facts from

---

Sargeant, and millions of dollars to Sargeant III and the co-conspirators. Sargeant III laundered in excess of 180 million dollars through IOTC Bahamas and its predecessor corporation. Sargeant III laundered $11,064,525.38 from IOTC Bahamas to Worldspan towards the construction of the Superyacht. The litigation was critically important to Worldspan, as Al-Saleh, the Plaintiff in the fraud litigation against Sargeant III, subsequently claimed against Worldspan seeking the disgorgement of $11,064,525.38 that had been defrauded from him by Sargeant III.  Comerica acquired Sargeant III's security interest in the Superyacht as part of the Superyacht Credit Bid Fraud and Conspiracy and then Comerica litigated against Al-Saleh, the unpaid trade creditors who worked on the Superyacht, Worldspan and Supreme Fuels.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

Worldspan and their representatives concerning various events related to Superyacht Credit Bid

Fraud and Conspiracy, including but not limited to the following:

a) During the Delray Beach Comerica Meeting, Shaw fraudulently concealed that Comerica had been laundering millions of dollars for Sargeant III and his wife, Deborah. These funds were being laundered from IOTC Bahamas, the same company that laundered over $11 million dollars to Worldspan. Comerica laundered the funds that were paid to Sargeant III and his wife so that they were protected from creditors (including Al-Saleh and Supreme Fuels FZE who claimed against Worldspan) by Sargeant III and his wife being tenants by entireties. By December 6, 2012, Sargeant III and his wife, as tenants by entireties, had received $9,681,615.00;

b) During the Delray Beach Comerica Meeting, Shaw fraudulently concealed that Sargeant III laundered funds through Rafferty Law which were paid to Sargeant III and his wife, tenants by entireties;

c) During the Delray Beach Comerica Meeting, Shaw fraudulently concealed that Sargeant laundered a total of $180,350,558.05 by directing the transfer of these funds to bank accounts held by Sargeant III and his wife, tenants by entireties, IOTC Bahamas and its predecessor, IOTC Dubai. This was done to put those assets beyond the reach of creditors, including but not limited to Al-Saleh;

These payments were for six figure amounts, transfer after transfer, millions of dollars, continuing for years. These payments were made from IOTC Bahamas to Sargeant and his wife, Deborah, personally. Deborah had not worked for 20 years at the time these payments were made to her;

d) During the Delray Beach Comerica Meeting, Shaw fraudulently concealed from Barnett that Worldspan was the recipient of millions of dollars of funds that had been laundered by Comerica from IOTC Bahamas. These funds which were the proceeds of fraud against Al-Saleh, were laundered by Comerica and paid to Worldspan for the construction of the Superyacht, without Worldspan knowing that these funds were laundered through IOTC Bahamas for the purpose of defrauding creditors, including, but not limited to Al-Saleh, Supreme Fuels FZE and others;

e) During the Delray Beach Comerica Meeting, Shaw fraudulently concealed from Barnett the fact that Comerica intended to co-mingle $9,387,398.67 of its own funds (the Comerica Superyacht loan proceeds) with the funds that were the proceeds of fraud against Al-Saleh that Comerica had laundered from IOTC Bahamas and paid to Worldspan for the construction of the Superyacht. Comerica intended to co-mingle its funds in order to support its security position against the Superyacht and prevent victims who had been defrauded by Sargeant III from claiming against Sargeant III's interest in the Superyacht;

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

f) During the Delray Beach Comerica Meeting, Shaw fraudulently concealed from Barnett the Superyacht Credit Bid Fraud and Conspiracy that was founded on the August 9, 2009 Assignment. Comerica's purpose at the Delray Beach Comerica Meeting was to induce Barnett to sign the August 9, 2009 Assignment;

g) During the Delray Beach Comerica Meeting, Shaw fraudulently concealed from Barnett the fact that Comerica had laundered millions of dollars for Sargeant through Comerica bank accounts with hundreds of blatantly obvious money laundering transactions that had every hallmark of fraud and money laundering associated with them, in amounts up to half a million dollars at a time;

h) During the Delray Beach Comerica Meeting, Shaw fraudulently concealed from Barnett that Sargeant had no need or requirement for a superyacht construction loan.[57] The Superyacht loan was a necessary component of the Superyacht Credit Bid Fraud and Conspiracy, and was for the purpose of collateralizing the Superyacht in order that creditors could not claim against Sargeant III's interest in the Superyacht;

i) During the Delray Beach Comerica Meeting, Shaw concealed from Barnett that the Superyacht construction loan / August 9, 2009 Assignment was part of the Superyacht Credit Bid Fraud and Conspiracy to encumber the superyacht with a charge in favor of Comerica for the purpose of defeating creditor claims and ultimately making a credit bid, in the same manner as the BTB Credit Bid Fraud, on the Superyacht, after the security was transferred from Comerica to a Sargeant III controlled corporation;[58]

j) During the Delray Beach Comerica Meeting, Shaw fraudulently concealed the fact that the August 14, 2009 Assignment was the cornerstone document of the Superyacht Credit Bid Fraud and Conspiracy;

k) During the Delray Beach Comerica Meeting, Shaw fraudulently concealed from Barnett that Comerica was the banker for BTB, the company The United States District Court for the Southern District of Texas, Corpus Christi Division found Sargeant III had used as a vehicle of fraud against PDVSA, utilizing the BTB Credit

