**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

WORLDSPAN MARINE INC., a Canadian
corporation, CSPAN FINANCIAL, LLC, a
Florida limited liability company, and
WEDMORE FINANCIAL, LLC, a Florida
limited liability company,

      Plaintiffs,                                  CASE NO.: 1:18-cv-21924-FAM

v.

COMERICA BANK, a Texas banking association
THE ESTATE OF KURT YOUNKER,
BARRY SHAW, an individual, CYNTHIA JONES,
an individual, HARRY SARGEANT, III ,
an individual, DEBORAH SARGEANT, an individual,
MERVYN MONGER, an individual, and
KEVIN KIRKEIDE, an individual

      Defendants.
_____/

**AMENDED COMPLAINT FOR DAMAGES AND**
**<u>DEMAND FOR JURY TRIAL</u>**

# TABLE OF CONTENTS

I. SUMMARY OF THE ACTION .................................................................................................4

II. PARTIES, VENUE, AND JURISDICTION ........................................................................10

   A. Plaintiffs .....................................................................................................................10

   B. Defendants..................................................................................................................11

   C. Jurisdiction and Venue..............................................................................................13

III. FACTUAL BASIS FOR ALL CLAIMS...........................................................................16

   Worldspan Initial Transaction with HS3 to Build the Superyacht /The Assignment By HS3 to
   Comerica.......................................................................................................................16

   Defendants' Efforts to Induce Worldspan to Consent to the Assignment and Execution of the
   Construction Loan Agreement .....................................................................................19

   HS3's Death Threat and $2 Million Dollar Extortion of the Principal of Plaintiffs Companies
   ......................................................................................................................................25

   HS3, Deborah, Comerica and Monger's Efforts to Devalue the Superyacht ............27

   Defendants' Efforts to Thwart the Sale of the Superyacht / Destroy Name Brands.................30

   Attempts to Buy the Superyacht that were rejected as a result of Defendants actions ............32

   The Mechanics of the Credit Bid Schemes – BTB and Worldspan ...........................33

   Defendant Harry Sargeant, III.....................................................................................35

   Defendant Cynthia Jones .............................................................................................40

   Defendant Barry Shaw.................................................................................................48

   Defendant Estate of Kurt Younker...............................................................................55

   Defendant Mervyn Monger ........................................................................................60

   Defendant Kevin Kirkeide...........................................................................................66

   Defendant Deborah Sargeant ......................................................................................72

   Comerica: Instrumental in Worldwide Fraudulent Schemes......................................76

   Comerica Deliberately Disregarded Internal Controls and Aided and Participated in Sargeant's
   Fraudulent Schemes ....................................................................................................78

   Comerica Repeatedly Ignored a Series of Obvious Anti-Money Laundering Red Flags and
   Facilitated the Money Laundering Scheme .................................................................79

   Comerica Acted with Knowledge ...............................................................................85

   When Plaintiffs were Damaged by Defendants' Acts..................................................86

IV. TOLLING OF THE STATUTE OF LIMITATIONS......................................................92

   A. Discovery Rule Tolling .............................................................................................92

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

B. Fraudulent Concealment Tolling.................................................................................94

C. Estoppel .......................................................................................................................98

V. RICO PREDICATE ACTS............................................................................................98

   A.    Mail Fraud and Wire Fraud ....................................................................................98

   B.    Money Laundering & Engaging in Monetary Transactions with Proceeds Derived from Unlawful Activity – Laundering and Spending the Proceeds of Mail and Wire Fraud and FCPA Violations ............................................................................................107

   Fraudulent Transfers by Comerica Bank to Plaintiff Worldspan Pursuant to the Assignment – Aiding and Abetting Fraud .........................................................................110

   Comerica Launders Fraudulently Obtained Funds from IOTC Bahamas Across State Lines and International Borders to Plaintiff Worldspan...............................................111

   C.    Violations of the Travel Act ................................................................................113

   D.    Extortion and Death Threat.................................................................................114

   Enterprise ....................................................................................................................114

   Relatedness and Continuity ........................................................................................117

   Injury ..........................................................................................................................118

   Damages as a Result of the RICO Conspiracy ..........................................................120

   Punitive Damages.......................................................................................................122

CAUSES OF ACTION ......................................................................................................124

COUNT I – RACKETEERING IN VIOLATION OF RICO, 18 U.S.C. §§1962 (c), 1964 (c)..124

COUNT II – RACKETEERING IN VIOLATION OF RICO, 18 U.S.C. §§ 1962(d), 1964 (c)126

COUNT III– FLORIDA RICO (Violation of §772.103(3), Fla. Stat; §772.104, Fla. Stat.).......128

COUNT IV – FLORIDA RICO (Violation of §772.103(4), Fla. Stat; §772.104, Fla. Stat.) .....129

COUNT V – FRAUDULENT MISREPRESENTATION......................................................132

COUNT VII – NEGLIGENT MISREPRESENTATION .....................................................133

(plead in the alternative to Fraudulent Misrepresentation) .......................................................133

COUNT VI – CONSPIRACY TO DEFRAUD......................................................................135

DEMAND FOR JURY TRIAL ...........................................................................................137

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

# I. SUMMARY OF THE ACTION

1.     Plaintiffs Worldspan Marine Inc. ("Worldspan"), CSPAN Financial, LLC ("CSPAN"), and Wedmore Financial, LLC ("Wedmore") (collectively, "Plaintiffs"), by and through undersigned counsel, file this Amended Complaint for damages against Defendants, Comerica Bank ("Comerica"), the Estate of Kurt Younker ("Younker"), Barry Shaw ("Shaw"), Cynthia Jones ("Jones"), Harry Sargeant, III ("HS3"), Deborah Sargeant ("Deborah"), Kevin Kirkeide ("Kirkeide"), and Mervyn Monger ("Monger") (collectively, "Defendants").  Comerica, Younker, Shaw and Jones are hereby collectively referred as the "Comerica Defendants."  HS3, Deborah, Kirkeide and Monger are hereby collectively referred as the "Sargeant Defendants."

2.     Plaintiffs bring this action against Defendants for wrongful acts that they committed in United States, Canada, Jordan, and elsewhere as part of an international enterprise and scheme to unlawfully devalue, compromise, and misappropriate the assets of the Plaintiffs and others through a pattern of unlawful activities including: (i) mail fraud in violation of 18 U.S.C. § 1341; (ii) wire fraud in violation of 18 U.S.C. § 1343; (iii) conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371; (iv) money laundering in violation of 18 U.S.C. § 1956; (v) engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, (vi) violations of the Travel Act in violation of 18 U.S.C. § 1952; (vii) violations of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1, *et seq.*;  (viii) extortion in violation of § 836.05, Fla. Stat. and 18 U.S.C. § 1951; and (ix) death threat in violation of § 836.05, Fla. Stat. and 18 U.S.C. § 1951.  Defendants undertook actions to cover up and conceal their scheme through fraud and obstruction.

3.     This Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO Act") action derives from the conduct of Comerica Defendants who conspired with

the Sargeant Defendants to defraud the Plaintiffs.  The Defendants were an association-in-fact and an association-at-law who participated in, conspired and both profited from the ten-year scheme involving defrauding individuals and corporations of hundreds of millions of dollars, and, as such, constitute an enterprise under 18 U.S.C. § 1961(4) (the "Enterprise").

4.     The purpose of the Enterprise was, through a series of illicit and illegal devices, mail and wire fraud, money laundering, misappropriation, assignments, transfers, collateralization, fraudulent misrepresentations, negligent misrepresentations, fraudulent inducements, fraudulent omissions, and other mechanisms, to defraud victims of large sums of money or property.  The scheme required the coordination and active participation of Comerica and HS3, both of whom were involved in the Enterprise as the masterminds with various other co-conspirators participating in the conspiracy.

5.     On June 26, 2014, the Plaintiffs learned of the conspiracy (the "Superyacht Credit Bid Fraud and Conspiracy"), and have brought this RICO action within the statutory time limits with all of the constituent components required to bring a RICO action.  All control and direction for the conspiracy originated exclusively from the Southern District of Florida and Detroit, Michigan.  The foundational documents for the Superyacht Credit Bid Fraud and Conspiracy contain choice of law clauses that stipulate Florida law shall apply.  All of the parties and witnesses are domiciled in Florida, with the exception of Cynthia Jones who is domiciled in Detroit, Michigan.  All of the profits were made in Florida and all payments derived from Florida.

6.     HS3's *modus operandi*, with the Defendant co-conspirators, is to utilize, among other things, alter ego corporations, security in favor of Defendant Comerica and other financial institutions, including AmCap Financial Services, Inc. ("AmCap") and ABN AMRO Bank N.V. ("ABN AMRO"), assignments, collateralization and mortgages on assets subject to seizure,

5

bankruptcy, litigation, money laundering and offshore shell corporations, all to effectuate his frauds and conceal and protect his ownership of assets derived from wire and mail fraud and bribery against companies and individuals. HS3 and his alter ego corporations have already been the subject of numerous lawsuits and final judgments, founded in fraud and RICO.

7.       Through a series of predicate acts, Defendants undertook a fraudulent credit bid scheme to devalue Worldspan's asset, a 144-foot long, three-story, luxury motor yacht, vessel number QE014226C010 (the "Superyacht"), and destroy the Plaintiff companies. This intricate and complicated fraudulent credit bid scheme, as described herein, utilizes the same tactics that the Defendants have masterfully engaged in for over a decade, as a continuing operation targeting individuals and corporations.

8.       In order to understand how Plaintiffs were affected by Defendants' fraudulent credit bid scheme, it is important to comprehend the norms of doing business in the vessel construction industry. When a vessel manufacturer, such as Worldspan, begins construction on a superyacht, it retains title until it delivers the superyacht to a buyer once the build-out is complete. The buyer of the superyacht merely has a **security interest** in the vessel, and only when the vessel is completed and delivered does the title transfer from the manufacturer of the vessel to the buyer. At all times during the course of Defendants' fraudulent credit bid scheme, Worldspan, not HS3, nor Comerica, held title in the Superyacht. Thus, when Defendants intentionally devalued the Superyacht as part of their fraudulent credit bid scheme, Defendants were interfering with Worldspan's property.

9.       Commencing in early 2009, Comerica assisted HS3 in defrauding several individuals and entities by, among several criminal activities, laundering proceeds of fraud and

bribery.[1]  One of the victims of these frauds, Mohammad Al-Saleh ("Al-Saleh"), who obtained a $28.8 million-dollar fraud judgment against HS3, his alter ego company and his business partner. HS3 entered into the Superyacht Construction Contract on February 28, 2008, and 42 days thereafter, on April 10, 2008, Al-Saleh filed his lawsuit in Florida state court founded on fraud. At the time that Al-Saleh's judgment was entered on July 27, 2011, construction of the Superyacht had ended.[2]  As a result of HS3's theft of Al-Saleh's money, and Al-Saleh's complaint being filed on April 10, 2008, HS3 knew that he would lose the Superyacht to Al-Saleh and other potential judgment creditors.  Thus, to avoid having Al-Saleh claim against the Superyacht, and more relevant hereto, to effectuate the Superyacht Credit Bid Fraud and Conspiracy, HS3 assigned his security interest and other contractual rights in the Superyacht to Comerica.

10.    As an essential requirement for HS3 to assign his security interest and construction contract to Comerica, HS3 and Comerica needed to obtain the consent of Steve Barnett ("Barnett"), the principal of Worldspan, to the assignment.  Barnett, on behalf of Worldspan, would not have consented to the assignment if he had known that Defendants intended to use the assignment to devalue the Superyacht, execute a fraudulent credit bid, destroy the Plaintiff corporations and defraud individuals including Al-Saleh and corporations including Supreme Fuels FZE ("Supreme Fuels").

---

[1] As further described below, Comerica assisted HS3 in defrauding Al-Saleh and others, as it laundered proceeds of wire and mail fraud and bribery in violation of the FCPA, from HS3's alter ego corporations, International Oil Trading Company, Ltd. formerly known as International Oil Trading FZCO ("IOTC Bahamas") and Sargeant Marine, Ltd. formerly known as Sargeant Marine, S.A. ("Sargeant Marine"), transferring these funds to Worldspan for the construction of the Superyacht.  Comerica co-mingled $9,387,398.67 of its funds with the $11,064,525.38 that HS3 stole from Al-Saleh.  Comerica also laundered many millions of dollars to Deborah, HS3 and his proxies.

[2] In fact, HS3 used proceeds of the wire and mail fraud against Al-Saleh and other specified unlawful activity to fund the construction of the Superyacht.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

11.     Knowing this, Defendants conspired to deceive Barnett into consenting to the assignment, and through a series of meetings, fraudulently induced Barnett by concealing their ulterior motives and making fraudulent omissions and representations,  (to execute the Superyacht Credit Bid Fraud and Conspiracy) and assuring him, amongst other things, that the litigation with Al-Saleh was of no concern to Worldspan and that the purpose of the Assignment was to provide a loan to HS3 required to fund construction on the Superyacht.[3]  Consequently, in reliance on the fraudulent representations and omissions, Barnett consented on behalf of Worldspan to the assignment, and on August 14, 2009, HS3 assigned his security and other contractual rights in the Superyacht to Comerica.  Comerica and HS3 represented to Barnett that the assignment was for the purpose of providing a construction loan to HS3 for the purpose of completing the Superyacht. As Comerica was well aware, HS3 did not require a loan to finish the construction of the Superyacht.

12.     Although Plaintiffs were unaware at the time, HS3's assignment of his rights in the Superyacht to Comerica was the initial and foundational step in the elaborate scheme to undertake the fraudulent credit bid that led to the demise of Worldspan, causing direct harm to CSPAN and Wedmore's property.  As a result of the Assignment, now Comerica, not HS3, held security interest in the Superyacht.  Consequently, HS3's creditors could not assert claims against the Superyacht. After the assignment, Comerica and HS3 devalued the Superyacht by accruing debt, failing to pay obligations, and opposing and interfering with the marketing and sale of the Superyacht to third parties in order for HS3 to acquire the Superyacht at a greatly reduced price through a fraudulent

---

[3] Defendants knew that the litigation with Al-Saleh and the $28.8 million-dollar fraud judgment obtained by Al-Saleh would affect and concern Plaintiffs, as Comerica had laundered millions of dollars of funds stolen Al-Saleh.   In fact, Al-Saleh eventually claimed against Worldspan in unrelated Canadian litigation for the return of $11,064,525.38 stolen from him by HS3.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

credit bid scheme.  This method of avoiding obligations to creditors by assigning rights in an asset to an alter ego in order to re-obtain the asset at a lower price through a fraudulent credit bid is exactly how HS3, Comerica, and their co-conspirators have devalued companies and assets for years.  In fact, Comerica and HS3 devalued the Superyacht and Plaintiffs utilizing the same fraudulent credit bid scheme used to undertake a fraudulent credit bid on an oil refinery in Corpus Christi, Texas.

13.     Significantly, superyacht construction companies like Worldspan merely construct one superyacht at a time due to the size of the vessel, which as it was the case here, took the entire space of Worldspan's construction facility.  Worldspan relied on completing the build-out of the Superyacht and selling the Superyacht to keep Worldspan financially sound.  However, Comerica and HS3's efforts to devalue the Superyacht by failing to pay Worldspan for its work and thwarting the marketing and sale of the Superyacht caused the Superyacht to eventually sell for only $5 million in 2014.   The Superyacht was appraised in 2011 by Comerica's maritime appraiser at $15 million in its current unfinished, as-is-where-is state.  Fraser Yachts, the world's largest superyacht broker, valued the Superyacht at $19 million as-is-where-is.  Notably, the Superyacht had $26 million dollars spent on it.

14.     The sale of the Superyacht finally took place in 2014, nearly six (6) years after the commencement of its construction.  After purchasing the Superyacht for $5 million dollars, the buyer of the Superyacht incurred an additional $30 million dollars to upgrade and complete the Superyacht.  Not only did Comerica and HS3 cause the massive devaluation of the Superyacht, their actions deprived Worldspan of the completion contract for the Superyacht, which generated $30 million dollars.  Defendants deliberately attacked Worldspan's reputation and brands in the

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

extremely small superyacht community as part of their tactics to thwart any potential sale of the Superyacht.

15.     As a result of the wrongful acts of Defendants, the assets of the Plaintiffs that were destroyed had a value of **$66,268,832.00**.

16.     As a result of the wrongful acts of the Defendants, and their co-conspirators, Worldspan's business was permanently destroyed; the cost to reconstitute the business is **$42 million dollars**.

17.     The Plaintiffs seek compensatory damages plus treble damages of **$198,806,496.00** under its statutory RICO claims, attorney's fees and costs, and pre and post-judgment interest.

## II. PARTIES, VENUE, AND JURISDICTION
### *A. Plaintiffs*

18.     Plaintiff CSPAN Financial, LLC ("**CSPAN**") is a Florida limited liability company with its principal place of business located at Vero Beach, Florida.    On December 1, 2011, Worldspan assigned all of its assets to CSPAN.  *See* **Exhibit 1**, Accord and Satisfaction Agreement between Worldspan and CSPAN dated December 1, 2011 (the "CSPAN Assignment").

19.     The Plaintiff Wedmore Financial, LLC ("**Wedmore**") is a Florida limited liability company with its principal place of business located at Vero Beach, Florida.    Wedmore owns 66.66% of the shares of Worldspan.

20.     CSPAN with Wedmore own the assets that were injured as a result of the predicate acts of the Defendants.  Defendants' predicate acts injured U.S. based property and harmed U.S. plaintiffs, thereby creating domestic injury.

21.     Plaintiff Worldspan Marine Inc. ("**Worldspan**") is a Canadian corporation.

### B. Defendants

22.     Defendant Comerica Bank ("**Comerica**") is a Texas banking association headquartered in Dallas, Texas, and has retail banking operations in Texas, Michigan, Arizona, California and more relevant hereto, Florida.  Comerica is a "person" as defined in the RICO Act.  At all times relevant hereto, Comerica provided, and continues to provide, a number of banking services from its Florida locations.  Comerica's Florida retail banking operation are headquartered in Boca Raton and Fort Lauderdale.

23.     Defendant Comerica is chartered by the State of Texas and subject to supervision and regulation by the Texas Department of Banking under the Texas Finance Code.  Comerica is also a member of the Federal Reserve System under the Federal Reserve Act and thus subject to federal regulations. Comerica is a subsidiary of Comerica Incorporated, which is incorporated under Delaware law and headquartered in Dallas, Texas.   Comerica is a "person" as defined in the RICO Act.

24.     Defendant Barry Shaw ("**Shaw**") is an individual residing in Florida and who is otherwise *sui juris*.  At all relevant times to this action, Shaw held the title of Vice President of Comerica Private Banking, with an address of 100 NE Third Ave., Suite 100, Fort Lauderdale, FL 33301.  Shaw, among other things, made fraudulent omissions and fraudulent representations of fact that were false and known to be false made to fraudulently induce Barnett, the principal of the Plaintiffs to act, specifically to agree to an assignment of HS3's interest in the Superyacht to Comerica.  This was foundational to the Superyacht Credit Bid Fraud and Conspiracy.   Shaw conspired with the Defendants as referred in this Amended Complaint.

25.     Defendant Estate of Kurt Younker ("**Younker**") is the probate estate of Kurt Younker an individual residing in Florida up until his death.  At all times relevant to this action,

Younker held the title of Regional Manager of Comerica with an address of 100 NE Third Ave., Suite 100, Fort Lauderdale, FL 33301.

26.     Younker, among other things, made fraudulent omissions and fraudulent representations of fact that were false made to induce Barnett, the principal of the Plaintiffs to act, specifically to undertake acts related to HS3 and Comerica's positions as it related to the Superyacht.  Younker conspired with the Defendants as referred in this Amended Complaint.

27.     Defendant Cynthia Jones ("**Jones**") is an individual residing in Michigan and who is otherwise *sui juris*.

28.     Defendants Shaw, Younker and Jones are persons  as defined in the RICO Act.

29.     Defendant Deborah Sargeant ("**Deborah**") is an individual residing in Florida and who is otherwise *sui juris*.  Deborah is the spouse of HS3.  Deborah has been an active co-conspirator, utilizing, for years, tenants by entireties and money laundering as a means of precluding victims and creditors from being paid, while she and HS3  received and spent millions of dollars and lived an extraordinarily opulent and lavish lifestyle.

30.     Defendant Harry Sargeant, III ("**HS3**") is businessman and a resident of Florida and who is otherwise *sui juris*.  HS3 conspired with the other Defendants as described in this Amended Complaint.  HS3 travelled to British Columbia, Canada, for the purpose of attending the premises of Worldspan where the Superyacht was being constructed.  HS3 also travelled to England, Jordan, Switzerland, the Dominican Republic, and other countries in furtherance of and in assistance to the illegal Enterprise.

31.     Defendant Kevin Kirkeide ("**Kirkeide**") is an individual residing in Florida and who is otherwise *sui juris*.  Kirkeide is a Chartered Accountant who acts as one of the strategy and

logistics operatives for HS3's various frauds committed in the United States and various other countries.   Kirkeide conspired with the Defendants as referred to in this Amended Complaint.

32.     The Defendant Mervyn Monger **("Monger")** is an individual residing in Florida and who is otherwise *sui juris*.  At all relevant times to this action, Monger was a full-time employee of HS3 and Deborah, for years, commencing at least as early as 2008.  Monger was an agent of Comerica and HS3 in regards to the Superyacht.  Commencing in 2008, in assistance of the illegal Enterprise, Monger travelled across state lines and across international borders in furtherance of the operation of the Enterprise and the money laundering described in this Amended Complaint.

33.     Specifically, Monger travelled to and lived in British Columbia, Canada, taking up residence in West Vancouver, British Columbia, Canada in 2008.  Monger supervised the construction of the Superyacht at the premises of Worldspan from 2008 until 2010.  Subsequent to cessation of construction on the Superyacht, Monger remained in Canada and provided false and fraudulent statements to both the Federal Court of Canada and the British Columbia Supreme Court.

34.     Deborah, HS3, Kirkeide, and Monger are individuals, and each of them is a "person" as defined in RICO Act.  At all times relevant hereto, Deborah, HS3, Kirkeide, and Monger provided, and continue to provide assistance to the RICO Enterprise.

### C. Jurisdiction and Venue

35.     This Court has personal jurisdiction over the Defendants because they participated in tortious acts directed from Florida, do sufficient business in Florida, reside in Florida, undertook the conspiracy from Florida, issued the instructions and controlled the conspiracy from Florida

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

and have sufficient minimum contacts with Florida, and/or otherwise intentionally avail themselves of the Florida consumer market through various means.

36.      Not only do the Defendants transact substantial business in Florida, the causes of action asserted in this lawsuit arise directly out of the Defendants' Florida acts, in controlling and issuing all of the directions and instructions regarding the illegal Enterprise, with the exception of limited instructions issued by Comerica employee, Cynthia Jones, from Detroit, Michigan.

37.      This Court has personal jurisdiction over Comerica because Comerica's agents employed at a Florida branch of Comerica made fraudulent and/or negligent misrepresentations to Barnett, the principal of Plaintiffs, as referred to in this Amended Complaint.

38.      This Court also has personal jurisdiction over Comerica and its executives named in this action, because Comerica and or its executives committed tortious acts in Florida, violated RICO statutes in Florida, transacts business in Florida, derives substantial revenue from business in Florida, derives substantial revenue from interstate commerce and foreign commerce with consequences in the State of Florida.  Comerica's agents employed at a Florida branch of Comerica made fraudulent omissions to Barnett, the principal of Plaintiffs, as referred to in this Amended Complaint.

39.      Comerica's co-mingled $9,387,398.67 of its own funds with the funds that were the proceeds of fraud against Al-Saleh that Comerica had laundered from IOTC Bahamas.[4]

---

[4] IOTC Bahamas, a HS3 alter ego corporation, that was used as a vehicle of fraud against Al-Saleh and others, previously banked with Wachovia Bank. The money laundering transactions undertaken with this account caused Wachovia Bank to cease dealing with IOTC Bahamas (and all of HS3's bank accounts including all the accounts of his controlled corporations), at which time, Comerica became the IOTC Bahamas money laundering bank and continued to be the money laundering bank for years.  Comerica also laundered funds for Sargeant's alter ego corporation BTB Refining, LLC (found to have been a vehicle of fraud by the Court of Appeals, Thirteenth District of Texas Corpus Christi-Edinburg Court in *Harry HS3 III, BTB Refining LLC, Appellants, v. Mohammad Anwar Farid Al Saleh*, Appellee in Case Nos. 13-15-0327-CV and 13-15-00395-

40.     Monger, a U.S. citizen and resident of Florida, travelled to and lived in British Columbia, Canada. Monger took up residence in West Vancouver, British Columbia, Canada in 2008 and supervised the construction of the Superyacht at the premises of Worldspan from 2008 until 2010.   Subsequent to cessation of construction on the Superyacht, Monger remained in Canada and provided false and fraudulent statements to both the Federal Court of Canada and the British Columbia Supreme Court.   Monger's activities are detailed in this Amended Complaint.

41.     All directions and control relating to HS3's, Deborah's, and Kirkeide's continuum of fraud were and are undertaken from Florida.   The nerve center for these continuing predicate acts was and is Florida, where Comerica's Boca Raton branch and Fort Lauderdale branch that undertook the predicate acts is located.

42.     This Court has original jurisdiction over the subject matter of this Amended Complaint under 28 U.S.C. §§ 1331 and 1337 because the claims arise under federal law, including RICO violations under 18 U.S.C. § 1961 *et seq.* This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

43.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district. Venue is also proper against Defendants under 28 U.S.C. § 1391 because they are subject to the Court's personal jurisdiction with respect to this action.

44.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this District for the claims alleged and a substantial part of the events and omissions giving rise to these claims occurred in this District.

---

CV and the U.S. District Court, Southern District of Texas, in *PDVSA Petroleo S.A. v. Trigeant, Ltd. et al*, Case No. 2:09-cv-00038).

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

### III. FACTUAL BASIS FOR ALL CLAIMS

*Worldspan Initial Transaction with HS3 to Build the Superyacht /The Assignment By HS3 to Comerica*

45.     Worldspan is a Canadian superyacht builder headquartered in Maple Ridge, British Columbia, Canada, which is 27 miles east of Vancouver, British Columbia, Canada.  Worldspan's premises were located on 9.315 acres of level waterfront that included a 150-foot dock, a high quality, 90,435 square foot purpose-built building (built for the purpose of constructing superyachts), and a waterfront residence.  Property taxes were $137,377.65 per year.  Worldspan employed approximately 100 employees, many of them specialized in the construction of superyachts.

46.     In early 2008, Barnett met with HS3 and Deborah at their 19,000 square foot residence in Gulfstream, Florida to arrange the construction of the Superyacht.  At this meeting, Deborah told Barnett and the Worldspan employees that the Superyacht was her Superyacht and discussed how her Superyacht should be built.  On February 29, 2008, HS3 entered into a Vessel Construction Agreement contract with Worldspan to construct the Superyacht (the "VCA").  *See* **Exhibit 2**, VCA.  The Superyacht was constructed inside Worldspan's purpose-built building. Given the size (144 foot long, plus scaffolding) and height (three stories high plus keel depth, plus scaffolding) of the Superyacht, no other yachts could be constructed on the Worldspan premises while the Superyacht was on the premises.  This meant that no other superyacht construction revenue existed during the time the Superyacht was on Worldspan's premises.

47.     As is customary in the yacht construction industry, the Superyacht was titled in the name of the builder, Worldspan.[5]  The buyer of the Superyacht, HS3, merely held a security interest in the Superyacht.  Upon completion and delivery of the Superyacht, the title would be transferred from Worldspan to HS3.

48.     Until August 14, 2009, HS3 was the original contracting party for the construction of the Superyacht with Worldspan.  However, that changed on August 14, 2009, when HS3 assigned both his security interest in the Superyacht and his interest in the VCA to Comerica (the "Assignment").  *See* **Exhibit 3**, the Assignment.  As a result of the Assignment, Comerica became the only contracting party with Worldspan.  **Notably, Comerica did not lien HS3's security interest on the Superyacht**.  Comerica took HS3's security in the Superyacht by having HS3 assign the security in the Superyacht to Comerica.  Despite the Assignment, Worldspan continued to hold title in the Superyacht and Comerica merely held a security interest in the Superyacht.

49.     With the Assignment, HS3, Comerica, and their co-conspirators intended to prevent HS3's creditors from claiming against the Superyacht, to devalue the Superyacht, and to prevent the sale of the Superyacht in order for HS3 and Deborah to acquire the Superyacht at a fraction of the price through a fraudulent credit bid.  The Assignment was merely a façade to hide HS3's and Comerica's intent to procure the fraudulent credit bid scheme.  Despite the Assignment, HS3 continued to act as the original contracting party and security holder of the Superyacht.

50.     Section 1.06 of the Assignment contains a provision stipulating that, in the event of breach of the VCA, only Comerica, as the only contracting party with Worldspan, could take steps pursuant to the security registered against the Superyacht and pursuant to the VCA.  Furthermore,

---

[5] Among other things, the Superyacht was titled in the name of Worldspan so as to comply with Canada Revenue Agency regulations in order to avoid paying Goods and Services Tax ("GST").

the Assignment included a specific provision precluding HS3 from taking any steps regarding the Superyacht security or the VCA after breach of same.

51.     On August 14, 2009, HS3 and Comerica also executed a construction loan agreement (the "Construction Loan Agreement") wherein Comerica agreed to loan funds to HS3 to be paid to Worldspan for the construction of the Superyacht (the "Construction Loan").  *See* **Exhibit 4**, Construction Loan Agreement.  The Construction Loan Agreement was signed by Shaw as Vice President of Comerica and Daniel Sargeant as attorney-in-fact for HS3.

52.     Pursuant to the Construction Loan Agreement, Comerica would pay funds towards the construction of the Superyacht to Worldspan, thereby co-mingling Comerica's loan proceeds with the $11,064,525.38 that Comerica had laundered into the Superyacht.  Because HS3 had various creditors claiming fraud against him, using his personal funds to pay for the construction of the Superyacht would be very risky, as doing so would increase the probability of HS3's creditors claiming against HS3's security interest in the Superyacht.  HS3's creditors could not claim against the Superyacht if the monies used to fund its construction was "clean" money obtained from Comerica pursuant to a loan.  In effect, the Construction Loan Agreement benefitted HS3 and Comerica: HS3 could fund the Superyacht without running the risk of losing it to his creditors, and Comerica would be repaid for the loan, including interest, with HS3's monies, which were obtained by fraud and bribery.  In fact, as set out below, HS3 paid the Construction Loan with the dirty funds of his alter ego corporation, IOTC Bahamas.

53.     Moreover, the Construction Loan was used as a disguise to co-mingle Comerica's "clean" money with the "dirty" money that had been laundered by Comerica and paid to Worldspan for the construction of the Superyacht.  Commencing immediately after the execution of the Construction Loan Agreement, Comerica began paying Worldspan for the construction of

the Superyacht with the proceeds of said loan, which amounted to $9,387,398.67 of "clean" money.  This resulted in Comerica co-mingling the "clean" $9,387,398.67 loan with the "dirty" $11,064,525.38 that Comerica had laundered for HS3 (the funds HS3 obtained by defrauding Al-Saleh).  Comerica intended to co-mingle its funds in order to support its security position against the Superyacht and prevent victims who had been defrauded by HS3 from claiming against the Superyacht.

54.     In sum, Comerica acted as a co-conspirator to HS3, by laundering the proceeds of fraud and other criminal activity and transferring HS3's asset, his security interest in the Superyacht, to Comerica and then allowing HS3 to make claims against the Superyacht, acting as Comerica's agent, even though the Assignment stipulated that only Comerica could make claims against the Superyacht.

***Defendants' Efforts to Induce Worldspan to Consent to the Assignment and Execution of the Construction Loan Agreement***

55.     In order to obtain the Assignment, HS3 and Comerica needed Worldspan's written consent.  Worldspan would not have consented to the Assignment if it had knowledge that the Assignment was merely a façade to disguise Defendants' creation of the fraudulent credit bid scheme, which consisted of devaluating the Superyacht and destroying Worldspan.  In order to obtain Worldspan's consent to assign HS3's security interest in the Superyacht and the Superyacht Construction Loan Agreement to Comerica, HS3 and Shaw arranged to meet with Barnett at a restaurant[6] in Delray Beach, Florida, in July 2009 (the "Delray Beach Meeting").  Shaw, HS3, and Barnett were present at this meeting.

---

[6] The restaurant in Delray Beach that the Delray Beach Meeting took place was the Tramonti Ristorante Italiano, located at 119 E Atlantic Avenue, Delray Beach, Florida.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

56.     During the Delray Beach Meeting, Shaw told Barnett that he and HS3 needed to discuss a litigation matter in private that did not concern Worldspan nor had any effect on Worldspan.   This critical fraudulent misrepresentation and fraudulent omission was made regarding the litigation that was underway against HS3, who, at that time, had defrauded Al-Saleh on a $2.1 billion-dollar U.S. Department of Defense contracts, had set up myriad alter ego corporations and bank accounts, was using Comerica to launder millions of dollars through offshore corporations with no employees, no business operations and in jurisdictions that do not enforce anti-money laundering laws.   The litigation was critically important to Worldspan, as Al-Saleh subsequently claimed against Worldspan seeking the disgorgement of $11,064,525.38 that had been defrauded from him by HS3, and laundered by Comerica into the construction of the Superyacht.

57.     On April 10, 2008, forty-one days after executing the VCA, Al-Saleh sued International Oil Trading Company, LLC ("IOTC USA"), a limited liability company used as a vehicle of fraud against him, along with HS3 and his partner Mustafa Abu Naba'a ("Mustafa"). On November 19, 2008, Supreme Fuels brought a RICO lawsuit in this Court against HS3 and other parties.

58.     Faced with this lawsuits, HS3 and Comerica had been laundering millions of dollars concerning the mail and wire fraud perpetrated against Al-Saleh and Supreme Fuels through IOTC Bahamas.   Comerica's money laundering transactions included the payments made to Worldspan from IOTC Bahamas and Sargeant Marine, as well as millions of dollars of money laundering transactions undertaken by Comerica with the money laundering funds being paid to HS3 personally, Deborah, and various other persons and entities – all without proper consideration and

with Comerica acting in a conspiracy to prevent victims of HS3's fraud from attaching the proceeds of fraud and, in the case of the plaintiffs from attaching HS3's interest in the Superyacht.

59.     During the Delray Beach Meeting, Shaw, in the presence of HS3, made representations, fraudulent statements and fraudulent omissions to Barnett, as referred to herein. Shaw knew the representations he made to Barnett were false because he had already agreed on behalf of Comerica to help HS3 insulate the Superyacht from his creditors as well as to put the key pieces necessary to execute the fraudulent credit bid against Worldspan in motion.  Shaw knew that HS3 did not need a loan from Comerica to complete the construction of the Superyacht and that HS3 desire to use the Comerica loan as cover to execute the fraudulent credit bid while simultaneously shielding this valuable security interest of HS3 from his creditors.

60.     During the Delray Beach Meeting, Shaw stated to Barnett that he would like to continue the meeting with HS3 in private after the three individuals discussed the assignment of the Superyacht contract and security from HS3 to Comerica.

61.     During the Delray Beach Meeting, Shaw stated to Barnett that he and HS3 needed to discuss a litigation matter in private that did not concern Worldspan.

62.     During the Delray Beach Meeting, Shaw fraudulently misrepresented to Barnett that the litigation matter he would be discussing with HS3 that involved HS3  was of no importance to him or Worldspan, would not have any effect on Worldspan and that he need not concern himself with the litigation against HS3.[7]

---

[7] The litigation was critically important to Worldspan, as the Plaintiff in the fraud litigation against HS3 subsequently claimed against Worldspan seeking the disgorgement of over $11 million dollars that had been defrauded from him by HS3.  Comerica acquired HS3's security interest in the Superyacht as part of the Superyacht Credit Bid Fraud and Conspiracy and then Comerica litigated against Al-Saleh, the unpaid trade creditors who worked on the Superyacht, Worldspan and Supreme Fuels.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

63.     During the Delray Beach Meeting, Shaw fraudulently misrepresented to Barnett that the assignment of HS3's security interest in the Superyacht and construction contract to Comerica was for the purpose of Comerica granting HS3 a construction loan.

64.     During the Delray Beach Meeting, Shaw fraudulently misrepresented to Barnett that the assignment of HS3's interest in the Superyacht and the assignment of HS3's interest in the construction contract for the Superyacht, to Comerica, was a good means of having the Superyacht funded to completion.  During the Delay Beach Meeting, Shaw fraudulently concealed from Barnett that HS3 had no need or requirement for a Superyacht Construction Loan.

65.     During the Delray Beach Meeting, Shaw fraudulently misrepresented to Barnett that the Assignment and the Construction Loan would be beneficial to Worldspan.

66.     During the Delray Beach Meeting, Shaw fraudulently concealed that Comerica had been laundering millions of dollars for HS3.

67.     HS3 laundered a total of $180,350,558.05 by directing the transfer of these funds to bank accounts held by his alter ego entities IOTC Bahamas, Sargeant Marine, BTB Refining, LLC, and many others.   This was done to put those assets beyond the reach of creditors, including but not limited to Al-Saleh.

68.     During the Delray Beach Meeting, Shaw fraudulently concealed from Barnett that the company he was the principal of, Worldspan, was the recipient of millions of dollars of funds that had been laundered by Comerica from IOTC Bahamas.  These funds which were the proceeds of wire and mail fraud against Al-Saleh were laundered by Comerica and paid to Worldspan for the construction of the Superyacht.

69.     During the Delray Beach Meeting, Shaw fraudulently concealed from Barnett the fact that Comerica intended to co-mingle $9,387,398.67 of its own funds (the Comerica

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

Superyacht loan proceeds) with the funds that were the proceeds of fraud against Al-Saleh that Comerica had laundered from IOTC Bahamas and paid to Worldspan for the construction of the Superyacht.

70.     During the Delray Beach Meeting, Shaw fraudulently misrepresented the nature of the Al-Saleh lawsuit against HS3.  Shaw did this by fraudulently misrepresenting to Barnett that there was litigation involving HS3 that was not relevant or germane or of any concern to Assignment. Not only was this litigation relevant and germane, Al-Saleh subsequently claimed against Worldspan for the disgorgement of the funds that Comerica had laundered from IOTC Bahamas to Worldspan for the construction of the Superyacht.

71.     During the Delray Beach Meeting, Shaw fraudulently concealed from Barnett the Superyacht Credit Bid Fraud and Conspiracy that was founded on the Assignment.  Comerica's purpose at the Delray Beach was to induce Barnett to sign the Assignment, along with Comerica and HS3.

72.     During the Delray Beach Meeting, Shaw fraudulently concealed from Barnett the fact that Comerica had laundered millions of dollars for HS3 through Comerica bank accounts with hundreds of blatantly obvious money laundering transactions that had every hallmark of fraud and money laundering associated with them, in amounts up to half a million dollars at a time.

73.     During the Delray Beach Meeting Shaw fraudulently concealed from Barnett that HS3 had no need or requirement for the Construction Loan.[8]

---

[8] The Comerica Superyacht loan was for the purpose of Comerica obtaining security against the Superyacht, by assigning HS3's security in the Superyacht to Comerica, for the purpose of defeating creditors and more relevant hereto undertaking the Superyacht Credit Bid Fraud and Conspiracy. HS3 did not need this loan, he had more than adequate resources to fund the construction of the Superyacht.

74.     During the Delray Beach Meeting, Shaw concealed from Barnett that the Superyacht Construction Loan/Assignment was part of the Superyacht Credit Bid Fraud and Conspiracy to encumber the Superyacht with a charge in favor of Comerica for the purpose of defeating creditor claims and ultimately making a credit bid on the Superyacht after the security was transferred from Comerica to a HS3 controlled corporation.[9]  The Assignment, which was the cornerstone of the Superyacht Credit Bid Fraud and Conspiracy, was authored and created exclusively and only by Comerica with the no input or involvement whatsoever from the Plaintiffs.

75.     HS3, working in concert and in tandem with Shaw at the Delray Beach Meeting, parroted what Shaw said, making the same fraudulent misrepresentations and the same fraudulent omissions.

76.     Barnett justifiably relied on the fraudulent representations and fraudulent omissions at the Delray Beach Comerica Meeting.  Based on the fraudulent representations, and fraudulent omissions, made by Shaw and HS3 at the July 2009 Delray Beach Meeting, Barnett, as a principal of Worldspan, agreed to the Assignment.   Barnett's justifiable reliance on the fraudulent representations and fraudulent omissions made by Shaw and HS3 at the Delray Beach Meeting caused Worldspan to ultimately agree to the Assignment, which was the foundational document for the fraudulent credit bid scheme.

---

[9] This was the same methodology that was used in the BTB Credit Bid that was found by the U.S. District Court for the Southern District of Texas to be actual fraud.  Shortly after HS3 began defrauding Al-Saleh on the IOTC fuel contracts with the U.S. Department of Defense, HS3 charged IOTC's receivables in favor of ABN AMRO, a bank in the Netherlands. The IOTC receivables were charged in favor of ABN AMRO as part of the conspiracy to defraud Al-Saleh from his share of these contracts. HS3 utilized loans as a means of fraud, by charging assets that creditors would not rank in priority claim against, in the case of the Superyacht Credit Bid Fraud and Conspiracy, the BTB Credit Bid fraud and the loans from ABN AMRO.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

***HS3's Death Threat and $2 Million Dollar Extortion of the Principal of Plaintiffs Companies***

77.     On Tuesday, February 15, 2011, at approximately 3:00 p.m., Barnett met with HS3 and Kirkeide at Jet Aviation, Palm Beach International Airport (the "Jet Aviation Death Threat & Extortion Meeting").  Jet Aviation is a Fixed Base Operation (FBO), which is a company that provides services for those that have private aircraft, including fueling, a lounge, hangaring, and maintenance.

78.     Jet Aviation in Palm Beach has a lobby/lounge where customers can meet with friends and associates.  The lounge area of Jet Aviation has doors on one side that open to the tarmac where aircrafts are located, and doors on the other side that open to the vehicle parking area.

79.     At the Jet Aviation Death Threat & Extortion Meeting, Barnett met with HS3 in the lounge area of Jet Aviation.  HS3's private jet was parked on the tarmac outside the Jet Aviation lounge area.

80.     At the Jet Aviation Death Threat & Extortion Meeting, Barnett and HS3 walked from the lobby of Jet Aviation to HS3's Jet.  Barnett did not enter the Hawker Jet, nor did he climb the stairs; however, Barnett stood beside the Jet, the passenger door was open and Barnett observed a number of male passengers seated.

81.     At the Jet Aviation Death Threat & Extortion Meeting, Barnett and HS3 discussed the construction of the Superyacht by Worldspan.  HS3 was angry regarding the construction costs of the Superyacht, which was constructed by Worldspan.  HS3 waved a piece of paper handed to him by Kirkeide that he claimed demonstrated that he had been overcharged on the Superyacht. Barnett asked to see the paper and HS3 refused to give it him.

25

82.    At the Jet Aviation Death Threat & Extortion Meeting, HS3 took Barnett aside in the Jet Aviation lounge and threatened him face-to-face.  HS3 told Barnett that he was going to destroy all of the companies Barnett was associated with unless Barnett paid him $2 million dollars within two (2) months.

83.    At the Jet Aviation Death Threat & Extortion Meeting, HS3 also told Barnett that if he did not pay him $2 million dollars within two (2) months he was going to have him killed. HS3 told Barnett that he had people who could execute the contract to kill him.  Kirkeide acquiesced and actively participated in HS3's criminal conduct by giving HS3 the blank piece of paper that HS3 would use to claim that Worldspan was overcharging HS3 for the construction of the Superyacht.

84.    The Jet Aviation Death Threat & Extortion Meeting ended at approximately 3:30 p.m. Tuesday, February 15, 2011.  Barnett drove away from the Jet Aviation Death Threat & Extortion Meeting.  Barnett was overwhelmed by fear from the death threat and extortion threat that he had to stop driving and pull over to compose himself.

85.    Immediately after the Jet Aviation Death Threat & Extortion Meeting, Barnett advised a senior member of Florida law enforcement of the death threat and extortion threat made by HS3.  Barnett advised this senior member of Florida law enforcement that if he were to be murdered that it would have been HS3 that had him killed.

86.    Immediately after the Jet Aviation Death Threat & Extortion Meeting, Barnett also advised certain Worldspan employees of the death and extortion threats made by HS3.  At the Jet Aviation Death Threat & Extortion Meeting, HS3 stated that he was going to destroy Steve Barnett's Florida corporations.  HS3's goal was the destruction of these corporations, with HS3

specifically articulating his intent to destroy these Florida corporations.  HS3's statements to Barnett demonstrate a specific intent to target the Plaintiff corporations.

### HS3, Deborah, Comerica and Monger's Efforts to Devalue the Superyacht

87.    Superyachts are a compilation of the latest technology in Navionics, electronics, entertainment systems, engine control systems, lighting systems, stabilization systems, galley and cooking systems as well a myriad of other high-tech systems.   Superyachts are enormously complex and represent one of the most technical and challenging construction projects of any type in the world.  Superyachts are expected to be representative of the very latest technology from bow to stern.  Consequently, the longer it takes to complete the construction of a superyacht and to sell a superyacht will affect its price, as state-of the-art technology and high-tech systems contained therein age rapidly since tech companies are constantly updating and improving their products.

88.    While construction of the Superyacht ceased in 2010, it was not sold until 2014 due to Defendants Comerica, HS3, Deborah, and Monger's efforts to devalue the Superyacht. Critically, HS3, Deborah, Comerica, and Monger purposely delayed the construction of the Superyacht and prevented its sale in order to further devalue the Superyacht by, amongst other things: (i) creating change orders; (ii) failing to pay $4.9 million dollars of work performed on the Superyacht; (iii) litigating against the Superyacht and Worldspan; (iv) interfering with the marketing and sale of the Superyacht; and (v) utilizing other tactics as described herein.  Having the Superyacht go untouched for four years caused the Superyacht's high-tech systems to age in comparison to newer technologies that continuously hit the market yearly.  Consequently, when the Superyacht eventually sold in 2014, it only sold for $5 million even though it had been previously appraised for $15 million by Comerica's appraisal and Fraser Yachts had opined that it

could be sold for $19 million.  The eventual buyer of the Superyacht ultimately spent an additional $30 million to update and finish the Superyacht.

89.    During the construction of the Superyacht, HS3, Deborah, and Monger requested various change orders with the intent of never paying for those changes.  A change order is work that is added to the original scope of work as agreed upon in a construction contract.   The change orders to the Superyacht requested by Monger, HS3, and Deborah cost millions of dollars.  These changes included both materials and labor, paid for by Worldspan.  Monger, HS3, and Deborah, in concert with the other co-conspirators, refused to pay Worldspan for any change orders that were not signed, even though the material and work had been supplied.  Monger, HS3, Deborah, and Comerica attempted to defraud Worldspan by having their lawyers state in writing that no payment would be made to Worldspan for the materials and labor associated with the change orders.  In June 2014, Comerica and HS3 attempted to have all the materials that were not attached to the Superyacht (but had been purchased by Worldspan) delivered to an empty building that was fraudulently represented by HS3 and Comerica as a "state of the art" superyacht manufacturing facility.  In June 2014, the Plaintiffs learned of the Defendants scheme to defraud Plaintiffs of the materials purchased by Worldspan pursuant to Change Orders and not paid for by the Defendants.

90.    Furthermore, during the construction of the Superyacht, between December 2009 and April 2010, Monger fraudulently stated to Worldspan employees, with knowledge of the contrary, that Worldspan would be paid for the work that it was undertaking on the Superyacht.  This representation was made for the purpose of inducing Worldspan to continue supplying materials and labor to the Superyacht and resulted in Worldspan being owed $4.9 million dollars which have never been paid.  Monger knew that Worldspan would never be paid for the materials purchased nor its labor, yet made the representations to encourage Worldspan to incur debt so that

unpaid creditors would litigate against Worldspan and HS3 could file insolvency proceedings against the Superyacht, thereby further delaying its sale and devaluing it.  Worldspan relied on these fraudulent misrepresentations and continued working on the Superyacht in the expectation of being paid.

91.     Like clockwork, litigation began in Canada as a result of the $4.9 million debt incurred by Worldspan.  On July 28, 2010, in the Federal Court of Canada, the Superyacht was arrested by an unpaid creditor (Offshore Interiors), who was not paid as a result of Comerica not paying Worldspan $4.9 million dollars. The Federal Court of Canada issued a Claims Process Order that directed all those that had *in rem* maritime claims against the Superyacht to file a claims process affidavit with the Court.  The Superyacht was the res against which the *in rem* claims were to be made, and the Court ordered that the Superyacht was to be sold and the sale proceeds would have the exact same legal status as the physical Superyacht).  Al-Saleh,[10] Supreme Fuels, the *in rem* trade creditors, HS3, Worldspan, and Comerica filed claims process affidavits claiming an interest in the Superyacht.  Comerica challenged Worldspan's right to be paid the $4.9 million dollars it was owed, which could only be recovered from the sale of the Superyacht.

92.     Then, Comerica and HS3 took further steps to delay the sale of the Superyacht, devalue the Superyacht and further the conspiracy against Worldspan by improperly bringing an *ex-parte* insolvency application.  HS3 brought the insolvency proceeding and filed a false affidavit stating he was the secured creditor even though Comerica, not HS3, was the only secured creditor as a result of the Assignment.  Monger was the individual who provided the false and fraudulent

---

[10] Al-Saleh's claim against the Superyacht was twofold: (1) Al-Saleh claimed as a unpaid execution creditor of Sargeant, based on his $28.8 million-dollar fraud judgment, and (2) on the basis that the $11,064,525.38 laundered by Comerica from IOTC Bahamas that were paid to Worldspan towards the construction of the Superyacht was the proceeds of fraud and should be disgorged by Worldspan and paid to Al-Saleh.

evidence to the British Columbia Supreme Court in support of the *ex-parte* receivership application brought against Worldspan by HS3.  In the receivership application, Monger stated that HS3 was the secured creditor of Worldspan, and that Worldspan was indebted to HS3 for millions of dollars. These statements which were the foundational statements for the receivership application were fraudulent and false, and known to be false to Comerica and HS3, as HS3 had assigned his security interest in the Superyacht to Comerica on August 14, 2009.

93.    As Defendants intended, these litigations further stalled the construction and sale of the Superyacht, causing its value to decrease daily.  Critically, during this time Worldspan had no revenue because the Superyacht remained at its premises.  Worldspan incurred years of massive legal fees litigating against Comerica and HS3.  Worldspan also incurred a six-figure amount in rent for the building that housed the Superyacht after construction ceased.  A six-figure tax lien was placed on the property by the City of Maple Ridge.  In addition, millions of dollars of interest were accrued on the amounts that were owed to unpaid creditors.  Thus, while the failure to pay Worldspan $4.9 million and the subsequent litigations did not destroy Worldspan, it was a factor in doing so because Defendants continued to litigate in an effort to delay and interfere with the sale of the Superyacht.

### *Defendants' Efforts to Thwart the Sale of the Superyacht / Destroy Name Brands*

94.    Aside from devaluing the Superyacht by delaying its construction and sale, claiming against it, and failing to pay Worldspan for materials and labor associated with its construction, Defendants Comerica, HS3, and Monger deliberately took actions to stop the marketing and sale of the Superyacht.  In a nutshell, these Defendants intentionally delayed the sale process to make the Superyacht become "old" and less marketable and made false representations to dissuade prospective purchasers from buying the Superyacht.

95.     The community of superyacht brokers is very small and tight-knit.  A superyacht broker recommends certain superyachts to its clients for purchase.  Fraser Yachts is the world's largest superyacht broker, with offices worldwide, including in Florida.  After construction of the Superyacht had ceased, Fraser Yachts estimated that the Superyacht could be sold for about $19 million.  In one of the Canadian litigations, the Federal Court of Canada ordered the sale and marketing of the Superyacht.  The order specifically stated that the Superyacht was to be marketed by Fraser Yachts.  Fraser Yachts diligently marketed the Superyacht and recommended it to its clients.  However, Monger repeatedly interfered with Fraser Yachts' efforts.  In fact, Monger actively denigrated the Superyacht in an effort to prevent a buyer's interest in purchasing the Superyacht.  Monger told superyacht brokers in the United States not to purchase the Superyacht because it was a problem ridden yacht and because the Federal Court of Canada would not approve the sale.

96.     Monger's interference with the marketing and sale of the Superyacht was so extreme and egregious that on April 13, 2012, counsel for Worldspan sent HS3 and Comerica's counsel a cease and desist letter stating that Monger was improperly and illegally interfering with the court ordered marketing of the Superyacht.  Defendant Jones was provided with a copy of this letter.

97.     Moreover, in an effort to further devalue the Superyacht and prevent its sale, Jones advised the Federal Court of Canada that Comerica wished to have the Superyacht moved from Worldspan's premises to an HS3 controlled shipyard.  The HS3 controlled shipyard, DG Shipyards, was located in Richmond, British Colombia.  In support of the application to move the Superyacht to the HS3 controlled shipyard, Monger provided a false sworn evidence to the Canadian court stating that the HS3 controlled shipyard was a "state of the art" superyacht

31

manufacturing facility.  That was far from the truth.   In fact, the HS3 controlled shipyard was an empty building that did not have the equipment, tools, or facilities to construct a Superyacht.

98.     As further evidence of the intentional attempts to devalue the Superyacht and prevent its sale, in 2014 Comerica submitted to the Federal Court of Canada that the Superyacht was the as old and obsolete as a "Commodore 64" computer.  This is an ironic statement that clearly evidences Comerica's bad faith and fraudulent mindset in furtherance of the fraudulent credit bid scheme, as a reasonable party holding a security interest in an asset would make every good-faith attempt to sell the asset in which it holds such security interest for the highest amount possible rather than refer to it as old and obsolete.

### *Attempts to Buy the Superyacht that were rejected as a result of Defendants actions*

99.     All of the potential purchasers that were interested in buying the Superyacht were dissuaded from doing so as a direct and proximate cause of Defendants' efforts (as mentioned in the previous subsection) to prevent the sale of the Superyacht.

100.    In January 2011, Comerica commissioned a maritime appraisal of the unfinished Superyacht, as is-where is.  The appraised value of the Superyacht as is-where is, as of January 2011 was $15 million dollars.  In 2013, the landlord of Worldspan's premises submitted a written offer to purchase the Superyacht.  The offer was worth for $5.8 million plus other very substantial benefits to the Plaintiffs (which amounted to an offer having a net value of around $9 million dollars). The Superyacht would have been completed in Worldspan's building, where the Superyacht had been built from its inception to its partially completed state.   However, Defendants Comerica, acting on the instruction of Jones, and HS3, opposed the sale and the landlord rescinded his offer to purchase the Superyacht.

### *The Mechanics of the Credit Bid Schemes – BTB and Worldspan*

101.    In the PDVSA case, the U.S. District Court for the Southern District of Texas, found that HS3 had orchestrated a credit bid fraud regarding an oil refinery located in Corpus Christi, Texas.  The credit bid fraud worked as follows:

   a.   Accruing debt against an asset.[11] In the PDVSA case the corporation that owned the Corpus Christi refinery, Trigeant Ltd., controlled by Sargeant, accrued tens of millions of dollars in obligations to PDVSA for oil shipments to the refinery and then failed to pay;

   b.   Failing to pay the obligations;[12]

   c.   Having a conventional lender[13] loan money and implement security against the asset. In the PDVSA case the asset was the Corpus Christi refinery and lender was AmCap;

   d.   Devaluing the asset.[14]  In the case of the Corpus Christi oil refinery, the refinery was purchased with a fraudulent credit bid for only a fraction of what the refinery ultimately sold for after the U.S. District Court reversed the fraudulent credit bid sale.  The U.S. District Court reversed the credit bid for fraud and the refinery ultimately sold for its

---

[11] In the Worldspan case, Comerica, the contracting party with Worldspan, accrued $4.9 million dollars  in unpaid invoices for the construction of the Superyacht.

[12] In the Worldspan case, the $4.9 million dollars owed by Comerica to Worldspan has never been paid.

[13] In the Worldspan case, Comerica not only lent money against the asset (the Superyacht), Comerica became HS3's alter ego corporation, becoming the contracting party (as opposed to a mortgagee simpliciter), and the mortgagee, thereby fulfilling the role that was undertaken by HS3's alter ego corporation, BTB Refining LLC, the corporation that was found by the Federal Court in Texas to be HS3's alter ego vehicle of fraud.

[14] In the Worldspan case, in January 2011, Comerica's own appraiser valued the as-is, where-is Superyacht at $15 million dollars.  After Comerica opposed and interfered with the marketing and sale of the Superyacht and Monger, HS3's employee, illegally and fraudulently interfered with the marketing and sale, Comerica submitted to the Federal Court of Canada in 2014 that the Superyacht was now obsolete and the same as a "Commodore 64". The verbatim language used by Comerica in 2014 was "Commodore 64". Comerica advised the Federal Court of Canada that they wished to have a HS3 controlled corporation acquire Comerica's security on the Superyacht and then credit bid on the Superyacht which was now only worth $5 million dollars. The Federal Court of Canada refused to allow this to happen. As part of Comerica's opposition to the sale of the Superyacht, Comerica and HS3 submitted that the Superyacht should be moved from Worldspan's facility to a HS3 controlled superyacht shipyard, DG Shipyards LLC, a Florida alter ego corporation controlled by HS3. HS3 fraudulently described the facility the Superyacht should be shipped to as a "state-of-the-art facility", when, in fact, it was an empty building.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

true value, close to $100 million dollars, many times the amount that had been paid with the fraudulent credit bid (about $22 million);

e.  Purchasing the debt and security with an alter ego, HS3  controlled corporation. In the BTB Credit Bid Fraud and Conspiracy case, the alter ego corporation was BTB Refining LLC;

f.  Having the alter ego corporation purchase the asset using the debt and security to make a credit bid, thereby changing the title holder to the name of the alter ego corporation, not the corporation that accrued the debt, thereby precluding creditors from recovery against the asset for amounts they were owed.[15]  The creditors were left holding debt against a corporation (Trigeant, Ltd., the prior owner of the refinery) that had no asset, as the refinery had been purchased by a credit bid made by the alter ego corporation, BTB Refining LLC, which did not owe the creditors anything. The U.S. District Court saw through this artifice and fraud and reversed the credit bid, putting the refinery back into the hands of the company that accrued the debt, Trigeant Ltd.

102.    This is the same credit bid artifice and scheme that Comerica, the Defendants and HS3 undertook against the Plaintiffs, with the exception that Comerica acted with a level of manifest dishonesty and fraud so profound that HS3 did not require an alter ego corporation to remove the asset from the debtor corporation.  In this case, Comerica became the alter ego corporation, undertaking the same position as BTB, the company that was found by the district court in Texas to have been the vehicle of fraud against creditors.

103.    Not only did Comerica implement security and comingle its funds with the funds they laundered from IOTC Bahamas, Comerica even **became the contracting party**, replacing HS3 as the contracting party with the yacht builder Worldspan. Comerica then failed to pay Worldspan $4,920,796.11, an amount that remains outstanding to this date.

---

[15] In the Worldspan case, HS3 defrauded Al-Saleh and others of tens of millions of dollars, then, to preclude his victims from claiming against the Superyacht, HS3 transferred his interest in the Superyacht (HS3 held the security against the Superyacht in his name) to Comerica, thereby implementing one of the fundamental predicate acts in the Superyacht Credit Bid Fraud and Conspiracy. At the time Al-Saleh, Supreme Fuels, the *in rem* trade creditors and Worldspan claimed against the Superyacht, Comerica opposed their claims, based on the fact that Comerica, not HS3 (who had defrauded these victims), now held security against the Superyacht.

34

104.    Comerica then opposed the sale of the Superyacht, while it became obsolete. Comerica opposed the claims of Al-Saleh, who had an unpaid $28.8 million-dollar fraud judgment against HS3.  Comerica opposed the claims of all who claimed against the Superyacht.

105.    Comerica repeatedly made submissions to the Federal Court of Canada that Comerica's only involvement was to determine the priority of Comerica's mortgage on the Superyacht and nothing else.

106.    On June 26, 2014, the Plaintiffs learned that these representations were knowingly fraudulent, false, and misleading when Comerica first disclosed the secret fraudulent credit bid scheme.

### Defendant Harry Sargeant, III

107.    HS3 is a key figure in the group of conspirators.  HS3 provides the financing for the illegal Enterprise and pays the co-conspirators, which includes, Comerica, Kirkeide, and Monger, the attorneys, the appraisers, and other necessary parties and expenditures.  In 2008, HS3 and his wife, Deborah, decided to have Worldspan construct the Superyacht for them. Representatives from Worldspan travelled to Florida and met HS3 and Deborah at their mansion in Gulfstream, Florida to plan the construction of the Superyacht.

108.    HS3 and Deborah paid Worldspan, through HS3's alter ego corporations, IOTC Bahamas and Sargeant Marine, with the proceeds of the fraud against Al-Saleh which he was able to perpetrate through numerous acts of wire and mail fraud.  HS3, Al-Saleh, and Mustafa were equal partners on a Jordanian corporation, International Oil Trade Center ("IOTC Jordan").  In 2004, IOTC Jordan submitted bids to Defense Logistics Agency formerly known as the Defense Energy Support Center ("DESC") for a contract for the transportation of oil to Iraq through Jordan

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

in connection with Operation Iraqi Freedom.  Al-Saleh, HS3, and Mustafa were to share equally in the profits generated by the contracts between IOTC Jordan and DESC.

109.    In early 2005, HS3 and Mustafa, without Al-Saleh's knowledge, formed IOTC USA.  Sargeant and Mustafa were the initial joint owners of IOTC USA – each had a half-interest membership interest in IOTC USA.  Subsequently, in May 2005, HS3 and Mustafa formed International Oil Trading FZCO ("IOTC Dubai").  Around the same time, HS3 and Mustafa transferred their membership interests in IOTC USA to IOTC Dubai.  As a result of this structure, IOTC Dubai became the sole member (owner) of IOTC USA.  Later, in March 2008, IOTC Dubai redomiciled in the Bahamas and became IOTC Bahamas.

110.    Unbeknownst to Al-Saleh, IOTC USA replaced IOTC Jordan as the contracting party in the contract awarded by DESC to IOTC Jordan.  In addition, IOTC USA subsequently bid for and obtained additional contracts with DESC, using the same Letter of Authorization obtained through Al-Saleh's efforts.  IOTC USA's contracts with DESC were actually serviced by IOTC Jordan pursuant to a services contract (the "Services Agreement") entered into between IOTC Jordan and IOTC Dubai acting for IOTC USA.  IOTC USA then diverted all DESC contract proceeds and profits away from IOTC Jordan to other IOTC entities, to wit:  IOTC Bahamas formerly known as IOTC Dubai and its wholly owned subsidiary, International Oil Trading Company, B.V. ("IOTC Netherlands), all to the detriment of Al-Saleh who was unable to obtain his share of the profits as a result of the legal maneuvering employed by HS3 and Mustafa.

111.    As a result, of the DESC contracts, IOTC USA generated over $1.95 billion dollar in revenue and reported profits ranged between $210 million and $133 million from 2005 to 2010.  **All of the funds** used by HS3 to pay Worldspan as well as those to pay the Comerica Construction Loan are traceable to the profits generated by the DESC contracts.  In other words, the funds to

pay Worldspan are derived from specified unlawful activity, to wit, the multiple instances of mail

and wire fraud directed in the fraudulent scheme to cheat Al-Saleh from his 1/3 share of the profits

from the DESC contracts.

112.    In addition, all the funds used by HS3 to pay Worldspan as well as those used to

pay the Comerica Construction Loan derive from additional specified unlawful activity.  Once Al-

Saleh was stripped from his right to receive his 1/3 share of the profits from the DESC contracts,

HS3 and Abu Naba'a needed help  from the Jordanian government in order to be able to perform

on the DESC contracts in order to continue to use the Jordanian thoroughfares to ship fuel to U.S.

military bases in western Iraq.  To that end, HS3 hired Marty Martin ("Martin"), a former senior

operative of the Central Intelligence Agency ("CIA") who held high level positions in the Middle

East and was at one point in charge of the unit responsible for hunting down Osama Bin Laden.

Notably, Martin had no operation whatsoever in the energy or logistics sector.  Because of his

work in the CIA, Martin had developed high level contacts with senior intelligence operatives in

Jordan.  *See*   http://www.nbcnews.com/id/42668435/ns/world_news-mideast_n_africa/t/us-

oilman-accused-bribing-jordan-official-win-contract/#.XLPeB6ZReCV.

113.    Martin coordinated on behalf of HS3 the payment of a **9 million-dollar bribe** to

General Mohammad Dahabi (in two separate wire transfers of $4.5 million each).  General Dahabi

was the then head of the General Intelligence Directorate (GID), Jordan's intelligence agency.  The

$9 million-dollar bribe payment to General Dahabi constitutes a violation of the FCPA and as a

result all of the proceeds from the DESC contracts are derived from specified unlawful activity.

Upon information and belief, General Dahabi has been incarcerated in Jordan for his role in

receiving the aforementioned $9 million-dollar bribe.  In other words, the entire revenue generated

by the DESC contracts is derived from specified unlawful activity as that term is defined in 18

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

U.S.C. § 1956(c)(7).  In addition, every time HS3 engaged in a monetary transaction in value of greater than $10,000 in connection with the proceeds of the DESC contracts he engaged in separate violations of 18 U.S.C. § 1957.

114.    At the Jet Aviation Death Threat & Extortion Meeting, HS3 engaged in acts of extorsion and threaten the life of Barnett in violation of §836.05, Fla. Stat. and 18 U.S.C. § 1951.

115.    HS3 associated with the Defendants affairs through a pattern of racketeering activity consisting of repeated violations of the Federal mail and wire fraud statutes, 18 U.S.C. §1341 and 18 U.S.C. §1343, based upon the use of the United States mails and wires to send emails, facsimiles and letters across state lines and across the international border between the United States and Canada. These repeated violations took place both before May 2014 and after May 2014.

116.    Given the nature of the Superyacht Credit Bid Fraud and Conspiracy, the implementation and execution of the fraudulent credit bid scheme was dependent upon the use of email, United States mail, Federal Express, U.S. Mail and other postal services.

117.    It was also dependent on the use of interstate communication wires, to include telephone, facsimile lines and the internet. These repeated violations took place both before May 2014 and after May 2014.

118.    The use of mails by the defendant Jones in order to execute the Superyacht Credit Bid Fraud and Conspiracy constitutes mail fraud. See 18 U.S.C. §1341.

119.    The transmission and use of interstate wire communications by Jones in order to execute the Superyacht Credit Bid Fraud and Conspiracy constitutes wire fraud. See 18 U.S.C. §1343.

120.    HS3 individually acted with the knowledge that the use of United States mails and wires would follow in the ordinary course knew that such use of the United States mails and wires could have been reasonably foreseen.

121.    HS3 was aware that correspondence, emails, packages, legal correspondence were sent to his counsel and to Monger in Canada, across an international border, through the use of the United States mails and wires in furtherance of the Defendants fraudulent credit bid scheme. These repeated violations took place both before May 2014 and after May 2014.

122.    The monies paid to Worldspan as well as those used to pay the Superyacht Construction Loan were paid with money laundered by HS3 through his alter ego, IOTC Bahamas. HS3 individually acted with the knowledge that the payments made on the Superyacht Construction Loan and to Worldspan were money laundering transactions, in order to execute the fraudulent credit bid scheme in violation of 18 U.S.C. § 1956.

123.    Payments made on the Superyacht Construction Loan were made with funds that were the proceeds of fraud against Al-Saleh as well as acts of bribery in violation of the FCPA, HS3 intentionally and knowingly participated directly and indirectly in the defendants' fraudulent credit bid scheme and or associated with the defendants through a pattern of racketeering consisting of repeated violations of the federal statute regarding monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957.

124.    From 2011 until present HS3 provided instructions to his Canadian lawyers in furtherance of the Superyacht Credit Bid Fraud and Conspiracy. These instructions were in the form of e-mails sent from Florida to Vancouver, B.C., transmitted across the international border between the United States and Canada, and, as such, are violations of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

125.    HS3 intentionally and knowing participated directly and indirectly in the defendants Superyacht Credit Bid Fraud and Conspiracy and or associated with the Defendants through a pattern of racketeering consisting of repeated violations of Federal mail and wire fraud statutes 18 U.S.C. §1341 and 18 U.S.C. §1343, based on the use of the United States mails and wires to send emails, facsimiles and letters across state lines and across the international border between Canada and the United States regarding the money laundering transactions that violated 18 U.S.C. §§ 1956, 1957 that were the payments on the Superyacht Construction Loan and to Worldspan.

### *Defendant Cynthia Jones*

126.    Jones, Vice President of Comerica, in the Detroit Michigan office, has been involved with HS3, Comerica, the Plaintiffs and the other Defendants since 2011. From 2011 until present, Jones, intentionally and knowingly, participated directly and indirectly in the defendants' fraudulent credit bid scheme and or associated with the Defendants' through a pattern of racketeering consisting of repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §1341 and 18 U.S.C. §1343, based on the use of the United States mails and wires to send emails, facsimiles and letters across state lines and across the international border between the United States and Canada.

127.    Jones associated with the Defendants affairs through a pattern of racketeering activity consisting of repeated violations of the Federal mail and wire fraud statutes, 18 U.S.C. §1341 and 18 U.S.C. §1343, based upon the use of the United States mails and wires to send emails, facsimiles and letters across state lines and across the international border between the United States and Canada. These repeated violations took place both before May 2014 and after May 2014.  One of the examples of wire fraud include the sworn affidavit Jones executed on

40

October 7, 2011 and filed with the Federal Court of Canada attached hereto as **Exhibit 5**. In paragraph 10 of said affidavit, Jones knowingly, fraudulently and intentionally states, under oath, to the court that the purpose of the Construction Loan Agreement was to fund the construction of the Superyacht,[16] when in actuality the Construction Loan was a foundational step taken towards executing the Superyacht Credit Bid Fraud and Conspiracy. Jones' affidavit was notarized in Detroit, Michigan and then transmitted across the international border between the United States and Canada where it was filed in the Federal Court of Canada *in rem* proceedings, thereby violating the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

128.    Given the nature of the Superyacht Credit Bid Fraud and Conspiracy, the implementation and execution of the fraudulent credit bid scheme was dependent upon the use of email, United States mail, Federal Express, U.S. Mail and other postal services.

129.    It was also dependent on the use of interstate communication wires, to include telephone, facsimile lines and the internet. These repeated violations took place both before May 2014 and after May 2014.

130.    The use of mails by the defendant Jones in order to execute the Superyacht Credit Bid Fraud and Conspiracy constitutes mail fraud. See 18 U.S.C. §1341.

131.    The transmission and use of interstate wire communications by Jones in order to execute the Superyacht Credit Bid Fraud and Conspiracy constitutes wire fraud. See 18 U.S.C. §1343.

---

[16] Plaintiffs learned that Jones' sworn statement was knowingly false and fraudulent when, in June 2014, Jones instructed Comerica's Canadian counsel to, among other things, attempt a credit bid on the Superyacht, this being the first ever disclosure of the Superyacht Credit Bid Fraud and Conspiracy.

132.     Jones individually acted with the knowledge that the use of United States mails and wires would follow in the ordinary course of Comerica's business and/or individually knew that such use of the United States mails and wires could have been reasonably foreseen.

133.     Jones was aware that correspondence, emails, packages, legal correspondence were sent to counsel for Comerica and to Monger in Canada, across an international border, through the use of the United States mails and wires in furtherance of the Defendants fraudulent credit bid scheme.  These repeated violations took place both before May 2014 and after May 2014.

134.     Jones was aware that correspondence, emails, facsimiles, and packages would be sent across State lines in furtherance of the defendants' fraudulent credit bid scheme to the Defendants in Florida, from Michigan, to HS3, Kevin Kirkeide, Shaw, Younker and Deborah in Florida, Comerica in Dallas, Texas, and to Monger in both Florida and Canada.

135.     Jones knew or acted with knowledge that the Defendants' fraudulent credit bid scheme would utilize the United States mails and wires and result in an extensive pattern of use of the United States mails and wires.

136.     The continued use of the United States mails and wires in order to effectuate the Defendants' fraudulent credit bid scheme constitutes a pattern of racketeering activity.

137.     Jones is the Comerica executive responsible for administering the Superyacht Construction Loan, (implemented by having Worldspan agree to an assignment of all of HS3's interests in the Superyacht security and the VCA).

138.     Payments made on the Superyacht Construction Loan administered by Jones were paid with money laundered by Comerica from IOTC Bahamas, a corporation with no assets, no employees and in an offshore jurisdiction that does not enforce anti-money laundering laws. Jones individually acted with the knowledge that the payments made on the superyacht loan she

administered were money laundering transactions, with the payments made from IOTC Bahamas, the money laundering transactions by Jones in order to execute the fraudulent credit bid scheme constitutes money laundering in violation of 18 U.S.C. § 1956. The Superyacht loan was outstanding as of May 2014, payments that were money laundering in violation of 18 U.S.C. § 1956 were made both before May 2014 and after May 2014.

139. Payments made on the Superyacht Construction Loan administered by Jones were made with funds that were the proceeds of fraud against Al-Saleh, Jones intentionally and knowingly participated directly and indirectly in the defendants' fraudulent credit bid scheme and or associated with the defendants through a pattern of racketeering consisting of repeated violations of the federal statute regarding monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957.

140. From 2011 until present Jones provided instructions to the Canadian lawyers for Comerica in furtherance of the Superyacht Credit Bid Fraud and Conspiracy. These instructions were in the form of e-mails sent from Detroit, Michigan to Vancouver, B.C., transmitted across the international border between the United States and Canada, and, as such, are violations of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

141. Jones provided instructions to the Canadian lawyers for Comerica. Jones was aware of the fact that Al-Saleh claimed against Worldspan for the disgorgement of $11,064,525.38 paid by IOTC Bahamas to Worldspan.

142. Jones intentionally and knowing participated directly and indirectly in the defendants Superyacht Credit Bid Fraud and Conspiracy and or associated with the Defendants through a pattern of racketeering consisting of repeated violations of Federal mail and wire fraud statutes 18 U.S.C. §1341 and 18 U.S.C. §1343, based on the use of the United States mails and

43

wires to send emails, facsimiles and letters across state lines and across the international border between Canada and the United States regarding the money laundering transactions that violated 18 U.S.C. §§ 1956, 1957 that were the payments on the Superyacht Construction Loan that Jones administered.

143.    Jones personally benefitted from the illegal Enterprise as a result of being paid for being an Executive at Comerica.

144.    As part of the 2014 Superyacht credit bid fraud, Jones instructed Comerica's Canadian counsel to submit to the Federal Court of Canada, with HS3, that the Superyacht owned by Worldspan, should be delivered to HS3 controlled shipyard, DG Shipyards, located in Richmond, B.C., Canada.

145.    Jones instructed Comerica's Canadian counsel to rely on the affidavit of Monger who provided sworn evidence that was false to the Federal Court of Canada in support of joint application to move the Superyacht to the HS3 controlled shipyard.  Monger, working with Comerica's Canadian lawyers under the instruction of Jones, provided false and fraudulent sworn evidence that the facility HS3 and Comerica wished to have the Superyacht moved to was a "state of the art" superyacht manufacturing facility.

146.    The Plaintiffs' agents attended at the manufacturing facility that Monger swore under oath was a "state of the art" superyacht manufacturing facility. The Plaintiffs' agents found an individual who was intoxicated in the parking lot of the facility. The intoxicated individual was living in a travel trailer in the parking lot with dogs leashed to the travel trailer.  The building did not have the equipment, tools or facilities to construct a Superyacht. The sworn statement made by Monger that the facility was a "state of the art" superyacht manufacturing facility was patently false and fraudulent and known to be false.

147.    Photographs of this individual, the trailer and the building are already part of the record of this action. The fraudulent evidence regarding the "state of the art" superyacht manufacturing facility was presented to the Federal Court of Canada by Comerica's counsel, acting on the instructions of Jones.

148.    In 2013, Monger, in concert with Comerica, on the instructions of Jones, and HS3, had thwarted the sale of the Superyacht to a prior purchaser of the Superyacht.  This purchaser had submitted a written offer to purchase the Superyacht. The 2013 offer to purchase Worldspan's Superyacht included cash payment of $5 million dollars and other benefits worth millions of dollars. The conduct of HS3 and Comerica resulted in the purchaser rescinding his offer to purchase the Superyacht.  The purchaser was the landlord of the building that the Superyacht was located in.  This individual had purchased the land and building and was renting the building to Worldspan.

149.    In 2014, an independent third party made an offer to purchase the Superyacht. This offer required the approval of the Federal Court of Canada as the Superyacht was under arrest. The purchaser of the Superyacht spent a very considerable sum preparing his offer. The purchaser carefully monitored the submissions made to the Federal Court of Canada by Comerica and HS3 in opposition to his offer to purchase the Superyacht. The purchaser became aware of the intensity and comprehensive nature of the opposition to his offer to purchase the Superyacht, noting that Comerica and HS3 had gone to the extraordinary extent of leasing a 49,400 Square foot commercial building in Richmond, B.C. for the purpose of submitting to the Federal Court of Canada that the Superyacht should be moved to the commercial building leased by HS3. The purchaser also became aware of the fact that Monger had submitted fraudulent and false information that the empty commercial building was a "state of the art" superyacht manufacturing

45

facility.  The purchaser became convinced that having Worldspan complete the Superyacht for him would result in HS3 and Comerica continuing their extraordinary and fraudulent tactics against Worldspan and the Superyacht. The purchaser was aware of the fraudulent boat yard and of all the tactics undertaken in the June 2014 credit bid scheme and was aware of the fact that contracting with Worldspan would mean a continuation of these extraordinary and fraudulent tactics against Worldspan and that Superyacht and this would greatly impair the completion of the Superyacht. The purchaser then decided not to have Worldspan complete the Superyacht, thereby depriving Worldspan of the contract that paid $30 million dollars to complete the Superyacht.

150.    At the time the purchaser made his offer to purchase the Superyacht, the Superyacht was located in the purpose built facilities of Worldspan. The completion contract would have allowed Worldspan to pay the rent and all overheads and would have put Worldspan in good financial standing. The Plaintiffs will offer accounting evidence as to the financial effect of the Superyacht completion contract at trial. As a direct and foreseeable consequence of the conduct of Jones and Comerica in June of 2014, extraordinary and wasteful steps had to be undertaken simply to begin to complete the Superyacht. The Superyacht, in an incomplete state, in a state where the Superyacht would not float on her own keel, had to be moved, by water, from Worldspan's facility to a different boat yard. This entailed a massive amount of work and expense, all of which was wasted. The Superyacht had to be transported with specialized dollies to a huge barge that then transported the Superyacht to the other facility where the procedure was again repeated.  There was a very significant insurance cost associated with the move of the Superyacht. A huge quantity of appurtenances to the Superyacht, some very large, had to be transported from Worldspan's premise to the new facility. All of the data and drawings regarding of the extremely complex systems on the Superyacht had to be learned by the new builder. This resulted in a delay in

46

completion and was the direct and foreseeable result of the conduct of Jones and Comerica in June of 2014.

151.    One year earlier, in 2013, the opposition to the sale of the Superyacht by Jones and Comerica and HS3 had resulted in the purchaser permanently rescinded his offer to purchase.

152.    From 2011 until June of 2014, Jones and Comerica repeatedly made representations that Comerica's only involvement in the matter was to have the priority of Comerica's mortgage (security) on the Superyacht determined.  Between 2010 and continuing to this day, Comerica has taken the position that Comerica's failure to pay Worldspan $4.9 million dollars was the result of a commercial dispute and that everything that flowed from (including all of the consequences to the Plaintiff corporations) the failure to pay $4.9 million dollars was the result of a legitimate commercial dispute.  Jones knowingly and fraudulently instructed Comerica's counsel to take these positions, with the intent to conceal the Superyacht Credit Bid Fraud and Conspiracy.

153.    Had Jones not made the fraudulent representations as referred to above, the Plaintiff corporations would have submitted to the Federal Court of Canada in 2010 that the true rationale for the opposition to the sale of the Superyacht and the failure to pay the $4.9 million dollars was part of scheme to obtain the Superyacht in the future, after devaluing the Superyacht and injuring Worldspan, including by having Worldspan lose the contract to complete the Superyacht, thereby putting an end to the fraudulent Superyacht credit bid fraud before it dramatically devalued the Superyacht, injured the Plaintiff corporations and caused Worldspan to lose the contract to complete the Superyacht.

154.    Jones made these fraudulent statements and issued these fraudulent instructions, commencing in 2011, with the intent to and knowledge that these statements would be relied upon

in order that the Plaintiff corporations could not submit to the Federal Court of Canada the true intent of Jones, Shaw, Younker, Comerica and the other co-conspirators.

155.    The knowingly false and fraudulent statements and instructions made by Jones since 2011 until present, were the direct, foreseeable and proximate cause of Plaintiffs injuries.

156.    Jones was under a continuous duty to disclose to the Plaintiffs the true character and nature of the fraudulent credit bid conspiracy. Jones knowingly, affirmatively, and actively concealed the true nature and character of the fraudulent credit bid scheme and continues to do so.

### *Defendant Barry Shaw*

157.    Shaw was an important co-conspirator in the fraudulent enterprise. One of the important steps that Shaw took in furtherance of the Superyacht credit bid conspiracy was his fraudulent misrepresentations and his fraudulent omissions in the Delray Beach Meeting.  Present at the Delray Beach Meeting were Shaw, HS3, and Barnett.

158.    One of the purposes that Shaw and HS3 had at the Delray Beach Meeting was to obtain the consent of Barnett, principal of the Plaintiff corporations, to the assignment of HS3's rights in the Superyacht Construction Agreement and the HS3's mortgage on the Superyacht.

159.    At the Delray Beach Meeting, Shaw fraudulently advised Barnett that the Assignment was for the purpose of creating security for Comerica in order that Comerica could fund the completion of the Superyacht with a loan to HS3.  Shaw knowingly and actively concealed from Barnett the fact that HS3 did not require a loan to complete the Superyacht.  Shaw knowingly, fraudulently, and actively concealed from Barnett the purpose of the Assignment was, among other things, to divest HS3 of his interest in the Superyacht to avoid it being attached by creditors that HS3 had defrauded, including, among others, Al-Saleh.

48

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

160.    Shaw knowingly, deliberately and fraudulently stated to Barnett the purpose of the Assignment when in fact Shaw knew the true purpose of the Assignment, these fraudulent misrepresentations were made with the intent to have Barnett consent to the Assignment for the fraudulent and concealed purpose of creating the foundation for the Superyacht Credit Bid Fraud and Conspiracy and for the purpose of defrauding HS3's creditors.

161.    Had Shaw not made these fraudulent misrepresentations Barnett would not have signed the Assignment and the Superyacht Credit Bid Fraud and Conspiracy could not have been undertaken and the Plaintiffs would not have suffered the loss and destruction of the Plaintiff corporations and brands.  The Superyacht Credit Bid Fraud and Conspiracy could not have been undertaken without the Assignment. The fraudulent statements and omissions made by Shaw were made with intent, and Shaw knew at the time he made the fraudulent statements and omissions that the statements would be relied upon to the detriment of Worldspan and Shaw knew that the foreseeable result would be the devaluation of the Superyacht and the destruction of Worldspan and the brands.

162.    Shaw actively concealed from Barnett the fact that the Assignment was also for the purpose of undertaking a fraudulent credit bid in the future, which, in fact, was attempted by Comerica in June 2014. Shaw actively concealed from Barnett the fact that he was aware of the nature of the litigation against HS3, said litigation being brought by, among others, Al-Saleh. Shaw actively concealed the fact that the Al-Saleh litigation against HS3 was for fraud committed by HS3 and that Comerica was laundering the proceeds of the fraud against Al-Saleh.

163.    In simple terms, the objective of Shaw in the Delray Beach Meeting was to divest HS3 of his interest in the Superyacht to avoid attachment by victims of HS3's fraud and to take the foundational step in the Superyacht Credit Bid Fraud and Conspiracy by having the security

interest in the Superyacht assigned from HS3 to Comerica and having the construction contract for the Superyacht assigned from HS3 to Comerica for the secret purpose of executing the Superyacht Credit Bid Fraud and Conspiracy in the future.

164.    Shaw actively concealed the Al-Saleh fraud lawsuit and the Supreme Fuels RICO suit and the fact that HS3 and Comerica had been laundering millions of dollars through IOTC Bahamas. Comerica's money laundering included the payments made to Worldspan from IOTC Bahamas, millions of dollars of money laundering transactions undertaken by Comerica with the laundered funds paid to HS3, Deborah Sargeant, and various other persons and entities.

165.    Shaw fraudulently misrepresented to Barnett that the assignment of HS3's security interest in the Superyacht and construction contract to Comerica was for the purpose of Comerica granting HS3 a construction loan.

166.    Shaw fraudulently misrepresented to Steven Barnett that the assignment and the construction loan would be beneficial to Worldspan.

167.    During the Delray Beach Meeting, Shaw fraudulently concealed from Barnett the fact that Comerica intended to co-mingle $9,387,398.67 of its own funds (the Comerica Superyacht loan proceeds) with the funds that were the proceeds of fraud against Al-Saleh that Comerica had laundered from IOTC Bahamas and paid to Worldspan for the construction of the Superyacht.

168.    Shaw fraudulently concealed from Barnett the Superyacht Credit Bid Fraud and Conspiracy that was founded on the Assignment.  Comerica's purpose at the Delray Beach was to induce Barnett to sign the Assignment, along with Comerica and HS3.

169.    Shaw fraudulently concealed from Barnett the fact that Comerica had laundered millions of dollars for HS3 through Comerica bank accounts with hundreds of blatantly obvious

money laundering transactions that had every hallmark of fraud and money laundering associated with them, in amounts up to half a million dollars at a time.

170.    Shaw fraudulently concealed from Barnett that HS3 had no need or requirement for a Superyacht Construction Loan.

171.    Shaw concealed from Barnett that the Superyacht Construction Loan /Assignment was part of the Superyacht Credit Bid Fraud and Conspiracy to encumber the Superyacht with a charge in favor of Comerica for the purpose of defeating creditor claims and ultimately making a credit bid on the superyacht after the security was transferred from Comerica to a HS3 controlled corporation.

172.    Barnett relied on the fraudulent representations and fraudulent omissions made by Shaw and HS3 at the Delray Beach Comerica Meeting.  Based on the fraudulent representations, and fraudulent omissions, made by Shaw and HS3 at the July 2009 Delray Beach Meeting, Barnett, as a principal of Worldspan agreed to the Assignment and Barnett, on behalf of Worldspan, signed the Assignment.  The Assignment was also signed by Daniel Sargeant as Attorney-in-Fact for HS3 and by Shaw on behalf of Comerica.

173.    Shaw was under a continuous duty to disclose to the Plaintiffs the true character and nature of the fraudulent credit bid conspiracy. Shaw knowingly, affirmatively, and actively concealed the true nature and character of the fraudulent credit bid scheme and continues to do so.

174.    From 2009 continuing until present, Shaw intentionally and knowingly participated directly and indirectly in the defendants' fraudulent credit bid scheme and or associated with the defendants' through a pattern of racketeering consisting of repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §1341 and 18 U.S.C. §1343, based on the use of the United

States mails and wires to send emails, facsimiles and letters across state lines and across the international border between the United States and Canada.

175.    Given the nature of the defendants' fraudulent credit bid scheme, the implementation and execution of the fraudulent credit bid scheme was dependent upon the use of email, United States mail, Federal Express, U.S. Mail and other postal services.

176.    Given the nature of the defendants' fraudulent credit bid scheme, the implementation and execution of the fraudulent credit bid scheme was dependant on the use of interstate communication wires, to include telephone, facsimile lines and the internet. These repeated violations took place both before May 2014 and after May 2014.

177.    The use of mails by the defendant Shaw in order to execute the Superyacht Credit Bid Fraud and Conspiracy constitutes mail fraud. *See* 18 U.S.C. §1341.

178.    The transmission and use of interstate and international wire communications by Shaw in order to execute the Superyacht Credit Bid Fraud and Conspiracy constitutes wire fraud. *See* 18 U.S.C. §1343.

179.    Shaw individually acted with the knowledge that the use of United States mails and wires would follow in the ordinary course of Comerica's business and / or individually knew that such use of the United States mails and wires could have been reasonably foreseen.

180.    Shaw was aware that correspondence, emails, packages, legal correspondence were sent to counsel for Comerica in Canada, across an international border, through the use of the United States mails and wires in furtherance of the Defendants' fraudulent credit bid scheme, to Comerica's offices in Dallas, Texas and to Comerica's counsel and Monger in Canada.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

181.    The correspondence, emails and legal communications that were sent from Florida across an international border to Canada and across state lines from Florida to Texas, in furtherance of the Superyacht Credit Bid Fraud and Conspiracy, commenced in August 2009.

182.    Shaw was aware that correspondence, emails, facsimiles, and packages would be sent across state lines in furtherance of the defendants' fraudulent credit bid scheme from Florida to Jones in Detroit, Michigan and to Worldspan in Canada, and to Comerica's office in Dallas, Texas.

183.    Shaw knew or acted with knowledge that the defendants' fraudulent credit bid scheme would utilize the United States mails and wires and result in an extensive pattern of use of the United States mails and wires.

184.    The continued use of the United States mails and wires in order to effectuate the defendants' fraudulent credit bid scheme constitutes a pattern of racketeering activity.

185.    Shaw is the Comerica executive responsible the implementation of the Assignment and the Superyacht Construction Loan.  Shaw transmitted Assignment from Florida across State and international borders, along with other documents in furtherance of the fraudulent conspiracy, thereby violating 18 U.S.C. §1343. These documents and e-mails were sent to Canada, Dallas, Texas, and to Detroit, Michigan.

186.    Shaw sent and received numerous emails in furtherance of the conspiracy from 2009 until present.  These emails were sent and received from Florida to Detroit, Michigan and to Canada, thereby violating 18 U.S.C. §1343.

187.    The Assignment assigned HS3's interest in the Superyacht security and the Superyacht construction. The security on the Superyacht was registered in Canada, meaning that numerous e-mails and documents had to be transmitted from Florida to Canada to effect the change

in registration of the security on the Superyacht from HS3 to Comerica. Each of these transmissions crossed the international border between the United States and Canada, thereby violating 18 U.S.C. §1343. The loan documentation and assignment documentation were also transmitted from the Florida branches of Comerica to the Michigan and Texas branches of Comerica, thereby violating 18 U.S.C. §1343.

188.    The Superyacht loan proceeds were paid through a series of payments sent from Comerica in Florida to Worldspan in Canada, each transfer of funds from Comerica in Florida to Worldspan in Canada was made in furtherance of the Superyacht Credit Bid Fraud and Conspiracy and was accompanied by e-mail correspondence from Comerica in Florida to Worldspan in Canada. These international payments are money laundering transactions in violation of 18 U.S.C. §§ 1956, 1957.

189.    Payments made by HS3 to Comerica on the Superyacht Construction Loan originated by Shaw were paid with money laundered by Comerica from IOTC Bahamas, a corporation with no assets, no employees and in an offshore jurisdiction that does not enforce anti-money laundering laws. Shaw, and, subsequently, Jones, individually acted with the knowledge that the payments HS3 made to Comerica on the Superyacht Construction Loan he implemented were paid with money laundering transactions, with the payments made from IOTC Bahamas. The money laundering transactions by Shaw in order to execute the fraudulent credit bid scheme constitutes money laundering in violation of 18 U.S.C. § 1956. The Superyacht loan was implemented as of August 14, 2009, with payments made by money laundering commencing from August 14, 2009 and continuing, said money laundering transactions in violation of 18 U.S.C. § 1956.

54

190.    Payments made on the Superyacht Construction Loan implemented by Shaw were made with funds that were the proceeds of fraud against Al-Saleh, Shaw intentionally and knowingly participated directly and indirectly in the defendants' fraudulent credit bid scheme and or associated with the Defendants through a pattern of racketeering consisting of repeated violations of Federal Statute regarding monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957.

191.    Shaw personally benefitted from the illegal Enterprise as a result of being paid for being an Executive at Comerica.

### *Defendant Estate of Kurt Younker*

192.    Younker held the title of Regional Manager of Comerica in Fort Lauderdale, Florida.  Younker died on June 12, 2018.

193.    Younker, who benefited from the illegal Enterprise as a consequence of being an Executive paid by Comerica, made false and fraudulent statements at a meeting in Florida in May 2011 between Barnett and Younker (the "Younker Florida Meeting").  At the Younker Florida Meeting, Younker made representations of fact that were known to Younker to be false, said representations made in furtherance of the Superyacht credit bid fraud.

194.    At the Younker Florida Meeting, Younker actively and fraudulently concealed critical facts from Barnett, the principal of Worldspan.  At the Younker Florida Meeting, Younker fraudulently told Barnett, the principal of Worldspan, that HS3 was going to complete the Superyacht at Worldspan's premises.

195.    At the Younker Florida Meeting, Younker actively and fraudulently concealed from Barnett, the principal of Worldspan, that Comerica had been laundering millions and millions

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

of dollars from offshore accounts in order to fraudulently defeat the claims of HS3's victims, including, but not limited to Al-Saleh.

196.    At the Younker Florida Meeting, Younker actively and fraudulently concealed from Barnett that Comerica and HS3 had no interest in resolving anything with Worldspan. At the Younker Florida Meeting, Younker actively concealed from Barnett the fact that HS3 and Comerica had already implemented the foundational steps in the Superyacht Credit Bid Fraud and Conspiracy so as to defraud the Plaintiffs, Al-Saleh and others.

197.    At the Younker Florida Meeting, Younker actively concealed the fact that Comerica and HS3 were involved in a conspiracy to, among other things, devalue the Superyacht and, in the future, use the security that Comerica held against Worldspan's Superyacht to undertake a fraudulent credit bid for the Superyacht titled in Worldspan's name.

198.    At the Younker Florida Meeting, Younker fraudulently, knowingly and with the intent the statements be relied upon, told Barnett that Comerica's only involvement and interest was in ensuring that its secured property, the Superyacht, maintained its value and ensuring that Comerica's security was valid. These statements were known to be false, as Comerica had been part of the conspiracy to defraud HS3's creditors by assigning HS3's security interest in the Superyacht to Comerica. Comerica had also implemented the August 14, 2009 Assignment for the purpose of undertaking, with the other conspirators, the Superyacht Credit Bid Fraud and Conspiracy.

199.    At the Younker Florida Meeting, Younker fraudulently, knowingly and with the intent the statements be relied upon, told Barnett that HS3 had required and needed a loan to fund construction on the Superyacht and that the purpose of the loan Comerica granted to HS3 was to provide the financing and funding that HS3 required to fund construction on the Superyacht.  This

56

statement was known to be false to Younker, as Younker was aware of HS3's assets (Comerica was HS3's banker) and, as such, Younker was patently aware of the fact that HS3 had no need for a loan to fund construction on the Superyacht. Younker knew the purpose of the August 14, 2009 Assignment and the Superyacht Construction Loan was to defraud HS3's creditors and to undertake the foundational steps in the Superyacht Credit Bid Fraud and Conspiracy.

200.    At the Younker Florida Meeting, Younker fraudulently, knowingly and with the intent the statements be relied upon, told Barnett that the failure to pay Worldspan $4.9 million dollars owed to Worldspan for work done on the Superyacht was due to a legitimate contractual dispute and that the consequences of the failure to pay $4.9 million dollars to Worldspan was a result of a legitimate view on the part of Comerica that there was a valid basis not to pay the $4.9 million dollars owed to Worldspan.

201.    This statement was known to be false to Younker, as Younker was aware of the fact that Comerica had no legitimate excuse for not paying Worldspan $4.9 million dollars, Younker knew that the failure to pay Worldspan $4.9 million dollars was one of the steps the co-conspirators were taking in furtherance of the Superyacht Credit Bid Fraud and Conspiracy.

202.    At the Younker Florida Meeting, Younker fraudulently, knowingly and with the intent the statements be relied upon, told Barnett that HS3 was contemplating completing the Superyacht. This statement was known to be false to Younker as Younker was aware of the fact that HS3 had no intention of completing the Superyacht, the intention of HS3 and the co-conspirators was to acquire the Superyacht after it was devalued through a fraudulent credit bid. In fact, this is what Comerica and the other co-conspirators attempted to do in 2014, after fraudulently concealing the intention of the co-conspirators.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

203.    Younker was under a continuous duty to disclose to the Plaintiffs the true character and nature of the fraudulent credit bid conspiracy. Younker knowingly, affirmatively, and actively concealed the true nature and character of the fraudulent credit bid scheme.

204.    From 2011 until 2018, Younker intentionally and knowingly participated directly and indirectly in the defendants' fraudulent credit bid scheme and or associated with the defendants' through a pattern of racketeering consisting of repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §1341 and 18 U.S.C. §1343, based on the use of the United States mails and wires to send emails, facsimiles and letters across state lines between Florida, Michigan and Texas and across the international border between the United States and Canada. Younker associated with the Defendants' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §1341 and 18 U.S.C. §1343, based upon the use of the United States mails and wires to send emails, facsimiles and letters across state lines and across the international border between the United States and Canada.

205.    Given the nature of the Defendants' fraudulent credit bid scheme, the implementation and execution of the fraudulent credit bid scheme was dependent upon the use of email, United States mail, Federal Express, U.S. Mail and other postal services.

206.    Given the nature of the defendants' fraudulent credit bid scheme, the implementation and execution of the fraudulent credit bid scheme was dependant on the use of interstate communication wires, to include telephone, facsimile lines and the internet. These repeated violations took place both before May 2014 and after May 2014.

207.    The use of mails by the defendant Younker in order to execute the fraudulent credit bid scheme constitutes mail fraud. See 18 U.S.C. §1341.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

208.    The transmission and use of interstate wire communications by Younker in order to execute the fraudulent credit bid scheme constitutes wire fraud. See 18 U.S.C. §1343.

209.    Younker individually acted with the knowledge that the use of United States mails and wires would follow in the ordinary course of Comerica's business and / or individually knew that such use of the United States mails and wires could have been reasonably foreseen.

210.    Younker was aware that correspondence, emails, packages, legal correspondence were sent from Florida to Jones in Detroit, Michigan, to Comerica in Dallas, Texas and to counsel for Comerica in Canada, across an international border, through the use of the United States mails and wires in furtherance of the Defendants' fraudulent credit bid scheme.

211.    Younker was aware that correspondence, emails, facsimiles, and packages would be sent across State lines and the international border between Canada and the United States in furtherance of the defendants' fraudulent credit bid scheme.

212.    Younker knew or acted with knowledge that the Defendants' fraudulent credit bid scheme would utilize the United States mails and wires and result in an extensive pattern of use of the United States mails and wires.

213.    The continued use of the United States mails and wires in order to effectuate the Defendants' fraudulent credit bid scheme constitutes a pattern of racketeering activity.  Younker sent and received numerous emails in furtherance of the conspiracy from 2009 until 2018. These emails were sent and received from Florida to Detroit, Michigan and to Canada, thereby violating 18 U.S.C. §1343.

214.    Younker intentionally and knowing participated directly and indirectly in the Defendants fraudulent credit bid scheme and or associated with the Defendants through a pattern of racketeering consisting of repeated violations of federal mail and wire fraud statutes 18 U.S.C.

§1341 and 18 U.S.C. §1343, based on the use of the United States mails and wires to send emails, facsimiles and letters across state lines and across the international border between Canada and the United States.

215.    From Florida, Younker sent and received emails to and from Monger in British Columbia, Canada. From Florida Younker sent and received emails to Jones in Detroit, Michigan.

216.    Younker sent emails to HS3, Shaw and Kirkeide.

217.    196.    Younker personally benefitted from the illegal Enterprise as a result of being paid for being an Executive at Comerica.

### *Defendant Mervyn Monger*

218.    Monger is a resident of Florida and was a full-time employee of HS3 and Deborah from January 2009 until the end of 2014. Monger is a boat captain who, among other things, attended at the premises of Worldspan during the time the Superyacht was being constructed between January 2009 and 2010.  Monger made these trips to Worldspan's facility in furtherance of the HS3's money laundering of the proceeds paid to Worldspan which derived from specified unlawful activity described above.  Monger moved from Florida to West Vancouver, B.C., Canada. Subsequent to construction ceasing on the Superyacht, Monger assisted with the legal proceedings in Vancouver, B.C., Canada.

219.    During the time the Superyacht was being constructed on the premises of Worldspan, Monger acted as the representative and agent of HS3 and Deborah Sargeant. Monger met with the workers and management of Worldspan on an ongoing basis from January 2009 until late 2010.  At times Monger attended at Worldspan's premises on a daily basis.

220.    Monger was an integral and key player in the Superyacht credit bid fraud. Monger was the only co-conspirator who was present in British Columbia, Canada. All of the other

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

Defendants resided in Florida or Michigan and all directions for the conspiracy derived from Florida or Michigan.

221.    Monger actively and fraudulently concealed from the Plaintiffs the conspiracy to undertake a fraudulent credit bid from the Plaintiffs. Monger fraudulently represented to Worldspan that Worldspan would be paid for the work it undertook on the Superyacht from December 2009 until April 2010. In fact, this work was never paid for and remains unpaid today.

222.    Monger also travelled to Florida and to Canada in furtherance of the conspiracy.

223.    Monger sent and received emails, and documents and correspondence, from Florida to British Columbia, Canada and from British Columbia to Florida in furtherance of the illegal enterprise. These emails, documents and correspondence were sent to Deborah, HS3 and Kirkeide.

224.    Monger benefited from his role in the illegal Enterprise. The Comerica bank statements show large and continuing payments to Monger from HS3.  Monger resided, for years, in the expensive and exclusive community of West Vancouver, British Columbia, Canada, with all of his expenses being paid for by HS3.

225.    In furtherance of the illegal Enterprise Monger travelled to Vancouver, British Columbia from Florida and from Florida to Vancouver, B.C. on an ongoing basis, during the time period January 2009 to 2014, in furtherance of the illegal Enterprise referred to herein, thereby violating the 18 U.S.C. § 1952 (Travel Act).

226.    In June 2014, Monger was one of the central conspirators in the fraud wherein Comerica and HS3 fraudulently conspired to obtain valuable and expensive accessories that were not attached to the Superyacht but had been purchased by Worldspan and were in Worldspan's possession and not paid for by Comerica, HS3 and Deborah. In furtherance of this fraud, Monger sent and received emails, from British Columbia, Canada to and from HS3, who was located in

61

Florida, thereby transmitting these emails across the international border between Canada and the United States. These communications were in violation of mail and wire fraud statutes 18 U.S.C. §1341 and 18 U.S.C. §1343.

227.   Monger illegally and improperly interfered with the marketing and sale of the Superyacht by, among other things, advising superyacht brokers in the United States not to have their clients make a purchase bid for the Superyacht and by illegally and improperly advising the superyacht brokers that the Superyacht would not be sold and advising the superyacht brokers that the Superyacht was a problem ridden yacht.

228.   Comerica, Deborah Sargeant, Monger and HS3 were central to and the most active co-conspirators in the scheme to defraud Worldspan as it related to the change orders relating to the construction of the Superyacht.  During the construction of the Superyacht by Worldspan, there were a number of changes to the specifications of the Superyacht.

229.   These changes to the Superyacht specifications cost millions of dollars.  These changes included both materials and labor, paid for by Worldspan.  Monger, in concert with the other co-conspirators, refused to pay Worldspan for any Change Orders that were not signed even though the material and work had been supplied. Monger and the co-conspirators attempted to defraud Worldspan after their London solicitor's stated in writing that no payment would be made to Worldspan for the materials and labor associated with unsigned Change Orders.

230.   In June 2014, Comerica and HS3 then attempted to have all of the materials that were not attached to the Superyacht but had been purchased by Worldspan delivered to the empty building that was fraudulently represented as a "state of the art" Superyacht manufacturing facility - without paying for very valuable and expensive materials that the London solicitors for HS3 had stated in writing would not be paid for.  This blatant fraud was engineered and masterminded by

HS3, Deborah and Comerica, with one of the main operatives being Monger, this fraud was attempted in June of 2014 when Comerica and HS3 sought a court order to have these materials moved to a HS3 controlled shipyard.

231.    In June 2014, Worldspan became aware of the fact that Comerica, HS3 and Deborah intended to take (without paying for them) the materials that had been purchased by Worldspan (and never paid for) pursuant to unsigned Change Orders when, in June 2014, Comerica and HS3 applied to the Federal Court of Canada seeking an order, among other things, that the unpaid materials be delivered to HS3's boat yard.

232.    In June 2014, Comerica and HS3 were forced to pull the trigger on the fraudulent credit bid scheme. Comerica and HS3 were faced with an application to the Federal Court of Canada to sell the Superyacht to a third party. Both Comerica and HS3 opposed the application to the Federal Court of Canada to sell the Superyacht. Extensive and extraordinary measures were undertaken by Comerica, HS3 and Monger as part of their efforts to oppose the application to the Federal Court of Canada to sell the Superyacht. Comerica and HS3, working with Monger entered into a lease for a very large (49,400 Square feet) commercial building in Richmond, B.C.

233.    June 2014 is the hallmark date when the co-conspirators disclosed the Superyacht credit bid fraud – Defendants HS3 and Comerica were forced to disclose the Superyacht credit bid fraud as they were faced with an application to the Federal Court of Canada to have the Superyacht sold to an independent third party.

234.    In addition to the extraordinary step of executing a lease incurring hundreds of thousands of dollars in liability (for the purpose of advising the Federal Court of Canada that the Superyacht should be moved to that building), Monger obtained detailed and extensive quotes to have the Superyacht moved from the premises of Worldspan to the premises leased by Defendant

Kirkeide. Monger swore an affidavit in June 2014 in which he swore that the premises leased by Defendant Kirkeide were "state of the art". These statements were plainly false as the building was empty. The construction of Superyachts requires vast amounts of machinery, supplies, tools, and specialty items. Monger fraudulently swore under oath that the premises were "state of the art" as part of the steps taken in the Superyacht credit bid fraud.

235.    The lease of the empty building entailed numerous emails sent from Monger in British Columbia to Kirkeide in Florida, as well as emails sent from Kirkeide to Monger.  Comerica was intimately involved as the Superyacht (over which it had security) was the subject of submissions to the Federal Court of Canada by both Comerica and HS3, that, among other things, the Superyacht should be moved from Worldspan's premises to the "state of the art" premises leased by Kirkeide.

236.    These emails are repeated violations of federal mail and wire fraud statutes 18 U.S.C. §1341 and 18 U.S.C. §1343, based on the use of the United States mails and wires to send emails, facsimiles and letters across state lines and across the international border between Canada and the United States.

237.    The lease payments were made from Florida and forwarded to Vancouver, these payments were made in furtherance of the illegal Enterprise and are money laundering transactions that violated money laundering in violation of 18 U.S.C. § 1956.

238.    In June 2014 the Superyacht was located at Worldspan's premises. Plaintiffs' agents sold the Superyacht to an independent third party.  At the time of the sale the Superyacht and all of the many pieces and parts that were not attached to the Superyacht but formed part of the Superyacht were located in Worldspan's premises. This included approximately 2 million dollars' worth of electronics, the flying bridge (which is a massive component) and many other

components. The Superyacht also had complete multi-level, four story scaffolding built on all sides of the Superyacht so that it could be worked on (a Superyacht cannot be constructed without scaffolding). The building had multiple large cranes built into the structure of the building.

239.    As a result of the application to the Federal Court of Canada by Comerica and HS3 to have the Superyacht moved from Worldspan's premises to the premises leased by Kirkeide (the HS3 controlled building in Richmond, B.C.) the purchaser of the partially completed Superyacht decided not to have Worldspan complete the Superyacht. The purchaser was not prepared to have Worldspan complete the Superyacht in the premises it was located in as the purchaser was aware of the extensive and extraordinary litigation and steps that Comerica and HS3 undertook in June of 2014 to thwart the sale of the Superyacht and to have the Superyacht moved to the premises leased by Kevin Kirkeide.

240.    As a result of the purchaser not having the Superyacht completed at the premises of Worldspan, huge additional costs were incurred to have the Superyacht moved, in an incomplete state, and in a state where the Superyacht would not float on its own keel, to a different boatyard to have the Superyacht completed. This included disassembling all of the scaffolding, dismantling the entire west wall of Worldspan's premises (four stories high), transporting the Superyacht with specialized dollies to the ramp on the water, and loading the Superyacht onto a huge barge so that it could be transported to the other superyacht manufacturing facility.

241.    As a direct and proximate result of the June 2014 conduct of all Defendants, Worldspan lost the contract to complete the Superyacht. The purchaser of the Superyacht spent $30 million dollars completing the Superyacht, said funds which would have been paid to the Plaintiffs, but for the conduct of the Defendants in June of 2014.

242.   The completion contract value for the Superyacht is not a speculative amount, in fact, and as can be established by documentation, $30 million dollars was spent on the completion of the Superyacht. Had the Defendants not acted in the manner described in June of 2014, the $30 million dollars would have been paid to Worldspan and this very large sum of money would have put the Plaintiffs corporations in sound financial standing.

243.   As a direct and proximate cause of losing the contract to complete the Superyacht, the Plaintiff businesses were destroyed.

### *Defendant Kevin Kirkeide*

244.   Kirkeide, who is an accountant, benefitted substantially from the illegal Enterprise by being paid large sums of money on an ongoing basis by HS3.  Kirkeide's role in the Enterprise included, but was not limited to, acting as the logistics conspirator who dealt with the implementation of the various schemes and artifices referred to in this Amended Complaint.

245.   Kirkeide has been involved with HS3, Comerica, and the rest of the Defendants since 2009.  From 2009 continuing until present, Kirkeide intentionally and knowingly, participated directly and indirectly in the Superyacht Credit Bid Fraud and Conspiracy and or associated with the Defendants through a pattern of racketeering consisting of repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §1341 and 18 U.S.C. §1343, based on the use of the United States mails and wires to send emails, facsimiles and letters across state lines and across the international border between the United States and Canada.

246.   Kirkeide associated with the Defendants affairs through a pattern of racketeering activity consisting of repeated violations of the Federal mail and wire fraud statutes, 18 U.S.C. §1341, 18 U.S.C. §1343, based upon the use of the United States mails and wires to send emails, facsimiles and letters across state lines and across the international border between the United

States and Canada. These repeated violations took place both before May 2014 and after May 2014.

247.    Kirkeide was intimately involved in the Superyacht Credit Bid Fraud and Conspiracy from its inception until present. Kirkeide is the co-conspirator who is most skilled and experienced at financial, accounting, and legal matters. Kirkeide's involvement in the June 2014 credit bid was so intimate that Kirkeide, as Chief Financial Officer of DG Shipyard, LLC, signed the lease on the 49,400 square foot HS3 controlled commercial building in Richmond, B.C. that was fraudulently described as a "state of the art" superyacht manufacturing facility.

248.    The tenant is DG Shipyard, LLC, an alter ego HS3 controlled corporation, created for the purpose of submitting to the Federal Court of Canada that the Superyacht should be moved to the commercial building leased by DG Shipyard, LLC and not sold to the independent third party. Kirkeide sent from Florida to British Columbia numerous emails and documents regarding the June 2014 credit bid, including, but not limited documentation relating to the lease.

249.    These emails and documents were transmitted across the international border between the United States and Canada, thereby violating Federal mail and wire fraud statutes, 18 U.S.C. §1341, 18 U.S.C. §1343.

250.    Kirkeide communicated, on an ongoing basis, with HS3, Comerica and the other co-conspirators. Kirkeide was essential to the illegal Enterprise as he utilized his accounting and corporate skills to assist in the creation of complex corporate structures as directed by HS3 and Comerica, said alter ego corporations used as vehicles of fraud as described in this Amended Complaint. Kirkeide assisted in creating the means and mechanisms for the money laundering transactions referred to in this Amended Complaint.  Kirkeide assumed the role of director of

certain HS3 alter ego corporations.  Kirkeide's involvement in the illegal Enterprise spans years and includes hundreds of acts in furtherance of the illegal Enterprise.

251.    Given the nature of the Defendants' Superyacht Credit Bid Fraud and Conspiracy, the implementation and execution of the Superyacht Credit Bid Fraud and Conspiracy was dependent upon the use of email, United States mail, Federal Express, U.S. Mail and other postal services.

252.    Given the nature of the Defendants' Superyacht Credit Bid Fraud and Conspiracy, the implementation and execution of the Superyacht Credit Bid Fraud and Conspiracy was dependent on the use of interstate communication wires, to include telephone, facsimile lines and the internet. These repeated violations took place both before May 2014 and after May 2014.

253.    The use of mails by Kirkeide in order to execute the Superyacht Credit Bid Fraud and Conspiracy constitutes mail fraud. See 18 U.S.C. §1341.  The transmission and use of interstate wire communications by Kirkeide in order to execute the fraudulent credit bid scheme constitutes wire fraud. See 18 U.S.C. §1343.

254.    Kirkeide was aware that correspondence, emails, facsimiles, and packages would be sent across State lines in furtherance of the defendants' fraudulent credit bid scheme to the Defendants Jones in Michigan, and Monger in Vancouver, Canada as well as counsel for HS3 in Vancouver, Canada and Comerica in Dallas, Texas.

255.    Kirkeide knew or acted with knowledge that the Defendants' fraudulent credit bid scheme would utilize the United States mails and wires and result in an extensive pattern of use of the United States mails and wires.

256.    The continued use of the United States mails and wires in order to effectuate the Defendants' fraudulent credit bid scheme constitutes a pattern of racketeering activity.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

257.    Payments made on the Superyacht Construction Loan administered by Jones were paid with money laundered by Comerica from IOTC Bahamas, a corporation with no assets, no employees and in an offshore jurisdiction that does not enforce anti-money laundering laws were made with the assistance of Kirkeide on the instructions of HS3 and Deborah Sargeant. Kirkeide individually acted with the knowledge that the payments made on the Superyacht loan he assisted with were money laundering transactions, with the payments made from IOTC Bahamas, the money laundering transactions by Kirkeide in order to execute the fraudulent credit bid scheme constitutes money laundering in violation of 18 U.S.C. § 1956. The Superyacht loan was outstanding as of May 2014, payments that were money laundering in violation of 18 U.S.C. § 1956 were made both before May 2014 and after May 2014.

258.    Payments made by on the Superyacht Construction Loan that Kirkeide assisted with were made with funds that were the proceeds of fraud against Al-Saleh, (and derived from a contract wherein Kirkeide assisted in the payment of a $9 million dollar bribe) Kirkeide intentionally and knowingly participated directly and indirectly in the defendants' fraudulent credit bid scheme and or associated with the defendants through a pattern of racketeering consisting of repeated violations of the federal statute regarding monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957.

259.    Kirkeide was aware of the fact that Al-Saleh claimed against Worldspan for the disgorgement of $11,064,525.38 paid by IOTC Bahamas to Worldspan.   Kirkeide intentionally and knowing participated directly and indirectly in the defendants fraudulent credit bid scheme and or associated with the Defendants through a pattern of racketeering consisting of repeated violations of Federal mail and wire fraud statutes 18 U.S.C. §1341 and 18 U.S.C. §1343, based on the use of the United States mails and wires to send emails, facsimiles and letters across state lines

and across the international border between Canada and the United States regarding the money laundering transactions that violated 18 U.S.C. §§ 1956, 1957.

260.   Kirkeide personally benefitted from the illegal Enterprise as a result of being paid large sums by HS3 and Deborah Sargeant, said payments being made from January 2008 until present.

261.   The fraudulent conduct of Kirkeide in furtherance of the Superyacht Credit Bid Fraud and Conspiracy, from 2008 until present, was the direct, foreseeable and proximate cause of Plaintiffs injuries.

262.   Kirkeide was under a continuous duty to disclose to the Plaintiffs the true character and nature of the Superyacht Credit Bid Fraud and Conspiracy. Kirkeide knowingly, affirmatively, and actively concealed the true nature and character of the Superyacht Credit Bid Fraud and Conspiracy and continues to do so.

263.   Kirkeide was essential to the illegal Enterprise as he utilized his accounting and corporate skills to assist in the creation of complex corporate structures as directed by HS3 and Comerica, said alter ego corporations used as vehicles of fraud as described in this Amended Complaint. Kirkeide assisted in creating the means and mechanisms for the money laundering transactions referred to in this Amended Complaint.  Kirkeide assumed the role of director of certain HS3 alter ego corporations.  Kirkeide's involvement in the illegal Enterprise spans years and includes hundreds of acts in furtherance of the illegal Enterprise.

264.   Kirkeide was also instrumental in the money laundering undertaken by HS3 and Comerica.  Kirkeide was the accountant for the illegal Enterprise referred to herein and was intimately familiar with the money laundering transactions referred to in this Amended Complaint,

as well as with the design and implementation of the fraudulent credit bit schemes referenced herein.

265.     Kirkeide was also instrumental in the money laundering undertaken by HS3 and Comerica.  Kirkeide was the accountant for the illegal Enterprise referred to herein and was intimately familiar with the money laundering transactions referred to in this Amended Complaint, as well as with the design and implementation of the fraudulent credit bit schemes referenced herein.  In furtherance of the illegal Enterprise, Kirkeide communicated extensively with HS3, the banks referred to in this Amended Complaint, Monger and the other co-conspirators, thereby committing wire fraud and mail fraud.  Kirkeide also travelled to assist in the illegal Enterprise, thereby violating the Travel Act.  Kirkeide, as an accounting professional, ignored his professional obligations and responsibilities, including, but not limited to, his obligation to report the illegal activities referred to in this Amended Complaint, electing instead to become an active participant in the illegal Enterprise.  Kirkeide was paid significant sums of money by HS3 for his participation in the Enterprise.

266.     Kirkeide was the individual in charge of initiating and executing all the wire transfer payments made to Worldspan on behalf of HS3 and his alter ego entities.  He  was also the person in charge of initiating and executing the electronic payments to pay the Construction Loan.  In addition, Kirkeide was an active and willing participant at the meeting where HS3 extorted and threaten Barnett's life.  Kirkeide also played a role in initiating and executing the wire transfers in the amount of $9 million dollars for the bribe paid to General Dahabai.

267.     In furtherance of the Enterprise, Kirkeide sent and received emails, from British Columbia, Canada to and from HS3, who was located in Florida, thereby transmitting these emails across the international border between Canada and the United States. These communications were

in violation of mail and wire fraud statutes 18 U.S.C. §1341 and 18 U.S.C. §1343.  Moreover, Kirkeide executed all wire transfer payments in furtherance of the credit bid fraud including the payments to Worldspan, Comerica, Monger, and HS3's legal team in Canada.

### *Defendant Deborah Sargeant*

268.    Deborah is an unemployed homemaker and the spouse of HS3. HS3 and Deborah reside together at their home Gulfstream, Florida.  Deborah has been involved with the Plaintiffs since prior to the commencement of the construction of the Superyacht.   Prior to the commencement of the construction of the Superyacht, representatives of Worldspan met with Deborah and HS3 at their home in Gulfstream, Florida, regarding the upcoming construction of the Superyacht (the "Deborah HS3 Superyacht Meeting").

269.    At the Deborah HS3 Superyacht Meeting, Deborah advised the Worldspan representatives that the Superyacht was hers.  Deborah had involvement with the Superyacht both prior to and throughout the construction.

270.    During the Deborah HS3 Superyacht Meeting, Deborah told the Worldspan representatives how she wanted her Superyacht constructed.   During the construction of the Superyacht she provided additional instructions to Worldspan as to the specifications of her Superyacht.  During the Deborah HS3 Superyacht Meeting, Deborah knowingly, fraudulently, and with the intent that her statements would be relied upon, advised Barnett and the Worldspan employees that were present, that she and HS3 were contracting with Worldspan to have Worldspan construct the Superyacht for her and HS3 and that this was a good opportunity for Worldspan to make money.  During the Deborah HS3 Superyacht Meeting, Deborah fraudulently omitted that she and HS3 did not intend to pay Worldspan in full and that they will seek to obtain the Superyacht through a fraudulent credit bid scheme.  At the time of the Deborah HS3 Superyacht

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

Meeting, Deborah was aware of the fact that since 2007 HS3 had been defrauding Al-Saleh and laundering millions of dollars that were used for, among other things, to fund their lavish and extravagant lifestyle.

271.    At the time of the Deborah HS3 Superyacht Meeting, Deborah knew that Worldspan was to be paid from the same pool of stolen and/or dirty money that she and HS3 had been stealing from Al-Saleh regarding the DESC contracts. Deborah knowingly and affirmatively concealed these critical facts from Barnett and the Worldspan employees.  At the Deborah HS3 Superyacht Meeting, Barnett and the Worldspan employees reasonably relied on the fraudulent statements and fraudulent omissions made by Deborah, and in reliance on these fraudulent statements and omissions, commenced construction on the Superyacht.  Had these fraudulent statements and omissions not been made, Worldspan would not have commenced construction on the Superyacht and would not have suffered the injuries referred to herein.  As a direct, proximate, and foreseeable consequence of Deborah's fraudulent statements and omissions, Worldspan was injured.  Deborah, HS3 and Comerica conspired to not pay Worldspan $4.9 million dollars towards the construction of her Superyacht (an amount that has never been paid).  Deborah, HS3 and Comerica conspired together, with the other co-conspirators, to illegally and improperly interfere with the marketing and sale of the Superyacht.

272.    From 2008 until present, Deborah intentionally and knowingly participated directly and indirectly in the defendants' Superyacht Credit Bid and Conspiracy and or associated with the Defendants' through a pattern of racketeering consisting of repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §1341 and 18 U.S.C. §1343, based on the use of the United States mails and wires to send emails, facsimiles and letters across state lines and across the international border between the United States and Canada. Deborah associated with the

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

Defendants affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §1341 and 18 U.S.C. §1343, based upon the use of the United States mails and wires to send emails, facsimiles and letters across state lines and across the international border between the United States and Canada. These repeated violations took place both before May 2014 and after May 2014.

273.    Given the nature of the Defendants' fraudulent credit bid scheme, the implementation and execution of the fraudulent credit bid scheme was dependent upon the use of email, United States mail, Federal Express, U.S. Mail and other postal services.

274.    Given the nature of the Defendants' fraudulent credit bid scheme, the implementation and execution of the fraudulent credit bid scheme was dependent on the use of interstate communication wires, to include telephone, facsimile lines and the internet. These repeated violations took place both before May 2014 and after May 2014.

275.    The use of mails by the Defendant Deborah in order to execute the fraudulent credit bid scheme constitutes mail fraud. See 18 U.S.C. §1341.

276.    The transmission and use of interstate wire communications by Deborah in order to execute the fraudulent credit bid scheme constitutes wire fraud. See 18 U.S.C. §1343.

277.    Deborah individually acted with the knowledge that the use of United States mails and wires would follow in the ordinary course of Comerica's business and / or individually knew that such use of the United States mails and wires could have been reasonably foreseen.

278.    Deborah was aware that correspondence, emails, packages, legal correspondence were sent to Monger in Canada, across an international border, through the use of the United States mails and wires in furtherance of the defendants fraudulent credit bid scheme.  These repeated violations took place both before May 2014 and after May 2014.

279.     Deborah was aware that correspondence, emails, facsimiles, and packages would be sent across State lines in furtherance of the defendants' fraudulent credit bid scheme to the Defendants' in Florida,  to HS3,  Kirkeide, Monger, Shaw, Younker and Jones in Michigan and to Monger in Canada as well as Worldspan in Canada.

280.     Deborah knew or acted with knowledge that the Defendants' fraudulent credit bid scheme would utilize the United States mails and wires and result in an extensive pattern of use of the United States mails and wires.

281.     The continued use of the United States mails and wires in order to effectuate the Defendants' fraudulent credit bid scheme constitutes a pattern of racketeering activity.

282.     Deborah sent emails to Monger while Monger was in Vancouver, B.C. Canada, said emails including instructions to Monger in furtherance of the Superyacht credit bid fraud. These emails were sent both before May 2014 and after May 2014. These emails were sent in order to effectuate the Defendants' fraudulent credit bid scheme and constitute a pattern of racketeering activity on the part of Deborah Sargeant.

283.     Deborah Sargeant sent multiple emails from Florida to Monger while Monger was in British Columbia, Canada, both before May 2014 and after May 2014, said emails in furtherance of the fraudulent credit bid conspiracy.

284.     Deborah Sargeant sent multiple emails from Florida to Monger while Monger was in British Columbia Canada both before May 2014 and after May 2014 regarding Change Orders to the Superyacht. These Change Orders resulted in millions of dollars of additional construction costs and also caused the construction cycle of the Superyacht to be significantly extended. These Change Orders were implemented prior to Comerica failing to pay Worldspan $4.9 million dollars owed to Worldspan for the construction of the Superyacht.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

### *Comerica: Instrumental in Worldwide Fraudulent Schemes*

285.   Comerica used its position and authority as a large, ostensibly legitimate, and national banking corporation, to illegally launder millions of dollars and take security on assets, said funds known by Comerica to be the proceeds of fraud.  Comerica used its banking licenses and banking operations to facilitate the illegal Enterprise referred to herein, said Enterprise that Comerica was involved from at least 2009 until present, and continuing.

286.   Comerica was one of the masterminds of the Superyacht Credit Bid Fraud and Conspiracy.  Comerica used its position and authority as an ostensibly legitimate banking corporation to conspire with HS3  and shield HS3 's assets from seizure with money laundering transactions and with Comerica's security, said security that was obtained by Comerica's fraudulent representations.

287.   HS3's banking activities with Comerica were integral to HS3 and Comerica's schemes to defraud Worldspan and others.  Comerica deliberately co-mingled $9,387,398.67 of its funds with Sargeant's funds which were impressed with a fraud judgment in order to allow HS3 to continue to perpetuate his fraud, avoid paying creditors and continue to profit from its business arrangements with Sargeant.

288.   Comerica conspired with and was instrumental in the conspiracy, fraud and money laundering related to Al-Saleh, the Plaintiffs, PDVSA, Supreme Fuels, BTB, Daniel Sargeant, the HS3 family members, the HS3 family businesses and other persons and companies.

289.   Over a nine-year period (at a minimum), Comerica conspired with and aided and abetted HS3  and others in their fraudulent schemes that victimized individuals, companies as referred to in this Amended Complaint.

76

290.    These schemes were masterminded and engineered in Florida and had wide ranging effects in Florida.  Comerica, among other things, provided the support and assistance of money laundering, acting as the bagman in multiple and continuing schemes that defrauded the entities referred to in this Amended Complaint.

291.    Comerica ignored laws and regulations relating to money laundering and laundered over a hundred million dollars, blatantly ignoring the fact that the companies undertaking these huge and continuing transfers of funds (for years) had no employees, no business operations, were text book examples of money laundering corporations and were located offshore in jurisdictions that fail to enforce money laundering laws.

292.    Importantly, Comerica was aware of the fact that HS3 had fraud and RICO litigation outstanding against him and very large fraud judgements outstanding and unpaid against him and companies he controlled.  Comerica laundered these funds so as to preclude the victims of these frauds from obtaining financial redress from HS3.

293.    Comerica, not satisfied with the profits from fees and charges from hundreds of millions of dollars of money laundering transactions related to funds obtained by fraud, became a leading conspirator in the fraud against the Plaintiffs, Al-Saleh, and against the other individuals and entities referred to in this Amended Complaint.

294.    Comerica's Florida location, acting in concert with HS3, laundered millions of dollars from IOTC Bahamas into a superyacht in Canada.  Comerica and HS3 conspired to defraud the Plaintiffs and Al-Saleh.

295.    All of these schemes required, as an essential and continuing element, a bagman, an entity that would launder, on an ongoing basis, for years, in huge transactional amounts, the

proceeds of fraud against victims in the U.S. and other countries.  The bagman was and still is Comerica.

296.    Comerica used its position, authority and perceived legitimacy as a major bank to launder money, aid and abet HS3 and Deborah Sargeant, implementing security in favor of Comerica and acting as the lead conspirator in the Superyacht Credit Bid Fraud and Conspiracy, working hand in hand with HS3 and Deborah Sargeant and the other co-conspirators.

297.    This conspiracy, fraud and money laundering victimized HS3's family members, the HS3 family businesses, the national oil company of Venezuela, PDVSA, Al-Saleh, the Plaintiffs and many other persons and companies.

### Comerica Deliberately Disregarded Internal Controls and Aided and Participated in Sargeant's Fraudulent Schemes

298.    Comerica had notice of HS3's fraud from a series of red flags associated with HS3 controlled bank accounts which HS3 utilized to launder misappropriated funds and conduct his fraudulent affairs.  Comerica enabled HS3's fraud.

299.    HS3, utilizing his Comerica bank accounts, routinely engaged in atypical banking activities.  HS3 used his Comerica bank accounts to spend millions on luxury purchases as well as transfer millions of dollars to himself, his wife and others with funds that were known by Comerica to be obtained by fraud.

300.    The steps taken in this conspiracy were masterminded from Florida and the United States and were undertaken, in various places, including, in the United States, Jordan, Bahamas, the United Arab Emirates, Netherlands, Canada, and Venezuela.

301.    All directions relating to the RICO conspiracy and the predicate acts of Comerica and the Comerica's agents were made from and originated in the U.S.

302.    The conduct of Comerica and its agents evidences a pattern of mail and wire fraud, money laundering, and monetary transactions involving unlawful and illegal activity.

303.    Numerous red flags, regarding money laundering and monetary transactions involving unlawful and illegal transactions, as described in detail herein, are evident from a review of the documents and facts.  Comerica knowingly participated and /or was willfully blind to such illegality.  Moreover, Comerica failed to act either by implementing normal industry safeguards and procedures, reporting the suspicious activity, or ending the banking relationship.

304.    Comerica laundered millions and millions of dollars from IOTC Bahamas corporate checking account ending in 8666 directly to HS3  and Deborah (husband and wife) personally commencing in June 16, 2009, and continuing to present.

305.    Comerica recommitted itself to the relationship time and again, disregarding anti-money laundering safeguards and other legal and regulatory requirements that it was legally required to implement, and allowed the scheme to continue unabated.

306.    The motive for this is that Comerica obtained many thousands of dollars in loan origination, renewal and late fees, wire transfers, other transfers and other fees by facilitating and participating in the alleged scheme.  The actions of Comerica and its agents were designed to protect the co-conspirators.

### Comerica Repeatedly Ignored a Series of Obvious Anti-Money Laundering Red Flags and Facilitated the Money Laundering Scheme

307.    A scheme of the scale and scope alleged herein was undertaken by the purposeful and knowing involvement of the financial institution hosting the key money laundering accounts, in this case, Comerica.   It was only with Comerica's substantial and sustained assistance that HS3 and his co-conspirators were able to launder, on an ongoing basis the funds referred to herein.

Comerica's actions over the course of a multi-year period between 2009 and present constituted a flagrant disregard and violation of anti-money laundering laws.

308.    The Currency and Foreign Transactions Reporting Act, also known as the Bank Secrecy Act (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1829(b), and 1951-1959, the "BSA"), and its implementing regulation (31 C.F.R. 103), were enacted to prevent banks and other financial service providers from being used as intermediaries for, or to hide the transfer or deposit of money derived from, illegal and criminal activity.

309.    Since its passage in 1970, Congress has amended the BSA a number of times to enhance its effectiveness, including in the aftermath of the September 11, 2001 terrorist attacks in the United States.  However, even before the 2001 enhancements to the BSA, more than 170 crimes were listed in the money laundering statutes then in force.  The laws applicable to the subject transactions required financial institutions to educate their employees, to understand their customers and their businesses, and to have systems and procedures in place to distinguish routine transactions from ones that rose to the level of suspicious or illegal activity.

310.    Among other things, the BSA and related regulations promulgated by the relevant bank regulators required banks to develop, administer, and maintain a program that ensured and monitored compliance with the BSA and its implementing regulations, including record keeping and reporting requirements.

311.    In addition, an effective compliance program during the relevant time period described here should have included controls and measures to identify and timely report suspicious transactions. A financial institution was required to employ due diligence to be able to make an informed decision about the suspicious nature of a particular transaction and whether to file a suspicious activity report.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

312.     For example, in its September 2000 Comptroller's BSA/Anti-Money Laundering Handbook, the Office of Currency Comptroller ("OCC"), an independent bureau with the U.S. Department of Treasury described money laundering as follows:

> I. Money laundering is the criminal practice of filtering ill-gotten gains or "dirty" money through a maze or series of transactions, so the funds are "cleaned" to look like proceeds from legal activities. Money laundering does not have to involve cash at every stage of the laundering process. Any transaction conducted with a bank might constitute money laundering. Although money laundering is a diverse and often complex process, it basically involves three independent steps that can occur simultaneously:

> i. Placement: The process of placing, through deposits or other means, unlawful cash proceeds into traditional financial institutions.

> ii. Layering: The process of separating the proceeds of criminal activity from their origin through the use of layers of complex financial transactions, such as converting cash into traveler's checks, money orders, wire transfers, letters of credit, stocks, bonds, or purchasing valuable assets, such as art or jewelry.

> iii. Integration: The process of using an apparently legitimate transaction to disguise the illicit proceeds, allowing the laundered funds to be disbursed back to the criminal. Different types of financial transactions, such as sham loans or false import/export invoices, can be used.

313.     This case features classic money laundering activity undertaken through the transfer of funds from offshore companies with no operational business, no operational business, said funds transferred in very large tranches, continuing for years and years, from offshore corporations into the United States of America, with the full assistance and participation of Comerica.

314.     In this case, HS3 directed DESC to pay the funds due under the DESC contracts to IOTC Netherlands at ABN Amro.  The funds placed at that account constitute the placement stage of the money laundering process.  These funds were generated with specified unlawful activity, to wit, mail and wire fraud directed at Al-Saleh as well as violations of the FCPA in connection with

81

the payment of bribes to Jordanian officials in order to perform the DESC contracts.  The layering stage occurred when HS3 and Kirkeide directed IOTC Netherlands to wire the funds into IOTC Bahamas account at Comerica.  Lastly, the integration stage occurred when HS3 used the dirty proceeds to pay Worldspan for the construction of the Superyacht as well as paying Comerica for the Construction Loan.

315.   At the center of the money laundering is IOTC Bahamas, an offshore corporation, with no employees, business operations that is domiciled in a country that does not enforce anti-money laundering laws and that had no privity of contract with DESC.

316.   The facts described herein also reveal multiple instances of placement, layering and integration as described in the OCC Handbook.  In addition, the OCC Handbook provides guidance for banks to use when opening business accounts.  Included are instructions to:

I.Determine who are the beneficial owners of all accounts in private banking, trust, and other specialized banking departments. The bank should pay particular attention to corporate entities, international business corporations, bearer share companies, or nominee officers, especially if such organizations are based in countries or jurisdictions considered to be secrecy or money laundering havens.

II.Consider the source of funds used to open the account. Large deposits, especially cash, should be questioned.

317.   Comerica failed to carry out these steps or any proper account opening procedures from the outset of the banking relationship with the various corporations that were alter ego corporations of HS3 , including both domestic and offshore corporations and accounts.

318.   These activities were violative of obligations applicable to the operation of Comerica in Florida pursuant to, among others things, the BSA and of applicable Federal Deposit Insurance Corporation regulations.

82

319.     It was part of Comerica's duties to verify the source of funds used to pay down the $9.4 million-dollar loan advanced by Comerica to HS3 for the construction of the Superyacht. The original balance on the Comerica loan to HS3 for construction on the Superyacht was $9.4 million, on August 31, 2016 the loan balance was $2,023,672.85.

320.     HS3 paid the Superyacht loan down by reducing the principal from $9.4 million to $2,023,672.85, thereby reducing the principal in the amount of $7,376,327.15.  These payments were made from the offshore corporation IOTC Bahamas, the same corporation that was used as a vehicle of fraud against Al-Saleh and others and the same corporation that, with its predecessor corporation, laundered over $180 million dollars.

321.     During the time period from August 9, 2009, to present there was also a substantial amount of interest paid by HS3 to Comerica on the Superyacht loan.  Comerica took no steps to determine the source of these funds.

322.     Comerica took no steps to determine or verify the payment by HS3 of over $11 million towards the construction of the Superyacht, and the payment of Monger, the employee and agent of HS3, the full-time employee of HS3 who was involved in the construction of the Superyacht.

323.     Comerica also ignored an extensive number of industry-recognized "red-flags" that should have triggered investigation, reporting and the cessation of the banking relationships with HS3 and his alter ego corporations.

324.     The September 2000 Comptroller's Handbook compiled by the OCC provides an extensive list of "potentially suspicious activities that should raise red flags for further investigation to determine whether the transactions or activities reflect illicit activities rather than

legitimate business activities and whether a SAR should be filed." These suspicious activities

include:

- **"A business account history that shows little or no regular, periodic activity; the account appears to be used primarily as a temporary repository for funds that are transferred abroad."**
  The alter ego corporations of HS3 were utilized to launder funds by HS3 . These very large transfers were textbook examples of money laundering, utilizing corporations with no business operations, no employees, located in offshore jurisdictions, to effect multiple transfers of very large sums of money, continuing for years and years, from offshore into the United States as part of HS3 's continuing pattern of international money laundering.

- **"A customer's place of business or residence is outside the financial institution's service area."**
  The businesses were, in many instances, outside of the service area of Comerica, in that the money laundering scheme required offshore corporations to effect the transfer of funds from offshore into the United States.

- **"Unusual transfer of funds among related accounts or accounts that involve the same principal or related principals."** Comerica knew that the loan made for the Superyacht, the payments made on the loan, and the funds utilized to pay for the construction of the Superyacht, and the funds utilized to pay for Monger all involved HS3 directly or derived from corporations all controlled by and / or beneficially controlled by HS3 .

- **"Wire transfer activity to/from financial secrecy haven countries without an apparent business reason or when it is inconsistent with the customer's business or history."**
  The offshore corporations utilized by HS3 to effect his money laundering and facilitate his scheme were undertaken without an apparent business reason and were inconsistent with the business history of HS3 . Funds that originated from American taxpayers that were paid from the DESC to HS3 's alter ego corporations, including to IOTC Bahamas, for the purpose of defrauding Worldspan, numerous corporations, individuals, and for the purpose of defrauding Al – Saleh of his share of the profits from the DESC contracts, were laundered by Comerica.

- **"Funds transferred in and out of an account on the same day or within a relatively short period of time."**
  Funds were transferred in and out of accounts controlled by HS3 and his alter ego corporations in a relatively short period of time as these transactions had, at their heart, the purpose of defrauding Al-Saleh of his share of the profits he was entitled to from the DESC contracts and defrauding the other entities referred to in this Amended Complaint.

84

- **"Regular deposits or withdrawals of large amounts of cash, using wire transfers to, from, or through countries … whose laws are ineffective in controlling the laundering of money."**
HS3 had his alter ego corporations transfer funds, in very large amounts, for years, from accounts located in countries including, but not limited to, the Bahamas, whose laws are ineffective in controlling the laundering of money and countries which have a history of being blacklisted by the U.S. regulators as a result of ineffective anti-money laundering regulations and controls.

- **"Unusual or suspicious identification documents that the financial institution cannot readily verify."**
Comerica failed to conduct enquiries into the identification documents utilized in regard to the alter ego corporate accounts that were utilized by HS3 . The underlying basis for these accounts was never investigated by Comerica.

### *Comerica Acted with Knowledge*

325.    Comerica and its co-conspirators conducted this racketeering activity through a pattern of predicate acts that began in 2009 and continues to this day.  The predicate acts all had the common purpose of facilitate the Superyacht Credit Bid Fraud and Conspiracy, and as part of the scheme to defraud Al-Saleh and the other persons and entities referred to in this Amended Complaint.  This constituted a continuing and concerted effort to obfuscate the scheme and to prevent the detection and uncovering of the involvement and extent of the roles of HS3 and Comerica in the Superyacht Credit Bid Fraud and Conspiracy.

326.    A number of key facts confirm that Comerica and HS3 acted with knowledge of the underlying fraud and conversion and that Comerica and HS3 intentionally acted in furtherance of the Superyacht Credit Bid Fraud and Conspiracy and cover-up.

### **When Plaintiffs Learned of the Fraudulent Credit Bid Scheme**

327.    Plaintiffs did not have knowledge of Defendants' elaborate scheme to devalue the Superyacht and destroy Worldspan until June 26, 2014, when they learned of Comerica and HS3's intention to undertake the same fraudulent credit bid scheme against Plaintiffs as was undertaken with the oil refinery in Corpus Christi, Texas.

328.   On June 26, 2014, for the first time ever, Comerica and HS3 disclosed their intention to undertake the same fraudulent credit bid scheme against the Plaintiffs as was undertaken in the BTB credit bid fraud.  Comerica and HS3 advised the Federal Court of Canada that they intended to have a HS3 controlled corporation acquire the Comerica security, and, the HS3 controlled corporation would then use that security to credit bid on the Superyacht.   This is when the Plaintiffs, first learned of the RICO conspiracy directly targeting them, with the masterminds being Comerica and HS3.

329.   Worldspan was amazed, when on June 26, 2014, in Federal Court, Comerica and HS3 stated that HS3 was going to make a credit bid in the identical manner as he had done in Corpus Christi, Texas. This is when Worldspan understood that Defendants engaged a multi-year conspiracy identical to the BTB credit bid fraud.

### *When Plaintiffs were Damaged by Defendants' Acts*

330.   Plaintiffs' injury occurred in 2014 when the Superyacht sold for $5 million and Plaintiffs lost the $30 million construction contract to update and finish building the Superyacht. The Superyacht was sold for $5 million dollars and Worldspan lost the $30 million construction contract to update and finish the Superyacht.  The Superyacht was sold for $5 million to an individual who then undertook an extensive re-design and upgrade of the partially finished Superyacht.  Worldspan lost the contract to complete the Superyacht as a result of the June 2014 fraudulent credit bid.

331.   Hence, in 2014, Worldspan learned that (i) the Superyacht was only worth $5 million dollars[17] despite being previously appraised, by Comerica's appraiser, as-is-where-is, for

---

[17] Comerica and HS3 opposed a 2013 sale of the Superyacht to the Landlord of the facility where the Superyacht was located. This caused the landlord to rescind his offer to purchase. The Landlord's offer was for $5.8 million dollars and included other very substantial benefits to

$15 million,[18] (ii) the Superyacht sold to a wealthy individual from Florida wishing to update and rebuild the Superyacht, and (iii) that the June 2014 Superyacht credit bid fraud had caused the new purchaser[19] of the Superyacht not to complete the construction of the Superyacht with Worldspan, thereby causing Worldspan to lose $30 million dollar completion contract.  The $30 million-dollar completion contract was more than enough to allow Worldspan to stay in business and to bring Worldspan back into the world of constructing superyachts.  In June 2014, Worldspan learned that it was not going to receive anything from the proceeds of sale of the Superyacht due to the fact that it only sold for $5 million dollars. In the face of this, it is clear that Plaintiffs' injury occurred in 2014.

332.    In 2011 (construction of the Superyacht ceased in April 2010), Comerica commissioned an appraisal of the Superyacht. The appraisal valued the Superyacht at $15 million USD, as is-where is. The Superyacht had approximately $26 million dollars spent on it (approximately $21 million spent by HS3 / Deborah and Comerica and $4.9 million from Worldspan) and in 2010 was brand new. The world's largest superyacht broker, Fraser Yachts,

---

Worldspan. The Superyacht would have been completed at the premises of Worldspan, in the building that was purpose built for Worldspan for the specific purpose of constructing Superyachts. The building which was over 90,000 square feet had departments for superyacht carpentry, fiberglass fairing, engineering, design, electrical, dynamic hull testing, electronics, mechanics and every department required to complete the Superyacht. The Superyacht had been constructed from scratch in this building and the vessel and all of the components were located in the building.

[18] The Superyacht had $26 million dollars spent on it.

[19] The purchaser was intimately aware of the June 2014 credit bid attempt and the enormous efforts of the Defendants to have the Superyacht moved to the HS3 controlled building as opposed to being sold to the purchaser. The purchaser knew that if the Superyacht remained at Worldspan's premises and Worldspan completed the Superyacht, HS3 and Comerica would continue to litigate against the company that was completing the Superyacht, Worldspan and continue their efforts to deprive Worldspan of possession of the Superyacht and the completion contract. For these reasons, which were a direct and proximate result of the June 2014 credit bid fraud, the purchaser did not contract with Worldspan to complete the Superyacht. The completion contract paid $30 million dollars, which is not a speculative amount.  The Plaintiffs will provide evidence at trial regarding the loss of the $30 million-dollar contract.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

valued the Superyacht at $19 million dollars in 2011. HS3, supported by Comerica, have asserted that the sale of the Superyacht at a higher price would not have resulted in payment to Worldspan. The assertion of the Defendants is based on the premise found in their submissions made the Federal Court of Canada in which they assert that the amounts due to Worldspan would be, at most, approximately $10.9 million, which would leave, after allowing for the set off of $10.9 million dollars from the amount secured by Comerica's mortgage, and that the sale of the Superyacht at $5 million, no funds for Worldspan.

333.    By the Defendants' HS3 and Comerica own submissions to the Federal Court of Canada, had the Superyacht sold for $15 million dollars (as it was appraised at in 2011), Worldspan would have been paid in full the $4.9 million dollars that was and is still owing to Plaintiffs.[20]  In the event the Superyacht had sold for more than $15 million dollars (the Comerica appraisal was not undertaken until 2011, Fraser Yachts valued the Superyacht at $19 million dollars and $26 million had been spent on the Superyacht) then Worldspan would have been paid as much as $10.9 million dollars, which is the number that HS3 and Comerica acknowledge could have been owned to Worldspan.

334.    Worldspan asserts that the amounts due to Worldspan were greater than the amount of $10.9 million dollars asserted by the Defendants Comerica HS3. Construction on the Superyacht commenced in 2008.  From 2008 until present, the Superyacht has always been titled in the name of Worldspan. The Federal Court of Canada ordered that the sale proceeds of the Superyacht had exactly the same legal status as did the physical Superyacht. Since the August 14, 2009 Assignment

---

[20] The Federal Court of Canada ruled that Comerica's security interest in the approximate amount of $21 million would be reduced by the amount owed to Worldspan (i.e., $10.9 million). Thus, if the Superyacht sold for $15 million, Comerica would be entitled to the first $10.1 million and the remaining $4.9 million would be paid to Worldspan.

of HS3's security interest in the Superyacht to Comerica, Comerica has been the secured creditor of the Superyacht.

335.    From the time construction ceased in April 2010, until 2014, Comerica took the position that the Superyacht should not be sold, Comerica also opposed the sale of the Superyacht in 2014.  After opposing the sale and marketing of the Superyacht that Comerica was the secured creditor in, from 2010 until 2014 (Comerica also opposed the sale application that was finally approved in 2014), counsel for Comerica, when faced with the application to sell the Superyacht, advised the Federal Court of Canada, that the Superyacht that Comerica had security over since 2009, (and which Comerica had devalued by opposing the marketing and sale for the purpose of the secret conspiracy) was now (in 2014) as obsolete as a "Commodore 64" computer.

336.    Comerica, as a participant in the conspiracy, devalued its own secured property, for years, ultimately submitting that the Superyacht was now (as a result of Comerica's conduct) as obsolete as a "Commodore 64" computer.  During the time it was operational, Worldspan employed approximately 100 specialized employees worked at Worldspan, including shipwrights, millwrights, electricians, carpenters, fiberglass experts, and engine specialists, as well as a complete office staff.  All of them had to be let go.  The terminations led to over $2 million in penalties against Worldspan by government agencies for improper termination.  In addition, the 9.315-acre waterfront property with the purpose-built building and waterfront home were lost.  In fact, the city placed a six-figure tax lien on the waterfront property, forcing CSPAN to sell the property.  All of this has been and to this day been characterized as events that flowed from a legitimate commercial dispute, referred to by the Defendants as a mundane commercial dispute, when, in fact, the Plaintiffs learned, in 2014, that the various steps and consequences referred to herein that were characterized as part of and the consequences of a mundane commercial dispute,

were steps taken in furtherance of the Superyacht credit bid fraud which was actively concealed until 2014.

337.    Thus, as a direct and proximate result of the Superyacht selling for merely $5 million and the loss of the $30 million contract to complete the Superyacht, Worldpsan, CSPAN, Wedmore, and the Crescent and Queenship brands were destroyed.   The Plaintiffs lost the Worldspan business and the entire value of the Worldspan business.   According to accountant Michael Nesbit,[21] Worldspan replacement cost valuation was $42 million.

338.    Because Worldspan's assets were assigned to CSPAN in 2011, CSPAN owned the assets and undertaking of Worldspan from that time forward, including at the time of the injury. Therefore, CSPAN suffered direct injury.   Similarly, Wedmore suffered direct injury because it is the majority shareholder of Worldspan.[22]   Generally, a shareholder may not claim direct injury for

---

[21] Michael Nesbit has been a Chartered Accountant for over 35 years and has conducted numerous forensic audits; filed numerous experts' reports with the British Columbia Supreme Court and has been engaged by numerous corporations and individuals in Canada and the United States.  Michael Nesbit has also been engaged by clients to deal with matters of financial reporting, taxation, forensic accounting, mergers, bankruptcy, acquisitions and litigation support.  Michael Nesbit's spectrum of expertise includes experience as a forensic accountant in fraud, economic damages, forecasting, accounting malpractice, management negligence, contractual performance failures, bankruptcy and other matters involving general commercial litigation.  Michael Nesbit has extensive accounting and consulting experience as it relates to the superyacht construction industry.   Michael Nesbit has been involved in the superyacht industry for decades and has consulted regarding the sale and construction of tens of millions of dollars' worth of superyachts, similar in nature to the Superyacht referred to herein.  Michael Nesbit has valued Worldspan's business with a replacement cost valuation of $42 million dollars.   Comerica and its co-conspirators are responsible for this amount to the Plaintiffs, plus interest from the date of destruction until paid in full, as well as the other amounts referred to herein.

[22] "[S]hareholders may have rights in corporate property . . . 'by virtue of their exclusive beneficial ownership, control, and possession of the properties and businesses allegedly destroyed.'"  *Helmerich & Payne Drilling Co. v. Bolivarian Republic of Venezuela*, 743 Fed. Appx. 442, 446 (D.C. Cir. 2018) (quoting *Helmerich & Payne Drilling Co. v. Bolivarian Republic of Venezuela*, 784 F.3d 804, 815 (D.C. Cir. 2015); *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1516 (D.C. Cir. 1984) (en banc), *vacated* 471 U.S. 1113 (1985)).   "International law undisputedly protects the "direct rights" shareholders enjoy in connection with corporate ownership, including the right to any declared dividend, the right to attend and vote at general

injury caused to its subsidiary, but when the injury is in fact the destruction or expropriation of the subsidiary the shareholder has standing because the value of its capital stock in the subsidiary has become worthless.  Because Worldspan was completely destroyed, Wedmore lost all of its rights as majority shareholder; Wedmore shares in Worldspan are virtually worthless and Wedmore lost its ability to any declared dividend, its right to vote at general meetings, etc.[23]  Consequently, Defendants' devaluation of the Superyacht and destruction of Worldpsan led to the complete destruction of the beneficial and productive value of Wedmore's ownership of Worldspan, leaving Wedmore with shares that have been rendered useless.

339.    The Crescent brand name was valued on August 31, 2005, by Evans & Evans, Inc., which is a leading investment banking firm with offices and affiliates in Canada, the U.S. and Asia. The comprehensive and extensive appraisal is 53 pages in length and contains a detailed description of valuation methodologies and methods employed, arriving at a value for the brand Crescent $7,119,112.00.  The Crescent brand was assigned to and owned by CSPAN.  Comerica and its co-conspirators caused direct injury to the U.S. entity, CSPAN, thereby creating domestic injury by destroying the brand Crescent.

---

meetings, and the right to share in the residual assets of the company on liquidation." *Helmerich & Payne Drilling Co. v. Bolivarian Republic of Venezuela*, 743 Fed. Appx. 442, 454 (D.C. Cir. 2018).  "It is also well established that a state violates international law if it takes measures that have an effect equivalent to a formal expropriation of a foreign shareholder's own property rights, even if the state does not formally divest the shareholder of its shares." *Id.* (internal quotations omitted).

[23] [W]here state action is aimed at the direct rights of the shareholder as such, it can form the basis for an international expropriation claim." *Helmerich & Payne Drilling Co. v. Bolivarian Republic of Venezuela*, 743 Fed. Appx. 442, 454 (D.C. Cir. 2018) (internal quotations omitted). **"When a state permanently takes over management and control of [a foreign shareholder's business, completely destroying the beneficial and productive value of the shareholder's ownership of their company, and leaving the shareholder with shares that have been rendered useless, it has indirectly expropriated the ownership of that business and has responsibility under customary international law to provide just compensation to the shareholder."** *Id.*

340.    The Queenship brand name was valued on December 7, 2004, by Evans & Evans, Inc.  The comprehensive and extensive appraisal is 49 pages in length and contains a detailed description of valuation methodologies and methods employed, arriving at a value for the brand Queenship of $6,649,720.00.  The Queenship brand was assigned to and owned by CSPAN. Comerica and its co-conspirators caused direct injury to the U.S. entity, CSPAN, thereby creating domestic injury by destroying the brand Queenship.  The valuation of the brands is not speculative as they were the subject of a highly detailed expert appraisal.

### IV. TOLLING OF THE STATUTE OF LIMITATIONS

<u>A. Discovery Rule Tolling</u>

341.    Plaintiffs had no way of knowing about the Defendants deception with respect to their conspiracy to acquire Plaintiffs' assets by way of credit bid.  Up until June 2014, Comerica Defendants had repeatedly told the Canadian Courts that Comerica was simply a mortgage holder, only trying to exercise its mortgage on the Superyacht.

342.    In fact, as is extensively detailed in this Amended Complaint, Comerica undertook a litany acts, that, in the context of the Superyacht credit bid attempt made in 2014, were exposed as being steps in the same credit bid fraud as was undertaken in Corpus Christi, Texas, wherein HS3's alter ego corporation, BTB, was found by the U.S. District Court to have undertaken a fraudulent credit bid.

343.    Unbeknownst to the Plaintiffs', Comerica was actively concealing and conspiring with HS3 and the other Defendants. Comerica was concealing its intention to undertake an identical credit bid to the fraudulent credit bid undertaken in Corpus Christi, Texas.

344.    There was no ways or means for the Plaintiffs, through due diligence or through any means whatsoever to discover that Comerica bank, who held the security on the Superyacht

(and repeatedly told the court that it only wished to exercise its mortgage on the Superyacht) was a co-conspirator in an illegal and fraudulent scheme to, among other things, undertake a fraudulent credit bid scheme against the Plaintiffs.

345.    The 2014 application to the Federal Court of Canada for the sale of the Superyacht triggered an enormous and continuing response on the part of Comerica, HS3 and the Defendants. Faced with the prospect of the Federal Court approving the sale of the Superyacht, Comerica was finally forced to disclose the secret Superyacht credit bid scheme – for the first time ever and one year after Comerica had been advised of the finding of the U.S. District Court regarding the Corpus Christi, Texas refinery credit bid fraud.

346.    In 2014, Comerica and HS3 went to the extraordinary length of renting an enormous (49,400 square foot) empty commercial building in Richmond, B.C. which was then fraudulently characterized to the Federal Court of Canada by Defendant Monger as a "state of the art" superyacht construction facility.

347.    Comerica and HS3 submitted to the Federal Court of Canada that the Superyacht should not be sold to a third-party buyer, but rather should be transported to the "state of the art" superyacht facility and that an HS3 controlled corporation was going to obtain Comerica's security on the Superyacht and use that security to credit bid on the Superyacht. This is the same methodology that was used in the fraudulent credit bid undertaken by BTB in Corpus Christi, Texas.

348.    This Amended Complaint contains a direct comparison of the mechanics and steps of the two credit bids, the BTB credit bid fraud and the Superyacht credit bid fraud.  Jones, executive vice president at Comerica, in Detroit, Michigan, was in charge of Comerica's involvement in the 2014 credit bid fraud.

349.     Within the period of any applicable statues of limitations, Plaintiffs could not have discovered through the exercise of reasonable diligence that the Defendants were concealing the conduct complained of herein and misrepresenting their true agenda with respect to Plaintiffs' property.

350.     Plaintiffs did not discover and did not know of, facts that would have caused a reasonable person to suspect that Comerica, who held the security and all rights to the title in the Superyacht, and holds itself out as a legitimate financial institution, was undertaking a fraudulent scheme with their customer and co-conspirators, HS3 and the other Defendants, to devalue Plaintiffs' property, acquire Plaintiffs assets through fraud and destroy the value of Plaintiffs' assets. Nor in any event would such an investigation on the part of the Plaintiffs have disclosed Defendants' true intent. Rather, in attempting to overtly deceive the Plaintiffs, the Defendants representations were that they were operating in good faith and trying to complete the Superyacht build and / or simply exercise their legal rights as a mortgage holder.  Comerica valued profits with their co-conspirators over truthfulness and compliance with the law.

351.     Further, HS3 and Comerica actively litigated the claims of Al-Saleh that the money was procured by fraud and laundered to Worldspan. For these reasons, all applicable statues of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims for money laundering and wire fraud from April 2009 until present.

<u>B. Fraudulent Concealment Tolling</u>

352.     All applicable statutes of limitation have also been tolled by the Defendants knowing and active fraudulent concealment and denial of the facts alleged herein and throughout the period relevant to this action.  Instead of disclosing its scheme, Defendants falsely represented to the Court.

353.    In 2010, Comerica failed to pay Worldspan 4.9 million dollars owed to Worldspan for construction undertaken on the Superyacht. HS3 and Comerica took the position that the 4.9 million dollars was the subject of a commercial dispute. The unpaid 4.9 million dollars is the subject of a commercial dispute in the Canadian court. To this day, Comerica and HS3 are referring to the failure to pay the 4.9 million dollars as a "mundane commercial dispute". In this action, the Plaintiffs do not seek recovery of any amounts that are the subject of the contractual dispute.

354.    Since 2011 until present, Comerica has repeatedly asserted to that its only involvement is to seek a priority ranking on its security on the Superyacht. Only after Comerica and the Defendants were forced to pull the trigger on the credit bid scheme in June 2014, did the prior acts of Comerica and the defendants (which to this day are still being represented by the defendants as "mundane commercial disputes" and acts that are entirely legitimate) could the Plaintiffs understand that these were acts in furtherance of the enterprise referred to as the fraudulent credit bid scheme.

355.    The events that flowed from Comerica's failure to pay Worldspan $4.9 million dollars (that the Defendants' characterize as a "mundane commercial dispute" that is being dealt with by the Canadian Court) are not actionable in the context of these events deriving from a legitimate commercial dispute. These events include the receivership application, the penalties imposed by government agencies resulting from the failure to pay $4.9 million dollars, taxes, and other events. The position taken by the Defendants Comerica and HS3 is that the failure to pay the $4.9 million dollars starts the clock on the statute, even though they state the failure to pay the $4.9 million is a legitimate commercial dispute, which would mean that it is not actionable under RICO. The $4.9 million is not being claimed in this action, it is a dispute in the Canadian court.

356.    Comerica and HS3 also claim that the statute should begin to run at the time that Al-Saleh sought the return of over $11,000,000.00 from Worldspan. Defendants directly contradict this by stating that there was no harm to Worldspan as Worldspan never paid anything to Al-Saleh. The Canadian court in which Al-Saleh claimed for the disgorgement of over $11,000,000.00 from Worldspan (based on Al-Saleh's claim that the funds paid to Worldspan were the proceeds of fraud against him) did not determine that Al-Saleh could not make an in rem claim until after the Superyacht sold in 2014.

357.    HS3 and Comerica also assert that the application to the Federal Court of Canada to credit bid on the Superyacht utilizing Comerica's security (Comerica's security was to be assigned to a HS3 alter ego corporation and then used to bid on the Superyacht) was not approved by the Federal Court of Canada, therefore, Defendants allege there was no harm to Plaintiffs. HS3 and Comerica are asserting that the degree of ultimate success in the credit bid scheme determines whether or not Plaintiffs have a cause of action against the Defendants for their conspiracy. The conspiracy, irrespective of whether or not it achieved one of its most important goals (acquiring the Superyacht with a credit bid), devalued the Superyacht and caused significant harm to Plaintiffs as referred to herein.

358.    The Defendants interference with and obstruction of the marketing and sale of the Superyacht was characterized throughout as the Defendants legitimate reasons for opposing the marketing and sale of the Superyacht, when, in fact, it was part of the scheme to devalue the Superyacht so as to allow the Defendants Comerica, HS3 and Deborah Sargeant to credit bid on a greatly devalued Superyacht for the lowest amount possible. Comerica took the extraordinary step of actively participating in multiple acts that devalued the Superyacht in which Comerica was the secured creditor, taking repeated steps over the years, to devalue their security, to the detriment of

the owner of the Superyacht, the Plaintiffs. This culminated in counsel for Comerica advising the Federal Court of Canada, in 2014, that the Superyacht was as obsolete as a "Commodore 64 computer".

359.    Instead of disclosing the credit bid scheme, Comerica and the Defendants falsely represented that the various acts the Defendants undertook were typical commercial disputes and transactions and not acts taken in furtherance of an illegal enterprise.

360.    The 2014 Superyacht credit bid fraud establish that the Defendants actively misled the Plaintiffs and that the Plaintiffs did not have actual or constructive knowledge of the fraud. The 2014 Superyacht credit bid fraud demonstrates that the Plaintiffs had neither actual nor constructive knowledge of the facts constituting the Plaintiffs cause of action, despite the Plaintiffs' due diligence.

361.    Comerica and the Defendants actively concealed the existence and nature of the Superyacht credit bid fraud and conspiracy by making it appear as though the assignment of all of HS3's rights in the Superyacht security and in the Superyacht Construction Contract to Comerica were part of a commercial transaction, when, in fact, this was discovered, in 2014, to be a foundational step in the credit bid fraud and conspiracy.

362.    In the credit bid found to be fraudulent by the U.S. District Court for the Southern District of Texas referred to above, HS3 had a conventional lender (AmCap) take security on the refinery.  This security was then acquired by an alter ego HS3 corporation who used the security to execute a fraudulent credit bid on the refinery. In Plaintiffs' case, the conduct of the conventional lender, Defendant Comerica, was so egregious, that HS3 did not need to have a HS3 controlled corporation acquire the security on the Superyacht to undertake the fraudulent scheme, Comerica

97

conspired with the Defendants to execute the Superyacht credit bid scheme that Comerica and all of the Defendants knew was fraudulent.

363.    Not only was Comerica advised of the finding of the U.S. District Court that the credit bid for the Corpus Christi refinery was fraudulent, Comerica was the banker for BTB, the alter ego HS3 controlled corporation that was used as a vehicle of fraud in the Corpus Christi refinery credit bid fraud. BTB was re-domiciled from Florida to Texas two days prior to Al-Saleh obtaining a 28.8-million-dollar fraud judgment against HS3.

## C. Estoppel

364.    The Defendants were under a continuous duty to disclose to the Plaintiffs the true character and nature of the fraudulent credit bid conspiracy. The Defendants knowingly, affirmatively, and actively concealed the true nature and character of the fraudulent credit bid scheme and continues to do so. Based on the foregoing, the Defendants are estopped from relying on any statutes of limitations in defense of this action.

## V. RICO PREDICATE ACTS

### A.  Mail Fraud and Wire Fraud

365.    The Defendants activities affected interstate and foreign commerce.  Mail fraud under of 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343 is a racketeering activity and constitute predicate acts under 18 U.S.C. § 1961.  The elements of  mail or wire fraud have been identified as: (1) a plan or scheme to defraud; (2) intent to defraud; (3) reasonable foreseeability that the mail or wires will be used; and (4) actual use of the mail or wires to further the scheme. *See Wisdom v. First Midwest Bank, of Poplar Bluff*, 167 F.3d 402 (8th Cir. 1999).  The wire or mail communications need not be fraudulent in and of themselves.  Innocuous or "innocent" wirings are sufficient RICO predicates as long as they further a fraudulent scheme. *Tabas v. Tabas*,

47 F.3d 1280, 1294 n.18 (3d Cir. 1995); *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991).

366.    The mail and wire fraud statutes, however, are not limited to matters that would be punishable as common-law fraud.  *See Durland v. United States*, 161 U.S. 306, 313-314 (1896); *United States v. Moore*, 37 F.3d 169, 172-173 (5th Cir. 1994); *United States v. Stewart*, 872 F.2d 957, 960 (10th Cir. 1989); *United States v. Bishop*, 825 F.2d 1278, 1280 (8th Cir. 1987).  The courts have also long recognized that, under the mail and wire fraud statutes, "[t]he fraudulent aspect of the scheme to 'defraud' is measured by a nontechnical standard." *Id.*; *Blachly v. United States*, 380 F.2d 665, 671 (5th Cir. 1967); *Gregory v. United States*, 253 F.2d 104, 109 (5th Cir. 1958).  Indeed, it has long been settled that, to be punishable as mail or wire fraud, a deceptive scheme "need not be fraudulent on its face." *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir. 1978); *see Oesting v. United States*, 234 F. 304, 307 (9th Cir. 1916), cert. denied, 242 U.S. 647 (1917).  "[I]f a scheme is devised with the intent to defraud, and the mails [or wires] are used in executing the scheme, the fact that there is no misrepresentation of a single fact makes no difference." *Silverman v. United States*, 213 F.2d 405, 407 (5th Cir. 1954), cert. denied, 348 U.S. 828 (1954).  Applying those standards, the lower courts have generally recognized that "omissions or concealment of material information can constitute fraud . . . cognizable under the mail fraud statute, without proof of a duty to disclose the information pursuant to a specific statute or regulation." *United States v. Keplinger*, 776 F.2d 678, 697 (7th Cir. 1985), cert. denied, 476 U.S. 1184 (1986).

367.    While "pleading a predicate act [that is premised on fraud] with specificity requires the complaint to answer the familiar questions of 'who, when, where, how, and why," *Florida Software Sys., Inc. v. Columbia/HCA Healthcare Corp.*, 46 F. Supp. 2d 1276, 1282 (M.D. Fla.

1999), a plaintiff pleading a claim for mail or wire fraud must satisfy these requirements **only as to the underlying fraudulent scheme**.  The plaintiff need only "reasonably notify the defendants of their purported role in the scheme," and the "nature of his alleged participation in the fraud." *Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997) (citations and quotations omitted).  Thus, the fraudulent scheme must be pled with sufficient particularity as to alert the "defendants to the precise misconduct with which they are charged and [protect] defendants against spurious charges of immoral and fraudulent behavior."  *Durham v. Business Mgt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (plaintiffs alleged use of mails with sufficient particularity to withstand motion to dismiss).

368.     As such, "[a] civil RICO plaintiff need not provide exacting detail of the dates and times at which the alleged predicate acts occurred at the pleading stage." *Leung v. Law*, 387 F. Supp. 2d 105, 125 (E.D..N.Y. 2005).  The reason is evident.  As with all claims, and particularly given the complexity of a RICO claim, a RICO plaintiff ***does not*** need to "plead evidence and prove the case in the complaint."  *Haroco, Inc. v. Am. Nat'l Bank & Trust Co.*, 747 F.2d 384, 404 (7th Cir. 1984).  The standard, instead, is that as set forth in Rule 9(b).[24]

---

[24] Specifically, "[t]o plead 'fraud' with particularity, as prescribed by Rule 9(b), a civil RICO plaintiff must allege, as to each defendant: (1) the precise statements, documents or misrepresentations made; (2) the time, place and person responsible for the statements; (3) the content and manner in which these statements misled the plaintiffs, and (4) what the defendants gained by the alleged fraud."  *State Farm Mut. Auto. Ins. Co. v. Kugler*, 11-80051, 2011 WL 4389915 (S.D. Fla. Sept. 21, 2011) (citations omitted).  In the RICO context, "alternative means are also available to satisfy the rule." *Durham v. Business Mgt. Assocs.,* 847 F.2d 1505, 1512 (11th Cir. 1988) (citing *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d at 791 (list containing allegations of fraud describing nature and subject of statements found to be sufficient, even where precise words used were not alleged)); *see also Managed Care Litig.*, 298 F. Supp. 2d 1259 (S.D. Fla. 2003) (dismissal not required for failure to specify details of each misrepresentation when one instance was specified as to one defendant; at the pleading stage, further detail is "not required for numerous misrepresentations that occur over an extended period of time").

369.    All of the Defendants made extensive use of the U.S. mails and wires, in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).  Instructions were made utilizing U.S. mails and wires, by the Defendants, to transfer funds and fraudulently charge assets. This included, but was not limited to, transferring funds into and out of Comerica accounts, transferring funds from offshore corporations, making payments to Worldspan for the construction of the Superyacht, paying down the Comerica Construction Loan, said funds that were the proceeds of fraud of the fraudulent scheme and in furtherance of the Superyacht Credit Bid Fraud and Conspiracy.  This also included transferring funds in and out of Comerica accounts for payments to the Defendants and the co-conspirators, with funds that were the proceeds of further wire and mail fraud against other victims including Al-Saleh.  Many of the instructions were sent to and sent from Florida, directing the transfer of funds and the fraudulent charging of assets.

370.    Below is a chart of the wirings made by HS3's alter ego companies (with the assistance of Kirkeide who actually initiated the wires), and Comerica to Worldspan pursuant to their fraudulent credit bid scheme:

| No. | Date Paid | Amount Paid (USD) |
|---|---|---|
| 1. | March 2007 | $175,000 |
| 2. | June 2007 | $400,000 |
| 3. | March 2008 | $1,000,000 |
| 4. | April 2008 | $736,574.37 |
| 5. | June 2008 | $423,458.15 |
| 6. | July 2008 | $441,591.52 |
| 7. | August 2008 | $439,504.15 |
| 8. | September 2008 | $434,386.24 |

| No. | Date Paid | Amount Paid (USD) |
|-----|-----------|-------------------|
| 9. | September 2008 | $757,783.43 |
| 10. | November 2008 | $418,047.30 |
| 11. | December 2008 | $484,505.09 |
| 12. | January 2009 | $425,547.66 |
| 13. | January 2009 | $1,265,834.02 |
| 14. | February 2009 | $589,169.59 |
| 15. | March 2009 | $404,582.25 |
| 16. | April 2009 | $980,826.31 |
| 17. | May 2009 | $857,715.30 |
| 18. | June 2009 | $200,000 |
| 19. | July 2009 | $500,000 |
| 20. | August 2009 | $100,000 |
| 21. | August 2009 | $30,000 |
| 22. | August 2009 | $1,024,485 |
| 23. | September 2009 | $1,672,824.40 |
| 24. | October 2009 | $945,993.40 |
| 25. | November 2009 | $1,182,714.22 |
| 26. | December 2009 | $1,186,780.59 |
| 27. | January 2010 | $1,983,548.11 |
| 28. | February 2010 | $1,253,794.46 |
| 29. | March 2010 | $137,258.49 |
| 30. | April 2010 | $200,000 |

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

360.    The payments in line 1 and 2 were made to Worldspan on HS3's behalf and for HS3's benefit by Sargeant Marine, a Bahamian company for which HS3 is the director. The payments in line 3 to 21 were made to Worldspan on HS3's behalf and for HS3's benefit by IOTC Bahamas for which HS3 is the director and president. The payments in line 22 to 29 were made to Worldspan on HS3's behalf and for HS3's benefit by Comerica. *See* **Exhibit 6**, HS3's affidavit sworn on October 13, 2011, wherein he states all of the wire transfers and explains their origin and destination along with corresponding bank statements.

361.    The aforementioned wires were made by HS3 (with Kirkeide's assistance) and Comerica in furtherance of the fraudulent credit bid scheme. HS3 and Comerica planned to defraud Worldspan into executing the Assignment in order to effectuate the fraudulent credit bid scheme. As mentioned above, the Assignment and the Superyacht Construction Loan were the main documents effectuated to successfully conduct the fraudulent credit bid scheme. The fraudulent credit bid scheme involved devaluing the Superyacht, failing to pay for work done on the Superyacht, interfering with the marketing and sale of the Superyacht, and bringing claims against the Superyacht in an effort for HS3 to later obtain the Superyacht at a fraction of the price via a credit bid. In order to further this scheme, HS3 and Comerica needed to make the above wire transfers to Worldspan. The above wires made by Comerica to Worldspan under the Superyacht Construction Loan Agreement were in furtherance of the fraud, as such loan agreement was executed in furtherance of the fraud to avoid HS3's creditors and devalue the Superyacht. Thus, it is clear that HS3 and Comerica made these wires with the intent to defraud Plaintiffs in furtherance of the fraudulent credit bid scheme. Moreover, HS3 and Comerica knew that the wires

would be used by Worldspan to work on the Superyacht.  In fact, Worldspan did use the wires to work on the Superyacht.

362.    Beginning in at least 2009, and continuing today, the Defendants perpetrated an ongoing massive fraudulent scheme against the individuals, corporations (Al-Saleh and Supreme Fuels) and the Plaintiffs referred to in this Amended Complaint.  This fraudulent scheme resulted in victims claiming against Worldspan for funds they were defrauded of by the fraudulent scheme and it resulted in the destruction of the Plaintiffs as referred to herein.

363.    The scheme was directed, in large part, towards the assets of the Plaintiffs.  Many of the underlying transfers at the heart of the scheme involved the transfer of money paid into Comerica and from Comerica accounts in Florida and the United States.

364.    In addition, all Defendants made extensive use of the U.S. mails and wires, in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).  Instructions were made utilizing U.S. mails and wires, by the Defendants, to transfer funds and fraudulently charge assets.  This included, but was not limited to, transferring funds into and out of Comerica accounts, transferring funds from offshore corporations, making payments to Worldspan for the construction of the Superyacht, said funds that were the proceeds of fraud of the fraudulent scheme.  This also included transferring funds in and out of Comerica accounts for payments to the Defendants and the co-conspirators, with funds that were the proceeds of fraud against victims of the fraudulent scheme.  Many of the instructions were sent to and sent from Florida, directing the transfer of funds and the fraudulent charging of assets.

365.    The frauds referred to herein and the scheme would not have been possible had the Defendants not used the mails and wires to send and receive instructions in and out of Florida.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

366.     The Defendants' fraudulent scheme gives rise to numerous predicate acts of mail and wire fraud under RICO. These acts include, but are not limited to:

a.   Communications to Monger from HS3 and Deborah, while HS3 and Deborah were in Florida and while Monger was in Florida, other States, and in Canada;

b.   Numerous wire transfers made from offshore corporations, through Comerica accounts located in Florida and in Texas, to effectuate the money laundering transactions and financial transactions with property derived from criminal activity identified herein.

c.   Numerous emails from Florida and Canada to England to correspond with HS3's London solicitors who stated that Worldspan would not be paid for the millions of dollars' worth of unattached accessories to the Superyacht, which was then followed by communications from Florida to and from Monger, who was in Canada, followed by Comerica and HS3 communicating, between Florida, Michigan, Canada, and England to effectuate their purpose of fraudulently seeking to obtain millions of dollars' worth of unattached accessories to the Superyacht, without paying for the unattached accessories.

d.   Hundreds of wire transfers were made by HS3, his alter ego corporations, Comerica, into and out of accounts in Florida

e.   HS3, Comerica and Deborah arranged for numerous wire transfers into joint accounts (Tenants by Entireties) of Deborah and HS3, in Florida, for the purpose of having non-exempt funds subject to seizure by Al-Saleh and others become exempt from seizure.

f.   HS3, Comerica and Deborah arranged for numerous wire transfers into the Canadian bank account of Worldspan for the purpose of paying for the construction of the Superyacht.  These wire transfers were made from IOTC Bahamas.  These wire transfers were made in conjunction with numerous emails and facsimiles to Worldspan in Canada to assist in effectuating these wire transfers.  The wire transfers were from IOTC Bahamas to Worldspan. IOTC Bahamas had no employees, no business operations, no legitimate business purpose and is situated in a country that does not enforce anti-money laundering laws.  IOTC Bahamas and its predecessor corporation laundered in excess of $180 million dollars.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

g.  All of these wire transfers were made at the explicit direction and for the illicit personal benefit of the Defendants and their co-conspirators.

h.  Frequent phone conversations between the Defendants or those acting upon their instructions, including, but not limited to phone conversations between HS3  in Florida and Monger in British Columbia, Canada were made for the purpose of effectuating the wire transfers and the Superyacht Credit Bid Fraud and Conspiracy.

i.  Numerous emails, facsimiles, telephone calls and documents originating from Cynthia Jones in Detroit, Michigan to Comerica's lawyers in Vancouver, B.C., Canada.

j.  Numerous emails, facsimiles, telephone calls and documents originating from Cynthia Jones in Detroit, Michigan to HS3, Kirkeide, Monger, Shaw and Younker in Florida.

k.  Numerous emails, facsimiles, telephone calls and documents originating from Cynthia Jones in Detroit, Michigan to HS3's lawyers in Florida.

l.  Numerous emails, facsimiles, telephone calls and documents originating from Cynthia Jones in Detroit, Michigan to Mervyn Monger in Vancouver, B.C., Canada.

m.  Numerous emails, facsimiles, telephone calls and documents originating from Cynthia Jones in Detroit, Michigan to HS3's lawyers in Vancouver, B.C., Canada.

n.  A series of sworn affidavits filed by HS3, Monger, and Jones in the Federal Court of Canada in furtherance of the fraudulent credit bid, including those attached to this Amended Complaint as exhibits.  Drafts of these affidavits were circulated via e-mail between the affiants and their Canadian counsel.

367.  These multiple and frequent acts of mail and wire fraud establish a pattern of racketeering and further, give context to the Defendants' related racketeering activity that persisted from 2005 until present and continues unabated today.  These acts were all undertaken in furtherance of the scheme.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

B.     Money Laundering & Engaging in Monetary Transactions with Proceeds Derived from Unlawful Activity – Laundering and Spending the Proceeds of Mail and Wire Fraud and FCPA Violations

368.     Beginning in at least 2009 and continuing through present, Comerica, HS3, Deborah and the other co-conspirator unlawfully obtained millions of dollars through theft, fraud, embezzlement, bribery, and other artifices and unlawful activity.  As noted above, HS3 and his co-conspirators obtained millions of dollars by defrauding his business partner Al-Saleh who obtained a judgment against him and the co-conspirators for fraud which was upheld on appeal.  HS3 used the mails and wires to defraud Al-Saleh to convert for himself and his co-conspirators millions of dollars from the DESC contracts that should have been paid to Al-Saleh.  In addition, as set out above, HS3 and his co-conspirators, including Martin and Kirkeide, assisted him in paying a $9 million dollar bribe to General Mohammad Dahabi, then head of the Jordanian Intelligence Service in violation of the FCPA.  Violations of the federal criminal statutes for mail and wire fraud as well as the FCPA constitute "specified unlawful activity" pursuant to 18 U.S.C. § 1956(c)(7) (laundering of monetary instruments) and 18 U.S.C. § 1957(f)(3) (engaging in monetary transactions in property derived from specified unlawful activity).

369.     Over that same time period, Comerica, HS3, Deborah, Kirkeide, and the other co-conspirators, have made numerous financial and money laundering transactions, with the proceeds of theft, wire and mail fraud and embezzlement, and for the purpose of theft, fraud and embezzlement, said transactions being undertaken with Comerica bank accounts utilizing offshore corporations, alter ego corporations, cut-outs such as IOTC Netherlands in violation of 18 U.S.C. §§ 1956 and 1957.

370.     The Laundering Transactions currently known include, but are not limited to, the transfers to and through Comerica bank accounts in Florida, said transactions being for millions

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

and millions of dollars, including all of the payments made to Worldspan by HS3's alter ego companies as well as those made by Comerica with the "clean" money of the Construction Loan that was repaid with the dirty money from the mail/wire fraud against Al-Saleh and obtained in connection with violations of the FCPA.

371.    The bank statements of the accounts at Comerica demonstrate blatant and obvious examples of money laundering, with millions and millions of dollars being transferred from offshore corporations with no employees (such as IOTC Bahamas and IOTC Netherlands), no business operations and located in jurisdictions that do not enforce anti-money laundering laws. These transactions are, among other things, to Deborah, HS3, alter ego corporations, and co-conspirators.  HS3 and Comerica laundered over $11 million dollars from IOTC Bahamas and paid it to Worldspan towards the construction of the Superyacht.  These same funds were then claimed by other victims of Comerica and HS3's frauds, the victims bringing claims against Worldspan for the return of their funds that were defrauded from them by Comerica and HS3 .

372.    Every money laundering transaction was made to either promote the specified unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(A)(i) or to conceal or disguise in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Kirkeide and Comerica agreed to engage in the violations of 18 U.S.C. §§ 1956, 1957 by conspiring with HS3 to commit the money laundering and financial transactions identified herein in violation of 18 U.S.C. § 1956(h).   Comerica and Kirkeide conducted the money laundering and financial transactions as that term is defined in 18 U.S.C. § 1956(c)(2) because Kirkeide in most cases initiated or concluded the wire transfers and Comerica as the financial institution used to move the proceeds of specified unlawful activity participated in the money laundering and financial transactions.

373.    In addition, every financial transaction in excess of $10,000 that is derived from the proceeds of the DESC contracts comes from specified unlawful activity (i.e., wire and mail fraud against Al-Saleh and violations of the FCPA).  Accordingly, every financial transaction in excess of $10,000 from the proceeds of the DESC contracts made by the Defendants, all of which are U.S. persons, whether made inside or outside of the United States constitutes a separate violation of 18 U.S.C. § 1957.

374.    The Laundering Transactions were made by Comerica, HS3, Kirkeide and the co-conspirators, with the intent of concealing and promoting the scheme, including the fraudulent credit bid scheme.

375.    Upon information and belief, Comerica, HS3, Kirkeide and the other co-conspirators made the Laundering Transactions with the specific intent to conceal or disguise the nature, location, source, ownership, or control of the illegal proceeds because the Laundering Transactions were made in an unnecessarily complicated way, because they were made without a legitimate business purpose, because their effect was to enrich Comerica, HS3, Deborah, and the other co-conspirators to the detriment of the Plaintiffs and the other victims.

376.    The Laundering Transactions affected interstate and foreign commerce as they involved the transfer of money between accounts in the United States or between accounts located in the United States, the Bahamas, the Netherlands, Jordan, Canada, Switzerland, and elsewhere. The Laundering Transactions were undertaken in violation of banking law and statute by Comerica.

377.    Upon information and belief, the nature and intent of the Laundering Transactions were concealed by Comerica, HS3, Kirkeide and the other co-conspirators from the Plaintiffs and the victims and the applicable banking and government authorities and were made with the specific

intent to, among other things, avoid being subject to sanctions, penalties and fines by banking and government authorities, and to enrich the Defendants.

378.    The scheme gives rise to multiple predicate acts of money laundering under RICO. The money laundering activities of Comerica, HS3, Kirkeide and the other co-conspirators establish a pattern of racketeering and give context to their related racketeering activity that persisted for years and continue to this day.

<u>Fraudulent Transfers by Comerica Bank to Plaintiff Worldspan Pursuant to the Assignment – Aiding and Abetting Fraud</u>

379.    On or about August 2009, in furtherance of the conspiracy, and after fraudulently inducing the Worldspan to execute the Assignment, Comerica transferred its funds across state lines and across an international border, to the account of Worldspan, located in Canada, the amount of $1,024,485.00.

380.    On or about September 2009, in furtherance of the conspiracy, and after fraudulently inducing the Plaintiff to execute the Assignment, Comerica transferred its funds across state lines and across an international border, to the account of Worldspan, located in Canada, the amount of $1,672,824.40.

381.    On or about October 2009, in furtherance of the conspiracy, and after fraudulently inducing the Plaintiff to execute the August 14, 2009 Assignment, Comerica transferred its funds across state lines and across an international border, to the account of Worldspan, located in Canada, the amount of $945,993.40.

382.    On or about November 2009, in furtherance of the conspiracy, and after fraudulently inducing the Plaintiff to execute the Assignment, Comerica transferred its funds across state lines and across an international border, to the account of Worldspan, located in Canada, the amount of $1,182,714.22.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

383.    On or about December 2009, in furtherance of the conspiracy, and after fraudulently inducing the Plaintiff to execute Assignment, Comerica transferred its funds across state lines and across an international border, to the account of Worldspan, located in Canada, the amount of $1,186,780.59.

384.    On or about January 2010, in furtherance of the conspiracy, and after fraudulently inducing the Plaintiff to execute the Assignment, Comerica transferred its funds across state lines and across an international border.

385.    On or about February 2010, in furtherance of the conspiracy, and after fraudulently inducing the Plaintiff to execute the Assignment, Comerica transferred its funds across state lines and across an international border, to the account of Worldspan, located in Canada, the amount of $1,253,794.46.

386.    On or about March 2010, in furtherance of the conspiracy, and after fraudulently inducing the Plaintiff to execute the August 14, 2009 Assignment, Comerica transferred its funds across state lines and across an international border, to the account of Worldspan, located in Canada, the amount of $137,258.49.

<u>Comerica Launders Fraudulently Obtained Funds from IOTC Bahamas Across State Lines and International Borders to Plaintiff Worldspan</u>

387.    On or about May 29, 2009, in furtherance of the conspiracy, and after fraudulently inducing the Plaintiff to execute the Assignment, HS3 transferred across state lines and across an international border, from IOTC Bahamas Comerica Account ending in #8666, to the account of Worldspan, located in Canada, the amount of $857,715.30.

388.    On or about June 25, 2009, in furtherance of the conspiracy, and after fraudulently inducing Worldspan to execute the Assignment, HS3 transferred across state lines and across an

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

international border, from IOTC Bahamas Comerica Account ending in #8666, to the account of Worldspan, located in Canada, the amount of $200,000.00.

389.    On or about July 10, 2009, in furtherance of the conspiracy, and after fraudulently inducing the Worldspan to execute the Assignment, HS3 transferred across state lines and across an international border, from IOTC Bahamas Comerica Account ending in #8666, to the account of Worldspan, located in Canada, the amount of $500,000.00.

371.    On or about August 5, 2009, in furtherance of the conspiracy, and after fraudulently inducing the Worldspan to execute the Assignment, HS3 transferred across state lines and across an international border, from IOTC Bahamas Comerica Account ending in #8666, to the account of Worldspan, located in Canada, the amount of $100,000.00.

372.    On or about August 13, 2009, in furtherance of the conspiracy, and after fraudulently inducing Worldspan to execute the Assignment, HS3 transferred across state lines and across an international border, from IOTC Bahamas Comerica Account ending in #8666, to the account of Worldspan, located in Canada, the amount of $30,00.00.

373.    On or about April 30, 2010, in furtherance of the conspiracy, and after fraudulently inducing the Worldspan to execute the Assignment, HS3 transferred across state lines and across an international border, from IOTC Bahamas Comerica Account ending in #8666, to the account of Worldspan, located in Canada, the amount of $200,000.00

374.    There are hundreds of payments from IOTC Bahamas, facilitated and conducted by Comerica, each of these payments was part of the scheme and in furtherance of the scheme to defraud numerous individuals and corporations, including Worldspan and Al-Saleh.

375.    Comerica transferred its funds across state lines and across an international border in transactions wherein Comerica transferred funds from Comerica Bank in the United States to

the account of Worldspan in Canada for the purposes referred to in detail in the Amended Complaint and as part of a conspiracy to defraud the Plaintiffs.

376.    Worldspan's account was held at the Bank of Montreal, in Maple Ridge, B.C. Canada.  These funds were paid for the construction of the Superyacht.  The payments made by Comerica, pursuant to the loan that Comerica granted to HS3, commenced in 2009.  IOTC Bahamas commenced using Comerica as its primary bank on or about May of 2009 (possibly earlier).

377.    The prior payments made to Worldspan for the construction of the Superyacht had been made by HS3 using funds that HS3  had defrauded from Al-Saleh in regards to the DESC contracts and for whose performance in Jordan HS3 and his co-conspirators including Kirkeide and Martin paid a $9 million dollar bribe to General Dahabi.  Comerica commingled their funds with the funds obtained by fraud by paying Worldspan with loan payments from a loan made to HS3 for the purpose of defrauding Al-Saleh and Worldspan.

378.    Worldspan, as a builder and seller of yachts, is a "financial institution" pursuant to 18 U.S.C. §§ 1956, 1957 as that term is defined in 31 U.S.C. § 5312(2)(T).

C.    Violations of the Travel Act

379.    At all relevant times to this lawsuit, Monger was HS3's full time employee, and co-conspirator, who, in furtherance of the Enterprise, travelled from his residence in Florida to Vancouver, B.C, Canada on numerous occasions.  HS3 also travelled from his residence in Florida to Vancouver, B.C., Canada on at least one occasion to visit Worldspan's construction facility in Maple Ridge.  In furtherance of the Enterprise, Monger and HS3 also travelled to various locations in the United States, this travel was to carry out his role in the illicit scheme in violation of 18 U.S.C. § 1952 (the "Travel Act") because they travelled to these locations to: (i) distribute the

proceeds of unlawful activity (the violations of 18 U.S.C. §§ 1956, 1957 referenced above) by supervising the construction of the Superyacht and approving the issuance of payments to Worldspan with funds derived from specified unlawful activity in violation of 18 U.S.C. § 1952(a)(1); and (ii) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activity (the violations of 18 U.S.C. §§ 1956, 1957 referenced above) in violation of 18 U.S.C. § 1952(a)(3). Monger and HSE could not have carried out their role in the scheme without traveling to Canada and throughout the United States to undertake the illegal acts referred to herein.

### D. Extortion and Death Threat

380.    At the Jet Aviation Death Threat & Extortion Meeting referenced above, HS3 and Kirkeide participated in the extortion of Barnett, the principal of Plaintiffs companies in violation of §836.05, Fla. Stat. and 18 U.S.C. § 1951 by demanding that Barnett paid to HS3 the sum of $2 million dollars.

381.    At the Jet Aviation Death Threat & Extortion Meeting, HS3 and Kirkeide participated in threatening Barnett's life, the principal of Plaintiffs companies in violation of § 836.05, Fla. Stat. and 18 U.S.C. § 1951 by threatening to kill him through a professional assassin could be contracted to carry the job.

### *Enterprise*

382.    As an association in fact of Comerica, Younker, Shaw, Jones, HS3, Deborah, Monger, Kirkeide, and the other co-conspirators conspired and profited from the scheme to devalue the Plaintiffs' assets, undertake a fraudulent credit bid, destroy the Plaintiffs' companies and brands, cause harm to the principals, including but not limited to Barnett the principal of the Plaintiffs, constitute an enterprise under 18 U.S.C. § 1961(4) (the "Enterprise").

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

383.     The purpose of the Enterprise was, through a series of illicit and illegal devices (principally through fraud, fraudulent misrepresentation, fraudulent omission, collateralization of assets for illegal purpose, mail and wire fraud, money laundering, financial transactions involving the proceeds of specified unlawful activity, violations of the FCPA,  a death threat, extortion, assignment of HS3 's interest in the Superyacht and misappropriation), to wrongfully obtain property and money from the Plaintiffs.  The Defendants used positions of control and authority to systematically devalue the Plaintiffs' assets and destroy the Plaintiffs' businesses. The scheme required the coordination and active participation of each and every defendant and co-conspirator involved in the Enterprise.

384.     The key Comerica employee who undertook the fraudulent Superyacht credit bid was Jones who, as an executive vice president at Comerica, operating from the Detroit, Michigan office, directed the Canadian lawyers for Comerica to undertake a fraudulent credit bid in 2014 as detailed herein.

385.     The conspirators used IOTC Bahamas to pay Worldspan with funds that were the proceeds of specified unlawful activity as referred to herein.  The conspirators laundered millions of dollars in a manner so as to preclude Al-Saleh and other creditors from recovering on judgments and amounts due, thereby causing Al-Saleh to claim against the Plaintiffs for the disgorgement of over $11 million dollars.  Comerica comingled its own funds with the over $11 million dollars it had laundered from IOTC Bahamas as part of the Superyacht Credit Bid Fraud and Conspiracy.

386.     The conspirators utilized offshore alter ego corporations as referred to herein. The conspirators undertook a ten-year illegal enterprise that targeted not only the Plaintiffs but an individual (Al-Saleh was defrauded by HS3) and a corporation (Supreme Fuels who was defrauded

by HS3) who then claimed against Worldspan seeking the recovery of their funds that had been stolen and or defrauded from them by the co-conspirators.

387.    Comerica actively participated in and undertook the same role as did the alter ego corporation, BTB, the company that the Texas U.S. District Court found to be a vehicle of fraud against PDVSA.  The masterminds, Comerica and HS3, used a series of artifices and frauds to effectuate and conceal the fraudulent scheme.

388.    Upon information and belief, the association in fact that made up the Enterprise includes other individuals and entities whose identity is not currently known, including, but not limited to, other further Comerica executives and employees whose identities will be made known through the litigation discovery process.

389.    The Enterprise is engaged in, and its activities affected foreign commerce, including but not limited to, Florida, Michigan, Texas, Canada, Bahamas, Netherlands, England, Venezuela, Jordan, the United Arab Emirates, and other countries.  The Enterprise destroyed a business and assets located in Canada and owned by Florida limited liability companies that are ultimately beneficially owned by American individuals.

390.    The association-in-fact Enterprise has a structure distinct from the pattern of racketeering activity described in this Amended Complaint.  The association-in-fact Enterprise in this Amended Complaint possesses three characteristics as follows:

> A.    A purpose; the purpose, as referred to herein in detail, was and is to defraud and financially harm the Plaintiffs, individuals, and corporations for the illegal financial benefit of the co-conspirators;
>
> B.    The relationships among those associated with the Enterprise exists as a result of all of the co-conspirators performing acts in furtherance of the Enterprise,[25]

---

[25] The acts of those associated with the Enterprise are referred to in specific detail in this Amended Complaint and refer, in detail, to the relationships between those associated with the Enterprise.

in a relationship that includes, among other things, payment to the co-conspirators (all co-conspirators received financial benefit from the Enterprise), all co-conspirators associated with members of the Enterprise to further the purpose of the Enterprise and each of those associated with the Enterprise undertook acts with other members of the Enterprise in furtherance of the Enterprise; and,

C.      The association-in-fact Enterprise has longevity so that it permitted the associates to pursue the Enterprises' purpose. Comerica's participation in the Enterprise commenced in, at a minimum, in 2009 and continues to this day, meaning that Comerica's participation in the Enterprise spans a ten-year period at a minimum. The other co-conspirators participation in the Enterprise date back to as early as 2005, with the last co-conspirator to join the Enterprise being Comerica, who joined the Enterprise in 2009.

391.    The Enterprise continues to this day, as Comerica, the other Defendants and HS3 and the co-conspirators continue to act in assistance of the Enterprise and continue to conceal the scheme and to thwart the Plaintiffs' efforts to uncover the full scope of the fraud.

### *Relatedness and Continuity*

392.    From at least 2009 and continuing today, in Florida and elsewhere, the defendants repeatedly engaged in acts indictable under 18 U.S.C. §§ 1341 (relating to mail fraud), 1343 (relating to wire fraud), 1951 (extortion and death threat), 1952 (relating to the Travel Act), 1956 (relating to the laundering of monetary instruments), 1957 (engaging in monetary transactions in property derived from unlawful activity, and § 836.05, Fla. Stat. (extortion and death threat) and thereby continually engaged in racketeering activity within the meaning of 18 U.S.C. § 1961(1)(b).

393.    The Defendants' violations of 18 U.S.C. §§ 1341, 1343, 1951-1952 and 1956-1957 and § 836.05, Fla. Stat. extended over a period of years (at least 2009 until present and continuing) and involved distinct and independent criminal acts.  They were neither isolated nor sporadic events, but involved regular and repeated violations of law to accomplish the Defendants' desired ends in the course of the business of the Enterprise.  These acts were related to each other by virtue of:

117

a)      Common participants – HS3,  Deborah, Comerica, Younker, Shaw and Jones, Monger, Kirkeide, and the other co-conspirators referred to herein;

b)      Common victims – the Plaintiffs corporations referred to herein and Barnett, resident of Florida, and the victims who claimed against the Plaintiffs, Al-Saleh and Supreme Fuels;

c)      Common methods of commission – complicated financial and corporate transactions effectuated through offshore shell companies in the Bahamas, Jordan, United Arab Emirates, Netherlands and other countries, and designed to obfuscate the transfer of laundered funds to HS3, Deborah, Comerica, and the other co-conspirators referred to herein.  The common methods of commission also included Comerica, in concert with HS3 and other co-conspirators, effectuating the Superyacht Credit Bid Fraud and Conspiracy as referred to herein.  HS3 and Comerica, the two masterminds, both contracted with Plaintiff Worldspan, first HS3, and then, by way of assignment of the Superyacht construction contract, Comerica. As part of the scheme, Comerica induced Worldspan to undertake work on the Superyacht with the expectation of being paid, ultimately failing to pay Worldspan $4.9 million dollars (still outstanding today); and,

d)      The common purpose of devaluing and destroying the assets of the Plaintiffs, including, but not limited to, illegally interfering with the marketing and sale of the Superyacht, improperly bringing an insolvency application, allowing HS3  to advance claims that only Comerica could advance, failing to pay $4.9 million dollars,, making false and fraudulent representations regarding a non-existent Superyacht manufacturing facility in 2014 as part of the Superyacht Credit Bid Fraud and Conspiracy and devaluing and destroying the assets of the Plaintiffs as well as causing to be imposed on the Plaintiffs costs, expenditures, fines and levies as referred to herein.

### *Injury*

394.    The Defendants' violations of 18 U.S.C. § 1962(c)-(d) proximately caused the Plaintiffs to suffer the damages and losses described above.  As a direct consequence of the RICO violations, Comerica, HS3 and their co-conspirators destroyed the Plaintiffs businesses and brands and devalued the Superyacht titled in the name of Worldspan as well as causing to be imposed massive costs levied by government agencies.  The Plaintiffs also incurred very significant costs and legal fees.

395.    The actions of the co-conspirators, as referred to herein, were the direct and proximate cause of the devaluation of the Superyacht titled in the name of Worldspan, the

destruction of the business Worldspan, the destruction of the value of the brands, Queenship and Crescent, the injury to CSPAN and Wedmore.  Very substantial sums were expended on accountants, experts, attorneys, and others as a result of the actions of the co-conspirators referred to herein.  The actions of the co-conspirators, in undertaking the 2014 credit bid fraud, were the direct and proximate cause in Worldspan losing the $30 million dollar contract to finish the Superyacht.

396.     The Plaintiffs injuries are Florida injuries. The brands Queenship and Crescent are owned by Florida limited liability companies. Worldspan is majority-owned by Wedmore, a Florida limited liability company. The Superyacht was titled in the name of Worldspan and all of Worldspan's assets were assigned, and thus owned, by CSPAN, a Florida limited liability company.

397.     At all relevant times to this action, Worldspan was doing business in the United States.  In fact, the Superyacht was being built for HS3 a U.S. citizen residing in Florida who was going to, upon completion of the Superyacht, transport it from Canada to Florida.  In addition, the ultimate purchaser of the Superyacht who purchased it for $5 million dollars is a U.S. citizen who resides in Florida.  The $30 million dollar contract to upgrade and finish the Superyacht that Worldspan lost as a result of the Defendants' predicate acts was for a U.S. customer.  As a result of Defendants Comerica's and HS3's actions thwarted Worldspan's ability to get $30 million dollars of U.S. business from a U.S. customer.  In other words, Worldspan was denied the ability to provide services to upgrade and finish the Superyacht for a U.S. customer residing in Florida. In addition, the destruction of Worldspan as superyacht builder affected its ability to serve other prospective purchasers of superyachts in the future throughout the United States.

398.    All of the Defendants are American, and all of the actions that constitute part of the RICO scheme took place in part or in whole in the United States.

### *Damages as a Result of the RICO Conspiracy*

399.    As a direct and proximate cause of the Superyacht Credit Bid Fraud and Conspiracy, the Crescent brand was destroyed, along with the Queenship brand and along with Worldspan.  The Crescent brand name was valued on August 31, 2005, by Evans & Evans, Inc., which is a leading investment banking firm with offices and affiliates in Canada, the U.S. and Asia. The comprehensive and extensive appraisal is 53 pages in length and contains a detailed description of valuation methodologies and methods employed, arriving at a value for the brand Crescent $7,119,112.00.  The Crescent brand was assigned to and owned by CSPAN. CSPAN is a Florida limited liability company.  Comerica and its co-conspirators caused direct injury to the U.S. entity, CSPAN, thereby creating domestic injury by destroying the brand Crescent.

400.    As a direct and proximate cause of the Superyacht Credit Bid Fraud and Conspiracy, among other things, all of the Worldspan employees permanently lost their jobs, and the 9.315-acre waterfront property with the purpose-built building and waterfront home was lost and Worldspan's business was destroyed.

401.    When Worldspan attempted to sell the Superyacht, Comerica and Sargeant opposed and interfered with the sale, their agent Monger illegally interfered with the Superyacht marketing efforts of Fraser Yachts, while Worldspan was saddled, for years, with a 90,435 square foot building, with an incomplete, three-story, Superyacht in the building, with no revenue. The City placed a six-figure tax lien on the waterfront property, CSPAN was forced to sell the waterfront property.

402.     After the forced sale of the waterfront property, the new owner charged Worldspan rent for the building that housed the incomplete Superyacht.   Part of the Superyacht Credit Bid Fraud and Conspiracy was to destroy Worldspan and devalue the asset, the Superyacht.

403.     The Superyacht was sold for $5 million dollars to an individual who then undertook an extensive re-design and upgrade of the partially finished Superyacht. The new owner spent $30 million dollars on the Superyacht. As a result of the June 2014 credit bid fraud, Worldspan lost the $30 million dollar contract to complete the Superyacht.   The new owner had to spend hundreds of thousands of dollars to transport the partially completed Superyacht from Worldspan's premises to a different superyacht facility, where he then spent $30 million dollars on a massive re-design and upgrade of the Superyacht.

404.     The Plaintiffs lost the Worldspan business and the entire value of the Worldspan business.   Worldspan assets were assigned to and owned by CSPAN.  CSPAN is a Florida limited liability company.   Comerica and its co-conspirators caused direct injury to the property of the U.S. entity, CSPAN, thereby creating domestic injury by destroying Worldspan.

405.     Wedmore holds 66.66% of the shares of Worldspan. Michael Nesbit has valued Worldspan's business with a replacement cost valuation of $42 million dollars.  The total value of the assets destroyed by the racketeering acts of the Defendants is $66,268,832.00, which is subject to treble damages, making the amount $198,806,496.00, plus applicable interest and attorney's fees and costs.

406.     As a result of the conspiracy, the Superyacht, which was titled in the name of Worldspan and had a security interest registered against it by Comerica, was devalued, by utilizing Comerica's own appraisers' valuation, by $10 million dollars.   The Plaintiffs assert that the Superyacht was worth more than $15 million dollars at the time it was appraised by Comerica's

appraiser.  This represents another $10 million-dollar loss to the Plaintiffs, directly caused by the conspiracy.

### Punitive Damages

407.    In addition to the RICO claims in this action, Worldspan advances common law claims against some of the defendants for, among other things, fraudulent inducement, aiding and abetting fraud and civil conspiracy. Under these common law claims Worldspan seeks punitive damages against Comerica.

408.    Given the deliberate, egregious and continuing nature of the conduct of Comerica and given the financial size of Comerica, the tortfeasor, Worldspan seeks punitive damages in the amount of not less than $530,150,656.00 dollars (a multiple of eight times the actual damages). Comerica's conduct is far more egregious than other U.S. banks that have had punitive awards against them for far greater amounts.  Comerica's conduct referred to in this Amended Complaint is not only a RICO conspiracy, with a continuum of predicate acts, it is a continuum of national and international criminal conduct, with a minimum of ten years of criminal conduct involving, among other things, money laundering, fraud,  criminal fraudulent misrepresentation and criminal fraudulent omission, fraudulent transfers, co-mingling funds with the proceeds of fraud, litigating against victims of the frauds and providing false evidence to courts.

409.    Comerica worked and continues to work as one of the two masterminds of the illegal enterprise and as one of the principal beneficiaries of the illegal enterprise (having received over $4.4 million dollars in loan and interest payments with numerous fees and charges for money laundering transactions and various other predicate acts committed by Comerica), conspiring with HS3 who has, since 2005, undertaken a continuous series of frauds against victims that he then sued, made a death threat against  Barnett, extorted Barnett, and utilized complex offshore money

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

laundering schemes in concert with Comerica and the Superyacht Credit Bid Fraud and Conspiracy.

410.    Comerica undertook a form of conduct never before undertaken by a U.S. bank when Comerica took over the contract to construct the Superyacht and took over the security that HS3 had on the Superyacht for the fraudulent purpose of making it impossible for Al-Saleh, Worldspan, Supreme Fuels and the other victims to claim against his interest in the Superyacht.

411.    Comerica's ten (10) years of continuous and unabated illegal conduct is a textbook example of willful misconduct.  Punitive damages are appropriate in order to deter Comerica from continuing to act in the manner they have acted and continue to act.  Punitive damages are warranted to deter Comerica from engaging in similar conduct in the future and to induce other victims to take actions against Comerica.

412.    Comerica acted with knowledge that Al-Saleh, Supreme Fuels, Worldspan, and others sought to recover from HS3's frauds, while, at the same time, Comerica laundered millions and millions of dollars, with transactions that were blatantly and obviously designed to prevent HS3's victims from attaching these laundered funds.  Comerica, acting with knowledge, and continuing its willful misconduct, implemented the Superyacht Credit Bid Fraud and Conspiracy, for the purpose of defeating the claims of HS3's and Comerica's victims and for the purpose of devaluing the Superyacht, damaging and destroying the Plaintiffs' businesses.

413.    Comerica should and must be subject to very significant regulatory penalties for blatantly violating, on an ongoing basis, for at least ten (10) years, the sections of the United States banking statutes referred to in this Amended Complaint.  Comerica's conduct as a national bank is extraordinarily and uniquely egregious in that, unlike typical RICO complaints against banks, wherein banks are sued for money laundering and other associated wrongdoing, Comerica took

the extraordinary step of becoming one of the two active masterminds in a ten-year RICO conspiracy against PDVSA,[26] Al-Saleh,[27] Supreme Fuels,[28] the Plaintiffs, ABN AMRO,[29] and many others.

## CAUSES OF ACTION

### COUNT I – RACKETEERING IN VIOLATION OF RICO, 18 U.S.C. §§1962 (c), 1964 (c)
### (By All Plaintiffs Against All Defendants)

414.    The Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 413.

415.    At all relevant times, each of the Plaintiffs is a "person" within the meaning of RICO 18 U.S.C. §§ 1961(3) and 1964(c).

416.    Each of the Defendants are "persons" as defined in 18 U.S.C. § 1961(3) and 1962(c).

417.    At all relevant times, Defendants engaged in activities affecting interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

---

[26] PDVSA, the National oil company of Venezuela, who was victimized by the BTB Credit Bid Fraud. Comerica was and is the banker for BTB Refining LLC, the corporation that was used as a vehicle of fraud against PDVSA and the other victims of the BTB Credit Bid Fraud.

[27] The business partner of HS3 who obtained a $28.8 million dollar fraud judgment against HS3 and was unable to be paid for years, expending $12 million dollars to collect on his fraud judgment. During the time period that Al-Saleh attempted to collect his $28.8 million fraud judgement, Comerica laundered millions and millions of dollars for HS3 and his wife, paying these amounts from offshore corporation in huge blocks of funds to HS3, his wife, Deborah, and HS3's proxies, all in a manner such that Al-Saleh could not attach these funds.

[28] Comerica actively assisted HS3 in preventing Supreme Fuels from being paid both prior to bringing its RICO lawsuit against HS3 and subsequent to Supreme Fuels obtaining judgment pursuant to its RICO lawsuit against HS3.

[29] ABN AMRO, was utilized by HS3 to collateralize the receivables of IOTC USA so as to make the receivables impossible to Al-Saleh to attach, which was part of HS3's strategy in defrauding Al-Saleh of millions of dollars. Ultimately, HS3 had no more use for ABN AMRO and ABN AMRO became yet another victim of the conspiracy that involved Comerica and HS3.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

418.   At all times relevant, all of the Defendants were employed by or associated with the Enterprise described herein.

419.   At all relevant times, this Enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

420.   At all relevant times, Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

421.   Specifically, at all relevant times, Defendants engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth above.

422.   The acts set forth in this Amended Complaint constitute a violation of one or more of the predicate acts: 18 U.S.C. § 1952 (Travel Act); 18 U.S.C. § 1956 (money laundering); 18 U.S.C. § 1957 (financial transactions from property derived from unlawful activity); 18 U.S.C. §1343 (wire fraud); 18 U.S.C. §1341 (mail fraud); extortion and a death threat in violation of § 836.05, Fla. Stat. and 18 U.S.C. § 1951.

423.   Each of the Defendants committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

424.   The acts of racketeering activity referred to in the previous paragraph constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The acts alleged were related to each other by virtue of common participants, common victims (the Plaintiffs), a common method of commission, a common purpose, to enrich the Defendants, and the common result of devaluing the Superyacht and destroying the Plaintiffs businesses.

425.   As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c), the Plaintiffs were injured in their businesses and property, with damages of $66,268,832.00.

426.     As a result of their misconduct, Defendants are liable to the Plaintiffs for their losses in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs requests that this Court enter judgment in favor of Plaintiffs against the Defendants awarding Plaintiffs treble damages in the amount of $198,806,496; reasonable attorneys' fees and costs, pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which the Plaintiffs may be entitled at law or in equity.

**COUNT II – RACKETEERING IN VIOLATION OF RICO, 18 U.S.C. §§  1962(d), 1964 (c)**
**(By All Plaintiffs Against All Defendants)**

427.     The Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 413.

428.     At all relevant times, each of the Plaintiffs is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

429.     Each of the Defendants are "persons" as defined in 18 U.S.C. § 1961(3) and 1962(c).

430.     Each of the Defendants engaged in, and whose activities affect, interstate commerce.  At all times relevant, each of the Defendants was employed by or associated with the Enterprise described above.

431.     The Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity.

432.     Pursuant to and in furtherance of the illegal scheme, the Defendants knowingly agreed to perform acts, and did perform multiple related acts of 18 U.S.C. § 1952 (Travel Act); 18 U.S.C. § 1956 (money laundering); 18 U.S.C. § 1957 (financial transactions from property derived from unlawful activity); 18 U.S.C. §1343 (wire fraud); 18 U.S.C. §1341 (mail fraud); extortion

126

and a death threat in violation of § 836.05, Fla. Stat. and 18 U.S.C. § 1951 set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

433.    The Defendants directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering described above in violation of 18 U.S.C. § 1962(c).

434.    As a direct and proximate result of the Defendants racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs were injured in its business and property through the loss of more than $66 million dollars.

435.    As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).

436.    The Defendants conspired to conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity.

437.    The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme described above and to enrich themselves.

438.    That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

439.    As a direct and proximate result of the Defendants conspiracy with the members of the enterprise and through the commission of the overt acts of 18 U.S.C. § 1952 (Travel Act); 18 U.S.C. § 1956 (money laundering); 18 U.S.C. § 1957 (financial transactions from property derived from unlawful activity); 18 U.S.C. §1343 (wire fraud); 18 U.S.C. §1341 (mail fraud); extortion and a death threat in violation of § 836.05, Fla. Stat. and 18 U.S.C. § 1951 taken in furtherance of

127

that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs were injured in its business and property through the loss of more than $66,268,832.00.

**WHEREFORE**, Plaintiffs requests that this Court enter judgment in favor of Plaintiffs against the Defendants awarding Plaintiffs' treble damages in the amount of $198,806,496; reasonable attorneys' fees and costs, pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which the Plaintiffs may be entitled at law or in equity.

### COUNT III– FLORIDA RICO (Violation of §772.103(3), Fla. Stat; §772.104, Fla. Stat.) (By All Plaintiffs Against All Defendants)

440.    The Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 413.

441.    At all relevant times, each of the Defendants is a "person" within the meaning of Florida Statute §772.103 and §772.104.

442.    Each of the Defendants is a "person" as defined in  Florida Statute §772.102.

443.    At all times relevant, all of the Defendants engaged in activities that affect interstate and foreign commerce

444.    At all times relevant, the Defendants were employed by or associated with the Enterprise described herein within the meaning of  Florida Statute §772.102.

445.    At all times relevant Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of criminal activity" within the meaning of Florida Statute §772.102, in violation of Florida Statute §772.103(3).

446.    The acts set forth in this Amended Complaint constitute a violation of of the following statutes: §817.034, Fla. Stat. (wire fraud); §817.034, Fla. Stat. (mail fraud); §836.05, Fla. Stat. (extortion and death threat); 18 U.S.C. § 1952 (Travel Act); 18 U.S.C. § 1956 (money

128

laundering); 18 U.S.C. § 1957(financial transactions from property derived from unlawful activity); 18 U.S.C. §1343 (wire fraud); 18 U.S.C. §1341 (mail fraud); and extortion and a death threat in violation of § 836.05, Fla. Stat. and 18 U.S.C. § 1951.

447.    Each of the Defendants committed and/or aided and abetted the commission of two or more of these acts of criminal activity.

448.    The acts of criminal activity referred to in the previous paragraph constitute a "pattern of criminal activity" within the meaning of Florida Statute §772.102(4).  The acts alleged were related to each other by virtue of having same intents, common participants, a common victim (the Plaintiffs), a common method of commission, a common purpose, to enrich the Defendants, and the common result of devaluing the Superyacht and destroying the Plaintiffs businesses.

449.    As a direct and proximate result of Defendants' violation of Florida Statute §772.103(3), the Plaintiffs were injured in their businesses and property, with damages of $66,268,832.00.

450.    As a result of their misconduct, Defendants are liable to the Plaintiffs for their losses in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs requests that this Court enter judgment in favor of Plaintiffs against the Defendants awarding Plaintiffs' treble damages in the amount of $198,806,496; reasonable attorneys' fees and costs, pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which the Plaintiffs may be entitled at law or in equity.

### COUNT IV – FLORIDA RICO (Violation of §772.103(4), Fla. Stat; §772.104, Fla. Stat.) (By All Plaintiffs Against All Defendants)

451.    The Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 413.

452.     At all relevant times, each of the Defendants is a "person" within the meaning of Florida Statute §772.103 and §772.104.

453.     Each of the Defendants is a "person" as defined in  Florida Statute §772.102.

454.     Defendants engaged in activities that affect interstate and foreign commerce.  At all times relevant, Defendants were employed by or associated with the Enterprise described above within the meaning of  Florida Statute §772.102.

455.     The Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of criminal activity and for the unlawful purpose of intentionally diverting, laundering and converting millions of dollars.

456.     Pursuant to and in furtherance of the illegal scheme, the Defendants knowingly agreed to perform acts, and did perform multiple related predicate acts of §817.034, Fla. Stat. (wire fraud); §817.034, Fla. Stat. (mail fraud); §836.05, Fla. Stat. (extortion and death threat); 18 U.S.C. § 1952 (Travel Act); 18 U.S.C. § 1956 (money laundering); 18 U.S.C. §1957 (financial transactions from property derived from unlawful activity); 18 U.S.C. §1343 (wire fraud); 18 U.S.C. §1341 (mail fraud); and extortion and a death threat in violation of § 836.05, Fla. Stat. and 18 U.S.C. § 1951.

457.     The predicate acts identified in the preceding paragraph constitute a pattern of criminal activity pursuant to Florida Statute §772.102(4).

458.     The Defendants directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of criminal activity described above in violation of Florida Statute §772.103(3).

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

459.     As a direct and proximate result of the Defendants criminal activities and violations of Florida Statute §772.103(3), Plaintiffs were injured in its business and property through the loss of more than $66 million dollars.

460.     As set forth above, the Defendants agreed and conspired to violate Florida Statute §772.103(3).

461.     The Defendants conspired to conduct and participate in the conduct of the enterprise's affairs through a pattern of criminal activity and for the unlawful purpose of intentionally diverting, laundering and converting millions of dollars.

462.     The Defendants knew that their predicate acts were part of a pattern of criminal activity and agreed to the commission of those acts to further the scheme described above and to enrich themselves.

463.     That conduct constitutes a conspiracy to violate Florida Statute §772.103(3) in violation of Florida Statute §772.103(4).

464.     As a direct and proximate result of the Defendants conspiracy with the members of the enterprise, the overt acts of mail and wire fraud, money laundering and monetary transactions in property derived from specified unlawful activity taken in furtherance of that conspiracy, and violation of Florida Statute §772.103(4), Plaintiffs were injured in its business and property through the loss of more than $66,268,832.00.

**WHEREFORE**, Plaintiffs requests that this Court enter judgment in favor of Plaintiffs against the Defendants awarding Plaintiffs' treble damages in the amount of $198,806,496; reasonable attorneys' fees and costs, pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which the Plaintiffs may be entitled at law or in equity.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

## COUNT V – FRAUDULENT MISREPRESENTATION
### (By Plaintiffs Worldspan and CSPAN Against Comerica, Shaw and Deborah)

465.    Worldspan and CSPAN reallege and incorporate herein by reference paragraphs 1 through 44, 55 through 76, 157 through 191, and 268 through 284.

466.    At the Delray Beach Meeting and the Deborah HS3 Superyacht Meeting, Shaw, Comerica, and Deborah knowingly made a series of fraudulent misrepresentations and fraudulently concealed material facts in order to induce the reliance of Worldspan.

467.    Defendants Comerica, Shaw and Deborah made such false statements and omissions without legal justification or excuse, with malice, ill will and/or with the intent to purposely defraud Worldspan, and by assignment, CSPAN.

468.    Worldspan justifiably relied upon and were deceived by the fraudulent statements and materials omissions of the Defendants Comerica, Shaw and Deborah.

469.    Worldspan, and through the assignment, CSPAN have been injured as a result of the fraudulent statements by, and material omissions of, Defendants identified in this count.

470.    As described throughout this Amended Complaint, Comerica, Shaw and Deborah had actual knowledge of the fraud that was being perpetrated on Worldspan by the above-named persons and entities.

471.    As a result of the above-described fraudulent misrepresentations and omissions, Worldspan, and its assignee CSPAN have sustained losses in excess of $66 million.

472.    The wrongful acts of the Defendants Comerica, Shaw and Deborah in this regard were done with malice and with the intent to defraud.

**WHEREFORE**, Plaintiffs Worldspan and CSPAN request that this Court enter judgment in favor of Worldspan and CSPAN and against Comerica, Shaw and Deborah awarding Worldspan's and CSPAN's compensatory damages of not less than $66,268,832.00, punitive

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

damages of not less than $530,150,656.00 against Comerica, costs, pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which Worldspan and CSPAN may be entitled at law or in equity.

### COUNT VII – NEGLIGENT MISREPRESENTATION
### (By Plaintiff Worldspan and CSPAN Against Comerica and Shaw)
### (plead in the alternative to Fraudulent Misrepresentation)

462.    Worldspan and CSPAN re-allege and incorporate herein by reference paragraphs 1 through 44, 55 through 76,  and 157 through 191.

463.    At the Delray Beach Meeting, Comerica and Shaw made false statements of material fact to Worldspan's representatives, including Barnett to induce the reliance of Worldspan.

464.    Specifically, at the Delray Beach Meeting, Comerica and Shaw negligently misrepresented to Barnett that the assignment of HS3's security interest in the Superyacht and construction contract to Comerica was for the purpose of Comerica granting HS3 a construction loan.

465.    Similarly, during the Delray Beach Meeting, Shaw and Comerica negligently misrepresented to Barnett that the assignment of HS3's interest in the Superyacht and the assignment of HS3's interest in the construction contract for the Superyacht, to Comerica, was a good means of having the Superyacht funded to completion.

466.    Shaw and Comerica also negligently misrepresented to Barnett that the Assignment and the Construction Loan would be beneficial to Worldspan.

467.    Shaw and Comerica were negligent in making these statements to Barnett because they should have known and/or actually knew that these statements were false.  Shaw and Comerica knew that the Construction Loan was not beneficial to Worldspan and was not for the

purpose of finalizing the construction of the Superyacht.  Rather, Shaw and Comerica knew that the construction loan was a vital step in furtherance of the fraudulent credit bid scheme and would be used to co-mingle proceeds of money laundering.

468.     In other words, Shaw and Comerica knew that the Superyacht Construction Loan/Assignment was part of the Superyacht Credit Bid Fraud and Conspiracy to encumber the Superyacht with a charge in favor of Comerica for the purpose of defeating creditor claims and ultimately making a credit bid on the Superyacht after the security was transferred from Comerica to a HS3 controlled corporation.

469.     Comerica and Shaw intentionally made these statements to Barnett, the principal of Worldspan, to induce Worldspan to rely on these statements and consent to the Assignment and the Construction Loan Agreement.

470.     Worldspan justifiably relied on Shaw's and Comerica's misrepresentations and consented to the Assignment and the Construction Loan Agreement.

471.     Worldspan would not have consented to the Assignment nor the Construction Loan Agreement had it known that both documents were executed in furtherance of conducting Superyacht Credit Bid Fraud and Conspiracy.

472.     Worldspan and CSPAN have been injured as a result of the negligent misrepresentations identified in this count, as described in the preceding paragraphs.

473.     As a result of the above-described negligent misrepresentations, Worldspan and CSPAN sustained damages in the amount of $66,268,832.00.

**WHEREFORE**, Plaintiffs requests that this Court enter judgment in favor of Plaintiffs Worldspan and CSPA against the Defendants Comerica and Shaw awarding damages in the amount of $66,268,832.00; costs, pre-judgment and post-judgment interest in the maximum

amounts allowed by law; and any and all other relief to which the Plaintiffs Worldspan and CSPAN may be entitled at law or in equity.

### COUNT VI – CONSPIRACY TO DEFRAUD
### (By Plaintiffs Worldspan and CSPAN Against All Defendants)

474.    Plaintiffs Worldspan and CSPAN incorporates and realleges the preceding paragraphs 1 through 413 as if fully set out herein.

475.    The Defendants engaged in a civil conspiracy to defraud Worldspan and its assignee, CSPAN.

476.    The fraudulent conspiracy included an agreement to commit several unlawful acts, including agreements to make fraudulent representations and omissions, engage in mail and wire fraud, money laundering, and engaging in monetary transactions involving property derived from specified unlawful activity, primarily through the use of Comerica's bank accounts.

477.    The Defendants engaged in numerous overt acts of making fraudulent misrepresentations and omissions and committing several overt acts of mail and wire fraud, money laundering, and engaging in monetary transactions involving property derived from specified unlawful activity

478.    As a direct and proximate result of the conspiracy, Worldspan, and its assignee, CSPAN have been damaged.

479.    The wrongful acts of the Defendants in this regard were done with malice and with the intent to defraud.

**WHEREFORE**, Plaintiffs Worldspan and CSPAN requests that this Court enter judgment in favor of Worldspan and CSPAN and against Defendants awarding Worldspan's and CSPAN's compensatory damages of at least $66,268,832.00, punitive damages of not less than $530,150,656.00 against Comerica, costs, pre-judgment and post-judgment interest in the

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

maximum amounts allowed by law; and any and all other relief to which Worldspan and CSPAN may be entitled at law or in equity.

## COUNT VII (AIDING AND ABETTING FRAUD)
### (By Worldspan and CSPAN Against Comerica, Shaw, Jones, Deborah, Younker, Kirkeide and Monger)

480. Worldspan and CSPAN incorporate and reallege the preceding paragraphs 1 through 413 as if fully set out herein.

481. HS3 committed a massive fraud against Worldspan, and its assignee, CSPAN.

482. As described throughout this Amended Complaint, Comerica, Kirkeide, Monger, Shaw, Jones, Deborah, Younker and Kirkeide had actual knowledge of the fraud that was being perpetrated on Worldspan and CSPAN by HS3.

483. Comerica, Kirkeide, Monger, Shaw, Jones, Deborah, Younker and Kirkeide knowingly and intentionally provided substantial assistance and facilitated numerous overt acts of mail and wire fraud, money laundering, and monetary transactions involving property derived from unlawful activity.

484. Without Comerica, Kirkeide, Monger, Shaw, Jones, Deborah, Younker and Kirkeide's substantial participation, assistance, and aid, HS3 would not have been able to carry forward the fraudulent credit bid scheme that cause the demise of Worldspan and its assignee, CSPAN.

485. As a result of the above-described fraud, Worldspan and its assignee, CSPAN have sustained losses in excess of $66,268,832.00.

486. The wrongful acts of Comerica, Kirkeide, Monger, Shaw, Jones, Deborah, Younker and Kirkeide in this regard were done with malice and with the intent to defraud.

136

487.    Worldspan and its assignee, CSPAN, are entitled to punitive and exemplary damages in an amount to be ascertained at trial.

**WHEREFORE**, Plaintiffs Worldspan and CSPAN request that this Court enter judgment in favor of Worldspan and CSPAN against Comerica, Kirkeide, Monger, Shaw, Jones, Deborah, Younker and Kirkeide awarding Worldspan and CSPAN damages in the amount of at least $66,268,832.00, punitive damages of not less than $530,150,656.00 against Comerica, costs, pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which Worldspan and CSPAN may be entitled at law or in equity.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial on any and all counts for which a trial by jury is permitted by law.

Dated: April 19, 2019                    Respectfully submitted,

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.
777 W. 41 Street, Suite 402
Miami Beach, Florida 33140
E-mail: rodrigo@rdasilvalaw.com
Telephone:     (305) 615-1434
Facsimile:     (305) 615-1435

By:     /s/ *Rodrigo S. Da Silva*
Rodrigo S. Da Silva, Esq.
Florida Bar No. 0088600
*Counsel for Plaintiffs, Worldspan Marine, Inc., CSPAN Financial, LLC and Wedmore Financial, LLC*

137

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 19, 2019, I filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certified that the foregoing document is being this day on all parties registered to receive Notices of Electronic Filing generated by CM/ECF.

/s/ *Rodrigo S. Da Silva*
Rodrigo S. Da Silva, Esq.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

# EXHIBIT 1

# ACCORD AND SATISFACTION AGREEMENT

This accord and satisfaction (this "Agreement") is dated 01 December 2011 and is between Worldspan Marine, Inc. (the "Debtor") and CSpan Financial, LLC (the "Creditor").

The Debtor and the Creditor (collectively, the "Parties") agree as follows:

## CONSIDERATION

1. In consideration of the transfer of any and all assets owned by Worldspan Marine, Inc. including but not limited to items as described in "Exhibit "A", the receipt and sufficiency of which consideration is acknowledged, the Creditor releases and forever discharges the Debtor, the Debtors' officers, directors, shareholders, legal representatives and assigns from all manner of actions, causes of action, debts, accounts, bonds, contracts, claims and demands which have been or may be sustained as a consequence of the failure of the Debtor to repay in full the debt owed to the Creditor described below.

## DETAILS OF DEBT

2. The claim arose as a result of:
   The outstanding debt due and owing including a Property Mortgage, Equipment Loan, Capital Loan and Accounts Receivable.
The debt amount claimed as owing to the Creditor is the amount of $1,294,248.96 USD.

## CONCURRENT RELEASE

3. The Creditor acknowledges that the Agreement is given with the express intention of effecting the extinguishment of certain obligations owed to the Creditor, and the intention of binding the Debtor's and their assigns.

## FULL AND FINAL SETTLEMENT

4. For the above noted consideration, the parties to this Agreement further agree not to make claim or take proceedings against any other person or corporation which might claim contribution or indemnity under the provisions of any statute or otherwise.

5. It is declared that the terms of this settlement are fully understood; that the amount or type of consideration stated is the sole consideration for the Agreement and that the sum is accepted voluntarily for the purpose of making a full and final compromise, adjustment and settlement of all claims for losses resulting or which may result from the above noted debt.

6. This Agreement is given in full knowledge that the consideration given, as noted above, is being accepted as full and final satisfaction of the full debt claim.

7. This Agreement contains the entire agreement between the parties to this Accord and Satisfaction and the terms of the Agreement are contractual and not a mere recital.

## NO ADMISSION OF LIABILITY

8. It is agreed that the payment is not deemed to be an admission of liability on the part of the Debtor.

## GOVERNING LAW

9. This Agreement will be construed in accordance with and governed by the laws of the State of Florida.

## TERMINATION OF LEGAL PROCEEDINGS

10.  This Agreement is also accepted by the Creditor in full and final satisfaction and settlement of any court proceedings with regard to the Dispute and all legal costs payable to the Creditor in connection with court proceedings and the Creditor does hereby covenant, agree and represent that:

    a. Neither the Creditor, nor anyone else to the Creditor's knowledge, has caused or will cause to be commenced any further legal proceedings against the Debtor by reason of this Dispute, or by reason of any injury loss or damage the Creditor may have suffered, including proceedings against any person who has or might claim contribution or indemnity from the Creditor, and

    b. The Creditor has not and will not hereafter make any assignment to any other person of any claim against the Debtor with respect to the Dispute.

IN WITNESS WHEREOF the Debtor and Creditor have duly affixed their signatures under hand and seal on this 1st day of December, 2011.

Debtor: Worldspan Marine, Inc.

Witness: Yvonne Rokaw

Creditor: CSpan Financial, LLC

Witness: Yvonne Rokaw

## EXHIBIT "A"
## Worldspan Marine, Inc., Debtor, and
## CSpan Financial, LLC, Secured Party - Creditor

All of Debtor's assets, including but not limited to:

all equipment (including vehicles) and fixtures, wherever located, now owned or in the future acquired by Debtor, and all chattel paper evidencing any past, present, or future leasing of the equipment or fixtures;

all inventory, wherever located, now owned or in the future acquired by Debtor; any and all bills of lading, warehouse receipts, and other documents of title evidencing inventory; any and all rights of stoppage in transit of inventory, and all chattel paper evidencing any past, present, or future leasing of inventory; and all letter-of-credit rights under all existing and future letters of credit securing all or part of the purchase price of inventory that has been or is in the future sold by Debtor;

all accounts, contract rights, chattel paper, instruments, investment property, general intangibles and letter-of-credit rights, wherever located, now owned or in the future acquired by Debtor;

all farm products and inventory, wherever located, now owned or in the future acquired by Debtor, including, without limitation, all crops, livestock, supplies, and all products of farm products or inventory; any and all bills of lading, warehouse receipts, and other documents of title evidencing farm products or inventory; any and all rights of stoppage in transit of farm products or inventory; all chattel paper evidencing any past, present, or future leasing of farm products or inventory; and all letter-of-credit rights under all existing and future letters of credit securing all or part of the purchase price of inventory that has been or in the future is sold by Debtor;

all deposit accounts, wherever located, now owned and in the future acquired by Debtor;

all inventory and equipment purchased by Debtor from Secured Party; together with (i) all proceeds of the foregoing, including, without limitation, all cash, checks, drafts, accounts receivable, chattel paper, leases, and instruments received by Debtor in connection with any sale, lease, license, exchange, or other disposition of any of the foregoing and (ii) all books, records (including computer software), and documents at any time evidencing or relating to any of the foregoing or any proceeds of the foregoing. All of the foregoing properties and assets of Debtor are referred to collectively as the "Collateral."

# EXHIBIT 2

This is Exhibit " A ", referred to in the

affidavit of ....MERVYN MONGER......

Sworn before me at....VANCOUVER.......

this...28....day of....APRIL....A.D. 20.11

.......................................

A Commissioner for taking Affidavits
for British Columbia

## VESSEL CONSTRUCTION AGREEMENT

**THIS VESSEL CONSTRUCTION AGREEMENT** (this "Agreement") is entered into as of the 29th
day of February, 2008 (the "Effective Date") between **WORLDSPAN MARINE INC.**, a company
incorporated under the laws of British Columbia, Canada, hereinafter referred to as "Builder", and
**HARRY SARGEANT III** of 3020 N Military Trail, Suite 100, Boca Raton 33431 in the State of
Florida or such corporation as he may at any time nominate in his place and stead and the permitted
assigns of any such corporation as determined in accordance with SECTION 8 hereof, hereinafter
referred to as "Owner".

**WHEREAS**, Owner desires to have built and delivered by Builder, and Builder desires to build and
deliver to Owner, one (1) Crescent Custom 142 foot trilevel motor yacht

**NOW, THEREFORE WITNESSETH**, for and in consideration of the premises contained herein, the
parties agree as follows:

### SECTION 1 – SCOPE

1.1    Builder undertakes to design, construct, outfit, launch, complete and sell and deliver to Owner,
subject to the provisions and stipulations hereinafter set forth, one (1) fibreglass composite
motor yacht known as a Crescent Custom 142' trilevel motor yacht, carrying Builder's Hull N°
QEO14226C010 (hereinafter called the "Vessel"), which Vessel shall be designed, constructed,
outfitted, launched and completed in accordance with the Contract Specifications
("Specifications") and the General Arrangement Plans ("Plans") attached hereto as ANNEX A
as amended (collectively, the "Plans and Specifications") (which, together with this Agreement,
including any Change Orders, user manuals and any other written materials relating to the
design or functionality of the Vessel are called the "Contract Documents"), as they may be
amended from time to time by written agreement of the parties.

The Vessel shall have the dimensions and characteristics set out in the Specifications.

1.2    All services and work product provided hereunder by Builder or its subcontractors, independent
contractors and other persons or entities retained by Builder or otherwise given access to the
Vessel or any part thereof or equipment or materials related thereto by Builder (collectively,
"Subcontractors") shall be referred to as "Services"

1.3    The Plans and Specifications remain the exclusive property of Builder, provided that Builder
hereby grants to Owner a perpetual, irrevocable, transferable right and license to use the Plans
and Specifications as are necessary for the operation, repair, maintenance, modification or
completion of the Vessel.

1.4    The Vessel will be constructed with first-class workmanship and materials to Builder's
standards, which standards in all aspects are in accordance with first-class yacht building, as
currently practiced in North America, for yachts of this size, type and value, which are intended
for extended transit in open seas  Also, the yacht will be constructed in conformity with:

(a)    the Classification Society for a vessel to be classed ✠ A1 Commercial Yachting Service
AMS;

(b)    the laws and regulations of the Flag State;

(c)    the MCA Code (LY2) not restricted to any specified distance from a safe haven;

000002

(d)   US Coast Guard Requirements for foreign flagged vessels; and

(e)   the requirements of all applicable maritime conventions

The Flag State will be the Cayman Islands and the Classification Society will be American Bureau of Shipping.

Builder will be responsible for the production of all necessary design and construction drawings, for the engineering of all shipboard systems, for the production and suitability of all drawings required by the Classification Society and regulatory bodies, and for all supporting weight and stability calculations

1.5   Builder agrees to furnish all plant, labour, tools, equipment, materials and outfit necessary or expedient for the construction of the Vessel, except such items expressly stated in the Specifications, if any, to be furnished by Owner. However, Builder will provide safe storage and insurance coverage for such items of Owner-furnished equipment from the time of receipt of said equipment until delivery of the same to Owner

1.6   ANNEX B hereto comprises a preliminary master construction schedule (the "Preliminary Master Construction Schedule") which will be adjusted within 30 days after the Effective Date in accordance with subsection 7.1 below to take into account a circumstances and conditions which have changed since the Preliminary Master Construction Schedule was prepared. The Master Construction Schedule to be prepared in accordance with subsection 7.1 below (the "Master Construction Schedule") will specify the date by which each important stage in the construction of the Vessel will be completed, including a number of Key Fixed Dates which will not be subject to any change (other than Change Orders and other delays described in subsection 3.2 below), and the date prior to which each item of Owner-furnished material and equipment should be delivered to Builder's yard and each Owner construction or decoration decision must be communicated to Builder   It is understood by Owner that if Owner-furnished item(s) and Owner decision are not received by the dates specified by Builder, the Vessel's completion estimate and costing estimates may be negatively impacted.   Except in the case of Key Fixed Dates, Builder may depart from the Master Construction Schedule without Owner's prior written agreement provided that such departure will not, in the professional opinion of the Technical Expert (hereinafter defined) cause the delivery of the Vessel to be delayed beyond the Extended Delivery Date (hereinafter defined)   Builder may not for any reason (other than delays caused by Owner's breach of this Agreement, Change Orders and other delays described in subsection 3.2 below), alter or depart from the Key Fixed Dates specified in the Master Construction Schedule

## SECTION 2 – COMPLETION AND DELIVERY

2.1   Upon completion, Builder agrees to deliver the Vessel to Owner ("Delivery")

2.2   Prior to Delivery, Builder will properly and sufficiently test the Vessel to ensure that the Vessel and its equipment and other features are operating properly   Owner shall be invited to observe and may also bring a reasonable number of representatives and technical advisers (not exceeding six at any one time) to observe such tests.  Owner acknowledges that to properly test the Vessel's engines, equipment and systems, it is likely that significant running time may be required   Further particulars of dock and sea trials to be carried out appear in SECTION 17 and in the Specifications

2.3   Upon Delivery, the Vessel, including any equipment, materials, supplies, parts or other components to be delivered with or as part of the Vessel (each, a "Component"), shall be free and clear of all liens, mortgages, and encumbrances (except liens and encumbrances approved by Owner in favour of Owner's construction finance lender, if any), and free and clear of all

000003

Canadian, Provincial, city and all other taxes and assessments, (except export duties or as otherwise provided in SECTION 11) which arise or attach prior to the delivery of the Vessel to Owner, against the Vessel or against the materials, labour, supplies or equipment furnished by Builder in performance of this Agreement

2.4     The Vessel will be delivered to Owner in full conformity with the Contract Documents as amended, thoroughly cleaned, inside and out, with all parts in good working condition suitable for immediate use by Owner. The Vessel will be delivered in International waters closest to Builder's shipyard or at such other place as agreed to by Builder and Owner. Subject to this subsection 2.4 and subsections 2.5, 2.6 and 2.7 below, Owner agrees to accept delivery when so tendered, such delivery also transferring to Owner risk of loss

2.5     At the time and place of Delivery, Builder shall deliver to Owner the following:

(a)     An original United States Coast Guard Form of Builder's Certificate naming Owner as first owner.

(b)     A bill of sale from Builder to Owner incorporating a warranty that the Vessel is free and clear of any and all claims, debts, liabilities, liens, charges, mortgages and encumbrances of any nature whatsoever

(c)     If required and available, a North American Free Trade Agreement Certificate of Origin.

(d)     An affidavit, executed by Builder, that all materials, equipment, parts, components and supplies furnished by Builder with or as part of the Vessel have been or will be paid for in full; and that all laborers, craftsmen, subcontractors and others providing labor or materials to the Vessel, who have been hired, engaged or retained by Builder, have been paid in full

(e)     Assignments and copies of warranties provided by manufacturers and suppliers of the Components furnished by or through Builder

(f)     A full set of as-built plans and specifications on paper and in electronic format.

(g)     All user manuals, instructions, maintenance and repair manuals, and a complete set of as-built drawings, to include vessel structure and vessel systems.

(h)     Certificate of Class in the terms required by the Specifications free and clear of qualifications, recommendations and/or notations.

(i)     Certificates of Compliance with the MCA Code (LY2) not restricted to any specified distance from a safe haven and US Coast Guard requirements for foreign-flagged yachts

(j)     All other documents and certificates as required by the Specifications

(k)     Such other things and documents as Owner may reasonably require for the purpose of perfecting and registering its ownership of the Vessel

It is acknowledged and agreed that the certificates mentioned in paragraphs (h) and (i) above may be provisional at the time of delivery of the Vessel. Builder nevertheless undertakes to do all things necessary or expedient on its part to ensure that Owner is able to obtain permanent certificates as soon as practicable after delivery of the Vessel and always before the expiry of the provisional certificates

2.6     Subject only to the following provisions of this SECTION 2, the Vessel shall not be tendered

000004

for Delivery, nor shall Owner have any obligation to accept Delivery, unless:

(a)    the Vessel has been constructed in full conformity with the Contract Documents; and

(b)    system tests and the sea trials described in subsection 2 2 of SECTION 2 and SECTION 17 are completed to the reasonable satisfaction of the parties

2 7    If the Vessel contains any material defects or deficiencies including, without limitation, malfunctions of mechanical or electrical equipment not manufactured by Builder (such as pumps, underwater exhausts, mufflers, controls, gensets, air conditioning equipment, etc.) that is covered by its own manufacturer's warranty ("Deficiencies"), Owner may, at its discretion, either:

(a)    unless such Deficiencies constitute Minor Noncomformities (defined below), refuse to accept delivery of the Vessel until such Deficiencies have been rectified to its reasonable satisfaction; or

(b)    accept delivery of the Vessel without prejudice to Owner's rights hereunder, and agree in writing with Builder regarding the nature of the Deficiencies to be completed or remedied and the amount of holdback ("Holdback") from the final payment due Builder All additional costs and expenses relating to curing the Deficiencies including, without limitation, transportation costs (the "Deficiency Costs), shall be borne by Builder The Holdback minus any Deficiency Costs will be released to Builder in stages as it completes the work for which it was held back Any such work to correct or complete the Deficiencies shall be completed by Builder or its authorized subcontractors within ninety (90) business days of Delivery provided that Builder has reasonable access to the Vessel for this purpose and Owner shall, where reasonably necessary and at Builder's expense, allow Builder and its subcontractors or agents reasonable access to the Vessel for such purpose Owner will be responsible for getting the Vessel to a suitable facility arranged by Builder where the necessary work can be carried out, such facility to be reasonably near the Vessel's area of operation Provided always that if Builder has had reasonable access to the Vessel but has not corrected or completed the Deficiencies within ninety (90) business days as aforesaid then Owner (without prejudice to its rights against Builder) may have the necessary work done elsewhere in its discretion and recover the cost from the Holdback.

2 8    If the Deficiencies are covered by Builder's warranty, do not constitute structural deficiencies or otherwise threaten the safe operation of the Vessel or Owner's reasonable use and enjoyment of the Vessel and do not, in the aggregate, total a cost to repair of more than US$150,000 as agreed to by the parties, such Deficiencies shall be considered "Minor Noncomformities" and shall not provide a basis for Owner to reject delivery of the Vessel. Notwithstanding the foregoing, any dispute relating to determining the "cost to repair" under this paragraph shall be submitted to determination by the Technical Expert as provided in SECTION 14 hereof. In the event of any such dispute, Owner shall not be obligated to accept delivery of the Vessel, provided that if Owner does accept delivery of the Vessel, it shall be without prejudice to Owner's rights hereunder and if Owner does not accept delivery, it shall be without prejudice to Builder's rights hereunder.

## SECTION 3 – COMPLETION AND DELIVERY DATE

3.1    Builder undertakes to deliver the completed Vessel in conformity with the Contract Documents on the date which is twenty four (24) months after the later of (a) the Effective Date and (b) the date on which Builder shall have received the balance of the Deposit (hereinafter defined) (the "Delivery Date") subject only to the Permitted Delay described in subsection 3.6 below, Change Orders and other delays described in subsection 3 2 below.

000005

3.2    The Delivery Date shall be extended to account for any delays in construction caused by Owner's failure to comply with its obligations under this Agreement including, without limitation, delays caused by Owner's failure to make timely payment; the occurrences of any events of force majeure which is defined for purposes of the Agreement as any fire, accident, war, riots, explosion, flood, earthquake, acts of God or other matters similarly beyond Builder's control, including, without limitation, delays caused by the inability to obtain delivery of any Component when required in spite of the timely order of such Component by Builder or its Subcontractor, and Builder's or Subcontractor's continued commercially reasonable efforts to obtain the same as soon as reasonably practical; delays caused by Owner's failure to select materials or provide decision per Builder's Master Construction Schedule; and delays caused by Change Orders (to the extent specified in the written Change Orders themselves).

For the avoidance of doubt the Delivery Date shall not be extended for any of the matters aforesaid except and to the extent that they actually cause a delay in construction – for example, if Owner fails to select materials or provide a decision by the date specified in Builder's Master Construction Schedule but the date specified is not critical because construction of the Vessel is delayed for other reasons not constituting a default of Owner under this Agreement

3.3    Builder will as soon as possible take all reasonable steps (including the rearrangement of work programmes) which do not delay other projects under construction and provided Builder can obtain a qualified workforce at planned costs to overcome or reduce the effects of any delay as aforesaid  It will be Builder's responsibility to prove that any delay has been caused by the events or circumstances stated above and that Builder has taken reasonable steps to overcome or reduce the effects thereof.

3.4    It will be a condition of Builder's entitlement to claim an extension of the Delivery Date by reason of delays as described above that:

(a)    within ten business days after the commencement of the relevant events and circumstances Builder notifies Owner of the nature, effects and likely duration and future effects thereof, and the steps taken and intended to be taken to overcome or reduce such effects; and

(b)    within ten business days after the cessation of the relevant events and circumstances Builder notifies Owner of the period of delay actually caused

3.5    In the event Builder fails to complete and deliver the Vessel to Owner in accordance with the Contract Documents by the sixtieth (60th) day after the Delivery Date, Owner shall be allowed to charge Builder liquidated damages for each subsequent day's delay calculated as daily interest at the rate of eight percent (8%) per annum on all sums paid by Owner to Builder under this Agreement ("Late Fee").  In no event shall Builder be liable for liquidated damages which would otherwise accrue after the Extended Delivery Date nor shall Builder be liable for liquidated damages should Owner terminate this Agreement  Any amounts payable by Builder under this subsection may be withheld by Owner from the Final Purchase Price

3.6    If the delay in delivery of the Vessel exceeds:

(a)    180 days from the Delivery Date as extended for permissible extensions by the terms of this Agreement (the "Extended Delivery Date"); or

(b)    320 days from the Delivery Date as extended for Change Orders and permissible extensions caused by Owner's failure to comply with its obligations under this Agreement, but not taking into account any other causes of delay whether permissible or not;

then Owner will have the option to terminate this Agreement with the consequences provided

000006

for in SECTION 13.

## SECTION 4 – COST AND PAYMENT

4.1    The cost of the Vessel and the final purchase price payable by Owner (the "Final Purchase Price") will be finally determined on a time-and-materials basis subject to reasonable verification / audit as set forth below and as adjusted for changes pursuant to SECTION 7. During the course of construction of the Vessel Owner will make payments on account of the Final Purchase Price as hereinafter provided but these payments will be in the nature of advances to Builder and the Final Purchase Price will not be earned by Builder until delivery and acceptance of the Vessel in accordance with this Agreement.

4.2    Based upon the Plans and Specifications, Builder estimates that the cost of the Vessel will be Fifteen Million U.S. Dollars (US$15,000,000.00) subject to changes as provided in SECTION 7 (the "Estimated Purchase Price") but, based on said Plans and Specifications and subject to changes as provided in SECTION 7, the Final Purchase Price will not be more than ten percent (10%) greater than the Estimated Purchase Price. If and to the extent that the Final Purchase Price exceeds the Estimated Purchase Price by more than ten percent (10%), the excess above ten percent (10%) shall be shared equally between Builder and Owner and (without limiting the right to recover by other means) Owner may deduct Builder's contribution to this excess from Owner's final payment when taking delivery of the Vessel. If at any time it becomes evident that the Final Purchase Price will be more than ten percent (10%) greater than the Estimated Purchase Price plus agreed changes as provided in SECTION 7 then Owner will have the option to terminate this Agreement with the consequences provided for in SECTION 13.

4.3    Upon execution of this Agreement, Owner shall pay to Builder a deposit (the "Deposit") in the amount of US$1,000,000.00 which shall stand as security for all payments due and payable by Owner under this Agreement. Builder shall have no obligations to commence construction of the Vessel until receipt of the Deposit. Thereafter Owner will make monthly payments in arrears by wire transfer to the account described in ANNEX C as follows:

   (a)    Each monthly payment will cover Builder's expenditure for the previous month in accordance with this Agreement. All payments claimed by Builder under this Agreement shall be subject to such verification and audit as Owner and its professional advisers and representatives may reasonably require and Builder shall consistently maintain records and take an open book / transparent approach so as to ensure that correct figures can be calculated and checked for accuracy at any and all times.

   (b)    Direct labor will be charged to Owner at the rate of US$39.00 per hour times the actual number of hours worked and administrative, supervisory and design labor will be charged to Owner at the rate of US$49.00 per hour times the number of hours worked. All equipment, inventory, design fees, subcontractors, equipment, materials, insurance and other third party costs shall be billed to Owner at 110% of the cost to Builder.

   (c)    Not later than the tenth working day after the end of each month Builder will submit for Owner's verification and approval a Claim Certificate substantially in the form of ANNEX C, setting out that month's expenditure for labor, materials, subcontractors, etc in accordance with this Agreement and accompanied and accompanied by all relevant worksheets, purchase orders, invoices, receipts, correspondence, etc necessary to substantiate the same. Thereafter Builder will cooperate in providing Owner with such additional information and documentation as it may require for the purpose of verifying the payment claimed in the Claim Certificate.

   (d)    Amounts properly claimed in a Claim Certificate submitted and verified as aforesaid will be payable by the last working day of the month in which the Claim Certificate is

000007

received by Owner. If any amount claimed in a Claim Certificate is disputed by Owner, Owner must pay all undisputed amounts and the amount in dispute will be referred to the Technical Expert in accordance with subsection 14.2. Builder will cooperate in providing the Technical Expert with such additional information and documentation as he may require for the purpose of determining whether the amount in question is properly payable

(e)  It is acknowledged that the foregoing arrangements are intended to maintain positive cash flow and expedite payments to Builder and that on occasion Owner may pay amounts in good faith believing them to be due when that is not in fact the case  Payment by Owner will not constitute an admission of liability and all amounts claimed and/or paid will be subject to audit from time to time by Owner and/or its professional advisers and if any amount paid is found not to have been properly claimed then future payments due from Owner will be adjusted accordingly

(f)  Notwithstanding anything stated above, the maximum payable by Owner in respect of any month will be an amount equal to ten percent (10%) of the Estimated Purchase Price and if (but for this subparagraph (f)) the amount payable in any month would exceed ten percent (10%) of the Estimated Purchase Price then the excess will be deferred and added to the payment due in respect of the next succeeding month(s) but not later than the date of delivery and acceptance of the Vessel in accordance with this Agreement.

All payments under this subsection 4 3 shall be made by wire transfer to the account described in ANNEX C

4 4   In addition to all other remedies to which Builder will be entitled, at law or otherwise:

(a)  Amounts due hereunder which are not advanced or paid when due as set forth in subsection 4 3 shall bear interest at the rate of eight percent (8%) per annum from the date such amounts are due until paid in full to Builder

(b)  If any payment due is not received by Builder by the due date for payment, Builder shall re-invoice Owner in writing with the words "Second Notice" conspicuously appearing thereon (the "Second Notice")  The Second Notice shall, in all cases, be sent to Owner entities listed in SECTION 20 hereof.

(c)  Unless the relevant unpaid amount is the subject of a good-faith dispute between the parties, if any such payment is not received by Builder within five (5) business days of the Second Notice Due Date (the "Final Due Date"), Builder may, if reasonably necessary, suspend all or any portion of the work on the Vessel for a maximum of sixty (60) days or (if sooner) until Owner cures its default. If work is suspended under this subsection (c), the Vessel may, if reasonably necessary, be rescheduled on Builder's production schedule, the Vessel's construction schedule recalculated, and a revised Delivery Date and Extended Delivery Date set as soon as reasonably practical  Owner shall be liable, in addition to the Final Purchase Price, for all of Builder's actual out of pocket costs and expenses which are a direct result of suspension of work, including but not limited to, any necessary relocation of the Vessel to storage, storage within Builder's premises (at a commercially reasonable rate), insurance, restarting construction. if necessary, direct and administrative wages and other necessary out-of pocket costs in excess of those that would have been incurred but for the default.

(d)  Builder shall not be entitled to suspend work on the Vessel for any period in excess of sixty (60) days and if any payment due remains outstanding for longer than that time Builder's sole remedies shall be interest under subparagraph (a) above or termination in accordance with subsection 13 5.

## SECTION 5 – RISKS AND INSURANCE

5.1   Builder shall have risk of loss of and damage to the Vessel and the work hereunder and all material, machinery, and equipment, whether or not already attached to or installed in the Vessel, provided that with respect to items furnished by parties other than Builder, such risk of loss on the part of Builder shall not commence until said items have been received by Builder at its yard at Mapleridge, British Columbia, Canada. Delivery to and acceptance of the Vessel by Owner shall immediately transfer to Owner such risk of loss.

5.2   During the entire period of construction and until the performance by Builder of the entirety of its obligations under the Contract Documents, Builder will pay for Owner's account all required Workers' Compensation taxes to the Province of British Columbia and hold harmless Owner therefrom, and shall maintain policies of insurance with the following minimum coverage's:

    (a)   Hull, P & I (Protection & Indemnity) and other marine coverage (to the extent that coverage is not provided by insurance described in subparagraph (c)) including transportation, wages, maintenance and cure, all with limits not less than specified in subparagraph (c) and subrogation waived against Owner;

    (b)   Comprehensive general liability insurance against bodily injury, death and property damage, including broad form contractual liability coverage, with combined single liability limits of not less than US$5,000,000 per occurrence. Said insurance shall name Owner and, if required, Owner's lender as additional insured(s) with waiver of subrogation against Owner;

    (c)   Standard builder's risk insurance (including protection and indemnity clauses, including employees of Builder and Owner, pollution liability, fire, sinking, war, strikes, riots and civil commotion) covering all periods (including sea trials) up to delivery and acceptance of the Vessel and work hereunder by Owner, including all materials and equipment to be furnished by parties other than Builder from the time that same are received by Builder at its yard at Mapleridge, British Columbia, Canada. The deductible for such builder's risk insurance will be not more than US$250,000, and all deductibles shall be for Owner's account. All first party coverages shall be maintained in an amount at least equal to the value of the completed work plus the value to Owner of materials and equipment received by Builder specifically for use on or for incorporation into the Vessel. All liability coverages shall be maintained with limits of not less than US$5,000,000 per occurrence. Said insurance shall name Owner and, if required, Owner's lender as additional insured with waiver of subrogation against Owner and Owner's lender, and shall provide that payments thereunder shall be made to Builder and Owner or Owner's lender as their respective interests may appear

    (d)   The full premium cost of each policy of insurance hereinabove referred to shall be borne solely by Owner and billed to Owner by Builder. Builder agrees to promptly notify Owner in writing in the event of any modification, cancellation, or notice of either, which may be received by Builder and of any circumstances or events that would trigger coverage under the insurance policies required hereunder. All policies of insurance shall be taken out in the name of Builder and Owner, with copies of same to be provided to Owner and Owner's lender and all losses thereunder shall be payable to Builder and, if required, Owner's lender and Builder as their respective interests may appear. All policies shall provide for fifteen (15) days minimum written notice of cancellation or material change in coverage to Owner and Builder at the addresses stipulated in SECTION 20 of this Agreement. Within fifteen (15) days of the execution of this Agreement, Builder shall furnish Owner with Certificates of Insurance for all insurance coverage required under this Agreement

5.3    In the event Builder is unable or otherwise fails to deliver the Vessel to Owner as required hereunder due to total loss of the Vessel during construction, Owner shall be entitled to recover all amounts paid to Builder hereunder, whether by insurance or otherwise (the "Refund"). The Refund shall be without prejudice to any other rights of Owner under law, this Agreement or otherwise.

## SECTION 6 – PATENT INDEMNITY

6.1    Builder agrees to indemnify, defend, and hold harmless Owner, the Vessel (and if required Owner's lender), and all machinery, equipment, and supplies used in connection therewith, against claims of third persons for damage sustained, including costs, by reason of the infringement of patent or trademark or other intellectual property rights by Builder with respect to designs, materials, processes, machinery, equipment and other such things selected or used by Builder in performing its work and constructing the Vessel. Owner will reasonably cooperate with Builder, at Builder's expense, in the defense of any such suit.

6.2    Owner agrees to reasonably cooperate with Builder should a third party file suit against Builder for infringement of patent rights with respect to materials, processes, machinery or equipment supplied by Owner or other party on behalf of Owner.

6.3    If at any time a third party commences proceedings alleging that any part of the Vessel for which Builder is responsible infringes a patent, trademark or other intellectual property right, and whether or not such allegation in question is proven, Builder shall promptly take all actions necessary to permit the Vessel to be operated without let or hindrance.

## SECTION 7 – CHANGES OR EXTRAS & ALLOWANCES

7.1    Within thirty (30) days after the Effective Date, Builder will provide Owner with the Master Construction Schedule which sets out the due date for completion of each Milestone in the construction of the Vessel; the Key Fixed Dates in the construction of the Vessel which will not be subject to any change (other than Change Orders and other delays described in subsection 3.2 above); the due date for tests and trials of the Vessel's machinery, equipment and systems; and the critical dates before which time Owner's final decisions can be changed. For example these items may include, but are not limited to, the choice of finishing wood, interior fabric selections, optional equipment and navigation electronics. Owner acknowledges that if final decisions are not made before the dates set out by Builder the result may be that the Vessel's completion schedule may be negatively affected. The Master Construction Schedule will be subject to Owner's approval (not to be unreasonably withheld or delayed) and, once approved by Owner, Builder will not alter or depart from the Master Construction Schedule without Owner's approval (not to be unreasonably withheld or delayed) except as provided in subsection 1.6 above.

7.2    Owner may request Builder in writing to make modifications to the Plans and Specifications and Builder will implement such modifications and (unless they have an unreasonable adverse effect on Builder's production schedule for other projects or substantially alter the appearance or function of the Vessel in Builder's reasonable opinion substantiated by the Technical Expert) carry them out, provided that Builder and Owner first agree in writing upon:

       (a)    any adjustment to the Final Purchase Price;

       (b)    any alteration of the Delivery Date; and

       (c)    any other adjustment to the characteristics of the Vessel as set out in this Agreement, the Plans and Specifications (including without limitation the Vessel's guaranteed Trim / List, Maximum Speed, Range, Noise Levels and Vibration Levels);

reasonably required by reason or in consequence of such modifications

7.3    Subject to the following provisions of this SECTION 7, if after the date of this Agreement any modifications, deletions or additions are made to the laws, rules, regulations and enactments applicable to the Vessel or their interpretation or their application (including withdrawal of provisional approvals of the Classification Society and/or additional requirements of the Classification Society as compared with the basis of this Agreement and/or similar measures of other regulatory bodies), and such modifications, deletions or additions are compulsory for the Vessel, Builder will effect them and notify to Owner:

(a)    any adjustment to the Final Purchase Price;

(b)    any alteration of the Delivery Date; and

(c)    any other adjustment to the characteristics of the Vessel as set out in this Agreement, the Plans and Specifications (including without limitation the Vessel's guaranteed Trim / List, Maximum Speed, Range, Noise Levels and Vibration Levels);

reasonably required by reason or in consequence of such modifications, deletions or additions

Owner may (but will not be obliged to) authorise Builder first to apply for a formal waiver of compliance with such modifications, deletions or additions from the authority by whom the modifications, deletions or additions have been promulgated should Owner consider that the operation of the Vessel in its intended service would permit of such waiver, provided that if such waiver has not been obtained within twenty (20) business days after application (or within such other period as Owner may specify), Builder will carry out the required modifications, deletions or additions. Modifications by regulatory bodies and by the Classification Society which are not compulsory for the Vessel will be treated as owner's modifications to which the provisions of subsection 7.2 will apply if Owner requests Builder to carry out the same.

7.4    Builder will use its best endeavours to minimise the additional cost and adverse consequences for Owner of all modifications, additions and deletions of a kind referred to in this SECTION 7. The cost of all additional labour, materials and equipment will be calculated in accordance with subsection Upon request Builder will provide fully detailed documentary verification of all additional costs for which an adjustment is sought to the Final Purchase Price

7.5    Builder will notify its claim for adjustments to the Final Purchase Price, Delivery Date and other matters required under this SECTION 7 as soon as practicable but in all events within fifteen (15) business days after Owner's request for modification or after Builder becomes aware of the relevant laws, rules, regulations, enactments or interpretation (as the case may be). Thereafter Builder and Owner will negotiate in good faith with a view to reaching agreement on the matters notified within ten business days, provided that in default of agreement such matters will be resolved in accordance with subsection 14.2

## SECTION 8 – ASSIGNMENT

8.1    Owner may freely assign the benefit of this Agreement to any corporation owned or controlled by Mr Harry Sargeant of Gulf Stream in the State of Florida. Owner may also freely assign the benefit of this Agreement by way of security to any bank or financial institution providing finance in connection with the construction of the Vessel and in that event Builder will cooperate as necessary in the assignment and provide such acknowledgments and assurances consistent with the terms of this Agreement as the bank or financial institution may require. Otherwise Owner shall have no right to assign any or all of its rights under this Agreement or to the Vessel at any time without Builder's written consent except    Notwithstanding the assignment by Owner of this Agreement, Owner shall remain liable for the obligations of

Owner hereunder

8.2    Builder shall no right to assign, transfer, delegate or subcontract any of its rights, obligations and duties under this Agreement except as expressly provided by this Agreement or with Owner's written consent

## SECTION 9 – WARRANTY

9.1    Builder will remedy by repairing to as-new standard or if necessary replacing:

(a)    all defects in the Vessel or her engines, machinery or equipment; and

(b)    all nonconformities with the Plans and Specifications which have not been agreed by Owner or Owner's Project Supervisor;

which are notified in writing by Owner at the time of delivery and acceptance of the Vessel

9.2    Builder will further remedy by repairing to as-new standard or if necessary replacing:

(a)    all defects in the Vessel or her engines, machinery or equipment flowing from poor design or engineering, defective materials or bad workmanship;

(b)    all nonconformities with the Plans and Specifications which have not been agreed by Owner or Owner's Project Supervisor; and

(c)    any and all defects in the Vessel and physical damage caused by or resulting directly from defects and nonconformities as aforesaid;

which become apparent during the period of twelve (12) months after delivery and acceptance of the Vessel provided that in each case notice of such defect or nonconformity giving known details is given to Builder as soon as reasonably practicable after such defect or nonconformities becomes apparent

9.3    Notwithstanding anything contained in subsections 9.1 and 9.2, if the Final Purchase Price for the Vessel is not more than 10% greater than the Estimated Purchase Price then Owner will bear and/or reimburse Builder for 50% of the verified cost of all work necessary to remedy Minor Nonconformities (within the meaning of subsection 2.8), until the total amount of such verified cost (of which Owner bears 50%) is equal to six percent (6%) of the Final Purchase Price. Otherwise Builder will bear all such cost  By way of illustration, if the Final Purchase Price is $15,000,000 and the total verified cost of all work necessary as aforesaid is $1,000,000, then Owner will bear $450,000 and Builder will bear the rest.  Sums payable by Owner under this subsection 9.3 will be calculated and verified in the manner provided by subsection 4.3 *mutatis mutandis*.

9.4    The foregoing warranty does not cover:

(a)    the items identified in ANNEX E, on condition that Builder arranges a warranty from the relevant manufacturer or supplier on terms and for a duration at least equivalent to the terms and duration of the warranty provided by this SECTION 9;

(b)    any condition or work which would be considered routine care or maintenance of a luxury motor yacht; or

(c)    damage not caused by a defect in the Vessel herself but by ordinary wear or tear, overloading, operation beyond capacity, wind, storm, fire, misuse, mismanagement or negligence in the use or maintenance of the boat or accident; or

(d) damage caused by repairs or alterations not performed in accordance with this SECTION 9 or otherwise with Builder's approval, or by substitution of parts or materials of a kind not approved by Builder.

9.5 All repair and replacement work will be carried out promptly at Builder's shipyard and at Builder's sole expense but if Owner considers that the replacement or repair of any defect under this SECTION 9 cannot be conveniently carried out at Builder's shipyard then subject as follows Owner may require Builder to pay the verified cost of having such repair or replacement carried out at some other convenient port or place. Before having any repair or replacement carried out elsewhere than at Builder's shipyard Owner will ask Builder either to recommend a suitable shipyard or contractor to carry out the necessary work or to propose satisfactory arrangements to send Builder's own employees or a specifically authorized service representative to carry it out. Builder will make any such recommendation or proposal within a reasonable time (having regard to the nature of the defect and the urgency of the situation) but latest three (3) business days after Owner's request. If Builder makes a recommendation or proposal within this timescale which Owner unreasonably declines to follow, Builder's liability in respect of the repair or replacement will be limited to the amount which would have been payable by Builder had Owner followed such recommendation or proposal. Builder will have the right to attend and inspect any warranty work being done at a location other than Builder's shipyard.

9.6 THE WARRANTY PROVISIONS SET FORTH HEREIN AND IN ADDENDUM C ARE THE ONLY WARRANTIES GIVEN AND ARE IN LIEU OF AND BUILDER DISCLAIMS TO THE EXTENT IT LEGALLY CAN AND ALL OTHER WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, WHATSOEVER INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES UNDER ANY SALE OF GOODS ACT OR SIMILAR LEGISLATION, ANDY IMPLIED WARRANTY OF MERCHANTABILITY AND ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE. THE REPLACEMENT OR REPAIR OF DEFECTIVE PARTS AS STATED ABOVE IN THIS WARRANTY SHALL BE THE SOLE AND EXCLUSIVE REMEDY OF OWNER OR ANY OTHER PERSON AND SHALL BE THE SOLE LIAVILITY OF THE ASR AND BUILDER UNDER THIS WARRANTY AND ANY IMPLIED WARRANTIES WHICH ARE NOT EFFECTIVELY DISCLAIMED HEREIN. NEITHER BUILDER NOR ANY ASR SHALL BE LIABLE UNDER ANY CIRCUMSTANCES FOR LOSS OF TIME, INCONVENIENCE, LOSS OF USE, OR FOR ANY OTHER INCIDENTAL, SPECIAL, CONSEQUENTIAL OR INDIRECT DAMAGES.

9.7 THIS WARRANTY IS EXPRESSLY IN LIEU OF ANY NON-CONTRACTUAL LIABILITIES INCLUDING, WITH OUT LIMITATION, PRODUCT LIABILITY BASED UPON NEGLIGENCE OR STRICT LIABILITY

9.8 Owner may secure performance of warranty obligations hereunder by:

(a) Written communication (which includes facsimile and email) with Builder

(b) Delivering the Vessel to Builder's shipyard or to a service representative which Builder.

9.9 Any other communications, necessary in connection with this warranty, should be sent to the following address:

WorldSpan Marine Inc.
27222 Lougheed Highway
PO Box 10, Station Whonnock
Maple Ridge, British Columbia
V2W 1V9 Canada

000013

## SECTION 10 – SUBCONTRACTORS

10.1   Builder will be entitled to subcontract work associated with the construction of the Vessel (but not the whole or substantially the whole of the work) to reputable and suitably qualified specialist subcontractors set forth in ANNEX F.  Builder will not, without Owner's prior approval (not to be unreasonably withheld or delayed), be entitled to place with any subcontractor or related subcontractors any subcontract or series of subcontracts exceeding US$50,000.

10.2   Save as provided by this Agreement no subcontract as aforesaid will in any way affect Owner's rights and Builder's obligations under this Agreement and Builder unconditionally guarantees the due and punctual performance by every subcontractor of the obligations subcontracted to them.

10.3   As security for Builder's obligations under this Agreement Owner will be entitled at any time to call for an assignment by Builder of its rights under any material subcontract made in relation to the construction of any part of the Vessel, or of the benefit of any claim or cause of action arising under any such subcontract, and Builder will ensure that all such subcontracts contain adequate provisions to permit such assignments at Owner's request.

## SECTION 11 – TAXES AND UNEMPLOYMENT CONTRIBUTION

11.1   Builder does hereby acknowledge and accept full responsibility for the payment of all duty for importing materials, machinery, or equipment into Canada (except owner furnished items); franchise taxes; income taxes; taxes measured by Builder's receipts or earnings; payroll taxes or unemployment contributions; or other taxes or contributions now or hereafter imposed by any government or taxing authority having jurisdiction in the premises, and which are measured or computed in accordance with salaries or other compensations, and which shall become due or payable by virtue of the performance of Builder's obligations hereunder up to, but excluding, Delivery, and Builder hereby agrees to indemnify Owner accordingly.

11.2   Subject to subsection 11.1 above, Owner does hereby acknowledge and accept exclusive liability for the payment of all taxes that may be levied based upon the sale or Delivery to or use by Owner or its representatives, successors or assigns of the delivered Vessel itself.  In the event there is duty payable for importing the completed Vessel into the United States or any country other than Canada, Owner will pay it in a timely manner.

## SECTION 12 – TITLE

12.1   Builder will retain title to the Vessel until delivery to Owner.  Builder grants to Owner a continuing first priority security interest in the Vessel, including all work, materials, machinery, and equipment relating to the Vessel, to secure any sums advanced or paid to Builder under this Agreement; provided, however, that such security interest shall be subordinate to Owner's obligations under the Contract Documents including Builder's right to receive payments pursuant to this Agreement.  In support of Owner's security interest in the Vessel Builder agrees to register a Ship's Mortgage in favour of Owner or Owner's construction lender (the form of the mortgage document is to be agreed upon between the parties acting reasonably) if Owner requests that this be done for any purpose.

## SECTION 13 – TERMINATION

**Builder's Default**

13.1   Owner shall have the right and power, without prejudice to any other right or remedy, to terminate this Agreement, in whole or in part, in the event of any of the following events (each,

000014

an "Event of Default"):

(a) if a bona fide petition is granted or an order is made or an effective resolution is passed for the winding up, liquidation or dissolution of Builder otherwise than for the purpose of an amalgamation or reconstruction previously approved in writing by Builder);

(b) if a receiver, receiver and manager or administrator is appointed of the whole or a substantial part of the undertaking or property of Builder;

(c) if Builder suspends payment of its debts or ceases to carry on its business or makes any arrangement or composition with its creditors;

(d) if any event or circumstance should occur or arise rendering Builder liable to the making of any order for the commencement of any proceedings under the applicable insolvency laws of any part of the world; or

(e) if Builder, otherwise than by reason of force majeure within the meaning of subsection 3.2 or default of Owner under this Agreement fails to achieve the stage of construction of the Vessel required at any Key Fixed Date indicated in the Master Construction Schedule by the one hundred eightieth (180th) day after such Key Fixed Date

13.2 Upon termination of this Agreement by Owner, Owner will be freely entitled to take over and complete the Vessel elsewhere in which event Builder will be liable:

(a) to deliver up the Vessel and/or such parts as have been constructed and all materials, engines, machinery, outfit and equipment from time to time appropriated to the Vessel and/or pertaining to this Agreement (including Owner's Supplies) free and clear of all mortgages, maritime liens and debts and claims whatsoever for removal from Builder's shipyard;

(b) to do and execute all acts, matters, things and documents necessary or reasonably required by Owner to transfer and convey all right, title and interest to and in the Vessel to Owner and protect the same against claims by other persons (including suppliers, subcontractors and creditors of Builder and persons from time to time representing such suppliers, subcontractors and creditors);

(c) to assign to Owner or as it may direct the benefit of any or all agreements for the supply of materials, engines, machinery, outfit or equipment or the execution of work in relation to this Agreement; and

(d) to indemnify Owner on written demand for any additional cost (over and above the Capped Purchase Price described in subsection 13.5) of completing the Vessel in accordance with the Plans and Specifications (all expenses of moving the Vessel to another place for completion being included in such cost) provided that Owner will take reasonable steps to minimise any such additional cost

13.3 As an alternative to its rights under the preceding provisions of this SECTION 13 Owner will be entitled by notice in writing given at any time within thirty (30) days after termination of this Agreement to require Builder to cooperate in the prompt sale of the Vessel on such terms and in such manner as Owner may decide and Builder may approve (approval not to be unreasonably withheld or delayed) and following such sale the provisions of SECTION 24 will apply.

13.4 Notwithstanding anything contained elsewhere in this Agreement if Owner has taken delivery of the Vessel in circumstances in which Owner would otherwise have been entitled under this Agreement to reject the Vessel and/or terminate this Agreement then at any time within three (3)

000015

months after taking delivery Owner will have the option to reject the Vessel and terminate this Agreement whereupon the Vessel will be sold in the manner contemplated by subsection 13.3 and following such sale the provisions of SECTION 24 will apply.

**Owner's Default**

13 5   Except for payments which are the subject of a good-faith dispute and have been submitted to arbitration as provided in SECTION 14, if Owner fails to make a payment required hereunder by the Final Due Date, Builder shall re-invoice Owner with the words Termination Notice written conspicuously thereon (the "Termination Notice")   The Termination notice shall, in all cases, be sent to all Owner entities listed in SECTION 20 hereof.   If such failure continues unremedied for a period of sixty (60) days after the Termination Notice, Builder may terminate this Agreement and notify Owner that Builder intends to offer the Vessel for sale, and in such case property in the Vessel (and in all Owner's Supplies integrated in the Vessel and incapable of being removed without causing damage) will revert or pass to Builder and Owner will promptly do and execute all acts, matters, things and documents necessary or reasonably required by Builder to perfect Builder's property therein

In the remainder of this subsection 13 5 "Capped Purchase Price" shall mean the lesser of (1) the Final Purchase Price and (2) an amount ten percent (10%) greater than the Estimated Purchase Price.  If Builder resells the Vessel for an amount less than the Capped Purchase Price, Builder shall refund to Owner all installment payments made to Builder less Builder's direct out-of-pocket costs and expenses for storage and resale (provided such cost and expenses are standard and customary in the industry), and less the difference between the Capped Purchase Price and the actual resale price of the Vessel   If Builder resells the Vessel for an amount equal to or in excess of the Capped Purchase Price, Builder shall refund to Owner any installment payments made to Builder, less Builder's costs and expense for storage and resale (provided such cost and expenses are standard and customary in the industry)   Builder's out-of-pocket costs for storage and resale shall not include the costs of any modifications required by the new purchaser; but shall include brokerage fees and reasonable advertising costs attributable solely to the sale of Vessel.  Owner shall not be liable for any losses or damages including special, consequential, incidental or direct losses or damages other than set out in this Agreement

## SECTION 14 – GOVERNING LAW; TECHNICAL EXPERT; ARBITRATION OF DISPUTES

14 1   This Agreement shall be governed by and construed in accordance with the laws of the United States including its maritime law and the State of Washington

14 2   All disputes relating to technical aspects of the construction of the Vessel (including but without limiting the generality of the foregoing disputes as to whether the Vessel suffers from any defect and/or complies with the Contract Documents when tendered for delivery by Builder and disputes relating to the consequential effects of modifications within the meaning of SECTION 7) which cannot be resolved by negotiation and agreement between the parties will at the written request of either party be submitted to and finally determined by **TOM CORNESS** or another suitably qualified surveyor of the company **PATTON MARINE INC** acting as a technical expert and not as an arbitrator **provided that** if neither Mr Corness nor any such other surveyor is willing and able to act then another technical expert will be appointed by agreement between the parties or (failing agreement within fourteen days after the aforesaid written request) by the Classification Society.

14 3   Except as otherwise provided in Section 14 2 above for disputes relating to technical aspects of the construction of the Vessel), any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement, shall be submitted

000016

exclusively to arbitration in the City of Seattle, Washington, United States of America under the auspices of the Washington Arbitration & Mediation Service ("WAMS"). Either party may initiate arbitration by sending written notice to the other of their intent to arbitrate specifying the dispute to be arbitrated and the specific relief sought. Within ten (10) business days after receipt of a notice to arbitrate a dispute, Owner and Builder shall agree upon and appoint an arbitrator. If the parties are unable to agree upon an arbitrator within such ten (10) day period, then each party shall select an arbitrator and the selected arbitrators shall select a third. The arbitrator may grant any relief and render any award, which the arbitrator deems just and equitable and within the scope of the Agreement and consistent with the laws of the State of Washington, including, but not limited to, specific performance, costs and reasonable attorneys' fees. The arbitrator's decision shall be final and legally binding. The parties further agree to submit exclusively to the jurisdiction of the federal or state courts in King County, Washington, United States of America for any action to enforce an arbitration award. The arbitrator shall award the expenses and costs of arbitration, including attorneys' fees, to the prevailing party in such amount as the arbitrator sees fit. This Section 14.3 may only be waived by mutual written agreement of the parties hereto.

## SECTION 15 – OIL POLLUTION

Builder shall hold harmless, defend, and indemnify the Vessel and Owner from any and all liability, fines or penalties to any federal, provincial, state or municipal authority by reason of pollution of waters by oil or refuse from the Vessel during the course of construction or while the Vessel is in the custody of Builder during dock trials or water running trials, up to the time of delivery to Owner under this Agreement.

## SECTION 16 – CONSTRUCTION DRAWINGS AND RIGHT TO INSPECT

16.1   Builder will prepare and submit all necessary Construction Drawings to Owner in triplicate not later than the requisite date (if any) specified in the Master Construction Schedule and in any event within reasonably good time to enable Owner properly to consider and comment thereon before the same are required to be implemented. Within ten (10) business days after receipt thereof from Builder, Owner will ensure that one copy of each Construction Drawing is returned to Builder, endorsed either with Owner's approval or with such remarks and/or amendments as Owner wishes to make. Owner will in any event endeavour to ensure that the Construction Drawings are returned as soon as possible within the time limit stated. If Owner wishes to make any amendment to any Construction Drawing, Builder will make such amendment and re-submit such Construction Drawing to Owner for approval as soon as reasonably practicable, provided that any such amendment which constitutes a modification to the Plans and the Specifications will be dealt with in accordance with SECTION 7. Owner's approval of the Construction Drawings will not in any way displace, limit or exclude Builder's responsibility for the design, construction, outfitting, launching and completion of the Vessel in accordance with this Agreement.

16.2   Owner will have the right to inspect the Vessel and all engines, machinery, equipment, outfit, materials and workmanship intended therefor and to photograph and film the same at Builder's shipyard during construction and Builder will grant Owner's authorised representatives free access for such purposes during working hours. Owner's authorised representatives will include the Project Supervisor and the names of additional and substituted representatives from time to time will be notified to Builder before their first attendance at Builder's shipyard and workshops. Owner will ensure that at any given time one of Owner's representatives is designated as the point of contact and authorised to make decisions on all material technical matters on Owner's behalf. Builder will use best endeavours to ensure that Owner's authorised representatives have the same right of access to all its subcontractors' premises for inspection purposes. Access and inspection will be at Owner's risk and expense.

000017

16 3 Builder at its own expense will provide Owner's authorised representatives with reasonably adequate and secure office space and furniture at Builder's shipyard and facilities including telephone, fax, modem, photocopier, refrigerator and shower. Telephone and fax charges will be for Owner's account.

16.4 Owner's authorised representatives will observe the works' rules prevailing at Builder's and its subcontractors' premises and address their remarks exclusively to Builder's appointed representatives whose names will be made known to Owner in advance.

16.5 Owner's authorised representatives will at all times be deemed employees of Owner and not of Builder. Neither Builder nor any of its servants or agents will be under any liability for (and Owner will indemnify Builder and its servants and agents from and against) personal injury (including death) or loss or damage to property suffered by Owner or its servants or agents (including the Project Supervisor and Owner's authorised representatives) during their performance of the works envisaged in this SECTION 16 or presence at Builder's premises for any other reason unless the same has been caused by Builder's negligence or that of its servants or agents. Owner shall provide proof of insurance covering such risks in amounts and with coverage reasonably satisfactory to Builder listing Builder as an additional insured. Neither Owner nor any of its servants or agents (including the Project Supervisor and Owner's authorised representatives) will be under any liability for (and Builder will indemnify Owner and its servants and agents from and against) personal injury (including death) or loss or damage or to property suffered by Builder or any of its servants or agents unless the same has been caused by Owner's negligence or that of its servants or agents

16.6 If Owner's authorised representatives claim that any item of construction, machinery, equipment, materials or workmanship does not conform to the requirements of this Agreement, the Plans and Specifications, they will promptly give notice thereof in writing to Builder's appointed representatives. Within five (5) business days after receipt of such notice Builder will investigate the matter to determine whether such non-conformity exists and, if it does, correct the same as soon as possible. Any dispute as to whether or not a non-conformity exists or has been properly corrected will be resolved in accordance with subsection 14 2.

16 7 Errors and omissions in the Construction Drawings (whether or not approved by Owner) will be Builder's sole responsibility. Builder will be obliged to rectify all consequences of such errors and omissions at its sole cost and they will not constitute grounds for an extension to the Delivery Date.

## SECTION 17 – TRIALS

17.1 On completion of construction and outfitting and prior to delivery and acceptance the Vessel and her machinery and equipment will be subject to the following trials and tests:

(a) An inclination test in accordance with SOLAS Regulation II-1/22 to determine the Vessel's correct stability figures, the manner of testing to be approved by the Classification Society and the MCA

(b) Trials to determine the Vessel's inherent trim / list corresponding to empty fuel and water tanks and with an allowance for fifteen tons of constant deadweight

(c) Sea trials to be conducted with clean bottom, in smooth and deep water, in calm weather (wind and sea force not exceeding Beaufort Scale 2) during which:

(i) the Vessel's maximum speed (100% MCR) and cruising speed (85% MCR) corresponding to half load condition will be determined;

    (ii)    the Vessel's range at cruising speed (15 knots) with 6000 gallons of consumable fuel of fuel and otherwise in half-load condition will be calculated on the following basis:

    Deep Salt water at 15°C and 3.5% salinity

    Wind speed 0 knots and air temperature 15°C

    Current speed 0 knots

    Wave height 0 m significant

    (iii)    noise level measurements will be taken, both at the Vessel's cruising speed and while lying alongside, in Owner's, Guest and VIP areas (including without limitation main saloon, main dining room and wheelhouse) and in the crew and staff areas, the measuring points in each case being at a height of one metre, not nearer than one metre to the walls or the ceiling and approximately in the centre of the room (more than one measuring point being used in more spacious areas and the arithmetic average used to determine the result); and

    (iv)    vibration level measurements will be taken at the Vessel's cruising speed in Owner's, Guest and VIP areas (including without limitation main saloon, main dining room and wheelhouse) and in the crew and staff areas.

    (d)    At least one further sea trial to be conducted in rough weather (wind and sea force exceeding Beaufort Scale 3 but not exceeding Beaufort Scale 5) but always within the Vessel's operational limits as defined by the Classification Society and the MCA

    (e)    Trials of at least four hours' duration to determine the Vessel's Range at cruising speed with 90% bunkers and full water tanks.

    (f)    Other trials and tests as set out in the Specifications or as reasonably required by Owner to verify the performance of the Vessel and her systems

17.2    All tests, trials and measurements will be conducted in a manner and to an extent as prescribed in the Contract Documents and by the Classification Society and the MCA, and in accordance with customary luxury yacht construction practices.

17.3    If on the day scheduled for the sea trials the weather and/or sea conditions are not suitable to enable them to be carried out in accordance with the Contract Documents then Builder may postpone the trials or such part thereof as deemed necessary until the next suitable day. In such case Builder will be entitled to an extension of the Delivery Date equivalent to the delay caused by such postponement

17.4    Builder will be entitled to conduct preliminary sea trials following which the main engines and other characteristics of the Vessel will be adjusted to comply with the Contract Documents  If at any trial or test the Vessel or any part of her machinery or equipment fails to satisfy the requirements of the Contract Documents either Builder or Owner will be entitled by notice in writing to the other to require such trial to be repeated but no such repetition will allow Builder an extension of to the Delivery Date

17.5    Within seventy-two (72) hours after completion of the aforesaid trials Owner or Owner's duly authorised representatives will notify Builder in writing of any deficiencies found as to the compliance with the Contract Documents  When Builder has remedied such deficiencies and conducted such trials and tests as may reasonably be necessary to demonstrate that the Vessel

000019

complies with the Contract Documents, or if no deficiencies are notified to Builder, Owner will accept the Vessel.

17.6 Builder will provide Owner with a trial and test program at least two months before the trials and tests referred to in subsection 17.1 are due to commence. Builder will also give to Owner's representative for the time being designated as the point of contact at least ten (10) business days' prior written notice of the trials and tests and Owner's representatives will be entitled to be present on board the Vessel or otherwise during all such trials and tests. Notwithstanding the foregoing no notice of a trial or test need be given if such trial or test follows immediately upon another trial or test and Owner's representatives are present.

17.7 Builder will supply the master and crew for the Vessel's sea trials. Builder will also supply all fuel oil, diesel/gas oil, lubrication oil and hydraulic oil required for the purpose of completing the Vessel's trials and Owner will on delivery and acceptance of the Vessel reimburse Builder the price paid by Builder for such quantities as are not consumed on trials and which remain on board.

17.8 Builder will have full responsibility for the Vessel during trials and tests and be liable for all loss and damage sustained to the Vessel, howsoever caused, unless caused by the wilful misconduct or gross negligence of Owner's representatives.

## SECTION 18 – GUARANTEED CHARACTERISTICS

18.1 Builder acknowledges that the Vessel's maximum speed, range, noise levels, vibration levels and trim are of critical importance to Owner and the liquidated damages provided for in this SECTION 18 are intended as a last resort in case a particular problem with the Vessel's maximum speed, range, noise levels, vibration levels and trim cannot be remedied. Subject always to Owner's rights and remedies under this SECTION 18 Builder shall use its best endeavours throughout the construction of the Vessel to ensure that the requirements of the Specifications as regards maximum speed, range, noise levels, vibration levels and trim are met. Without limiting the generality of the foregoing if any problem with the Vessel's maximum speed, range, noise levels, vibration levels and trim should become apparent then Builder shall at its own expense use best endeavours (without thereby adversely affecting any other characteristic of the Vessel) to correct the same, provided that no such remedial action shall constitute grounds for an extension to the Delivery Date.

18.2 If the Vessel's actual maximum speed in half-load condition, measured in accordance with subsection 17.1 and the Contract Documents, is less than 20.5 knots, and Builder using its best endeavours cannot remedy the problem, then Builder shall pay to Owner as liquidated damages the following amounts:

   (a)   for the first half knot of speed deficiency, nothing; and

   (b)   for each half knot or part thereafter, **$15,000;**

   provided that if the deficiency in the Vessel's maximum speed as aforesaid is more than two full knots then, as an alternative to claiming any liquidated damages for speed deficiency, Owner shall have the option to terminate this Agreement with the consequences provided for in SECTION 13. In no event shall Builder be liable for liquidated damages for any speed deficiency in excess of two full knots and nor shall Builder be liable for liquidated damages should Owner terminate this Agreement.

18.3 If the Vessel's actual range at cruising speed (15 knots) with 6,000 gallons of consumable fuel of fuel and otherwise in half-load condition, calculated or extrapolated in accordance with subsection 17.1, is less than 1,350 nautical miles, and Builder using its best endeavours cannot

000020

remedy the problem, then Builder shall pay to Owner as liquidated damages the following amounts:

(a)  for the first 50 nautical miles of range deficiency, nothing; and

(b)  for each successive 50 nautical miles or part thereafter, **$15,000**;

provided that if the deficiency in the Vessel's range as aforesaid is more than 200 nautical miles then, as an alternative to claiming any liquidated damages for range deficiency, Owner shall have the option to terminate this Agreement with the consequences provided for in SECTION 13  In no event shall Builder be liable for liquidated damages for any range deficiency in excess of 200 nautical miles and nor shall Builder be liable for liquidated damages should Owner terminate this Agreement.

18 4   If the actual noise level in any interior accommodation area of the Vessel (excluding service and mechanical spaces), measured either at cruising speed or while lying alongside in accordance with subsection 17 1 and the Contract Documents, exceeds 58 dBA (Owner's or guest areas) or 60 dBA (crew areas), and Builder using its best endeavours cannot remedy the problem, then in respect of each area and each condition in which the actual noise level exceeds 58 dBA (Owner's or guest areas) or 60 dBA (crew areas), Builder shall pay to Owner as liquidated damages the following amounts:

(a)  for the first two dBA of excessive noise, nothing; and

(b)  for each successive dBA or part thereafter, **$5,000**;

provided that if the actual noise level as aforesaid in any area in either condition is more than 63 dBA (Owner's or guest areas) or 65 dBA (crew areas) then, as an alternative to claiming any liquidated damages for excessive noise, Owner shall have the option to terminate this Agreement with the consequences provided for in SECTION 13  In no event shall Builder be liable for liquidated damages for any noise in excess of 63 dBA (Owner's or guest areas) or 65 dBA (crew areas), and nor shall Builder be liable for liquidated damages should Owner terminate this Agreement

18 5   If the actual vibration level in any interior accommodation area of the Vessel (excluding service and mechanical spaces), measured at cruising speed (15 knots) in accordance with subsection 17 1 and the Contract Documents, exceeds a velocity of 1,5mm/sec RMS for frequencies above 5Hz or a peak acceleration of 32mm/sec² for frequencies below 5Hz, and Builder using its best endeavours cannot remedy the problem, then Builder will pay to Owner as liquidated damages the following amounts:

(a)  for the first 0 5mm/sec RMS above 5Hz of velocity or the first 16mm/sec² below 5Hz of peak acceleration, nothing; and

(b)  for each successive 0 5mm/sec RMS above 5Hz of velocity or part thereafter or each successive 16mm/sec² below 5Hz of peak acceleration or part thereafter, **$5,000**;

provided that if the actual vibration level in any area as aforesaid exceeds a velocity of 3.0mm/sec RMS above 5Hz or a peak acceleration of 80mm/sec² below 5Hz then, as an alternative to claiming any liquidated damages for excessive vibration, Owner shall have the option to terminate this Agreement with the consequences provided for in SECTION 13.  In no event shall Builder be liable for liquidated damages for any vibration exceeding a velocity of 3.0mm/sec RMS above 5Hz or a peak acceleration of 80mm/sec² below 5Hz, and nor shall Builder be liable for liquidated damages should Owner terminate this Agreement

18.6 If the Vessel's inherent trim, including an allowance for fifteen (15) tons of permanent ballast but on the basis of empty fuel, water and ballast tanks, measured in accordance with subsection 17.1 and the Contract Documents, is not level, and Builder using its best endeavours cannot remedy the problem before delivery of the Vessel, then Builder will pay to Owner as liquidated damages the following amounts:

(a) for negative (bow-down) trim and/or list: (1) for the first 100 mm of negative trim and/or list, nothing and (2) for each successive 50 mm or part thereafter, **$5,000** provided that if the negative trim and/or list as aforesaid is more than 250 mm then, as an alternative to claiming any liquidated damages for negative (bow-down) trim and/or list, Owner will have the option to terminate this Agreement with the consequences provided for in SECTION 13; and

(b) for positive (bow-up) trim: (1) for the first 200 mm of positive trim, nothing and (2) for each successive 100 mm or part thereafter, **$5,000** provided that if the positive trim as aforesaid is more than 500 mm then, as an alternative to claiming any liquidated damages for positive (bow-up) trim, Owner will have the option to terminate this Agreement with the consequences provided for in SECTION 13

In no event shall Builder be liable for liquidated damages for any negative (bow-down) trim and/or list exceeding 250 mm or for any positive (bow-up) trim exceeding 500 mm, and nor shall Builder be liable for liquidated damages should Owner terminate this Agreement.

## SECTION 19 – SUCCESSORS

This Agreement shall be binding upon Builder and Owner and upon their respective heirs, legal representatives, successors, and approved assigns

## SECTION 20 – NOTICES

All notices or communications hereunder shall be in writing, shall be effective on receipt, and shall be sent by form of registered mail or courier requiring a receipt with a copy transmitted by fax and email as follows:

If to Builder:

WorldSpan Marine Inc.
Attention: Mr. Jim Hawkins
27222 Lougheed Highway
PO Box 10, Station Whonnock
Maple Ridge, British Columbia
V2W 1V9 Canada

Fax +1 606 462 1677

With a mandatory copy to:

David H. Baker
PO Box 431
340 Royal Poinciana Way
Suite 321
Palm Beach, Florida 33480

Facsimile +1 561 833 2261
Email david.baker@amil.com

000022

If to Owner       Harry Sargeant
            C/O Sargeant Marine
            3020 N Military Trail
            Suite 100
            Boca Raton
            FL 33431

            Fax +1 561 999 9506
            Email hsargeantjr@sargeant.net

With a mandatory copy to:   Jay Tooker
            Holman Fenwick & Willan
            Marlow House
            Lloyds Avenue
            London EC3N 3AL
            United Kingdom

            Fax +44 20 7481 0316

## SECTION 21 – PROMOTIONAL PHOTOGRAPHIC RIGHTS; CONFIDENTIALITY

21.1 Owner authorises Builder to photograph the Vessel during construction and in the period immediately before delivery and at other times reasonably acceptable to Owner after delivery, with Owner's prior approval (not to be unreasonably withheld) to use a selection of the photography for promotional and editorial purposes in reputable publications, provided that Owner shall not be identified by name without Owner's express written consent. If Builder does photograph the Vessel it will provide a selection of the photographs to Owner. Owner agrees that the Vessel will be built with the Crescent logo permanently attached to the Vessel's superstructure as specified in the Contract Documents and in such other aesthetically pleasing places as Owner may agree (agreement not to be unreasonably withheld)

21.2 Save as provided in subsection 21.1 neither party will disclose the contents or import of the Contract Documents to any person (except its legal and other professional representatives or as required by law or as reasonably necessary in connection with the construction of the Vessel) without the prior written approval of the other. Builder will not disclose and will take all reasonable precautions to ensure that its servants and agents do not disclose the identity of the beneficial owner of the Vessel, the Final Purchase Price or any information concerning the design, performance or characteristics of the Vessel which is not already in the public domain otherwise than as a result of a breach of Builder's obligations. All press releases concerning the Vessel and the publication of all information and articles thereon and photographs thereof will be subject to Owner's prior written approval in its sole discretion not to be unreasonably withheld

## SECTION 22 – OTHER BUILDER RIGHTS

As a material inducement for Builder to enter into this Agreement which provides for labor rates and material, equipment and subcontract mark ups at below market rates, Owner shall make the Vessel available to Builder from time to time after reasonable notice from Builder for demonstration by Builder to others of the work product and craftsmanship of Builder. Such use by Builder shall be at no charge to Builder except for consumable supplies, for example, fuel, and the cost of the crew used prorated on a daily basis. Additionally, Owner agrees to allow the Vessel to be placed in up to 4 boat shows per year in the United States at no charge to Builder except for Builder's expense for crew, docking space and consumables. As further consideration for the below market rates paid by Owner for the construction of the Vessel, upon sale of the Vessel by Owner, the gross profit from the Vessel,

000023

that is, the profit after deducting the cost of the Vessel and the direct costs of sale, for example, any brokerage commission to an unrelated third party, shall be split equally between the parties.

## SECTION 23 – GENERAL CONDITIONS

23.1  Except as otherwise provided herein, the Contract Documents represent the entire agreement between the parties and supersedes and makes void all prior agreements, ship's mortgage documentation, general information found in promotional or editorial literature, negotiations, correspondence, other specifications, undertakings or commitments, whether written or oral, and shall constitute the entire agreement between the parties regarding the construction of the Vessel. Any amendment hereof shall be in writing and signed by the party against whom it is sought to be enforced; any purported amendment, not in writing and not so signed shall be void. Except for Builder's warranty described in SECTION 9 hereof, Builder's delivery warranty of good title and freedom from liens and encumbrances as of the delivery of the Vessel to Owner and Builder's rights under SECTION 21 and SECTION 22, this Agreement shall terminate and expire upon the acceptance of delivery of the Vessel by Owner.

23.2  In the event of any conflict between this Agreement and any of its Addenda, this Agreement shall take precedence. In addition, in the event of any conflict between the Contract Documents and this Agreement, this Agreement shall take precedence over the provisions of the Specifications, which shall in turn take precedence over the Plans. Any conflict in the provisions of the said Contract Documents shall be resolved with proper regard for said order of precedence.

23.3  The provisions of this Agreement are severable, and if any provisions shall be held illegal, invalid, or unenforceable, such holding shall not offset the legality, validity or enforceability of any other provision. In addition, if any term or provision of this Agreement shall be found invalid, illegal or otherwise unenforceable, the provision shall be deemed modified to the extent necessary to render such term or provision enforceable, and the rights and obligations of the parties shall be construed and enforced accordingly, preserving to the fullest permissible extent the intent and agreements of the parties herein set forth.

23.4  All dollar amounts in this Agreement are stated in terms of United States dollars.

23.5  The term "business days" shall mean days on which commercial banks located in Vancouver, British Columbia, Canada are open for the conduct of regular business.

## SECTION 24 – EVENTUAL SALE OF VESSEL

24.1  The provisions of this Article SECTION 24 will apply if (and only if) Owner sells the Vessel, whether complete or incomplete, at any time within three years after the Delivery Date.

24.2  For the purposes of this SECTION 24:

A  =  a sum 10% greater than the Estimated Purchase Price plus changes as provided in SECTION 7 ($16,500,000 if there are no such changes)

B  =  the Final Purchase Price taking into account all sums contributed by Owner and Builder

C  =  the net proceeds of sale of the Vessel (after any brokerage and expenses connected with the sale and transfer of the Vessel)

D  =  the profit (if any) on sale of the Vessel (C – B)

E  =  the loss (if any) on sale of the Vessel (B – C)

000024

24.3 If **B** is not more than **A** and if **C** is more than **B**, then Owner will promptly account to Builder for either:

    (a)    one-half of **D**; or

    (b)    one half of **A − B**;

    whichever is the lesser

24.4 If **B** is not more than **A** and if **C** is less than **B**, then Builder will promptly pay to Owner either:

    (a)    one-half of **E**; or

    (b)    one half of **A − B**;

    whichever is the lesser

24.5 If **B** is more than **A** and if **C** is more than **B**, then Owner will promptly account to Builder for either:

    (a)    one-half of **D**; or

    (b)    one half of **B − A**;

    whichever is the lesser

24.6 If **B** is more than **A** and if **C** is less than **B**, then Builder will promptly pay to Owner either:

    (a)    one-half of **E**; or

    (b)    one half of **B − A**;

    whichever is the lesser

24.7 If **B = C** then neither party will have any liability to the other under this SECTION 24.

24.8 When making any payment under this SECTION 24 each party will be entitled to set off and deduct from the amount due to the other party any amount then due and owing by that party under or pursuant to this Agreement, to the intent that so far as possible this SECTION 24 will operate as a final adjustment and accounting between the parties of their liabilities to each other under this Agreement

## SECTION 25 – GUARANTEE OF PRINCIPALS

25.1 Steven L. Barnett of 825 18th Street, Suite 200, Vero Beach 32960 in the State of Florida and W. Chris Blane of 505 Beachland Boulevard, Suite 1, PMB 270, Vero Beach 32963 in the State of Florida, being the principals of Builder, as principal debtors and not as surety only, jointly and severally guarantee the due and punctual performance of Builder's obligations under or pursuant this Agreement or arising out of any breach or termination of this Agreement and the due and punctual payment of all sums of money, interest and damages at any time payable by Builder under or pursuant this Agreement or arising out of any breach or termination of this Agreement, provided that the maximum aggregate liability of the said principals will be Two Million Dollars ($2,000,000)

25.2 The said Harry Sargeant III, being the principal of Owner, as principal debtor and not as surety only, guarantees the due and punctual performance of Owner's obligations under or pursuant

000025

this Agreement or arising out of any breach or termination of this Agreement and the due and punctual payment of all sums of money, interest and damages at any time payable by Owner under or pursuant this Agreement or arising out of any breach or termination of this Agreement, provided that the maximum aggregate liability of the said principal will be Two Million Dollars ($2,000,000).

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement in multiple counterpart originals as of the date first above written

**BUILDER: WORLDSPAN MARINE INC.**

By:_____

Name:

Its:

**OWNER: HARRY SARGEANT III**

By:_____

Name:

Its:

**PRINCIPALS:**

For the purpose of agreeing to subsection 25.1 only:

_____

Steve Barnett

_____

Chris Blane

For the purpose of agreeing to subsection 25.2 only:

_____

Harry Sargeant III

000026

List of Schedules:

ANNEX A       Plans and Specifications

ANNEX B       Master Construction Schedule

ANNEX C       Claim Certificate

ANNEX D       Wire Transfer Instructions to Builder's Account

ANNEX E       Supplier Warranties

ANNEX F       Subcontractors

# EXHIBIT 3

## ASSIGNMENT OF SECURITY AGREEMENT & MORTGAGE

**THIS ASSIGNMENT OF SECURITY AGREEMENT & MORTGAGE** (this "Assignment") made as of August 14, 2009, by **HARRY SARGEANT, III** (hereinafter the "Secured Party") in favor of **COMERICA BANK** (hereinafter the "Assignee").

## W I T N E S S E T H :

A.      A. Worldspan Marine, Inc. ("Builder") and Mortgagee are parties to that certain Yacht Construction Agreement dated February 29, 2008 under the terms of which Builder is constructing a 142 foot motor yacht identified in such agreement as Builder's hull no QEO14226C010

B.      As security for Builder's obligations to Mortgagee, under the terms of the Vessel Construction Agreement Builder granted to Mortgagee (1) a first priority ship mortgage lien on the Vessel, as evidenced by that certain Builder's Mortgage executed by Builder in favor of Mortgagee and filed with Transport Canada and entered in the record book on May 14, 2008, as Mortgage "A" and assigned record no. 3 in 2008, a copy of which is attached hereto as "Exhibit A" (the "Mortgage"), and (2) a security interest in the collateral described in that certain Financing Statement filed in the British Columbia Personal Property Registry on May 1, 2008 and designated base registration no. 334150E, a copy of which is attached hereto as "Exhibit B". (the "Financing Statement"). The security interest created by the Vessel Construction Agreement and perfected by the Financing Statement is referred to herein as the "Personal Property Collateral".

C. Assignee will extend credit to Secured Party under the terms of that certain promissory note (the "Note") of even date herewith in the original principal amount of Nine Million Four Hundred Thousand ($9,400,000) subject to among other things, Secured Party assigning to Assignee its rights under the Security Agreement to secure Secured Party's obligations to Assignee under the Note.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Secured Party hereby covenants and agrees in favor of the Assignee as follows:

## ARTICLE I

Section 1.01. **Assignment of Rights by Secured Party.** Secured Party hereby assigns, transfers, delivers, pledges, mortgages, charges, grants and conveys to Assignee all of the Secured Party's right, title and interest in and to the Mortgage and the Personal Property Collateral, and grants a continuing security interest in, and acknowledges and agrees that Assignee has and shall continue to have a continuing security interest in, (a) all right, title, interest and claim of the Secured Party, but none of the obligations, in, to and under the Mortgage and Personal Property Collateral, and (b) all proceeds of any and all of the foregoing (all of the foregoing rights, interests, properties, privileges described in clauses (a) and (b) above assigned and in which a security interest is granted pursuant hereto being hereinafter collectively called the "Collateral").

Section 1.02. **Payments.** The Secured Party hereby authorizes any party at any time holding any funds due the Secured Party under the terms of the Mortgage or the Vessel Construction Agreement and constituting part of the Collateral to pay all such sums due and to become due under the terms of the Mortgage or the Vessel Construction Agreement or in respect of or on account of the Collateral directly to the Assignee to the extent of the Assignee's interest therein, and agrees that such deliveries and payments to the Assignee as

1

aforesaid shall be a good receipt and acquittance to the Secured Party to the extent so made. All amounts received by the Assignee shall be applied in accordance with the Vessel Construction Agreement

Section 1.03. **Power of Attorney.** The Secured Party does hereby irrevocably constitute and appoint the Assignee its true and lawful attorney with full power of substitution for it and in its name, place and stead, to ask, demand, collect, receive, receipt for, sue for, compound and give acquittance for any and all Collateral including, without limitation, the power to execute and endorse for transfer for and on behalf of the Secured Party any documents relating to the Vessel Construction Agreement or the Vessel referenced therein and any and all sums which may be or become due or payable to the Secured Party under the Vessel Construction Agreement or in respect of or on account of the Collateral with full power to settle, adjust or compromise any claim under the Vessel Construction Agreement and such sums as fully as the Secured Party could itself do and, in its discretion, to file any claim or take any other action or proceeding, either in its own name or in the name of the Secured Party, or otherwise, which the Assignee may deem necessary or appropriate to collect any and all sums which may be or become due or payable to the Secured Party under the Vessel Construction Agreement or in respect of or on account of the Collateral, or which may be necessary or appropriate to protect and preserve or enforce the right, title and interest of the Assignee in and to the Collateral and the security intended to be afforded hereby. The Secured Party hereby further covenants that it will, upon request of the Assignee, execute and deliver such further instruments and do and perform such other acts and things as the Assignee may deem necessary or desirable to more effectually vest in and secure the Assignee in the Collateral, including without limitation the Vessel and sums due or hereafter to become due under the Vessel Construction Agreement

Section 1.04. **Performance by Secured Party.** Secured Party further agrees promptly to perform all of its obligations under the Vessel Construction Agreement. In the event the Debtor fails to pay or perform any obligation arising under the Vessel Construction Agreement or this Assignment, Secured Party shall immediately notify Assignee in writing.

Section 1.05. **Acknowledgment of Assignment.** Secured Party agrees to cause Debtor to execute the acknowledgment of this Assignment which is included at the end of this Assignment.

Section 1.06. **Vessel Construction Agreement.** Secured Party agrees, and Debtor by executing the acknowledgment of this Assignment agrees, to the following: (i) upon receipt of a written notice that an Event of Default under the Vessel Construction Agreement has occurred, that all rights of the Secured Party under the Vessel Construction Agreement may only be exercised by the Assignee, and (ii) Secured Party shall provide the Assignee with copies of all notices to the Debtor regarding any default or alleged default by the Debtor under such agreements.

## ARTICLE II

## REPRESENTATIONS, WARRANTIES, AND COVENANTS

Section 2.01. **Representations and Warranties.** The Secured Party represents and warrants to Assignee as follows:

(a) A true, correct and complete copy of the Mortgage is attached hereto as Exhibit A. A true, correct and complete copy of the Financing Statement is attached hereto as Exhibit B.

(b) As to the Debtor and the Secured Party, the Vessel Construction Agreement and Mortgage are valid, enforceable and in full force and effect.

2

514071v2 960766.0213

(c)      The Secured Party is the sole holder of the rights and interests ascribed thereto under the Vessel Construction Agreement the Mortgage and the Financing Statement, and has full power and authority to assign, transfer and set over the same and to grant to and confer upon the Assignee the rights, interests, powers and authorities herein granted and conferred.

(d)      The right of the Secured Party to enforce the Vessel Construction Agreement and Mortgage and the assignment and security interest conveyed hereunder are, and will continue to be, free and clear of all defenses, set-offs, counterclaims, Liens and encumbrances of every kind and nature.

(e)      The Secured Party has observed and performed all covenants and obligations under the Vessel Construction Agreement and Mortgage required to be performed by the Secured Party, and the Secured Party shall observe and perform all of the covenants under the Vessel Construction Agreement and Mortgage required of the Secured Party, it being understood that the Assignee shall not be required or obligated in any manner to perform any of the covenants or obligations of the Secured Party under the Vessel Construction Agreement and Mortgage by reason of this Assignment or otherwise.

(f)      The Secured Party has no knowledge of any facts which impair the validity of the Vessel Construction Agreement or the Mortgage

(g)      The Secured Party will not create any lien or other encumbrance upon the Vessel Construction Agreement, the Vessel or the Personal Property Collateral or the right to payment thereunder, other than in favor of the Assignee.

(h)      Except as consented to in writing by Assignee, the Secured Party will not modify, waive or amend or consent to any modification, waiver or amendment of the Vessel Construction Agreement or the Mortgage in any manner.

(i)      Secured Party has the right to sell, assign, transfer, set over and encumber the Mortgage and the Personal Property Collateral to the Assignee and to grant to and confer upon the Assignee the rights, interests, powers and authorities herein granted and conferred.

(j)      Any and all actions, approvals and consents required by law or by any agreement to which the Secured Party is a party have been obtained in connection with the Secured Party's execution and performance of this Assignment; the Secured Party is under no legal disability affecting the enforceability of this Assignment.

(k)      This Assignment has been duly executed and delivered by the Secured Party and is a legal, valid and binding obligation of the Secured Party, enforceable in accordance with its terms, subject, as to enforcement of remedies, to the qualification that an order of specific performance and an injunction are discretionary remedies and, in particular, may not be available where damages are considered an adequate remedy at law.

3

## ARTICLE III

## DEFAULT

Section 3.01. **Events of Default.** An "Event of Default" shall exist under this Assignment upon the occurrence of any Event of Default (as defined therein) under the Vessel Construction Agreement.

Section 3.02. **Remedies.** Without limiting any rights, remedies or privileges that the Assignee may have under the terms of any instrument or agreement applicable to or related to the Obligations (as defined in the Vessel Construction Agreement), it is understood and agreed that upon the occurrence of an Event of Default, the Assignee, in addition to any other rights or remedies it may have, shall have the right to exercise all the rights, options and remedies of a secured party upon default as provided for under applicable law. Any requirement under applicable law for reasonable notice shall be satisfied if such notice is mailed, postage prepaid, to the Secured Party at its address as shown on the records of the Assignee at least five (5) days before the time of the sale, disposition or other event or thing giving rise to the required notice. The expenses of collecting the sums due or to become due to the Secured Party in, under and pursuant to the Vessel Construction Agreement or in respect of or on account of the Collateral, including without limitation court costs and attorneys' fees incurred in realizing upon the security interest granted hereby or in enforcing this security interest, shall constitute so much additional Obligations which the Secured Party promises to pay to the Assignee upon demand, and may be deducted from the sums so collected.

Without limiting any rights, remedies or privileges that the Assignee may have under the terms of the Construction Agreement, it is understood and agreed that upon the occurrence of any Event of Default hereunder the Assignee may exercise all rights of the Secured Party under the Vessel Construction Agreement.

Section 3.03. **Waiver.** The satisfaction or discharge of any part of the Obligations shall not in any way satisfy or discharge this Assignment, but this Assignment shall remain in full force and effect so long as any amount remains unpaid on any such Obligations or the Assignee is committed to extend credit to or for the account of the Secured Party.

Section 3.04. **Application of Proceeds.** The proceeds of any sale or remedy hereunder, or any part thereof, shall be paid and applied as provided in the Vessel Construction Agreement.

Section 3.05. **Indemnification.** This Assignment shall not operate to place any responsibility or obligation whatsoever upon the Assignee. Neither the Assignee nor its respective employees, representatives, agents, officers and directors, shall assume any liability as a result of this Assignment. The Secured Party agrees to protect, indemnify and save harmless the Assignee and its employees, representatives, agents, officers and directors from and against all losses, liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses including, without limitation, legal fees and expenses (except as may arise from the gross negligence or willful misconduct of the Person seeking indemnification) imposed upon, suffered or incurred by the Assignee, or any of its respective employees, representatives, agents, officers and directors, by reason of this Assignment and any claim or demand whatsoever which may be asserted against the Assignee, or any of its employees, representatives, agents, officers and directors, by reason of any alleged obligation or undertaking to be performed or discharged by the Assignee, under this Assignment. In the event the Assignee, or any of its respective employees, representatives, officers and directors, incur any liability, loss or damage by reason of this Assignment or in curing any default or breach by the Secured Party of its obligations under this Assignment or in the defense of any claims or demands arising out of or in connection with this Assignment, the amount of such liability, loss or damage shall be added to the Obligations and shall be payable upon demand.

4

514071\v2 960766.0213

## ARTICLE IV

## MISCELLANEOUS

Section 4.01. **Notices.** Unless specifically indicated otherwise herein, all notices and other communications provided for hereunder shall be in writing and addressed as provided in the Vessel Construction Agreement

Section 4.02. **Severability.** Any provision of this Assignment which is prohibited, unenforceable or not authorized in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition, unenforceability or nonauthorization without invalidating the remaining provisions hereof or affecting the validity, enforceability or legality of such provision in any other jurisdiction.

Section 4.03. **Headings.** Section headings in this Assignment are included herein for convenience of reference only and shall not have any effect for purposes of interpretation or construction of the terms of this Assignment.

Section 4.04. **Successors and Assigns.** This Assignment shall inure to the benefit of and be binding upon the Secured Party and the Assignee and their respective heirs, executors, legal representatives, successors and assigns. Whenever a reference is made in this Assignment to "the Secured Party" or the "Assignee" such reference shall be deemed to include a reference to the heirs, executors, legal representatives, successors and assigns of the Secured Party and the Assignee, as the case may be.

Section 4.05. **Amendments.** The Secured Party agrees that it will not agree to any amendment or modification to or termination of the Vessel Construction Agreement or sell or assign any of its interests therein or waive compliance by Debtor with any of the material terms and conditions thereof, without in each case first securing the prior written consent of the Assignee. Upon notice to Debtor from Assignee that an Event of Default has occurred, Debtor agrees to send to the Assignee copies of all notices and communications with respect to the Vessel Construction Agreement which are required to be sent to the Secured Party pursuant to the Vessel Construction Agreement. If the Vessel Construction Agreement is revoked or otherwise loses full force and effect, the Secured Party will give written notice thereof to the Assignee within five (5) days after the Secured Party knows or has reason to know thereof.

Section 4.06. **Cumulative Remedies.** The remedies herein provided shall be in addition to and not in substitution of the rights and remedies vested in the Assignee in any of the Loan Documents or in law or equity, all of which rights and remedies are specifically reserved by the Assignee. The remedies herein provided or otherwise available to the Assignee shall be cumulative and may be exercised concurrently. The failure to exercise any of the remedies herein provided shall not constitute a waiver thereof, nor shall use of any of the remedies herein provided prevent the subsequent or concurrent resort to any other remedy or remedies. It is intended that this clause shall be broadly construed so that all remedies herein provided or otherwise available to the Assignee shall continue and be each and all available to the Assignee until the Obligations shall have been paid in full.

Section 4.07. **Liability of the Secured Party.** The Secured Party, by its execution hereof, acknowledges and agrees that it is and remains liable for the performance of any and all of its obligations under the Vessel Construction Agreement to the same extent as though this Assignment had not been made and further acknowledges that this Assignment constitutes an assignment of the rights of the Secured Party pursuant to said Agreement and not an assignment of any duties or obligations of the Secured Party with

5

respect to the Vessel Construction Agreement, it being understood that the Assignee shall not be in any manner responsible for the performance of any of such duties and obligations.

Section 4.08. **Integration.** This Assignment shall supersede any prior agreement or understanding between the parties (other than the Loan Documents) as to the subject matter hereof.

Section 4.09. **Counterparts.** This Assignment may be executed in any number of counterparts, each of which shall be deemed to be an original and shall be binding upon both parties, their successors and assigns.

Section 4.10.    **GOVERNING LAW.**  THIS ASSIGNMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA AND THE FEDERAL LAWS OF THE UNITED STATES APPLICABLE THEREIN; PROVIDED, THAT TO THE EXTENT THAT PERFECTION AND PRIORITY OF ANY PROPERTY ASSIGNED HEREUNDER IS GOVERNED BY CANADIAN OR BRITISH COLUMBIA LAW THEN CANADIAN OR BRITISH COLUMBIA LAW SHALL CONTROL.

[Remainder of page intentionally left blank]

6

514071v2 960766.0213

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be duly executed and delivered under seal by their respective officers thereunto duly authorized, to be effective as of August 14, 2009.

"Secured Party"

By: _____
Name:  Daniel Sargeant, as Attorney-in-fact for Harry Sargeant, III

"Assignee"

Comerica Bank

By: _____
Name: Barry W. Shaw
Title: Vice President

The terms of this Assignment are acknowledged and consented to by Debtor:

"Debtor"

Worldspan Marine, Inc.

By: _____
Name:
Title:

7

514071v2 960766.0213

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be duly executed and delivered under seal by their respective officers thereunto duly authorized, to be effective as of August 14, 2009.

"Secured Party"

By: _____
Name:  Daniel Sargeant, as Attorney-in-fact for Harry Sargeant, III

"Assignee"

**Comerica Bank**

By: _____
Name: Barry W. Shaw
Title: Vice President

The terms of this Assignment are acknowledged and consented to by Debtor:

"Debtor"

Worldspan Marine, Inc.

By: _Lee Taubeneck_
Name: LEE TAUBENECK
Title:  PRESIDENT

7

Exhibit A

**Builder's Mortgage**

8

PROTECTED "A" WHEN COMPLETED - PROTÉGÉ « A » LORSQUE REMPLI

| Transport Canada | Transports Canada | | FORM/FORMULAIRE 16 |

**BUILDER'S MORTGAGE**
**HYPOTHÈQUE DE CONSTRUCTEUR**

Entered as Mortgage "A" in the Record Book
Inscrit comme hypothèque « au livre d'inscription
Date (dd-mm-yyyy / jj-mm-aaaa) 14 - D5 - 2008
at / à 10:25 am/p.m.
Registrar - Registraire.

| Record no. - N° d'inscription 3 in 2008 | Temporary name or Hull no. - Nom provisoire ou numéro de coque QX016226C010 | Intended / port of registry - Port d'immatriculation / prévu Not in Canada |

| **A- BUILDER'S MORTGAGE - HYPOTHÈQUE DE CONSTRUCTEUR** | | |
|---|---|---|
| Full legal name(s) and address(es) of registered owner(s)/mortgagor(s) Nom(s) officiel(s) au complet et adresse(s) du(des) propriétaire(s)/débiteur(s) hypothécaire(s) | | Number of shares Nombre de parts |
| WORLDSPAN MARINE INC., 27222 Lougheed Highway, Maple Ridge, BC    V2W 1V9 | | 64 |

**Whereas** (State that there is an account current between mortgagor and mortgagee (describing both), and describe the nature of the transaction so as to show how the amount of principal and interest due at any given time is to be ascertained and the manner and time of payment).
**Considérant que** (Indiquer qu'il existe un compte courant entre le débiteur hypothécaire et le créancier hypothécaire en désignant l'un et l'autre et décrire la nature de l'opération de façon à indiquer comment le montant du principal et des intérêts dus à date fixe, doivent être déterminés, et le mode et la date du paiement):

There is an account current pursuant to that certain Vessel Construction Agreement dated February 29, 2008 among mortgagor and mortgagee which Agreement specifies the obligations hereby secured.

Full legal name(s) and address(es) of mortgagee(s) - Nom(s) officiel(s) au complet et adresse(s) du(des) créancier(s) hypothécaire(s)

HARRY SARGEANT III, 3020 N. Military Trail, Suite 100, Boca Raton, Florida 33431

I/We, the mortgagor(s) in consideration of the above now covenant with the mortgagee(s) to pay to the mortgagee(s) the sums for the time being due on this security, whether by way of principal or interest, at the times and in the manner set out. For the purpose of better securing payment to the mortgagee(s), the mortgagor(s) hereby mortgage to the mortgagee(s) 64 shares (number of shares must be indicated) of which the mortgagor(s) are the owner(s) in the vessel described above, and in its boats and appurtenances. Further, the mortgagor(s) covenant with the mortgagee(s) that the mortgagor(s) have the power to mortgage the shares and that they are free of encumbrances except as appears in the record of the said vessel. (delete if not applicable)

Je/Nous, débiteur(s) hypothécaire(s) en contrepartie, nature de laquelle est décrite ci-dessus, convenons avec le(s) créancier(s) hypothécaire(s) de le/leur payer dès lors les sommes dues sur la présente garantie, soit en principal, soit en intérêts, aux dates et de la manière indiquées. Afin de mieux garantir au(x) créancier(s) hypothécaire(s) le paiement de ces sommes, déclarent hypothéquer au(x) créancier(s) hypothécaire(s) _____ parts (indiquer le nombre de parts) dans le bâtiment susmentionné et appareaux. En outre, le(s) débiteur(s) hypothécaire(s) conviennent avec le(s) créancier(s) hypothécaire(s) que celui-ci(ceux ci) a(ont) le pouvoir d'hypothéquer ces parts et que celles-ci sont libres de charge sauf pour ce qui figure d'après l'inscription dudit bâtiment. (rayer si non applicable)

| Issued at Délivré à | Maple Ridge, B.C.  Place - Endroit | on le | 06 -05-2008  Date (dd-mm-yyyy / jj-mm-aaaa) |

IN THE PRESENCE OF: - EN PRÉSENCE DE :

INDIVIDUAL: - PARTICULIER:

_____
Signature

_____
Name and title (please print) - Nom et titre (en lettres moulées)

_____
Address - Adresse

Signature of registered owner/mortgagor - Signature du propriétaire enregistré/débiteur hypothécaire

Signature of registered owner/mortgagor - Signature du propriétaire enregistré/débiteur hypothécaire

Signature of registered owner/mortgagor - Signature du propriétaire enregistré/débiteur hypothécaire

Signature of registered owner/mortgagor - Signature du propriétaire enregistré/débiteur hypothécaire

CORPORATION OR INDIAN BAND PERSONNE MORALE OU BANDE INDIENNE

Signature of registered owner/mortgagor - Signature du propriétaire enregistré/débiteur hypothécaire
WORLDSPAN MARINE INC.
→ Name of Corporation / Indian Band (please print) - Nom de la personne morale/Bande indienne (en lettres moulées)

Jim Hawkins, Director
Signature
Name and title of person signing above (please print) - Nom et titre de la personne signant ci-dessus (en lettres moulées)

SEAL
SCEAU

84-0067 (0712-05)

Page 1 of/de 3

Canada

| Record no. - N° d'inscription | Temporary name or Hull no. - Nom provisoire ou numéro de coque | Intended / port of registry - Port d'immatriculation / prévu |
|---|---|---|

**B - DISCHARGE OF BUILDER'S MORTGAGE - MAINLEVÉE DE L'HYPOTHÈQUE DE CONSTRUCTEUR**

I/We, the mortgagee(s) authorize the discharge of the mortgage described above
Je/Nous, le(s) créancier(s) hypothécaire(s), autorise(autorisons) la mainlevée de l'hypothèque décrite ci-dessus

Issued at
Délivré à _____                                    on
                                                                              le _____
                          Place - Endroit                                         Date (dd-mm-yyyy / jj-mm-aaaa)

IN THE PRESENCE OF: - EN PRÉSENCE DE :                    INDIVIDUAL: - PARTICULIER:

_____              _____
              Signature                        Signature of mortgagee - Signature du créancier hypothécaire

_____              _____
Name and title (please print) - Nom et titre (en lettres moulées)    Signature of mortgagee - Signature du créancier hypothécaire

Address - Adresse

CORPORATION
OR INDIAN BAND
PERSONNE MORALE  →  _____
OU BANDE INDIENNE    Name of Corporation / Indian Band (please print) - Nom de la personne morale/Bande indienne (en lettres moulées)

                                                                              SEAL
_____                                              SCEAU
              Signature

_____
Name and title of person signing above (please print) - Nom et titre de la personne signant ci-dessus (en lettres moulées)

CORPORATION
OR INDIAN BAND
PERSONNE MORALE  →  _____
OU BANDE INDIENNE    Name of Corporation / Indian Band (please print) - Nom de la personne morale/Bande indienne (en lettres moulées)

                                                                              SEAL
_____                                              SCEAU
              Signature

_____
Name and title of person signing above (please print) - Nom et titre de la personne signant ci-dessus (en lettres moulées)

**NOTES: - REMARQUES :**

1. The expressions "mortgagee" and "mortgager" used in this document include their heirs, successors, assigns, executors, administrators and any other legal representative.
Les termes "débiteur hypothécaire" et "créancier hypothécaire" employés dans le présent acte visent leurs héritiers, successeurs, ayants droit, exécuteurs, administrateurs et tout autre représentant légal.

2. This mortgage must be completed by all of the owner(s). If jointly owned, all the joint owners must act together.
L'hypothèque doit être complétée par tous les propriétaires. Dans le cas d'un intérêt conjoint, tous les propriétaires conjoints doivent agir ensemble.

3. In the case of a corporation, this Mortgage must be made by an officer of the corporation authorized by company resolution or by affixing the seal of the corporation on this form. Dans le cas d'une personne morale, l'hypothèque doit être faite par un agent de la personne morale autorisé par une résolution de celle-ci ou doit porter le sceau de la personne morale.

4. In the case of an Indian Band, this Application must be made by person(s) authorized by Band Council Resolution.
Dans le cas d'une bande indienne, la demande doit être faite par une(des) personne(s) autorisée(s) par une résolution du Conseil de bande.

5. The original builder's mortgage deed must be presented to discharge a builder's mortgage or if not available, by Statutory Declaration.
L'acte hypothécaire original du constructeur ou, si cet acte n'est pas disponible, une déclaration solennelle doit être produite pour la mainlevée de l'hypothèque du constructeur.

Page 2 of/de 3

**Exhibit B**

**Financing Statement**

9

TRUCTED BY BUILDER, TOGETHER WITH ANY AND ALL PRESENT AND FUTURE MATER
IALS, COMPONENTS, ENGINES, BOILERS, MACHINERY, MASTS, BOATS, ANCHORS,
CABLES, CHAINS, RIGGING, TACKLE, APPAREL, FURNITURE, CAPSTANS, OUTFIT,
TOOLS, PUMPS, GEAR, FURNISHINGS, APPLIANCES, FITTINGS, SPARE AND REPL
ACEMENT PARTS FOR SUCH VESSEL AND ANY AND ALL MANUALS, MATERIALS, SUPP
LIES AND COMPONENTS IN ANY WAY RELATED TO THE CONSTRUCTION OF SUCH VES
SEL AND ANY AND ALL OTHER APPURTENANCES THERETO, APPERTAINING OR BELON
GING TO SUCH VESSEL, WHETHER NOW OR HEREAFTER ACQUIRED, AND WHETHER ON
BOARD OR NOT ONBOARD, TOGETHER WITH ANY AND ALL PRESENT AND FUTURE ADD
ITIONS, IMPROVEMENTS AND REPLACEMENTS THEREFOR, MADE IN OR TO SAID VES
SEL, OR ANY PART OR PARTS THEREOF.

---------------- A M E N D M E N T / O T H E R   C H A N G E ----------------

               Reg. #: 989187D            Reg. Date: OCT 19, 2007
                                          Reg. Time: 10:05:00
                                          Control #: B8347024
         Base Reg. Type: PPSA SECURITY AGREEMENT
         Base Reg. #: 931405D      Base Reg. Date: SEP 21, 2007

                                          Continued on Page 15


Search Criteria: WORLDSPAN MARINE INC                    Page: 15


        Details Description:
          ADDITION OF DEBTOR
Block#

        *** ADDED ***
   D0002    Bus. Debtor: WORLDSPAN MARINE INC.
                         27222 LOUGHEED HIGHWAY
                         MAPLE RIDGE BC   V2W 1V9

        Registering
             Party: LINDSAY KENNEY
                    1800 -401 WEST GEORGIA STREET
                    VANCOUVER B.C.   V6B 5A1

*************** P P S A   S E C U R I T Y   A G R E E M E N T ***************

       Reg. Date: MAY 01, 2008         Reg. Length: 5 YEARS
       Reg. Time: 11:29:29             Expiry Date: MAY 01, 2013
       Base Reg. #: 334150E              Control #: B8703229
Block#


  S0001  Secured Party: HARRY SARGEANT III
                        3020 N. MILITARY TRAIL, #100
                        BOCA RATON FL  33431

  *D0001    Base Debtor: WORLDSPAN MARINE INC
            (Business) 27222 LOUGHEED HWY, PO BOX 10
                       MAPLE RIDGE BC  V2W 1V9

       General Collateral:
         A FIBREGLASS COMPOSITE MOTOR YACHT KNOWN AS A CRESCENT CUSTOM 142'
         TRILEVEL MOTOR YACHT CARRYING BUILDER'S HULL NUMBER QEO14226C010
         (THE "VESSEL") BEING CONSTRUCTED BY WORLDSPAN MARINE INC.

("WORLDSPAN") AT OR ABOUT 27222 LOUGHEED HIGHWAY, MAPLE RIDGE,
BRITISH COLUMBIA, AND ALL ITEMS IDENTIFIED FOR USE IN THE
CONSTRUCTION OF THE VESSEL UNDER THE TERMS OF THAT VESSEL
CONSTRUCTION AGREEMENT DATED FEBRUARY 29, 2008 MADE BETWEEN
WORLDSPAN AS BUILDER AND HARRY SARGEANT III AS OWNER, WHETHER SUCH
ITEMS ARE NOW EXISTING OR HEREAFTER ACQUIRED, INCLUDING, WITHOUT
LIMITATION:

A.  ALL PARTS, MATERIAL, EQUIPMENT, INVENTORY AND OTHER GOODS (THE
"COMPONENTS") CREATED, MANUFACTURED, ORDERED OR DELIVERED FOR
PLACEMENT ON OR INCORPORATION INTO THE VESSEL OR WHICH ARE
OTHERWISE IDENTIFIED FOR USE IN CONNECTION WITH CONSTRUCTION OF THE
VESSEL OR IN THE VESSEL CONSTRUCTION AGREEMENT;
B.  ALL ACCOUNTS, CHATTEL PAPER, DOCUMENTS, INSTRUMENTS,
PROMISSORY NOTES, INVESTMENT PROPERTY, LETTERS OF CREDIT,
COMMERCIAL TORT CLAIMS OR GENERAL INTANGIBLES IN RESPECT OF THE
VESSEL OR THE VESSEL CONSTRUCTION AGREEMENT;
C.  THE RIGHTS OF WORLDSPAN TO ANY PLANS, SPECIFICATIONS, SHOP
DRAWINGS, COMPUTER PRINTOUTS, DIAGRAMS, MODELS AND ELECTRONIC
DATA OR OTHERWISE RELATED TO OR FOR THE USE IN THE DESIGN OR
CONSTRUCTION OF THE VESSEL OR IN RESPECT OF THE VESSEL;
D.  THE RIGHTS OF WORLDSPAN TO ANY SOFTWARE, INCLUDING OPERATING

Continued on Page 16

PROGRAMS, APPLICATIONS AND ELECTRONIC DATA AND FILES FOR USE IN THE
DESIGN OR CONSTRUCTION OF THE VESSEL OR IN RESPECT OF THE VESSEL
INCLUDING ALL RIGHTS AND LICENSES OF WORLDSPAN TO USE SUCH
SOFTWARE; AND
E.  ALL PROCEEDS, INCLUDING, WITHOUT LIMITATION, ANY INSURANCE
CLAIMS OR PROCEEDS, IN RESPECT OF ANY OF THE FOREGOING.
FOR THE PURPOSES OF PARAGRAPH A ABOVE EACH OF THE COMPONENTS
SHALL BE CONSIDERED AS BEING IDENTIFIED TO THE VESSEL OR TO THE VESSEL
CONSTRUCTION AGREEMENT, DEPENDING ON THE NATURE OF SUCH
COMPONENT, AS FOLLOWS:
1.  WHEN IT BEGINS TO BE MANUFACTURED IN ACCORDANCE WITH
THE PLANS AND SPECIFICATIONS, IF IT IS SPECIFICALLY MANUFACTURED BY
WORLDSPAN,
2.  WHEN IT IS REMOVED FROM INVENTORY, IF IT IS TAKEN FROM THE
GENERAL INVENTORY OF WORLDSPAN,
3.  WHEN IT IS DELIVERED TO WORLDSPAN FOR THE VESSEL, IF IT IS
ORDERED SPECIFICALLY FOR THE VESSEL AND PART OF THE SUPPLIER'S
INVENTORY;
4.  WHEN IT IS IDENTIFIED BY THE MANUFACTURER, IF IT IS ORDERED
SPECIFICALLY FOR THE VESSEL; OR
5.  WHEN IT IS INCORPORATED INTO, ATTACHED, OR PLACED ON THE
VESSEL, IF IT IS ANYTHING OTHER THAN THE ITEMS SET FORTH ABOVE IN
CLAUSES (1), (2), (3) OR (4).
TERMS USED HEREIN THAT ARE DEFINED IN THE PERSONAL PROPERTY SECURITY
ACT (BRITISH COLUMBIA), THE REGULATIONS MADE THEREUNDER OR ANY
AMENDMENTS MADE THERETO HAVE THOSE DEFINED MEANINGS.

Registering

Party: LANG MICHENER LLP
        BOX 11117,1500 1055 W. GEORGIA
        VANCOUVER BC   V6E 4N7

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Some, but not all, tax liens and other Crown claims are registered at the
Personal Property Registry (PPR) and if registered, will be displayed on
this search result.  HOWEVER, it is possible that a particular chattel is
subject to a Crown claim that is not registered at the PPR.  Please consult
the Miscellaneous Registrations Act, 1992 for more details.  If you are
concerned that a particular chattel may be subject to a Crown claim not
registered at the PPR, please consult the agency administering the type
of Crown claim.

>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>> END OF SEARCH <<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<

# EXHIBIT 4

# CONSTRUCTION LOAN AGREEMENT

between

**HARRY SARGEANT, III** and **DANIEL SARGEANT**,
collectively, as the Borrower,

and

**COMERICA BANK**,
as the Lender

Dated as of August 14, 2009

This is Exhibit "C" referred to in the affidavit
of Cynthia B. Jones sworn before me at
Miller, Canfield, Paddock and Stone, P.L.C.
this 7th day of October, 2011

*Judith Ann Sutton*

**JUDITH ANN SUTTON**
**NOTARY PUBLIC - STATE OF MICHIGAN**
**COUNTY OF WAYNE**
**My Commission Expires Mar. 29, 2014**
ACTING IN THE COUNTY OF WAYNE

1

# CONSTRUCTION LOAN AGREEMENT

**THIS CONSTRUCTION LOAN AGREEMENT** (this "Agreement") is executed and entered into as of August 14, 2009, by and between **COMERICA BANK** (the "Lender"), and **HARRY SARGEANT, III,** and **DANIEL SARGEANT** (collectively, the "Borrower"). Each capitalized term used herein and not otherwise defined shall have the meaning ascribed thereto in Article 1 hereof.

## W I T N E S S E T H :

**WHEREAS,** Borrower has requested that Lender provide Borrower with a loan for the purpose of constructing an 142 foot motor yacht being constructed by Worldspan Marine, Inc. and identified as Builder's hull no QEO14226C010 ;

**WHEREAS**, Lender has agreed to provide such loan on the terms and conditions set forth in this Agreement;

**NOW, THEREFORE,** for mutual and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree with each other as follows:

## ARTICLE 1

## DEFINITIONS

**Section 1.1     Defined Terms.** The following terms when used in this Agreement, including its preamble and recitals, shall, except where the context otherwise requires, have the following meanings (such meanings to be equally applicable to the singular and plural forms thereof):

*"Advances"* shall mean monies advanced on behalf of the Borrower under the Construction Loan  in accordance with the terms of Section 2.1 of this Agreement.

*"Agreement"* shall mean this Loan Agreement, as the same may be amended and supplemented from time to time.

*"Applicable Law"* shall mean, in respect of any Person, all provisions of constitutions, statutes, treaties, rules, regulations, guidelines, directives and orders of Governmental Authorities applicable to such Person, and all orders and decrees of all courts and arbitrators in proceedings or actions to which the Person in question is a party or by which it or any of its property is bound.

*"Assignment of Insurances"* means that certain Assignment of Insurances (Construction Period) of even date herewith executed and delivered by Borrower, as assignor, in favor of Lender, as assignee, regarding the Borrower's assignment of Borrower's rights in insurance on the Vessel maintained by Builder.

*"Assignment of Builder's Mortgage Agreement"* means that certain Assignment of Builder's Mortgage of even date herewith executed and delivered by Borrower, as assignor, in favor of Lender, as assignee, regarding the  Borrower's assignment of Borrower's mortgage lien and security interest in the Vessel.

*"Assignment of Vessel Construction Agreement"* means that certain Assignment of Vessel Construction Agreement of even date herewith executed and delivered by Borrower, as

I

assignor, in favor of Lender, as assignee, regarding Borrower's assignment to Lender of Borrower's rights under the Vessel Construction Agreement.

*"Borrower"* shall mean Harry Sargeant, III, and Daniel Sargeant, and their permitted successors and assigns.

*"Builder"* shall mean Worldspan Marine, Inc., a British Columbia corporation.

*"Builder's Mortgage"* shall mean that certain Builder's Mortgage, executed by Builder dated May 6, 2008, and filed with Transport Canada on 10:25 am May 14, 2008 and assigned Record No. 3 in 2008, evidencing a first priority mortgage lien on hull no CEO14226C010.

*"Business Day"* shall mean a day on which banks are not authorized or required to be closed in Fort Lauderdale, Florida.

*"Closing Check List"* shall mean the check list attached hereto as Exhibit A.

*"Collateral"* shall mean all personal property and other collateral from time to time assigned, mortgaged or pledged by the Borrower or any other Person to the Lender as security for the Loan.

*"Commitment"* shall mean Nine Million Four Hundred Thousand Dollars ($9,400,000).

*"Commitment Letter"* shall mean that certain letter addressed to Harry Sargeant and Daniel Sargeant, from Barry W. Shaw on behalf of Comerica Bank, dated August 6, 2009.

*"Construction Advances"* shall have the meaning assigned in Section 2.1.

*"Delivery Date"* shall mean the date title to the Vessel is delivered to Borrower by Builder, which shall occur not later than May 1, 2010 unless such date is extended in writing by Lender.

*"Demand"* shall mean Lender has made a demand for payment in full as permitted under the terms of the Note.

*"Dollars," "U.S. $," "$" and "U.S. Dollars"* shall mean the lawful currency of the United States of America.

*"Event of Default"* shall mean a Demand has been made by Lender and the Obligations of Borrower to Lender have not been satisfied within three (3) Business Days.

*"Governmental Authority"* shall mean any nation or government, any state or other political subdivision thereof, any municipality, any court and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

*"Guarantors"* shall mean any Person executing and delivering a Guaranty in connection with this Agreement.

*"Guaranty"* shall mean that certain Guaranty of even date herewith executed and delivered by each of the Guarantors in favor of Lender, and all amendments, replacements, modifications or restatements thereof.

2

104

*"Indebtedness"* shall mean, with respect, to any Person, (a) all items, except items of shareholders and partners equity or capital stock or surplus, which in accordance with generally accepted accounting principles would be included in determining total liabilities as shown on the liability side of a balance sheet of such Person, and (b) to the extent not otherwise included, all Capitalized Lease Obligations of such Person.

*"Indebtedness for Money Borrowed"* shall mean, with respect to any Person, all money borrowed and Indebtedness represented by notes payable and drafts accepted representing extensions of credit, all obligations evidenced by agreements, bonds, debentures, notes or other similar instruments (including, without duplication, reimbursement obligations in respect of letters of credit issued in connection with other Indebtedness), all Indebtedness upon which interest charges are customarily paid, and all Indebtedness issued or assumed as full or partial payment for property or services, whether or not any such notes, drafts, obligations or Indebtedness represent Indebtedness for money borrowed.  For purposes of this definition, interest which is accrued but not paid on the original due date or within any applicable cure or grace period as provided by the underlying contract for such interest shall be deemed Indebtedness for Money Borrowed.

*"Lender"* shall mean Comerica Bank, any Person to which all or a portion of any Loan is assigned or participated in accordance with Section 9.3 hereof and their permitted successors and assigns.

*"Lender's Office"* shall mean the office of the Lender located at 100 N.E. 3rd Avenue, Suite 100, Fort Lauderdale, FL 33301,  or such other office or offices as may be designated pursuant to the provisions of Section 9.1 hereof.

*"Loan"* shall mean aggregate amount advanced by the Lender to the Borrower under the Note.

*"Loan Documents"* shall mean, without limitation, this Agreement, the Note, the Assignment of Vessel Construction Agreement, the Builder's Mortgage, the Assignment of Builder's Mortgage & Security Agreement, the Assignment of Insurances, any Guaranty, the Builder's Consent, the Commitment Letter, all legal opinions of counsel to the Borrower in connection herewith, and all other documents, instruments, certificates and agreements executed or delivered in connection with or contemplated by any of such instruments.

*"Material"* and *"Materially"* shall mean, with respect to any Person, material to the ability of such Person to perform its obligations under the Loan Documents.

*"Material Adverse Effect"* shall mean, with respect to any Person, any material adverse effect upon the business, assets, liabilities, financial condition, results of operations or business prospects of such Person, or the ability of such Person to own and operate its properties or to perform its obligations, such that such Person is not able to pay or perform all of its legal obligations owed to other Persons.

*"Obligations"* shall mean (i) all payment and performance obligations of the Borrower and all other third Persons under any Loan Document to or for the benefit of the Lender, (ii) all obligations under any swap agreements (as defined in 11 U.S.C. § 101) between Borrower and Lender, or its affiliates, whenever executed, and (iii) the obligation to pay an amount equal to the amount of any and all damage (other than lost profits) which the Lender may suffer by reason of a breach by the Borrower or any other Persons of any obligation, covenant or undertaking with respect to any Loan Document not otherwise included in clause (i).

3

513985v2 960766.0213

**"Person"** shall mean an individual, corporation, partnership, limited liability company, trust or unincorporated organization or a government, or any agency or political subdivision thereof.

**"Pre-Closing Change Orders"** shall mean the change orders which have been agreed to by Builder and Borrower (change order, no.'s 001-009, 011, 012) and outstanding change orders which are under consideration (change orders no. 010 and 013) and which were disclosed to Lender by Borrower on or before closing.

**"Progress Payment"** shall mean the monthly payments due Seller as described in Section 4.3 of the Vessel Construction Agreement.

**"Promissory Note" or "Note"** shall mean that certain promissory note of even date herewith executed and delivered by Borrower, as maker, in favor of Lender, as payee, in the original principal amount of $9,400,000.00.

**"Tax"** shall mean any tax, duty, levy, impost, assessment or other governmental charge imposed by any Governmental Authority.

**"Vessel"** shall mean the motor yacht described as Builder's hull number QEO14226C010 to be constructed pursuant to the terms of the Vessel Construction Agreement.

**"Vessel Construction Agreement"** shall mean that certain Vessel Construction Agreement dated February 29, 2008, between Builder and Borrower regarding the construction and purchase of the Vessel.

**"written" or "in writing"** shall mean any form of written communication, including written communication by telecopier or telex.

**Section 1.2     Interpretation.** Each definition of an agreement in this Article 1 shall include such agreement as modified, amended, restated or supplemented from time to time by the Lender and the Borrower, and except where the context otherwise requires, the singular shall include the plural and vice versa.  Except where otherwise specifically restricted, reference to a party to this Agreement or any Loan Document includes that party and its successors and assigns.  All terms used herein which are defined in Article 9 of the Uniform Commercial Code in effect in the State of Florida on the date hereof and which are not otherwise defined herein shall have the meanings as set forth therein.

**Section 1.3     Cross References.** Unless otherwise specified, references in this Agreement and in each other Loan Document to the term "hereof" or "herein" or to any Article or Section are references to this Agreement or such other Loan Documents or such Article or Section of this Agreement or such other Loan Document, as the case may be.  Unless otherwise specified, references in any Article, Section or definition to the term "hereof" or "herein" or to any clause are references to this Agreement or such other Loan Document, as the case may be, or to such clause of such Article, Section or definition.

4

# ARTICLE 2

## LOANS

**Section 2.1    Loan.**  Contemporaneously with the execution of this Agreement, Borrower shall execute and deliver to Lender the Promissory Note.  Lender agrees to make Advances ("Construction Advances") to Borrower for the purpose of funding Progress Payments under the Vessel Construction Agreement and paying closing costs associated with this Loan; provided that such Advances shall not exceed the Commitment. In the event that the outstanding  Loan at any time exceeds the Commitment, Borrower shall immediately repay theLoan in the amount of such excess.  Construction Advances shall be funded upon satisfaction of the conditions precedent set forth in Sections 2.6 (All Advances) and 2.7 (Individual Advances) of this Agreement.  In addition, upon completion of the Vessel and delivery of the Vessel by Builder to Borrower, the continuation of the Loan shall be subject to satisfaction of the conditions precedent in Section 2.8 of this Loan Agreement.  At Lender's discretion, Lender may fund construction Advances directly to Builder. Principal and interest on the Loan shall be repaid as described in the Note.  On the Delivery Date, Lender's obligation to fund Advances hereunder shall terminate, unless extended in writing by Lender.  Additionally, upon the Maturity Date set forth in the Note all outstanding principal, interest and any other amounts due Lender hereunder shall bedue and payable.

**Section 2.2    Payment of Interest and Principal.**  The Loan shall be evidenced by, and shall be repayable in accordance with the terms and provisions set forth in theNote.  The Lender may open and maintain on its books in the name of the Borrower a loan receivable with respect to the Loan and any other amounts due the Lender under the Loan Documents and interest thereon. The Lender may debit the loan receivable for the principal amount of each Advance made by it under the terms of this Agreement and accrued interest thereon, and may credit such loan receivable for each payment on receivable of principal of or interest on the Loans or other amounts due under the Loan Documents and accrued interest thereon.  The records of the Lender with respect to the loan receivable maintained by it shall be presumed to be correct evidence of the Loans and other amounts due such Lender under the Loan Documents.

**Section 2.3    Withholding; Setoff.**  All payments of principal, interest and any other sums due under this Agreement and any other Loan Document shall be made in the amounts required without reduction, setoff or counterclaim by the Borrower, notwithstanding the assertion of any right of recoupment or setoff or of any counterclaim by the Borrower, and without any deduction or withholding by the Borrower for or onaccount of any present or future Taxes.

**Section 2.4    Application of Payments.**  Monies received by Lender from any source for application toward payment of the Obligations shall be applied to accrued interest and then to principal.  If a Default occurs, monies may be applied to the Obligations in any manner or order deemed appropriate by Lender.  If any payment received by Lender under this Note or other Loan Documents is rescinded, avoided or for any reason returned by Lender because of any adverse claim or threatened action, the returned payment shall remain payable as an obligation of all persons liable under this Note or other Loan Documents as though such payment had not been made.

**Section 2.5    Security for the Loan.**  The Loan shall be secured by a first priority security interest in the Vessel and related collateral through execution and delivery of the following Loan Documents at closing: (i) Assignment of Builder's Mortgage & Security Agreement, (ii) Assignment of Insurances, and (iii) Assignment of Vessel Construction Agreement.  In addition, the guarantors described in Section 25.1 of the Vessel Construction Agreement shall execute and deliver an

5

acknowledgement and consent in a form satisfactory to Lender allowing Lender to rely on and enforce such guaranty in accordance with the terms thereof if an Event of Default shall occur hereunder.

**Section 2.6     Conditions Precedent to Funding the Initial Construction Advances** . The Lender's obligation to fund the initial Construction Advance is subject to the following conditions precedent described below:

      (a)     The Borrower's execution and delivery of all of the Loan Documents to which Borrower is a party and satisfaction of the conditions to funding the initial Advance set forth in Lender's Closing Check List delivered to Borrower.

      (b)     Borrower shall deliver the Vessel Construction Agreement to Lender for its review and approval.

      (c)     Payment in full to the Lender at closing of the Commitment Fee described in Section 2.8 below, and payment of all of the Lender's costs and expenses, including without limitation, payment of the Lender's legal fees and costs.

      (d)     All representations and warranties of Borrower in this Agreement shall be true and correct in all material respects.

      (e)     No Event of Default shall have occurred or be continuing, nor any material default which with the passage of time will constitute an Event of Default.

**Section 2.7     Conditions Precedent to Funding of Construction Advances.** In addition to meeting the conditions precedent in Section 2.6, Borrower shall satisfy the following conditions for each Construction Advance before Lender is obligated to fund a Construction Advance:

      (a)     With respect to payments to Builder, Borrower shall deliver to Lender: (i) a written Claim Certificate (as defined in the Vessel Construction Agreement) and any other form of payment request submitted to Borrower from Builder, and (ii) a written advance request from Borrower to Lender indicating the amount of the proposed Advance, each with sufficient detail to justify the request and such other supporting documentation as may be required by Lender.

      (b)     Prior to each Advance, the Vessel shall be inspected by a reputable marine surveyor or marine engineer (the "Marine Surveyor") selected by Borrower and approved by Lender, such approval to not be unreasonably withheld or delayed.  The Marine Surveyor shall deliver a written survey report to Lender, which confirms that as of the date of such survey, the Builder is entitled to all Progress Payments and other payments made by Borrower, or otherwise due to Builder under the terms of the Vessel Construction Agreement.

      (c)     Borrower shall request Advances not more often that once per month.

**Section 2.8     Fees.**  Borrower shall pay to Lender a commitment fee equal to $12,500.00 which is due on the date of this Agreement.  The commitment fee is fully earned when paid and is non-refundable.

**ARTICLE 3**

**GENERAL REPRESENTATIONS
AND COVENANTS**

The Borrower hereby makes the following representations and warranties as of the date hereof and further makes the following covenants and agreements throughout the term hereof and so long as any Obligation remains outstanding:

**Section 3.1    Organization; Good Standing.**  Each Borrower is an individual residing in the State of Florida and has the legal capacity to execute and deliver the Loan documents to which he is a party.

**Section 3.2    Authorization and Enforceability.**  Borrower, has duly executed and delivered this Agreement and the Loan Documents, and this Agreement and the Loan Documents are, and will be and remain, valid, binding and enforceable against the Borrower in accordance with their terms.

**Section 3.3    Consents and Approvals.**  The Borrower has obtained, and will obtain and maintain, each and every consent, approval, authorization, permit, license, or similar action, and has effected, and will effect or maintain, any filing or registration or similar action, required by any Governmental Authority or other Person or necessary in connection with the ownership of his properties or the conduct of his businesses, including, without limitation, in connection with the execution, delivery and performance of this Agreement and the Loan Documents, and the consummation of the transactions contemplated hereby and thereby and is not in violation, and will not cause or permit any violation of any of the foregoing or of any valid rights of other Persons in any of the foregoing.

**Section 3.4    Legal Compliance.**  Borrower has complied, and will comply, in all material respects with all Applicable Laws, including, without limitation, maritime and shipping laws, and other laws, in connection with the ownership of its properties, including, without limitation, in connection with the execution, delivery and performance of this Agreement and the Loan Documents, the consummation of the transaction contemplated hereby and thereby.

**Section 3.5    Payment and Performance.**  The Borrower has paid and performed, and will pay and perform, each and every payment and performance obligation of any Applicable Law, regulation, judgment decree or order of any Governmental Authority, and of any material indenture, agreement or other instrument to which the Borrower is, or becomes, a party or by which its properties are, or become, bound, including, without limitation, the payment and performance of each and every Obligation in connection with this Agreement and the Loan Documents, the consummation of the transaction contemplated hereby.

**Section 3.6    No Event of Default.**  The Borrower is not in breach or default, and will not cause or permit the breach or default, and the execution, delivery and performance of this Agreement and the Loan Documents, the consummation of the transactions contemplated hereby will not result in the breach or default, and no event has occurred or failed to occur which has not been remedied or waived, the occurrence or non-occurrence of which constitutes, or with the passage of time or giving of notice or both would constitute, any breach or default, of any Applicable Law, regulation, judgment decree or order of any Governmental Authority, or of any material

7

indenture, agreement or other instrument to which the Borrower is, or becomes, a party or by which its properties are, or become, bound.

**Section 3.7    Taxes.**  If required to file by applicable law, the Borrower has filed, and will file, all United States Federal income tax returns and all other tax returns by their respective due dates, including extensions, and the Borrower has paid, and will pay, all taxes due with respect to the Borrower pursuant to such returns or pursuant to any assessment received by the Borrower, except any such taxes or charges which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with generally accepted accounting principles have been set aside by the Borrower on its books.  The charges, accruals and reserves on the books of the Borrower in respect of taxes or other governmental charges are, and will be and remain, adequate.  The Borrower has paid, and will pay all taxes, fees and other charges in connection with the execution, delivery, recording, filing and registration of the Loan Documents as the same respectively become due or provisions for such payment have been, or will be, made to the satisfaction of the Lender in its sole discretion.

**Section 3.8    Solvency.**  The Borrower is solvent on the agreement date as such term is defined under the Federal Bankruptcy Act as amended, and the Borrower's performance of its obligations hereunder shall not be deemed a fraudulent transfer within the meaning of the Bankruptcy Act or the Florida Fraudulent Transfer Act.

**Section 3.9.    Financial Covenants.**  Borrower agrees to comply with the following covenants:

**(a)  Minimum Debt Service Coverage Ratio.**  Borrower shall collectively, at all times, maintain a Debt Service Coverage Ratio of not less than 1.40 to 1.00. "Debt Service Coverage Ratio" shall mean the sum of Borrower's net cash flow, divided by the current interest and other amounts due on the Note. This covenant shall be tested quarterly.

**(b) Liquidity Covenant.**  Borrower shall collectively, at all times, maintain Liquid Assets of not less than $2,000,000. "Liquid Assets" shall mean the sum of all cash, time deposits and marketable securities. This covenant shall be tested quarterly.

8

# ARTICLE 4

## CONSTRUCTION RELATED
## REPRESENTATIONS AND COVENANTS

The Borrower hereby makes the following representations and warranties as of the date hereof and further makes the following covenants and agreements throughout the term hereof and so long as any Obligation remains outstanding:

**Section 4.1    Plans and Specifications.**    One complete set of final plans and specifications certified by Builder of the Vessel shall be submitted to and approved by Lender prior to closing.    Any material change orders evidencing deviations from the approved plans and specifications set forth in the Vessel Construction Agreement must be approved in advance by Lender in writing.    Additionally, if the aggregate cost of all change orders or deviations to the plans and specifications as evidenced by the original Vessel Construction Agreement exceeds $1,000,000, no further change orders or deviations shall be made without Lender's prior written consent which shall not be unreasonably withheld

**Section 4.2    Insurance.**

(a)    Before any advances will be made under the Loan, Borrower shall furnish to Lender:

(i)    a Builder's Risk insurance policy or Certificate of Insurance covering the Vessel throughout construction until delivery to Borrower, naming Lender as a loss payee and/or additional insured, as Lender may require, containing a loss payable clause satisfactory to Lender and an agreement to notify Lender in writing at least thirty (30) days prior to any cancellation or reduction in coverage of such policy, covering such hazards, in such amounts, in such form, and issued by such company as shall have been approved by Lender in writing.    The policy shall include, or Borrower shall procure a separate policy providing, breach of warranty or mortgagee's interest coverage that will protect Lender notwithstanding failure of Borrower or Builder to comply with the terms of the builder's risk policy.

(ii)    A certificate from an insurance company satisfactory to Lender indicating that Borrower and Builder are covered by public liability and worker's compensation insurance to the satisfaction of Lender.

In the event any insurance required to be in force hereunder is provided for in an umbrella policy covering Borrower, then Borrower shall furnish a certificate of insurance confirming the applicable insurance coverage hereunder, plus a copy of the umbrella insurance policy.

(b)    In the event the Loan has not been repaid in full by the time coverage will terminate under the Builder's Risk policy, Borrower shall immediately procure and pay for an "All Risks" marine insurance policy containing a loss payable clause satisfactory to Lender, and an agreement to notify Lender in writing at least thirty (30) days prior to any cancellation or reduction in coverage of such policy, covering such hazards, in such amounts, in such form, and issued by such company as shall have been approved by Lender in writing.    The policy shall include, or Borrower shall procure a separate policy providing Breach of Warranty or Mortgagee's Interest coverage that

9

will protect Lender notwithstanding the failure of Borrower or any other party to comply with the terms of the policy. The original of said policy shall be delivered to Lender prior to the termination of coverage under the Builder's Risk policy. The "All Risk" marine insurance policy shall meet the additional requirements set forth in the Mortgage.

**Section 4.3    Equity Requirement.** In order to assure Lender that Borrower has sufficient funds available to pay all additional costs that may be incurred in the construction of the Vessel, Borrower will be required to supply additional funds over and above the amount of the Loan proceeds in an amount equal to any difference between the maximum principal amount of the Loan and the final total cost (including, without limitation, all extras and change orders and a sufficient reserve for funding of interest) to be incurred in connection with the construction of the Vessel. As a condition of each advance, if requested by Lender, Borrower shall prove to Lender's satisfaction that sufficient funds are available to complete the Vessel according to the approved plans and specifications, including any extras or change orders. In no event shall the outstanding Advances exceed 65% of the projected fair market value of the Vessel on an as completed basis per the Lender's valuation report, or 50% of the actual cost of the Vessel per the terms of the Vessel Construction Agreement.

**Section 4.4    Inspections.** As referenced above in Section 2.7(b), the Vessel is to be inspected by a marine surveyor prior to final delivery and acceptance of the Vessel. The Marine Surveyor shall provide to Lender satisfactory evidence (including such written reports, photographs or certificates as Lender may require) that the stage of construction entitles Builder to a particular Progress Payment and other payments made by Borrower to Builder through final delivery and that Builder has completed the Vessel in compliance with the standards required under the Vessel Construction Agreement. The appointment of the Marine Surveyor by Lender shall not be deemed to place any duty or responsibility upon Lender to inspect the Vessel or any obligation or liability upon Lender regarding the quality of construction or the absence of defects in the Vessel. Any surveys or other information obtained pursuant to this Agreement are obtained solely for the benefit of Lender, and may not be relied upon by Borrower.

**Section 4.5    Restriction on Secondary Financing and Sale of Vessel:** It is the intent of Lender that Borrower's rights under this Agreement and the Loan shall be personal since Lender has evaluated this Loan and has agreed to make this Loan based on the unique qualifications of Borrower, both financial and otherwise, successfully to complete the project. So long as this Agreement or any part of the Loan is outstanding, the Vessel shall remain free and clear of all encumbrances, liens, mortgages, or security interests, except those in favor of Lender and Borrower as set forth herein, and any liens or security interests created or granted by Builder that are in all respects inferior and subordinate to those in favor of Lender and Borrower. Borrower shall not, without the prior written consent of Lender, sell, donate, give, mortgage, encumber or otherwise transfer or convey all or any part of its interest in the Vessel. The occurrence of any of the foregoing prohibited events shall, at the option of Lender, constitute grounds for terminating this Agreement and for accelerating any and all sums unpaid under the Loan.

10

**ARTICLE 5**

**INFORMATION REPRESENTATIONS
AND COVENANTS**

The Borrower hereby makes the following representations and warranties as of the date hereof and further makes the following covenants and agreements throughout the term hereof and so long as any Obligation remains outstanding:

**Section 5.1    Financial Information.**    Borrower shall deliver the following financial information to Lender:

(a)  **Personal Financial Statements.**  Each Borrower who is an individual shall deliver to Lender annually, within thirteen months of the previous statement date on file with Lender, Borrower's financial statement.  Said financial statement shall disclose all of Borrower's assets, liabilities, net worth, income and contingent liabilities, all in reasonable detail and acceptable to Lender and submitted on a form to be provided by Lender or on such other form acceptable to Lender, signed by Borrower and certified by Borrower to Lender to be true, correct and complete.

(b)  **Tax Returns.**  Borrower shall deliver to Lender, within 30 days of filing, complete copies of federal and state tax returns, as applicable, together with all schedules thereto, including, without limitation, K-1 statements for all Partnerships and Sub Chapter S Corporations, each of which shall be signed and certified by Borrower to be true and complete copies of such returns.  In the event an extension is filed, Borrower shall deliver a copy of the extension within 30 days of filing.

(c)  **Liquidity Statements.**  Borrower shall provide to the Lender annual liquidity statements showing current individual values for cash, time deposits, listed stocks and other immediately marketable securities.  Liquidity statements shall consist of Lender statements, brokerage statements and other documentation acceptable to Lender.

**Section 5.2    Litigation Notices.**  There is no action, suit, proceeding, investigation or inquiry affecting or instituted, pending or threatened against, the Borrower or any property or business of the Borrower.  The Borrower shall give to the Lender prompt written notice of the following events as to which the Borrower has received notice or otherwise become aware:

(a)       the commencement of all proceedings and investigations by or before any governmental body and all actions and proceedings in any court or before any arbitrator against or, to the extent known to the Borrower, in any other way relating adversely and directly to the Borrower, or any of its properties, assets or businesses (i) in which the recovery sought is in excess of $10,000 unless the claim is covered by insurance from a third party insurer (other than an Affiliate) and such insurer has affirmatively agreed that such claim is covered by such insurance (to the extent the loss exceeds deductible amounts, which deductible amounts shall not exceed $10,000 per occurrence); (ii) which, in the case of proceedings in any court or before any arbitrator, if adversely determined, could have a Material Adverse Effect; (iii) which, in the case of proceedings by or before any governmental body which in the reasonable judgment of the Borrower may be determined adversely to the Borrower, and if so determined could have a Material Adverse Effect, or (iv) which calls into question the validity of this Agreement or any other Loan Document;

11

        (b)    any occurrence of an event which has a Material Adverse Effect on the Borrower;

        (c)    any Default; any default by the Borrower under any material agreement (other than this Agreement) to which the Borrower is party or by which any of its properties is bound, including, without limitation, or the occurrence of any event which has a Material Adverse Effect on the Borrower, giving in each case the details thereof and specifying the action proposed to be taken with respect thereto; and

        (d)    any material decrease in the amounts of insurance coverage maintained by the Borrower or Builder from that existing as of the date hereof.

    **Section 5.3    Additional Information.**  The Borrower shall furnish to the Lender, within five (5) Business Days of any request therefor, such additional information as the Lender may reasonably request.

    **Section 5.4    Accuracy and Completeness of Information.**  All information, reports, prospectuses, notices and other papers and data relating to the Borrower and furnished by or on behalf of the Borrower to the Lender were, and will be, at the time furnished, complete and correct in all material respects.  None of such information, reports, prospectuses, notices and other papers and data contains, or will contain, any material misstatement of fact or omits, or will omit, to state a material fact or any fact necessary to make the statements contained therein not materially misleading.

# ARTICLE 6

## NEGATIVE REPRESENTATIONS
## AND COVENANTS

The Borrower hereby makes the following representations and warranties as of the date hereof and further makes the following covenants and agreements throughout the term hereof and so long as any Obligation remains outstanding:

**Section 6.1    Amendment and Waiver.** The Borrower has not entered into, and shall not cause or permit, any amendment of, or, agree to or accept or consent to any waiver of any of the provisions of the Vessel Construction Agreement.

**Section 6.2    No Additional Indebtedness.** Other than the Loan evidenced hereby, the Borrower is not, and shall not create, incur, assume, cause or permit itself to become, directly obligated for any Indebtedness for Money Borrowed without the Lender's prior written consent.

**Section 6.3    No Liens.** The Borrower is not, and shall not create, incur, assume, cause or permit himself to become, directly or contingently obligated upon any mortgage, deed of trust, lien, security interest, hypothecation, assignment, deposit arrangement or other preferential arrangement, charge or other encumbrance (including, without limitation, any conditional sale or title retention agreement or finance lease) of any nature upon or with respect to the Vessel, whether now owned or hereafter acquired, other than the liens created in favor of Lender under the Loan Documents and a second priority lien in favor of Builder and Builder's floor plan lender during the construction of the Vessel.  The Borrower has not, and shall not file any UCC financing statement which names as debtor the Borrower or any security agreement other than a Loan Document permitting any secured party thereunder to file such financing statement.

**Section 6.4    Material Adverse Effect.** There has not occurred since the end of the most recent fiscal year of the Borrower, and the Borrower shall not cause or permit to exist or occur, any event, fact or situation which has had or could reasonably be expected to have a Material Adverse Effect.

13

## ARTICLE 7

### DEMAND; REMEDIES

**Section 7.1    Demand .** As described in the Note, the Obligations are immediately due and payable on demand by Lender.

**Section 7.2    Remedies.** If a demand for immediate payment in full is made by Lender

(a)    All principal and interest on the Loan and the Note and all other amounts owed under this Agreement or the Note shall thereupon and concurrently therewith become due and payable, and the Commitment shall forthwith terminate, all without any action by the Lender, or the holders of the Note, or any of them, and without presentment, demand, protest or other notice of any kind, all of which are expressly waived, anything in this Agreement or in the Note to the contrary notwithstanding.

(b)    The Lender may exercise all of the post-default rights granted to it under the Loan Documents or under Applicable Law.

(c)    The rights and remedies of the Lender hereunder shall be cumulative and not exclusive.

## ARTICLE 8

### MISCELLANEOUS

**Section 8.1    Notices.**

(a)    All notices and other communications under this Agreement shall be in writing and shall be deemed to have been given (i) three (3) Business Days after deposit in the mail, designated as certified mail, return receipt requested, postage-prepaid; or (ii) one (1) Business Day after being entrusted to a reputable commercial overnight delivery service for overnight delivery; or (iii) one (1) Business Day after delivery via facsimile provided such notice is confirmed by a notice described in (i) or (ii) above. All notices and other communications under this Agreement shall be given to the parties hereto at the following addresses:

(iii)    If to the Borrower, to him at:

Harry Sargeant, III
Daniel Sargeant
3020 North Military Trail, Suite 100
Boca Raton, FL 33431

14

with a copy to:

Alley, Maass, Rogers & Lindsay, P.A.
340 Royal Poinciana Way, Suite 321
P.O. Box 431
Palm Beach, FL  33480-0431
Attn:  Robb R. Maass, Esq.

    (ii)     If to the Lender, to it at:

Comerica Bank
100 N.E. 3rd Avenue, Suite 100,
Fort Lauderdale, FL 33301
Attn: Barry W. Shaw, Vice President

with a copy to:

Tripp Scott, P.A.
110 S.E. 6th Street, 15th Floor
Fort Lauderdale, FL 33301
Attention:  Gregory A. McLaughlin, Esq.

Copies shall be provided to persons other than parties hereto only in the case of notices under Article 8 hereof.  Failure to provide copies of notices given hereunder to parties which are not parties to this Agreement shall not effect the validity of a notice which is otherwise properly given.

(b)     Any party hereto may change the address to which notices shall be directed under this Section 8.1 by giving ten (10) days written notice of such change to the other party.

**Section 8.2     Expenses.**  The Borrower agrees promptly to pay:

(a)     consistent with the Commitment Letter or as otherwise agreed to by Borrower, all reasonable out-of-pocket expenses of the Lender in connection with the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents, and the transactions contemplated hereby and thereby, which in each case shall include out-of-pocket expenses and fees of counsel to (which shall include any in-house counsel), and experts, agents and consultants of, the Lender, including, without limitation, all such costs, expenses and fees on trial, on appeal or in bankruptcy or other proceedings.

(b)     all reasonable out-of-pocket costs and expenses incurred by Lender to third party vendors directly relating to the administration of the transactions contemplated in this Agreement or the Loan Documents, including any assignments of the Loans, the consideration, preparation, negotiation, execution and delivery of any proposed waiver, amendment or consent by the Lender relating to this Agreement or the other Loan Documents, all actions and activities relating to the Collateral, the creation, perfection or protection of any liens, and the protection, collection, enforcement and obtaining performance of this Agreement and the Loan Documents, which in each case shall include reasonable out-of-pocket expenses and fees of counsel to (which shall include any in-house counsel), and experts, agents and consultants of, the Lender, including, without limitation, all such costs, expenses and fees on trial, on appeal or in bankruptcy or other proceedings.

15

(c)     all reasonable out-of-pocket costs and expenses in connection with any Default, any enforcement of this Agreement or the Loan Documents, any restructuring, refinancing or "work out" of the transactions contemplated by this Agreement or the Loan Documents or any insolvency proceeding, and of obtaining performance under this Agreement or the Loan Documents, and all out-of-pocket costs and expenses of collection if any default is made in the payment of the Note, including, without limitation, all out-of-pocket expenses in connection with sale or disposition of any collateral for the Obligations, which in each case shall include out-of-pocket expenses and fees of counsel to (which shall include any in-house counsel), and experts, agents and consultants of, the Lender, including, without limitation, all such costs, expenses and fees on trial, on appeal or in bankruptcy or other proceedings.

(d)     all transfer, stamp, documentary, excise, property, registration, recordation and other similar taxes, assessments and charges levied by or payable to any Governmental Authority in respect of this Agreement, any Loan Document, any collateral for any obligations or any document referred to in this Agreement or any other Loan Document.

**Section 8.3     Assignment.**

(a)     *By the Borrower.* The Borrower may not assign or transfer any of its rights or obligations hereunder or under the Note or under any Loan Document without the prior written consent of the Lender in its sole discretion.

(b)     *By the Lender.*  The Lender may, at any time, issue participations in, and/or sell, assign, transfer or otherwise dispose of, its rights and obligations under this Agreement, the Note and the Loan Documents.  The Borrower agrees to reasonably assist Lender in Lender's efforts to assign or issue participations in this transaction if requested by the Lender.

**Section 8.4     Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument.

**Section 8.5     Governing Law.**  This Note shall be governed by and construed in accordance with the internal laws of the State of Florida, including all matters of construction, validity and performance.

**Section 8.6     Severability.**  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdction.

**Section 8.7     Headings.** Headings used in this Agreement are for convenience only and shall not be used in connection with the construction or interpretation of any provision hereof.

**Section 8.8     Entire Agreement.**  Except as otherwise expressly provided herein, this Agreement, together with each of the Loan Documents, embody the entire agreement and understanding among the parties hereto and thereto and supersede all prior agreements, understandings, and conversations relating to the subject matter hereof and thereof.  The Borrower represents and warrants to the Lender that it has read the provisions of this Section and discussed the provisions of this Section and the rest of this Agreement and the Loan Documents with counsel for the Borrower, and the Borrower acknowledges and agrees that the Lender is expressly relying

16

upon such representations and warranties of the Borrower (as well as the other representations and warranties of the Borrower set forth in this Agreement and the Loan Documents) in entering into this Agreement and the Loan Documents.

**Section 8.9    Amendment and Waiver.** Neither this Agreement nor any Loan Documents, nor any term hereof or thereof may be amended orally, nor may any provision hereof or thereof be waived orally but only by an instrument in writing signed by the Lender and, in the case of an amendment, by the Borrower.

**Section 8.10    Other Relationships.** No relationship created under this Agreement or under any Loan Document shall in any way affect the ability of the Lender to enter into or maintain business relationships with the Borrower and its Affiliates beyond the relationships expressly contemplated by this Agreement and the Loan Documents.

**Section 8.11    Interpretation.** Should any provision of this Agreement or a Loan Document require a judicial interpretation, it is agreed that the judicial body interpreting or construing this Agreement or such Loan Document shall not apply the assumption that the terms of this Agreement or such Loan Document shall be more strictly construed against one party by reason of the rule of legal construction that an instrument is to be construed more strictly against the party which itself or through its agents prepared the agreement.  The Lender and the Borrower acknowledge and agree that they and their attorneys and agents have each participated equally in the negotiation and preparation of this Agreement and the Loan Documents.

**Section 8.12    Survival.** All representations and warranties made under this Agreement or any Loan Document and all statements, certifications and other information provided in or pursuant to this Agreement or any Loan Document shall be deemed to be made, and shall be true and correct, throughout the term hereof and so long as any Obligation remains outstanding, except to the extent previously fulfilled in accordance with the terms hereof and except to the extent that by their respective terms such representations and warranties relate solely to a prior date.   All representations and warranties made under this Agreement shall survive six (6) months after the satisfaction of all obligations of Borrower to Lender, and shall not be waived by, the execution hereof by the Lender, any investigation or inquiry by the Lender.

**Section 8.13    Time of the Essence.** Time is of the essence as to the Loan Documents.

513985v2 960766.0213

## ARTICLE 9

### WAIVER OF JURY TRIAL

**Section 91    WAIVER OF JURY TRIAL. WAIVER OF JURY TRIAL.** TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF BORROWER BY EXECUTION HEREOF AND LENDER BY ACCEPTANCE HEREOF, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS LOAN AGREEMENT, THE LOAN DOCUMENTS OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION WITH THIS LOAN AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO.  THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO ACCEPT THIS LOAN AGREEMENT. EACH OF THE PARTIES AGREES THAT THE TERMS HEREOF SHALL SUPERSEDE AND REPLACE ANY PRIOR AGREEMENT RELATED TO ARBITRATION OF DISPUTES BETWEEN THE PARTIES CONTAINED IN ANY LOAN DOCUMENT OR ANY OTHER DOCUMENT OR AGREEMENT HERETOFORE EXECUTED IN CONNECTION WITH, RELATED TO OR BEING REPLACED, SUPPLEMENTED, EXTENDED OR MODIFIED BY, THIS LOAN AGREEMENT.

[Remainder of page intentionally blank]

18

513985v2 960766 0213

*120*

**IN WITNESS WHEREOF**, the parties hereto have executed this Construction Loan Agreement or caused it to be executed under seal by their duly authorized representatives, all as of the day and year first above written.

**"Lender"**

**COMERICA BANK**

By: _____
Name: Barry W. Shaw
Title:    Vice President

**"Borrower"**

By: _____
Name: Daniel Sargeant, as attorney-in-fact for
Harry Sargeant, III

By: _____
Name: Daniel Sargeant

19

## ASSIGNMENT OF SECURITY AGREEMENT & MORTGAGE

**THIS ASSIGNMENT OF SECURITY AGREEMENT & MORTGAGE** (this "Assignment") made as of August 14, 2009, by **HARRY SARGEANT, III** (hereinafter the "Secured Party") in favor of **COMERICA BANK** (hereinafter the "Assignee").

## W I T N E S S E T H :

A.   A. Worldspan Marine, Inc. ("Builder") and Mortgagee are parties to that certain Yacht Construction Agreement dated February 29, 2008 under the terms of which Builder is constructing a 142 foot motor yacht identified in such agreement as Builder's hull no QEO14226C010

B.   As security for Builder's obligations to Mortgagee, under the terms of the Vessel Construction Agreement Builder granted to Mortgagee (1) a first priority ship mortgage lien on the Vessel, as evidenced by that certain Builder's Mortgage executed by Builder in favor of Mortgagee and filed with Transport Canada and entered in the record book on May 14, 2008, as Mortgage "A" and assigned record no. 3 in 2008, a copy of which is attached hereto as "<u>Exhibit A</u>" (the "Mortgage"), and (2) a security interest in the collateral described in that certain Financing Statement .filed in the British Columbia Personal Property Registry on May 1, 2008 and designated base registration no. 334150E, a copy of which is attached hereto as "<u>Exhibit B</u>". (the "Financing Statement"). The security interest created by the Vessel Construction Agreement and perfected by the Financing Statement is referred to herein as the "Personal Property Collateral".

C.   Assignee will extend credit to Secured Party under the terms of that certain promissory note (the "Note") of even date herewith in the original principal amount of Nine Million Four Hundred Thousand ($9,400,000) subject to among other things, Secured Party assigning to Assignee its rights under the Security Agreement to secure Secured Party's obligations to Assignee under the Note.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Secured Party hereby covenants and agrees in favor of the Assignee as follows:

## ARTICLE I

Section 1.01.  **Assignment of Rights by Secured Party.**  Secured Party hereby assigns, transfers, delivers, pledges, mortgages, charges, grants and conveys to Assignee all of the Secured Party's right, title and interest in and to the Mortgage and the Personal Property Collateral, and grants a continuing security interest in, and acknowledges and agrees that Assignee has and shall continue to have a continuing security interest in, (a) all right, title, interest and claim of the Secured Party, but none of the obligations, in, to and under the Mortgage and Personal Property Collateral, and (b) all proceeds of any and all of the foregoing (all of the foregoing rights, interests, properties, privileges described in clauses (a) and (b) above assigned and in which a security interest is granted pursuant hereto being hereinafter collectively called the "Collateral").

Section 1.02.  **Payments.**  The Secured Party hereby authorizes any party at any time holding any funds due the Secured Party under the terms of the Mortgage or the Vessel Construction Agreement and constituting part of the Collateral to pay all such sums due and to become due under the terms of the Mortgage or the Vessel Construction Agreement or in respect of or on account of the Collateral directly to the Assignee to the extent of the Assignee's interest therein, and agrees that such deliveries and payments to the Assignee as

**JUDITH ANN SUTTON**
**NOTARY PUBLIC - STATE OF MICHIGAN**
514071v2 960766.0215    **COUNTY OF WAYNE**
**My Commission Expires Mar. 29, 2014**
*ACTING IN THE COUNTY OF WAYNE*

1    This is Exhibit "D" referred to in the affidavit of Cynthia B. Jones sworn before me at Miller, Canfield, Paddock and Stone, P.L.C. this 7th day of October, 2011

*Judith Ann Sutton*



aforesaid shall be a good receipt and acquittance to the Secured Party to the extent so made. All amounts received by the Assignee shall be applied in accordance with the Vessel Construction Agreement

Section 1.03. **Power of Attorney.** The Secured Party does hereby irrevocably constitute and appoint the Assignee its true and lawful attorney with full power of substitution for it and in its name, place and stead, to ask, demand, collect, receive, receipt for, sue for, compound and give acquittance for any and all Collateral including, without limitation, the power to execute and endorse for transfer for and on behalf of the Secured Party any documents relating to the Vessel Construction Agreement or the Vessel referenced therein and any and all sums which may be or become due or payable to the Secured Party under the Vessel Construction Agreement or in respect of or on account of the Collateral with full power to settle, adjust or compromise any claim under the Vessel Construction Agreement and such sums as fully as the Secured Party could itself do and, in its discretion, to file any claim or take any other action or proceeding, either in its own name or in the name of the Secured Party, or otherwise, which the Assignee may deem necessary or appropriate to collect any and all sums which may be or become due or payable to the Secured Party under the Vessel Construction Agreement or in respect of or on account of the Collateral, or which may be necessary or appropriate to protect and preserve or enforce the right, title and interest of the Assignee in and to the Collateral and the security intended to be afforded hereby. The Secured Party hereby further covenants that it will, upon request of the Assignee, execute and deliver such further instruments and do and perform such other acts and things as the Assignee may deem necessary or desirable to more effectually vest in and secure the Assignee in the Collateral, including without limitation the Vessel and sums due or hereafter to become due under the Vessel Construction Agreement.

Section 1.04. **Performance by Secured Party.** Secured Party further agrees promptly to perform all of its obligations under the Vessel Construction Agreement. In the event the Debtor fails to pay or perform any obligation arising under the Vessel Construction Agreement or this Assignment, Secured Party shall immediately notify Assignee in writing.

Section 1.05. **Acknowledgment of Assignment.** Secured Party agrees to cause Debtor to execute the acknowledgment of this Assignment which is included at the end of this Assignment.

Section 1.06. **Vessel Construction Agreement.** Secured Party agrees, and Debtor by executing the acknowledgment of this Assignment agrees, to the following: (i) upon receipt of a written notice that an Event of Default under the Vessel Construction Agreement has occurred, that all rights of the Secured Party under the Vessel Construction Agreement may only be exercised by the Assignee, and (ii) Secured Party shall provide the Assignee with copies of all notices to the Debtor regarding any default or alleged default by the Debtor under such agreements.

## ARTICLE II

### REPRESENTATIONS, WARRANTIES, AND COVENANTS

Section 2.01. **Representations and Warranties.** The Secured Party represents and warrants to Assignee as follows:

(a)     A true, correct and complete copy of the Mortgage is attached hereto as Exhibit A. A true, correct and complete copy of the Financing Statement is attached hereto as Exhibit B.

(b)     As to the Debtor and the Secured Party, the Vessel Construction Agreement and Mortgage are valid, enforceable and in full force and effect.

2

(c)     The Secured Party is the sole holder of the rights and interests ascribed thereto under the Vessel Construction Agreement, the Mortgage and the Financing Statement, and has full power and authority to assign, transfer and set over the same and to grant to and confer upon the Assignee the rights, interests, powers and authorities herein granted and conferred.

(d)     The right of the Secured Party to enforce the Vessel Construction Agreement and Mortgage and the assignment and security interest conveyed hereunder are, and will continue to be, free and clear of all defenses, set-offs, counterclaims, Liens and encumbrances of every kind and nature.

(e)     The Secured Party has observed and performed all covenants and obligations under the Vessel Construction Agreement and Mortgage required to be performed by the Secured Party, and the Secured Party shall observe and perform all of the covenants under the Vessel Construction Agreement and Mortgage required of the Secured Party, it being understood that the Assignee shall not be required or obligated in any manner to perform any of the covenants or obligations of the Secured Party under the Vessel Construction Agreement and Mortgage by reason of this Assignment or otherwise.

(f)     The Secured Party has no knowledge of any facts which impair the validity of the Vessel Construction Agreement or the Mortgage

(g)     The Secured Party will not create any lien or other encumbrance upon the Vessel Construction Agreement, the Vessel or the Personal Property Collateral or the right to payment thereunder, other than in favor of the Assignee.

(h)     Except as consented to in writing by Assignee, the Secured Party will not modify, waive or amend or consent to any modification, waiver or amendment of the Vessel Construction Agreement or the Mortgage in any manner.

(i)     Secured Party has the right to sell, assign, transfer, set over and encumber the Mortgage and the Personal Property Collateral to the Assignee and to grant to and confer upon the Assignee the rights, interests, powers and authorities herein granted and conferred.

(j)     Any and all actions, approvals and consents required by law or by any agreement to which the Secured Party is a party have been obtained in connection with the Secured Party's execution and performance of this Assignment; the Secured Party is under no legal disability affecting the enforceability of this Assignment.

(k)     This Assignment has been duly executed and delivered by the Secured Party and is a legal, valid and binding obligation of the Secured Party, enforceable in accordance with its terms, subject, as to enforcement of remedies, to the qualification that an order of specific performance and an injunction are discretionary remedies and, in particular, may not be available where damages are considered an adequate remedy at law.

3

# ARTICLE III

## DEFAULT

Section 3.01. **Events of Default.** An "Event of Default" shall exist under this Assignment upon the occurrence of any Event of Default (as defined therein) under the Vessel Construction Agreement.

Section 3.02. **Remedies.** Without limiting any rights, remedies or privileges that the Assignee may have under the terms of any instrument or agreement applicable to or related to the Obligations (as defined in the Vessel Construction Agreement), it is understood and agreed that upon the occurrence of an Event of Default, the Assignee, in addition to any other rights or remedies it may have, shall have the right to exercise all the rights, options and remedies of a secured party upon default as provided for under applicable law. Any requirement under applicable law for reasonable notice shall be satisfied if such notice is mailed, postage prepaid, to the Secured Party at its address as shown on the records of the Assignee at least five (5) days before the time of the sale, disposition or other event or thing giving rise to the required notice. The expenses of collecting the sums due or to become due to the Secured Party in, under and pursuant to the Vessel Construction Agreement or in respect of or on account of the Collateral, including without limitation court costs and attorneys' fees incurred in realizing upon the security interest granted hereby or in enforcing this security interest, shall constitute so much additional Obligations which the Secured Party promises to pay to the Assignee upon demand, and may be deducted from the sums so collected.

Without limiting any rights, remedies or privileges that the Assignee may have under the terms of the Construction Agreement, it is understood and agreed that upon the occurrence of any Event of Default hereunder the Assignee may exercise all rights of the Secured Party under the Vessel Construction Agreement.

Section 3.03. **Waiver.** The satisfaction or discharge of any part of the Obligations shall not in any way satisfy or discharge this Assignment, but this Assignment shall remain in full force and effect so long as any amount remains unpaid on any such Obligations or the Assignee is committed to extend credit to or for the account of the Secured Party.

Section 3.04. **Application of Proceeds.** The proceeds of any sale or remedy hereunder, or any part thereof, shall be paid and applied as provided in the Vessel Construction Agreement.

Section 3.05. **Indemnification.** This Assignment shall not operate to place any responsibility or obligation whatsoever upon the Assignee. Neither the Assignee nor its respective employees, representatives, agents, officers and directors, shall assume any liability as a result of this Assignment. The Secured Party agrees to protect, indemnify and save harmless the Assignee and its employees, representatives, agents, officers and directors from and against all losses, liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses including, without limitation, legal fees and expenses (except as may arise from the gross negligence or willful misconduct of the Person seeking indemnification) imposed upon, suffered or incurred by the Assignee, or any of its respective employees, representatives, agents, officers and directors, by reason of this Assignment and any claim or demand whatsoever which may be asserted against the Assignee, or any of its employees, representatives, agents, officers and directors, by reason of any alleged obligation or undertaking to be performed or discharged by the Assignee, under this Assignment. In the event the Assignee, or any of its respective employees, representatives, officers and directors, incur any liability, loss or damage by reason of this Assignment or in curing any default or breach by the Secured Party of its obligations under this Assignment or in the defense of any claims or demands arising out of or in connection with this Assignment, the amount of such liability, loss or damage shall be added to the Obligations and shall be payable upon demand.

4

## ARTICLE IV

## MISCELLANEOUS

Section 4.01. **Notices.** Unless specifically indicated otherwise herein, all notices and other communications provided for hereunder shall be in writing and addressed as provided in the Vessel Construction Agreement

Section 4.02. **Severability.** Any provision of this Assignment which is prohibited, unenforceable or not authorized in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition, unenforceability or nonauthorization without invalidating the remaining provisions hereof or affecting the validity, enforceability or legality of such provision in any other jurisdiction.

Section 4.03. **Headings.** Section headings in this Assignment are included herein for convenience of reference only and shall not have any effect for purposes of interpretation or construction of the terms of this Assignment.

Section 4.04. **Successors and Assigns.** This Assignment shall inure to the benefit of and be binding upon the Secured Party and the Assignee and their respective heirs, executors, legal representatives, successors and assigns. Whenever a reference is made in this Assignment to "the Secured Party" or the "Assignee" such reference shall be deemed to include a reference to the heirs, executors, legal representatives, successors and assigns of the Secured Party and the Assignee, as the case may be.

Section 4.05. **Amendments.** The Secured Party agrees that it will not agree to any amendment or modification to or termination of the Vessel Construction Agreement or sell or assign any of its interests therein or waive compliance by Debtor with any of the material terms and conditions thereof, without in each case first securing the prior written consent of the Assignee. Upon notice to Debtor from Assignee that an Event of Default has occurred, Debtor agrees to send to the Assignee copies of all notices and communications with respect to the Vessel Construction Agreement which are required to be sent to the Secured Party pursuant to the Vessel Construction Agreement. If the Vessel Construction Agreement is revoked or otherwise loses full force and effect, the Secured Party will give written notice thereof to the Assignee within five (5) days after the Secured Party knows or has reason to know thereof.

Section 4.06. **Cumulative Remedies.** The remedies herein provided shall be in addition to and not in substitution of the rights and remedies vested in the Assignee in any of the Loan Documents or in law or equity, all of which rights and remedies are specifically reserved by the Assignee. The remedies herein provided or otherwise available to the Assignee shall be cumulative and may be exercised concurrently. The failure to exercise any of the remedies herein provided shall not constitute a waiver thereof, nor shall use of any of the remedies herein provided prevent the subsequent or concurrent resort to any other remedy or remedies. It is intended that this clause shall be broadly construed so that all remedies herein provided or otherwise available to the Assignee shall continue and be each and all available to the Assignee until the Obligations shall have been paid in full.

Section 4.07. **Liability of the Secured Party.** The Secured Party, by its execution hereof, acknowledges and agrees that it is and remains liable for the performance of any and all of its obligations under the Vessel Construction Agreement to the same extent as though this Assignment had not been made and further acknowledges that this Assignment constitutes an assignment of the rights of the Secured Party pursuant to said Agreement and not an assignment of any duties or obligations of the Secured Party with

5

respect to the Vessel Construction Agreement, it being understood that the Assignee shall not be in any manner responsible for the performance of any of such duties and obligations.

Section 4.08. **Integration.** This Assignment shall supersede any prior agreement or understanding between the parties (other than the Loan Documents) as to the subject matter hereof.

Section 4.09. **Counterparts.** This Assignment may be executed in any number of counterparts, each of which shall be deemed to be an original and shall be binding upon both parties, their successors and assigns.

Section 4.10. **GOVERNING LAW.** THIS ASSIGNMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA AND THE FEDERAL LAWS OF THE UNITED STATES APPLICABLE THEREIN; PROVIDED, THAT TO THE EXTENT THAT PERFECTION AND PRIORITY OF ANY PROPERTY ASSIGNED HEREUNDER IS GOVERNED BY CANADIAN OR BRITISH COLUMBIA LAW THEN CANADIAN OR BRITISH COLUMBIA LAW SHALL CONTROL.

[Remainder of page intentionally left blank]

6

   **IN WITNESS WHEREOF,** the parties hereto have caused this Assignment to be duly executed and delivered under seal by their respective officers thereunto duly authorized, to be effective as of August 14, 2009.

                                          "Secured Party"

                                          By: _____
                                          Name:  Daniel Sargeant, as Attorney-in-fact for
                                          Harry Sargeant, III

                                          "Assignee"

                                          Comerica Bank

                                          By: _____
                                          Name: Barry W. Shaw
                                          Title: Vice President

The terms of this Assignment are acknowledged and consented to by Debtor:

**"Debtor"**

Worldspan Marine, Inc.

   By: _____
   Name:
   Title:

514071v2 960766.0213

**IN WITNESS WHEREOF**, the parties hereto have caused this Assignment to be duly executed and delivered under seal by their respective officers thereunto duly authorized, to be effective as of August 14, 2009.

**"Secured Party"**

By: _____
Name:  Daniel Sargeant, as Attorney-in-fact for Harry Sargeant, III

**"Assignee"**

**Comerica Bank**

By: _____
Name: Barry W. Shaw
Title: Vice President

The terms of this Assignment are acknowledged and consented to by Debtor:

**"Debtor"**

Worldspan Marine, Inc.

By: *Lee Taubeneck*
Name: LEE TAUBENECK
Title: PRESIDENT

7

*129*

**Exhibit A**

**Builder's Mortgage**

514071 v2 960766.0213

130

PROTECTED "A" WHEN COMPLETED - PROTÉGÉ « A » LORSQUE REMPLI   FORM/FORMULAIRE 16

Transport Transports
Canada Canada

**BUILDER'S MORTGAGE**
**HYPOTHÈQUE DE CONSTRUCTEUR**

Entered as Mortgage "A" in the Record Book
Inscrit comme hypothèque « A » au livre d'inscription

Date (dd-mm-yyyy / jj-mm-aaaa)   **14~05-2008**

at / à   **10:25**   a.m./p.m.

Registrar - Registraire.

| Record no. - N° d'inscription | Temporary name or Hull no. - Nom provisoire ou numéro de coque | Intended / port of registry - Port d'immatriculation / prévu |
|---|---|---|
| **3 in 2008** | **QE014226C010** | **Not in Canada** |

**A - BUILDER'S MORTGAGE - HYPOTHÈQUE DE CONSTRUCTEUR**

| Full legal name(s) and address(es) of registered owner(s)/mortgagor(s)<br>Nom(s) officiel(s) au complet et adresse(s) du(des) propriétaire(s)/débiteur(s) hypothécaire(s) | Number of shares<br>Nombre de parts |
|---|---|
| **WORLDSPAN MARINE INC., 27222 Lougheed Highway, Maple Ridge, BC   V2W 1V9** | **64** |

**Whereas** (State that there is an account current between mortgagor and mortgagee (describing both), and describe the nature of the transaction so as to show how the amount of principal and interest due at any given time is to be ascertained and the manner and time of payment).
**Considérant que** (Indiquer qu'il existe un compte courant entre le débiteur hypothécaire et le créancier hypothécaire en désignant l'un et l'autre et décrire la nature de l'opération de façon à indiquer comment le montant du principal et des intérêts dus à date fixe, doivent être déterminés, et le mode et la date du paiement).

**There is an account current pursuant to that certain Vessel Construction Agreement dated February 29, 2008 among mortgagor and mortgagee which Agreement specifies the obligations hereby secured.**

Full legal name(s) and address(es) of mortgagee(s) - Nom(s) officiel(s) au complet et adresse(s) du(es) créancier(s) hypothécaire(s)
**HARRY SARGEANT III, 3020 N. Military Trail, Suite 100, Boca Raton, Florida 33431**

I/We, the mortgagor(s) in consideration of the above now covenant with the mortgagee(s) to pay to the mortgagee(s) the sums for the time being due on this security, whether by way of principal or interest, at the times and in the manner set out. For the purpose of better securing payment to the mortgagee(s), the mortgagor(s) hereby mortgage to the mortgagee(s)   **64**   shares (number of shares must be indicated) of which the mortgagor(s) are the owner(s) in the vessel described above, and in its boats and appurtenances. Further, the mortgagor(s) covenant with the mortgagee(s) that the mortgagor(s) have the power to mortgage the shares and that they are free of encumbrances except as appears in the record of the said vessel. (delete if not applicable)

Je/Nous, débiteur(s) hypothécaire(s) en contrepartie, nature de laquelle est décrite ci-dessus, convenons avec le(s) créancier(s) hypothécaire(s) de lui/leur payer dès lors les sommes dues sur la présente garantie, soit en principal, soit en intérêts, aux dates et de la manière indiquées. Afin de mieux garantir au(x) créancier(s) hypothécaire(s) le paiement de ces sommes, déclarons hypothéquer au(x) créancier(s) hypothécaire(s)   parts (indiquer le nombre de parts) dans le bâtiment susmentionné et apparaux. En outre, le(s) débiteur(s) hypothécaire(s) conviennent avec le(s) créancier(s) hypothécaire(s) que celui-ci(ceux ci) a(ont) le pouvoir d'hypothéquer ces parts et que celles-ci sont libres de charge sauf pour ce qui figure d'après l'inscription dudit bâtiment. (rayer si non applicable)

| Issued at<br>Délivré à   **Maple Ridge, B.C.**<br>Place - Endroit | on<br>le   **06 -05- 2008**<br>Date (dd-mm-yyyy / jj-mm-aaaa) |
|---|---|

IN THE PESENCE OF: - EN PRÉSENCE DE :

INDIVIDUAL: - PARTICULIER:

_____
Signature

_____
Signature of registered owner/mortgagor - Signature du propriétaire enregistré/débiteur hypothécaire

_____
Name and title (please print) - Nom et titre (en lettres moulées)

_____
Signature of registered owner/mortgagor - Signature du propriétaire enregistré/débiteur hypothécaire

_____
Signature of registered owner/mortgagor - Signature du propriétaire enregistré/débiteur hypothécaire

_____
Address - Adresse

_____
Signature of registered owner/mortgagor - Signature du propriétaire enregistré/débiteur hypothécaire

CORPORATION OR
INDIAN BAND
PERSONNE MORALE
OU BANDE INDIENNE

**WORLDSPAN MARINE INC.**
Name of Corporation / Indian Band (please print) - Nom de la personne morale/Bande indienne (en lettres moulées)

_____
Signature

**Jim Hawkins, Director**
Name and title of person signing above (please print) - Nom et titre de la personne signant ci-dessus (en lettres moulées)

SEAL
SCEAU

84-0067 (0712-08)

Page 1 of/de 3

Canada

| Record no. - N° d'inscription | Temporary name or Hull no. - Nom provisoire ou numéro de coque | Intended / port of registry - Port d'immatriculation / prévu |

**B - DISCHARGE OF BUILDER'S MORTGAGE - MAINLEVÉE DE L'HYPOTHÈQUE DE CONSTRUCTEUR**

I/We, the mortgagee(s) authorize the discharge of the mortgage described above
Je/Nous, le(s) créancier(s) hypothécaire(s), autorise(autorisons) la mainlevée de l'hypothèque décrite ci-dessus

Issued at
Délivré à _____     on le _____

Place - Endroit                                                        Date (dd-mm-yyyy / jj-mm-aaaa)

IN THE PRESENCE OF: - EN PRÉSENCE DE :                   INDIVIDUAL: - PARTICULIER:

_____                          _____
Signature                                                          Signature of mortgagee - Signature du créancier hypothécaire

_____                          _____
Name and title (please print) - Nom et titre (en lettres moulées)      Signature of mortgagee - Signature du créancier hypothécaire

_____
Address - Adresse

CORPORATION
OR INDIAN BAND
PERSONNE MORALE  →  _____
OU BANDE INDIENNE        Name of Corporation / Indian Band (please print) - Nom de la personne morale/Bande indienne (en lettres moulées)

SEAL
SCEAU

_____
Signature

_____
Name and title of person signing above (please print) - Nom et titre de la personne signant ci-dessus (en lettres moulées)

CORPORATION
OR INDIAN BAND
PERSONNE MORALE  →  _____
OU BANDE INDIENNE        Name of Corporation / Indian Band (please print) - Nom de la personne morale/Bande indienne (en lettres moulées)

SEAL
SCEAU

_____
Signature

_____
Name and title of person signing above (please print) - Nom et titre de la personne signant ci-dessus (en lettres moulées)

**NOTES: - REMARQUES :**

1. The expressions "mortgagee" and "mortgagor" used in this document include their heirs, successors, assigns, executors, administrators and any other legal representative.
   Les termes "débiteur hypothécaire" et "créancier hypothécaire" employés dans le présent acte visent leurs héritiers, successeurs, ayants droit, exécuteurs, administrateurs et tout autre représentant légal.

2. This mortgage must be completed by all of the owner(s). If jointly owned, all the joint owners must act together.
   L'hypothèque doit être complétée par tous les propriétaires. Dans le cas d'un intérêt conjoint, tous les propriétaires conjoints doivent agir ensemble.

3. In the case of a corporation, this Mortgage must be made by an officer of the corporation authorized by company resolution or by affixing the seal of the corporation on this form. Dans le cas d'une personne morale, l'hypothèque doit être faite par un agent de la personne morale autorisé par une résolution de celle-ci ou doit porter le sceau de la personne morale.

4. In the case of an Indian Band, this Application must be made by person(s) authorized by Band Council Resolution.
   Dans le cas d'une bande indienne, la demande doit être faite par une(des) personne(s) autorisée(s) par une résolution du Conseil de bande.

5. The original builder's mortgage deed must be presented to discharge a builder's mortgage or if not available, by Statutory Declaration.
   L'acte hypothécaire original du constructeur ou, si cet acte n'est pas disponible, une déclaration solennelle doit être produite pour la mainlevée de l'hypothèque du constructeur.

**Exhibit B**

**Financing Statement**

9

TRUCTED BY BUILDER, TOGETHER WITH ANY AND ALL PRESENT AND FUTURE MATER
IALS, COMPONENTS, ENGINES, BOILERS, MACHINERY, MASTS, BOATS, ANCHORS,
CABLES, CHAINS, RIGGING, TACKLE, APPAREL, FURNITURE, CAPSTANS, OUTFIT,
TOOLS, PUMPS, GEAR, FURNISHINGS, APPLIANCES, FITTINGS, SPARE AND REPL
ACEMENT PARTS FOR SUCH VESSEL AND ANY AND ALL MANUALS, MATERIALS, SUPP
LIES AND COMPONENTS IN ANY WAY RELATED TO THE CONSTRUCTION OF SUCH VES
SEL AND ANY AND ALL OTHER APPURTENANCES THERETO, APPERTAINING OR BELON
GING TO SUCH VESSEL, WHETHER NOW OR HEREAFTER ACQUIRED, AND WHETHER ON
BOARD OR NOT ONBOARD, TOGETHER WITH ANY AND ALL PRESENT AND FUTURE ADD
ITIONS, IMPROVEMENTS AND REPLACEMENTS THEREFOR, MADE IN OR TO SAID VES
SEL, OR ANY PART OR PARTS THEREOF.

--------------- A M E N D M E N T / O T H E R  C H A N G E ---------------

Reg. #: 989187D          Reg. Date: OCT 19, 2007
                         Reg. Time: 10:05:00
                         Control #: B8347024
Base Reg. Type: PPSA SECURITY AGREEMENT
Base Reg. #: 931405D      Base Reg. Date: SEP 21, 2007

Continued on Page 15

Search Criteria: WORLDSPAN MARINE INC                    Page: 15

         Details Description:
          ADDITION OF DEBTOR
Block#

       *** ADDED ***
D0002    Bus. Debtor: WORLDSPAN MARINE INC.
                      27222 LOUGHEED HIGHWAY
                      MAPLE RIDGE BC  V2W 1V9

         Registering
           Party: LINDSAY KENNEY
                  1800 -401 WEST GEORGIA STREET
                  VANCOUVER B.C.  V6B 5A1

*************** P P S A   S E C U R I T Y   A G R E E M E N T ***************

         Reg. Date: MAY 01, 2008        Reg. Length: 5 YEARS
         Reg. Time: 11:29:29            Expiry Date: MAY 01, 2013
         Base Reg. #: 334150E           Control #: B8703229
Block#

S0001  Secured Party: HARRY SARGEANT III
                      3020 N. MILITARY TRAIL, #100
                      BOCA RATON FL  33431

=D0001   Base Debtor: WORLDSPAN MARINE INC
         (Business) 27222 LOUGHEED HWY, PO BOX 10
                    MAPLE RIDGE BC  V2W 1V9

       General Collateral:
       A FIBREGLASS COMPOSITE MOTOR YACHT KNOWN AS A CRESCENT CUSTOM 142'
       TRILEVEL MOTOR YACHT CARRYING BUILDER'S HULL NUMBER QEO14226C010
       (THE "VESSEL") BEING CONSTRUCTED BY WORLDSPAN MARINE INC.

134

("WORLDSPAN") AT OR ABOUT 27222 LOUGHEED HIGHWAY, MAPLE RIDGE, BRITISH COLUMBIA, AND ALL ITEMS IDENTIFIED FOR USE IN THE CONSTRUCTION OF THE VESSEL UNDER THE TERMS OF THAT VESSEL CONSTRUCTION AGREEMENT DATED FEBRUARY 29, 2008 MADE BETWEEN WORLDSPAN AS BUILDER AND HARRY SARGEANT III AS OWNER, WHETHER SUCH ITEMS ARE NOW EXISTING OR HEREAFTER ACQUIRED, INCLUDING, WITHOUT LIMITATION:

A.   ALL PARTS, MATERIAL, EQUIPMENT, INVENTORY AND OTHER GOODS (THE "COMPONENTS") CREATED, MANUFACTURED, ORDERED OR DELIVERED FOR PLACEMENT ON OR INCORPORATION INTO THE VESSEL OR WHICH ARE OTHERWISE IDENTIFIED FOR USE IN CONNECTION WITH CONSTRUCTION OF THE VESSEL OR IN THE VESSEL CONSTRUCTION AGREEMENT;
B.   ALL ACCOUNTS, CHATTEL PAPER, DOCUMENTS, INSTRUMENTS, PROMISSORY NOTES, INVESTMENT PROPERTY, LETTERS OF CREDIT, COMMERCIAL TORT CLAIMS OR GENERAL INTANGIBLES IN RESPECT OF THE VESSEL OR THE VESSEL CONSTRUCTION AGREEMENT;
C.   THE RIGHTS OF WORLDSPAN TO ANY PLANS, SPECIFICATIONS, SHOP DRAWINGS, COMPUTER PRINTOUTS, DIAGRAMS, MODELS AND ELECTRONIC DATA OR OTHERWISE RELATED TO OR FOR THE USE IN THE DESIGN OR CONSTRUCTION OF THE VESSEL OR IN RESPECT OF THE VESSEL;
D.   THE RIGHTS OF WORLDSPAN TO ANY SOFTWARE, INCLUDING OPERATING

Continued on Page 16

Search Criteria: WORLDSPAN MARINE INC                                    Page: 16

PROGRAMS, APPLICATIONS AND ELECTRONIC DATA AND FILES FOR USE IN THE DESIGN OR CONSTRUCTION OF THE VESSEL OR IN RESPECT OF THE VESSEL INCLUDING ALL RIGHTS AND LICENSES OF WORLDSPAN TO USE SUCH SOFTWARE; AND
E.   ALL PROCEEDS, INCLUDING, WITHOUT LIMITATION, ANY INSURANCE CLAIMS OR PROCEEDS, IN RESPECT OF ANY OF THE FOREGOING.
FOR THE PURPOSES OF PARAGRAPH A ABOVE EACH OF THE COMPONENTS SHALL BE CONSIDERED AS BEING IDENTIFIED TO THE VESSEL OR TO THE VESSEL CONSTRUCTION AGREEMENT, DEPENDING ON THE NATURE OF SUCH COMPONENT, AS FOLLOWS:
1.   WHEN IT BEGINS TO BE MANUFACTURED IN ACCORDANCE WITH THE PLANS AND SPECIFICATIONS, IF IT IS SPECIFICALLY MANUFACTURED BY WORLDSPAN,
2.   WHEN IT IS REMOVED FROM INVENTORY, IF IT IS TAKEN FROM THE GENERAL INVENTORY OF WORLDSPAN,
3.   WHEN IT IS DELIVERED TO WORLDSPAN FOR THE VESSEL, IF IT IS ORDERED SPECIFICALLY FOR THE VESSEL AND PART OF THE SUPPLIER'S INVENTORY;
4.   WHEN IT IS IDENTIFIED BY THE MANUFACTURER, IF IT IS ORDERED SPECIFICALLY FOR THE VESSEL; OR
5.   WHEN IT IS INCORPORATED INTO, ATTACHED, OR PLACED ON THE VESSEL, IF IT IS ANYTHING OTHER THAN THE ITEMS SET FORTH ABOVE IN CLAUSES (1), (2), (3) OR (4).
TERMS USED HEREIN THAT ARE DEFINED IN THE PERSONAL PROPERTY SECURITY ACT (BRITISH COLUMBIA), THE REGULATIONS MADE THEREUNDER OR ANY AMENDMENTS MADE THERETO HAVE THOSE DEFINED MEANINGS.

Registering

Party: LANG MICHENER LLP
       BOX 11117,1500 1055 W. GEORGIA
       VANCOUVER BC  V6E 4N7

*************************************************************************

Some, but not all, tax liens and other Crown claims are registered at the
Personal Property Registry (PPR) and if registered, will be displayed on
this search result.  HOWEVER, it is possible that a particular chattel is
subject to a Crown claim that is not registered at the PPR.  Please consult
the Miscellaneous Registrations Act, 1992 for more details.  If you are
concerned that a particular chattel may be subject to a Crown claim not
registered at the PPR, please consult the agency administering the type
of Crown claim.

>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>> END OF SEARCH <<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<

136

④

Lterm: XPSP0050     BC OnLine: DOCUMENT PRINT     2009/08/12
                  For: PZ69191  LANG MICHENER          15:23:13

        Attn./Ref. No.: 57206-10

*************** P P S A   S E C U R I T Y   A G R E E M E N T ***************

       Reg. Date: AUG 12, 2009       Reg. Length: 3 YEARS
       Reg. Time: 15:23:13          Expiry Date: AUG 12, 2012
       Base Reg. #: 123779F         Control #: B9514907
Block#

S0001  Secured Party: COMERICA BANK
                100 NE 3RD AVENUE, SUITE 100
                FORT LAUDERDALE FL  33302

D0001  Base Debtor: SARGEANT          HARRY       III
       (Individual) #100-3020 NORTH MILITARY TRAIL     Birthdate:
              BOCA RATON         FL    33431

       General Collateral:
       ALL OF THE RIGHT, TITLE AND INTEREST OF DEBTOR IN AND TO ALL OF THE
       FOLLOWING PROPERTY (COLLECTIVELY, THE "COLLATERAL"):
       (A) THAT AGREEMENT (THE "VESSEL CONSTRUCTION AGREEMENT") DATED
       FEBRUARY 29, 2008 MADE BETWEEN WORLDSPAN MARINE INC. AND THE
       DEBTOR FOR THE CONSTRUCTION OF A CRESCENT CUSTOM 142' TRILEVEL
       YACHT HAVING BUILDER'S HULL NO. QE014226C010 (THE "VESSEL") AND ALL OF
       THE RIGHTS, CLAIMS, BENEFITS, POWERS AND REMEDIES OF DEBTOR
       THEREUNDER, INCLUDING, WITHOUT LIMITATION, THE RIGHT TO ENSURE THE
       COMPLETION OF CONSTRUCTION OF THE VESSEL, AND THE RIGHT TO ALL
       MONIES AND CLAIMS FOR MONIES OWING OR WHICH AT ANY TIME HEREAFTER
       MAY BECOME OWING TO DEBTOR UNDER OR AS A RESULT OF THE BREACH OF
       THE VESSEL CONSTRUCTION AGREEMENT, THE BUILDERS MORTGAGE IN
       RESPECT OF THE VESSEL GRANTED TO DEBTOR PURSUANT TO THE VESSEL
       CONSTRUCTION AGREEMENT (AND HAVING RECORD NO. 3 IN 2008 IN THE SHIP
       REGISTRY VANCOUVER), AND THE SECURITY INTEREST GRANTED TO DEBTOR
       PURSUANT TO THE VESSEL CONSTRUCTION AGREEMENT (AND HAVING BASE
       REGISTRATION NO. 334150E);
       (B) ALL RIGHT, TITLE AND INTEREST IN AND TO ANY OTHER CONTRACTS,
       SUBCONTRACTS OR AGREEMENTS FOR SERVICES, LABOR OR MATERIALS
       PERTAINING TO THE VESSEL, AND ALL CLAIMS AND RIGHTS WITH RESPECT TO
       NON-PERFORMANCE OR BREACH OF SAID CONTRACTS, SUBCONTRACTS AND
       AGREEMENTS;
       (C) ALL RIGHT, TITLE AND INTEREST IN AND TO ANY PROCEEDS, REVENUES,
       OR OTHER BENEFITS ARISING UNDER OR PURSUANT TO ANY OF THE ASSIGNED
       CONTRACTS (AS DEFINED HEREIN) AND ALL MONIES, ADDITIONAL DOCUMENTS
       OR INSTRUMENTS, OR OTHER PROPERTY AT ANY TIME AND FROM TIME TO TIME
       PAYABLE, RECEIVABLE, OR OTHERWISE DISTRIBUTABLE IN RESPECT OF, IN
       EXCHANGE FOR, OR IN SUBSTITUTION OF ANY OF THE ASSIGNED CONTRACTS
       INCLUDING, WITHOUT LIMITATION, ANY RIGHT TO RECEIVE PROCEEDS OF ANY
       INSURANCE, INDEMNITY, WARRANTY OR GUARANTY WITH RESPECT TO ANY OF
       THE ASSIGNED CONTRACTS;
       (D) ALL RIGHTS, CLAIMS, POWERS, PRIVILEGES, AND REMEDIES OF DEBTOR,
       WHETHER ARISING BY STATUTE, AT LAW, IN EQUITY OR OTHERWISE, OR
       PROVIDED FOR IN THE ASSIGNED CONTRACTS FOR THE FAILURE ON THE PART
       OF ANY PARTY TO PERFORM OR COMPLY WITH ANY TERM OF THE ASSIGNED

Continued on Page  2

Control #: B9514907                                          Page:  2

CONTRACTS;
(E) ALL MONIES AND CLAIMS FOR MONIES OWING OR WHICH AT ANY TIME
HEREAFTER MAY BECOME OWING TO DEBTOR FROM UNDERWRITERS,
INSURANCE COMPANIES, INDEMNITORS OR FUNDS IN RESPECT OF ANY TYPE OF
INSURANCE ON THE VESSEL OR ON ANY MATERIALS, MACHINERY, PARTS OR
EQUIPMENT THEREFORE, WHETHER SUCH INSURANCE BE MAINTAINED BY
DEBTOR OR THE BUILDER;
(F) ALL MONIES AND CLAIMS FOR MONIES OWING OR WHICH AT ANY TIME
HEREAFTER MAY BECOME OWING TO DEBTOR, AND ALL CLAIMS OF DEBTOR
FOR DAMAGES, IN RESPECT OF THE ACTUAL OR CONSTRUCTIVE TOTAL LOSS OF
THE VESSEL.
PROCEDS :  ALL PROCEEDS THAT ARE GOODS, CHATTEL PAPER,
INTANGIBLES, INSTRUMENTS, DOCUMENTS OF TITLE, INVESTMENT PROPERTY,
MONEY OR OTHER PRESENT OR AFTER-ACQUIRED PERSONAL PROPERTY.
TERMS USED IN THIS GENERAL COLLATERAL DESCRIPTION WHICH ARE
DEFINED IN THE PERSONAL PROPERTY SECURITY ACT (BRITISH COLUMBIA)
SHALL HAVE THE MEANINGS SPECIFIED IN THAT ACT, UNLESS THE CONTEXT
OTHERWISE REQUIRES.
THE TERM "ASSIGNED CONTRACTS" SHALL MEAN THE VESSEL CONSTRUCTION
AGREEMENT AND ALL OF THE CONTRACTS ASSIGNED TO SECURED PARTY
PURSUANT TO THE ASSIGNMENT OF VESSEL CONSTRUCTION AGREEMENT BY
AND BETWEEN DEBTOR, AS ASSIGNOR, AND SECURED PARTY AS ASSIGNEE
DATED AUGUST 14, 2009.

Registering
    Party: LANG MICHENER LLP
           BOX 11117,1500 1055 W. GEORGIA
           VANCOUVER BC  V6E 4N7

>>>>>>>>>>>>>>>>>>>>>>>>>>> END OF DOCUMENT PRINT <<<<<<<<<<<<<<<<<<<<<<<<<<

## ASSIGNMENT OF INSURANCES
### (Construction Period)

**HARRY SARGEANT, III** (hereinafter called the "Purchaser"), is the purchaser of an 142 foot motor yacht identified as hull no. QEO14226C010 (the "Vessel") being built for the Purchaser by Worldspan Marine, Inc., a British Columbia corporation (the "Builder"), pursuant to the Vessel Construction Agreement between Purchaser and Builder, dated as of February 29, 2008, as at any time amended (the "Vessel Construction Agreement") regarding the construction and purchase of the Vessel, title to which Vessel remains in the Builder during construction **Comerica Bank** ("Assignee") is making a Nine Million Four Hundred Thousand and 00/100 Dollars ($9,400,000.00) loan to Purchaser to partially finance the construction and acquisition of the Vessel (the "Loan") under the terms of the Vessel Construction Agreement

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Builder do hereby assign, unto Assignee, and unto the Assignee's successors and assigns, to its and its successors and assigns' own proper use and benefit, as collateral security for Purchaser's indebtedness to the Assignee now or hereafter existing, all rights, title and interest of the Builder and Purchaser, as loss payee or otherwise as their interests may appear, under, in and to:

A.  With respect to the Vessel only, subject to Builder's Retained Interest (defined below), all insurances (including, without limitation, all builder's risks insurance or marine insurance), whether heretofore, now or hereafter effected, and all renewals of or replacements for the same (whether such insurance be maintained by Builder or Purchaser);

B.  With respect to the Vessel only, subject to Builder's Retained Interest, all insurance claims and proceeds thereof, returns of premium and other monies and claims for monies which may be or become payable under or in respect of any of said insurances, including any amounts payable due to the partial loss or actual, constructive, agreed, arranged or compromised total loss of the Vessel, or due to the loss, damage or destruction of any materials, machinery, parts, furnishings or any type of equipment therefor;

C.  With respect to the Vessel only, and subject to Builder's Retained Interest, all other rights of Purchaser or Builder under or in respect of any of said insurances; and

D.  All proceeds of all of the foregoing.

The items assigned in "A" through "D" above are hereinafter referred to as the "Insurances".

**Notwithstanding any of the provisions of this Assignment to the contrary, Builder retains a first right to payment under the Insurances for all amounts due and payable to Builder under the terms of the Vessel Construction Agreement ("Builder's Retained Interest").**

This Assignment is made pursuant to the Note dated as of even date herewith (the "Note") executed and delivered by Purchaser, as maker, in favor of Assignee, as payee, and various other documents executed or to be executed in connection therewith (the Note and such other documents being collectively the "Loan Documents") between Assignee and the Purchaser. This Assignment is intended to grant to Assignee a security interest in the assigned property as security for all amounts due Assignee under the Loan Documents and all other moneys due and to become due from Purchaser to Assignee, whether under said Loan Documents, or otherwise, and may be further assigned in connection with the enforcement of said security interest of Assignee.

1

**JUDITH ANN SUTTON**
**NOTARY PUBLIC - STATE OF MICHIGAN**
**COUNTY OF WAYNE**
**My Commission Expires Mar. 29, 2014**
ACTING IN THE COUNTY OF WAYNE

514053v2 960766.0210

This is Exhibit "E" referred to in the affidavit
of Cynthia B. Jones sworn before me at
Miller, Canfield, Paddock and Stone, P.L.C.
this 7th day of October, 2011

Judith Ann Sutton

*139*

It is expressly agreed that anything herein contained to the contrary notwithstanding, Purchaser and Builder, as applicable, shall remain liable under said Insurances to perform all of the obligations assumed by them thereunder. Assignee shall have no obligation or liability (including, without limitation, any obligation or liability with respect to the payment of premiums, calls or assessments) under said Insurances by reason of or arising out of this instrument of assignment, nor shall Assignee be required or obligated in any manner to perform or fulfill any obligations of Purchaser or Builder under or pursuant to said Insurances, or to make any payment, or to make any inquiry as to the nature or sufficiency of any payment received by them, or to present or file any claim, or to take any other action to collect or enforce the payment of any amounts which may have been assigned to them, or to which they may be entitled hereunder at any time or times.

Purchaser does hereby constitute Assignee, its successors and assigns, their true and lawful attorney, irrevocably, with full power (in their name or otherwise) to ask, require, demand, receive, compound and give acquittance for any and all moneys and claims for moneys due and to become due under or arising out of said Insurances, to endorse any checks or other instruments or orders in connection therewith, to make, compromise, withdraw or otherwise deal with any claims, and/or to take any action or institute any proceedings which Assignee may deem to be necessary or advisable in the premises. The powers and authority granted to Assignee herein have been given for a valuable consideration and are hereby declared to be irrevocable.

Purchaser and Builder do hereby warrant and represent that they have not assigned, pledged or in any way created or suffered to be created a security interest in the whole or any part of the right, title and interest hereby assigned except in favor of Assignee. Purchaser and Builder hereby covenant that, without the prior written consent thereof of Assignee, so long as this instrument of assignment shall remain in effect, it will not assign or pledge or create a security interest in the whole or any part of the right, title and interest hereby assigned to anyone other than Assignee, its successors or assigns, and it will not take or omit to take any action, the taking or omission of which might result in an alteration or impairment of said Insurances, of this Assignment or of any of the rights created by said Insurances or this Assignment.

Purchaser and Builder agree that at any time and from time to time, upon the written request of Assignee, its successors and assigns, Purchaser and Builder will promptly and duly execute and deliver any and all such further instruments and documents as Assignee, its successors and assigns, may reasonably request in order to obtain the full benefits of this Assignment and of the rights and powers herein granted. Purchaser shall reimburse Builder for Builder's reasonable out of pocket costs and expenses associated with complying with the preceding sentence.

Any payments made pursuant to the terms hereof shall be made to such account as may, from time to time, be designated by Assignee, and shall be applied as provided in the Loan Documents.

This Assignment shall be governed by the laws of the State of Florida and may not be amended or changed except by an instrument in writing; provided, that to the extent that perfection and priority of any property assigned hereunder is governed by Canadian or British Columbia law, then Canadian or British Columbia law shall control.

Purchaser and Builder hereby authorize Assignee to execute on its behalf and file, at any time and from time to time, any Financing Statements (Form UCC-1) and amendments thereto (Form UCC-3) as provided in Article 9 of the Uniform Commercial Code, or papers of similar purpose or effect in respect of this Assignment in any applicable jurisdiction which may be necessary or desirable to perfect the security interests of Assignee hereunder.

2

All of the provisions of this Assignment shall be binding upon Purchaser and Builder and their successors, executors or personal representatives and shall inure to the benefit of Assignee and its successors and assigns. Any and all rights assigned herein may be further assigned by Assignee.

By executing this Assignment, it is acknowledged by the parties that the rights assigned to Assignee herein shall be no greater than Purchaser's rights under the Construction Agreement  The parties expressly acknowledge Builder's first lien rights and rights to payment of any insurance proceeds.  Builder has no duties to Purchaser that are not expressly set forth in the Vessel Construction Agreement and no additional obligations are created except as modified by this Assignment, as their interests may appear.

[Remainder of page intentionally left blank]

3



**IN WITNESS WHEREOF**, Purchaser and Builder have caused this Assignment to be duly executed as of the 14th day of August, 2009.

**Purchaser:**

By: _____

Name:  Daniel Sargeant, as attorney-in-fact
for Harry Sargeant, III

**Builder:**

Worldspan Marine, Inc.

By: _____
Name: _____
Title: _____

The Assignee acknowledges and accepts this assignment:

Comerica Bank

By: _____
Name: Barry W. Shaw
Title: Vice President

4

IN WITNESS WHEREOF, Purchaser and Builder have caused this Assignment to be duly executed as of the 14th day of August, 2009.

Purchaser:

By: _____
Name:  Daniel Sargeant, as attorney-in-fact
for Harry Sargeant, III

**Builder:**

Worldspan Marine, Inc.

By: _____
Name: _____
Title: _____

The Assignee acknowledges and accepts this assignment:

Comerica Bank

By: _____
Name: Barry W. Shaw
Title: Vice President

4

## ASSIGNMENT OF INSURANCES
### (Construction Period)

**HARRY SARGEANT, III** (hereinafter called the "Purchaser"), is the purchaser of an 142 foot motor yacht identified as hull no. QEO14226C010 (the "Vessel") being built for the Purchaser by Worldspan Marine, Inc., a British Columbia corporation (the "Builder"), pursuant to the Vessel Construction Agreement between Purchaser and Builder, dated as of February 29, 2008, as at any time amended (the "Vessel Construction Agreement") regarding the construction and purchase of the Vessel, title to which Vessel remains in the Builder during construction **Comerica Bank** ("Assignee") is making a Nine Million Four Hundred Thousand and 00/100 Dollars ($9,400,000.00) loan to Purchaser to partially finance the construction and acquisition of the Vessel (the "Loan") under the terms of the Vessel Construction Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Builder do hereby assign, unto Assignee, and unto the Assignee's successors and assigns, to its and its successors and assigns' own proper use and benefit, as collateral security for Purchaser's indebtedness to the Assignee now or hereafter existing, all rights, title and interest of the Builder and Purchaser, as loss payee or otherwise as their interests may appear, under, in and to:

A.    With respect to the Vessel only, subject to Builder's Retained Interest (defined below), all insurances (including, without limitation, all builder's risks insurance or marine insurance), whether heretofore, now or hereafter effected, and all renewals of or replacements for the same (whether such insurance be maintained by Builder or Purchaser);

B.    With respect to the Vessel only, subject to Builder's Retained Interest, all insurance claims and proceeds thereof, returns of premium and other monies and claims for monies which may be or become payable under or in respect of any of said insurances, including any amounts payable due to the partial loss or actual, constructive, agreed, arranged or compromised total loss of the Vessel, or due to the loss, damage or destruction of any materials, machinery, parts, furnishings or any type of equipment therefor;

C.    With respect to the Vessel only, and subject to Builder's Retained Interest, all other rights of Purchaser or Builder under or in respect of any of said insurances; and

D.    All proceeds of all of the foregoing.

The items assigned in "A" through "D" above are hereinafter referred to as the "Insurances".

**Notwithstanding any of the provisions of this Assignment to the contrary, Builder retains a first right to payment under the Insurances for all amounts due and payable to Builder under the terms of the Vessel Construction Agreement ("Builder's Retained Interest").**

This Assignment is made pursuant to the Note dated as of even date herewith (the "Note") executed and delivered by Purchaser, as maker, in favor of Assignee, as payee, and various other documents executed or to be executed in connection therewith (the Note and such other documents being collectively the "Loan Documents") between Assignee and the Purchaser. This Assignment is intended to grant to Assignee a security interest in the assigned property as security for all amounts due Assignee under the Loan Documents and all other moneys due and to become due from Purchaser to Assignee, whether under said Loan Documents, or otherwise, and may be further assigned in connection with the enforcement of said security interest of Assignee.

1

It is expressly agreed that anything herein contained to the contrary notwithstanding, Purchaser and Builder, as applicable, shall remain liable under said Insurances to perform all of the obligations assumed by them thereunder. Assignee shall have no obligation or liability (including, without limitation, any obligation or liability with respect to the payment of premiums, calls or assessments) under said Insurances by reason of or arising out of this instrument of assignment, nor shall Assignee be required or obligated in any manner to perform or fulfill any obligations of Purchaser or Builder under or pursuant to said Insurances, or to make any payment, or to make any inquiry as to the nature or sufficiency of any payment received by them, or to present or file any claim, or to take any other action to collect or enforce the payment of any amounts which may have been assigned to them, or to which they may be entitled hereunder at any time or times.

Purchaser does hereby constitute Assignee, its successors and assigns, their true and lawful attorney, irrevocably, with full power (in their name or otherwise) to ask, require, demand, receive, compound and give acquittance for any and all moneys and claims for moneys due and to become due under or arising out of said Insurances, to endorse any checks or other instruments or orders in connection therewith, to make, compromise, withdraw or otherwise deal with any claims, and/or to take any action or institute any proceedings which Assignee may deem to be necessary or advisable in the premises. The powers and authority granted to Assignee herein have been given for a valuable consideration and are hereby declared to be irrevocable.

Purchaser and Builder do hereby warrant and represent that they have not assigned, pledged or in any way created or suffered to be created a security interest in the whole or any part of the right, title and interest hereby assigned except in favor of Assignee. Purchaser and Builder hereby covenant that, without the prior written consent thereof of Assignee, so long as this instrument of assignment shall remain in effect, it will not assign or pledge or create a security interest in the whole or any part of the right, title and interest hereby assigned to anyone other than Assignee, its successors or assigns, and it will not take or omit to take any action, the taking or omission of which might result in an alteration or impairment of said Insurances, of this Assignment or of any of the rights created by said Insurances or this Assignment.

Purchaser and Builder agree that at any time and from time to time, upon the written request of Assignee, its successors and assigns, Purchaser and Builder will promptly and duly execute and deliver any and all such further instruments and documents as Assignee, its successors and assigns, may reasonably request in order to obtain the full benefits of this Assignment and of the rights and powers herein granted. Purchaser shall reimburse Builder for Builder's reasonable out of pocket costs and expenses associated with complying with the preceding sentence.

Any payments made pursuant to the terms hereof shall be made to such account as may, from time to time, be designated by Assignee, and shall be applied as provided in the Loan Documents.

This Assignment shall be governed by the laws of the State of Florida and may not be amended or changed except by an instrument in writing; provided that to the extent that perfection and priority of the security interest in any property assigned hereunder is governed by Canadian or British Columbia law, Canadian or British Columbia law shall control.

Purchaser and Builder hereby authorize Assignee to execute on its behalf and file, at any time and from time to time, any Financing Statements (Form UCC-1) and amendments thereto (Form UCC-3) as provided in Article 9 of the Uniform Commercial Code, or papers of similar purpose or effect in respect of this Assignment in any applicable jurisdiction which may be necessary or desirable to perfect the security interests of Assignee hereunder.

2

All of the provisions of this Assignment shall be binding upon Purchaser and Builder and their successors, executors or personal representatives and shall inure to the benefit of Assignee and its successors and assigns. Any and all rights assigned herein may be further assigned by Assignee.

By executing this Assignment, it is acknowledged by the parties that the rights assigned to Assignee herein shall be no greater than Purchaser's rights under the Construction Agreement. The parties expressly acknowledge Builder's first lien rights and rights to payment of any insurance proceeds. Builder has no duties to Purchaser that are not expressly set forth in the Vessel Construction Agreement and no additional obligations are created except as modified by this Assignment, as their interests may appear.

[Remainder of page intentionally left blank]

3

*14L*

**IN WITNESS WHEREOF**, Purchaser and Builder have caused this Assignment to be duly executed as of the 14th day of August, 2009.

**Purchaser:**

By: _____
Name:  Daniel Sargeant, as attorney-in-fact
for Harry Sargeant, III


**Builder:**

Worldspan Marine, Inc.

By: *Lee Taubeneck*
Name:  LEE TAUBENECK
Title:  PRESIDENT


The Assignee acknowledges and accepts this assignment:

Comerica Bank


By: _____
Name: Barry W. Shaw
Title: Vice President

4

147

7

**Builder's Acknowledgment and Consent**

To:    Comerica Bank
       100 N.E. 3rd Avenue, Suite 100
       Fort Lauderdale, FL 33301
       Attn: Barry W. Shaw, Vice President

Dear Mr. Shaw:

Re: Vessel Construction Agreement (the "Vessel Construction Agreement") dated February 29, 2008 between Worldspan Marine, Inc., a British Columbia corporation ("Builder") and Harry Sargeant, III ("Owner") regarding the construction by Builder, and Builder's sale to Owner of that certain 142 foot motor yacht identified as Builder's hull no. QEO14226C010 ("the Vessel")

1.     We acknowledge notice of, and consent to, the fact that by Assignment of Vessel Construction Agreement dated as of even date herewith, Owner has assigned to you all its beneficial interests and all its benefits, rights and titles (but not its obligations) in and under the Vessel Construction Agreement, and all amendments, modifications, replacements or restatements thereof relating to the construction of the Vessel, but that the Buyer continues to be responsible to us for performance of its obligations thereunder and until such time as you may give us notice in writing that an Event of Default has occurred, the Buyer may continue to superintend the construction of the Vessel, require modifications in accordance with the terms of the Vessel Construction Agreement (and our right to be paid by the Buyer for such modifications required by the Buyer in accordance with the terms of the Vessel Construction Agreement prior to such notice being given by you shall not be affected) and/or take delivery of the Vessel and/or (subject to clause 2 below) exercise all the Buyer's rights, privileges and discretions under and in relation to the Vessel Construction Agreement and we may continue to deal with the Buyer accordingly. (Any references to "we" or "us" in this letter means collectively, the Builder).

2.     In accordance with authority and instructions given to us by the Buyer, which cannot be revoked or varied without your consent in writing, we hereby undertake:

       (a)    upon payment and satisfaction of the Final Purchase Price, to deliver to you or to your order the Builder's Certificate and any other documents or certificates required to be delivered to Buyer under the terms of the Contract;

       (b)    to pay to you all sums which we may become liable to pay to the Buyer under the Contract, including sums arising from an arbitration award; and

       (c)    no further assignments or grants of security by the Buyer in the Vessel Construction Agreement will be consented to by us without your written consent.

3.     We hereby further undertake that:

       (a)    should default be made by the Buyer in any installment of the Final Purchase Price of the Vessel or should the Buyer commit any other default and we then take any action to exercise our remedies under the Vessel Construction Agreement to either stop work on the Vessel or to terminate the Contract, we shall immediately give you notice in writing; and

This is Exhibit "F" referred to in the affidavit of
Cynthia B. Jones sworn before me at Miller,
Canfield, Paddock and Stone, P.L.C. this 7th
day of October, 2011

*Judith Ann Sutton*

514055v2 960766 0316    **JUDITH ANN SUTTON**
       **NOTARY PUBLIC - STATE OF MICHIGAN**
       **COUNTY OF WAYNE**
       **My Commission Expires Mar. 29, 2014**

ACTING IN THE COUNTY OF WAYNE

(b)    before exercising any option or right available to us on any such default as is mentioned in sub-clause (a) above, we shall first give you the opportunity, to be exercised within thirty (30) days, to rectify all the Buyer's subsisting defaults under the Vessel Construction Agreement and to assume and undertake unconditionally all the Buyer's remaining obligations under the Contract, provided that if such default is one that can not readily be resolved within thirty (30) days and Buyer or Assignee are pursuing a remedy of such default with due diligence and dispatch then you shall have an additional fifteen (15) days to remedy such default.

4.    All notices and communications under this Acknowledgment and Consent will be in writing or some facsimile of writing addressed to the parties at their addresses set out below or most recently notified to each other:

Comerica Bank
100 N.E. 3rd Avenue, Suite 100
Fort Lauderdale, FL 33301
Attn: Barry W. Shaw, Vice President

Worldspan Marine, Inc.
27222 Lougheed Highway
Maple Ridge, BC V2W 1V9
Attention: Lee Taubeneck, President

5    As of the date of this Acknowledgment and Consent we confirm to you the following:

(a)   As of the date of this Acknowledgment and Consent, the Borrower has paid us the sum of $ _11,131,192.04_ representing the Deposit and all payments presently due towards the Final Purchase Price under the terms of Section 4 of the Vessel Construction Agreement.

(b)  The amounts currently due to Builder under the terms of the Vessel Construction Agreement with respect to invoices issued, but not yet paid is $ _1,884,187.88_.

(c)  Subject to the terms of the Vessel Construction Agreement which provide that the billing for the Vessel is on a time and materials basis, as of this date Builder's estimated cost to complete the Vessel in accordance with the terms of the Vessel Construction Agreement is $ _6,516,374.08_.

> NOTE: This Amount does NOT include $1,884,187.88 listed in (b) Above. (April, May, June invoices)
It does include July Invoice of $788,636.52 due August 31, 2009.
L.T.

Sincerely,

Worldspan Marine, Inc.

By: _Lee Taubeneck_
Name: Lee Taubeneck
Title: President

Date: August 14, 2009

514055v2 960766.0213                    2

149

9895214590

# PROMISSORY NOTE

$9,400,000.00

August 14, 2009
Executed outside the State of Florida

**FOR VALUE RECEIVED, HARRY SARGEANT, III, and DANIEL SARGEANT** (collectively, the "Borrower"), promises to pay to the order of **COMERICA BANK** (hereinafter referred to as "Lender"), at 100 N.E. 3rd Ave., Suite 100, Fort Lauderdale, FL 33301, or at such other place as Lender may designate in writing to Borrower, the principal sum of the lesser of: (1) **NINE MILLION FOUR HUNDRED THOUSAND AND NO/100 DOLLARS ($9,400,000.00)**, or (2) the amount actually advanced to the Borrower in accordance with the terms of that certain Construction Loan Agreement of even date herewith between Borrower and Lender (the "Construction Loan Agreement", in United States funds, plus interest, costs and expenses as hereinafter provided. Any capitalized terms used herein, and not defined in this Note, shall have the meanings assigned in the Construction Loan Agreement.

**I. Line of Credit.** Subject to the terms and conditions of this Note, and provided that no Event of Default or Default has occurred and is continuing, Borrower may borrow and Lender may advance (each, an "**Advance**" and together the "**Advances**") to Borrower so long as the total principal balance outstanding under this Note at any one time does not exceed the principal amount stated on the face of this Note, subject to the limitations described in this Note and the Construction Loan Agreement. Lender's obligation to make Advances under this Note shall terminate if a demand for payment is made under this Note or if a Default or Event of Default (as defined in the other Loan Documents (as defined below) under any Loan Document occurs. As of the date of each proposed Advance, Borrower shall be deemed to represent that each representation made in the Loan Documents is true as of such date. The loan evidenced herein, if repaid, may not be re-borrowed.

**II. Security.** This Promissory Note is secured by the Security described in the Construction Loan Agreement.

**III. Payment of Principal and Interest.**

(a) **Repayment Terms.** On each Payment Date (as defined below) through and including the Maturity Date (as defined below), Borrower shall make monthly payments of interest only on the outstanding principal amount hereunder at the then Applicable Interest Rate (as defined below) under the terms of this Note. The monthly payments of interest are subject to change with each change in the Applicable Interest Rate hereunder, at the discretion of the Lender to an interest amount based on the then Applicable Interest Rate under the terms of this Note. On demand by Lender as described below in the Section titled Demand Note; Remedies (the "**Maturity Date**") the loan evidenced herein shall mature and all outstanding principal, accrued and unpaid interest and costs, fees and expenses due under this Note and the other Loan Documents shall be due and payable.

Interest shall accrue on the outstanding principal at a floating rate referred to herein as the "Applicable Interest Rate" (as defined below), except as provided with respect to the "Default Rate", and in either case adjusted if necessary so as to not exceed the highest rate permitted by applicable law. Interest shall be computed on the basis of a 360 day year for the actual number of days elapsed in the period. Lender's actual days/360 days computation determines the annual effective interest yield by taking the stated (nominal) interest rate for a year's period and then dividing said rate by 360 to determine the daily periodic rate to be applied for each day in the applicable interest period. Such computation produces an annualized effective interest rate exceeding that of the nominal rate. Notwithstanding any other provision of this Note, however,

513977v2 960766.0213

JUDITH ANN SUTTON
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WAYNE
My Commission Expires Mar. 29, 2014
ACTING IN THE COUNTY OF WAYNE

This is Exhibit "G" referred to in the affidavit of Cynthia B. Jones sworn before me at Miller, Canfield, Paddock and Stone, P.L.C. this 7th day of October, 2011

neither the Applicable Interest Rate nor the Default Rate shall ever exceed the maximum rate allowed by applicable law.

For any Interest Period for which the Applicable Interest Rate is the LIBOR-based Rate, if Lender shall designate a LIBOR Lending Office which maintains books separate from those of the rest of Lender, Lender shall have the option of maintaining and carrying this Note, and the relevant Indebtedness hereunder, on the books of such LIBOR Lending Office.

If, with respect to any Interest Period, Lender determines that, (a) Lender is unable to determine or ascertain the LIBOR Rate for such Interest Period, or (b) by reason of circumstances affecting the foreign exchange and interbank markets generally, deposits in eurodollars in the applicable amounts or for the relative maturities are not being offered to Lender for such Interest Period, or (c) the LIBOR-based Rate will not accurately or fairly cover or reflect the cost to Lender of maintaining any of the Indebtedness under this Note at the LIBOR-based Rate for such Interest Period, then Lender shall forthwith give notice thereof to the undersigned and thereafter, until Lender notifies the undersigned that such conditions or circumstances no longer exist, the Applicable Interest Rate for all Indebtedness hereunder during such period of time shall be as determined by Lender from another recognized source or interbank quotation.

**(b) Definitions.** Unless otherwise defined herein, all capitalized terms used in this Note which are not defined herein shall have the meaning assigned in the Pledge Agreement or other Loan Documents

(1) Applicable Interest Rate. The term **"Applicable Interest Rate"** means, in respect of all or · any part of the Indebtedness hereunder. the LIBOR based Rate plus the Applicable Margin.

(2) Applicable Margin. The **"Applicable Margin"** to be added to the LIBOR Rate for purposes of determining the Applicable Interest Rate, shall be a margin of three hundred basis points (3.00%) provided, however, that such rate shall be reduced by fifty basis points (.50%) to two hundred fifty basis points (2.50%) if Borrower, satisfies the following conditions: (i) establishment of a Comerica securities account or similar investment account with the Lender, and (ii) maintain a minimum average balance on a quarterly basis of at least Five Million U.S. Dollars ($5,000,000). In the event that the Borrower or the guarantor no longer meet the conditions in (i) and (ii) of the preceding sentence, then the Lender in its discretion may increase the Applicable Margin by fifty basis points (50%) to the unadjusted margin.

(3) Business Day. The term **"Business Day"** means any day, other than a Saturday, Sunday or any other day designated as a holiday under Federal or applicable State statute or regulation, on which Lender is open for all or substantially all of its domestic and international business (including dealings in foreign exchange) in Detroit, Michigan, and, in respect of notices and determinations relating to the Applicable Interest Rate and Interest Periods, also a day on which dealings in dollar deposits are also carried on in the London interbank market and on which banks are open for business in London, England.

(4) Default Rate. For purposes of this Note the term **"Default Rate"** shall mean a rate per annum that is five percentage points (5%) higher than the Applicable Interest Rate, which interest shall be' payable upon demand. The Default Rate shall apply from acceleration until the Obligations or a judgment thereon in favor of Lender have been paid in full.

(5) Interest Period. The term **"Interest Period"** means a period of time not to exceed three (3) months, commencing on the effective date of this Note, and each monthly period thereafter commencing on the last day of the preceding Interest Period then ending, provided that:

(a) any Interest Period which would otherwise end on a day which is not a Business Day shall be extended to the next succeeding Business Day, except that if the next succeeding Business Day falls in another calendar month, the Interest Period shall end on the next preceding Business Day, and when an Interest

# EXHIBIT 5

**FEDERAL COURT**

**ADMIRALTY ACTION *IN REM* AGAINST THE VESSEL "QE014226C010"
AND *IN PERSONAM***

BETWEEN:

OFFSHORE INTERIORS INC.

PLAINTIFF

AND:

WORLDSPAN MARINE INC., CRESCENT CUSTOM YACHTS INC.,
THE OWNERS AND ALL OTHERS INTERESTED IN
THE VESSEL "QE014226C010", and
THE VESSEL "QE014226C010"

DEFENDANTS

**AFFIDAVIT**

I, **CYNTHIA B. JONES**, Banker, of 500 Woodward Avenue, City of Detroit, State of Michigan, USA, MAKE OATH AND SAY AS FOLLOWS:

1.     I am Vice President, Special Assets Group, with Comerica Bank ("Comerica"), and as such have personal knowledge of the facts and matters hereinafter deposed to save and except where the same are stated to be made upon information and belief and where so stated I verily believe them to be true.

2.     I make this Affidavit pursuant to the Order of Roger Lafreniere, Case Management Judge pronounced August 29, 2011.

3.     This Affidavit supports a claim by Comerica against the Vessel "QE014226C010" (the "Vessel").

4.     Comerica is a Texas banking association incorporated in the United States of America.

5.      The Defendant, Worldspan Marine Inc. ("Worldspan") entered into a Vessel Construction Agreement (the "VCA") with Harry Sargeant III ("Sargeant") dated as of February 29, 2008 pursuant to which Worldspan as Builder was to construct and deliver the Vessel to Sargeant as Buyer.

6.      A copy of the VCA is attached hereto and marked as Exhibit **"A"** to this my Affidavit.

7.      Pursuant to paragraph 12.1 of the VCA Worldspan granted Sargeant a continuing first priority security interest in the Vessel including all work, materials, machinery and equipment relating to the Vessel to secure any amounts advanced or paid to Worldspan under the VCA, and further agreed to grant Worldspan a Ships Mortgage as additional security for monies paid or advanced to Worldspan under the VCA.

8.      Worldspan granted a ships mortgage to Sargeant (the "Mortgage"). The Mortgage was registered in the Ships Registry on May 14, 2008. A copy of the Mortgage is attached hereto and marked as Exhibit **"B"** to this my Affidavit.

9.      Pursuant to paragraph 8.1 of the VCA Worldspan agreed that Sargeant could assign the benefit of the VCA by way of security to any bank or financial institution.

10.     Comerica entered into a Construction Loan Agreement with Sargeant and others dated August 14, 2009. Under the Construction Loan Agreement Comerica agreed to make loans and advances to Sargeant for the purpose of funding the construction of the Vessel under the VCA, and Sargeant agreed to provide security to Comerica for such loans and advances including an assignment of the VCA and an assignment of the Mortgage.

11.     A copy of the Construction Loan Agreement is attached hereto and marked as Exhibit **"C"** to this my Affidavit.

12.     Pursuant to the terms of the Construction Loan Agreement Sargeant executed an Assignment of Security Agreement and Mortgage dated August 14, 2009 (the "Assignment"). Under the terms of the Assignment, Sargeant assigned all of his rights under the Mortgage and all

of his rights in respect of the security interest created in his favour under the VCA, to Comerica to secure loans and advances made by Comerica under the Construction Loan Agreement.

13.     A copy of the Assignment of Security Agreement and Mortgage is attached hereto and marked as Exhibit **"D"** to this my Affidavit.

14.     As further security Sargeant executed an assignment of insurance policies in respect of the Vessel, a copy of which is attached hereto and marked as Exhibit **"E"** to this my Affidavit.

15.     On August 14, 2009 Worldspan, by way of an executed Builders Acknowledgement and Consent, consented to the assignment by Sargeant of all his benefits, rights and titles under the VCA to Comerica and acknowledged that as of that date Sargeant had advanced $11,131,192.04 to Worldspan under the VCA, a copy of which is attached hereto and marked as Exhibit **"F"** to this my Affidavit

16.     The advances and loans made by Comerica to Sargeant were evidenced in part by a Promissory Note in the face amount of US$9,400,000 (the "Note").

17.     A copy of the Note is attached hereto and marked as Exhibit **"G"** to this my Affidavit.

18.     The Note was amended from time to time including by way of an Extension Letter dated June 8, 2011. Pursuant to the extension letter Sargeant acknowledges his indebtedness to Comerica in the amount of US$9,400,000 principal, plus interest of US$5,982.77 plus further interest after June 8, 2011 and costs and expenses incurred by Comerica. A copy of the June 8, 2011 letter is attached hereto and marked as Exhibit **"H"** to this my Affidavit.

19.     Comerica has advanced US$9,400,000 to Sargeant. In addition Comerica has incurred cost and expenses for attorney's fees and costs in the amount of US$ 74,732.83 plus CDN$ 66,722.45.

20.     As of the date of this Affidavit, Sargeant is indebted to Comerica for US$ 9,400,000, plus accrued interest to October 6, 2011 of US$ 29,913.86, costs and expenses as set out in paragraph

19 of this Affidavit, plus accruing interest at the rate provided in the Note and further costs and expenses that have or will be incurred.

21.     It is my understanding that the sum of US$20,682,520.92 has been advanced by Sargeant to Worldspan under the VCA. I base this understanding on a review of an Affidavit (the "Monger Affidavit") sworn and filed by Mr. Mervyn Monger, a representative of Sargeant. The Monger Affidavit was filed in the Supreme Court of British Columbia, Vancouver Registry, Action No. S112804. In the Monger Affidavit Mr. Monger deposes to the fact that US$20,682,520.92 has been advanced by Sargeant to Worldspan under the VCA, and attaches as Exhibit "BB" to the Monger Affidavit a schedule of those advances. Attached hereto and marked as Exhibit **"I"** to this my Affidavit is a copy of the Monger Affidavit without exhibits except for Exhibit "BB".

22.     I make this Affidavit in support of Comerica's claim to an interest in the Vessel as detailed in this Affidavit.


**CYNTHIA B. JONES**


STATE OF MICHIGAN           )
                            )
COUNTY OF _WAYNE_           )

~~The foregoing instrument~~ was acknowledged before me this _7TH_ ~~day of October, 2011~~ by Cynthia B. Jones the Vice ~~President of Comerica Bank, on behalf of the Bank~~, who is known ~~personally to me or~~ provided a driver's license for identification.

SUBSCRIBED AND SWORN TO BEFORE ME ON OCTOBER 7, 2011

Notary's Signature: _Judith Ann Sutton_
Notary's Name:_____ JUDITH ANN SUTTON
Notary Public, State of Michigan, County of _WAYNE_
My commission Expires:____ 03/29/2014
Acting in the County of: _WAYNE_


JUDITH ANN SUTTON
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WAYNE
My Commission Expires Mar. 29, 2014

# CONSTRUCTION LOAN AGREEMENT

between

**HARRY SARGEANT, III**, and **DANIEL SARGEANT**,
collectively, as the Borrower,

and

**COMERICA BANK**,
as the Lender

Dated as of August 14, 2009

This is Exhibit "C" referred to in the affidavit
of Cynthia B. Jones sworn before me at
Miller, Canfield, Paddock and Stone, P.L.C.
this 7th day of October, 2011

_Judith Ann Sutton_

**JUDITH ANN SUTTON**
**NOTARY PUBLIC - STATE OF MICHIGAN**
**COUNTY OF WAYNE**
**My Commission Expires Mar. 29, 2014**
ACTING IN THE COUNTY OF WAYNE

1

# CONSTRUCTION LOAN AGREEMENT

**THIS CONSTRUCTION LOAN AGREEMENT** (this "Agreement") is executed and entered into as of August 14, 2009, by and between **COMERICA BANK** (the "Lender"), and **HARRY SARGEANT, III**, and **DANIEL SARGEANT** (collectively, the "Borrower"). Each capitalized term used herein and not otherwise defined shall have the meaning ascribed thereto in Article 1 hereof.

## W I T N E S S E T H :

**WHEREAS,** Borrower has requested that Lender provide Borrower with a loan for the purpose of constructing an 142 foot motor yacht being constructed by Worldspan Marine, Inc. and identified as Builder's hull no QEO14226C010 ;

**WHEREAS**, Lender has agreed to provide such loan on the terms and conditions set forth in this Agreement;

**NOW, THEREFORE,** for mutual and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree with each other as follows:

## ARTICLE 1

## DEFINITIONS

**Section 1.1    Defined Terms.** The following terms when used in this Agreement, including its preamble and recitals, shall, except where the context otherwise requires, have the following meanings (such meanings to be equally applicable to the singular and plural forms thereof):

*"Advances"* shall mean monies advanced on behalf of the Borrower under the Construction Loan  in accordance with the terms of Section 2.1 of this Agreement.

*"Agreement"* shall mean this Loan Agreement, as the same may be amended and supplemented from time to time.

*"Applicable Law"* shall mean, in respect of any Person, all provisions of constitutions, statutes, treaties, rules, regulations, guidelines, directives and orders of Governmental Authorities applicable to such Person, and all orders and decrees of all courts and arbitrators in proceedings or actions to which the Person in question is a party or by which it or any of its property is bound.

*"Assignment of Insurances"* means that certain Assignment of Insurances (Construction Period) of even date herewith executed and delivered by Borrower, as assignor, in favor of Lender, as assignee, regarding the Borrower's assignment of Borrower's rights in insurance on the Vessel maintained by Builder.

*"Assignment of Builder's Mortgage Agreement"* means that certain Assignment of Builder's Mortgage of even date herewith executed and delivered by Borrower, as assignor, in favor of Lender, as assignee, regarding the  Borrower's assignment of Borrower's mortgage lien and security interest in the Vessel.

*"Assignment of Vessel Construction Agreement"* means that certain Assignment of Vessel Construction Agreement of even date herewith executed and delivered by Borrower, as

1

assignor, in favor of Lender, as assignee, regarding Borrower's assignment to Lender of Borrower's rights under the Vessel Construction Agreement.

*"Borrower"* shall mean Harry Sargeant, III, and Daniel Sargeant, and their permitted successors and assigns.

*"Builder"* shall mean Worldspan Marine, Inc., a British Columbia corporation.

*"Builder's Mortgage"* shall mean that certain Builder's Mortgage, executed by Builder dated May 6, 2008, and filed with Transport Canada on 10:25 am May 14, 2008 and assigned Record No. 3 in 2008, evidencing a first priority mortgage lien on hull no ŒO14226C010.

*"Business Day"* shall mean a day on which banks are not authorized or required to be closed in Fort Lauderdale, Florida.

*"Closing Check List"* shall mean the check list attached hereto as Exhibit A.

*"Collateral"* shall mean all personal property and other collateral from time to time assigned, mortgaged or pledged by the Borrower or any other Person to the Lender as security for the Loan.

*"Commitment"* shall mean Nine Million Four Hundred Thousand Dollars ($9,400,000).

*"Commitment Letter"* shall mean that certain letter addressed to Harry Sargeant and Daniel Sargeant, from Barry W. Shaw on behalf of Comerica Bank, dated August 6, 2009.

*"Construction Advances"* shall have the meaning assigned in Section 2.1.

*"Delivery Date"* shall mean the date title to the Vessel is delivered to Borrower by Builder, which shall occur not later than May 1, 2010 unless such date is extended in writing by Lender.

*"Demand"* shall mean Lender has made a demand for payment in full as permitted under the terms of the Note.

*"Dollars," "U.S. $," "$" and "U.S. Dollars"* shall mean the lawful currency of the United States of America.

*"Event of Default"* shall mean a Demand has been made by Lender and the Obligations of Borrower to Lender have not been satisfied within three (3) Business Days.

*"Governmental Authority"* shall mean any nation or government, any state or other political subdivision thereof, any municipality, any court and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

*"Guarantors"* shall mean any Person executing and delivering a Guaranty in connection with this Agreement.

*"Guaranty"* shall mean that certain Guaranty of even date herewith executed and delivered by each of the Guarantors in favor of Lender, and all amendments, replacements, modifications or restatements thereof.

2

*"Indebtedness"* shall mean, with respect, to any Person, (a) all items, except items of shareholders and partners equity or capital stock or surplus, which in accordance with generally accepted accounting principles would be included in determining total liabilities as shown on the liability side of a balance sheet of such Person, and (b) to the extent not otherwise included, all Capitalized Lease Obligations of such Person.

*"Indebtedness for Money Borrowed"* shall mean, with respect to any Person, all money borrowed and Indebtedness represented by notes payable and drafts accepted representing extensions of credit, all obligations evidenced by agreements, bonds, debentures, notes or other similar instruments (including, without duplication, reimbursement obligations in respect of letters of credit issued in connection with other Indebtedness), all Indebtedness upon which interest charges are customarily paid, and all Indebtedness issued or assumed as full or partial payment for property or services, whether or not any such notes, drafts, obligations or Indebtedness represent Indebtedness for money borrowed. For purposes of this definition, interest which is accrued but not paid on the original due date or within any applicable cure or grace period as provided by the underlying contract for such interest shall be deemed Indebtedness for Money Borrowed.

*"Lender"* shall mean Comerica Bank, any Person to which all or a portion of any Loan is assigned or participated in accordance with Section 9.3 hereof and their permitted successors and assigns.

*"Lender's Office"* shall mean the office of the Lender located at 100 N.E. 3rd Avenue, Suite 100, Fort Lauderdale, FL 33301, or such other office or offices as may be designated pursuant to the provisions of Section 9.1 hereof.

*"Loan"* shall mean aggregate amount advanced by the Lender to the Borrower under the Note.

*"Loan Documents"* shall mean, without limitation, this Agreement, the Note, the Assignment of Vessel Construction Agreement, the Builder's Mortgage, the Assignment of Builder's Mortgage & Security Agreement, the Assignment of Insurances, any Guaranty, the Builder's Consent, the Commitment Letter, all legal opinions of counsel to the Borrower in connection herewith, and all other documents, instruments, certificates and agreements executed or delivered in connection with or contemplated by any of such instruments.

*"Material"* and *"Materially"* shall mean, with respect to any Person, material to the ability of such Person to perform its obligations under the Loan Documents.

*"Material Adverse Effect"* shall mean, with respect to any Person, any material adverse effect upon the business, assets, liabilities, financial condition, results of operations or business prospects of such Person, or the ability of such Person to own and operate its properties or to perform its obligations, such that such Person is not able to pay or perform all of its legal obligations owed to other Persons.

*"Obligations"* shall mean (i) all payment and performance obligations of the Borrower and all other third Persons under any Loan Document to or for the benefit of the Lender, (ii) all obligations under any swap agreements (as defined in 11 U.S.C. § 101) between Borrower and Lender, or its affiliates, whenever executed, and (iii) the obligation to pay an amount equal to the amount of any and all damage (other than lost profits) which the Lender may suffer by reason of a breach by the Borrower or any other Persons of any obligation, covenant or undertaking with respect to any Loan Document not otherwise included in clause (i).

3

*"Person"* shall mean an individual, corporation, partnership, limited liability company, trust or unincorporated organization or a government, or any agency or political subdivision thereof.

*"Pre-Closing Change Orders"* shall mean the change orders which have been agreed to by Builder and Borrower (change order, no.'s 001-009, 011, 012) and outstanding change orders which are under consideration (change orders no. 010 and 013) and which were disclosed to Lender by Borrower on or before closing.

*"Progress Payment"* shall mean the monthly payments due Seller as described in Section 4.3 of the Vessel Construction Agreement.

*"Promissory Note"* or *"Note"* shall mean that certain promissory note of even date herewith executed and delivered by Borrower, as maker, in favor of Lender, as payee, in the original principal amount of $9,400,000.00.

*"Tax"* shall mean any tax, duty, levy, impost, assessment or other governmental charge imposed by any Governmental Authority.

*"Vessel"* shall mean the motor yacht described as Builder's hull number QEO14226C010 to be constructed pursuant to the terms of the Vessel Construction Agreement.

*"Vessel Construction Agreement"* shall mean that certain Vessel Construction Agreement dated February 29, 2008, between Builder and Borrower regarding the construction and purchase of the Vessel.

*"written"* or *"in writing"* shall mean any form of written communication, including written communication by telecopier or telex.

**Section 1.2    Interpretation.** Each definition of an agreement in this Article 1 shall include such agreement as modified, amended, restated or supplemented from time to time by the Lender and the Borrower, and except where the context otherwise requires, the singular shall include the plural and vice versa. Except where otherwise specifically restricted, reference to a party to this Agreement or any Loan Document includes that party and its successors and assigns. All terms used herein which are defined in Article 9 of the Uniform Commercial Code in effect in the State of Florida on the date hereof and which are not otherwise defined herein shall have the meanings as set forth therein.

**Section 1.3    Cross References.** Unless otherwise specified, references in this Agreement and in each other Loan Document to the term "hereof" or "herein" or to any Article or Section are references to this Agreement or such other Loan Documents or such Article or Section of this Agreement or such other Loan Document, as the case may be. Unless otherwise specified, references in any Article, Section or definition to the term "hereof" or "herein" or to any clause are references to this Agreement or such other Loan Document, as the case may be, or to such clause of such Article, Section or definition.

4

**ARTICLE 2**

**LOANS**

**Section 2.1    Loan.**  Contemporaneously with the execution of this Agreement, Borrower shall execute and deliver to Lender the Promissory Note.  Lender agrees to make Advances ("Construction Advances") to Borrower for the purpose of funding Progress Payments under the Vessel Construction Agreement and paying closing costs associated with this Loan; provided that such Advances shall not exceed the Commitment. In the event that the outstanding  Loan at any time exceeds the Commitment, Borrower shall immediately repay the Loan in the amount of such excess.  Construction Advances shall be funded upon satisfaction of the conditions precedent set forth in Sections 2.6 (All Advances) and 2.7 (Individual Advances) of this Agreement.  In addition, upon completion of the Vessel and delivery of the Vessel by Builder to Borrower, the continuation of the Loan shall be subject to satisfaction of the conditions precedent in Section 2.8 of this Loan Agreement.  At Lender's discretion, Lender may fund construction Advances directly to Builder. Principal and interest on the Loan shall be repaid as described in the Note.  On the Delivery Date, Lender's obligation to fund Advances hereunder shall terminate, unless extended in writing by Lender.  Additionally, upon the Maturity Date set forth in the Note all outstanding principal, interest and any other amounts due Lender hereunder shall be due and payable.

**Section 2.2    Payment of Interest and Principal.**  The Loan shall be evidenced by, and shall be repayable in accordance with the terms and provisions set forth in the Note.  The Lender may open and maintain on its books in the name of the Borrower a loan receivable with respect to the Loan and any other amounts due the Lender under the Loan Documents and interest thereon. The Lender may debit the loan receivable for the principal amount of each Advance made by it under the terms of this Agreement and accrued interest thereon, and may credit such loan receivable for each payment on receivable of principal of or interest on the Loans or other amounts due under the Loan Documents and accrued interest thereon.  The records of the Lender with respect to the loan receivable maintained by it shall be presumed to be correct evidence of the Loans and other amounts due such Lender under the Loan Documents.

**Section 2.3    Withholding; Setoff.**  All payments of principal, interest and any other sums due under this Agreement and any other Loan Document shall be made in the amounts required without reduction, setoff or counterclaim by the Borrower, notwithstanding the assertion of any right of recoupment or setoff or of any counterclaim by the Borrower, and without any deduction or withholding by the Borrower for or on account of any present or future Taxes.

**Section 2.4    Application of Payments.**  Monies received by Lender from any source for application toward payment of the Obligations shall be applied to accrued interest and then to principal.  If a Default occurs, monies may be applied to the Obligations in any manner or order deemed appropriate by Lender.  If any payment received by Lender under this Note or other Loan Documents is rescinded, avoided or for any reason returned by Lender because of any adverse claim or threatened action, the returned payment shall remain payable as an obligation of all persons liable under this Note or other Loan Documents as though such payment had not been made.

**Section 2.5    Security for the Loan.**  The Loan shall be secured by a first priority security interest in the Vessel and related collateral through execution and delivery of the following Loan Documents at closing: (i) Assignment of Builder's Mortgage & Security Agreement, (ii) Assignment of Insurances, and (iii) Assignment of Vessel Construction Agreement.  In addition, the guarantors described in Section 25.1 of the Vessel Construction Agreement shall execute and deliver an

5

acknowledgement and consent in a form satisfactory to Lender allowing Lender to rely on and enforce such guaranty in accordance with the terms thereof if an Event of Default shall occur hereunder.

**Section 2.6    Conditions Precedent to Funding the Initial Construction Advances** . The Lender's obligation to fund the initial Construction Advance is subject to the following conditions precedent described below:

(a)    The Borrower's execution and delivery of all of the Loan Documents to which Borrower is a party and satisfaction of the conditions to funding the initial Advance set forth in Lender's Closing Check List delivered to Borrower.

(b)    Borrower shall deliver the Vessel Construction Agreement to Lender for its review and approval.

(c)    Payment in full to the Lender at closing of the Commitment Fee described in Section 2.8 below, and payment of all of the Lender's costs and expenses, including without limitation, payment of the Lender's legal fees and costs.

(d)    All representations and warranties of Borrower in this Agreement shall be true and correct in all material respects.

(e)    No Event of Default shall have occurred or be continuing, nor any material default which with the passage of time will constitute an Event of Default.

**Section 2.7    Conditions Precedent to Funding of Construction Advances.**  In addition to meeting the conditions precedent in Section 2.6, Borrower shall satisfy the following conditions for each Construction Advance before Lender is obligated to fund a Construction Advance:

(a)    With respect to payments to Builder, Borrower shall deliver to Lender: (i) a written Claim Certificate (as defined in the Vessel Construction Agreement) and any other form of payment request submitted to Borrower from Builder, and (ii) a written advance request from Borrower to Lender indicating the amount of the proposed Advance, each with sufficient detail to justify the request and such other supporting documentation as may be required by Lender.

(b)    Prior to each Advance, the Vessel shall be inspected by a reputable marine surveyor or marine engineer (the "Marine Surveyor") selected by Borrower and approved by Lender, such approval to not be unreasonably withheld or delayed.  The Marine Surveyor shall deliver a written survey report to Lender, which confirms that as of the date of such survey, the Builder is entitled to all Progress Payments and other payments made by Borrower, or otherwise due to Builder under the terms of the Vessel Construction Agreement.

(c)    Borrower shall request Advances not more often that once per month.

**Section 2.8    Fees.**  Borrower shall pay to Lender a commitment fee equal to $12,500.00 which is due on the date of this Agreement.  The commitment fee is fully earned when paid and is non-refundable.

6

# ARTICLE 3

## GENERAL REPRESENTATIONS
## AND COVENANTS

The Borrower hereby makes the following representations and warranties as of the date hereof and further makes the following covenants and agreements throughout the term hereof and so long as any Obligation remains outstanding:

**Section 3.1    Organization; Good Standing.**  Each Borrower is an individual residing in the State of Florida and has the legal capacity to execute and deliver the Loan documents to which he is a party.

**Section 3.2    Authorization and Enforceability.**  Borrower, has duly executed and delivered this Agreement and the Loan Documents, and this Agreement and the Loan Documents are, and will be and remain, valid, binding and enforceable against the Borrower in accordance with their terms.

**Section 3.3    Consents and Approvals.**  The Borrower has obtained, and will obtain and maintain, each and every consent, approval, authorization, permit, license, or similar action, and has effected, and will effect or maintain, any filing or registration or similar action, required by any Governmental Authority or other Person or necessary in connection with the ownership of his properties or the conduct of his businesses, including, without limitation, in connection with the execution, delivery and performance of this Agreement and the Loan Documents, and the consummation of the transactions contemplated hereby and thereby and is not in violation, and will not cause or permit any violation of any of the foregoing or of any valid rights of other Persons in any of the foregoing.

**Section 3.4    Legal Compliance.**  Borrower has complied, and will comply, in all material respects with all Applicable Laws, including, without limitation, maritime and shipping laws, and other laws, in connection with the ownership of its properties, including, without limitation, in connection with the execution, delivery and performance of this Agreement and the Loan Documents, the consummation of the transaction contemplated hereby and thereby.

**Section 3.5    Payment and Performance.**  The Borrower has paid and performed, and will pay and perform, each and every payment and performance obligation of any Applicable Law, regulation, judgment decree or order of any Governmental Authority, and of any material indenture, agreement or other instrument to which the Borrower is, or becomes, a party or by which its properties are, or become, bound, including, without limitation, the payment and performance of each and every Obligation in connection with this Agreement and the Loan Documents, the consummation of the transaction contemplated hereby.

**Section 3.6    No Event of Default.**  The Borrower is not in breach or default, and will not cause or permit the breach or default, and the execution, delivery and performance of this Agreement and the Loan Documents, the consummation of the transactions contemplated hereby will not result in the breach or default, and no event has occurred or failed to occur which has not been remedied or waived, the occurrence or non-occurrence of which constitutes, or with the passage of time or giving of notice or both would constitute, any breach or default, of any Applicable Law, regulation, judgment decree or order of any Governmental Authority, or of any material

7

indenture, agreement or other instrument to which the Borrower is, or becomes, a party or by which its properties are, or become, bound.

**Section 3.7    Taxes.**  If required to file by applicable law, the Borrower has filed, and will file, all United States Federal income tax returns and all other tax returns by their respective due dates, including extensions, and the Borrower has paid, and will pay, all taxes due with respect to the Borrower pursuant to such returns or pursuant to any assessment received by the Borrower, except any such taxes or charges which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with generally accepted accounting principles have been set aside by the Borrower on its books.  The charges, accruals and reserves on the books of the Borrower in respect of taxes or other governmental charges are, and will be and remain, adequate.  The Borrower has paid, and will pay all taxes, fees and other charges in connection with the execution, delivery, recording, filing and registration of the Loan Documents as the same respectively become due or provisions for such payment have been, or will be, made to the satisfaction of the Lender in its sole discretion.

**Section 3.8    Solvency.**  The Borrower is solvent on the agreement date as such term is defined under the Federal Bankruptcy Act as amended, and the Borrower's performance of its obligations hereunder shall not be deemed a fraudulent transfer within the meaning of the Bankruptcy Act or the Florida Fraudulent Transfer Act.

**Section 3.9.    Financial Covenants.**  Borrower agrees to comply with the following covenants:

**(a) Minimum Debt Service Coverage Ratio.**  Borrower shall collectively, at all times, maintain a Debt Service Coverage Ratio of not less than 1.40 to 1.00. "Debt Service Coverage Ratio" shall mean the sum of Borrower's net cash flow, divided by the current interest and other amounts due on the Note. This covenant shall be tested quarterly.

**(b) Liquidity Covenant.**  Borrower shall collectively, at all times, maintain Liquid Assets of not less than $2,000,000. "Liquid Assets" shall mean the sum of all cash, time deposits and marketable securities. This covenant shall be tested quarterly.

513985v2 960766.0213

110

## ARTICLE 4

## CONSTRUCTION RELATED
## REPRESENTATIONS AND COVENANTS

The Borrower hereby makes the following representations and warranties as of the date hereof and further makes the following covenants and agreements throughout the term hereof and so long as any Obligation remains outstanding:

**Section 4.1    Plans and Specifications.**    One complete set of final plans and specifications certified by Builder of the Vessel shall be submitted to and approved by Lender prior to closing.    Any material change orders evidencing deviations from the approved plans and specifications set forth in the Vessel Construction Agreement must be approved in advance by Lender in writing.    Additionally, if the aggregate cost of all change orders or deviations to the plans and specifications as evidenced by the original Vessel Construction Agreement exceeds $1,000,000, no further change orders or deviations shall be made without Lender's prior written consent which shall not be unreasonably withheld.

**Section 4.2    Insurance.**

(a)    Before any advances will be made under the Loan, Borrower shall furnish to Lender:

(i)    a Builder's Risk insurance policy or Certificate of Insurance covering the Vessel throughout construction until delivery to Borrower, naming Lender as a loss payee and/or additional insured, as Lender may require, containing a loss payable clause satisfactory to Lender and an agreement to notify Lender in writing at least thirty (30) days prior to any cancellation or reduction in coverage of such policy, covering such hazards, in such amounts, in such form, and issued by such company as shall have been approved by Lender in writing.    The policy shall include, or Borrower shall procure a separate policy providing, breach of warranty or mortgagee's interest coverage that will protect Lender notwithstanding failure of Borrower or Builder to comply with the terms of the builder's risk policy.

(ii)    A certificate from an insurance company satisfactory to Lender indicating that Borrower and Builder are covered by public liability and worker's compensation insurance to the satisfaction of Lender.

In the event any insurance required to be in force hereunder is provided for in an umbrella policy covering Borrower, then Borrower shall furnish a certificate of insurance confirming the applicable insurance coverage hereunder, plus a copy of the umbrella insurance policy.

(b)    In the event the Loan has not been repaid in full by the time coverage will terminate under the Builder's Risk policy, Borrower shall immediately procure and pay for an "All Risks" marine insurance policy containing a loss payable clause satisfactory to Lender, and an agreement to notify Lender in writing at least thirty (30) days prior to any cancellation or reduction in coverage of such policy, covering such hazards, in such amounts, in such form, and issued by such company as shall have been approved by Lender in writing.    The policy shall include, or Borrower shall procure a separate policy providing Breach of Warranty or Mortgagee's Interest coverage that

9

will protect Lender notwithstanding the failure of Borrower or any other party to comply with the terms of the policy. The original of said policy shall be delivered to Lender prior to the termination of coverage under the Builder's Risk policy. The "All Risk" marine insurance policy shall meet the additional requirements set forth in the Mortgage.

**Section 4.3     Equity Requirement.** In order to assure Lender that Borrower has sufficient funds available to pay all additional costs that may be incurred in the construction of the Vessel, Borrower will be required to supply additional funds over and above the amount of the Loan proceeds in an amount equal to any difference between the maximum principal amount of the Loan and the final total cost (including, without limitation, all extras and change orders and a sufficient reserve for funding of interest) to be incurred in connection with the construction of the Vessel. As a condition of each advance, if requested by Lender, Borrower shall prove to Lender's satisfaction that sufficient funds are available to complete the Vessel according to the approved plans and specifications, including any extras or change orders. In no event shall the outstanding Advances exceed 65% of the projected fair market value of the Vessel on an as completed basis per the Lender's valuation report, or 50% of the actual cost of the Vessel per the terms of the Vessel Construction Agreement.

**Section 4.4     Inspections.** As referenced above in Section 2.7(b), the Vessel is to be inspected by a marine surveyor prior to final delivery and acceptance of the Vessel. The Marine Surveyor shall provide to Lender satisfactory evidence (including such written reports, photographs or certificates as Lender may require) that the stage of construction entitles Builder to a particular Progress Payment and other payments made by Borrower to Builder through final delivery and that Builder has completed the Vessel in compliance with the standards required under the Vessel Construction Agreement. The appointment of the Marine Surveyor by Lender shall not be deemed to place any duty or responsibility upon Lender to inspect the Vessel or any obligation or liability upon Lender regarding the quality of construction or the absence of defects in the Vessel. Any surveys or other information obtained pursuant to this Agreement are obtained solely for the benefit of Lender, and may not be relied upon by Borrower.

**Section 4.5     Restriction on Secondary Financing and Sale of Vessel**: It is the intent of Lender that Borrower's rights under this Agreement and the Loan shall be personal since Lender has evaluated this Loan and has agreed to make this Loan based on the unique qualifications of Borrower, both financial and otherwise, successfully to complete the project. So long as this Agreement or any part of the Loan is outstanding, the Vessel shall remain free and clear of all encumbrances, liens, mortgages, or security interests, except those in favor of Lender and Borrower as set forth herein, and any liens or security interests created or granted by Builder that are in all respects inferior and subordinate to those in favor of Lender and Borrower. Borrower shall not, without the prior written consent of Lender, sell, donate, give, mortgage, encumber or otherwise transfer or convey all or any part of its interest in the Vessel. The occurrence of any of the foregoing prohibited events shall, at the option of Lender, constitute grounds for terminating this Agreement and for accelerating any and all sums unpaid under the Loan.

10

513985v2 960766.0213

## ARTICLE 5

## INFORMATION REPRESENTATIONS
## AND COVENANTS

The Borrower hereby makes the following representations and warranties as of the date hereof and further makes the following covenants and agreements throughout the term hereof and so long as any Obligation remains outstanding:

**Section 5.1    Financial Information.**    Borrower shall deliver the following financial information to Lender:

(a) **Personal Financial Statements.**  Each Borrower who is an individual shall deliver to Lender annually, within thirteen months of the previous statement date on file with Lender, Borrower's financial statement.  Said financial statement shall disclose all of Borrower's assets, liabilities, net worth, income and contingent liabilities, all in reasonable detail and acceptable to Lender and submitted on a form to be provided by Lender or on such other form acceptable to Lender, signed by Borrower and certified by Borrower to Lender to be true, correct and complete.

(b) **Tax Returns.**  Borrower shall deliver to Lender, within 30 days of filing, complete copies of federal and state tax returns, as applicable, together with all schedules thereto, including, without limitation, K-1 statements for all Partnerships and Sub Chapter S Corporations, each of which shall be signed and certified by Borrower to be true and complete copies of such returns.  In the event an extension is filed, Borrower shall deliver a copy of the extension within 30 days of filing.

(c) **Liquidity Statements.**  Borrower shall provide to the Lender annual liquidity statements showing current individual values for cash, time deposits, listed stocks and other immediately marketable securities.  Liquidity statements shall consist of Lender statements, brokerage statements and other documentation acceptable to Lender.

**Section 5.2    Litigation Notices.**  There is no action, suit, proceeding, investigation or inquiry affecting or instituted, pending or threatened against, the Borrower or any property or business of the Borrower.  The Borrower shall give to the Lender prompt written notice of the following events as to which the Borrower has received notice or otherwise become aware:

(a) the commencement of all proceedings and investigations by or before any governmental body and all actions and proceedings in any court or before any arbitrator against or, to the extent known to the Borrower, in any other way relating adversely and directly to the Borrower, or any of its properties, assets or businesses (i) in which the recovery sought is in excess of $10,000 unless the claim is covered by insurance from a third party insurer (other than an Affiliate) and such insurer has affirmatively agreed that such claim is covered by such insurance (to the extent the loss exceeds deductible amounts, which deductible amounts shall not exceed $10,000 per occurrence); (ii) which, in the case of proceedings in any court or before any arbitrator, if adversely determined, could have a Material Adverse Effect; (iii) which, in the case of proceedings by or before any governmental body which in the reasonable judgment of the Borrower may be determined adversely to the Borrower, and if so determined could have a Material Adverse Effect, or (iv) which calls into question the validity of this Agreement or any other Loan Document;

11

(b)     any occurrence of an event which has a Material Adverse Effect on the Borrower;

(c)     any Default; any default by the Borrower under any material agreement (other than this Agreement) to which the Borrower is party or by which any of its properties is bound, including, without limitation, or the occurrence of any event which has a Material Adverse Effect on the Borrower, giving in each case the details thereof and specifying the action proposed to be taken with respect thereto; and

(d)     any material decrease in the amounts of insurance coverage maintained by the Borrower or Builder from that existing as of the date hereof.

**Section 5.3     Additional Information.**  The Borrower shall furnish to the Lender, within five (5) Business Days of any request therefor, such additional information as the Lender may reasonably request.

**Section 5.4     Accuracy and Completeness of Information.**  All information, reports, prospectuses, notices and other papers and data relating to the Borrower and furnished by or on behalf of the Borrower to the Lender were, and will be, at the time furnished, complete and correct in all material respects.  None of such information, reports, prospectuses, notices and other papers and data contains, or will contain, any material misstatement of fact or omits, or will omit, to state a material fact or any fact necessary to make the statements contained therein not materially misleading.

513985v2 960766.0213

# ARTICLE 6

## NEGATIVE REPRESENTATIONS
## AND COVENANTS

The Borrower hereby makes the following representations and warranties as of the date hereof and further makes the following covenants and agreements throughout the term hereof and so long as any Obligation remains outstanding:

**Section 6.1    Amendment and Waiver.**  The Borrower has not entered into, and shall not cause or permit, any amendment of, or, agree to or accept or consent to any waiver of any of the provisions of the Vessel Construction Agreement.

**Section 6.2    No Additional Indebtedness.**  Other than the Loan evidenced hereby, the Borrower is not, and shall not create, incur, assume, cause or permit itself to become, directly obligated for any Indebtedness for Money Borrowed without the Lender's prior written consent.

**Section 6.3    No Liens.**  The Borrower is not, and shall not create, incur, assume, cause or permit himself to become, directly or contingently obligated upon any mortgage, deed of trust, lien, security interest, hypothecation, assignment, deposit arrangement or other preferential arrangement, charge or other encumbrance (including, without limitation, any conditional sale or title retention agreement or finance lease) of any nature upon or with respect to the Vessel, whether now owned or hereafter acquired, other than the liens created in favor of Lender under the Loan Documents and a second priority lien in favor of Builder and Builder's floor plan lender during the construction of the Vessel.  The Borrower has not, and shall not file any UCC financing statement which names as debtor the Borrower or any security agreement other than a Loan Document permitting any secured party thereunder to file such financing statement.

**Section 6.4    Material Adverse Effect.**  There has not occurred since the end of the most recent fiscal year of the Borrower, and the Borrower shall not cause or permit to exist or occur, any event, fact or situation which has had or could reasonably be expected to have a Material Adverse Effect.

13

513985v2 960766.0213

# ARTICLE 7

## DEMAND; REMEDIES

**Section 7.1    Demand .** As described in the Note, the Obligations are immediately due and payable on demand by Lender.

**Section 7.2    Remedies.** If a demand for immediate payment in full is made by Lender

(a)    All principal and interest on the Loan and the Note and all other amounts owed under this Agreement or the Note shall thereupon and concurrently therewith become due and payable, and the Commitment shall forthwith terminate, all without any action by the Lender, or the holders of the Note, or any of them, and without presentment, demand, protest or other notice of any kind, all of which are expressly waived, anything in this Agreement or in the Note to the contrary notwithstanding.

(b)    The Lender may exercise all of the post-default rights granted to it under the Loan Documents or under Applicable Law.

(c)    The rights and remedies of the Lender hereunder shall be cumulative and not exclusive.

# ARTICLE 8

## MISCELLANEOUS

**Section 8.1    Notices.**

(a)    All notices and other communications under this Agreement shall be in writing and shall be deemed to have been given (i) three (3) Business Days after deposit in the mail, designated as certified mail, return receipt requested, postage-prepaid; or (ii) one (1) Business Day after being entrusted to a reputable commercial overnight delivery service for overnight delivery; or (iii) one (1) Business Day after delivery via facsimile provided such notice is confirmed by a notice described in (i) or (ii) above. All notices and other communications under this Agreement shall be given to the parties hereto at the following addresses:

(iii)    If to the Borrower, to him at:

Harry Sargeant, III
Daniel Sargeant
3020 North Military Trail, Suite 100
Boca Raton, FL 33431

14

*116*

with a copy to:

Alley, Maass, Rogers & Lindsay, P.A.
340 Royal Poinciana Way, Suite 321
P.O. Box 431
Palm Beach, FL 33480-0431
Attn: Robb R. Maass, Esq.

(ii)     If to the Lender, to it at:

Comerica Bank
100 N.E. 3rd Avenue, Suite 100,
Fort Lauderdale, FL 33301
Attn: Barry W. Shaw, Vice President

with a copy to:

Tripp Scott, P.A.
110 S.E. 6th Street, 15th Floor
Fort Lauderdale, FL 33301
Attention: Gregory A. McLaughlin, Esq.

Copies shall be provided to persons other than parties hereto only in the case of notices under Article 8 hereof. Failure to provide copies of notices given hereunder to parties which are not parties to this Agreement shall not effect the validity of a notice which is otherwise properly given.

(b)     Any party hereto may change the address to which notices shall be directed under this Section 8.1 by giving ten (10) days written notice of such change to the other party.

**Section 8.2    Expenses.**  The Borrower agrees promptly to pay:

(a)     consistent with the Commitment Letter or as otherwise agreed to by Borrower, all reasonable out-of-pocket expenses of the Lender in connection with the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents, and the transactions contemplated hereby and thereby, which in each case shall include out-of-pocket expenses and fees of counsel to (which shall include any in-house counsel), and experts, agents and consultants of, the Lender, including, without limitation, all such costs, expenses and fees on trial, on appeal or in bankruptcy or other proceedings.

(b)     all reasonable out-of-pocket costs and expenses incurred by Lender to third party vendors directly relating to the administration of the transactions contemplated in this Agreement or the Loan Documents, including any assignments of the Loans, the consideration, preparation, negotiation, execution and delivery of any proposed waiver, amendment or consent by the Lender relating to this Agreement or the other Loan Documents, all actions and activities relating to the Collateral, the creation, perfection or protection of any liens, and the protection, collection, enforcement and obtaining performance of this Agreement and the Loan Documents, which in each case shall include reasonable out-of-pocket expenses and fees of counsel to (which shall include any in-house counsel), and experts, agents and consultants of, the Lender, including, without limitation, all such costs, expenses and fees on trial, on appeal or in bankruptcy or other proceedings.

15

(c)     all reasonable out-of-pocket costs and expenses in connection with any Default, any enforcement of this Agreement or the Loan Documents, any restructuring, refinancing or "work out" of the transactions contemplated by this Agreement or the Loan Documents or any insolvency proceeding, and of obtaining performance under this Agreement or the Loan Documents, and all out-of-pocket costs and expenses of collection if any default is made in the payment of the Note, including, without limitation, all out-of-pocket expenses in connection with sale or disposition of any collateral for the Obligations, which in each case shall include out-of-pocket expenses and fees of counsel to (which shall include any in-house counsel), and experts, agents and consultants of, the Lender, including, without limitation, all such costs, expenses and fees on trial, on appeal or in bankruptcy or other proceedings.

(d)     all transfer, stamp, documentary, excise, property, registration, recordation and other similar taxes, assessments and charges levied by or payable to any Governmental Authority in respect of this Agreement, any Loan Document, any collateral for any obligations or any document referred to in this Agreement or any other Loan Document.

**Section 8.3     Assignment.**

(a)     *By the Borrower.* The Borrower may not assign or transfer any of its rights or obligations hereunder or under the Note or under any Loan Document without the prior written consent of the Lender in its sole discretion.

(b)     *By the Lender.* The Lender may, at any time, issue participations in, and/or sell, assign, transfer or otherwise dispose of, its rights and obligations under this Agreement, the Note and the Loan Documents. The Borrower agrees to reasonably assist Lender in Lender's efforts to assign or issue participations in this transaction if requested by the Lender.

**Section 8.4     Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument.

**Section 8.5     Governing Law.** This Note shall be governed by and construed in accordance with the internal laws of the State of Florida, including all matters of construction, validity and performance.

**Section 8.6     Severability.** Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdction.

**Section 8.7     Headings.** Headings used in this Agreement are for convenience only and shall not be used in connection with the construction or interpretation of any provision hereof.

**Section 8.8     Entire Agreement.** Except as otherwise expressly provided herein, this Agreement, together with each of the Loan Documents, embody the entire agreement and understanding among the parties hereto and thereto and supersede all prior agreements, understandings, and conversations relating to the subject matter hereof and thereof. The Borrower represents and warrants to the Lender that it has read the provisions of this Section and discussed the provisions of this Section and the rest of this Agreement and the Loan Documents with counsel for the Borrower, and the Borrower acknowledges and agrees that the Lender is expressly relying

513985v2 960766.0213

*118*

upon such representations and warranties of the Borrower (as well as the other representations and warranties of the Borrower set forth in this Agreement and the Loan Documents) in entering into this Agreement and the Loan Documents.

**Section 8.9    Amendment and Waiver.** Neither this Agreement nor any Loan Documents, nor any term hereof or thereof may be amended orally, nor may any provision hereof or thereof be waived orally but only by an instrument in writing signed by the Lender and, in the case of an amendment, by the Borrower.

**Section 8.10    Other Relationships.** No relationship created under this Agreement or under any Loan Document shall in any way affect the ability of the Lender to enter into or maintain business relationships with the Borrower and its Affiliates beyond the relationships expressly contemplated by this Agreement and the Loan Documents.

**Section 8.11    Interpretation.** Should any provision of this Agreement or a Loan Document require a judicial interpretation, it is agreed that the judicial body interpreting or construing this Agreement or such Loan Document shall not apply the assumption that the terms of this Agreement or such Loan Document shall be more strictly construed against one party by reason of the rule of legal construction that an instrument is to be construed more strictly against the party which itself or through its agents prepared the agreement. The Lender and the Borrower acknowledge and agree that they and their attorneys and agents have each participated equally in the negotiation and preparation of this Agreement and the Loan Documents.

**Section 8.12    Survival.** All representations and warranties made under this Agreement or any Loan Document and all statements, certifications and other information provided in or pursuant to this Agreement or any Loan Document shall be deemed to be made, and shall be true and correct, throughout the term hereof and so long as any Obligation remains outstanding, except to the extent previously fulfilled in accordance with the terms hereof and except to the extent that by their respective terms such representations and warranties relate solely to a prior date. All representations and warranties made under this Agreement shall survive six (6) months after the satisfaction of all obligations of Borrower to Lender, and shall not be waived by, the execution hereof by the Lender, any investigaton or inquiry by the Lender.

**Section 8.13    Time of the Essence.** Time is of the essence as to the Loan Documents.

17

# ARTICLE 9

## WAIVER OF JURY TRIAL

**Section 91    WAIVER OF JURY TRIAL. WAIVER OF JURY TRIAL.** TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF BORROWER BY EXECUTION HEREOF AND LENDER BY ACCEPTANCE HEREOF, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS LOAN AGREEMENT, THE LOAN DOCUMENTS OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION WITH THIS LOAN AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO.  THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO ACCEPT THIS LOAN AGREEMENT.  EACH OF THE PARTIES AGREES THAT THE TERMS HEREOF SHALL SUPERSEDE AND REPLACE ANY PRIOR AGREEMENT RELATED TO ARBITRATION OF DISPUTES BETWEEN THE PARTIES CONTAINED IN ANY LOAN DOCUMENT OR ANY OTHER DOCUMENT OR AGREEMENT HERETOFORE EXECUTED IN CONNECTION WITH, RELATED TO OR BEING REPLACED, SUPPLEMENTED, EXTENDED OR MODIFIED BY, THIS LOAN AGREEMENT.

[Remainder of page intentionally blank]

513985v2 960766 0213

120

**IN WITNESS WHEREOF**, the parties hereto have executed this Construction Loan Agreement or caused it to be executed under seal by their duly authorized representatives, all as of the day and year first above written.

"Lender"

**COMERICA BANK**

By:_____
Name: Barry W. Shaw
Title:    Vice President

"Borrower"

By:_____
Name: Daniel Sargeant, as attorney-in-fact for
Harry Sargeant, III

By:_____
Name: Daniel Sargeant

19

121

3

# ASSIGNMENT OF SECURITY AGREEMENT & MORTGAGE

**THIS ASSIGNMENT OF SECURITY AGREEMENT & MORTGAGE** (this "Assignment") made as of August 14, 2009, by **HARRY SARGEANT, III** (hereinafter the "Secured Party") in favor of **COMERICA BANK** (hereinafter the "Assignee").

## W I T N E S S E T H :

A.      A. Worldspan Marine, Inc. ("Builder") and Mortgagee are parties to that certain Yacht Construction Agreement dated February 29, 2008 under the terms of which Builder is constructing a 142 foot motor yacht identified in such agreement as Builder's hull no QEO14226C010

B.      As security for Builder's obligations to Mortgagee, under the terms of the Vessel Construction Agreement Builder granted to Mortgagee (1) a first priority ship mortgage lien on the Vessel, as evidenced by that certain Builder's Mortgage executed by Builder in favor of Mortgagee and filed with Transport Canada and entered in the record book on May 14, 2008, as Mortgage "A" and assigned record no. 3 in 2008, a copy of which is attached hereto as "Exhibit A" (the "Mortgage"), and (2) a security interest in the collateral described in that certain Financing Statement .filed in the British Columbia Personal Property Registry on May 1, 2008 and designated base registration no. 334150E, a copy of which is attached hereto as "Exhibit B". (the "Financing Statement"). The security interest created by the Vessel Construction Agreement and perfected by the Financing Statement is referred to herein as the "Personal Property Collateral".

C.      Assignee will extend credit to Secured Party under the terms of that certain promissory note (the "Note") of even date herewith in the original principal amount of Nine Million Four Hundred Thousand ($9,400,000) subject to among other things, Secured Party assigning to Assignee its rights under the Security Agreement to secure Secured Party's obligations to Assignee under the Note.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Secured Party hereby covenants and agrees in favor of the Assignee as follows:

## ARTICLE I

Section 1.01. **Assignment of Rights by Secured Party.** Secured Party hereby assigns, transfers, delivers, pledges, mortgages, charges, grants and conveys to Assignee all of the Secured Party's right, title and interest in and to the Mortgage and the Personal Property Collateral, and grants a continuing security interest in, and acknowledges and agrees that Assignee has and shall continue to have a continuing security interest in, (a) all right, title, interest and claim of the Secured Party, but none of the obligations, in, to and under the Mortgage and Personal Property Collateral, and (b) all proceeds of any and all of the foregoing (all of the foregoing rights, interests, properties, privileges described in clauses (a) and (b) above assigned and in which a security interest is granted pursuant hereto being hereinafter collectively called the "Collateral").

Section 1.02. **Payments.** The Secured Party hereby authorizes any party at any time holding any funds due the Secured Party under the terms of the Mortgage or the Vessel Construction Agreement and constituting part of the Collateral to pay all such sums due and to become due under the terms of the Mortgage or the Vessel Construction Agreement or in respect of or on account of the Collateral directly to the Assignee to the extent of the Assignee's interest therein, and agrees that such deliveries and payments to the Assignee as

**JUDITH ANN SUTTON**
514071v2 960766.0215   **NOTARY PUBLIC - STATE OF MICHIGAN**
**COUNTY OF WAYNE**
**My Commission Expires Mar. 29, 2014**
*ACTING IN THE COUNTY OF WAYNE*

1   This is Exhibit "D" referred to in the affidavit of Cynthia B. Jones sworn before me at Miller, Canfield, Paddock and Stone, P.L.C. this 7th day of October, 2011

*Judith Ann Sutton*

aforesaid shall be a good receipt and acquittance to the Secured Party to the extent so made. All amounts received by the Assignee shall be applied in accordance with the Vessel Construction Agreement

Section 1.03. **Power of Attorney.** The Secured Party does hereby irrevocably constitute and appoint the Assignee its true and lawful attorney with full power of substitution for it and in its name, place and stead, to ask, demand, collect, receive, receipt for, sue for, compound and give acquittance for any and all Collateral including, without limitation, the power to execute and endorse for transfer for and on behalf of the Secured Party any documents relating to the Vessel Construction Agreement or the Vessel referenced therein and any and all sums which may be or become due or payable to the Secured Party under the Vessel Construction Agreement or in respect of or on account of the Collateral with full power to settle, adjust or compromise any claim under the Vessel Construction Agreement and such sums as fully as the Secured Party could itself do and, in its discretion, to file any claim or take any other action or proceeding, either in its own name or in the name of the Secured Party, or otherwise, which the Assignee may deem necessary or appropriate to collect any and all sums which may be or become due or payable to the Secured Party under the Vessel Construction Agreement or in respect of or on account of the Collateral, or which may be necessary or appropriate to protect and preserve or enforce the right, title and interest of the Assignee in and to the Collateral and the security intended to be afforded hereby. The Secured Party hereby further covenants that it will, upon request of the Assignee, execute and deliver such further instruments and do and perform such other acts and things as the Assignee may deem necessary or desirable to more effectually vest in and secure the Assignee in the Collateral, including without limitation the Vessel and sums due or hereafter to become due under the Vessel Construction Agreement.

Section 1.04. **Performance by Secured Party.** Secured Party further agrees promptly to perform all of its obligations under the Vessel Construction Agreement. In the event the Debtor fails to pay or perform any obligation arising under the Vessel Construction Agreement or this Assignment, Secured Party shall immediately notify Assignee in writing.

Section 1.05. **Acknowledgment of Assignment.** Secured Party agrees to cause Debtor to execute the acknowledgment of this Assignment which is included at the end of this Assignment.

Section 1.06. **Vessel Construction Agreement.** Secured Party agrees, and Debtor by executing the acknowledgment of this Assignment agrees, to the following: (i) upon receipt of a written notice that an Event of Default under the Vessel Construction Agreement has occurred, that all rights of the Secured Party under the Vessel Construction Agreement may only be exercised by the Assignee, and (ii) Secured Party shall provide the Assignee with copies of all notices to the Debtor regarding any default or alleged default by the Debtor under such agreements.

## ARTICLE II

## REPRESENTATIONS, WARRANTIES, AND COVENANTS

Section 2.01. **Representations and Warranties.** The Secured Party represents and warrants to Assignee as follows:

(a)     A true, correct and complete copy of the Mortgage is attached hereto as Exhibit A. A true, correct and complete copy of the Financing Statement is attached hereto as Exhibit B.

(b)     As to the Debtor and the Secured Party, the Vessel Construction Agreement and Mortgage are valid, enforceable and in full force and effect.

2

(c)     The Secured Party is the sole holder of the rights and interests ascribed thereto under the Vessel Construction Agreement the Mortgage and the Financing Statement, and has full power and authority to assign, transfer and set over the same and to grant to and confer upon the Assignee the rights, interests, powers and authorities herein granted and conferred.

(d)     The right of the Secured Party to enforce the Vessel Construction Agreement and Mortgage and the assignment and security interest conveyed hereunder are, and will continue to be, free and clear of all defenses, set-offs, counterclaims, Liens and encumbrances of every kind and nature.

(e)     The Secured Party has observed and performed all covenants and obligations under the Vessel Construction Agreement and Mortgage required to be performed by the Secured Party, and the Secured Party shall observe and perform all of the covenants under the Vessel Construction Agreement and Mortgage required of the Secured Party, it being understood that the Assignee shall not be required or obligated in any manner to perform any of the covenants or obligations of the Secured Party under the Vessel Construction Agreement and Mortgage by reason of this Assignment or otherwise.

(f)     The Secured Party has no knowledge of any facts which impair the validity of the Vessel Construction Agreement or the Mortgage

(g)     The Secured Party will not create any lien or other encumbrance upon the Vessel Construction Agreement, the Vessel or the Personal Property Collateral or the right to payment thereunder, other than in favor of the Assignee.

(h)     Except as consented to in writing by Assignee, the Secured Party will not modify, waive or amend or consent to any modification, waiver or amendment of the Vessel Construction Agreement or the Mortgage in any manner.

(i)     Secured Party has the right to sell, assign, transfer, set over and encumber the Mortgage and the Personal Property Collateral to the Assignee and to grant to and confer upon the Assignee the rights, interests, powers and authorities herein granted and conferred.

(j)     Any and all actions, approvals and consents required by law or by any agreement to which the Secured Party is a party have been obtained in connection with the Secured Party's execution and performance of this Assignment; the Secured Party is under no legal disability affecting the enforceability of this Assignment.

(k)     This Assignment has been duly executed and delivered by the Secured Party and is a legal, valid and binding obligation of the Secured Party, enforceable in accordance with its terms, subject, as to enforcement of remedies, to the qualification that an order of specific performance and an injunction are discretionary remedies and, in particular, may not be available where damages are considered an adequate remedy at law.

3

# ARTICLE III

## DEFAULT

Section 3.01. **Events of Default.** An "Event of Default" shall exist under this Assignment upon the occurrence of any Event of Default (as defined therein) under the Vessel Construction Agreement.

Section 3.02. **Remedies.** Without limiting any rights, remedies or privileges that the Assignee may have under the terms of any instrument or agreement applicable to or related to the Obligations (as defined in the Vessel Construction Agreement), it is understood and agreed that upon the occurrence of an Event of Default, the Assignee, in addition to any other rights or remedies it may have, shall have the right to exercise all the rights, options and remedies of a secured party upon default as provided for under applicable law. Any requirement under applicable law for reasonable notice shall be satisfied if such notice is mailed, postage prepaid, to the Secured Party at its address as shown on the records of the Assignee at least five (5) days before the time of the sale, disposition or other event or thing giving rise to the required notice. The expenses of collecting the sums due or to become due to the Secured Party in, under and pursuant to the Vessel Construction Agreement or in respect of or on account of the Collateral, including without limitation court costs and attorneys' fees incurred in realizing upon the security interest granted hereby or in enforcing this security interest, shall constitute so much additional Obligations which the Secured Party promises to pay to the Assignee upon demand, and may be deducted from the sums so collected.

Without limiting any rights, remedies or privileges that the Assignee may have under the terms of the Construction Agreement, it is understood and agreed that upon the occurrence of any Event of Default hereunder the Assignee may exercise all rights of the Secured Party under the Vessel Construction Agreement.

Section 3.03. **Waiver.** The satisfaction or discharge of any part of the Obligations shall not in any way satisfy or discharge this Assignment, but this Assignment shall remain in full force and effect so long as any amount remains unpaid on any such Obligations or the Assignee is committed to extend credit to or for the account of the Secured Party.

Section 3.04. **Application of Proceeds.** The proceeds of any sale or remedy hereunder, or any part thereof, shall be paid and applied as provided in the Vessel Construction Agreement.

Section 3.05. **Indemnification.** This Assignment shall not operate to place any responsibility or obligation whatsoever upon the Assignee. Neither the Assignee nor its respective employees, representatives, agents, officers and directors, shall assume any liability as a result of this Assignment. The Secured Party agrees to protect, indemnify and save harmless the Assignee and its employees, representatives, agents, officers and directors from and against all losses, liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses including, without limitation, legal fees and expenses (except as may arise from the gross negligence or willful misconduct of the Person seeking indemnification) imposed upon, suffered or incurred by the Assignee, or any of its respective employees, representatives, agents, officers and directors, by reason of this Assignment and any claim or demand whatsoever which may be asserted against the Assignee, or any of its employees, representatives, agents, officers and directors, by reason of any alleged obligation or undertaking to be performed or discharged by the Assignee, under this Assignment. In the event the Assignee, or any of its respective employees, representatives, officers and directors, incur any liability, loss or damage by reason of this Assignment or in curing any default or breach by the Secured Party of its obligations under this Assignment or in the defense of any claims or demands arising out of or in connection with this Assignment, the amount of such liability, loss or damage shall be added to the Obligations and shall be payable upon demand.

4

125

# ARTICLE IV

## MISCELLANEOUS

Section 4.01. **Notices.** Unless specifically indicated otherwise herein, all notices and other communications provided for hereunder shall be in writing and addressed as provided in the Vessel Construction Agreement

Section 4.02. **Severability.** Any provision of this Assignment which is prohibited, unenforceable or not authorized in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition, unenforceability or nonauthorization without invalidating the remaining provisions hereof or affecting the validity, enforceability or legality of such provision in any other jurisdiction.

Section 4.03. **Headings.** Section headings in this Assignment are included herein for convenience of reference only and shall not have any effect for purposes of interpretation or construction of the terms of this Assignment.

Section 4.04. **Successors and Assigns.** This Assignment shall inure to the benefit of and be binding upon the Secured Party and the Assignee and their respective heirs, executors, legal representatives, successors and assigns. Whenever a reference is made in this Assignment to "the Secured Party" or the "Assignee" such reference shall be deemed to include a reference to the heirs, executors, legal representatives, successors and assigns of the Secured Party and the Assignee, as the case may be.

Section 4.05. **Amendments.** The Secured Party agrees that it will not agree to any amendment or modification to or termination of the Vessel Construction Agreement or sell or assign any of its interests therein or waive compliance by Debtor with any of the material terms and conditions thereof, without in each case first securing the prior written consent of the Assignee. Upon notice to Debtor from Assignee that an Event of Default has occurred, Debtor agrees to send to the Assignee copies of all notices and communications with respect to the Vessel Construction Agreement which are required to be sent to the Secured Party pursuant to the Vessel Construction Agreement. If the Vessel Construction Agreement is revoked or otherwise loses full force and effect, the Secured Party will give written notice thereof to the Assignee within five (5) days after the Secured Party knows or has reason to know thereof.

Section 4.06. **Cumulative Remedies.** The remedies herein provided shall be in addition to and not in substitution of the rights and remedies vested in the Assignee in any of the Loan Documents or in law or equity, all of which rights and remedies are specifically reserved by the Assignee. The remedies herein provided or otherwise available to the Assignee shall be cumulative and may be exercised concurrently. The failure to exercise any of the remedies herein provided shall not constitute a waiver thereof, nor shall use of any of the remedies herein provided prevent the subsequent or concurrent resort to any other remedy or remedies. It is intended that this clause shall be broadly construed so that all remedies herein provided or otherwise available to the Assignee shall continue and be each and all available to the Assignee until the Obligations shall have been paid in full.

Section 4.07. **Liability of the Secured Party.** The Secured Party, by its execution hereof, acknowledges and agrees that it is and remains liable for the performance of any and all of its obligations under the Vessel Construction Agreement to the same extent as though this Assignment had not been made and further acknowledges that this Assignment constitutes an assignment of the rights of the Secured Party pursuant to said Agreement and not an assignment of any duties or obligations of the Secured Party with

5

respect to the Vessel Construction Agreement, it being understood that the Assignee shall not be in any manner responsible for the performance of any of such duties and obligations.

Section 4.08. **Integration.** This Assignment shall supersede any prior agreement or understanding between the parties (other than the Loan Documents) as to the subject matter hereof.

Section 4.09. **Counterparts.** This Assignment may be executed in any number of counterparts, each of which shall be deemed to be an original and shall be binding upon both parties, their successors and assigns.

Section 4.10. **GOVERNING LAW.** THIS ASSIGNMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA AND THE FEDERAL LAWS OF THE UNITED STATES APPLICABLE THEREIN; PROVIDED, THAT TO THE EXTENT THAT PERFECTION AND PRIORITY OF ANY PROPERTY ASSIGNED HEREUNDER IS GOVERNED BY CANADIAN OR BRITISH COLUMBIA LAW THEN CANADIAN OR BRITISH COLUMBIA LAW SHALL CONTROL.

[Remainder of page intentionally left blank]

514071v2 960766.0213

**IN WITNESS WHEREOF**, the parties hereto have caused this Assignment to be duly executed and delivered under seal by their respective officers thereunto duly authorized, to be effective as of August 14, 2009.

"Secured Party"

By: _____

Name:  Daniel Sargeant, as Attorney-in-fact for Harry Sargeant, III

"Assignee"

**Comerica Bank**

By: _____

Name: Barry W. Shaw

Title: Vice President

The terms of this Assignment are acknowledged and consented to by Debtor:

**"Debtor"**

Worldspan Marine, Inc.

By: _____

Name:

Title:

7

514071v2 960766.0213

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be duly executed and delivered under seal by their respective officers thereunto duly authorized, to be effective as of August 14, 2009.

"Secured Party"

By: _____
Name:  Daniel Sargeant, as Attorney-in-fact for Harry Sargeant, III

"Assignee"

Comerica Bank

By: _____
Name: Barry W. Shaw
Title: Vice President

The terms of this Assignment are acknowledged and consented to by Debtor:

"Debtor"

Worldspan Marine, Inc.

By: _Lee Taubeneck_
Name: LEE TAUBENECK
Title: PRESIDENT

7

514071v2 960766.0213

**Exhibit A**

**Builder's Mortgage**

8

130

Transport Canada · Transports Canada

PROTECTED "A" WHEN COMPLETED - PROTÉGÉ « A » LORSQUE REMPLI   FORM/FORMULAIRE 16

**BUILDER'S MORTGAGE**
**HYPOTHÈQUE DE CONSTRUCTEUR**

Entered as Mortgage "A" in the Record Book
Inscrit comme hypothèque « A » au livre d'inscription

Date (dd-mm-yyyy / jj-mm-aaaa): 14~05~2008
at / à 10:25   am/pm

Registrar - Registraire.

| Record no. - N° d'inscription | Temporary name or Hull no. - Nom provisoire ou numéro de coque | Intended / port of registry - Port d'immatriculation / prévu |
|---|---|---|
| 3 in 2008 | QE014226C010 | Not in Canada |

**A- BUILDER'S MORTGAGE - HYPOTHÈQUE DE CONSTRUCTEUR**

| Full legal name(s) and address(es) of registered owner(s)/mortgagor(s)  Nom(s) officiel(s) au complet et adresse(s) du(des) propriétaire(s)/débiteur(s) hypothécaire(s) | Number of shares  Nombre de parts |
|---|---|
| WORLDSPAN MARINE INC., 27222 Lougheed Highway, Maple Ridge, BC   V2W 1V9 | 64 |

**Whereas** (State that there is an account current between mortgagor and mortgagee (describing both), and describe the nature of the transaction so as to show how the amount of principal and interest due at any given time is to be ascertained and the manner and time of payment.)
**Considérant que** (Indiquer qu'il existe un compte courant entre le débiteur hypothécaire et le créancier hypothécaire en désignant l'un et l'autre et décrire la nature de l'opération de façon à indiquer comment le montant du principal et des intérêts dus à date fixe, doivent être déterminés, et le mode et la date du paiement).

There is an account current pursuant to that certain Vessel Construction Agreement dated February 29, 2008 among mortgagor and mortgagee which Agreement specifies the obligations hereby secured.

Full legal name(s) and address(es) of mortgagee(s) - Nom(s) officiel(s) au complet et adresse(s) du(es) créancier(s) hypothécaire(s)

HARRY SARGEANT III, 3020 N. Military Trail, Suite 100, Boca Raton, Florida 33431

I/We, the mortgagor(s) in consideration of the above now covenant with the mortgagee(s) to pay to the mortgagee(s) the sums for the time being due on this security, whether by way of principal or interest, at the times and in the manner set out. For the purpose of better securing payment to the mortgagee(s), the mortgagor(s) hereby mortgage to the mortgagee(s)    64    shares (number of shares must be indicated) of which the mortgagor(s) are the owner(s) in the vessel described above, and in its boats and appurtenances. Further, the mortgagor(s) covenant with the mortgagee(s) that the mortgagor(s) have the power to mortgage the shares and that they are free of encumbrances except as appears in the record of the said vessel. (delete if not applicable)

Je/Nous, débiteur(s) hypothécaire(s) en contrepartie, nature de laquelle est décrite ci-dessus, convenons avec le(s) créancier(s) hypothécaire(s) de lui/leur payer dès lors les sommes dues sur la présente garantie, soit en principal, soit en intérêts, aux dates et de la manière indiquées. Afin de mieux garantir au(x) créancier(s) hypothécaire(s) le paiement de ces sommes, déclarent hypothéquer au(x) créancier(s) hypothécaire(s)    parts (indiquer le nombre de parts) dans le bâtiment susmentionné et appareaux. En outre, le(s) débiteur(s) hypothécaire(s) conviennent avec le(s) créancier(s) hypothécaire(s) que celui-ci(ceux ci) a(ont) le pouvoir d'hypothéquer ces parts et que celles-ci sont libres de charge sauf pour ce qui figure d'après l'inscription dudit bâtiment. (rayer si non applicable)

| Issued at  Délivré à | Maple Ridge, B.C.  Place - Endroit | on  le | 06 -05- 2008  Date (dd-mm-yyyy / jj-mm-aaaa) |
|---|---|---|---|

IN THE PRESENCE OF: - EN PRÉSENCE DE :   INDIVIDUAL: - PARTICULIER:

_____
Signature

Name and title (please print) - Nom et titre (en lettres moulées)

Signature of registered owner/mortgagor - Signature du propriétaire enregistré/débiteur hypothécaire

Signature of registered owner/mortgagor - Signature du propriétaire enregistré/débiteur hypothécaire

Address - Adresse

Signature of registered owner/mortgagor - Signature du propriétaire enregistré/débiteur hypothécaire

CORPORATION OR INDIAN BAND
PERSONNE MORALE OU BANDE INDIENNE

WORLDSPAN MARINE INC.
Name of Corporation / Indian Band (please print) - Nom de la personne morale/Bande indienne (en lettres moulées)

Signature

Jim Hawkins, Director
Name and title of person signing above (please print) - Nom et titre de la personne signant ci-dessus (en lettres moulées)

SEAL
SCEAU

Canada

| Record no. - Nº d'inscription | Temporary name or Hull no. - Nom provisoire ou numéro de coque | Intended / port of registry - Port d'immatriculation / prévu |
| --- | --- | --- |

**B - DISCHARGE OF BUILDER'S MORTGAGE - MAINLEVÉE DE L'HYPOTHÈQUE DE CONSTRUCTEUR**

I/We, the mortgagee(s) authorize the discharge of the mortgage described above
Je/Nous, le(s) créancier(s) hypothécaire(s), autorise(autorisons) la mainlevée de l'hypothèque décrite ci-dessus

Issued at
Délivré à _____ on le _____
Place - Endroit                                                                                   Date (dd-mm-yyyy / jj-mm-aaaa)

IN THE PRESENCE OF: - EN PRÉSENCE DE :                         INDIVIDUAL: - PARTICULIER:

_____                              _____
Signature                                                                Signature of mortgagee - Signature du créancier hypothécaire

_____                              _____
Name and title (please print) - Nom et titre (en lettres moulées)      Signature of mortgagee - Signature du créancier hypothécaire

_____
Address - Adresse

CORPORATION
OR INDIAN BAND          →  _____
PERSONNE MORALE            Name of Corporation / Indian Band (please print) - Nom de la personne morale/Bande indienne (en lettres moulées)
OU BANDE INDIENNE

SEAL
SCEAU

_____
Signature

_____
Name and title of person signing above (please print) - Nom et titre de la personne signant ci-dessus (en lettres moulées)

CORPORATION
OR INDIAN BAND          →  _____
PERSONNE MORALE            Name of Corporation / Indian Band (please print) - Nom de la personne morale/Bande indienne (en lettres moulées)
OU BANDE INDIENNE

SEAL
SCEAU

_____
Signature

_____
Name and title of person signing above (please print) - Nom et titre de la personne signant ci-dessus (en lettres moulées)

**NOTES: - REMARQUES :**

1. The expressions "mortgagee" and "mortgagor " used in this document include their heirs, successors, assigns, executors, administrators and any other legal representative.
   Les termes "débiteur hypothécaire" et "créancier hypothécaire" employés dans le présent acte visent leurs héritiers, successeurs, ayants droit, exécuteurs, administrateurs et tout autre représentant légal.
2. This mortgage must be completed by all of the owner(s). If jointly owned, all the joint owners must act together.
   L'hypothèque doit être complétée par tous les propriétaires. Dans le cas d'un intérêt conjoint, tous les propriétaires conjoints doivent agir ensemble.
3. In the case of a corporation, this Mortgage must be made by an officer of the corporation authorized by company resolution or by affixing the seal of the corporation on this form. Dans le cas d'une personne morale, l'hypothèque doit être faite par un agent de la personne morale autorisé par une résolution de celle-ci ou doit porter le sceau de la personne morale.
4. In the case of an Indian Band, this Application must be made by person(s) authorized by Band Council Resolution.
   Dans le cas d'une bande indienne, la demande doit être faite par une(des) personne(s) autorisée(s) par une résolution du Conseil de bande.
5. The original builder's mortgage deed must be presented to discharge a builder's mortgage or if not available, by Statutory Declaration.
   L'acte hypothécaire original du constructeur ou, si cet acte n'est pas disponible, une déclaration solennelle doit être produite pour la mainlevée de l'hypothèque du constructeur.

**Exhibit B**

**Financing Statement**

TRUCTED BY BUILDER, TOGETHER WITH ANY AND ALL PRESENT AND FUTURE MATER
IALS, COMPONENTS, ENGINES, BOILERS, MACHINERY, MASTS, BOATS, ANCHORS,
CABLES, CHAINS, RIGGING, TACKLE, APPAREL, FURNITURE, CAPSTANS, OUTFIT,
TOOLS, PUMPS, GEAR, FURNISHINGS, APPLIANCES, FITTINGS, SPARE AND REPL
ACEMENT PARTS FOR SUCH VESSEL AND ANY AND ALL MANUALS, MATERIALS, SUPP
LIES AND COMPONENTS IN ANY WAY RELATED TO THE CONSTRUCTION OF SUCH VES
SEL AND ANY AND ALL OTHER APPURTENANCES THERETO, APPERTAINING OR BELON
GING TO SUCH VESSEL, WHETHER NOW OR HEREAFTER ACQUIRED, AND WHETHER ON
BOARD OR NOT ONBOARD, TOGETHER WITH ANY AND ALL PRESENT AND FUTURE ADD
ITIONS, IMPROVEMENTS AND REPLACEMENTS THEREFOR, MADE IN OR TO SAID VES
SEL, OR ANY PART OR PARTS THEREOF.

--------------- A M E N D M E N T / O T H E R   C H A N G E ---------------

        Reg. #: 989187D                    Reg. Date: OCT 19, 2007
                                           Reg. Time: 10:05:00
                                           Control #: B8347024
        Base Reg. Type: PPSA SECURITY AGREEMENT
        Base Reg. #: 931405D          Base Reg. Date: SEP 21, 2007

                                              Continued on Page 15

Search Criteria: WORLDSPAN MARINE INC                    Page: 15

        Details Description:
        ADDITION OF DEBTOR
Block#

        *** ADDED ***
D0002   Bus. Debtor: WORLDSPAN MARINE INC.
                     27222 LOUGHEED HIGHWAY
                     MAPLE RIDGE BC  V2W 1V9

        Registering
             Party: LINDSAY KENNEY
                    1800 -401 WEST GEORGIA STREET
                    VANCOUVER B.C.  V6B 5A1

*************** P P S A   S E C U R I T Y   A G R E E M E N T ***************

        Reg. Date: MAY 01, 2008           Reg. Length: 5 YEARS
        Reg. Time: 11:29:29               Expiry Date: MAY 01, 2013
        Base Reg. #: 334150E              Control #: B8703229
Block#

S0001   Secured Party: HARRY SARGENT III
                       3020 N. MILITARY TRAIL, #100
                       BOCA RATON FL  33431

=D0001  Base Debtor: WORLDSPAN MARINE INC
        (Business) 27222 LOUGHEED HWY, PO BOX 10
                   MAPLE RIDGE BC  V2W 1V9

        General Collateral:
        A FIBREGLASS COMPOSITE MOTOR YACHT KNOWN AS A CRESCENT CUSTOM 142'
        TRILEVEL MOTOR YACHT CARRYING BUILDER'S HULL NUMBER QEO14226C010
        (THE "VESSEL") BEING CONSTRUCTED BY WORLDSPAN MARINE INC.

("WORLDSPAN") AT OR ABOUT 27222 LOUGHEED HIGHWAY, MAPLE RIDGE, BRITISH COLUMBIA, AND ALL ITEMS IDENTIFIED FOR USE IN THE CONSTRUCTION OF THE VESSEL UNDER THE TERMS OF THAT VESSEL CONSTRUCTION AGREEMENT DATED FEBRUARY 29, 2008 MADE BETWEEN WORLDSPAN AS BUILDER AND HARRY SARGEANT III AS OWNER, WHETHER SUCH ITEMS ARE NOW EXISTING OR HEREAFTER ACQUIRED, INCLUDING, WITHOUT LIMITATION:

A. ALL PARTS, MATERIAL, EQUIPMENT, INVENTORY AND OTHER GOODS (THE "COMPONENTS") CREATED, MANUFACTURED, ORDERED OR DELIVERED FOR PLACEMENT ON OR INCORPORATION INTO THE VESSEL OR WHICH ARE OTHERWISE IDENTIFIED FOR USE IN CONNECTION WITH CONSTRUCTION OF THE VESSEL OR IN THE VESSEL CONSTRUCTION AGREEMENT;
B. ALL ACCOUNTS, CHATTEL PAPER, DOCUMENTS, INSTRUMENTS, PROMISSORY NOTES, INVESTMENT PROPERTY, LETTERS OF CREDIT, COMMERCIAL TORT CLAIMS OR GENERAL INTANGIBLES IN RESPECT OF THE VESSEL OR THE VESSEL CONSTRUCTION AGREEMENT;
C. THE RIGHTS OF WORLDSPAN TO ANY PLANS, SPECIFICATIONS, SHOP DRAWINGS, COMPUTER PRINTOUTS, DIAGRAMS, MODELS AND ELECTRONIC DATA OR OTHERWISE RELATED TO OR FOR THE USE IN THE DESIGN OR CONSTRUCTION OF THE VESSEL OR IN RESPECT OF THE VESSEL;
D. THE RIGHTS OF WORLDSPAN TO ANY SOFTWARE, INCLUDING OPERATING

Continued on Page 16

Search Criteria: WORLDSPAN MARINE INC                Page: 16

PROGRAMS, APPLICATIONS AND ELECTRONIC DATA AND FILES FOR USE IN THE DESIGN OR CONSTRUCTION OF THE VESSEL OR IN RESPECT OF THE VESSEL INCLUDING ALL RIGHTS AND LICENSES OF WORLDSPAN TO USE SUCH SOFTWARE; AND
E. ALL PROCEEDS, INCLUDING, WITHOUT LIMITATION, ANY INSURANCE CLAIMS OR PROCEEDS, IN RESPECT OF ANY OF THE FOREGOING.
FOR THE PURPOSES OF PARAGRAPH A ABOVE EACH OF THE COMPONENTS SHALL BE CONSIDERED AS BEING IDENTIFIED TO THE VESSEL OR TO THE VESSEL CONSTRUCTION AGREEMENT, DEPENDING ON THE NATURE OF SUCH COMPONENT, AS FOLLOWS:
1. WHEN IT BEGINS TO BE MANUFACTURED IN ACCORDANCE WITH THE PLANS AND SPECIFICATIONS, IF IT IS SPECIFICALLY MANUFACTURED BY WORLDSPAN,
2. WHEN IT IS REMOVED FROM INVENTORY, IF IT IS TAKEN FROM THE GENERAL INVENTORY OF WORLDSPAN,
3. WHEN IT IS DELIVERED TO WORLDSPAN FOR THE VESSEL, IF IT IS ORDERED SPECIFICALLY FOR THE VESSEL AND PART OF THE SUPPLIER'S INVENTORY;
4. WHEN IT IS IDENTIFIED BY THE MANUFACTURER, IF IT IS ORDERED SPECIFICALLY FOR THE VESSEL; OR
5. WHEN IT IS INCORPORATED INTO, ATTACHED, OR PLACED ON THE VESSEL, IF IT IS ANYTHING OTHER THAN THE ITEMS SET FORTH ABOVE IN CLAUSES (1), (2), (3) OR (4).
TERMS USED HEREIN THAT ARE DEFINED IN THE PERSONAL PROPERTY SECURITY ACT (BRITISH COLUMBIA), THE REGULATIONS MADE THEREUNDER OR ANY AMENDMENTS MADE THERETO HAVE THOSE DEFINED MEANINGS.

Registering

135

Party: LANG MICHENER LLP
          BOX 11117,1500 1055 W. GEORGIA
          VANCOUVER BC  V6E 4N7

**********************************************************************

   Some, but not all, tax liens and other Crown claims are registered at the
   Personal Property Registry (PPR) and if registered, will be displayed on
   this search result.  HOWEVER, it is possible that a particular chattel is
   subject to a Crown claim that is not registered at the PPR.  Please consult
   the Miscellaneous Registrations Act, 1992 for more details.  If you are
   concerned that a particular chattel may be subject to a Crown claim not
   registered at the PPR, please consult the agency administering the type
   of Crown claim.

   >>>>>>>>>>>>>>>>>>>>>>>>>>>>>>> END OF SEARCH <<<<<<<<<<<<<<<<<<<<<<<<<<<<<<



136

Page: 1

2009/08/12
Lterm: XPSP0050          For: PZ69191  LANG MICHENER          15:23:13

Attn./Ref. No.: 57206-10

*************** P P S A   S E C U R I T Y   A G R E E M E N T ***************

Reg. Date: AUG 12, 2009          Reg. Length: 3 YEARS
Reg. Time: 15:23:13              Expiry Date: AUG 12, 2012
Base Reg. #: 123779F             Control #: B9514907
Block#

S0001  Secured Party: COMERICA BANK
                      100 NE 3RD AVENUE, SUITE 100
                      FORT LAUDERDALE FL  33302

D0001  Base Debtor: SARGEANT              HARRY              III
       (Individual) #100-3020 NORTH MILITARY TRAIL    Birthdate:
                     BOCA RATON           FL    33431

General Collateral:
ALL OF THE RIGHT, TITLE AND INTEREST OF DEBTOR IN AND TO ALL OF THE
FOLLOWING PROPERTY (COLLECTIVELY, THE "COLLATERAL"):
(A) THAT AGREEMENT (THE "VESSEL CONSTRUCTION AGREEMENT") DATED
FEBRUARY 29, 2008 MADE BETWEEN WORLDSPAN MARINE INC. AND THE
DEBTOR FOR THE CONSTRUCTION OF A CRESCENT CUSTOM 142' TRILEVEL
YACHT HAVING BUILDER'S HULL NO. QE014226C010 (THE "VESSEL") AND ALL OF
THE RIGHTS, CLAIMS, BENEFITS, POWERS AND REMEDIES OF DEBTOR
THEREUNDER, INCLUDING, WITHOUT LIMITATION, THE RIGHT TO ENSURE THE
COMPLETION OF CONSTRUCTION OF THE VESSEL, AND THE RIGHT TO ALL
MONIES AND CLAIMS FOR MONIES OWING OR WHICH AT ANY TIME HEREAFTER
MAY BECOME OWING TO DEBTOR UNDER OR AS A RESULT OF THE BREACH OF
THE VESSEL CONSTRUCTION AGREEMENT, THE BUILDERS MORTGAGE IN
RESPECT OF THE VESSEL GRANTED TO DEBTOR PURSUANT TO THE VESSEL
CONSTRUCTION AGREEMENT (AND HAVING RECORD NO. 3 IN 2008 IN THE SHIP
REGISTRY VANCOUVER), AND THE SECURITY INTEREST GRANTED TO DEBTOR
PURSUANT TO THE VESSEL CONSTRUCTION AGREEMENT (AND HAVING BASE
REGISTRATION NO. 334150E);
(B) ALL RIGHT, TITLE AND INTEREST IN AND TO ANY OTHER CONTRACTS,
SUBCONTRACTS OR AGREEMENTS FOR SERVICES, LABOR OR MATERIALS
PERTAINING TO THE VESSEL, AND ALL CLAIMS AND RIGHTS WITH RESPECT TO
NON-PERFORMANCE OR BREACH OF SAID CONTRACTS, SUBCONTRACTS AND
AGREEMENTS;
(C) ALL RIGHT, TITLE AND INTEREST IN AND TO ANY PROCEEDS, REVENUES,
OR OTHER BENEFITS ARISING UNDER OR PURSUANT TO ANY OF THE ASSIGNED
CONTRACTS (AS DEFINED HEREIN) AND ALL MONIES, ADDITIONAL DOCUMENTS
OR INSTRUMENTS, OR OTHER PROPERTY AT ANY TIME AND FROM TIME TO TIME
PAYABLE, RECEIVABLE, OR OTHERWISE DISTRIBUTABLE IN RESPECT OF, IN
EXCHANGE FOR, OR IN SUBSTITUTION OF ANY OF THE ASSIGNED CONTRACTS
INCLUDING, WITHOUT LIMITATION, ANY RIGHT TO RECEIVE PROCEEDS OF ANY
INSURANCE, INDEMNITY, WARRANTY OR GUARANTY WITH RESPECT TO ANY OF
THE ASSIGNED CONTRACTS;
(D) ALL RIGHTS, CLAIMS, POWERS, PRIVILEGES, AND REMEDIES OF DEBTOR,
WHETHER ARISING BY STATUTE, AT LAW, IN EQUITY OR OTHERWISE, OR
PROVIDED FOR IN THE ASSIGNED CONTRACTS FOR THE FAILURE ON THE PART
OF ANY PARTY TO PERFORM OR COMPLY WITH ANY TERM OF THE ASSIGNED

Continued on Page 2

Control #: B9514907        Page: 2

CONTRACTS;
(E) ALL MONIES AND CLAIMS FOR MONIES OWING OR WHICH AT ANY TIME
HEREAFTER MAY BECOME OWING TO DEBTOR FROM UNDERWRITERS,
INSURANCE COMPANIES, INDEMNITORS OR FUNDS IN RESPECT OF ANY TYPE OF
INSURANCE ON THE VESSEL OR ON ANY MATERIALS, MACHINERY, PARTS OR
EQUIPMENT THEREFORE, WHETHER SUCH INSURANCE BE MAINTAINED BY
DEBTOR OR THE BUILDER;
(F) ALL MONIES AND CLAIMS FOR MONIES OWING OR WHICH AT ANY TIME
HEREAFTER MAY BECOME OWING TO DEBTOR, AND ALL CLAIMS OF DEBTOR
FOR DAMAGES, IN RESPECT OF THE ACTUAL OR CONSTRUCTIVE TOTAL LOSS OF
THE VESSEL.
PROCEEDS : ALL PROCEEDS THAT ARE GOODS, CHATTEL PAPER,
INTANGIBLES, INSTRUMENTS, DOCUMENTS OF TITLE, INVESTMENT PROPERTY,
MONEY OR OTHER PRESENT OR AFTER-ACQUIRED PERSONAL PROPERTY.
TERMS USED IN THIS GENERAL COLLATERAL DESCRIPTION WHICH ARE
DEFINED IN THE PERSONAL PROPERTY SECURITY ACT (BRITISH COLUMBIA)
SHALL HAVE THE MEANINGS SPECIFIED IN THAT ACT, UNLESS THE CONTEXT
OTHERWISE REQUIRES.
THE TERM "ASSIGNED CONTRACTS" SHALL MEAN THE VESSEL CONSTRUCTION
AGREEMENT AND ALL OF THE CONTRACTS ASSIGNED TO SECURED PARTY
PURSUANT TO THE ASSIGNMENT OF VESSEL CONSTRUCTION AGREEMENT BY
AND BETWEEN DEBTOR, AS ASSIGNOR, AND SECURED PARTY AS ASSIGNEE
DATED AUGUST 14, 2009.

Registering
    Party: LANG MICHENER LLP
            BOX 11117,1500 1055 W. GEORGIA
            VANCOUVER BC  V6E 4N7

>>>>>>>>>>>>>>>>>>>>>>>>>>> END OF DOCUMENT PRINT <<<<<<<<<<<<<<<<<<<<<<<<<

138

(a)

## ASSIGNMENT OF INSURANCES
### (Construction Period)

**HARRY SARGEANT, III** (hereinafter called the "Purchaser"), is the purchaser of an 142 foot motor yacht identified as hull no. QEO14226C010 (the "Vessel") being built for the Purchaser by Worldspan Marine, Inc., a British Columbia corporation (the "Builder"), pursuant to the Vessel Construction Agreement between Purchaser and Builder, dated as of February 29, 2008, as at any time amended (the "Vessel Construction Agreement") regarding the construction and purchase of the Vessel, title to which Vessel remains in the Builder during construction **Comerica Bank** ("Assignee") is making a Nine Million Four Hundred Thousand and 00/100 Dollars ($9,400,000.00) loan to Purchaser to partially finance the construction and acquisition of the Vessel (the "Loan") under the terms of the Vessel Construction Agreement

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Builder do hereby assign, unto Assignee, and unto the Assignee's successors and assigns, to its and its successors and assigns' own proper use and benefit, as collateral security for Purchaser's indebtedness to the Assignee now or hereafter existing, all rights, title and interest of the Builder and Purchaser, as loss payee or otherwise as their interests may appear, under, in and to:

A.  With respect to the Vessel only, subject to Builder's Retained Interest (defined below), all insurances (including, without limitation, all builder's risks insurance or marine insurance), whether heretofore, now or hereafter effected, and all renewals of or replacements for the same (whether such insurance be maintained by Builder or Purchaser);

B.  With respect to the Vessel only, subject to Builder's Retained Interest, all insurance claims and proceeds thereof, returns of premium and other monies and claims for monies which may be or become payable under or in respect of any of said insurances, including any amounts payable due to the partial loss or actual, constructive, agreed, arranged or compromised total loss of the Vessel, or due to the loss, damage or destruction of any materials, machinery, parts, furnishings or any type of equipment therefor;

C.  With respect to the Vessel only, and subject to Builder's Retained Interest, all other rights of Purchaser or Builder under or in respect of any of said insurances; and

D.  All proceeds of all of the foregoing.

The items assigned in "A" through "D" above are hereinafter referred to as the "Insurances".

**Notwithstanding any of the provisions of this Assignment to the contrary, Builder retains a first right to payment under the Insurances for all amounts due and payable to Builder under the terms of the Vessel Construction Agreement ("Builder's Retained Interest").**

This Assignment is made pursuant to the Note dated as of even date herewith (the "Note") executed and delivered by Purchaser, as maker, in favor of Assignee, as payee, and various other documents executed or to be executed in connection therewith (the Note and such other documents being collectively the "Loan Documents") between Assignee and the Purchaser.  This Assignment is intended to grant to Assignee a security interest in the assigned property as security for all amounts due Assignee under the Loan Documents and all other moneys due and to become due from Purchaser to Assignee, whether under said Loan Documents, or otherwise, and may be further assigned in connection with the enforcement of said security interest of Assignee.

1

This is Exhibit "E" referred to in the affidavit of Cynthia B. Jones sworn before me at Miller, Canfield, Paddock and Stone, P.L.C. this 7th day of October, 2011

_Judith Ann Sutton_

514053v2 960766.0315

**JUDITH ANN SUTTON**
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WAYNE
My Commission Expires Mar. 29, 2014
ACTING IN THE COUNTY OF WAYNE

It is expressly agreed that anything herein contained to the contrary notwithstanding, Purchaser and Builder, as applicable, shall remain liable under said Insurances to perform all of the obligations assumed by them thereunder. Assignee shall have no obligation or liability (including, without limitation, any obligation or liability with respect to the payment of premiums, calls or assessments) under said Insurances by reason of or arising out of this instrument of assignment, nor shall Assignee be required or obligated in any manner to perform or fulfill any obligations of Purchaser or Builder under or pursuant to said Insurances, or to make any payment, or to make any inquiry as to the nature or sufficiency of any payment received by them, or to present or file any claim, or to take any other action to collect or enforce the payment of any amounts which may have been assigned to them, or to which they may be entitled hereunder at any time or times.

Purchaser does hereby constitute Assignee, its successors and assigns, their true and lawful attorney, irrevocably, with full power (in their name or otherwise) to ask, require, demand, receive, compound and give acquittance for any and all moneys and claims for moneys due and to become due under or arising out of said Insurances, to endorse any checks or other instruments or orders in connection therewith, to make, compromise, withdraw or otherwise deal with any claims, and/or to take any action or institute any proceedings which Assignee may deem to be necessary or advisable in the premises. The powers and authority granted to Assignee herein have been given for a valuable consideration and are hereby declared to be irrevocable.

Purchaser and Builder do hereby warrant and represent that they have not assigned, pledged or in any way created or suffered to be created a security interest in the whole or any part of the right, title and interest hereby assigned except in favor of Assignee. Purchaser and Builder hereby covenant that, without the prior written consent thereof of Assignee, so long as this instrument of assignment shall remain in effect, it will not assign or pledge or create a security interest in the whole or any part of the right, title and interest hereby assigned to anyone other than Assignee, its successors or assigns, and it will not take or omit to take any action, the taking or omission of which might result in an alteration or impairment of said Insurances, of this Assignment or of any of the rights created by said Insurances or this Assignment.

Purchaser and Builder agree that at any time and from time to time, upon the written request of Assignee, its successors and assigns, Purchaser and Builder will promptly and duly execute and deliver any and all such further instruments and documents as Assignee, its successors and assigns, may reasonably request in order to obtain the full benefits of this Assignment and of the rights and powers herein granted. Purchaser shall reimburse Builder for Builder's reasonable out of pocket costs and expenses associated with complying with the preceding sentence.

Any payments made pursuant to the terms hereof shall be made to such account as may, from time to time, be designated by Assignee, and shall be applied as provided in the Loan Documents.

This Assignment shall be governed by the laws of the State of Florida and may not be amended or changed except by an instrument in writing; provided, that to the extent that perfection and priority of any property assigned hereunder is governed by Canadian or British Columbia law, then Canadian or British Columbia law shall control.

Purchaser and Builder hereby authorize Assignee to execute on its behalf and file, at any time and from time to time, any Financing Statements (Form UCC-1) and amendments thereto (Form UCC-3) as provided in Article 9 of the Uniform Commercial Code, or papers of similar purpose or effect in respect of this Assignment in any applicable jurisdiction which may be necessary or desirable to perfect the security interests of Assignee hereunder.

2



All of the provisions of this Assignment shall be binding upon Purchaser and Builder and their successors, executors or personal representatives and shall inure to the benefit of Assignee and its successors and assigns. Any and all rights assigned herein may be further assigned by Assignee.

By executing this Assignment, it is acknowledged by the parties that the rights assigned to Assignee herein shall be no greater than Purchaser's rights under the Construction Agreement  The parties expressly acknowledge Builder's first lien rights and rights to payment of any insurance proceeds.  Builder has no duties to Purchaser that are not expressly set forth in the Vessel Construction Agreement and no additional obligations are created except as modified by this Assignment, as their interests may appear.

[Remainder of page intentionally left blank]

3



**IN WITNESS WHEREOF**, Purchaser and Builder have caused this Assignment to be duly executed as of the 14th day of August, 2009.

**Purchaser:**

By: _____

Name: Daniel Sargeant, as attorney-in-fact
for Harry Sargeant, III

**Builder:**

Worldspan Marine, Inc.

By: _____
Name: _____
Title: _____

The Assignee acknowledges and accepts this assignment:

Comerica Bank

By: _____
Name: Barry W. Shaw
Title: Vice President

4

**IN WITNESS WHEREOF**, Purchaser and Builder have caused this Assignment to be duly executed as of the 14th day of August, 2009.

Purchaser:

By: _____
Name:  Daniel Sargeant, as attorney-in-fact
for Harry Sargeant, III


**Builder:**

Worldspan Marine, Inc.


By: _____
Name: _____
Title: _____


The Assignee acknowledges and accepts this assignment:

Comerica Bank

By: _____
Name: Barry W. Shaw
Title: Vice President

4

## ASSIGNMENT OF INSURANCES
### (Construction Period)

**HARRY SARGEANT, III** (hereinafter called the "Purchaser"), is the purchaser of an 142 foot motor yacht identified as hull no. QEO14226C010 (the "Vessel") being built for the Purchaser by Worldspan Marine, Inc., a British Columbia corporation (the "Builder"), pursuant to the Vessel Construction Agreement between Purchaser and Builder, dated as of February 29, 2008, as at any time amended (the "Vessel Construction Agreement") regarding the construction and purchase of the Vessel, title to which Vessel remains in the Builder during construction **Comerica Bank** ("Assignee") is making a Nine Million Four Hundred Thousand and 00/100 Dollars ($9,400,000.00) loan to Purchaser to partially finance the construction and acquisition of the Vessel (the "Loan") under the terms of the Vessel Construction Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Builder do hereby assign, unto Assignee, and unto the Assignee's successors and assigns, to its and its successors and assigns' own proper use and benefit, as collateral security for Purchaser's indebtedness to the Assignee now or hereafter existing, all rights, title and interest of the Builder and Purchaser, as loss payee or otherwise as their interests may appear, under, in and to:

A.  With respect to the Vessel only, subject to Builder's Retained Interest (defined below), all insurances (including, without limitation, all builder's risks insurance or marine insurance), whether heretofore, now or hereafter effected, and all renewals of or replacements for the same (whether such insurance be maintained by Builder or Purchaser);

B.  With respect to the Vessel only, subject to Builder's Retained Interest, all insurance claims and proceeds thereof, returns of premium and other monies and claims for monies which may be or become payable under or in respect of any of said insurances, including any amounts payable due to the partial loss or actual, constructive, agreed, arranged or compromised total loss of the Vessel, or due to the loss, damage or destruction of any materials, machinery, parts, furnishings or any type of equipment therefor;

C.  With respect to the Vessel only, and subject to Builder's Retained Interest, all other rights of Purchaser or Builder under or in respect of any of said insurances; and

D.  All proceeds of all of the foregoing.

The items assigned in "A" through "D" above are hereinafter referred to as the "Insurances".

**Notwithstanding any of the provisions of this Assignment to the contrary, Builder retains a first right to payment under the Insurances for all amounts due and payable to Builder under the terms of the Vessel Construction Agreement ("Builder's Retained Interest").**

This Assignment is made pursuant to the Note dated as of even date herewith (the "Note") executed and delivered by Purchaser, as maker, in favor of Assignee, as payee, and various other documents executed or to be executed in connection therewith (the Note and such other documents being collectively the "Loan Documents") between Assignee and the Purchaser. This Assignment is intended to grant to Assignee a security interest in the assigned property as security for all amounts due Assignee under the Loan Documents and all other moneys due and to become due from Purchaser to Assignee, whether under said Loan Documents, or otherwise, and may be further assigned in connection with the enforcement of said security interest of Assignee.

1



It is expressly agreed that anything herein contained to the contrary notwithstanding, Purchaser and Builder, as applicable, shall remain liable under said Insurances to perform all of the obligations assumed by them thereunder. Assignee shall have no obligation or liability (including, without limitation, any obligation or liability with respect to the payment of premiums, calls or assessments) under said Insurances by reason of or arising out of this instrument of assignment, nor shall Assignee be required or obligated in any manner to perform or fulfill any obligations of Purchaser or Builder under or pursuant to said Insurances, or to make any payment, or to make any inquiry as to the nature or sufficiency of any payment received by them, or to present or file any claim, or to take any other action to collect or enforce the payment of any amounts which may have been assigned to them, or to which they may be entitled hereunder at any time or times.

Purchaser does hereby constitute Assignee, its successors and assigns, their true and lawful attorney, irrevocably, with full power (in their name or otherwise) to ask, require, demand, receive, compound and give acquittance for any and all moneys and claims for moneys due and to become due under or arising out of said Insurances, to endorse any checks or other instruments or orders in connection therewith, to make, compromise, withdraw or otherwise deal with any claims, and/or to take any action or institute any proceedings which Assignee may deem to be necessary or advisable in the premises. The powers and authority granted to Assignee herein have been given for a valuable consideration and are hereby declared to be irrevocable.

Purchaser and Builder do hereby warrant and represent that they have not assigned, pledged or in any way created or suffered to be created a security interest in the whole or any part of the right, title and interest hereby assigned except in favor of Assignee. Purchaser and Builder hereby covenant that, without the prior written consent thereof of Assignee, so long as this instrument of assignment shall remain in effect, it will not assign or pledge or create a security interest in the whole or any part of the right, title and interest hereby assigned to anyone other than Assignee, its successors or assigns, and it will not take or omit to take any action, the taking or omission of which might result in an alteration or impairment of said Insurances, of this Assignment or of any of the rights created by said Insurances or this Assignment.

Purchaser and Builder agree that at any time and from time to time, upon the written request of Assignee, its successors and assigns, Purchaser and Builder will promptly and duly execute and deliver any and all such further instruments and documents as Assignee, its successors and assigns, may reasonably request in order to obtain the full benefits of this Assignment and of the rights and powers herein granted. Purchaser shall reimburse Builder for Builder's reasonable out of pocket costs and expenses associated with complying with the preceding sentence.

Any payments made pursuant to the terms hereof shall be made to such account as may, from time to time, be designated by Assignee, and shall be applied as provided in the Loan Documents.

This Assignment shall be governed by the laws of the State of Florida and may not be amended or changed except by an instrument in writing; provided that to the extent that perfection and priority of the security interest in any property assigned hereunder is governed by Canadian or British Columbia law, Canadian or British Columbia law shall control.

Purchaser and Builder hereby authorize Assignee to execute on its behalf and file, at any time and from time to time, any Financing Statements (Form UCC-1) and amendments thereto (Form UCC-3) as provided in Article 9 of the Uniform Commercial Code, or papers of similar purpose or effect in respect of this Assignment in any applicable jurisdiction which may be necessary or desirable to perfect the security interests of Assignee hereunder.

2



All of the provisions of this Assignment shall be binding upon Purchaser and Builder and their successors, executors or personal representatives and shall inure to the benefit of Assignee and its successors and assigns. Any and all rights assigned herein may be further assigned by Assignee.

By executing this Assignment, it is acknowledged by the parties that the rights assigned to Assignee herein shall be no greater than Purchaser's rights under the Construction Agreement. The parties expressly acknowledge Builder's first lien rights and rights to payment of any insurance proceeds. Builder has no duties to Purchaser that are not expressly set forth in the Vessel Construction Agreement and no additional obligations are created except as modified by this Assignment, as their interests may appear.

[Remainder of page intentionally left blank]

3

514053v2 960766.0213



**IN WITNESS WHEREOF**, Purchaser and Builder have caused this Assignment to be duly executed as of the 14th day of August, 2009.

**Purchaser:**

By: _____
Name:  Daniel Sargeant, as attorney-in-fact
for Harry Sargeant, III

**Builder:**

Worldspan Marine, Inc.

By: _Lee Taubeneck_
Name: _LEE TAUBENECK_
Title: _PRESIDENT_

The Assignee acknowledges and accepts this assignment:

Comerica Bank

By: _____
Name: Barry W. Shaw
Title: Vice President

4

**Builder's Acknowledgment and Consent**

To:     Comerica Bank
        100 N.E. 3rd Avenue, Suite 100
        Fort Lauderdale, FL 33301
        Attn:  Barry W. Shaw, Vice President

Dear Mr. Shaw:

Re: Vessel Construction Agreement (the "Vessel Construction Agreement") dated February 29, 2008 between Worldspan Marine, Inc., a British Columbia corporation ("Builder") and Harry Sargeant, III ("Owner") regarding the construction by Builder, and Builder's sale to Owner of that certain 142 foot motor yacht identified as Builder's hull no. QEO14226C010 ("the Vessel")

1.      We acknowledge notice of, and consent to, the fact that by Assignment of Vessel Construction Agreement dated as of even date herewith, Owner has assigned to you all its beneficial interests and all its benefits, rights and titles (but not its obligations) in and under the Vessel Construction Agreement, and all amendments, modifications, replacements or restatements thereof relating to the construction of the Vessel, but that the Buyer continues to be responsible to us for performance of its obligations thereunder and until such time as you may give us notice in writing that an Event of Default has occurred, the Buyer may continue to superintend the construction of the Vessel, require modifications in accordance with the terms of the Vessel Construction Agreement (and our right to be paid by the Buyer for such modifications required by the Buyer in accordance with the terms of the Vessel Construction Agreement prior to such notice being given by you shall not be affected) and/or take delivery of the Vessel and/or (subject to clause 2 below) exercise all the Buyer's rights, privileges and discretions under and in relation to the Vessel Construction Agreement and we may continue to deal with the Buyer accordingly. (Any references to "we" or "us" in this letter means collectively, the Builder).

2.      In accordance with authority and instructions given to us by the Buyer, which cannot be revoked or varied without your consent in writing, we hereby undertake:

        (a)     upon payment and satisfaction of the Final Purchase Price, to deliver to you or to your order the Builder's Certificate and any other documents or certificates required to be delivered to Buyer under the terms of the Contract;

        (b)     to pay to you all sums which we may become liable to pay to the Buyer under the Contract, including sums arising from an arbitration award; and

        (c)     no further assignments or grants of security by the Buyer in the Vessel Construction Agreement will be consented to by us without your written consent.

3.      We hereby further undertake that:

        (a)     should default be made by the Buyer in any installment of the Final Purchase Price of the Vessel or should the Buyer commit any other default and we then take any action to exercise our remedies under the Vessel Construction Agreement to either stop work on the Vessel or to terminate the Contract, we shall immediately give you notice in writing; and

This is Exhibit "F" referred to in the affidavit of
Cynthia B. Jones sworn before me at Miller,
Canfield, Paddock and Stone, P.L.C. this 7th
day of October, 2011

514055v2 960766 0216      JUDITH ANN SUTTON
                          NOTARY PUBLIC - STATE OF MICHIGAN      *Judith Ann Sutton*
                          COUNTY OF WAYNE
                          My Commission Expires Mar. 29, 2014

*ACTING IN THE COUNTY OF WAYNE*

(b)      before exercising any option or right available to us on any such default as is mentioned in sub-clause (a) above, we shall first give you the opportunity, to be exercised within thirty (30) days, to rectify all the Buyer's subsisting defaults under the Vessel Construction Agreement and to assume and undertake unconditionally all the Buyer's remaining obligations under the Contract, provided that if such default is one that can not readily be resolved within thirty (30) days and Buyer or Assignee are pursuing a remedy of such default with due diligence and dispatch then you shall have an additional fifteen (15) days to remedy such default.

4.      All notices and communications under this Acknowledgment and Consent will be in writing or some facsimile of writing addressed to the parties at their addresses set out below or most recently notified to each other:

         Comerica Bank
         100 N.E. 3rd Avenue, Suite 100
         Fort Lauderdale, FL 33301
         Attn: Barry W. Shaw, Vice President

         Worldspan Marine, Inc.
         27222 Lougheed Highway
         Maple Ridge, BC V2W 1V9
         Attention: Lee Taubeneck, President

5      As of the date of this Acknowledgment and Consent we confirm to you the following:

(a)   As of the date of this Acknowledgment and Consent, the Borrower has paid us the sum of $ 11,131,192.04 representing the Deposit and all payments presently due towards the Final Purchase Price under the terms of Section 4 of the Vessel Construction Agreement.

(b)   The amounts currently due to Builder under the terms of the Vessel Construction Agreement with respect to invoices issued, but not yet paid is $ 1,884,187.88.

(c)   Subject to the terms of the Vessel Construction Agreement which provide that the billing for the Vessel is on a time and materials basis, as of this date Builder's estimated cost to complete the Vessel in accordance with the terms of the Vessel Construction Agreement is $ 6,516,374.08.

*→ Note: This amount does not include $1,884,187.88 listed in (b) above. (April, May, June invoices)*

*It does include July Invoice of $788,636.52 due August 31, 2009.*

*L.T.*

Sincerely,

Worldspan Marine, Inc.

By: *Lee Taubeneck*
Name: Lee Taubeneck
Title: President

Date: August 14, 2009

514055v2 960766.0213            2

*149*

*9895214590*

# PROMISSORY NOTE

$9,400,000.00

August 14, 2009
Executed outside the State of Florida

**FOR VALUE RECEIVED, HARRY SARGEANT, III,** and **DANIEL SARGEANT** (collectively, the "Borrower"), promises to pay to the order of **COMERICA BANK** (hereinafter referred to as "Lender"), at 100 N.E. 3rd Ave., Suite 100, Fort Lauderdale, FL 33301, or at such other place as Lender may designate in writing to Borrower, the principal sum of the lesser of: (1) **NINE MILLION FOUR HUNDRED THOUSAND AND NO/100 DOLLARS ($9,400,000.00),** or (2) the amount actually advanced to the Borrower in accordance with the terms of that certain Construction Loan Agreement of even date herewith between Borrower and Lender (the "Construction Loan Agreement", in United States funds, plus interest, costs and expenses as hereinafter provided. Any capitalized terms used herein, and not defined in this Note, shall have the meanings assigned in the Construction Loan Agreement.

    **I. Line of Credit.** Subject to the terms and conditions of this Note, and provided that no Event of Default or Default has occurred and is continuing, Borrower may borrow and Lender may advance (each, an "**Advance**" and together the "**Advances**") to Borrower so long as the total principal balance outstanding under this Note at any one time does not exceed the principal amount stated on the face of this Note, subject to the limitations described in this Note and the Construction Loan Agreement. Lender's obligation to make Advances under this Note shall terminate if a demand for payment is made under this Note or if a Default or Event of Default (as defined in the other Loan Documents (as defined below) under any Loan Document occurs. As of the date of each proposed Advance, Borrower shall be deemed to represent that each representation made in the Loan Documents is true as of such date. The loan evidenced herein, if repaid, may not be re-borrowed.

    **II. Security.** This Promissory Note is secured by the Security described in the Construction Loan Agreement.

    **III. Payment of Principal and Interest.**

        (a)    **Repayment Terms.** On each Payment Date (as defined below) through and including the Maturity Date (as defined below), Borrower shall make monthly payments of interest only on the outstanding principal amount hereunder at the then Applicable Interest Rate (as defined below) under the terms of this Note. The monthly payments of interest are subject to change with each change in the Applicable Interest Rate hereunder, at the discretion of the Lender to an interest amount based on the then Applicable Interest Rate under the terms of this Note. On demand by Lender as described below in the Section titled <u>Demand Note; Remedies</u> (the "**Maturity Date**") the loan evidenced herein shall mature and all outstanding principal, accrued and unpaid interest and costs, fees and expenses due under this Note and the other Loan Documents shall be due and payable.

        Interest shall accrue on the outstanding principal at a floating rate referred to herein as the "Applicable Interest Rate" (as defined below), except as provided with respect to the "Default Rate", and in either case adjusted if necessary so as to not exceed the highest rate permitted by applicable law. Interest shall be computed on the basis of a 360 day year for the actual number of days elapsed in the period. Lender's actual days/360 days computation determines the annual effective interest yield by taking the stated (nominal) interest rate for a year's period and then dividing said rate by 360 to determine the daily periodic rate to be applied for each day in the applicable interest period. Such computation produces an annualized effective interest rate exceeding that of the nominal rate. Notwithstanding any other provision of this Note, however,

513977v2 960766.0213

<table>
<tr><td>JUDITH ANN SUTTON<br>NOTARY PUBLIC - STATE OF MICHIGAN<br>COUNTY OF WAYNE<br>My Commission Expires Mar. 29, 2014<br>*ACTING IN THE COUNTY OF WAYNE*</td><td>This is Exhibit "G" referred to in the affidavit of Cynthia B. Jones sworn before me at Miller, Canfield, Paddock and Stone, P.L.C. this 7th day of October, 2011<br>*Judith Ann Sutton*</td></tr>
</table>

neither the Applicable Interest Rate nor the Default Rate shall ever exceed the maximum rate allowed by applicable law.

For any Interest Period for which the Applicable Interest Rate is the LIBOR-based Rate, if Lender shall designate a LIBOR Lending Office which maintains books separate from those of the rest of Lender, Lender shall have the option of maintaining and carrying this Note, and the relevant Indebtedness hereunder, on the books of such LIBOR Lending Office.

If, with respect to any Interest Period, Lender determines that, (a) Lender is unable to determine or ascertain the LIBOR Rate for such Interest Period, or (b) by reason of circumstances affecting the foreign exchange and interbank markets generally, deposits in eurodollars in the applicable amounts or for the relative maturities are not being offered to Lender for such Interest Period, or (c) the LIBOR-based Rate will not accurately or fairly cover or reflect the cost to Lender of maintaining any of the Indebtedness under this Note at the LIBOR-based Rate for such Interest Period, then Lender shall forthwith give notice thereof to the undersigned and thereafter, until Lender notifies the undersigned that such conditions or circumstances no longer exist, the Applicable Interest Rate for all Indebtedness hereunder during such period of time shall be as determined by Lender from another recognized source or interbank quotation.

**(b) Definitions.** Unless otherwise defined herein, all capitalized terms used in this Note which are not defined herein shall have the meaning assigned in the Pledge Agreement or other Loan Documents

(1) Applicable Interest Rate. The term **"Applicable Interest Rate"** means, in respect of all or any part of the Indebtedness hereunder. the LIBOR-based Rate plus the Applicable Margin.

(2) Applicable Margin. The **"Applicable Margin"** to be added to the LIBOR Rate for purposes of determining the Applicable Interest Rate, shall be a margin of three hundred basis points (3.00%) provided, however, that such rate shall be reduced by fifty basis points (.50%) to two hundred fifty basis points (2.50%) if Borrower, satisfies the following conditions: (i) establishment of a Comerica securities account or similar investment account with the Lender, and (ii) maintain a minimum average balance on a quarterly basis of at least Five Million U.S. Dollars ($5,000,000). In the event that the Borrower or the guarantor no longer meet the conditions in (i) and (ii) of the preceding sentence, then the Lender in its discretion may increase the Applicable Margin by fifty basis points (50%) to the unadjusted margin.

(3) Business Day. The term **"Business Day"** means any day, other than a Saturday, Sunday or any other day designated as a holiday under Federal or applicable State statute or regulation, on which Lender is open for all or substantially all of its domestic and international business (including dealings in foreign exchange) in Detroit, Michigan, and, in respect of notices and determinations relating to the Applicable Interest Rate and Interest Periods, also a day on which dealings in dollar deposits are also carried on in the London interbank market and on which banks are open for business in London, England.

(4) Default Rate. For purposes of this Note the term "Default Rate" shall mean a rate per annum that is five percentage points (5%) higher than the Applicable Interest Rate, which interest shall be' payable upon demand. The Default Rate shall apply from acceleration until the Obligations or a judgment thereon in favor of Lender have been paid in full.

(5) Interest Period. The term **"Interest Period"** means a period of time not to exceed three (3) months, commencing on the effective date of this Note, and each monthly period thereafter commencing on the last day of the preceding Interest Period then ending, provided that:

(a) any Interest Period which would otherwise end on a day which is not a Business Day shall be extended to the next succeeding Business Day, except that if the next succeeding Business Day falls in another calendar month, the Interest Period shall end on the next preceding Business Day, and when an Interest

513977v2 960766.0213                              2

Period begins on a day which has no numerically corresponding day in the calendar month during which such Interest Period is to end, it shall end on the last Business Day of such calendar month;

(b) each Interest Period after the initial Interest Period shall commence on and end on an installment Payment Date under this Note; and

(c) no Interest Period shall extend beyond the Maturity Date.

(6) <u>LIBOR-based Rate.</u> The term "LIBOR-based Rate" means a per annum interest rate which is equal to the quotient of the following:

(a) the LIBOR Rate;

divided by

(a) 1.00 minus the maximum rate (expressed as a decimal) during such Interest Period at which Bank is required to maintain reserves on "Euro-currency Liabilities" as defined in and pursuant to Regulation D of the Board of Governors of the Federal Reserve System or, if such regulation or definition is modified, and as long as Bank is required to maintain reserves against a category of liabilities which includes eurodollar deposits or includes a category of assets which includes eurodollar loans, the rate at which such reserves are required to be maintained on such category;

provided, however, in no event and at no time shall the LIBOR-based Rate be less than two percent (2.00%) per annum.

(7) <u>Libor Lending Office.</u> Means the Lender's office located in the Cayman Islands, British West Indies, or such other branch of the Lender, domestic or foreign, as it may hereafter designate as its Libor Lending Office by notice to the Borrower.



(8) <u>Libor Rate.</u> **"LIBOR Rate"** means, with respect to any Obligations outstanding under this Note, the per annum rate of interest determined on the basis of the rate for deposits in United States Dollars for a period equal to the relevant Interest Period for such Obligations, commencing on the first day of such Interest Period, appearing on Page BBAM of the Bloomberg Financial Markets Information Service as of 11:00 a.m. (Detroit, Michigan time) (or soon thereafter as practical), two (2) Business Days prior to the first day of such Interest Period. In the event that such rate does not appear on Page BBAM of the Bloomberg Financial Markets Information Service (or otherwise on such Service), the "LIBOR Rate" shall be determined by reference to such other publicly available service for displaying eurodollar rates as may be agreed upon by Lender and Borrower, or, in the absence of such agreement, the "LIBOR Rate" shall, instead, be the per annum rate equal to the average of the rates at which Lender is offered dollar deposits at or about 11:00 a.m. (Detroit, Michigan time) (or soon thereafter as practical), two (2) Business Days prior to the first day of such Interest Period in the interbank eurodollar market in an amount comparable to the principal amount of the respective LIBOR-based advance which is to bear interest at such LIBOR-based rate and for a period equal to the relevant Interest Period.

The LIBOR Rate for the initial Interest Period shall be determined as of the date of this Note and shall be re-determined and reset for each applicable Interest Period thereafter. The Applicable Interest Rate shall be adjusted to reflect any changes in the LIBOR Rate and each adjustment shall be effective on the day the change in the LIBOR Rate occurs.

152

(9) <u>Payment Date</u>. The term **"Payment Date"** means the respective monthly payment due dates commencing on September 1, 2009, and the first Business Day of each succeeding month thereafter, until (and including) the Maturity Date.

(10) <u>Indebtedness</u>. The term **"Indebtedness"** means the aggregate of all sums of money at any time or from time to time owing to the Lender under or pursuant to this Note and the other Loan Documents, whether actually or contingently, in the present or in the future.

(11) <u>Obligations</u>. The term **"Obligations"** shall mean (i) all payment and performance obligations of the Borrower and all other third persons under any Loan Document to or for the benefit of the Lender, and (ii) the obligation to pay an amount equal to the amount of any and all damage (other than lost profits) which the Lender may suffer by reason of a breach by the Borrower or any other persons of any obligation, covenant or undertaking with respect to any Loan Document not otherwise included in clause (i), and (iii) all Swap Obligations.

(12) <u>Swap Obligations</u>. The term **"Swap Obligations"** shall mean all obligations under any swap agreements (as defined in 11 U.S.C. § 101, as in effect from time to time) between Borrower and Lender, or its affiliates, whenever executed.

(13) <u>Loan Documents</u>. The term **"Loan Documents"** shall mean all documents executed in connection with or related to the loan evidenced by this Note and any prior notes which evidence all or any portion of the loan evidenced by this Note, and any letters of credit issued pursuant to any loan agreement to which this Note is subject, any applications for such letters of credit and any other documents executed in connection therewith or related thereto, and may include, without limitation, a commitment letter that survives closing, a loan agreement, this Note, guaranty agreements, security agreements, security instruments, financing statements, mortgage instruments, any renewals or modifications, whenever any of the foregoing are executed, but does not include swap agreements (as defined in 11 U.S.C. § 101, as in effect from time to time).

(c) **Additional Payment Terms**. Borrower shall make all monthly payments directly to the Lender at the address of the Lender set forth above, <u>to the attention of such person as Lender may from time to time designate</u>, or at such other place as Lender may from time to time designate. A monthly invoice will be sent to Borrower prior to the date on which the next payment is due to assist Borrower in making the proper payments. The monthly invoices will itemize the interest that will be due for the relevant Interest Period (calculated on the assumption of no change between the invoice date and the due date in the Applicable Interest Rate or Default Rate or in the amount of the principal Indebtedness outstanding), and any other amounts that may then be due. If during the time between the preparation of the monthly invoice and the due date there is a change in the Applicable Interest Rate or Default Rate or in the amount of principal Indebtedness outstanding, or in any other amounts due, then the monthly invoice for the next accounting period will incorporate an appropriate adjustment.

All payments to be made by Borrower to Lender under this Note shall be made in immediately available funds, without set off or counterclaim, and in the event that any payments submitted hereunder are in funds not available until collected, said payments shall continue to bear interest until collected. Borrower authorizes Lender to charge any account(s) of Borrower with Lender for all sums due hereunder when due in accordance with the terms hereof.

The amount from time to time outstanding under this Note, the Applicable Interest Rate, the Interest Period, and the amount and date of any repayment shall be noted on Lender's records, which records shall be conclusive evidence thereof, absent manifest error; provided, however, any failure by Lender to make any such notation, or any error in any such notation, shall not relieve Borrower of its obligations to repay

Lender all amounts payable by Borrower to Lender under or pursuant to this Note, when due in accordance with the terms hereof.

Each payment by Borrower shall be applied, first to pay interest due on the date the payment is received; next, to any fees, charges, expenses, advances or other Obligations then due; and the balance, if any, to the unpaid principal.

(d) **Prepayment**. Borrower shall be entitled to make prepayments of principal under this Note at any time or times, without premium or penalty. Each such prepayment must also include all interest accrued and unpaid to the date of payment. All prepayments of principal and accrued interest shall be made at the office of Lender at the address stated in above, or at such other place as from time to time may be designated to Borrower by Lender. Any partial prepayment will be applied first to accrued and unpaid interest, then to any other amounts due hereunder other than principal, and the remaining balance to principal in reverse chronological order in which the installments required hereunder become due. Partial prepayments may reduce the term of the Loan but will not change the amount or the due date of any scheduled monthly payment until the Loan is fully repaid.

(e) **Change in Laws; Regulations, Etc.**

If, after the date hereof, the introduction of, or any change in, any applicable law, rule or regulation or in the interpretation or administration thereof by any governmental authority charged with the interpretation or administration thereof, or compliance by Lender (or its LIBOR Lending Office) with any request or directive (whether or not having the force of law) of any such authority, shall make it unlawful or impossible for the Lender (or its LIBOR Lending Office) to make or maintain any advance with interest at the LIBOR-based Rate, Lender shall forthwith give notice thereof to the undersigned. Thereafter, until Lender notifies the undersigned that such conditions or circumstances no longer exist, the Applicable Interest Rate for all Indebtedness hereunder during such period of time shall be as determined by Lender from another recognized source or interbank quotation.

If the adoption after the date hereof, or any change after the date hereof in, any applicable law, rule or regulation (whether domestic or foreign) of any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Lender with any request or directive (whether or not having the force of law) made by any such authority, central bank or comparable agency after the date hereof: (a) shall subject Lender to any tax, duty or other charge with respect to this Note or any Obligations hereunder, or shall change the basis of taxation of payments to Lender of the principal of or interest under this Note or any other amounts due under this Note in respect thereof (except for changes in the rate of tax on the overall net income of Lender imposed by the jurisdiction in which Lender's principal executive office is located); or (b) shall impose, modify or deem applicable any reserve (including, without limitation, any imposed by the Board of Governors of the Federal Reserve System), special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by Lender, or shall impose on Lender or the foreign exchange and interbank markets any other condition affecting this Note or the Obligations hereunder; and the result of any of the foregoing is to increase the cost to Lender of maintaining any part of the Obligations hereunder or to reduce the amount of any sum received or receivable by Lender under this Note by an amount deemed by the Lender to be material, then Borrower shall pay to Lender, within fifteen (15) days of Borrower's receipt of written notice from Lender demanding such compensation, such additional amount or amounts as will compensate Lender for such increased cost or reduction. A certificate of Lender, prepared in good faith and in reasonable detail by Lender and submitted by Lender to Borrower, setting forth the basis for determining such additional amount or amounts necessary to compensate Lender shall be conclusive and binding for all purposes, absent manifest error.

In the event that any applicable law, treaty, rule or regulation (whether domestic or foreign) now or hereafter in effect and whether or not presently applicable to Lender, or any interpretation or

administration thereof by any governmental authority charged with the interpretation or administration thereof, or compliance by Lender with any guideline, request or directive of any such authority (whether or not having the force of law), including any risk-based capital guidelines, affects or would affect the amount of capital required or expected to be maintained by Lender (or any corporation controlling Lender), and Lender determines that the amount of such capital is increased by or based upon the existence of any obligations of Lender hereunder or the maintaining of any Obligations hereunder, and such increase has the effect of reducing the rate of return on Lender's (or such controlling corporation's) capital as a consequence of such obligations of Lender or the maintaining of any Obligations hereunder to a level below that which Lender (or such controlling corporation) could have achieved but for such circumstances (taking into consideration its policies with respect to capital adequacy), then Borrower shall pay to Lender, within fifteen (15) days of Borrower's receipt of written notice from Lender demanding such compensation, additional amounts as are sufficient to compensate Lender (or such controlling corporation) for any increase in the amount of capital and reduced rate of return which Lender reasonably determines to be allocable to the existence of any obligations of the Lender hereunder or to maintaining any Obligations hereunder. A certificate of Lender as to the amount of such compensation, prepared in good faith and in reasonable detail by the Lender and submitted by Lender to Borrower, shall be conclusive and binding for all purposes absent manifest error.

(f) **Late Charges**. In addition to the above, Lender may collect a late charge not to exceed an amount equal to five percent (5%) of any installment payment which is not paid within ten (10) days of the due date thereof to cover the extra expense involved in handling delinquent payments, provided that collection of said late charge shall not be deemed a waiver by Lender of any of its other rights under this Note or any instrument given to secure this Indebtedness.

**IV. Demand Note; Remedies.** This is a demand Note and all obligations of Borrower hereunder shall become immediately due and payable upon demand by Lender. In addition, the obligations of Borrower hereunder shall automatically become immediately due and payable if Borrower or any Guarantor or endorser of this Note commences or has commenced against it a bankruptcy or insolvency proceeding.

Upon demand by the Lender or the occurrence of a default in the payment of the Obligations ("Default" or "Event of Default") or a Default or Event of Default (as defined in the Loan Documents) under any other Loan Document or a default in the payment or performance of any obligation under any other loans, contracts or agreements of Borrower with Lender or its affiliates, as in effect from time to time, or under any other obligations under any loans, contracts or agreements of any other entity with Lender if such obligations or loans, contracts or agreements are guaranteed by Borrower (whether now existing or created) or upon demand by Lender, Lender may at any time thereafter, take the following actions: (a) Declare any or all of the Indebtedness to be immediately due and payable (notwithstanding any provisions contained in the evidence of it to the contrary); (b) Accelerate the maturity of this Note and, at Lender's option, any or all other Obligations, but not Swap Obligations, which Swap Obligations shall be due in accordance with and governed by the provisions of said swap agreements; whereupon this Note and the accelerated Obligations shall be immediately due and payable; provided, however, if the Event of Default or Default is based upon a bankruptcy or insolvency proceeding commenced by or against Borrower or any guarantor or endorser of this Note, all Obligations (other than Swap Obligations) shall automatically and immediately be due and payable; (c) Foreclose its security interest or lien against the property and collateral described in any instrument given to secure this Indebtedness or the indebtedness evidenced by the Renewal Promissory Note or Borrower's or any guarantor's accounts with Lender or any Lender affiliate without notice; and (d) Exercise any rights and remedies as provided under this Note, the Pledge Agreement, the Mortgage, the Snowmass Mortgage, the Trust Mortgage, any guaranty and any other Loan Document or as provided by law or equity.

Borrower hereby expressly waives notice of default, presentment or demand for prepayment, demand, notice of nonpayment or dishonor, protest and notice of protest, or any other notice or demand.

513977v2 960766.0213                                    6



No delay or omission on the part of Borrower or Lender in exercising their rights under this Note, or delay or omission on the part of Borrower or Lender, in exercising their rights under any other Loan Document, or course of conduct relating thereto, shall operate as a waiver of such rights or any other right of Borrower or Lender, nor shall any waiver by Borrower or Lender, of any such right or rights on any one (1) occasion be deemed a bar to, or waiver of, the same right or rights on any future occasion.

The Borrower promises to pay all costs of collection, including reasonable attorneys' fees incurred by Lender in connection with the enforcement or presentation of any of Lender's rights or remedies hereunder or any motion, proceeding or other activity of any kind in connection with a bankruptcy proceeding or case arising out of or relating to any petition under Title 11 of the United States Code, as the same shall be in effect from time to time or any similar law.

## V. General Provisions.

Time is of the essence of this Note.

This Promissory Note may be executed in counterparts by the Borrower and each executed counterpart when taken together shall be considered one instrument.

This Note shall be construed in accordance with and governed by the laws of the State of Florida. Venue for any dispute arising out of this Note shall be the Circuit Court located in Broward County, Florida, and each party consents to the jurisdiction of such court.

Anything herein to the contrary notwithstanding, if during any period for which interest is computed hereunder, the amount of interest computed on the basis provided for in this Note, together with all fees, charges and other payments which are treated as interest under applicable law, as provided for herein or in any other document executed in connection herewith, would exceed the amount of such interest computed on the basis of the Highest Lawful Rate, Borrower shall not be obligated to pay, and the Lender shall not be entitled to charge, collect, receive, reserve or take interest in excess of the Highest Lawful Rate and, during any such period, the interest payable hereunder shall be computed on the basis of the Highest Lawful Rate. As used herein, "Highest Lawful Rate" means the maximum non-usurious rate of interest, as in effect from time to time, which may be charged, contracted for, reserved, received or collected by the Lender in connection with this Note under applicable law.

**THE BORROWER HEREBY AGREES TO WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT AND IN ANY ACTION OR PROCEEDING OF ANY TYPE IN WHICH THE BORROWER, THE LENDER OR ANY OF THEIR RESPECTIVE SUCCESSORS OR ASSIGNS IS A PARTY, AS TO ALL MATTERS AND THINGS ARISING DIRECTLY OR INDIRECTLY OUT OF THIS NOTE, ANY GUARANTY OR THE OTHER LOAN DOCUMENTS.**

[signature page to follow]

**IN WITNESS WHEREOF,** the undersigned, have executed this Note as of the day and year first above written.

**BORROWER:**

By:_____
Name: Harry Sargeant, III

By:_____
Name: Daniel Sargeant

Florida documentary stamp taxes are not due on this Note as the Borrowers' executed and delivered the Note to the Lender outside the State of Florida.

**EXHIBIT A**

**Disbursements:**

Closing Advance Amount

1. To Builder, Worldspan Marine, Inc., via wire transfer        1,000,000.00

         wire instructions:
         Beneficiary:                 Worldspan Marine, Inc.
         Beneficiary Address:       27222 Lougheed Hwy
                                     Maple Ridge, BC  V2W 1V9
                                     Canada
         Beneficiary Account:       0004 4687-261
         Beneficiary Bank:          Bank of Montreal
         Beneficiary Bank Address:   595 Burrard Street
                                     Vancouver, BC  V7X 1L7
                                     Canada
         Beneficiary Bank Swift Code BOFMCAM2
         Intermediary Bank:        Wachovia Bank
         Intermediary Bank Swift Coc PNBPUS3NNYC

2. to Bank, via intra bank transfer                $12,500.00

3. To Tripp Scott, P.A., deposit to Comerica Bank Trust Account    $11,985.00

         wire instructions
         Comerica Bank
         100 N.E. 3rd Avenue
         Fort Lauderdale, FL 33301
         Name of Account: Tripp, Scott, PA Trust Account
         ABA No.: 067012099
         Account No.: 1811017324

**Total Closing Disbursements**                     $24,485.00

Acknowledged and agreed to:

Borrower's Intials:

By: _____

Comerica

Comerica

June 8, 2011

Harry Sargeant, III
Daniel Sargeant
3020 North Military Trail, Suite 100
Boca Raton, FL 33431

     Re:    **Financing Arrangements among Comerica Bank ("Bank"), and Harry Sargeant, III, and Daniel Sargeant ("Borrowers")**

Dear Messrs. Sargeant:

    Please refer to Promissory Note dated August 14, 2009, as amended (the "Note"), Construction Loan Agreement dated August 14, 2009, as amended (the "Loan Agreement"), Assignment of Security Agreement & Mortgage dated August 14, 2009, (the "Mortgage Assignment") and to any and all other documents, instruments and agreements executed in connection with the financing arrangements from Bank to Borrowers (collectively, the "Loan Documents"). All amounts due from Borrower to Bank, whether now or in the future, contingent, fixed, primary and/or secondary, including, but not limited to, principal, interest, inside and outside counsel fees, audit fees, costs, expenses and any and all other charges provided for in the Loan Documents shall be known, in the aggregate, as the "Liabilities". All capitalized terms not defined in this letter ("June 2011 Extension Letter") shall have the meanings ascribed to them in the Loan Documents.

    The Vessel has not been delivered to Borrowers by April 1, 2011, as required in the January 15, 2011, Extension Letter. In addition, the Builder, being Worldspan Marine, Inc., is the subject of insolvency proceedings currently pending in British Columbia (the "Insolvency Proceeding"). Various parties have asserted liens against the Vessel. Borrowers seek to have the Vessel completed during the Insolvency Proceeding.

    Bank and Borrowers agree:

1.    The "Delivery Date" is amended to be April 1, 2012.

2.    The "Review Date" is amended to be March 1, 2012. Notwithstanding the Review Date, Borrowers acknowledge that Bank will monitor and review the status of the Loan, the status of the Insolvency Proceeding, and the status of the Vessel at such frequency as Bank in its discretion determines. Borrowers further acknowledge that Bank and Borrowers will continue their discussions regarding additional collateral to secure the Liabilities. Borrowers further acknowledge that Bank has the right to demand payment under the Note at any time prior to the new Review Date and prior to the new Delivery Date.

3.    Borrowers acknowledge that the Liabilities as of June 8, 2011, include $9,400,000.00 (US) in principal plus accrued interest in the amount of $5,982.77 (US). The foregoing amounts are exclusive of interest accruing after June 8, 2011, and are exclusive of Bank's costs and attorney fees, including costs and attorney fees incurred in the Insolvency Proceeding and in protecting Bank's security interest and mortgage lien in the Vessel.

4.    Borrowers acknowledge that Bank has no obligation to undertake any action in the Insolvency Proceeding, or otherwise to protect its security interest and mortgage lien in the Vessel. Borrowers

19,137,826.3\147420-00021

This is Exhibit "H" referred to in the affidavit of Cynthia B. Jones sworn before me at Miller, Canfield, Paddock and Stone, P.L.C. this 7th day of October, 2011

*Judith Ann Sutton*

JUDITH ANN SUTTON
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WAYNE
My Commission Expires Mar. 29, 2014
ACTING IN THE COUNTY OF WAYNE

June 8, 2011
Page Two



further acknowledge that Bank's actions to date in the Insolvency Proceeding were at the request of Borrowers, and not as a result of any obligation of Bank to do so. Borrowers further acknowledge that Bank, at any time in the future, may elect to act or not to act in the Insolvency Proceeding without discharging Borrowers' obligation under the Note to pay the Liabilities upon Bank's demand.

5.      Bank has no obligation to make any further Advances under the Note, including any Advances to further the building of the Vessel.

6.      Borrowers acknowledge and reaffirm the demand nature of the Note and that Bank in its sole discretion may demand full and immediate payment of the Liabilities at any time, and for any reason or no reason.

7.      Borrowers agree that no extension or indulgence to Borrowers (or either of them) or release, substitution or nonenforcement of any security, or release or substitution of either Borrower, whether with or without notice, shall affect the obligations of Borrowers. Borrowers waive all defenses or rights to discharge available under Florida Statutes Section 673.605 of the Florida Uniform Commercial Code and under any similar statute, regulation or rule of law that might be applicable where the Vessel is located, and waive all other suretyship defenses or rights to discharge. Borrowers waive presentment, demand, protest, notice of dishonor, notice of demand or intent to demand, notice of acceleration or intent to accelerate, and all other notices.

8.      Borrowers waive, discharge, and forever release Bank, Bank's current and former employees, officers, directors, attorneys, stockholders, and their successors and assigns, from and of any and all claims, causes of action, allegations or assertions that either Borrower has or may have had at any time up through and including the date of this June 2011 Extension Letter, against any or all of the foregoing, regardless of whether any such claims, causes of action, allegations or assertions are known to either Borrower and whether any such claims, causes of action, allegations or assertions arose as result of Bank's actions or omissions in connection with any of the Loan Documents, or any amendments, extensions or modifications thereto, or Bank's administration of the Liabilities.

9.      Each Borrower acknowledges that the term "Mortgagee" in the Mortgage Assignment means the Secured Party as defined in the Mortgage Assignment.

10.     Except as expressly amended by the terms of this June 2011 Extension Letter, all terms and conditions of the Loan Agreements, as previously amended, remain in full force and effect. In the event of a conflict between a term in this June 2011 Extension Letter and a term in any of the Loan Documents, the June 2011 Extension Letter shall control.

11.     This agreement may be executed in counterparts and facsimile signatures shall be treated the same as originals. Borrower shall deliver to Bank the original of any facsimile signature by June 18, 2011.

12.     This agreement shall be construed in accordance with and governed by the internal laws of the Sate of Florida without giving effect to its conflict of law principles.

19,137,826.3\147420-00021

160

June 8, 2011
Page Three



     Please call me if you have any questions or wish to discuss.  Please sign and return this letter agreement to me by June 15, 2011.

                                   Very truly yours,

                                   Cynthia B. Jones, Vice President,
                                   500 Woodward MC 3205
                                   Detroit, MI  48226
                                   (313)222-3826
                                   (313)222-5706 fax

AGREED:

_____
Harry Sargeant, III
Dated:  June ___, 2011

_____
Daniel Sargeant
Dated:  June ___, 2011

June 8, 2011
Page Three



        Please call me if you have any questions or wish to discuss.  Please sign and return this letter
agreement to me by June 15, 2011.

                                        Very truly yours,


                                        Cynthia B. Jones, Vice President,
                                        500 Woodward MC 3205
                                        Detroit, MI 48226
                                        (313)222-3826
                                        (313)222-5706 fax

AGREED:


Harry Sargeant, III
Dated: June ___, 2011


Daniel Sargeant
Dated: June 22, 2011

# EXHIBIT 6

NO. T-1226-10

# FEDERAL COURT
## ADMIRALTY ACTION *IN REM* AGAINST THE VESSEL "QE014226C010" AND *IN PERSONAM*

COUR FÉDÉRALE
FEDERAL COURT
Copie du document
Copy of Document
Déposé / Filed
Reçu / Received

OCT 14 2011

Date
Greffier
Registrar    PLAINTIFF

BETWEEN:

OFFSHORE INTERIORS INC.

AND:

WORLDSPAN MARINE INC., CRESCENT CUSTOM YACHTS INC.,
THE OWNERS AND ALL OTHERS INTERESTED IN THE
VESSEL "QE14226C010" and THE VESSEL "QE14226C010"

DEFENDANTS

## AFFIDAVIT

I, Harry Sargeant III, Businessman, of the City of Gulf Stream, in the State of Florida of the United States of America, SWEAR AND SAY AS FOLLOWS:

1.     I am an Intervenor in the within proceedings and as such have personal knowledge of the facts and matters hereinafter deposed to save and except where the same are stated to be based on information and belief and where so stated I verily believe them to be true.

2.     I make this affidavit pursuant to the Order of Roger Lafreniere, Case Management Judge, pronounced August 29, 2011.

3.     This affidavit supports my claim against the vessel bearing hull number "QE014226C010" (the "Vessel").

4.     My claim against the Vessel is derived from payments that were made by me or on my behalf, at my direction and for my benefit to the legal owner of the Vessel, the Defendant Worldspan Marine Inc. ("Worldspan"), totaling $20,965,924.05 (of which $20,945,924.05 represents US funds and $20,000 represents Canadian funds) for the construction of the Vessel, and from the security interest in the Vessel granted to me by Worldspan to secure these payments, all as further described below.

2

5.      By a Vessel Construction Agreement dated for reference February 29, 2008 (the "VCA") made between myself and WorldSpan Marine Inc. ("Worldspan"), Worldspan undertook to design, construct, outfit, launch, complete and sell and deliver the Vessel to me.

6.      Attached as **Exhibit "A"** to this my affidavit is a copy of the VCA.

7.      The VCA provided, among other things, that:

(a)     Worldspan was to retain title to the Vessel until the Vessel was delivered to me (section 12.1);

(b)     the cost of the Vessel and the final purchase price (the "Final Purchase Price") payable by me was to be determined on a time and materials basis as provided in the VCA and as adjusted for agreed changes to the plans and specifications for the Vessel (section 4.1);

(c)     I would pay a deposit of $1.0 million USD to Worldspan (section 4.3);

(d)     delivery of the completed Vessel was to occur within 24 months of receiving the deposit, subject to permitted delays under the VCA including agreed changes (section 3.1);

(e)     direct labour was to be charged at the rate of $39.00 USD per hour times the actual number of hours worked, and administrative, supervisory, and design labour was to be charged at a rate of $49.00 USD per hour times the number of hours worked (section 4.3(b));

(f)     all equipment, inventory, design fees, subcontractors, equipment, materials, insurance and other third party costs were to be billed to me at 110% cost to Worldspan (section 4.3(b));

(g)     during construction of the Vessel, I would make monthly payments in arrears to cover Worldspan's expenditure for the previous month, such payments being in the nature of advances to Worldspan on account of the Final Purchase Price (section 4.3(a));

(h)     each month Worldspan would submit to Sargeant a Claim Certificate setting out that month's expenditure (section 4.3(c)); and

(i)     all payments claimed by Worldspan would be subject to verification and audit and Worldspan would consistently maintain records and take an open book and transparent approach (section 4.3(a)).

8.      On May 14, 2008, the Vessel was recorded in the Vancouver Ship Registry as record no. 3 in 2008.  Attached as **Exhibit "B"** to this my affidavit is a copy of the Vancouver Ship Registry's entry for the Vessel.

**234**

3

9.      By section 12.1 of the VCA, Worldspan granted to me a continuing first priority security interest in the Vessel including all work, materials, machinery, and equipment related to the Vessel to secure the sums advanced or paid to Worldspan.

10.      In support of the security interest granted to me:

(a)      a Builder's Mortgage in my favour as against the Vessel was filed in the Vancouver Ship Registry on May 14, 2008 as transaction no. 1A;

(b)      a financing statement was registered in the British Columbia Personal Property Registry (the "PPR") on May 1, 2008 and designated base registration no. 334150E.

11.      Attached as **Exhibit "C"** to this my affidavit is a copy of the Builder's Mortgage in respect of the Vessel.  Attached as **Exhibit "D"** to this my affidavit is a copy of the PPR search for Worldspan confirming the registration of the financing statement in my favour.

12.      Construction of the Vessel began in or around March 2008.

13.      By August 2009, monies advanced to Worldspan totaled $11,064,525.38 USD including:

(a)      pre-contractual advances associated with the design of the Vessel in the sum of $575,000 USD;

(b)      a deposit of $1,000,000 USD, paid to Worldspan in March 2008 pursuant to the VCA; and

(c)      the balance being payments of monthly Claims Certificates issued by Worldspan under the VCA.

14.      In August 2009, I arranged a construction loan with Comerica Bank ("Comerica") for $9,400,000 USD to finance the remaining cost to complete construction of the Vessel.

15.      Particulars of the Comerica financing are set out in the affidavit of Cynthia B. Jones sworn October 7, 2011 and filed in these proceedings.

16.      In the period August 2009 to March 2010, pursuant to the financing arrangements referenced above Comerica paid to Worldspan on my behalf the sum of $9,387,398.67 USD on account of Claims Certificates issued by Worldspan under the VCA.

17.    In April 2010 the sum of $200,000 USD was advanced to Worldspan on my behalf to pay employee wages.

18.    Attached as **Exhibit "E"** to this my affidavit is a spreadsheet summarizing the Claims Certificates issued by Worldspan and the payments totaling $20,651,924.05 that were made to Worldspan in the period March 2007 to April 2010.

19.    The payments set out in lines 1 and 2 of Exhibit E made in March and June 2007 were paid to Worldspan on my behalf at my direction and for my benefit by Sargeant Marine S.A., a Bahamian company of which I am a Director.  Attached hereto as **Exhibit "F"** is a copy of the bank account statements of Sargeant Marine S.A. for the relevant period, as redacted, showing the funds transfers to Worldspan's bank.

20.    The payments set out in lines 3 to 16 of Exhibit E made in the period March to December 2008 were paid to Worldspan on my behalf at my direction and for my benefit by International Oil Trading Company Ltd. ("IOTC Ltd.", formerly known as International Oil Trading FZCO), a Bahamian company of which I am a Director and President.  Attached hereto as **Exhibit "G"** is a copy of the bank account statements of International Oil Trading FZCO for the relevant period, as redacted, showing the funds transfers to Worldspan's bank.

21.    The payments set out in lines 17 to 21 of Exhibit E made in the period January to April 2009 and the payment set out in line 30 made in April 2010 were paid to Worldspan on my behalf at my direction and for my benefit by IOTC Ltd.  Attached hereto as **Exhibit "H"** is a copy of the bank account statements of IOTC Ltd. for the relevant period, as redacted, showing the funds transfers to Worldspan's bank.

22.    The payments set out in lines 22 to 29 of Exhibit E made in the period August 2009 to March 2010 were paid to Worldspan on my behalf by Comerica Bank.  Attached hereto as **Exhibit "I"** is a copy of a statement from Comerica for the relevant period showing the funds transfers to Worldspan.

23.    Attached as **Exhibit "J"** to this my affidavit are copies of Claims Certificates issued by Worldspan in the period March 2008 to December 2009 and which are summarized in Exhibit F.

24.    In addition to the payments set out above, I have also made other payments in connection with the Vessel construction including:

(a) Payments to Capri Insurance of $144,000 USD for insurance on the Vessel as follows:

    (i) $96,000 USD on October 22, 2010; and

    (ii) $ 48,000 on April 20, 2011.

(b) Payment to Offshore Interiors Inc. of $20,000 on September 20, 2011 on account of work to be performed in connection with the cost to complete analysis for Vessel construction; and

(c) Payment of $150,000 to Wolrige Mahon Ltd., the court-appointed Vessel Construction Officer, which payment is subject to a court-ordered priority charge in this proceeding;

25. The amounts set out in the preceding paragraph were paid to the various payees with funds advanced by IOTC Ltd. on my behalf at my direction and for my benefit.

SWORN BEFORE ME at the City of )
_____PALM BEACH_____ , in the )
State of Florida this _13th_ day of October, )
2011. )
)
        YVETTE MEDINA )
    MY COMMISSION # DD 811402 )
      EXPIRES: August 4, 2012 )
  Bonded Thru Notary Public Underwriters )
A Commissioner for taking Affidavits in )
the State of Florida )

HARRY SARGEANT III

This is Exhibit "E" referred to in the
Affidavit of Harry Sargeant III
Sworn before me at _COUNTY OF PALM BEACH_
this _13th_ day of October, 2011

YVETTE MEDINA
MY COMMISSION # DD 811402
EXPIRES: August 4, 2012

A Commissioner for Taking Affidavits
for the State of Florida

Worldspan Marine Inc.
Summary of Claims Certificates and Sargeant Payments

| No. | Claim Cert Date | Claim amount (USD) | Paid Date | Paid Amount (USD) |
|---|---|---|---|---|
| 1. | | | Mar-07 | 175,000.00 |
| 2. | | | Jun-07 | 400,000.00 |
| 3. | | | Mar-08 | 1,000,000.00 |
| 4. | Mar-08 | 736,574.37 | Apr-08 | 736,574.37 |
| 5. | Apr-08 | 423,458.15 | Jun-08 | 423,458.15 |
| 6. | May-08 | 441,591.52 | Jul-08 | 441,591.52 |
| 7. | Jun-08 | 439,504.15 | Aug-08 | 439,504.15 |
| 8. | Jul-08 | 434,386.24 | Sep-08 | 434,386.24 |
| 9. | Aug-08 | 757,783.43 | Sep-08 | 757,783.43 |
| 10. | Sep-08 | 1,540,047.30 | Nov-08 | 418,047.30 |
| 11. | Oct-08 | 484,505.09 | Dec-08 | 484,505.09 |
| 12. | Nov-08 | 425,547.66 | Jan-09 | 425,547.66 |
| 13. | Nov-08 | 1,265,834.02 | Jan-09 | 1,265,834.02 |
| 14. | Dec-08 | 589,169.59 | Feb-09 | 589,169.59 |
| 15. | Jan-09 | 404,582.25 | Mar-09 | 404,582.25 |
| 16. | Feb-09 | 980,826.31 | Apr-09 | 980,826.31 |
| 17. | Mar-09 | 857,715.30 | May-09 | 857,715.30 |
| 18. | Apr-09 | 906,526.50 | Jun-09 | 200,000.00 |
| 19. | May-09 | 1,264,903.12 | Jul-09 | 500,000.00 |
| 20. | Jun-09 | 609,424.92 | Aug-09 | 100,000.00 |
| 21. | Jul-09 | 788,636.52 | Aug-09 | 30,000.00 |
| 22. | Aug-09 | 945,993.40 | Aug-09 | 1,024,485.00 |
| 23. | Sep-09 | 1,182,714.22 | Sep-09 | 1,672,824.40 |
| 24. | Oct-09 | 1,186,780.59 | Oct-09 | 945,993.40 |
| 25. | Nov-09 | 1,983,548.55 | Nov-09 | 1,182,714.22 |
| 26. | Dec-09 | 1,253,794.46 | Dec-09 | 1,186,780.59 |
| 27. | | | Jan-10 | 1,983,548.11 |
| 28. | | | Feb-10 | 1,253,794.46 |
| 29. | | | Mar-10 | 137,258.49 |
| 30. | | | Apr-10 | 200,000.00 |
| | | | | |
| TOTAL | | 19,903,847.66 | | 20,651,924.05 |
| | | | | |

/3229449

This is Exhibit "G" referred to in the
Affidavit of Harry Sargeant III
Sworn before me at *COUNTY OF PALM BEACH*
this *13th* day of October, 2011

YVETTE MEDINA
MY COMMISSION # DD 811402
EXPIRES: August 4, 2012
A Commissioner for Taking Affidavits
for the State of Florida

## Commercial Checking

**WACHOVIA**

01     4807 036 130     0 41     106,820

00037902 02 AV 0,437 02   5DG 115

INTERNATIONAL OIL TRADING FZCO
ONE NORTH FEDERAL HWY STE 500     CB
BOCA RATON, FL 33432

## Commercial Checking

3/01/2008 thru 3/31/2008

Account number:     4807
Account owner(s):     INTERNATIONAL OIL TRADING FZCO

### Account Summary



| | |
|---|---|
| Opening balance 3/01 | |
| Deposits and other credits | |
| Checks | |
| Other withdrawals and service fees | |
| Closing balance 3/31 | |

### Deposits and Other Credits

Date     Amount     Description



WACHOVIA BANK, N.A., PALM BEACH PRVT ADVISORY #5

## Commercial Checking

03      4807  036  130      0  41      106,822

---

### Other Withdrawals and Service Fees  *continued*

| Date | Amount | Description |
|------|--------|-------------|



| 3/07 | 1,000,000.00 | INTL FUNDS TRANSFER (ADVICE 2008030700019337) SENT TO WACHOVIA BANK NA /BANK OF MONTREAL BNF=WORLDSPAN MARINE RFB=20000809INTERNOI AMT= 1000000.00 CUR=USD RATE= REF=20000809INTERNOI 03/07/08 10:20AM ET |



*Other Withdrawals and Service Fees continued on next page.*

358



## Commercial Checking

06  █████4807  036  130        0  41      104,997

---

### Other Withdrawals and Service Fees  *continued*

| Date | Amount | Description |
|------|--------|-------------|



| 4/16 | 736,574.37 | INTL FUNDS TRANSFER (ADVICE 2008041600043675) SENT TO  WACHOVIA BANK NA /BANK OF MONTREAL BNF=WORLDSPAN MARINE RFB=20000913INTERNOI AMT=  738574.37 CUR=USD RATE= REF=20000913INTERNOI 04/16/08  03:10PM ET |



*Other Withdrawals and Service Fees continued on next page.*

---

WACHOVIA BANK, N.A. , PALM BEACH PRVT ADVISORY #5

page 6 of 10

359

## Commercial Checking

05     ■■■■■4807   036   130     0   41     108,636

**WACHOVIA**

---

### Other Withdrawals and Service Fees   *continued*

| Date | Amount | Description |
|------|--------|-------------|



| 6/20 | 423,458.15 | INTL FUNDS TRANSFER (ADVICE 2008062000053762) SENT TO WACHOVIA BANK NA /BANK OF MONTREAL BNF=WORLDSPAN MARINE RFB=20001111INTERNOI AMT= 423458.15 CUR=USD RATE= REF=20001111INTERNOI 06/20/08 03:58PM ET |



*Other Withdrawals and Service Fees continued on next page.*

---

**WACHOVIA BANK, N.A. , PALM BEACH PRVT ADVISORY #5**       page 5 of 8

**360**

**WACHOVIA**

## Commercial Checking

07   4807   036   130    0   41     106,075

---

### Other Withdrawals and Service Fees   continued

Date      Amount   Description



| 7/18 | 441,591.52 | INTL FUNDS TRANSFER (ADVICE 2008071700059229) SENT TO WACHOVIA BANK NA /BANK OF MONTREAL BNF=WORLDSPAN MARINE RFB=20001187INTERNOI AMT= 441591.52 CUR=USD RATE= REF=20001187INTERNOI 07/18/08 05:18AM ET |



*Other Withdrawals and Service Fees continued on next page.*

---

WACHOVIA BANK, N.A. , PALM BEACH PRVT ADVISORY #5             page 7 of 10

## Commercial Checking

05    4807   036   130     0   41     109,323

**WACHOVIA**

---

### Other Withdrawals and Service Fees *continued*

| Date | Amount | Description |
|------|--------|-------------|



| 8/18 | 439,504.15 | INTL FUNDS TRANSFER (ADVICE 2008081800011007) SENT TO WACHOVIA BANK NA /BANK OF MONTREAL BNF=WORLDSPAN MARINE RFB=20001253INTERNOI AMT= 439504.15 CUR=USD RATE= REF=20001253INTERNOI 08/18/08 08:57AM ET |



*Other Withdrawals and Service Fees continued on next page.*

---



## Commercial Checking

04    4807   036   130     0   41     113,194

**WACHOVIA**

---

### Other Withdrawals and Service Fees    *continued*

| Date | Amount | Description |
|------|--------|-------------|



| 9/05 | 434,386.24 | INTL FUNDS TRANSFER (ADVICE 2008090500030287) SENT TO WACHOVIA BANK NA /BANK OF MONTREAL BNF=WORLDSPAN MARINE RFB=20001318INTERNOI AMT= 434386.24 CUR=USD RATE= REF=20001318INTERNOI 09/05/08 12:04PM ET |



*Other Withdrawals and Service Fees continued on next page.*

---

**WACHOVIA BANK, N.A. , PRIVATE BANKING-NO PALM-FT LD**



## Commercial Checking

08    4807 036 130     0   41    113,198

WACHOVIA

---

### Other Withdrawals and Service Fees    *continued*

| Date | Amount | Description |
|------|--------|-------------|



9/29    757,783.43    INTL FUNDS TRANSFER (ADVICE 2008092900041775)
SENT TO WACHOVIA BANK NA /BANK OF MONTREAL
BNF=WORLDSPAN MARINE RFB=20001382INTERNOI
AMT= 757783.43 CUR=USD RATE=
REF=20001382INTERNOI 09/29/08 01:04PM ET



*Other Withdrawals and Service Fees continued on next page.*

---

**WACHOVIA BANK, N.A. , PRIVATE BANKING-NO PALM-FT LD**     

## Commercial Checking

WACHOVIA

05    4807 036 130    0 41    114,266

### Other Withdrawals and Service Fees   *continued*

| Date | Amount | Description |
| --- | --- | --- |



| 11/13 | 418,047.30 | INTL FUNDS TRANSFER (ADVICE 2008111300054194) SENT TO WACHOVIA BANK NA /BANK OF MONTREAL BNF=WORLDSPAN MARINE RFB=20001537INTERNOI AMT= 418047.30 CUR=USD RATE= REF=20001537INTERNOI 11/13/08 04:14PM ET |



*Other Withdrawals and Service Fees continued on next page.*



## Commercial Checking

06  ████4807  036  130        0   41      108,695

---

## Other Withdrawals and Service Fees   *continued*

Date        Amount   Description



12/17     484,505.09   INTL FUNDS TRANSFER (ADVICE 2008121600055988)
                       SENT TO  WACHOVIA BANK NA /BANK OF MONTREAL
                       BNF=WORLDSPAN MARINE RFB=20001870INTERNOI
                       AMT=    484505.09 CUR=USD RATE=
                       REF=20001870INTERNOI  12/17/08  05:24AM ET

*Other Withdrawals and Service Fees continued on next page.*

---

WACHOVIA BANK, N.A. , PRIVATE BANKING-NO PALM-FT LD

366

## Commercial Checking

05 ████4807 036 130 0 41 103,448

*2009*

### Other Withdrawals and Service Fees *continued*

Date | Amount | Description



1/14     425,547.66    INTL FUNDS TRANSFER (ADVICE 2009011400052594)
SENT TO WACHOVIA BANK NA /BANK OF MONTREAL
BNF=WORLDSPAN MARINE RFB=20001806INTERNOI
AMT= 425547.66 CUR=USD RATE=
REF=20001806INTERNOI 01/14/09 04:05PM ET

*Other Withdrawals and Service Fees continued on next page.*

WACHOVIA BANK, N.A., PRIVATE BANKING-NO PALM-FT LD       



# Commercial Checking

06    4807 036 130         0  41     103,449

---

## Other Withdrawals and Service Fees  *continued*

| Date | Amount | Description |
|------|--------|-------------|



| 1/15 | 1,265,834.02 | INTL FUNDS TRANSFER (ADVICE 2009011400052593) SENT TO WACHOVIA BANK NA /BANK OF MONTREAL BNF=WORLDSPAN MARINE RFB=20001807INTERNOI AMT= 1265834.02 CUR=USD RATE= REF=20001807INTERNOI 01/15/09 02:29PM ET |



*Other Withdrawals and Service Fees continued on next page.*

---

WACHOVIA BANK, N.A. , PRIVATE BANKING-NO PALM-FT LD

page 6 of 10



## Commercial Checking

09 ████4807 056 130 0 41 108,903

**WACHOVIA**

---

## Other Withdrawals and Service Fees *continued*

| Date | Amount | Description |
|------|--------|-------------|
| 2/25 | 589,169.59 | INTL FUNDS TRANSFER (ADVICE 2009022400054416) SENT TO WACHOVIA BANK NA /BANK OF MONTREAL BNF=WORLDSPAN MARINE RFB=20001985INTERNOI AMT= 589169.59 CUR=USD RATE= REF=20001985INTERNOI 02/25/09 04:51AM ET |



## Daily Balance Summary

| Dates | Amount | Dates | Amount | Dates | Amount |
|-------|--------|-------|--------|-------|--------|

*Daily Balance Summary continued on next page*

---

**WACHOVIA BANK, N.A., PRIVATE BANKING-NO PALM-FT LD**



# Commercial Checking

| 08 | 4807 036 130 | 0 | 41 | 111,161 |

---

## Other Withdrawals and Service Fees  *continued*

Date    Amount    Description



| 3/20 | 404,582.25 | INTL FUNDS TRANSFER (ADVICE 2009032000039157) SENT TO WACHOVIA BANK NA /BANK OF MONTREAL BNF=WORLDSPAN MARINE RFB=20002098INTERNOI AMT= 404582.25 CUR=USD RATE= REF=20002098INTERNOI 03/20/09 01:26PM ET |



*Other Withdrawals and Service Fees continued on next page.*

---

WACHOVIA BANK, N.A. , PRIVATE BANKING-NO PALM-FT LD

370

## Commercial Checking

WACHOVIA

08      4807  036  130     0  41     338

## Other Withdrawals and Service Fees *continued*

| Date | Amount | Description |
|------|--------|-------------|



| 4/17 | 980,826.31 | INTL FUNDS TRANSFER (ADVICE 2009041700054599) SENT TO WACHOVIA BANK NA /BANK OF MONTREAL BNF=WORLDSPAN MARINE RFB=20002234INTERNOI AMT=    980826.31 CUR=USD RATE= REF=20002234INTERNOI 04/17/09 04:32PM ET |



*Other Withdrawals and Service Fees continued on next page.*

This is Exhibit "H" referred to in the
Affidavit of Harry Sargeant III
Sworn before me at _COUNTY OF PALMBEACH_
this _13TH_ day of October, 2011

YVETTE MEDINA
MY COMMISSION # DD 811402
EXPIRES: August 4, 2012
Bonded Thru Notary Public Underwriters

A Commissioner for taking Affidavits
for the State of Florida

80805

INTERNATIONAL OIL TRADING COMPANY LTD
ONE N FEDERAL HIGHWAY
SUITE 500
BOCA RATON FL 33432

### *Commercial Checking*
**statement**
May 1, 2009 to May 31, 2009
Account number ████8666

## Account summary

Beginning balance
on May 1, 2009

*Plus deposits*
Electronic deposits
Paper deposits

*Less withdrawals*
Checks
Electronic (EFT) withdrawals
Fees and service charges
Transfers to other accounts

**Ending balance**
on May 31, 2009



**To contact us**

**Call**
(800) 225-6077

**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
100 N.E. 3RD AVENUE
FORT LAUDERDALE FL 33301-5176

**Important information***

Effective June 1, 2009, the following fees will
apply:
Counter Checks                 $2.00/check
NSF (Return of unpaid items)
and Paid Overdraft             $35.00/each
Official Check                 $8.00/each

Effective May 1, 2009, the FDIC Charge may
change monthly and will be published in this
message space. The FDIC Charge for May 2009
is $.1141/$1,000.

**Thank you**

*Thank you for being a Comerica customer. We
value the trust and confidence that you continue
to place in us.*

Page 1 of 5



*Commercial Checking* statement
May 1, 2009 to May 31, 2009

## Commercial Checking: ████████8666

### Electronic withdrawals this statement period (continued)

| Date | Amount ($) | Activity | Reference numbers Customer | Bank |
|---|---|---|---|---|
| May 29 | 657,715.00 | Wire # 501113 Bnf Woddspan Mari Fed # 001857 | | 9485000179 |

### Fees and service charges this statement period

| Date | Amount ($) | Activity | Bank reference number |
|---|---|---|---|

Total Fees and Service Charges: ██████
Total number of Fees and Service Charges: ██

### Transfers to other accounts this statement period

| Date | Amount ($) | Activity | Bank reference number |
|---|---|---|---|

Page 3 of 5

374



*Commercial Checking* statement
June 1, 2009 to June 30, 2009

## Commercial Checking: ████8666

### Electronic withdrawals this statement period

| Date | Amount ($) | Activity | Reference numbers Customer | Bank |
|---|---|---|---|---|
| Jun 25 | -260,000.00 | Wire # 501188 Bnf Worldspan Mari Swf # 554239 | | 9485000200 |

Page 3 of 5

375

Commercial Checking statement
July 1, 2009 to July 31, 2009

## Commercial Checking: ████ 8666

### Electronic withdrawals this statement period



| Date | Amount ($) | Activity | Reference numbers Customer | Bank |
|------|-----------|----------|-----------|------|
| Jul 10 | -500,000.00 | Wire # 501725 Bnf Worldspan Mari Fed # 002572 | | 9485000225 |

Page 3 of 6

*Commercial Checking* statement
August 1, 2009 to August 31, 2009

## Commercial Checking: �as8666

## Checks paid this statement period (continued)
• This symbol indicates a break in check number sequence
# This symbol indicates an original item not enclosed
● This symbol indicates a break in check number sequence and an original item not enclosed

| Check number | Amount ($) | Date paid | Bank reference number | Check number | Amount ($) | Date paid | Bank reference number |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

Total checks paid this statement period: ▮▮▮▮▮▮
Total number of checks paid this statement period: ▮▮

## Electronic withdrawals this statement period

| Date | Amount ($) | Activity | Reference numbers Customer | Bank |
|---|---|---|---|---|
| Aug 05 | -100,000.00 | Wire # 501376 Bnf Worldspan Mari Fed # 001879 | | 9485000131 |
| Aug 13 | -30,000.00 | Wire # 500774 Bnf Worldspan Mari Fed # 001116 | | 9485000139 |

*Commercial Checking* statement
April 1, 2010 to April 30, 2010

## Commercial Checking: ████████8666

### Electronic withdrawals this statement period (continued)

| | | | Reference numbers | |
|---|---|---|---|---|
| Date | Amount ($) | Activity | Customer | Bank |
| ████████████████████████████████████████████████ | | | | |
| Apr 30 | -200,000.00 | Wire # 500301 Bnf Worldspan Mari Fed # 000754 | | 9485000341 |
| ████████████████████████████████████████████████ | | | | |

Total Electronic Withdrawals: ███████████
Total number of Electronic Withdrawals: ███

### Other withdrawals this statement period

| | | | Bank reference number |
|---|---|---|---|
| Date | Amount ($) | Activity | |
| ████████████████████████████████████████████████ | | | |

Total Other Withdrawals: █████████
Total number of Other Withdrawals: █

### Fees and service charges this statement period

| | | | Bank reference number |
|---|---|---|---|
| Date | Amount ($) | Activity | |
| ████████████████████████████████████████████████ | | | |

Total Fees and Service Charges: ████████
Total number of Fees and Service Charges: █

This is Exhibit "I" referred to in the
Affidavit of Harry Sargeant III
Sworn before me at _COUNTY OF PALM BEACH_
this _13th_ day of October, 2011

YVETTE MEDINA
MY COMMISSION # DD 811402
EXPIRES: August 4, 2012
A Commissioner for Taking Affidavits
for the State of Florida

02   COMERICA BANK

LOAN INTEREST AND PRINCIPAL STATEMENT                         DATE 12-31-09

SERV UNIT 00000

CUSTOMER NUMBER 98-9521459-0

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-8   051510

| Date | Type | | | |
|---|---|---|---|---|
| 081709 | FUT-001 | 940000000 | | 940000000 |
| 081709 | FUT-001 | 102448500CR | | 837551500 |
| 081709 | FUT-001 | 00 | | 00 |
| 081709 | FEE-513 | 1250000CR | 1250000 | |
| 090209 | FUT-001 | 16782440CR | | 670269060 |
| 090209 | FUT-001 | 4519872CR | | 668817073 |
| 090409 | FUT-001 | 11993103 | | 666697142 |
| 100109 | FUT-001 | 9459934OCR | | 575097802 |
| 100209 | FUT-001 | 1377982CR | | 574960004 |
| 100709 | FUT-001 | 1377982CR | | 574822206 |
| 110209 | FUT-001 | 118271422CR | | 456550784 |
| 110209 | FUT-001 | 1366985CR | | 456614099 |
| 110309 | FUT-001 | 118271422CR | | 338142677 |
| 120109 | FUT-001 | 118670059CR | | 219464618 |
| 120109 | FUT-001 | 13634703 | | 219328271 |

TOTAL   133109                        1250000                219328271

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-6   DEMAND        102448500   102448500   00

| Date | Type | | | |
|---|---|---|---|---|
| 081709 | PRIN-001 | 102448500 | | 102448500 |
| 081709 | PRIN-001 | 00 | | 00 |
| 090209 | PRIN-001 | 16782440 | | 269730940 |
| 090209 | PRIN-001 | 451987 | | 270182327 |
| 090409 | PRIN-001 | 139931 | | 270302858 |
| 100109 | PRIN-001 | 125499CR | | 270177359 |
| 100709 | PRIN-001 | 125499 | 125499 | 270302858 |
| 100109 | INT-100 | 94593340 | | 364902198 |
| 100209 | PRIN-001 | 137798 | | 365039996 |
| 100209 | PRIN-001 | 137798CR | | 364902198 |
| 100709 | PRIN-001 | 137798 | | 365039996 |
| 101909 | INT-100 | 648815CR | 774014 | |
| 110209 | PRIN-001 | 118271422 | | 483311418 |

294

FOR PERIOD STARTING 01-01-09

AND ENDING 12-31-09

HARRY SARGEANT III
DANIEL SARGEANT
ATTN: KEVIN KIRKEIDE, IOTC USA
1 N FEDERAL HWY, #500
BOCA RATON FL  33432

SERV UNIT  00000

02  COMERICA BANK

LOAN INTEREST AND PRINCIPAL STATEMENT

CUSTOMER NUMBER  98-9521459-0                     DATE 12-31-09

| Date | Code | | | |
|---|---|---|---|---|
| 110209 | PRIN-001 | | 136685 | 483448103 |
| 110209 | PRIN-001 | | 118271422CR | 365176681 |
| 110209 | PRIN-001 | | | |
| 110309 | PRIN-001 | | 118271422 | 483448103 |
| 110909 | INT-100 | 953903CR | | |
| 120109 | PRIN-001 | | 118678059 | 602126162 |
| 120109 | PRIN-001 | | | 602262509 |
| 120109 | INT-100 | 1073291CR | 136347 | |

27794

TOTAL  1231.09                              2801208      602262509

                          FOR PERIOD STARTING 01-01-09

                          AND ENDING 12-31-09

BARRY SARGEANT III                PRINCIPAL PAID            0.00
DANIEL SARGEANT                   INTEREST/FEE PAID    40,512.08
ATTN: KEVIN KIRKEIDE, IOTC USA
1 N FEDERAL HWY, #500
BOCA RATON  FL  33432

                                  TOTAL AMOUNT PAID    40,512.08
                                  THIS PERIOD

381

02 COMERICA BANK

LOAN INTEREST AND PRINCIPAL STATEMENT

DATE 12-31-10

SERV UNIT 00000

CUSTOMER NUMBER 98-9521459-0

| | | | | |
|---|---|---|---|---|
| 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-8 | 100110A | | | |
| | A | | | |
| | 100209 | FUT-001 | 137798 | 575097802 |
| | 110309 | FUT-001 | 118271422 | 436551897 |
| | 123109 | FUT-001 | 00 | 337737491 |
| | 010410 | FUT-001 | 136583CR | 337600908 |
| | 010410 | FUT-001 | 198356811CR | 139246097 |
| | 020110 | FUT-001 | 140802CR | 139246097 |
| | 020110 | FUT-001 | 125379446CR | 139105295 |
| | 030110 | FUT-001 | 125379446CR | 13725849 |
| | 072910 | FUT-001 | 13725849CR | 00 |
| | | | 00 | 00 |

TOTAL 123110

| | | | | |
|---|---|---|---|---|
| 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-6 | DEMAND | | 00 | 00 |
| | 123109 | PRIN-001 | 00 | 602262509 |
| | 010410 | PRIN-001 | 136583 | 602399092 |
| | 010410 | PRIN-001 | 198356811 | 800753903 |
| | 010410 | INT-100 | 1580932CR | 1580932 |
| | 020110 | PRIN-001 | 140802 | 800884705 |
| | 020110 | PRIN-001 | 125379446 | 926274151 |
| | 020110 | | | |
| 27491 | 020110 | INT-100 | 1731034CR | 3311966 |
| | 030110 | PRIN-100 | 13725849 | 3311966 |
| | 030110 | INT-100 | 1980549CR | 5292515 |
| | 040110 | INT-100 | 2225244CR | 7517759 |
| | 050310 | | | |
| 28531 | 050310 | INT-100 | 2297026CR | 9814785 |
| | 060110 | INT-100 | 2160431CR | 11975216 |
| | 070110 | INT-100 | 2234928CR | 14210144 |
| | 080210 | | | |
| 34446 | 080210 | INT-100 | 2383923CR | 16594067 |
| | 090110 | INT-100 | 2698270CR | 19292337 |
| | 100110 | INT-100 | 2698270CR | 21990607 |
| | 110110 | | | |
| 32859 | 110110 | INT-100 | 2788213CR | 24778820 |
| | 120110 | INT-100 | 2573955CR | 27352775 |

FOR PERIOD STARTING 01-01-10

AND ENDING 12-31-10

HARRY SARGEANT III
DANIEL SARGEANT
3020 MILITARY TRAIL
BOCA RATON FL 33431

382