---

[57] The Comerica Superyacht loan was for the purpose of Comerica obtaining security against the Superyacht, by assigning Sargeant's security in the Superyacht to Comerica, for the purpose of defeating creditors and undertaking the Superyacht Credit Bid Fraud and Conspiracy. Sargeant did not need this loan, he had more than adequate resources to fund the Superyacht construction.

[58] This was the same methodology that was used in the BTB Credit Bid that was found by the United States District Court for the Southern District of Texas to be actual fraud. Shortly after Sargeant began defrauding Al-Saleh on the IOTC fuel contract with the US Department of Defense, Sargeant charged IOTC's receivables in favor of ABN AMRO, a bank in the Netherlands. The IOTC receivables were charged in favor of ABN AMRO as part of the conspiracy to defraud Al-Saleh from his share of the IOTC Jordan contract with the US Department of Defense. Sargeant utilized loans as a means of fraud, by charging assets that creditors would not rank in priority claim against, in the case of the Superyacht Credit Bid Fraud and Conspiracy, the BTB Credit Bid fraud and the loans from ABN AMRO.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

Bid.  During the Delray Beach Comerica Meeting, Shaw fraudulently concealed the fact that same credit bid scheme, with the intimate involvement of Comerica Bank and Comerica Employees was planned and conspired by Comerica Bank and Sargeant III against Worldspan;

l)  During the Delray Beach Comerica Meeting, Shaw fraudulently concealed from Barnett that Comerica had been laundering funds for Sargeant, III, his wife, and his associates, aiding and abetting Sargeant's frauds and profiting from their involvement with Sargeant's fraudulent transactions;

m)  Sargeant III working in concert and in tandem with Shaw at the Delray Beach Comerica Meeting, parroted what Shaw said, making the same fraudulent statements omissions and the same fraudulent omissions; and,

n)  Steven Barnett as a principal of Worldspan relied on the fraudulent representations and fraudulent omissions at the Delray Beach Comerica Meeting. Based on the fraudulent representations, and fraudulent omissions, made by Shaw and Sargeant III at the July 2009 Delray Beach Comerica Meeting, Worldspan agreed to the August 14, 2009 Assignment and Barnett, on behalf of Worldspan, signed the August 14, 2009 Assignment. The August 14, 2009 Assignment was also signed by Daniel Sargeant as Attorney-in-Fact for Sargeant III and by Shaw on behalf of Comerica.

573.  Defendants Comerica, Shaw and Sargeant made such false statements and omissions without legal justification or excuse, with malice, ill will and / or with the intent to purposely defraud the Plaintiffs.

574.  Worldspan justifiably relied upon and were deceived by the fraudulent statements and materials omissions of the Defendants Comerica, Shaw and Sargeant III.

575.  Worldspan has been injured as a result of the fraudulent statements by, and material omissions of, defendants identified in this count, as described in the preceding paragraphs.

576.  As described throughout this Complaint, Comerica, Shaw and Sargeant III had actual knowledge of the fraud that was being perpetrated on Worldspan by the above-named persons and entities.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

577.    Comerica and Shaw knowingly and intentionally provided substantial assistance and facilitated numerous overt act of mail, wire and bank fraud, money laundering, and monetary transactions involving property derived from unlawful activity, as referred to herein.

578.    Without Comerica's, Shaw's, and Sargeant III's substantial participation, assistance, and aid, the conspirators would not have been able to fraudulently launder the funds that were the proceeds of fraud against Worldspan, and the others referred to herein.

579.    As a result of the above-described fraud, Worldspan has sustained losses in excess of $66 million, excluding the losses occasioned by the destruction of the value of the brands, Queenship and Crescent.

580.    The wrongful acts of the Defendants Comerica, Shaw and Sargeant III in this regard were done with malice and with the intent to defraud.

**WHEREFORE**, Plaintiff Worldspan requests that this Court enter judgment in favor of Worldspan and against Comerica, Shaw and Sargeant III awarding Worldspan's compensatory damages, punitive damages of not less than $4.1 billion dollars against Comerica, costs, pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which Worldspan may be entitled at law or in equity.

## COUNT IV – CONSPIRACY TO DEFRAUD
### (By Plaintiff Worldspan Against All Defendants)

581.    Plaintiff Worldspan incorporates and realleges the preceding paragraphs 1 through 542 as if fully set out herein.

582.    The Defendants engaged in a civil conspiracy to defraud Worldspan.

583.    The fraudulent conspiracy included an agreement to commit several unlawful acts, including agreements to engage in mail, wire and bank fraud, money laundering, and engaging in

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

monetary transactions involving property derived from specified unlawful activity, primarily through the use of Comerica's bank accounts.

584.    The Defendants engaged in numerous overt acts through mail, wire and bank fraud, money laundering, and monetary transactions involving property derived from specified unlawful activity, most significantly, but not limited to, the above-described back-to-back loan transactions which allowed the conspirators to launder millions of dollars.

585.    As a direct and proximate result of the conspiracy, Worldspan has been damaged.

586.    The wrongful acts of the Defendants in this regard were done with malice and with the intent to defraud.

**WHEREFORE**, Plaintiff Worldspan requests that this Court enter judgment in favor of Worldspan and against Defendants awarding Worldspan's compensatory damages, punitive damages of not less than $4.1 billion dollars against Comerica, costs, pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which Worldspan may be entitled at law or in equity.

### COUNT V – FLORIDA RICO (Violation of §772.103, Fla. Stat.)
### (By All Plaintiffs Against All Defendants)

587.    Plaintiffs incorporate and reallege the preceding paragraphs 1 through 542 as if fully set out herein.

588.    For the reasons set forth above, Defendants have violated the Florida Civil Remedies for Criminal Practices Act, §772.103(1), (3)-(4), Fla. Stat., which is Florida's state law version of the RICO Act, and which tracks the RICO Act virtually verbatim.

589.    Specifically, as described in detailed above, Defendants and their co-conspirators have, since 2009, comprised a group of persons associated together for the common purpose of carrying out the conspiracy described in this complaint to defraud their victims, including Plaintiffs,

through a series of frauds, including fraudulent credit bid transactions.  Each of the Defendants and their co-conspirators participated in this conspiratorial conduct through a pattern of racketeering activity including violations of one or more of 18 U.S.C. § 1952 (Travel Act); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1956 (money laundering); 18 U.S.C. § 1344 (bank fraud) and 18 U.S.C. § 1957 (monetary transactions in property derived from specified unlawful activity).

590.    As a direct and proximate result of Defendants' conspiracy with the members of the enterprise, the overt acts of mail, wire and bank fraud, money laundering and monetary transactions in property derived from specified unlawful activity taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs were injured in its business and property through the loss of $66,268,832.00.

**WHEREFORE**, Plaintiffs requests that this Court enter judgment in favor of Plaintiffs against the Defendants awarding Plaintiffs' treble damages in the amount of $198,806,496; reasonable attorneys' fees and costs, pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which the Plaintiffs may be entitled at law or in equity.

### COUNT VI – PRESERVATION ORDER
### (By All Plaintiffs Against All Defendants)

591.    Plaintiffs reallege and incorporate the preceding paragraphs 1 through 542 as if fully set forth herein.

592.    The Plaintiffs request that the Court exercise its own equitable power and requests that the Court grant a preservation order as follows (the "Preservation Order"), as it relates to documents relevant to this matter:

    a)  That the Defendants, each of them and all of them, preserve all documents, including, but not limited to, letters, facsimiles, emails, memorandums, logs, notes, interoffice

144

memos, credit reports, and any and all documents related to all of the co-conspirators, whether they are defendants or not;

b) That the Defendants, each and all of them, preserve data by creating a copy of the data relevant to this Complaint as a precaution against the loss or damage of the original data;

c) That the Defendants disable any and all programs that delete the data that is relevant to this Complaint;

d) That the Defendants preserve all metadata;

e) That the Defendants preserve all documents as defined by Fed. R. Civ. P. 34(a);

f) That the Defendants preserve do not over write any data that has been deleted by the consumer or end-user activity.

g) That the Defendants preserve all on- and off-site computer systems and removable electronic media and all computer systems, services, and devices (including all remote access and wireless devices) used in the Defendants' overall operation. This includes, but is not limited to, e-mail and other electronic communications; electronically stored documents, records, images, graphics, recordings, spreadsheets, databases; calendars, system usage logs, contact manager information, telephone logs, internet usage files, deleted files, cache files, user information, and other data;

h) That the Defendants preserve all electronic devices that contain the information and documents referred to herein, including, but not limited to, cellular telephones, notebooks, tablets, laptops and digital storage devices;

i) That the Defendants preserve archives, backup and disaster recovery tapes, discs, drives, cartridges, voicemail and other data;

j) That the Defendants preserve all operating systems, software, applications, hardware, operating manuals, codes, keys and other support information needed to fully search, use, and access the electronically stored information must also be preserved; and,

k) That the Defendants preserve all Electronically Stored Information ("ESI") as described herein.

593.    This applies to Comerica, all branches of Comerica, all companies, entities and individuals that provide computer services and internet services to Comerica, and all the Defendants.

594.    These documents shall include, but are not limited to, all of Sargeant III's and Deborah Sargeant's loan applications and bank statements.

145

595.     These documents shall include, but are not limited to, all documents related to the Deborah & Harry Sargeant Foundation, Inc.

596.     These documents shall include, but are not limited to, all documentation relating to all of Sargeant III's alter ego corporations, including, but not limited to, every Sargeant III corporation that banks or banked with Comerica, and the following IOTC corporate entities:

   a)  International Oil Trade Center (Jordan);

   b)  International Oil Trading Company, LLC ("IOTC USA");

   c)  International Oil Trading Free Zone Company ("IOTC Dubai");

   d)  International Oil Trading Company, Ltd. ("IOTC Bahamas");

   e)  International Oil Trading Company, B.V. ("IOTC Netherlands");

   f)  IOTC Asphalt, LLC.

597.     These documents shall include, but are not limited to, all corporate records and all banking records, for all of the Defendants, including all banking transactions undertaken with Comerica by any and all of the Defendants, without limiting the foregoing, wire transfers, SWIFT transactions, loan applications, bank statements, checks and deposit forms.

598.     These documents shall include, but are not limited to, as it relates to all of the Defendants, all documentation, forms, reports, notices, and communications sent to or received from, any State or Federal banking regulatory agency, any State or Federal Attorney General, the Office of the Comptroller of Currency and Office of Foreign Assets Control (OFAC), the Federal Reserve System and the Securities and Exchange Commission.

599.     These documents shall include, but are not limited to, as it relates to all of the Defendants all documentation relating to compliance with the BSA.

600.     These documents shall include, but are not limited to, as it relates to all of the Defendants, all communications sent to or received by the following individuals, their employees,

146

agents, subordinates, co-workers, supervisors, and the entities referred to below, as well as all banking documents as referred to above:

    a)  Barry Shaw;

    b)  Kurt Younker;

    c)  Cynthia Jones;

    d)  All Comerica employees and Comerica agents;

    e)  Kevin Kirkeide;

    f)  Deborah Sargeant;

    g)  Mervyn Monger;

    h)  Sargeant III;

    i)  Mustafa Abu-Naba'a;

    j)  International Oil Trade Center (Jordan);

    k)  International Oil Trading Company, LLC ("IOTC USA");

    l)  International Oil Trading Free Zone Company ("IOTC Dubai");

    m) International Oil Trading Company, Ltd. ("IOTC Bahamas");

    n)  International Oil Trading Company, B.V. ("IOTC Netherlands");

    o)  IOTC Asphalt, LLC;

    p)  BTB Refining, LLC;

    q)  All Sargeant alter ego corporations;

    r)  Mohammad Al-Saleh;

    s)  Supreme Fuels FZE;

    t)  PDVSA Petroleo;

    u)  Curtis Meade;

v)   Any and all creditors of Sargeant III, Deborah Sargeant;

w)  Any and all creditors of the various IOTC entities;

x)   Any and all creditors of Sargeant III controlled entities;

y)   The United States Department of Defense, The Defense Energy Support Center, the United States Central Command, and any and all departments of the United States Department of Defense;

z)   United States House Committee on Oversight and Government Reform;

aa) Jordanian government and Jordanian government officials;

bb) Jordanian Embassy;

cc) The Jordanian Anti Money Laundering & Counter Terrorist Financing Unit;

dd) Any United States Embassy;

ee) The Government of Bahamas Compliance Commission;

ff)  The Ministry of Finance for the Netherlands;

gg) The Financial Intelligence Unit for the Netherlands;

hh) The United Kingdom Financial Intelligence Unit (UKFIU);

ii)  Dominican Republic Financial Analysis Unit (UAF);

jj)  Any agency, in any country, involved with or having authority related to money laundering transactions.

**WHEREFORE**, Plaintiffs requests that this Court enter an order that documents identified above be preserved in the manner referred to.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs request a jury trial on any and all counts for which a trial by jury is permitted by law.

Dated this 14th day of May, 2018                    Respectfully submitted,

148

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.
777 W. 41 Street, Suite 402
Miami Beach, Florida 33140
E-mail: rodrigo@rdasilvalaw.com
Telephone:     (305) 615-1434
Facsimile:      (305) 615-1435

By:     /s/ *Rodrigo S. Da Silva*
        Rodrigo S. Da Silva, Esq.
        Florida Bar No. 0088600
        *Counsel for Plaintiffs, Worldspan Marine, Inc.,*
        *CSPAN Financial, LLC and Wedmore*
        *Financial, LLC*

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.